## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Nikola Corp., *et al.*,[1] | Case No. 25-10258 (___) |
| Debtors. | (Joint Administration Requested) |
|  | **Hearing Date: TBD** **Objection Deadline: TBD** |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO DESIGNATE ONE OR MORE STALKING HORSE BIDDERS AND TO PROVIDE BID PROTECTIONS, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (E) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (F) GRANTING RELATED RELIEF; AND (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file this motion (the "Motion")[2] for the entry of (a) an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"): (i)(a) approving bidding procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures"), to be used in connection with one or more sale transactions (each, a "Sale")

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Nikola Corporation (registered to do business in California as Nikola Truck Manufacturing Corporation) (1153); Nikola Properties, LLC (3648); Nikola Subsidiary Corporation (1876); Nikola Motor Company LLC (0193); Nikola Energy Company LLC (0706); Nikola Powersports LLC (6771); Free Form Factory Inc. (2510); Nikola H2 2081 W Placentia Lane LLC (N/A); 4141 E Broadway Road LLC (N/A); and Nikola Desert Logistics LLC (N/A).  The Debtors' headquarters are located at 4141 East Broadway Road, Phoenix, AZ 85040.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration (as defined below) or the Bidding Procedures (defined below).

of all, substantially all, or a portion of the Debtors' assets (the "Assets"), (b) authorizing the Debtors to designate one or more Stalking Horse Bidders (as defined herein) and provide Bid Protections (as defined herein) in accordance with the Stalking Horse Designation Procedures (as defined herein), (c) scheduling an auction (if necessary) of the Assets (the "Auction") and approving the form and manner of notice thereof and scheduling the hearing to approve the sale of the Assets (the "Sale Hearing") and approving the form and manner of notice thereof, (ii) approving the form and manner of notice of the proposed Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice"), (iii) authorizing procedures governing the assumption and assignment of executory contracts and unexpired leases (the "Contracts") in connection with the Sale (the "Assumption and Assignment Procedures"), (iv) approving the form and manner of notice to each non-debtor counterparty to a Contract (each, a "Counterparty") of (A) the amount necessary to cure any defaults (the "Cure Costs") under a Contract proposed to be assumed and (B) other information regarding the potential assumption and assignment of the Contracts in connection with the Sale, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Assumption and Assignment Notice"), and (v) granting related relief.

The Debtors will seek entry of an order or orders (each, a "Sale Order"), a proposed version of which will be filed before the Bid Deadline: (a) authorizing the Sale of the Assets free and clear of all liens, claims, interests, and encumbrances; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale; and (c) granting related relief.

In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Drew M. Talarico in Support of the Debtors' Motion for Entry of Orders*

*(I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption And Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief*, filed contemporaneously herewith (the "Bidding Procedures Declaration") and the *Declaration of Stephen J. Girsky in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration").  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") to kick off an in-court restructuring strategy that contemplates a continuation of the Debtors' robust prepetition sale and marketing efforts through a court-approved bidding and auction process designed to foster competitive bidding and maximize the value of the Debtors' estates for the benefit of their stakeholders.

2.      As described in detail herein, in the Bidding Procedures Declaration and in the First Day Declaration, prior to the commencement of the Chapter 11 Cases, the Debtors spent significant time and effort to bring to market a formal process for an investment in, or a sale of, the Debtors' business with the assistance of an investment banker (which itself was an extension of a process seeking a private offering for the issuance and sale of equity, equity-linked, equity-related, convertible or hybrid securities of Debtor Nikola Corporation or any of its subsidiaries or controlled affiliates run by another investment banker dating back to May 2024).  Specifically, in

October 2024, the Debtors, retained Houlihan Lokey (as defined below), as their investment banker to conduct a marketing process to explore a wide range of potential opportunities for potential strategic transactions.

3.        Despite having several promising opportunities, including one party with whom the Debtors entered into a non-binding letter of intent with and engaged in extensive diligence over a period of numerous weeks, the Debtors were unable to reach agreement with any of the prospective investors or purchasers on the terms of an actionable out-of-court transaction.  However, the Debtors continued their marketing efforts and, in the period, immediately preceding the Petition Date, Houlihan Lokey reengaged with numerous parties who had conducted substantial diligence to discuss their interest in purchasing the Assets and/or serving as a stalking horse bidder.  Those and other parties have received an updated confidential information memorandum, the Debtors' most recent financial information, and additional diligence materials regarding the opportunity. While a stalking horse bidder has not yet been selected, Houlihan Lokey, working in conjunction with the Debtors and the Debtors' other advisors, is in regular dialogue with several prospective bidders regarding the opportunity to submit a stalking horse bid.

4.        The Debtors believe strongly that a value-maximizing transaction can be achieved expeditiously through a sale under section 363 of the Bankruptcy Code.  To advance the Chapter 11 Cases toward the Debtors' ultimate goal—a going concern transaction—the Debtors have designed the Bidding Procedures to maximize the likelihood of competitive participation in the Sale while maintaining optionality for the Debtors and their stakeholders.

5.        The Debtors believe that approval of the Bidding Procedures is necessary to ensure a full, fair and transparent sale process that will maximize the value of the Assets.  Accordingly, the Debtors request that the Court grant this Motion and enter (a) the Bidding Procedures Order,

(i) approving the Bidding Procedures, (ii) authorizing the Debtors to designate a Stalking Horse Bidder and provide Bid Protections in accordance with the Stalking Horse Designation Procedures, (iii) scheduling an Auction and a Sale Hearing, (iv) approving the Sale Notice, (v) authorizing the Assumption and Assignment Procedures, (vi) approving the form and manner of notice to each relevant non-debtor counterparty to a Contract of (A) the Debtors' calculation of Cure Costs and (B) the Assumption and Assignment Notice, and (vii) granting related relief; and (b) the Sale Order, (i) authorizing the sale of the Assets free and clear of all liens, claims, interests, and encumbrances, except certain assumed liabilities and permitted encumbrances as determined by the Debtors and the Successful Bidder, with liens to attach to the proceeds of the Sale (subject to the terms of the Cash Collateral Order); (ii) authorizing the assumption and assignment of certain Contracts in connection with the Sale; and (iii) granting related relief.

### TIMELINE FOR SALE

6.     Through this Motion, the Debtors seek the Court's approval of Bidding Procedures pursuant to which the Debtors will seek bids for an anticipated auction of all, substantially all, or a portion of their Assets.  Considering the limited liquidity available to the Debtors, the Debtors believe it is critical that the sale process be consummated on the timeline set forth below.  The Debtors lack the liquidity to support a protracted sale process which, in any event, would threaten key relationships and close the door to any possible going concern sale of the Debtors' business. The Debtors believe that the proposed timeline maximizes value to the estates both by providing for a robust sale process and minimizing value-destructive business disruption from a prolonged stay in chapter 11.

| **Two business days after the entry of the Bidding Procedures Order** | Deadline to file and serve Sale Notice |
|---|---|
| **Three business days after the entry of the Bidding Procedures Order** | Deadline to file and serve Assumption and Assignment Notice |
| **Within Five business days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter** | Deadline to publish Publication Notice |
| **March 10, 2025, at 4:00 p.m. (ET)** | Deadline for Debtors to designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement |
| **March 27, 2025, at 4:00 p.m. (ET)** | Bid Deadline |
| **March 28, 2025, at 4:00 p.m. (ET)** | Sale Objection Deadline, Cure Objection Deadline, and Contract Objection Deadline |
| **March 31, 2025, at 10:00 a.m. (ET)** | Auction (if necessary) |
| **Earlier of five (5) business hours after the conclusion of the Auction and Noon (ET) the calendar day after the conclusion of the Auction** | Deadline to file and serve Notice of Auction Results |
| **April 1, 2025 at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline (if necessary) |
| **12:00 p.m. (ET) one business day before the Sale Hearing** | Deadline to reply to any Sale Objections or Supplemental Sale Objections |
| **April 3, 2025 at [●:● a/p.m.] (ET) (subject to the Court's availability)** | Sale Hearing |
| **April 11, 2025** | Deadline to consummate approved Sale |

**JURISDICTION AND VENUE**

7.     The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these cases is proper in this district under 28 U.S.C. §§ 1408 and 1409.

8.     Pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court, absent consent of

the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      The statutory bases for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 2002-1, 6004-1 and 9006-1.

**GENERAL BACKGROUND**

10.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of this Motion, no trustee, examiner or statutory committee of creditors is appointed in these cases.

11.     The Debtors are global leaders in zero-emissions commercial transportation, including the design and manufacture of battery-electric and hydrogen fuel cell electric trucks and the development of infrastructure for hydrogen fueling solutions.  Founded in 2015, the Debtors are headquartered in Phoenix, Arizona and employ approximately 900 employees.

12.     Additional information about the Debtors, including their business operations, corporate and capital structure, and the events leading to the filing of these cases is detailed in the First Day Declaration, filed contemporaneously herewith and incorporated herein by reference.

**SALE PROCESS**

**A.      Prepetition Marketing Process**

13.     To address their increasingly critical operational challenges and liquidity needs, the Debtors worked with various advisors to raise funds and engaged in various M&A initiatives in the year leading up to the Petition Date to explore numerous possible restructuring options.  Since

7

the Summer of 2024, Nikola raised $80 million in convertible debt financing and an additional $65 million in common equity (in exchange for resetting the conversion price of another series of convertible debt) to support the Debtors' extensive efforts in pursuit of a strategic and/or financial transaction.

14.     Extensive internal and external time and resources have been devoted to exploring transactions with numerous potential counterparties.  Initial conversations focused on operational work (*e.g.*, how to sell the trucks, potential for serving as a financing company, and other regular way strategic initiatives).  Later conversations focused on potential financing and sale transactions to extend the liquidity runway.  Most recently, the Company has solicited investor interest in buying individual assets.

15.     Through the initial phases of the process, the Debtors utilized three investment bankers, all on a non-exclusive basis, to assist with raising funds (proposed common stock and convertible notes public offerings, and proposed private offerings, issue and sale of equity or convertible or hybrid securities) and exploring a possible sale of the Debtors as a going concern. Those bankers included Citigroup Global Markets Inc., BTIG, LLC, and Goldman Sachs & Co., LLC (collectively, the "Prepetition Investment Bankers").

16.     While Citigroup and BTIG primarily focused on capital raising strategies, commencing in the Summer of 2024, Goldman Sachs increased the urgency of Nikola's efforts to identify parties that it and the Company determined would be interested in acquiring the Company as a going concern.  Approximately five (5) months before the Petition Date, Goldman Sachs reached out to approximately twenty-two (22) separate parties to gauge their interest in acquiring the Debtors as a going concern.  This outreach focused on truck manufacturing companies and

companies with transportation logistics needs who were large enough to possible be interested in an acquisition.

17.     Out of the parties contacted by Goldman Sachs, two (2) international automotive manufacturers expressed interest in a possible transaction.  After one of those manufacturers dropped out, the Debtors had further discussions with the other party and various term sheets were exchanged.  Unfortunately, that party ultimately fell away in the fall of 2024.  As an out-of-court solution became less likely, Nikola sought to engage an investment banker with distressed capabilities to simultaneously explore restructuring options and continue the financial and strategic investor outreach initiated by the Prepetition Investment Bankers.

18.     As the Debtors' liquidity position continued to erode, Houlihan Lokey Capital, Inc. ("HL"), was selected in October 2024 to provide prepetition investment banking services to the Debtors.  In that role, HL has, among other things: (a) continued the marketing process with the parties that were engaged with the Debtors before HL's retention, and solicited additional third-party interest to gauge potential interest in both a standalone investment and an investment alongside a potential strategic partner; (b) assisted the Debtors in developing a sale strategy and bidding procedures for their postpetition marketing process; and (c) solicited lenders to provide a postpetition loan to the Debtors, negotiated loan terms, and advised the Debtors in connection with the loan.

19.     Following its retention, HL initially reached out to twenty-four (24) financial investors regarding the Nikola opportunity.  Multiple follow-up conversations were had with prospective investors; however, general feedback was that the investment required to achieve the business plan was too difficult for a financial investor without a strategic interest in the assets to make given the long and uncertain path towards profitability.

20.     HL also assisted the Debtors with continuing to explore a sale of all their assets as an ongoing, operating business.  In early December 2024, discussions with one potentially interested international vehicle manufacturing company who previously executed a confidentiality agreement (neither of the two companies that engaged in discussions with the Prepetition Investment Bankers referenced above) restarted.  After a non-binding letter of intent was signed to facilitate discussions concerning a potential acquisition, the Debtors granted access to their electronic data room and invited the party to have meetings with the Debtors' management.

21.     Thereafter, the parties engaged (on an exclusive basis pursuant to the terms of the LOI) in substantial due diligence over an approximately four-week period, including a comprehensive review of the legal, financial, tax, commercial, environmental, intellectual property, operation, labor and employment and material agreements of the Debtors.  Due diligence included a several day-long site visit to the Debtors' manufacturing facility by the prospective buyer's agents, lawyers, accountants and advisors.  While it appeared that an agreement to purchase substantially all the Debtors' assets through a bankruptcy sale process was progressing, the prospective buyer ultimately walked away.

22.     Following the disappointing conclusion of negotiations outlined above, the Debtors, with the assistance of HL, redoubled their efforts to find a going concern buyer.  As of the Petition Date, the Debtors are in active discussions with at least three (3) parties interested in such opportunity.  Given the prior unsuccessful efforts by the Prepetition Investment Bankers and HL to find a buyer for the Debtors as a going concern sale, however, the Debtors, with the assistance of their advisors also have pivoted to evaluating the sale of the Debtors' separate business segments.  Since a going concern sale may not ultimately prove viable, HL and the

Debtors have begun to market various of the Debtors' assets and business separately. Those efforts will accelerate with the commencement of the Chapter 11 Cases.

**B.      Need For A Timely Process**

23.      In light of the Debtors' extensive prepetition marketing process, the Debtors believe that the auction process and time periods set forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and information necessary to formulate a bid to purchase all, substantially all, or portion of the Assets.

24.      The circumstances of the Chapter 11 Cases require that the Debtors run an expedited, but robust, sale process. Speed and certainty are critical because the Debtors simply do not have sufficient liquidity to support a protracted sale process. Additionally, I believe that a protracted sale process could be detrimental to the Debtors' operations and relationships with key stakeholders, including employees, vendors and suppliers in the event that a going concern sale materializes, without whose support the Debtors may not be able to achieve the best sale outcome.

25.      Most importantly, however, is that the Debtors, in consultation with Houlihan Lokey, believe the proposed timeline is reasonable and that the Debtors can run a robust sale process that encourages bidder participation. Indeed, the proposed timeline takes into consideration the extensive prepetition marketing process, including discussions with potential buyers regarding being a stalking horse bidder or otherwise participating in the Auction. The most likely bidders are among those who the Debtors or Houlihan Lokey previously contacted during the prepetition marketing and sale process. A substantial amount of information regarding the Debtors' businesses has already been made available to these prospective purchasers prior to the Petition Date. As such, the Debtors believe that many, if not all, prospective bidders are already intimately familiar with the Assets and, in the timeline proposed herein, will have sufficient time and information to conduct the necessary due diligence to submit binding bids. Moreover, if new

bidders emerge, the proposed timeline will provide them with sufficient time to perform due diligence and meaningfully participate.

26.     For the foregoing reasons, the Debtors believe that the proposed sale timeline is designed to minimize any further deterioration of the Assets and is in the best interests of all stakeholders.  Thus, pursuing the Sale in the manner and within the time periods prescribed in the Bidding Procedures is in the best interest of the Debtors' estates and will provide interested parties with sufficient opportunity to participate.

### STALKING HORSE DESIGNATION PROCEDURES

27.     As part of their Bidding Procedures, the Debtors seek authority, subject to the terms of the Bidding Procedures Order, to designate one or more stalking horse bids (each, a "Stalking Horse Bid"), pursuant to the procedures set forth in the Bidding Procedures (the "Stalking Horse Designation Procedures") for any or all of the Debtors' Assets and to enter into a purchase agreement (the "Stalking Horse Agreement") with a potential bidder (the "Stalking Horse Bidder").  In the event the Debtors select a Stalking Horse Bid, the Debtors propose to designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement **no later than March 10, 2025, at 4:00 p.m. (prevailing Eastern Time)**, which deadline may be extended by the Debtors (after consultation with the Consultation Parties).

28.     The Debtors believe that the ability to enter into a Stalking Horse Agreement with a potential buyer will drive value for the Debtors' estates, as a Stalking Horse Bidder will set the baseline bid in what the Debtors anticipate will be a robust auction process.  Consistent with the market for this kind of process, the Debtors anticipate that it may be necessary to afford a Stalking Horse Bidder certain protections to induce the Stalking Horse Bidder to provide a substantial bid and firm commitment to the Sale.

29.     Pursuant to the Bidding Procedures, upon the designation of a Stalking Horse Bidder, the Debtors are hereby requesting authority to award a Stalking Horse Bidder with incentives in the form of a break-up fee in an amount not to exceed three percent (3%) of an applicable Qualified Bid and reimbursement of documented, actual, and necessary expenses incurred by a Stalking Horse Bidder, in connection with submitting its Qualified Bid, in an amount not to exceed $400,000.00 (collectively, the "Bid Protections").  Those Bid Protections will be described with specificity in a proposed order, to be submitted to the Court under certification of counsel, that approves such Bid Protections (the "Stalking Horse Order").  In the event the Debtors select a Stalking Horse Bidder, the Debtors will provide three (3) calendar days' notice by promptly filing with the Court and serving a notice that includes the following: (a) the identification of the Stalking Horse Bidder(s); (b) instructions for obtaining a copy of the proposed Stalking Horse Order and Stalking Horse Agreement; (c) the purchase price provided for in the Stalking Horse Agreement; (d) the deposit paid by the Stalking Horse Bidder(s); and (e) the amount of any break-up fee or any expense reimbursement (the "Stalking Horse Notice").

30.     The Stalking Horse Notice will be served on (a) (i) the DIP Lender, if any; and (ii) any official committee appointed in the Chapter 11 Cases (the "Committee," and together with the DIP Lender, if any, the "Consultation Parties"); (b) the Office of the United States Trustee (the "U.S. Trustee"); and (c) any Prospective Bidder (as defined in the Bidding Procedures); all counterparties to the proposed assumed contracts; and the (d) any Sale Notice Parties (as defined in the Bidding Procedures) not included in aforementioned (a) and (b).

31.     Absent objection from any Sale Notice Party,  any Prospective Bidder (as defined in the Bidding Procedures), any counterparty to the proposed assumed contracts within the three (3) day notice period, the Court may enter the Stalking Horse Order, and the Debtors will provide

13

notice of entry of the Stalking Horse Order on the Sale Notice Parties, any Prospective Bidder, and any counterparties to the proposed assumed contracts.

32.     If any Sale Notice Party, any Prospective Bidder, or any counterparty to the proposed assumed contracts object to the proposed Bid Protections and entry of the Stalking Horse Order, the Debtors shall be authorized to file a notice seeking an expedited hearing on not less than three (3) calendar days' notice (the "Stalking Horse Hearing") seeking approval of the Stalking Horse Order.  All parties-in-interest shall have the right at the Stalking Horse Hearing to object to the Debtors' entry into a Stalking Horse Agreement on any grounds, including objections to the Bid Protections and the form of Stalking Horse Order, in whole or in part.  To the extent that the Debtors seek to award a Stalking Horse Bidder with a break-up fee in excess of three percent (3%) of an applicable Qualified Bid, whether or not the other Consultation Parties and U.S. Trustee consent to such Bid Protections, the Debtors agree to seek Court approval of the Bid Protections and may do so on an expedited basis.

**OVERVIEW OF BIDDING PROCEDURES, NOTICE PROCEDURES AND ASSIGNMENT PROCEDURES**

**A.     Bidding Procedures**

33.     The Bidding Procedures are intended to facilitate a competitive marketing and sale process, including by identifying the highest and best offers for the Assets.  The Sale may be for all or a portion of the Assets to one or more purchasers as potential purchasers may direct and based on the highest or otherwise best return for the Debtors' estates.

34.     The Bidding Procedures are attached to the Bidding Procedures Order and consequently are not restated in their entirety herein.  In compliance with Local Rule 6004-1, key terms of the Bidding Procedures are summarized below.

| | |
|---|---|
| | **MATERIAL TERMS OF THE BIDDING PROCEDURES AND BIDDING PROCEDURES ORDER** |
| **Provisions Governing Qualification of Bidders and Qualified Bids**<br><br>L.R. 6004-1(c)(i)(A)-(B) | Due Diligence, Qualified Bid and Qualified Bidder[3] Requirements are set forth in Sections III, V, and VI of the Bidding Procedures.<br><br>**A.**      **Due Diligence**.<br><br>Each person or entity that desires to participate in the Auction process (each, a "<u>Prospective Bidder</u>") must first deliver to Houlihan Lokey the following:<br><br>    • documentation identifying the Prospective Bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale;<br><br>    • an executed confidentiality agreement, in form and substance satisfactory to the Debtors;<br><br>    • a statement and other factual support demonstrating to the Debtors and their advisors, in its sole judgment, that the Prospective Bidder has a *bona fide* interest in purchasing some or all of the Assets; and<br><br>    • preliminary proof by the Prospective Bidder of its financial capacity to close a proposed sale transaction, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Prospective Bidder (or, if the Prospective Bidder is an entity formed for the purpose of acquiring the Assets to be sold, the party that will bear liability for a breach by the Prospective Bidder of an asset purchase agreement or other agreement entered into in respect of the sale transaction), the adequacy of which the Debtors and their advisors will determine in their sole judgment.<br><br>Without the need for any further action, any Stalking Horse Bidder is a Prospective Bidder and a Qualified Bidder.<br><br>Upon execution of a valid confidentiality agreement and subject to the other limitations and guidelines set forth herein, the Debtors may grant a Prospective Bidder that the Debtors identify as reasonably likely to become a Qualified Bidder with access to information contained in the Debtors' confidential electronic data room (the "<u>Data Room</u>") allowing such Prospective Bidder to conduct due diligence with respect to the potential acquisition of some or all of the Assets. Access may be terminated by the Debtors in their reasonable discretion at any time for any reason whatsoever, including that a Potential Bidder does not become a Qualified Bidder, these Bidding Procedures are terminated, the Potential Bidder breaches any obligations under its confidentiality agreement or the Debtors become aware that information submitted by the Potential Bidder for requesting access to the Data Room is inaccurate or misleading. The Debtors may restrict or limit access of a Potential Bidder to the Data Room if the Debtors determine, based on their reasonable business judgment that certain information |

---

[3]      Pursuant to the terms of the Bidding Procedures Order, a bid received for the Assets that the Debtors determine satisfies the requirements set forth in Sections V and VI.A of the Bidding Procedures will qualify as a "<u>Qualified Bid</u>," and any bidder that submits a Qualified Bid will qualify as a "<u>Qualified Bidder</u>."

in the Data Room is sensitive, proprietary, or otherwise not appropriate for disclosure to such Potential Bidder.

If the Debtors determine, after consultation with the Consultation Parties, that a Prospective Bidder is unlikely to qualify as a Qualified Bidder or fails to become a Qualified Bidder, then such Prospective Bidder shall have no further right to access due diligence or any other non-public information.   The Prospective Bidder shall return or destroy any non-public information the Debtors or their advisors provided to the Prospective Bidder in accordance with the terms of the confidentiality agreement executed by the Debtors and the Prospective Bidder.   For purposes hereof, the term "Consultation Parties" shall include the official committee of unsecured creditors (the "Committee") and, solely to the extent it is not otherwise participating in the Auction as a bidder, or is a participant in any active or prospective Bid with respect to any Asset(s), the DIP Lender, if any.  If a member of the Committee submits a Qualifying Bid, the Committee will continue to have consultation rights as set forth in these Bid Procedures.

The Debtors will try to accommodate all reasonable requests from Prospective Bidders for additional information and due diligence access.  All due diligence requests shall be directed to Drew Talarico (DTalarico@HL.com) and Marcus Bellows (MBellows@HL.com).

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Debtors' businesses or assets to any person or entity who (i) is not a Potential Bidder, (ii) does not comply with the participation requirements set forth herein, or (iii) in the case of competitively sensitive information, is a competitor of the Debtors, in the reasonable business judgment of the Debtors after consulting with the Consultation Parties; *provided*, *however*, that with respect to any strategic bidders, the Debtors will make reasonable commercial efforts to provide such strategic bidders with the same information provided to any Stalking Horse Bidder.

Each Qualified Bidder shall be deemed to acknowledge and represent (i) that it has had an opportunity to (x) conduct any and all due diligence regarding the applicable acquired Assets prior to making a bid and (y) investigate and/or inspect any documents and the applicable acquired Assets in making its bid; (ii) that it has relied solely upon its own independent review in making its bid; and (iii) that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise regarding the applicable acquired Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures. The Debtors and their respective estates are not responsible for, and will have no liability with respect to, any information obtained by, or provided to, any Potential Bidders in connection with these Bidding Procedures and the Sale Transactions.

**B.      Bid Deadline**.  March 27, 2025 at 4:00 p.m. (prevailing Eastern Time).

**C.      Qualified Bid Requirements**

1.      Identification of Bidder.   A Qualified Bid must fully disclose the following: (a) the legal identity of each person or entity bidding for the Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such bid), or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such bid) the Auction in connection with such bid and the complete terms of any such participation; and (b) any past or present connections or agreements with the Debtors, any Stalking Horse Bidder, any other known Prospective Bidder or

Qualified Bidder, the DIP Lender, if any, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtors).

2. <u>Purchased Assets</u>. A Qualified Bid must identify the following:

    a.      the Assets to be purchased, including any executory contracts and unexpired leases (collectively, the "<u>Contracts</u>") that, as of the submission of such bid, the Prospective Bidder proposes to be assumed and assigned by the Debtors in connection with the proposed Sale; and

    b.      the liabilities, if any, to be assumed, including any debt to be assumed.

3. <u>Form of Consideration</u>.

    a.      <u>Consideration</u>. Each Qualified Bid must include a statement confirming that the bid is based on an all-cash offer, or if a bid includes forms of consideration other than cash, the bidder shall include an analysis or description of the value of such non-cash components, including any supporting documentation, to assist the Debtors and the Consultation Parties in evaluating the bid.

    b.      <u>Credit Bidding</u>. In connection with the Sale of all or any portion of the Assets, a person or entity holding a perfected security interest in such Assets may seek to credit bid some or all of their claims for their respective collateral (each such bid, a "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code; provided that the Credit Bid complies with the orders of the Bankruptcy Court. A Credit Bid may only be applied to reduce the cash consideration with respect to the Assets in which the party submitting the Credit Bid holds a security interest. Each person or entity holding a valid, perfected security interest in Assets for which it submits a bid shall be deemed a Qualified Bidder with respect to its right to acquire such Assets by Credit Bid.

4. <u>Minimum Bid for Assets</u>. If a Stalking Horse Bidder has been designated, each bid that is not a Stalking Horse Bid must have a value to the Debtors, as determined by the Debtors, in consultation with the Consultation Parties, that is greater than or equal to the sum of (a) the value offered under the Stalking Horse Agreement, <u>plus</u> (b) the amount of the Bid Protections, <u>plus</u> (c) $100,000 (collectively, the "<u>Minimum Bid Amount</u>"). Any subsequent bid made by the Stalking Horse Bidder shall be deemed to have been made in an amount equal to such subsequent bid plus the Break-Up Fee and the Expense Reimbursement, to the extent provided for in the Stalking Horse Agreement.

If the value of a bid relative to the Stalking Horse Bid includes non-cash components (such as fewer contingencies than are in such Stalking Horse Agreement), the bidder should include an analysis or description of the value of any such additional non-cash components, including any supporting documentation, to assist the Debtors and the Consultation Parties in better evaluating the competing bid. The Debtors, in consultation with their advisors and the Consultation Parties, reserve the right in their sole discretion to ascribe a value to any non-cash components of competing bids and the Stalking Horse Bid.

If a Stalking Horse Bidder is not designated pursuant to the Stalking Horse Designation Procedures, the Debtors may set a minimum bid requirement, which

shall be considered the Minimum Bid Amount for all purposes hereunder.  In such case, the Debtors will file a notice on the docket identifying the Minimum Bid Amount **no later than March 13, 2025 at 5:00 p.m. (prevailing Eastern Time)** and shall serve such notice on any known potential bidder.

5.    Proposed Asset Purchase Agreement.  A Qualified Bid must constitute an irrevocable offer and be in the form of an asset purchase agreement reflecting the terms and conditions of the bid (each, a "Proposed Asset Purchase Agreement").  A Proposed Asset Purchase Agreement shall be (a) duly authorized and executed; (b) based on, and marked against the form asset purchase agreement attached to the Bidding Procedures as Exhibit A (the "Form APA") or, if a Stalking Horse Bidder has been designated, the Stalking Horse Agreement, to reflect the proposed sale transaction and to show any other proposed modifications to the Form APA or Stalking Horse  Agreement, as applicable; (c) specify the proposed purchase price for the Assets in U.S. dollars; (d) include all exhibits and schedules contemplated thereby (other than exhibits and schedules that, by their nature, must be prepared by the Debtors); and (e) identify any Contracts that, as of the submission of such bid, the Prospective Bidder proposes to be assumed and assigned by the Debtors in connection with the proposed sale transaction.

6.    Proposed Sale Order.  A Qualified Bid must include a proposed sale order (each, a "Proposed Sale Order"), and be marked against the proposed Sale Order, which the Debtors will file with the Court in advance of the Bid Deadline

7.    Financial Information.  A Qualified Bid must include the following:

a.      a statement that the Prospective Bidder is financially capable of consummating the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement and Proposed Sale Order;

b.      sufficient evidence, as determined by the Debtors in their sole discretion, to determine that the Prospective Bidder has, or will obtain, the financial wherewithal to consummate the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement and Proposed Sale Order; and

c.      Adequate Assurance Information with respect to any Contracts included or that may be included in the Prospective Bidder's bid, including the identity of any known proposed assignee of the applicable Contracts (if different from the Prospective Bidder), including contact information for such proposed assignee;

8.    Good Faith Deposit.  Each Qualified Bid must be accompanied by a good faith deposit (each, a "Good Faith Deposit") in the form of cash in an amount equal to ten percent (10%) of the proposed purchase price for the Assets.  The Good Faith Deposits shall be deposited **no later than March 27, 2025 at 4:00 pm (prevailing Eastern Time)** with an escrow agent selected by the Debtors (the "Escrow Agent") and held in escrow until ten (10) business days after the conclusion of the Auction, except for the Good Faith Deposit of any bidder who is selected at the Auction as a Successful Bidder or as a Backup Bidder, and thereafter returned to the respective Qualified Bidders in accordance with Section VII.D of the Bidding Procedures.

9.      <u>Adequate Assurance</u>.  A Qualified Bid must include evidence of the Prospective Bidder's (or any other relevant assignee's) ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to perform future obligations arising under any Contracts included in its bid.  The Debtors may require the following information in connection with demonstrating adequate assurance of future performance: (a) information evidencing the Prospective Bidder's (or any other relevant assignee's) financial wherewithal and willingness to perform under any Contracts included in the bid, which information may include (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control, (ii) financial statements, (iii) tax returns, and (iv) annual reports; and (b) the Prospective Bidder's (or any other relevant assignee's) proposed use of any leased premises or other property included in the bid (the information described in clauses (a) and (b) of Section VI.A.9 of the Bidding Procedures, the "<u>Adequate Assurance Information</u>").

All Adequate Assurance Information must be in a form that will permit its immediate dissemination to Contract counterparties ("<u>Counterparties</u>").

10.     <u>Representations and Warranties (As-Is, Where-Is)</u>.  Each Qualified Bid must include a written acknowledgement and representation that (a) the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its Qualified Bid, (b) the Prospective Bidder has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets in making its Qualified Bid, (c) the Prospective Bidder did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Prospective Bidder's Proposed Asset Purchase Agreement, and (d) the Assets will be conveyed "as is, where is, with all faults," with limited representations and warranties, and no indemnification or guarantees by the Debtors.

11.     <u>Authorization</u>.  A Qualified Bid must (a) include evidence of authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of any bid for the Assets, participation in the Auction, and closing of the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement and Proposed Sale Order; or, (b) if the Prospective Bidder is an entity formed for the purpose of effecting the proposed sale transaction, a Qualified Bid must provide written evidence acceptable to the Debtors of authorization and the approval by the equity holder(s) of such Prospective Bidder.

12.     <u>Other Requirements</u>. A Qualified Bid must:

a.      state that the Prospective Bidder agrees to serve as a backup bidder (a "<u>Backup Bidder</u>") if such bidder's Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid (as defined in Section VII.C.1 of the Bidding Procedures) for the Assets (each such bid, a "<u>Backup Bid</u>");

b.      state that the bid represents a binding, good-faith, and *bona fide* offer to purchase the Assets and is not subject to or conditioned on any further due diligence, and is irrevocable (i) until the selection of the

|   |   |   |
|---|---|---|
|   |   | Successful Bid in accordance with these Bidding Procedures; or (ii) if the bid is selected as a Successful Bid or as a Backup Bid, until the Backup Bid Expiration Date; |
|   | c. | for any bidder other than a Stalking Horse Bidder, state and acknowledge that the Prospective Bidder shall not be entitled to any bidding protection or payment in connection with the submission of a bid for the Assets or otherwise participating in the Sale Process; |
|   | d. | state that the Prospective Bidder is committed to closing the sale transaction contemplated in its bid as soon as practicable (and in no event later than April 11, 2025); |
|   | e. | expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the Sale Process; |
|   | f. | not contain any financing contingencies of any kind; |
|   | g. | state whether the Prospective Bidder intends to offer future employment to any of the Debtors' employees and, if so, to whom; |
|   | h. | certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture, or other entity in which more than one bidder (or any affiliates of a bidder) has a direct or indirect interest, unless consented to in writing by the Debtors; |
|   | i. | include a covenant to comply with the terms of the Bidding Procedures and the Bidding Procedures Order; and |
|   | j. | contain such other information as may be reasonably requested by the Debtors. |
| **Provisions Providing Bid Protections to Stalking Horse Bidder**<br><br>Local Rule 6004-1(c)(i)(C) | Subject to the provisions set forth herein, the Bidding Procedures Order, and in consultation with the Consultation Parties, the Debtors may designate a Stalking Horse Bidder that submits a Qualified Bid (as defined below) acceptable to the Debtors and enter into a Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction, **no later than March 10, 2025, at 4:00 p.m. (prevailing Eastern Time)**, which deadline may be extended by the Debtors (after consultation with the Consultation Parties).<br><br>In the event the Debtors select a Stalking Horse Bidder, the Debtors shall provide three (3) calendar days' notice to the Consultation Parties and the Office of the United States Trustee (the "U.S. Trustee").  Absent objection from the Consultation Parties or the U.S. Trustee within the three (3) day notice period, the Debtors may offer the following Bid Protections to the Stalking Horse Bidder: (i) break-up fees, if any, in an amount not to exceed three percent (3%) of the Qualified Bid and (ii) reimbursement of expenses, if any, for documented, actual and necessary expenses incurred by any Stalking Horse Bidder in connection with the submitting its Qualified Bid in an amount not to exceed $400,000.00 (collectively, the "Bid Protections").<br><br>With such consent, the Debtors shall be authorized to submit a proposed order to the Court under certification of counsel that approves such Bid Protections (the "Stalking Horse Order").  The Debtors will cause a copy of a notice of entry of the Stalking Horse Order to be |

| | served on the Sale Notice Parties, all counterparties to the proposed assumed contracts and any Prospective Bidder. |
|---|---|
| | If any Consultation Party or the U.S. Trustee object to the proposed Bid Protections and entry of the Stalking Horse Order, the Debtors shall be authorized to file a notice seeking an expedited hearing on not less than three (3) calendar days' notice (the "<u>Stalking Horse Hearing</u>"). All parties-in-interest shall have the right at the Stalking Horse Hearing to object to the Debtors' entry into a Stalking Horse Agreement on any grounds, including to object to the Bid Protections and the form of Stalking Horse Order. If the Debtors, in consultation with the other Consultation Parties, determine that the Bid Protections must exceed the amounts set forth herein, the Debtors shall request that the Court hold a hearing on the approval of any such greater Bid Protections on an expedited basis. |
| **Modification of Bidding Procedures**<br><br>Local Rule 6004-1(c)(i)(D) | Section IX of the Bidding Procedures sets forth the Debtors' reservation of rights to, in their reasonable business judgment and after consultation with the Consultation Parties, and in a manner consistent with its fiduciary duties and applicable law, (i) modify the Bidding Procedures, including to, among other things, extend or waive deadlines or other terms and conditions set forth herein, adopt new rules and procedures for conducting the bidding and Auction process so long as any such modifications are disclosed to all Prospective Bidders and Qualified Bidders, as applicable, or (ii) otherwise modify the Bidding Procedures to further promote competitive bidding for and maximizing the of value of the Assets, in each case, to the extent not materially inconsistent with the Bidding Procedures or the Bidding Procedures Order. |
| **Closing with Alternative Back-up Bidders**<br><br>Local Rule 6004-1(c)(i)(E) | Section VII.C.2 of the Bidding Procedures sets forth the primary requirements with respect to Backup Bids.<br><br>Immediately prior to the conclusion of the Auction, the Debtors will (a) determine, in a manner consistent with the Bidding Procedures and in consultation with the Consultation Parties, which Qualified Bid, other than any Credit Bid, is the Backup Bid; and (b) notify all Qualified Bidders at the Auction of the identity of the Backup Bidder and the amount of the purchase price and other material terms of the Backup Bid.<br><br>Except as otherwise provided in any Stalking Horse Agreement, a Backup Bid will remain binding on the applicable Backup Bidder until the earlier of (a) the first business day after the closing of a Sale with the Successful Bidder for the applicable Assets and (b) 30 days after the Sale Hearing (such date, the "<u>Backup Bid Expiration Date</u>"). If the Sale with the Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Backup Bidder shall be deemed the new Successful Bidder for the applicable Assets and shall be obligated to consummate the Backup Bid as if it were the Successful Bid at the Auction; *provided* that the Debtors may, in their reasonable business judgment (after filing a notice and after consultation with the Consultation Parties), elect not to pursue the sale transaction contemplated by the Backup Bid. |
| **Provisions Governing the Auction**<br><br>Local Rule 6004-1(c)(ii) | Section VII of the Bidding Procedures sets forth the procedures governing the Auction.<br><br>If the Debtors receive more than one Qualified Bid (including a combination of bids that, when considered together, constitute a Qualified Bid) for the Assets, the Debtors will conduct an Auction for the Assets. If any Stalking Horse Bid is the only Qualified Bid received in respect of the Assets, the Debtors will not conduct an Auction for the Assets and will seek approval of such Stalking Horse Bid at the Sale Hearing. If the Debtors determine not to hold an Auction for some or all of the Assets, the Debtors will file with the Court, serve on the Sale Notice Parties, and cause to be published on the on the website maintained by Epiq Corporate Restructuring, LLC, the Debtors' claims and noticing agent in the Chapter 11 Cases, located at https://dm.epiq11.com/Nikola (the "<u>Epiq Website</u>"), a notice containing the following information, as applicable: (a) a statement that the Auction for the Assets has been canceled; (b) the identity of the Successful Bidder; (c) a copy of the Successful Bid or a summary of the |

material terms of such bid or provide instructions for accessing the Successful Bid free of charge from the Epiq Website; and (d) the date, time, and location of the Sale Hearing.

The Auction, if required, will be conducted on **March 31, 2025, at 10:00 a.m. (prevailing Eastern Time)**, either (a) at the offices of Houlihan Lokey Capital, Inc., 245 Park Avenue, 20th Floor, New York, New York 10167, (b) at some other physical location to be determined by the Debtors, or (c) virtually or at such other date, time or location as designated by the Debtors, after consulting with the Consultation Parties (subject to Section XI.C of the Bidding Procedures).  If the Debtors conduct the Auction virtually, the Debtors will provide instructions setting forth how to attend the Auction to the participants and other attendees via electronic mail.  The Debtors will provide notice (via electronic mail or otherwise) of any change in the date, time or location of the Auction to Qualified Bidders and the Consultation Parties (subject to Section XI.C of the Bidding Procedures), and will cause publication of such change to occur on the Epiq Website.

A. Participation.  Each participant in the Auction must (i) be a Qualified Bidder, (ii) appear at the Auction, either personally or through a duly authorized representative, and (iii) confirm on the record that (x) it has not engaged in any collusion with respect to the Auction or the submission of any bid for any of the Assets, and (y) its Qualified Bid that gained the Qualified Bidder admission to participate in the Auction and each Qualified Bid submitted by the Qualified Bidder at the Auction is a binding, good-faith, and *bona fide* offer to purchase the Assets identified in such bids.

All Prospective Bidders and Qualified Bidders are deemed to (i) agree that all Sale proceedings are core proceedings, (ii) have waived their right to a jury trial, and (iii) consent to the entry of a final order by the Court.

Professionals and principals for the Debtors, each Qualified Bidder (including, its representative(s), if any), each of the Consultation Parties, and any creditor of the Debtors that has provided notice in writing of its intent to observe the Auction via electronic mail to co-counsel for the Debtors, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: Brett M. Haywood (bhaywood@potteranderson.com) at least one (1) day prior to the start of the Auction shall be able to attend and observe the Auction, along with any other parties the Debtors deem appropriate.

B. Proceedings. The Auction proceedings will (i) be transcribed and/or video recorded, and (ii) include open bidding in the presence of all Qualified Bidders, subject to reasonable limitations imposed by a virtual auction platform to be evaluated and determined by the Debtor.

C. Baseline Bid.  Prior to the commencement of the Auction, the Debtors will determine, in their reasonable business judgment (and in consultation with the Consultation Parties (subject to Section XI.C of the Bidding Procedures)) the highest or otherwise best Qualified Bid submitted for the Assets (such Qualified Bid, a "Baseline Bid").  Bidding at the Auction shall commence at the amount of the Baseline Bid.  **No later than March 28, 2025 at 5:00 p.m. (prevailing Eastern Time)**, the Debtors will provide all Qualified Bidders with (a) a notice identifying which Qualified Bid is the Baseline Bid; and (b) a copy of each Qualified Bid.

D. Minimum Overbids.  Bidding shall commence at the Baseline Bid.  The first overbid at the Auction shall be in an amount not less than the amount of the Baseline Bid (plus the Bid Protections if the Stalking Horse Bid is the Baseline Bid) plus $100,000 (the "Minimum Overbid").  At each round of bidding, Qualified Bidders may submit successive bids higher than the Leading Bid (as defined below) from the prior round.  During the Auction, the Debtors may, in their reasonable discretion, after consultation with the Consultation Parties, announce increases or reductions to Minimum Overbids at any time.

Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by any bid subsequent to the Baseline Bid, the Debtors will, at each round of bidding, consider and/or give effect to (a) any additional liabilities to be assumed by a Qualified Bidder under the bid, including whether such liabilities are secured or unsecured; (b) any additional costs that may be imposed on the Debtors; and (c) any liabilities waived against the estate. Any subsequent bid made by any Stalking Horse Bidder shall be deemed to have been made in an amount equal to such subsequent bid <u>plus</u> the Bid Protections, to the extent provided for in the Stalking Horse Agreement.

E. <u>Leading Bids</u>. After the first round of bidding and between each subsequent round of bidding, the Debtors will announce the bid that they believe to be the highest or otherwise best offer for the Assets (each such bid, a "<u>Leading Bid</u>") and describe the material terms thereof. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the material terms of the Leading Bid.

The Auction will include open bidding in the presence of all other Qualified Bidders. Each Qualified Bidder shall have the right to be present for all rounds of bidding and to submit additional bids and make modifications to its Proposed Asset Purchase Agreement at the Auction to improve its bid. The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders participating in the Auction.

The Debtors shall have the right to determine, in their reasonable business judgment after consultation with the Consultation Parties, which bid is the highest or otherwise best bid with respect to the Assets and, after consultation with the Consultation Parties, reject, at any time, without liability (but only in the absence of gross negligence or willful misconduct), any bid that the Debtors deem to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, these Bidding Procedures, any order of the Court, or the best interests of the Debtors and their estates.

F. <u>Successful Bids</u>. Immediately prior to the conclusion of the Auction, the Debtors will (a) determine, consistent with these Bidding Procedures and in consultation with the Consultation Parties, which Qualified Bid constitutes the highest or otherwise best bid (such bid, including any Stalking Horse Bid, if no additional Qualified Bids are received and no Auction conducted, a "<u>Successful Bid</u>") and (b) notify all Qualified Bidders at the Auction of the identity of the bidder that submitted the Successful Bid (such bidder, including any Stalking Horse Bidder if no Qualified Bids are received and no Auction conducted, a "<u>Successful Bidder</u>"). Following the conclusion of the Auction, the Debtors shall serve a notice of the Successful Bidder, which notice shall include a copy of the Successful Bid or a summary of the material terms of such bid or provide instructions for accessing the Successful Bid free of charge from the Epiq Website

## B.    Key Dates and Deadlines

35.    The Debtors propose the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:

| | |
|---|---|
| **Two business days after the entry of the Bidding Procedures Order** | Deadline to file and serve Sale Notice |
| **Three business days after the entry of the Bidding Procedures Order** | Deadline to file and serve Assumption and Assignment Notice |
| **Within Five business days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter** | Deadline to publish Publication Notice |
| **March 10, 2025, at 4:00 p.m. (ET)** | Deadline for Debtors to designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement |
| **March 27, 2025, at 4:00 p.m. (ET)** | Bid Deadline |
| **March 28, 2025, at 4:00 p.m. (ET)** | Sale Objection Deadline, Cure Objection Deadline, and Contract Objection Deadline |
| **March 31, 2025, at 10:00 a.m. (ET)** | Auction (if necessary) |
| **Earlier of five (5) business hours after the conclusion of the Auction and Noon (ET) the calendar day after the conclusion of the Auction** | Deadline to file and serve Notice of Auction Results |
| **April 1, 2025 at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline (if necessary) |
| **12:00 p.m. (ET) one business day before the Sale Hearing** | Deadline to reply to any Sale Objections or Supplemental Sale Objections |
| **April 3, 2025 at [●:● a/p.m.] (ET) (subject to the Court's availability)** | Sale Hearing |
| **April 11, 2025** | Deadline to consummate approved Sale |

**C.    Sale Noticing and Objection Procedures**

36.    The Bidding Procedures provide the following "<u>Noticing Procedures</u>":

    a.    **Stalking Horse Order**.  As soon as practicable after the Debtors submit the Stalking Horse Order to the Court, the Debtors will cause a copy of a notice of entry of the Stalking Horse Order to be served on the Sale Notice Parties, all counterparties to the proposed assumed contracts, and any Prospective Bidder.

    b.    **Sale Notice.**  Within two (2) business days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors shall serve on the Sale Notice Parties and cause to be published on the Epiq Website the Sale Notice.

    c.    **Publication**.  Within five (5) business days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the

Debtors will post the Sale Notice on the Epiq Website and cause the information contained in the Sale Notice, with any modifications necessary for ease of publication, to be published once in the national edition of either the Wall Street Journal, USA Today, The New York Times (national edition) or another publication of similar distribution (the "<u>Publication Notice</u>").

d.    **<u>Sale Objection</u>**.   Except objections to the conduct of the Auction, the Successful Bidder or the Backup Bidder, objections to the sale of the Assets, including (i) any objection to a sale of Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (ii) the entry of any Sale Order must be (A) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (B) filed with the Court by **no later than March 28, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Sale Objection Deadline</u>"); and (C) served on the Objection Notice Parties (as defined in the Bidding Procedures).

e.    **<u>Notice of Determination of Qualified Bids</u>**.   The Debtors, in consultation with the Consultation Parties, will make a determination regarding which bids qualify as Qualified Bids and will notify Potential Bidders whether they have been selected as Qualified Bidders by **no later than March 28, 2025 at 10:00 a.m. (prevailing Eastern Time)**.

  i.    **No later than March 28, 2025 at 5:00 p.m. (prevailing Eastern Time)**, the Debtor will provide all Qualified Bidders (including the Stalking Horse Bidder, if any) copies of the Qualified Bid that the Debtors, after consultation with the Consultation Parties, determines is the highest or otherwise best offer for the Assets (the "<u>Baseline Bid</u>").

f.    **<u>Auction Results</u>.**   Upon the earlier to occur of (i) five (5) business hours after the conclusion of the Auction; and (ii) Noon (prevailing Eastern Time) the calendar day after the conclusion of the Auction, the Debtors will file with the Court, serve on the Sale Notice Parties and cause to be published on the Epiq Website, a notice of the results of the Auction (the "<u>Notice of Auction Results</u>"), which will (A) identify the Successful Bidder and the Backup Bidder; (B) include a copy of the Successful Bid or a summary of the material terms of such bid, including any assumption and assignment of Contracts contemplated thereby, or provide instructions for accessing the Successful Bid free of charge from the Epiq Website; and (C) set forth the Supplemental Sale Objection Deadline and the date, time and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction.

g.   **Supplemental Sale Objections.**  Following service of the Notice of Auction Results, Sale Notice Parties will have an opportunity to object solely with respect to the conduct of the Auction, the Successful Bidder, the Backup Bidder, or the Sale to the Successful Bidder or the Backup Bidder (each such objection, a "Supplemental Sale Objection").  Any Supplemental Objection must be (i) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (ii) filed with the Court by **no later than April 1, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Supplemental Sale Objection Deadline"); and (iii) served on the Objection Notice Parties.

37.     The Debtors believe that the Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, the dates and deadlines identified in paragraph 30 above.  Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

**D.     Assumption and Assignment Procedures**

38.     In connection with the Sale, the Debtors likely will seek to assume and assign to the Successful Bidder (or its designated assignee(s)) one or more Contracts.  The Assumption and Assignment Procedures are designed to, among other things, govern the Debtors' provision of Adequate Assurance Information and notice of Cure Costs to applicable Counterparties.

39.     Accordingly, the Debtors hereby seek approval of the proposed Assumption and Assignment Procedures set forth below, which are designed to, among other things, (i) outline the process by which the Debtors will serve notice to all Counterparties regarding the proposed assumption and assignment, related Cure Costs, if any, and information regarding the Successful Bidder's adequate assurance of future performance, and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of executory contacts and unexpired leases.  Specifically, the Assumption and Assignment Procedures are as follows:

a.   **Potential Assumption and Assignment Notice**.  Three (3) business days after the entry of the Bidding Procedures Order, the Debtors will file with the Court and serve on each Counterparty to a Contract that may be assumed in connection with any Sale an Assumption and Assignment Notice, which will (i) identify the applicable Contracts; (ii) list the Debtors' good-faith calculation of Cure Costs with respect to each such Contract; (iii) expressly state that assumption or assignment of a Contract is not guaranteed and is subject to Court approval; and (iv) prominently display the deadlines to file Cure Objections and Adequate Assurance Objections (each as defined below).  The Assumption and Assignment Notice shall also be served on each Counterparty listed therein via first class mail.

To the extent the Debtors, at any time after the deadline to file and serve the Assumption and Assignment Notice (i) identify additional Contracts to be assumed and assigned to any Stalking Horse Bidder or other Successful Bidder (the "Additional Contracts"), (ii) remove Contracts from the list of executory contracts and leases proposed to be assumed and assigned in connection with the sale of the Assets, (iii) and/or modify the previously stated Cure Cost associated with any Contracts, the Debtors will promptly file with this Court and serve by first-class mail or email a supplemental notice of contract assumption (a "Supplemental Assumption and Assignment Notice") on each of the counterparties to such Contracts and their counsel of record, if any.  Each Supplemental Assumption and Assignment Notice will include the same information with respect to listed Additional Contracts as was included in the initial Assumption and Assignment Notice.  Any Stalking Horse Bidder may designate Additional Contracts to be assumed and assigned at any time until two (2) Business Days prior to the Closing Date (as defined in the Stalking Horse Agreement), and may remove Contracts from the list of Contracts at any time until two (2) Business Days prior to the Closing Date.  Counterparties to Additional Contracts or that otherwise receive a Supplemental Assumption and Assignment Notice shall have until 4:00 p.m. (prevailing Eastern Time) on the date that is ten (10) days after the filing and service of the Supplemental Assumption and Assignment Notice by the Debtors to the Counterparty to file a Cure Objection (as defined herein).

b.   **Assumption and Assignment Objections**.

i.   Contract Objection Deadline.  Any Counterparty to a Contract that wishes to object to the Debtors' proposed Cure Costs (each such objection, a "Cure Objection") or the assumption and assignment on any basis (except objections solely related to adequate assurance of future performance provided by a Successful Bidder other than any Stalking Horse Bidder) (each such objection, an "Assumption/Assignment Objection" and, together with a Cure Objection, a "Contract Objection") shall file with the Court and

serve on the Objection Notice Parties its Cure Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by **no later than March 28, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Cure Objection Deadline</u>").

ii.  <u>Resolution of Cure Objections</u>.  The Debtors, the Successful Bidder, and the objecting Counterparty shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention.  If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court shall make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to the following paragraph.  If a Cure Objection is resolved in a manner that is not in the best interests of the Debtors and their estates, whether or not such resolution occurs prior to or after the closing of the Sale, the Successful Bidder may determine that any Contract subject to such resolved Cure Objection will no longer be assumed and assigned pursuant to the Sale (subject to the terms of the Sale). All other objections to the proposed assumption and assignment of the Debtors' right, title and interest in, to and under a Contract will be heard at the Sale Hearing.

iii. <u>Adjournment</u>.  If a timely filed Cure Objection cannot otherwise be resolved by the parties, the Cure Objection may be heard at the Sale Hearing, or, with the agreement of the Debtors and the Successful Bidder, be adjourned to a subsequent hearing, with notice to the party having filed the Cure Objection (each such Cure Objection, an "<u>Adjourned Cure Objection</u>").  An Adjourned Cure Objection may be resolved after the closing date of the Sale.  Any Contract that is the subject of an Adjourned Cure Objection may be assumed and assigned prior to the resolution of such objection, so long as the Debtors or Successful Bidder, as applicable, (i) pay any undisputed Cure Costs on or before (x) the Closing Date (as defined in the Stalking Horse Agreement) or (y) in the event the Successful Bidder is a party other than any Stalking Horse Bidder, the date designated for consummating the sale under such Successful Bidder's purchase agreement and (ii) appropriately reserve funding for the disputed portion of the Cure Costs pending resolution of the dispute.

iv.  <u>Failure to Timely Object</u>.  If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Contract Objection, (i) the Counterparty shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Contract, (ii) the Successful Bidder shall be deemed to have provided adequate assurance of future performance with respect to a Contract in accordance with Bankruptcy Code

sections 365(b)(1)(C), 365(f)(2)(B), and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document, (iii) the Counterparty shall be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder), (iv) any and all defaults under the Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and upon payment of the Cure Costs set forth in the Assumption and Assignment Notice for such Contract, and the Counterparty shall be forever barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract, and (v) the Counterparty shall be forever barred from asserting any other claims related to such Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving such Contract Objection and any Sale Order.

v.   <u>Adequate Assurance Objection Deadline</u>.  Any Counterparty to a Contract that wishes to object to the proposed assumption and assignment of the Contract, the subject of which objection is a Successful Bidder's (or any other relevant assignee's), other than any Stalking Horse Bidder's proposed form of adequate assurance of future performance (each such objection, an "<u>Adequate Assurance Objection</u>"), shall file with the Court and serve on the Objection Notice Parties an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, **by April 1, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Adequate Assurance Objection Deadline</u>" and, together with the Cure Objection Deadline, the Sale Objection Deadline and the Supplemental Sale Objection Deadline, the "<u>Objection Deadlines</u>").

vi.   <u>Resolution of Adequate Assurance Objections</u>.  The Debtors, the Successful Bidder, and the objecting Counterparty shall first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention.  If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the Successful Bidder (or any other relevant assignee), other than any Stalking Horse Bidder, shall be determined by the Court at the Sale Hearing or, with the agreement of the Debtors and the Successful Bidder, be adjourned to a subsequent hearing, with notice to the party having filed the Adequate Assurance Objection.

vii.   <u>Failure to Timely Object</u>.  If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of the applicable Contract with regard to adequate assurance of future performance.   The Successful Bidder (or any other relevant assignee) shall be deemed to have provided adequate assurance of future performance with respect to the Contract in accordance with Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document.

c.   **Notice of Assumed Contracts**.  As soon as reasonably practicable after the closing of the Sale, the Debtors will file with the Court, serve on the applicable Counterparties and cause to be published on the Epiq Website, a notice containing the list of Contracts that the Debtors assumed and assigned pursuant to the asset purchase agreement with the Successful Bidder on the closing date of the sale of the Assets.

d.   **Reservation of Rights**.  The inclusion of a Contract or specification of any Cure Costs with respect to any Contract on any Assumption and Assignment Notice or any Notice of Auction Results, shall not constitute or be deemed a determination or admission by the Debtors, the Successful Bidder or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned. The Debtors reserve all of its rights, claims and causes of action with respect to each Contract listed on the aforementioned notices.

<u>**R**ELIEF **R**EQUESTED</u>

40.     By this Motion, pursuant to sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1, the Debtors request entry of the following:

a.   the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A,** granting the following relief:

i.   approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**, to be used in connection with one or more Sale of all, substantially all, or portion of the Debtors' Assets;

ii. authorizing the Debtors to designate a Staking Horse Bidder and provide Bid Protections in accordance with the Stalking Horse Designation Procedures;

iii. scheduling (A) the Auction of the Assets **no later than March 31, 2025, at 10:00 a.m. (prevailing Eastern Time)** and (B) the Sale Hearing to consider approval of the proposed Sale **no later than April 3, 2025,** subject to the availability of the Court;

iv. approving the Sale Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**;

v. approving the Assumption and Assignment Procedures;

vi. approving the Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3**; and

vii. granting related relief; and

b. a Sale Order, granting the following relief:

i. authorizing the sale of the Assets free and clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances and assumed liabilities as determined by the Debtor and the Successful Bidder, with liens to attach to the proceeds of the Sale;

ii. authorizing the assumption and assignment of certain Contracts in connection with a Sale; and

iii. granting related relief.

## BASIS FOR RELIEF

**A.      The Proposed Bidding Procedures Are Fair, Appropriate and Should Be Approved.**

41.      For nearly four months, Houlihan Lokey has engaged actively in a comprehensive prepetition marketing process that included seeking: (i) investment capital to partner with the Debtors to extend runway to execute the Debtors' long-range business plans; (ii) sale of the going concern business; and (iii) sale of individual components of the Debtors' businesses.  Although no investor or purchaser ultimately emerged to execute an out-of-court transaction in the timeframe permitted by the Debtors' limited available liquidity, the Debtors' Assets and their attributes have been well-known to the marketplace for an extended period of time through exposure by other

bankers that came before Houlihan Lokey. The Bidding Procedures are an extension of the ongoing marketing process and are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and protect the value of the estate's assets); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that a main goal of any proposed sale of property of a debtor's estate is to maximize value). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Off.Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing the benefit of sale procedures that "encourage bidding and . . . maximize the value of the debtor's assets").

42. Here, the Bidding Procedures meet this standard because the proposed timeframe is necessary to allow the Debtors to potentially transact as a going concern, likely bidders have already been contacted, and the Debtors believe that the auction process and time periods set forth in the Bidding Procedures are reasonable and will provide interested parties with sufficient time and information necessary to formulate a bid to purchase all or substantially all of the Assets. The proposed timeline will facilitate a fair and open sale process and will position the Debtors to maximize the value received for the Assets. Bidding Procedures Declaration ¶ 18.

43.     Moreover, the facts and circumstances of the Chapter 11 Cases, justify the timeline proposed by the Debtors herein.  First, the Bidding Procedures provide for an orderly and appropriately competitive process through which interested parties may submit offers to purchase the Assets.  *Id*.  Indeed, given the Debtors' liquidity constraints, and in light of the prepetition marketing process, the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Assets.  *Id*. ¶ 20.

44.     Importantly, the most likely competing bidders are among those who the Debtors or Houlihan Lokey have already contacted and are therefore already part of the prepetition sales process.  *Id*. ¶ 21.  Specifically, the proposed Bidding Procedures provide interested parties with more than five (5) additional weeks to continue diligence and submit a qualified bid.  *Id*.  While expedited, the timeline set forth in the Bidding Procedures should be sufficient to provide any motivated potential purchasers with an adequate amount of time to diligence the assets and submit bids.  *Id*.

45.     Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale.  Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.  *Id*. ¶ 18.  Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate and in the best interests of the Debtors, its estates and all parties-in-interest.

46.     Courts in this District routinely approve procedures substantially similar to the proposed Bidding Procedures. *See, e.g., In re Biolase, Inc.*, No. 24-12245 (KBO) (Bankr. D. Del. Oct. 17, 2024) (sale hearing held 42 days after the petition date); *In re Supply Source Enters., Inc., et al.*, No. 24-11054 (BLS) (Bankr. D. Del. May 17, 2024) (sale hearing held 49 days after the petition date); *In re Humanigen, Inc.*, No. 24-10003 (BLS) (Bankr. D. Del. Jan. 25, 2024) (sale hearing held 42 days after petition date); *In re The Rockport Co., LLC, et al.*, No. 23-10774 (BLS) (Bankr. D. Del. July 25, 2023) (sale hearing held 41 days after the petition date); *In re Tricida, Inc.*, No. 23-10024 (JTD) (Bankr. D. Del. Jan. 26, 2023) (sale hearing held 40 days after the petition date); *In re Enjoy Tech., Inc.*, No. 22-10580 (JKS) (Bankr. D. Del. Jul. 26, 2022) (sale hearing held 43 days after the petition date); *In re Gold Standard Baking, LLC*, No. 22-10559 (JKS) (Bankr. D. Del. Jul. 8, 2022) (sale hearing held 42 days after the petition date); *In re Fast Radius, Inc.*, No. 22-11051 (JKS) (Bankr. D. Del. Nov. 14, 2022) (sale hearing held 35 days after the petition date).

**B.      The Proposed Bid Protections Have Sound Business Purposes and Should Be Approved.**

47.     As described above, the Bid Protections, if they prove necessary for the entry into any Stalking Horse Agreement, include break-up fees in an amount not to exceed three percent (3%) of an applicable Qualified Bid and reimbursement of reasonable, documented expenses in an amount not to exceed $400,000.00.  The Debtors believe that the Bid Protections may be necessary to encourage prospective bidders to become the Stalking Horse Bidder and enter into a binding Stalking Horse Agreement.  The Debtors believe that the presence of a Stalking Horse Bidder will set a floor for the value of the Assets and attract other potential buyers to bid for the Assets, thereby maximizing the realizable value of the Assets for the benefit of the Debtors' estates, their creditors and all other parties-in-interest.

48.     Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context.  Courts have identified at least two instances in which bid protections may benefit the estate.  *First*, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537.  *Second*, if the availability of a break-up fee was to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id*.; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

49.     In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

a.      the presence of self-dealing or manipulation in negotiating the break-up fee;

b.      whether the fee hampers, rather than encourages, bidding;

c.      the reasonableness of the break-up fee relative to the purchase price;

d.      whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.      the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.      the correlation of the fee to a maximum value of the debtor's estate;

      g.     the support of the principal secured creditors and creditors' committees of the break-up fee;

      h.     the benefits of the safeguards to the debtor's estate; and

      i.     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See O'Brien*, 181 F.3d at 536.

50.     While none of the factors are dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections.  In particular, the Bid Protections are necessary to preserve the value of the Debtors' estates because they may enable the Debtors to secure an adequate floor for the Assets and to therefore insist that competing bids be materially higher or otherwise better than any Stalking Horse Agreement—a clear benefit to the Debtors' estates.  Further, a Stalking Horse Bidder may not agree to act as a "stalking horse" without the Bid Protections, given the substantial time and expense that would be incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction.  Without the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose any downside protection that would be afforded by the existence of a Stalking Horse Bidder.  The bid of a Stalking Horse Bidder would send a message to all potential bidders that the Assets are worth at least as much as any Stalking Horse Bid. Therefore, without the benefit of the bid of a Stalking Horse Bidder (*i.e.*, a bid providing the floor), the bids received at auction for the Assets could be substantially lower than any bid offered by a Stalking Horse Bidder.

51.     "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable."  *In re Integrated Res., Inc.*, 147 B.R. at 659.  The Debtors do not believe that the Bid Protections will stifle bidding.  To the contrary, the Debtors believe that such bid protections will encourage bidding by serving "any of three possible useful

functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders." *Id.* at 662.

52.     Here, the bid of a Stalking Horse Bidder would serve all three functions. *First*, a Stalking Horse Bidder might not enter into a Stalking Horse Agreement without the Bid Protections. *Second*, pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of any Stalking Horse Bidder. *Third*, the bid of the Stalking Horse Bidder could attract additional bidders because, among other things, additional bidders would be able to save considerable time and expense because they could use many of the documents that a Stalking Horse Bidder may negotiate, including, among other things, any Stalking Horse Agreement and the schedules thereto, in making their bid. In sum, if all, substantially all, or portion of the Assets are sold to a Successful Bidder other than a Stalking Horse Bidder, the Sale likely will be the result of the Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

53.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. 'When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible.'" *Id.* (citation omitted).

54.     Here, the Bidding Procedures would authorize the Debtors to submit an order to the Court under certification of counsel that approves a break-up fee in an amount no greater than three percent (3%) of an applicable Qualified Bid and reimbursement of expenses, if any, for documented, actual and necessary expenses incurred by any Stalking Horse Bidder in an amount not to exceed $400,000.00. This amount is consistent with the range of bid protections typically

paid in sale transactions that have been recently approved by courts in this District. *See, e.g., In re Vyaire Medical, Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. July 11, 2024) (approving stalking horse break-up fee of 3% and expense reimbursement of $250,000); *In re Sientra, Inc.*, No. 24-10245 (JTD) (Bankr. D. Del. Mar. 5, 2024) (approving stalking horse break-up fee of 3% and expense reimbursement of $500,000); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Nov. 17, 2023) (approving stalking horse break-up fee of 3% inclusive of expense reimbursement); *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Sept. 15, 2023) (same); *In re Am. Eagle Del. Holding Co., LLC*, No. 22-10028 (JKS) (Bankr. D. Del. Mar. 8, 2022) (approving a breakup fee of 3% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of 1.25% of the cash consideration of the stalking horse bid); *In re BHCosmetics Holdings, LLC*, No. 22-10050 (CSS) (Bankr. D. Del. Feb. 18, 2022) (approving breakup fee equal to 4% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of approximately 3.5% of the cash consideration of the stalking horse bid); *In re Sequential Brands Grp., Inc.*, No. 21-11194 (JTD) (Bankr. D. Del. Sept. 24, 2021) (approving a break-up fee of 3.65% of the purchase price); *In re Knotel, Inc.*, No. 21-10146 (MFW) (Bankr. D. Del. Mar. 11, 2021) (approving a break-up fee of 3% of the purchase price); *In re Brooks Bros.Grp., Inc.*, No. 20-11785 (CSS) (Bankr. D. Del. Aug. 3, 2020) (approving a break-up fee of 3% of the purchase price); *In re Southland Royalty Co. LLC*, No. 20-10158 (KBO) (Bankr. D. Del. Apr. 29, 2020) (authorizing a break-up fee in an amount not to exceed 3% of the purchase price).

**D.     Approval of One or More Sales of the Assets Is Warranted Under Section 363 of the Bankruptcy Code.**

55.     Ample authority exists for approval of one or more Sales contemplated by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of a debtors' estate, courts have approved the authorization of a sale of a debtors' assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513 (7th Cir. 1991)); *Official Comm. Of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *Comm.of Equity Sec.Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

56.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was provided to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (citations omitted).

**1.     The Debtors Have Demonstrated a Sound Business Justification for One or More Sales of the Assets.**

57.     A sound business purpose for the sale of a debtors' assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the

benefit of creditors and interest holders.  *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 148 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1070-71; *In re Food Barn*, 107 F.3d at 564-65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

58.     As set forth above, a strong business justification exists for the sale of all, substantially all, or portion of the Assets as described herein.  An orderly and expeditious sale of the Assets is critical to maximizing the value of the Debtors' estates and recoveries for the Debtors' economic stakeholders.  Bidding Procedures Declaration ¶ 18.  Absent one or more sales, the Debtors lack liquidity to reorganize and will be forced to shut down and liquidate.

### 2.     The Noticing Procedures Are Reasonable and Appropriate.

59.     Bankruptcy Rules 2002 and 6004 require the Debtors to notify creditors of the proposed sale transactions, provide a description of the Assets and disclose the time and place of the Auction, the terms and conditions of any proposed Sale, and the Objection Deadlines.  *See* Fed. R. Bankr. P. 2002(a), 2002(c), 6004(a).  The Noticing Procedures described herein are reasonably calculated to provide all of the Debtors' known creditors and all other parties-in-interest with adequate and timely notice of, among other things, the proposed Sales, the Bidding Procedures, the potential for designation of a Stalking Horse Bidder, the Auction, and the Sale Hearing. Further, publishing notice as described above is designed to capture any creditors and parties-in-interest not currently known to the Debtors.  Accordingly, the Debtors request that the Court approve the Noticing Procedures described herein and in the Bidding Procedures Order.

### 3.     The Proposed Sales Will Yield a Fair and Reasonable Purchase Price for the Assets.

60.     As set forth above, the Debtors believe that one or more Sales governed by the Bidding Procedures will yield fair and reasonable prices for the Assets under the circumstances. The Bidding Procedures were designed to facilitate a competitive bidding process.

61.     The Debtors also constructed the Bidding Procedures to promote transparency, good faith and fairness throughout the entire sale process.  The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze and compare bids for the Assets and to engage with bidders on an arm's-length basis to work to improve the quality of their bids for the benefit of all parties-in-interest.

62.     One or more Sales governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase prices for the Assets, but also the highest or otherwise best value for the Assets.  This is a critical feature of the Bidding Procedures, which will inure to the benefit of all parties-in-interest in the Chapter 11 Cases.

> **4.      The Bidding Procedures Ensure that the Sale Process Is Conducted in Good Faith and that the Ultimate Purchaser of the Applicable Assets Is Entitled to the Protections Afforded by Section 363(m) of the Bankruptcy Code.**

63.     Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtors' assets to a good-faith purchaser.  Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely." *In re Abbotts Dairies*, 788 F.2d at 147 (citations omitted); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

64.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies*, 788 F.2d at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) (second citation omitted); *see also Kabro Assocs. of W. Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

65.     In other words, a party would have to show fraud or collusion between the buyer and the debtors in possession, the trustee or other bidders to demonstrate a lack of good faith. *See In re Colony Hill Assocs.*, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (quoting *Rock Indus.*, 572 F. 2d at 1198) (citations omitted).  Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *Rock Indus.*, 572 F.2d at 1198).

66.     The Debtors submit that any Successful Bidder will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  As set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.  In addition, Houlihan is an independent professional retained by the Debtors for the purpose of exploring strategic alternatives, marketing the Debtors' business, soliciting bids, and negotiating the terms of potential Sales.  Moreover, each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of the Assets.  Any purchase agreement with a Successful Bidder executed by the Debtors will be negotiated at arm's

length and in good faith by sophisticated parties represented by competent counsel.  Accordingly, the Debtors seek a finding that any Successful Bidder (including a Stalking Horse Bidder, if any) is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

67.     Based on the foregoing, the Debtors submit that they have demonstrated that the proposed Sale is a sound exercise of their business judgment and should be approved as a good faith transaction.

**D.     A Sale of the Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code.**

68.     A free and clear sale is a pre-requisite to ensuring that the Debtors are able to attract the best or otherwise highest offers and achieve a value-maximizing transaction in the Chapter 11 Cases for the benefit of the Debtors and their stakeholders.

69.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances of an entity other than the estate if any one of the following conditions is met:

a.     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b.     such entity consents;

c.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.     such interest is in bona fide dispute; or

e.     such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.") (citation omitted); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

70.     The Debtors anticipate that any Sale they elect to pursue will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code to permit a "free and clear" sale of the applicable Assets.  As an initial matter, the Prepetition Lender, who is secured by liens on substantially all of the Assets, have already consented to the terms of the Bidding Procedures, and subject to the Bidding Procedures, will be an active participant in the sale process.

71.     Accordingly, the Debtors request that the Court authorize the sale of the Assets free and clear of any liens, claims, interests and encumbrances, to the fullest extent permitted by section 363(f) of the Bankruptcy Code.

**E.     The Debtors' Assumption and Assignment of Executory Contracts and Unexpired Leases Are Appropriate under Section 365 of the Bankruptcy Code.**

72.     Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."   11 U.S.C. § 365(a).   Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or an unexpired lease.  *See, e.g., In re Mkt. Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment . . ..") (citation omitted); *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice).  In this context, the business judgment test

only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

73.     Any proposed Sale will provide a Successful Bidder with the opportunity to designate certain Contracts for assumption and assignment.  Assumption of any Contracts is an exercise of the Debtors' sound business judgment because the transfer of Contracts in connection with a Sale is an essential element in the Debtors' ability to maximize the value of the Assets— and particularly so when a Contract is integral to the ownership or operation of the Assets to be acquired.  Further, the ability to assume and assign Contracts will increase the likelihood that the Debtors will be able to sell the Assets as a going concern, thereby avoiding needless value-destruction through a liquidation.

74.     The consummation of any Sale involving the assignment of a Contract will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) requires that the Debtors either cure, or provide adequate assurance that they will promptly cure, any outstanding defaults under the Contracts to be assumed. *See* 11 U.S.C. § 365(b)(1).  The Debtors' assumption and assignment of any Contracts will be dependent upon payment of Cure Costs and effective only upon the closing of a Sale.  As described with specificity herein, subject to the Court's approval, the Debtors will file with the Court and serve on each Counterparty an Assumption and Assignment Notice setting forth the Debtors' good-faith calculation of the Cure Costs for each Contract that could be assumed in connection with a Sale.  Counterparties will have an opportunity to raise any Cure Objections in advance of the Sale Hearing.

75.     Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance . . . whether or not there has been a default in such contract."  11 U.S.C. § 365(f)(2)(B).  While the Bankruptcy Code does not define "adequate assurance," courts have held that what constitutes "adequate assurance" should be determined by "a practical, pragmatic construction based upon the facts and circumstances of each case."  *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citing *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations") (footnote and citations omitted).  While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance."  *In re Carlisle Homes*, 103 B.R. at 538 (citations omitted); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

76.     Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

77.     The Bidding Procedures expressly specify that for a bid to qualify as a "Qualified Bid," a Prospective Bidder must include with its bid Adequate Assurance Information regarding the Prospective Bidder's (or any other relevant assignee's) ability to perform the applicable

obligations under any Contracts that may be included in the bid.  The Debtors will furnish all available Adequate Assurance Information to the relevant Counterparties as soon as reasonably possible following its receipt of such information, upon such Counterparty's request.  Finally, any Counterparty that is dissatisfied with the content or quality of any relevant Adequate Assurance Information will have an opportunity to request additional information from the Debtors and, if necessary, lodge an Adequate Assurance Objection in advance of the Sale Hearing.  In light of the foregoing, the Debtors' assumption and assignment of any Contracts in accordance with the Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

78.     Finally, to facilitate the assumption and assignment of Contracts in furtherance of maximizing the value of the Assets, the Debtors also request that the Court find that any anti-assignment provision included in any Contract, whether such provision expressly prohibits, or has the effect of restricting or limiting assignment of a Contract, is unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.

**F.     Requests for Immediate Relief & Waiver of Stay.**

79.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Bidding Procedures Order, any Sale Order, any order authorizing the assumption or assumption and assignment of a Contract in connection with a Sale, and any other order entered by this Court in connection with the Sale.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the

expiration of 14 days after the entry of the order unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

80.     The relief requested herein is necessary and appropriate to maximize the value of the Debtors' Assets for the benefit of the Debtors' economic stakeholders.  Given the Debtors' precarious financial condition and limited cash runway, the relief requested herein should be granted and effective as soon as practicable.  Any delay in the sale process could jeopardize the Debtors' chapter 11 strategy and the ability of the Debtors to consummate a value-maximizing transaction.  Accordingly, the Debtors submit that ample cause exists to justify waiving the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

### DEBTORS SATISFY REQUIREMENTS OF BANKRUPTCY RULE 6003

81.     Bankruptcy Rule 6003(b) empowers a court to grant certain relief within the first twenty-one days after the filing of the petition "to the extent that relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, the Third Circuit has instructed that irreparable harm is that which "cannot be redressed by a legal or an equitable remedy following a trial."  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801-02 (3d Cir. 1989).  The Debtors submit that, for the reasons set forth above, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

### NOTICE

82.     Notice of this Motion will be provided to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Debtors' thirty largest unsecured creditors; (c) the Internal Revenue

48

Service; (d) the Securities and Exchange Commission; (e) the United States Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in which the Debtors conduct business; (g) the DIP lender, if any; (h) Bank of America, N.A.; (i) Citibank, N.A.; (j) all other parties who have expressed a written interest in the Debtors' Assets; (k) any other party that has asserted a lien on or security interest in the Debtors' Assets; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no further notice is necessary.

### NO PRIOR REQUEST

83.     The Debtors have not previously sought the relief requested herein from the Court or any other court.

### CONCLUSION

WHEREFORE, the Debtors respectfully requests that the Court (i) enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**; (ii) and, after the Sale Hearing, the Sale Order, respectively, granting the relief requested in the Motion; and (iii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: February 19, 2025
      Wilmington, Delaware

Joshua D. Morse, Esq.
Jonathan Doolittle, Esq.
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Four Embarcadero Center, 22nd Floor
San Francisco, California 94111-5998
Telephone: (415) 983-1000
Facsimile:  (415) 983-1200
Email: joshua.morse@pillsburylaw.com
      jonathan.doolittle@pillsburylaw.com

-and-

Andrew V. Alfano, Esq.
Caroline Tart, Esq.
Chazz Coleman, Esq.
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
31 West 52nd Street
New York, New York 10019
Telephone: (212) 858-1000
Facsimile:  (212) 858-1500
Email: andrew.alfano@pillsburylaw.com
      caroline.tart@pillsburylaw.com
      chazz.coleman@pillsburylaw.com

Respectfully submitted,

*/s/ Maria Kotsiras*

M. Blake Cleary (No. 3614)
Brett M. Haywood (No. 6166)
Maria Kotsiras (No. 6840)
Shannon A. Forshay (No. 7293)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email: bcleary@potteranderson.com
      bhaywood@potteranderson.com
      mkotsiras@potteranderson.com
      sforshay@potteranderson.com

*Proposed Counsel to the Debtors and Debtors in Possession*