**<u>EXHIBIT A</u>**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Nikola Corp., *et al.*,[1] | Case No. 25-10258 (TMH) |
| Debtors. | (Joint Administration Requested) |
|  | **Re: Docket No.__** |

**ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO DESIGNATE ONE OR MORE STALKING HORSE BIDDERS, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (E) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (F) GRANTING RELATED RELIEF**

Upon consideration of the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and*

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Nikola Corporation (registered to do business in California as Nikola Truck Manufacturing Corporation) (1153); Nikola Properties, LLC (3648); Nikola Subsidiary Corporation (1876); Nikola Motor Company LLC (0193); Nikola Energy Company LLC (0706); Nikola Powersports LLC (6771); Free Form Factory Inc. (2510); Nikola H2 2081 W Placentia Lane LLC (N/A); 4141 E Broadway Road LLC (N/A); and Nikola Desert Logistics LLC (N/A).  The Debtors' headquarters are located at 4141 East Broadway Road, Phoenix, AZ 85040.

*(C) Granting Related Relief* [Docket No. __] (the "<u>Motion</u>")[2] filed by the debtors and debtors in possession (the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>"); and the Court having reviewed the Motion, the First Day Declaration [Docket No. ___], and the Bidding Procedures Declaration [Docket No. ___]; and the Court having considered the statements of counsel and the evidence adduced with respect to the Motion at a hearing before the Court on [_____] to consider certain of the relief requested in the Motion (the "<u>Bidding Procedures Hearing</u>"); and after due deliberation, this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and their creditors, and the Debtors having demonstrated good, sufficient, and sound business justifications for the relief granted herein;

## IT IS HEREBY FOUND AND DETERMINED THAT:

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The predicates for the relief granted herein are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

B.      Venue of these cases is proper in this district under 28 U.S.C. §§ 1408 and 1409.

C.      Notice of the Motion, the Bidding Procedures Hearing, the dates and objection deadlines contained in this Order and the Bidding Procedures, and the proposed entry of this Order was sufficient under the circumstances of the Chapter 11 Cases, and such notice complied with all

---

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion or in the Bidding Procedures, as applicable.

applicable requirements of the Bankruptcy Code, Bankruptcy Rules, and the Local Rules. Accordingly, no other or further notice of the Motion, the Bidding Procedures Hearing, or this Order need be provided.

D.     The bidding procedures, substantially in the form attached hereto as **Exhibit 1** (the "Bidding Procedures") and incorporated herein by reference as if fully set forth in this Order, are fair, reasonable, and appropriate and are designed to maximize the value of the Debtors' assets (the "Assets").

E.     The Bidding Procedures comply with the requirements of Local Rule 6004-1(c).

F.     The procedures set forth herein regarding the Debtors' assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts") in connection with a sale of the Assets (the "Assumption and Assignment Procedures") are fair, reasonable, and appropriate and comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

G.     The Debtors have articulated good and sufficient business reasons for the Court to approve the relief requested in the Motion, including, without limitation, (i) the Bidding Procedures (including the Stalking Horse Designation Procedures); (ii) the form and manner of notice of the Bidding Procedures, the auction of the Assets (the "Auction"), and the final hearing to consider approval of a sale of the Assets (the "Sale Hearing"), substantially in the form attached hereto as **Exhibit 2** (the "Sale Notice"); (iii) the form and manner of notice to each relevant non-debtor counterparty to a Contract (each, a "Counterparty") of (a) the Debtors' calculation of the amount necessary to cure any defaults under an applicable Contract (the "Cure Costs") and (b) certain other information regarding the potential assumption and assignment of Contracts in connection with the sale of the Assets, substantially in the form attached hereto as **Exhibit 3** (the

"Assumption and Assignment Notice"); and (iv) the Assumption and Assignment Procedures. Such good and sufficient business reasons, which were set forth in the Motion and on the record at the Bidding Procedures Hearing, including the First Day Declaration and the Bidding Procedures Declaration are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

H.     The Bidding Procedures are reasonably designed to promote active bidding at and participation in the Auction to ensure that the highest or otherwise best value is generated for the Assets.

I.     The Debtors are authorized to seek payment of the break-up fee and expense reimbursement comprising the Bid Protections pursuant to the procedures set forth in this Order and in compliance with the Stalking Horse Designation Procedures. In the event the Debtors select a Stalking Horse Bidder, the Debtors will provide three (3) calendar days' notice by serving a copy of the proposed Stalking Horse Notice on the Consultation Parties; (b) U.S. Trustee; (c) any Prospective Bidder (as defined in the Bidding Procedures); all counterparties to the proposed assumed contracts; and the (d) Sale Notice Parties as defined in the Bidding Procedures.  The Bid Protections, if utilized, and to the extent payable under any Stalking Horse Bidder's Proposed Asset Purchase Agreement, (a)(x) are actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, and (y) shall be treated as allowed administrative claims against the Debtors' estates pursuant to sections 105(a) of the Bankruptcy Code, are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidders, and (c) are fair, reasonable and appropriate, including in light of the size and nature of the sale transaction, the necessity to announce a sale transaction for the Assets, and the efforts that have been and will be expended by

the Stalking Horse Bidders. The Bid Protections are a material inducement for, and condition of, each Stalking Horse Bidder's execution of the applicable Stalking Horse Bidder's Proposed Asset Purchase Agreement. Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidders are unwilling to remain obligated to consummate the sale transaction or otherwise be bound under its Stalking Horse Bidder's Proposed Asset Purchase Agreement, (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

J.       Good and sufficient notice of the relief sought in the Motion has been provided under the circumstances, and no other or further notice is required except as set forth in the Bidding Procedures and the Assumption and Assignment Procedures.  A reasonable opportunity to object and be heard regarding the relief granted herein has been afforded to all parties-in-interest.

L.       The Sale Notice, the Publication Notice (as defined below), and the Assumption and Assignment Notice are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Sale Hearing, the Bidding Procedures, the Assumption and Assignment Procedures, the Debtors' proposed Cure Costs, and all relevant and important dates and deadlines with respect to the foregoing, and no other or further notice of the Auction, the sale of the Assets, or the assumption and assignment of Contracts in connection therewith shall be required.

K.       The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.       The Motion is GRANTED to the extent set forth herein.

2.       All objections to the relief granted in this Order that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included therein, are hereby overruled, and denied on the merits with prejudice.

**A.       The Timeline for the Sale**

3.       The Debtors are authorized to proceed with the sale transaction in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| | |
|---|---|
| **Two business days after the entry of the Bidding Procedures Order** | Deadline to file and serve Sale Notice |
| **Three business days after the entry of the Bidding Procedures Order** | Deadline to file and serve Assumption and Assignment Notice |
| **Within Five business days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter** | Deadline to publish Publication Notice |
| **March 10, 2025, at 4:00 p.m. (ET)** | Deadline for Debtors to designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement |
| **March 27, 2025, at 4:00 p.m. (ET)** | Bid Deadline |
| **March 28, 2025, at 4:00 p.m. (ET)** | Sale Objection Deadline, Cure Objection Deadline, and Contract Objection Deadline |
| **March 31, 2025, at 10:00 a.m. (ET)** | Auction (if necessary) |
| **Earlier of five (5) business hours after the conclusion of the Auction and Noon (ET) the calendar day after the conclusion of the Auction** | Deadline to file and serve Notice of Auction Results |
| **April 1, 2025 at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline (if necessary) |
| **12:00 p.m. (ET) one business day before the Sale Hearing** | Deadline to reply to any Sale Objections or Supplemental Sale Objections |
| **April 3, 2025 at [●:● a/p.m.] (ET) (subject to the Court's availability)** | Sale Hearing |
| **April 11, 2025** | Deadline to consummate approved Sale |

**B.     The Bidding Procedures**

4.     The Bidding Procedures attached hereto as **Exhibit 1** are hereby approved in their entirety and are incorporated by reference as if fully set forth herein.  The Bidding Procedures shall govern the selection of the Stalking Horse Bidder, bids and proceedings related to the Auction and the sale of the Assets.  The failure to specifically include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision.

5.     Subject to this Order and the Bidding Procedures, the Debtors, in the exercise of their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, shall have the right to, following consultation with any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee") and, solely to the extent it is not participating in the Auction as a bidder, or is a participant in any active or prospective Bid with respect to any Asset(s), and the DIP Lender,[3] if any, (collectively, in such capacities if applicable, the "Consultation Parties"):[4] (i) select a Stalking Horse Bidder and provide such Stalking Horse Bidder with Bid Protections; (ii) determine which bidders qualify as "Qualified Bidders," and which bids qualify as "Qualified Bids;" (iii) make final determinations as to whether the Debtors will conduct an Auction; (iv) select the Baseline Bid for the Assets; (v) determine the amount of each Minimum Overbid; (vi) determine the highest or otherwise best offer for the Assets (such bid, a "Leading Bid"); (vii) determine which Qualified Bid is the highest or otherwise best bid for the Assets (such Qualified Bid, including the Stalking Horse Bid if no other Qualified Bids are received and no Auction conducted, a "Successful Bid") and which Qualified Bid is the next

---

[3]   For the avoidance of doubt, nothing herein modifies the general information rights available to the DIP Lender under the DIP Credit Agreement, if any.

[4]   Any reference to a consent right of the DIP Lender hereunder shall be a reference to the consent of the DIP Lender under the DIP Documents, as applicable.

highest and otherwise best bid after the Successful Bid for the Assets (such Qualified Bid, a "Backup Bid"); (viii) reject any bid that is (a) inadequate or insufficient; (b) not in conformity with the requirements of this Order or any other applicable order of the Court, the Bidding Procedures, the Bankruptcy Code, or other applicable law; or (c) contrary to the best interests of the Debtors and their estates; (ix) adjourn or cancel the Auction in accordance with the Bidding Procedures; and (x) adjourn the Sale Hearing in accordance with the Bidding Procedures.

6.       In accordance with and subject to the Bidding Procedures, the Debtors, in the exercise of their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, shall have the right, in consultation with the Consultation Parties, to modify the Bidding Procedures, including to (a) extend or waive deadlines or other terms and conditions set forth herein or therein; (b) adopt new rules and procedures for conducting the bidding and Auction process so long as any such modifications are disclosed to all Prospective Bidders and Qualified Bidders; and (c) otherwise modify the Bidding Procedures to further promote competitive bidding for and maximizing the value of the Assets.

7.       In connection with the Sale of all or any portion of the Assets, a person or entity holding a perfected security interest in such Assets may seek to credit bid some or all of their claims for their respective collateral (each such bid, a "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code; provided that the Credit Bid complies with the orders of the Bankruptcy Court.  A Credit Bid may only be applied to reduce the cash consideration with respect to the Assets in which the party submitting the Credit Bid holds a security interest.  Each person or entity holding a valid, perfected security interest in Assets for which it submits a bid shall be deemed a Qualified Bidder with respect to its right to acquire such Assets by Credit Bid.

**B.      Stalking Horse Agreement and Bid Protections**

8.      The Stalking Horse Designation Procedures are approved, and the Debtors are authorized to seek approval of a Stalking Horse Agreement with a Stalking Horse Bidder and provide Bid Protections, in accordance with the Stalking Horse Designation Procedures.  The Debtors may designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement **no later than March 10, 2025, at 4:00 p.m. (prevailing Eastern Time)**, which deadline may be extended by the Debtors (after consultation with the Consultation Parties).

**C.      Bid Deadline and Auction**

9.      Any Prospective Bidder that intends to participate in the Auction must submit in writing to Houlihan Lokey (as defined below) (contact information in Sections I and III of the Bidding Procedures) a Qualified Bid on or before **March 27, 2025 at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").  The Debtors shall promptly provide a copy of each bid to each of the Consultation Parties, but in no event later than the day after the date of the Bid Deadline.

10.      If the Debtors receive more than one Qualified Bid for the Assets, the Debtors shall conduct an Auction for the Assets.

11.      The Auction, if required, will be conducted on **March 31, 2025, at 10:00 a.m. (prevailing Eastern Time)**, either (a) at the offices of Houlihan Lokey, 245 Park Avenue, 20th Floor, New York, New York 10167, (b) at some other physical location to be determined by the Debtors, or (c) virtually or at such other date, time or location as designated by the Debtors, after consulting with the Consultation Parties.  If the Debtors conduct the Auction virtually, the Debtors will provide instructions setting forth how to attend the Auction to the participants and other attendees via electronic mail.  The Debtors will provide notice (via electronic mail or otherwise) of any change in the date, time, or location of the Auction to Qualified Bidders and the

Consultation Parties and will cause publication of such change to occur on the Epiq Website (as defined below). If held, the Auction proceedings shall be transcribed or video recorded.

12. If the Debtors determine not to hold an Auction, the Debtors shall file with the Court, serve on the Sale Notice Parties (as defined in Section X.B of the Bidding Procedures), and cause to be published on the website maintained by Epiq Corporate Restructuring, LLC, the Debtors' claims and noticing agent in these Chapter 11 Cases, located at https://dm.epiq11.com/Nikola (the "Epiq Website"), a notice containing the following information (as applicable): (a) a statement that the Auction has been canceled; (b) the identity of the Successful Bidder; (c) either include a copy of the Successful Bid or a summary of the material terms of such bid, or provide instructions for accessing the Successful Bid free of charge from the Epiq Website; and (d) the date, time, and location of the Sale Hearing.

13. Only a Qualified Bidder that has submitted a Qualified Bid shall be eligible to participate in the Auction, subject to any other limitations as the Debtors may reasonably impose in accordance with the Bidding Procedures. Qualified Bidders participating in the Auction must attend the Auction personally or through a duly authorized representative. The Debtors may establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of a Qualified Bidder or otherwise attend the Auction.

14. Each Qualified Bidder participating in the Auction shall confirm in writing on the record that (a) it has not engaged in any collusion with respect to the Auction or the submission of any bid for any of the Assets; and (b) the Qualified Bid that gained the Qualified Bidder admission to participate in the Auction and each Qualified Bid submitted by the Qualified Bidder at the Auction constitutes a binding, good-faith, and *bona fide* offer to purchase the Assets identified in such bids.

15.     Upon the earlier to occur of (i) five (5) business hours after the conclusion of the Auction; and (ii) Noon (prevailing Eastern Time) the calendar day after the conclusion of the Auction, the Debtors shall file with the Court, serve on the Sale Notice Parties, and cause to be published on the Epiq Website, a notice setting forth the results of the Auction (the "Notice of Auction Results").  The Notice of Auction Results will (a) identify each Successful Bidder and each Backup Bidder, as applicable; (b) either include a copy of each Successful Bid and each Backup Bid or a summary of the material terms of such bid, or provide instructions for accessing each Successful Bid and each Backup Bid free of charge from the Epiq Website; and (c) set forth the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction.

**D.      Sale Noticing and Objection Procedures**

16.     Except objections to the conduct of the Auction, the Successful Bidder or the Backup Bidder, all objections to the sale of the Assets (each, a "Sale Objection"), including (a) any objection to the sale of any Assets free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code to a Successful Bidder, and/or a Backup Bidder (as applicable) and (b) any objection to the entry of any Sale Order shall be (i) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (ii) filed with the Court by **no later than March 28, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"); and (iii) served on the Objection Notice Parties (as defined in Section X.D of the Bidding Procedures).

17.     Following service of the Notice of Auction Results, parties in interest may file an objection solely with respect to the conduct of the Auction, the Successful Bidder, the Backup Bidder, or the Sale to the Successful Bidder or the Backup Bidder (in each case, if such bidder is

not the Stalking Horse Bidder) (each such objection, a "Supplemental Sale Objection"). Any Supplemental Sale Objection shall be (a) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (b) filed with the Court by **no later than April 1, 2025 at 4:00 p.m. (prevailing Eastern Time)** (the "Supplemental Sale Objection Deadline"); and (c) served on the Objection Notice Parties.

18.    Any party who fails to file and serve a timely Sale Objection or Supplemental Sale Objection in accordance with the terms of this Order shall be forever barred from asserting, at the Sale Hearing or thereafter, any Sale Objection or Supplemental Sale Objection to the relief requested in the Motion, or to the consummation or performance of the sale of the Assets, including the transfer of Assets to the Successful Bidder free and clear of liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" to such sale for purposes of section 363(f) of the Bankruptcy Code.

19.    The Debtors or any other party in interest may file a reply to any Sale Objection or Supplemental Sale Objection, if any, by **no later than 12:00 p.m. (prevailing Eastern Time) one business day before the Sale Hearing.**

20.    Consummation of the sale of the Assets pursuant to a Successful Bid shall be subject to Court approval. The Sale Hearing to (a) approve a sale of all, substantially all, or a portion of the Assets to the Stalking Horse Bidder or another Successful Bidder(s) and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held before the Court on **April 3, 2025 at [●:● a/p.m.] (prevailing Eastern Time)**; *provided, that*, the Debtors may seek an adjournment or rescheduling of the Sale Hearing, consistent with the Bidding Procedures and this Order. At the Sale Hearing, the Debtors will seek Court approval of the Successful Bid(s) and the Backup Bid(s) (if any). Unless the Court orders

otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the sale transaction and there will be no further bidding at the Sale Hearing.  If the Successful Bidder(s) cannot or refuses to consummate the Sale(s) because of the breach or failure on the part of such Successful Bidder, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the applicable transaction with the Backup Bidder without further order of the Court.

21.     The Sale Notice, substantially in the form attached hereto as **Exhibit 2**, is approved, and no other or further notice of the proposed sale of the Assets, the Auction, the Sale Hearing, the Sale Objection Deadline, or the Supplemental Sale Objection Deadline shall be required if the Debtors serve and publish the Sale Notice in the manner provided in the Bidding Procedures and this Order.  **By no later than two (2) business days after entry of the Bidding Procedures Order**, the Debtors shall file with the Court, serve on the Sale Notice Parties, and cause to be published on the Epiq Website, the Sale Notice.

22.     Within five (5) business days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors shall post the Sale Notice on the Epiq Website and cause the information contained in the Sale Notice, with such modifications as may be appropriate for purposes of publication, to be published once in the national edition of either the Wall Street Journal, USA Today, The New York Times (national edition) or another publication of similar distribution (the "Publication Notice").

E.      **Assumption and Assignment Procedures**

23.     The Assumption and Assignment Notice, substantially in the form attached hereto as **Exhibit 3**, is approved, and no other or further notice of the Debtors' intention to assume or assign the Contracts or of the Debtors' proposed Cure Costs is necessary or required.

24.     **By no later than three (3) business days after entry of the Bidding Procedures Order**, the Debtors shall file with the Court, serve on the applicable Counterparties (and counsel, if known), and cause to be published on the Epiq Website, the Assumption and Assignment Notice.

25.     To the extent the Debtors, at any time after the deadline to file and serve the Assumption and Assignment Notice (i) identify additional Contracts to be assumed and assigned to any Stalking Horse Bidder or other Successful Bidder (the "Additional Contracts"), (ii) remove Contracts from the list of executory contracts and leases proposed to be assumed and assigned in connection with the sale of the Assets, (iii) and/or modify the previously stated Cure Cost associated with any Contracts, the Debtors will promptly file with this Court and serve by first-class mail or email a supplemental notice of contract assumption (a "Supplemental Assumption and Assignment Notice") on each of the counterparties to such Contracts and their counsel of record, if any.  Each Supplemental Assumption and Assignment Notice will include the same information with respect to listed Additional Contracts as was included in the initial Assumption and Assignment Notice.  Any Stalking Horse Bidder may designate Additional Contracts to be assumed and assigned at any time until two (2) Business Days prior to the Closing Date (as defined in the Stalking Horse Agreement), and may remove Contracts from the list of Contracts at any time until two (2) Business Days prior to the Closing Date.  Counterparties to Additional Contracts or that otherwise receive a Supplemental Assumption and Assignment Notice shall have until 4:00 p.m. (prevailing Eastern Time) on the date that is ten (10) days after the filing and service of the

Supplemental Assumption and Assignment Notice by the Debtors to the Counterparty to file a Cure Objection (as defined herein)

26.     Any objection to the Debtors' proposed Cure Costs (each such objection, a "Cure Objection") shall be (a) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (b) filed with the Court by **no later than March 28, 2025, at 4:00 p.m. (prevailing Eastern Time)**; and (c) served on the Objection Notice Parties.

27.     The Debtors, any Stalking Horse Bidder or, as applicable, the Successful Bidder, and the objecting Counterparty shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention.  If the parties are unable to consensually resolve the Cure Objection prior to the commencement of the Sale Hearing, the Court will make all necessary determinations relating to the applicable Cure Costs and Cure Objection at a hearing scheduled pursuant to this Order.  If a Cure Objection is resolved in a manner that is not in the best interests of the Debtors and their estates, whether or not such resolution occurs prior to or after the closing of the sale of the Assets, the Debtors, any Stalking Horse Bidder or, as applicable, the Successful Bidder, may determine that any Contract subject to such resolved Cure Objection no longer will be assumed and assigned in connection with the sale of the Assets (subject to the terms of the applicable purchase agreement); *provided* that in the case of an unexpired lease of nonresidential real property, such determination shall be prior to the expiration of the applicable deadline to assume or reject unexpired leases under section 365(d)(4) of the Bankruptcy Code.  All other objections to the Debtors' proposed assumption and assignment of the Debtors' right, title, and interest in, to, and under a Contract shall be heard at the Sale Hearing.

28.     If a timely Cure Objection cannot otherwise be resolved by the parties, the Cure Objection may be heard at the Sale Hearing or, at the option of the Debtors and the Successful Bidder, be adjourned to a subsequent hearing, with notice to the party having filed the Cure Objection (each such Cure Objection, an "Adjourned Cure Objection").  An Adjourned Cure Objection may be resolved after the closing date of the sale of the Assets.  Upon resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any, the Contract that was the subject of such Adjourned Cure Objection shall, at the election of the Successful Bidder, and subject to the Debtors' rights set forth in paragraph 30 of this Order, be deemed assumed and assigned to the Successful Bidder as of the closing date of the sale of the Assets.

29.     If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty forever shall be barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract.  The Cure Costs set forth in the applicable Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code, and the Counterparty to the Contract shall be bound by and deemed to have consented to the Cure Costs.

30.     In accordance with the Bidding Procedures, Qualified Bids shall be accompanied by Adequate Assurance Information (as defined in the Bidding Procedures).  The Debtors shall promptly provide, upon a Counterparty's request to the Debtors' counsel, the Adequate Assurance Information to any Counterparty (and counsel, if known) to any Contract that may be assumed by the applicable Qualified Bidder.  Any Adequate Assurance Information provided to a Counterparty shall be provided on a confidential basis unless otherwise agreed by the applicable Qualified Bidder.

16

31.     Any objection to the proposed assumption and assignment of a Contract, the subject of which objection is a Successful Bidder's (or any other relevant assignee's), other than the Stalking Horse Bidder's, proposed form of adequate assurance of future performance with respect to the Contract (each such objection, an "Adequate Assurance Objection" and, together with a Cure Objection, a "Contract Objection"), shall be (a) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (b) filed with the Court by **no later than April 1, 2025 at 4:00 p.m. (prevailing Eastern Time)**; and (c) served on the Objection Notice Parties.

32.     The Debtors, the Successful Bidder, and a Counterparty that has filed an Adequate Assurance Objection shall first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention.  If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the Successful Bidder (or any other relevant assignee) shall be determined by the Court at the Sale Hearing or, at the option of the Debtors and the Successful Bidder, be adjourned to a subsequent hearing, with notice to the party having filed the Adequate Assurance Objection.

33.     If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of a Contract with regard to adequate assurance of future performance.  The Successful Bidder (or any other relevant assignee) shall be deemed to have provided adequate assurance of future performance with respect to a Contract in accordance with Bankruptcy Code sections 365(b)(1)(C), 365(f)(2)(B), and, if applicable,

17

Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document.

34.     If a Contract Objection is resolved in a manner that is not in the best interests of the Debtors and their estates, whether or not such resolution occurs prior to or after the closing of the sale of the Assets, the Debtors or the Successful Bidder may determine that any Contract subject to such resolved Contract Objection no longer will be assumed and assigned in connection with the sale of the Assets (subject to the terms of the applicable purchase agreement).

35.     If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Contract Objection, (i) the Counterparty shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Contract, (ii) the Successful Bidder shall be deemed to have provided adequate assurance of future performance with respect to a Contract in accordance with Bankruptcy Code sections 365(b)(1)(C), 365(f)(2)(B), and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document, (iii) the Counterparty shall be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder), (iv) any and all defaults under the Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and upon payment of the Cure Costs set forth in the Assumption and Assignment Notice for such Contract, and the Counterparty shall be forever barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract, and (v) the Counterparty shall be forever barred from asserting any other claims related to such Contract against the Debtors and their estates or

the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving such Contract Objection and any Sale Order.

36.    As soon as reasonably practicable after the closing of the sale of the Assets, the Debtors shall file with the Court, serve on the applicable Counterparties, and cause to be published on the Epiq Website, a notice containing the list of Contracts that the Debtors assumed and assigned pursuant to any asset purchase agreement with a Successful Bidder on the closing date of the sale of the Assets.

37.    The inclusion of a Contract or Cure Costs with respect to any Contract on any Assumption and Assignment Notice, shall not constitute or be deemed a determination or admission by the Debtors, any Successful Bidder, or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned.  The Debtors reserve all of their rights, claims, and causes of action with respect to each Contract listed on any Assumption and Assignment Notice.

**F.    Other Related Relief**

38.    Notwithstanding anything herein or in the Bidding Procedures to the contrary, the Debtors shall not be permitted to modify the consultation rights of the Consultation Parties in the Bidding Procedures absent further order of this Court or the consent of any affected Consultation Parties, *provided, however,* that the Debtors will not consult with or provide copies of any bids or other confidential information to any Consultation Party or any insider or affiliate of the Debtors if such party is an active bidder for the Assets at the applicable time, and *provided, further,* that if a member of the Committee submits a Qualified Bid for the Assets, the Committee will maintain its consultation rights as a Consultation Party, *provided* that the Committee shall exclude the

bidding Committee member from any discussions or deliberations regarding a transaction involving the relevant Assets, and shall not provide any confidential information regarding the Assets or otherwise involving the Sale Process to such bidding Committee member. Notwithstanding anything to the contrary herein, (i) upon written notice (which may be via email) by the DIP Lender, if any, or such Committee member to the Debtors, or express confirmation on the record, if applicable, during the Auction, of its permanent withdrawal as a bidder for the Assets, the DIP Lender's rights and such Committee member's rights, as applicable, as a Consultation Party shall be restored, and (ii) during any period in which a Consultation Party has submitted a Qualified Bid and has become a Qualified Bidder hereunder, such Consultation Party shall no longer be considered a Consultation Party for purposes of the Bidding Procedures and shall only receive the same diligence, information, and notice as all other Qualified Bidders, unless and until such party unequivocally revokes its bid and waives its right to continue in the Auction process. For the avoidance of doubt, once a Committee member becomes a Consultation Party after withdrawing as a bidder for the Assets, such member shall not be permitted to again become an active bidder for the Assets.

39.     All persons and entities that participate in the Auction or bid for the Assets during the Sale Process shall be deemed to have knowingly and voluntarily (a) consented to the core jurisdiction of the Court to enter any order related to the Bidding Procedures, the Auction, or any other relief requested in the Motion or granted in this Order; (b) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction, or any other relief requested in the Motion or granted in this Order; and (c) consented to the entry of a final order or judgment in connection with any disputes relating to the Bidding Procedures, the Auction, or any other relief requested in the Motion or granted in this Order, if it is determined that the Court would

lack Article III jurisdiction to enter such a final order or judgment absent the consent of the relevant parties.

40.     Nothing in this Order or the Bidding Procedures shall (i) prevent the Debtors from, in the exercise of their fiduciary duties, pursuing or otherwise consummating an alternative transaction or (ii) obligate the Debtors to pursue or consummate any transaction with any Qualified Bidder.

41.     Notwithstanding the applicability of any of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or any other provisions of the Bankruptcy Rules or the Local Rules stating to the contrary, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

42.     The Debtors are authorized to take all steps necessary or appropriate to implement the relief granted in this Order.

43.     This Order shall be binding on and inure to the benefit of the Debtors, including any Chapter 7 or Chapter 11 trustee or other fiduciary appointed for the estate of the Debtors.

44.     This Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

45.     To the extent any of the deadlines set forth in this Order do not comply with the Local Rules or the Bankruptcy Rules, such rules are waived and the terms of this Order shall govern.

46.     This Court shall retain jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.

## <u>Exhibit 1</u>

**Bidding Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Nikola Corp., *et al.*,[1] | Case No. 25-10258 (TMH) |
| Debtors. | (Joint Administration Requested) |

## BIDDING PROCEDURES

The above-captioned debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases will use the procedures set forth herein (the "Bidding Procedures") in connection with a sale or disposition of all, substantially all, or a portion of the Debtors' assets (the "Assets").

On February [__], 2025, the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. __] (the "Motion"). By the Motion, the Debtors sought, among other things, entry of an order approving Bidding Procedures for soliciting bids for an auction (the "Auction") of, and consummating a sale of, the Assets, as further described herein.

On March [__], 2025, the Court entered an *Order (A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment*

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Nikola Corporation (registered to do business in California as Nikola Truck Manufacturing Corporation) (1153); Nikola Properties, LLC (3648); Nikola Subsidiary Corporation (1876); Nikola Motor Company LLC (0193); Nikola Energy Company LLC (0706); Nikola Powersports LLC (6771); Free Form Factory Inc. (2510); Nikola H2 2081 W Placentia Lane LLC (N/A); 4141 E Broadway Road LLC (N/A); and Nikola Desert Logistics LLC (N/A). The Debtors' headquarters are located at 4141 East Broadway Road, Phoenix, AZ 85040.

*Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief* [Docket No. [__]] (the "Order").[2]

## I.    ASSETS FOR SALE

The Debtors intend to sell all, substantially all, or a portion of their Assets.  The ability to undertake and consummate a sale of the Assets shall be subject to competitive bidding, as set forth herein, and approval by the Court.

A Prospective Bidder (as defined in Section III below) may bid on the Assets, subject to the conditions set forth herein.

The ability to undertake and consummate a sale of the Assets shall be subject to competitive bidding, as set forth herein, and approval by the Court.  In addition to any Stalking Horse Bid (as defined in the Motion), and as set forth herein, the Debtors will consider bids for the Assets from other parties.

Parties may submit bids for all or some of the Debtors' business and assets, including for parts of the Debtors' business or assets (each, a "Partial Bid"), which bids may be combined with other Partial Bids or be considered independently and/or together with the liquidation value (as reasonably determined by the Debtors in good faith) of the Debtors' business or assets that are not the subject of other Partial Bids to be deemed a Qualified Bid.

Any party interested in submitting a bid for any of the Debtors' Assets should contact the following individuals at Houlihan Lokey Capital, Inc. ("Houlihan Lokey"):

**Houlihan Lokey Capital, Inc.**
245 Park Avenue, 20th Floor
New York, NY 10167
Attn: Drew M. Talarico and Marcus Bellows
DTalarico@HL.com | (212) 497-4240
MBellows@HL.com | (212) 497-4214

---

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in these Bidding Procedures, the Motion, or the Order, as applicable.

## II.    KEY DATES AND DEADLINES

| | |
|---|---|
| **Two business days after the entry of the Bidding Procedures Order** | Deadline to file and serve Sale Notice |
| **Three business days after the entry of the Bidding Procedures Order** | Deadline to file and serve Assumption and Assignment Notice |
| **Within Five business days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter** | Deadline to publish Publication Notice |
| **March 10, 2025, at 4:00 p.m. (ET)** | Deadline for Debtors to designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement |
| **March 27, 2025, at 4:00 p.m. (ET)** | Bid Deadline |
| **March 28, 2025, at 4:00 p.m. (ET)** | Sale Objection Deadline, Cure Objection Deadline, and Contract Objection Deadline |
| **March 31, 2025, at 10:00 a.m. (ET)** | Auction (if necessary) |
| **Earlier of five (5) business hours after the conclusion of the Auction and Noon (ET) the calendar day after the conclusion of the Auction** | Deadline to file and serve Notice of Auction Results |
| **April 1, 2025 at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline (if necessary) |
| **12:00 p.m. (ET) one business day before the Sale Hearing** | Deadline to reply to any Sale Objections or Supplemental Sale Objections |
| **April 3, 2025 at [●:● a/p.m.] (ET) (subject to the Court's availability)** | Sale Hearing |
| **April 11, 2025** | Deadline to consummate approved Sale |

**III.    DUE DILIGENCE**

Each person or entity that desires to participate in the Auction process (each, a "<u>Prospective Bidder</u>") must first deliver to Houlihan Lokey (contact information in Section I above and in this Section III) the following:

- documentation identifying the Prospective Bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale;

- an executed confidentiality agreement, in form and substance satisfactory to the Debtors;

- a statement and other factual support demonstrating to the Debtors and their advisors, in their sole judgment, that the Prospective Bidder has a *bona fide* interest in purchasing some or all of the Assets; and

- preliminary proof by the Prospective Bidder of its financial capacity to close a proposed sale transaction, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Prospective Bidder (or, if the Prospective Bidder is an entity formed for the purpose of acquiring the Assets to be sold, the party that will bear liability for a breach by the Prospective Bidder of an asset purchase agreement or other agreement entered into in respect of the sale transaction), the adequacy of which the Debtors and their advisors will determine in their sole judgment.

Without the need for any further action, any Stalking Horse Bidder is a Qualified Bidder (as defined in Section VI.C below).

Upon execution of a valid confidentiality agreement and subject to the other limitations and guidelines set forth herein, the Debtors may grant a Prospective Bidder that the Debtors identify as reasonably likely to become a Qualified Bidder with access to information contained in the Debtors' confidential electronic data room (the "<u>Data Room</u>") allowing such Prospective Bidder to conduct due diligence with respect to the potential acquisition of some or all of the Assets.  Access may be terminated by the Debtors in their reasonable discretion at any time for any reason whatsoever, including that a Potential Bidder does not become a Qualified Bidder, these Bidding Procedures are terminated, the Potential Bidder breaches any obligations under its confidentiality agreement or the Debtors become aware that information submitted by the Potential Bidder for requesting access to the Data Room is inaccurate or misleading.  The Debtors may restrict or limit access of a Potential Bidder to the Data Room if the Debtors determine, based on their reasonable business judgment that certain information in the Data Room is sensitive, proprietary, or otherwise not appropriate for disclosure to such Potential Bidder.

If the Debtors determine, after consultation with the Consultation Parties, that a Prospective Bidder is unlikely to qualify as a Qualified Bidder or fails to become a Qualified Bidder, then such Prospective Bidder shall have no further right to access due diligence or any other non-public information.  The Prospective Bidder shall return or destroy any non-public information the Debtors or their advisors provided to the Prospective Bidder in accordance with the terms of the confidentiality agreement executed by the Debtors and the Prospective Bidder.  For purposes hereof, the term "Consultation Parties" shall include any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee")[3] and, solely to the extent it is not participating in the Auction as a bidder, or is a participant in any active or prospective Bid with respect to any Asset(s), the DIP Lender,[4] if any, (collectively, in such capacities if applicable, the "Consultation Parties").

The Debtors will try to accommodate all reasonable requests from Prospective Bidders for additional information and due diligence access.  All due diligence requests shall be directed to Drew Talarico (DTalarico@HL.com) and Marcus Bellows (MBellows@HL.com).

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Debtors' businesses or assets to any person or entity who (i) is not a Potential Bidder, (ii) does not comply with the participation requirements set forth herein, or (iii) in the case of competitively sensitive information, is a competitor of the Debtors, in the reasonable business judgment of the Debtors after consulting with the Consultation Parties; *provided*, *however*, that with respect to any strategic bidders, the Debtors will make reasonable commercial efforts to provide such strategic bidders with the same information provided to the Stalking Horse Bidder.

Each Qualified Bidder shall be deemed to acknowledge and represent (i) that it has had an opportunity to (x) conduct any and all due diligence regarding the applicable acquired Assets prior to making a bid and (y) investigate and/or inspect any documents and the applicable acquired Assets in making its bid; (ii) that it has relied solely upon its own independent review in making its bid; and (iii) that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise regarding the applicable acquired Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures.  The Debtors and their respective estates are not responsible for, and will have no liability with respect to, any information obtained by, or provided to, any Potential Bidders in connection with these Bidding Procedures and the Sale Transactions.

---

[3]  If a member of the Committee submits a Qualifying Bid, the Committee will continue to have consultation rights as set forth in these Bid Procedures; provided that the Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any information regarding the sale of the Assets to such member.

[4]  For the avoidance of doubt, nothing herein modifies the general information rights available to the DIP Lender under the DIP Credit Agreement, if any.

**IV.   STALKING HORSE AGREEMENT AND BID PROTECTIONS**

The procedures set forth in this section (the "<u>Stalking Horse Designation Procedures</u>") shall apply to the designation of any Stalking Horse Bidder, Stalking Horse Agreement and Bid Protections.

Subject to the provisions set forth herein, the Bidding Procedures Order, and in consultation with the Consultation Parties, the Debtors may designate a Stalking Horse Bidder that submits a Qualified Bid (as defined below) acceptable to the Debtors and enter into a Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction, **no later than March 10, 2025, at 4:00 p.m. (prevailing Eastern Time)**, which deadline may be extended by the Debtors (after consultation with the Consultation Parties).

In the event the Debtors select a Stalking Horse Bidder, the Debtors shall provide three (3) calendar days' notice to the Sale Notice Parties, any Prospective Bidder, and all counterparties to the proposed assumed contracts.  Absent objection from the Sale Notice Parties, any Prospective Bidder (as defined in the Bidding Procedures), and all counterparties to the proposed assumed contracts within the three (3) day notice period, the Debtors may offer the following Bid Protections to the Stalking Horse Bidder: (i) break-up fees, if any, in an amount not to exceed three percent (3%) of the Qualified Bid and (ii) reimbursement of expenses, if any, for documented, actual and necessary expenses incurred by any Stalking Horse Bidder in connection with the submitting its Qualified Bid in an amount not to exceed $400,000.00 (collectively, the "<u>Bid Protections</u>").

With such consent, the Debtors shall be authorized to submit a proposed order to the Court under certification of counsel that approves such Bid Protections (the "<u>Stalking Horse Order</u>").  The Debtors will cause a copy of a notice of entry of the Stalking Horse Order to be served on the Sale Notice Parties, all counterparties to the proposed assumed contracts and any Prospective Bidder.

If any Consultation Party or the Office of the United States Trustee (the "<u>U.S. Trustee</u>") object to the proposed Bid Protections and entry of the Stalking Horse Order, the Debtors shall be authorized to file a notice seeking an expedited hearing on not less than three (3) calendar days' notice (the "<u>Stalking Horse Hearing</u>").  All parties-in-interest shall have the right at the Stalking Horse Hearing to object to the Debtors' entry into a Stalking Horse Agreement on any grounds, including to object to the Bid Protections and the form of Stalking Horse Order.  If the Debtors, in consultation with the other Consultation Parties, determine that the Bid Protections must exceed the amounts set forth herein, the Debtors shall request that the Court hold a hearing on the approval of any such greater Bid Protections on an expedited basis.

Any Stalking Horse Agreement executed by the Debtors and the transactions contemplated thereby will be deemed a Qualified Bid (as defined below) for all purposes, and any Stalking Horse Bidder party to a Stalking Horse Agreement executed by the Debtors will be deemed to be a Qualified Bidder (as defined below).

Other than as provided by order of the Court, no party submitting a Bid shall be entitled to a break-up fee or expense reimbursement except for the Bid Protections for any Stalking Horse Bidder. Any substantial contribution claims by any bidder are deemed waived.

## V.    BID DEADLINE

Any Prospective Bidder that intends to participate in the Auction must submit in writing to the Bid Notice Parties a Qualified Bid (as defined in Section VI.C below) on or before **March 27, 2025 at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"). The Debtors shall (subject to Section XI.C hereof) promptly provide a copy of each bid to each of the Consultation Parties, but in no event later than the day after the date of the Bid Deadline.

## VI.    BID REQUIREMENTS

### A.    Qualified Bid Requirements

To qualify as a "Qualified Bid," a bid must be in writing and satisfy the following requirements:

1.    Identification of Bidder. A Qualified Bid must fully disclose the following: (a) the legal identity of each person or entity bidding for the Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such bid), or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such bid) the Auction in connection with such bid and the complete terms of any such participation; and (b) any past or present connections or agreements with the Debtors, any Stalking Horse Bidder, any other known Prospective Bidder or Qualified Bidder, the DIP Lender, if any, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtors).

2.    Purchased Assets. A Qualified Bid must identify the following:

   a.    the Assets to be purchased, including any executory contracts and unexpired leases (collectively, the "Contracts") that, as of the submission of such bid, the Prospective Bidder proposes to be assumed and assigned by the Debtors in connection with the proposed Sale; and

   b.    the liabilities, if any, to be assumed, including any debt to be assumed.

3.    Form of Consideration.

   a.    Consideration. Each Qualified Bid must include a statement confirming that the bid is based on an all-cash offer, or if a bid includes forms of consideration other than cash, the bidder shall include an analysis or description of the value of such non-cash

components, including any supporting documentation, to assist the Debtors and the Consultation Parties in evaluating the bid.

b.    <u>Credit Bidding</u>.  In connection with the Sale of all or any portion of the Assets, a person or entity holding a perfected security interest in such Assets may seek to credit bid some or all of their claims for their respective collateral (each such bid, a "<u>Credit Bid</u>") pursuant to section 363(k) of the Bankruptcy Code; <u>provided</u> that the Credit Bid complies with the orders of the Bankruptcy Court.  A Credit Bid may only be applied to reduce the cash consideration with respect to the Assets in which the party submitting the Credit Bid holds a security interest.  Each person or entity holding a valid, perfected security interest in Assets for which it submits a bid shall be deemed a Qualified Bidder with respect to its right to acquire such Assets by Credit Bid.

4.    <u>Minimum Bid for Assets</u>.  If a Stalking Horse Bidder has been designated, each bid that is not a Stalking Horse Bid must have a value to the Debtors, as determined by the Debtors, in consultation with the Consultation Parties, that is greater than or equal to the sum of (a) the value offered under the Stalking Horse Agreement, <u>plus</u> (b) the amount of the Bid Protections, <u>plus</u> (c) $100,000 (collectively, the "<u>Minimum Bid Amount</u>").  Any subsequent bid made by the Stalking Horse Bidder shall be deemed to have been made in an amount equal to such subsequent bid plus the Break-Up Fee and the Expense Reimbursement, to the extent provided for in the Stalking Horse Agreement.

If the value of a bid relative to the Stalking Horse Bid includes non-cash components (such as fewer contingencies than are in such Stalking Horse Agreement), the bidder should include an analysis or description of the value of any such additional non-cash components, including any supporting documentation, to assist the Debtors and the Consultation Parties in better evaluating the competing bid.  The Debtors, in consultation with their advisors and the Consultation Parties, reserve the right in their sole discretion to ascribe a value to any non-cash components of competing bids and the Stalking Horse Bid.

If a Stalking Horse Bidder is not designated pursuant to the Stalking Horse Designation Procedures, the Debtors may set a minimum bid requirement, which shall be considered the Minimum Bid Amount for all purposes hereunder.  In such case, the Debtors will file a notice on the docket identifying the Minimum Bid Amount **no later than March 13, 2025 at 5:00 p.m. (prevailing Eastern Time)** and shall serve such notice on any known potential bidder.

5.    <u>Proposed Asset Purchase Agreement</u>.  A Qualified Bid must constitute an irrevocable offer and be in the form of an asset purchase agreement

reflecting the terms and conditions of the bid (each, a "Proposed Asset Purchase Agreement"). A Proposed Asset Purchase Agreement shall be (a) duly authorized and executed; (b) based on, and marked against the form asset purchase agreement attached to the Bidding Procedures as Exhibit A (the "Form APA") or, if a Stalking Horse Bidder has been designated, the Stalking Horse Agreement, to reflect the proposed sale transaction and to show any other proposed modifications to the Form APA or Stalking Horse Agreement, as applicable; (c) specify the proposed purchase price for the Assets in U.S. dollars; (d) include all exhibits and schedules contemplated thereby (other than exhibits and schedules that, by their nature, must be prepared by the Debtors); and (e) identify any Contracts that, as of the submission of such bid, the Prospective Bidder proposes to be assumed and assigned by the Debtors in connection with the proposed sale transaction.

6.  Proposed Sale Order. A Qualified Bid must include a proposed sale order (each, a "Proposed Sale Order"), and be marked against the proposed Sale Order, which the Debtors will file with the Court in advance of the Bid Deadline.

7.  Financial Information. A Qualified Bid must include the following:

    a.  a statement that the Prospective Bidder is financially capable of consummating the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement and Proposed Sale Order;

    b.  sufficient evidence, as determined by the Debtors in their sole discretion, to determine that the Prospective Bidder has, or will obtain, the financial wherewithal to consummate the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement and Proposed Sale Order; and

    c.  Adequate Assurance Information (as defined in Section VI.A.9 below) with respect to any Contracts included or that may be included in the Prospective Bidder's bid, including the identity of any known proposed assignee of the applicable Contracts (if different from the Prospective Bidder), including contact information for such proposed assignee;

8.  Good Faith Deposit. Each Qualified Bid (other than the Stalking Horse Bid) must be accompanied by a good faith deposit (each, a "Good Faith Deposit") in the form of cash in an amount equal to ten percent (10%) of the proposed purchase price for the Assets. The Good Faith Deposits shall be deposited **no later than March 27, 2025 at 4:00 pm (prevailing Eastern Time)** with an escrow agent selected by the Debtors (the "Escrow Agent") and held in escrow until ten (10) business days after the conclusion of the Auction, except for the Good Faith Deposit of any bidder who is

9

selected at the Auction as a Successful Bidder or as a Backup Bidder, and thereafter returned to the respective Qualified Bidders in accordance with Section VII.D of these Bidding Procedures.

9.  Adequate Assurance.  A Qualified Bid must include evidence of the Prospective Bidder's (or any other relevant assignee's) ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to perform future obligations arising under any Contracts included in its bid.  The Debtors may require the following information in connection with demonstrating adequate assurance of future performance: (a) information evidencing the Prospective Bidder's (or any other relevant assignee's) financial wherewithal and willingness to perform under any Contracts included in the bid, which information may include (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control, (ii) financial statements, (iii) tax returns, and (iv) annual reports; and (b) the Prospective Bidder's (or any other relevant assignee's) proposed use of any leased premises or other property included in the bid (the information described in clauses (a) and (b) of this Section VI.A.9, the "Adequate Assurance Information").

All Adequate Assurance Information must be in a form that will permit its immediate dissemination to Contract counterparties ("Counterparties").

10.  Representations and Warranties (As-Is, Where-Is).  Each Qualified Bid must include a written acknowledgement and representation that (a) the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its Qualified Bid, (b) the Prospective Bidder has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets in making its Qualified Bid, (c) the Prospective Bidder did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Prospective Bidder's Proposed Asset Purchase Agreement, and (d) the Assets will be conveyed "as is, where is, with all faults," with limited representations and warranties, and no indemnification or guarantees by the Debtors.

11.  Authorization.  A Qualified Bid must (a) include evidence of authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of any bid for the Assets, participation in the Auction, and closing of the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement and Proposed Sale Order; or, (b) if the

Prospective Bidder is an entity formed for the purpose of effecting the proposed sale transaction, a Qualified Bid must provide written evidence acceptable to the Debtors of authorization and the approval by the equity holder(s) of such Prospective Bidder.

12. <u>Other Requirements</u>.  A Qualified Bid must:

a.   state that the Prospective Bidder agrees to serve as a backup bidder (a "<u>Backup Bidder</u>") if such bidder's Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid (as defined in Section VII.C.1 below) for the Assets (each such bid, a "<u>Backup Bid</u>");

b.   state that the bid represents a binding, good-faith, and *bona fide* offer to purchase the Assets and is not subject to or conditioned on any further due diligence, and is irrevocable (i) until the selection of the Successful Bid in accordance with these Bidding Procedures; or (ii) if the bid is selected as a Successful Bid or as a Backup Bid, until the Backup Bid Expiration Date (as defined in Section VII.C.2 below);

c.   for any bidder other than a Stalking Horse Bidder, state and acknowledge that the Prospective Bidder shall not be entitled to any bidding protection or payment in connection with the submission of a bid for the Assets or otherwise participating in the Sale Process;

d.   state that the Prospective Bidder is committed to closing the sale transaction contemplated in its bid as soon as practicable (and in no event later than April 11, 2025);

e.   expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the Sale Process;

f.   not contain any financing contingencies of any kind;

g.   state whether the Prospective Bidder intends to offer future employment to any of the Debtors' employees and, if so, to whom;

h.   certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture, or other entity in which more than one bidder (or any affiliates of a bidder) has a direct or indirect interest, unless consented to in writing by the Debtors;

> i.   include a covenant to comply with the terms of these Bidding Procedures and the Bidding Procedures Order; and
>
> j.   contain such other information as may be reasonably requested by the Debtors.

**B.     Bid Review Process**

The Debtors will evaluate bids and, based upon their evaluation of the content of each bid, the Debtors may, as they deem appropriate in their reasonable business judgment and in a manner consistent with their fiduciary duties and applicable law, engage in negotiations with any Prospective Bidder for the purposes of (i) curing any deficiencies in a bid that prevents them from constituting a Qualified Bid, (ii) improving the terms of the Prospective Bidder's bid, or (iii) otherwise promoting a more competitive bidding and Auction process with the ultimate goal of maximizing the value of the Assets.

In evaluating a bid, the Debtors may take into consideration any and all factors that the Debtors deem reasonably pertinent, including (i) the amount of the proposed purchase price and proposed form of consideration (provided that any Credit Bid satisfying the requirements set forth in the Order and the Bidding Procedures shall be deemed to have the same value as the equivalent amount of cash); (ii) any Assets included in, or excluded from, the bid, including any Contracts to be assumed and assigned; (iii) the value to be provided to the Debtors under the bid, including the net economic effect on the Debtors' estates; (iv) any benefits to the Debtors' estates from any assumption or waiver of liabilities contemplated by the bid; (v) the structure of the proposed sale transaction and any attendant execution risk, including conditions to, timing of, and certainty of closing; termination provisions; availability of financing and general financial wherewithal to meet all commitments; and any required governmental approvals; and (vi) the impact of the proposed sale transaction on the Debtors' employees, trade creditors, landlords, and any other parties-in-interest.

The Debtors will evaluate timely bids and will (i) after consultation with the Consultation Parties (subject to Section XI.C hereof), determine which bids qualify as Qualified Bids and which Qualified Bid has been selected as the Baseline Bid and (ii) notify bidders whether they are Qualified Bidders as soon as commercially reasonable following the Bid Deadline.  A Qualified Bidder shall not (without the consent of the Debtors), modify, amend, or withdraw its Qualified Bid, unless for the purposes of increasing the purchase price or otherwise improving the terms of the Qualified Bid, as determined by the Debtors in their reasonable business judgment.  Any Consultation Party that submits a bid or a Credit Bid shall immediately upon submission of such bid or Credit Bid cease to be a Consultation Party, *provided, however,* that upon written notice (which may be via email) by the DIP Lender, if any, or a Committee member to the Debtors, or express confirmation on the record during the Auction, of its withdrawal as a bidder for the Debtors' assets, the DIP Lender's, if any, or the Committee member's (as applicable) rights as a Consultation Party (directly or as a member of the Committee) shall be restored.

### C.     Qualified Bidders

Any bidder that submits a Qualified Bid as set forth in Sections V and VI.A above will qualify as a "Qualified Bidder."

The Debtors may, after consultation with the Consultation Parties, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, amend or waive the conditions precedent to qualifying as a Qualified Bidder.

### D.     Bid Protections

Other than any Bid Protections approved by the Court in connection with the Stalking Horse Bid, if any, no bidder or any other party shall be entitled to any termination or "break-up" fee, expense reimbursement, or any other bidding protection in connection with the submission of a bid for the Assets or otherwise participating in the Auction or the Sale process.

## VII.    THE AUCTION

If the Debtors receive more than one Qualified Bid (including a combination of bids that, when considered together, constitute a Qualified Bid) for the Assets, the Debtors will conduct an Auction for the Assets.  If the Stalking Horse Bid is the only Qualified Bid received in respect of the Assets, the Debtors will not conduct an Auction for the Assets and will seek approval of such Stalking Horse Bid at the Sale Hearing.  If the Debtors determine not to hold an Auction, the Debtors will file with the Court, serve on the Sale Notice Parties, and cause to be published on the Epiq Website, a notice containing the following information, as applicable: (a) a statement that the Auction for the Assets has been canceled; (b) the identity of the Successful Bidder; (c) a copy of the Successful Bid or a summary of the material terms of such bid or provide instructions for accessing the Successful Bid free of charge from the Epiq Website; and (d) the date, time, and location of the Sale Hearing.

The Auction, if required, will be conducted on **March 31, 2025, at 10:00 a.m. (prevailing Eastern Time)**, either (a) at the offices of Houlihan Lokey Capital, Inc., 245 Park Avenue, 20th Floor, New York, New York 10167, (b) at some other physical location to be determined by the Debtors, or (c) virtually or at such other date, time or location as designated by the Debtors, after consulting with the Consultation Parties (subject to Section XI.C hereof).  If the Debtors conduct the Auction virtually, the Debtors will provide instructions setting forth how to attend the Auction to the participants and other attendees via electronic mail.  The Debtors will provide notice (via electronic mail or otherwise) of any change in the date, time or location of the Auction to Qualified Bidders and the Consultation Parties (subject to Section XI.C hereof), and will cause publication of such change to occur on the Epiq Website as soon as reasonably practicable and in any event no later than 24 hours before the Auction.

If held, the Auction proceedings will be transcribed and/or video recorded.

### A.     Participants and Attendees

Only Qualified Bidders are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures.

Qualified Bidders participating in the Auction must attend the Auction personally or through a duly authorized representative. Subject to the Auction procedures set forth in Section VII.B, all Qualified Bidders and the Consultation Parties (including the members of the Committee and its counsel) are permitted to attend the Auction; *provided* that the Debtors may, in their sole discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of a Qualified Bidder or otherwise attend the Auction.

Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (i) it has not engaged in any collusion with respect to the Auction or the submission of any bid for any of the Assets, and (ii) its Qualified Bid that gained the Qualified Bidder admission to participate in the Auction and each Qualified Bid submitted by the Qualified Bidder at the Auction is an irrevocable, binding, good-faith, and *bona fide* offer to purchase the Assets identified in such bids.

All Prospective Bidders and Qualified Bidders (including any Stalking Horse Bidder, Successful Bidder, and Backup Bidder) shall be deemed to have (i) agreed that all proceedings in the Court related to these Bidding Procedures, the Auction, any other relief requested in the Motion or granted pursuant to the Bidding Procedures Order, or the construction or enforcement of any agreement or any other document directly relating to the sale transaction are core proceedings as described in 28 U.S.C. § 157; (ii) waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the Auction, or the construction or enforcement of any agreement or any other document directly relating to the sale transaction; and (iii) consented to the entry of a final order or judgment by the Court in connection with any disputes relating to these Bidding Procedures, the Auction, or the construction or enforcement of any agreement or any other document relating directly to the sale transaction, if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the relevant parties.

Professionals and principals for the Debtors, each Qualified Bidder (including, its representative(s), if any), each of the Consultation Parties, and any creditor of the Debtors that has provided notice in writing of its intent to observe the Auction via electronic mail to co-counsel for the Debtors, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: Brett M. Haywood (bhaywood@potteranderson.com) and Maria Kotsiras (mkotsiras@potteranderson.com)) at least one (1) day prior to the start of the Auction shall be able to attend and observe the Auction, along with any other parties the Debtors deem appropriate.

### B. Auction Procedures

The Auction shall be governed by the following procedures, subject to the Debtors' rights to modify such procedures in their reasonable business judgment (in a manner consistent with their fiduciary duties and in consultation with the Consultation Parties (subject to Section XI.C hereof)):

>     1.   Baseline Bids. Prior to the commencement of the Auction, the Debtors will determine, in their reasonable business judgment (and in consultation with the Consultation Parties (subject to Section XI.C hereof)) the highest or otherwise best Qualified Bid submitted for the Assets (such Qualified Bid, a "Baseline Bid"). Bidding at the Auction shall commence at the amount

of the Baseline Bid. **No later than March 23, 2025 at 5:00 p.m. (prevailing Eastern Time)**, the Debtors will provide all Qualified Bidders with (a) a notice identifying which Qualified Bid is the Baseline Bid; and (b) a copy of each Qualified Bid.

2.    <u>Minimum Overbid</u>.  Bidding shall commence at the Baseline Bid.  The first overbid at the Auction shall be in an amount not less than the amount of the Baseline Bid (<u>plus</u> the Bid Protections if the Stalking Horse Bid is the Baseline Bid) <u>plus</u> $100,000 (the "<u>Minimum Overbid</u>").  At each round of bidding, Qualified Bidders may submit successive bids higher than the Leading Bid (as defined below) from the prior round.  During the Auction, the Debtors may, in their reasonable discretion, after consultation with the Consultation Parties, announce increases or reductions to Minimum Overbids at any time.

Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by any bid subsequent to the Baseline Bid, the Debtors will, at each round of bidding, consider and/or give effect to (a) any additional liabilities to be assumed by a Qualified Bidder under the bid, including whether such liabilities are secured or unsecured; (b) any additional costs that may be imposed on the Debtors; and (c) any liabilities waived against the estate.  Any subsequent bid made by any Stalking Horse Bidder shall be deemed to have been made in an amount equal to such subsequent bid plus the Bid Protections, to the extent provided for in the Stalking Horse Agreement.

3.    <u>Leading Bid</u>.  After the first round of bidding and between each subsequent round of bidding, the Debtors will announce, after consultation with the Consultation Parties, the bid that they believe to be the highest or otherwise best offer for the Assets (such bid, a "<u>Leading Bid</u>") and describe the material terms thereof.  Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the material terms of the Leading Bid.

The Auction will include open bidding in the presence of all other Qualified Bidders.  Each Qualified Bidder shall have the right to be present for all rounds of bidding and to submit additional bids and make modifications to its Proposed Asset Purchase Agreement at the Auction to improve its bid.  The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders participating in the Auction.

The Debtors shall have the right to determine, in their reasonable business judgment after consultation with the Consultation Parties, which bid is the highest or otherwise best bid with respect to the Assets and, after consultation with the Consultation Parties (subject to Section XI.C hereof), reject, at any time, without liability (but only in the absence of gross

15

negligence or willful misconduct), any bid that the Debtors deem to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, these Bidding Procedures, any order of the Court, or the best interests of the Debtors and their estates.

**C.    Auction Results**

1.    <u>Successful Bids</u>.  Immediately prior to the conclusion of the Auction, the Debtors will (a) determine, consistent with these Bidding Procedures and in consultation with the Consultation Parties, which Qualified Bid constitutes the highest or otherwise best bid (such bid, including the Stalking Horse Bid, if no additional Qualified Bids are received and no Auction conducted, a "<u>Successful Bid</u>") and (b) notify all Qualified Bidders at the Auction of the identity of the bidder that submitted the Successful Bid (such bidder, including the Stalking Horse Bidder if no Qualified Bids are received and no Auction conducted, a "<u>Successful Bidder</u>").  Following the conclusion of the Auction, the Debtors shall serve a notice of the Successful Bidder, which notice shall include a copy of the Successful Bid or a summary of the material terms of such bid or provide instructions for accessing the Successful Bid free of charge from the Epiq Website.

2.    <u>Backup Bids</u>.  Immediately prior to the conclusion of the Auction, the Debtors will (a) determine, in a manner consistent with these Bidding Procedures and in consultation with the Consultation Parties, which Qualified Bid, other than any Credit Bid, is the Backup Bid; and (b) notify all Qualified Bidders at the Auction of the identity of the Backup Bidder and the amount of the purchase price and other material terms of the Backup Bid.

Except as may otherwise be provided in any Stalking Horse Agreement, a Backup Bid will remain binding on the applicable Backup Bidder until the earlier of (a) the first business day after the closing of the sale transaction with the Successful Bidder for the Assets and (b) 30 days after the Sale Hearing (such date, the "<u>Backup Bid Expiration Date</u>").  If the sale transaction with the Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Backup Bidder shall be deemed the new Successful Bidder for the Assets and shall be obligated to consummate the Backup Bid as if it were the Successful Bid at the Auction; *provided* that the Debtors may, in their reasonable business judgment (after providing notice to the Sale Notice Parties and after consultation with the Consultation Parties), elect not to pursue the sale transaction contemplated by the Backup Bid.

3.    <u>Notice of Auction Results</u>.  Upon the earlier to occur of (i) five (5) business hours after the conclusion of the Auction; and (ii) Noon (prevailing Eastern Time) the calendar day after the conclusion of the Auction, the Debtors will file with the Court, serve on the Sale Notice Parties, and cause to be

published on the Epiq Website, a notice setting forth the results of the Auction (the "Notice of Auction Results"), which will (a) identify each Successful Bidder and the Backup Bidder; (b) include a copy of each Successful Bid and the Backup Bid or a summary of the material terms of such bids, or provide instructions for accessing each Successful Bid and the Backup Bid free of charge from the Epiq Website; and (c) set forth the Supplemental Sale Objection Deadline (as defined in Section X.D below), the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction.

**D.    Disposition of Good Faith Deposit**

1.    <u>Prospective Bidders</u>.  Within five business days after the Debtors make final determinations as to which Prospective Bidders qualify as Qualified Bidders, the Escrow Agent shall return to each Prospective Bidder that did not qualify as a Qualified Bidder, as confirmed by the Debtors, such Prospective Bidder's Good Faith Deposit.  Upon the authorized return of a Prospective Bidder's Good Faith Deposit in accordance with this Section VII.D, the bid of such Prospective Bidder shall be deemed terminated and no longer binding against the Prospective Bidder.

2.    <u>Qualified Bidders</u>.

a.    <u>Forfeiture of Good Faith Deposit</u>.  The Good Faith Deposit of a Qualified Bidder shall be forfeited if the Qualified Bidder attempts to withdraw its Qualified Bid, except as may be permitted by these Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures.  The Debtors and their estates shall be entitled to retain the Qualified Bidder's Good Faith Deposit as partial compensation for the damages caused to the Debtors and their estates as a result of the Qualified Bidder's failure to adhere to the terms of these Bidding Procedures and/or the relevant Qualified Bid.  If a Qualified Bidder's Good Faith Deposit is deemed forfeited, the Escrow Agent shall release such Good Faith Deposit by wire transfer of immediately available funds to an account designated by the Debtors within two business days after the Escrow Agent receives written notice by an authorized officer of the Debtors stating that the applicable Qualified Bidder has breached or otherwise failed to satisfy its obligations in accordance with these Bidding Procedures and the applicable Qualified Bid.

b.    <u>Return of Good Faith Deposit</u>.  With the exception of the Good Faith Deposits of the Successful Bidder and the Backup Bidder, the Escrow Agent shall return to any other Qualified Bidder the

Qualified Bidder's Good Faith Deposit, within 10 business days after the conclusion of the Auction for the Assets.

c.  <u>Backup Bidder</u>.  Unless the Backup Bidder becomes the Successful Bidder, the Escrow Agent shall return the Backup Bidder's Good Faith deposit, within 10 business days after the occurrence of the applicable Backup Bid Expiration Date; *provided*, *however*, if the Backup Bidder becomes the Successful Bidder, its Good Faith Deposit shall be forfeited if it fails to consummate the sale transaction because of a breach that entitles the Debtors to terminate the applicable asset purchase agreement with such Backup Bidder, and the Debtors and their estates shall be entitled to retain the Backup Bidder's Good Faith Deposit as partial compensation for the damages caused to the Debtors and their estates as a result of such breach.  If a Backup Bidder's Good Faith Deposit is deemed forfeited, the Escrow Agent shall release such Good Faith Deposit by wire transfer of immediately available funds to an account designated by the Debtors within two business days after the Escrow Agent receives written notice by an authorized officer of the Debtors stating that the applicable Backup Bidder has breached or otherwise failed to satisfy its obligations in accordance with these Bidding Procedures and the applicable Backup Bid.

d.  <u>Successful Bidder</u>.    At the closing of the sale transaction, the Successful Bidder shall be entitled to a credit against the purchase price in the amount of the Successful Bidder's Good Faith Deposit. The Good Faith Deposit of a Successful Bidder shall be forfeited if the Successful Bidder fails to consummate the sale transaction because of a breach that entitles the Debtors to terminate the applicable asset purchase agreement with such Successful Bidder, and the Debtors and their estates shall be entitled to retain the Successful Bidder's Good Faith Deposit as partial compensation for the damages caused to the Debtors and their estates as a result of such breach.  If a Successful Bidder's Good Faith Deposit is deemed forfeited, the Escrow Agent shall release such Good Faith Deposit by wire transfer of immediately available funds to an account designated by the Debtors within two business days after the Escrow Agent receives written notice by an authorized officer of the Debtors stating that the Successful Bidder has breached or otherwise failed to satisfy its obligations in accordance with these Bidding Procedures and the Successful Bid.

## VIII.  SALE HEARING

The Successful Bid (including any Backup Bid that is subsequently deemed a Successful Bid) will be subject to Court approval.  The hearing to approve the sale transaction consummated in accordance with these Bidding Procedures (except in the case of the sale transaction

contemplated by a Backup Bid that subsequently is deemed a Successful Bid) shall take place on **April 3, 2025 at [●:● a/p.m.] (prevailing Eastern Time)** (the "<u>Sale Hearing</u>") before the Honorable _____, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 N. Market Street, Wilmington, Delaware 19801, __[rd/th] floor, courtroom #__.

At the Sale Hearing, the Debtors will seek entry of an order (a "<u>Sale Order</u>") approving, among other things, the sale of the Assets to the Stalking Horse Bidder or Successful Bidder(s).

The Debtors may, in their reasonable business judgment (after consulting with the Consultation Parties, adjourn or reschedule the Sale Hearing by filing a notice or by announcing such adjournment or rescheduling at the Auction or in Court on the date of the originally scheduled Sale Hearing.

The Debtors' presentation to the Court for approval of a selected Qualified Bid as a Successful Bid does not bind the Debtors to such bid. The Debtors will be bound to the Successful Bid only when such Successful Bid has been approved by the Court at the Sale Hearing.

## IX.    RESERVATION OF RIGHTS TO MODIFY BIDDING PROCEDURES

The Debtors reserve the right to, in their reasonable business judgment, after consultation with the Consultation Parties (subject to Section XI.C hereof) and in a manner consistent with their fiduciary duties and applicable law, (i) modify these Bidding Procedures, including to, among other things, extend or waive deadlines or other terms and conditions set forth herein; adopt new rules and procedures for conducting the bidding and Auction process so long as any such modifications are disclosed to all Prospective Bidders and Qualified Bidders, as applicable; or (ii) otherwise modify these Bidding Procedures to further promote competitive bidding for and maximizing the of value of the Assets, in each case, to the extent not materially inconsistent with these Bidding Procedures or the Bidding Procedures Order.

## X.    NOTICING

### A.    Bid Notice Parties

Qualified Bids must be submitted in writing to the following parties (collectively, the "<u>Bid Notice Parties</u>"):

- Proposed counsel for the Debtors: (i) Pillsbury Winthrop Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111-5998 (Attn: Joshua D. Morse (joshua.morse@pillsburylaw.com), and Andrew V. Alfano (andrew.alfano@pillsburylaw.com), and (ii) Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Brett M. Haywood (bhaywood@potteranderson.com));

- The Debtors' investment banker:  Houlihan Lokey Capital, Inc., 245 Park Avenue, 20th Floor, New York, New York 10167 (Attn: Drew Talarico (DTalarico@HL.com) and Marcus Bellows (MBellows@HL.com)); and

- Proposed counsel for any official committee of unsecured creditors appointed in these Chapter 11 Cases (the "Committee").

**B.     Sale Notice Parties**

The "Sale Notice Parties" shall include the following persons and entities:

- the Consultation Parties (as applicable);

- counsel for the [DIP Lender: (i) _____ LLP, _____, _____, __ _____ (Attn: _____ (_____@_____.com)) and (ii) _____ LLP, _____, _____, __ _____ (Attn: _____ (_____@_____.com))];

- counsel to any Stalking Horse Bidder;

- all persons and entities known by the Debtors to have asserted any lien, claim, interest, or encumbrance in the Assets (for whom identifying information and addresses are available to the Debtors);

- all relevant non-debtor parties (each, a "Counterparty") to any Contract that may be assumed or rejected in connection with the sale transaction;

- all of the Debtors' known creditors (for whom identifying information and addresses are available to the Debtors);

- any governmental authority known to have a claim against the Debtors in the Chapter 11 Cases;

- the U.S. Trustee;

- all applicable federal, state, and local taxing authorities, including the Internal Revenue Service;

- the United States Securities and Exchange Commission;

- the United States Attorney's Office for the District of Delaware;

- United States Attorney General's Office for the District of Delaware;

- the Office of the Attorney General and the Secretary of State in each state in which the Debtors operate;

- the Antitrust Division of the United States Department of Justice;

- the Federal Trade Commission;

- proposed counsel for the Committee: (i) _____ LLP, _____, _____, __ _____ (Attn: _____ (_____@_____.com)) and (ii) _____ LLP, _____, _____, __ _____ (Attn: _____ (_____@_____.com));

- all of the parties entitled to notice pursuant to Bankruptcy Rule 2002; and

- all other parties as directed by the Court.

## C.  Sale Notice and Publication Notice

No later than **two business days after the entry of the Bidding Procedures Order**, the Debtors will file with the Court, serve on the Sale Notice Parties, and cause to be published on the Epiq Website a notice (the "Sale Notice") setting forth (i) a description of the Assets available for sale in accordance with these Bidding Procedures; (ii) the date, time, and location of the Auction and Sale Hearing; (iii) the Sale Objection Deadline and Supplemental Sale Objection Deadline (each as defined in Section X.D below) and the procedures for filing such objections; and, (iv) if applicable, a summary of the material terms of any Stalking Horse Agreement, including the terms and conditions of any Bid Protections to be provided thereunder, as of the date of the Sale Notice.

As soon as practicable but no later than five (5) business days after the entry of this Order, the Debtors shall the post the Sale Notice on the Epiq Website and cause the information contained in the Sale Notice, with such modifications as may be appropriate for purposes of publication, to be published once in the national edition of either the Wall Street Journal, USA Today, The New York Times (national edition) or another publication of similar distribution (the "Publication Notice").

## D.  Sale Objections and Supplemental Sale Objections

Except objections to the conduct of the Auction, the Successful Bidder or the Backup Bidder, all objections to a sale of the Assets, including (i) any objection to a sale of the Assets free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (ii) entry of any Sale Order (each such objection, a "Sale Objection") shall, by no later than **March 28, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"), be filed with Court and served on the following parties (collectively, the "Objection Notice Parties"):

- Proposed counsel for the Debtors: (i) Pillsbury Winthrop Shaw Pittman LLP, Four Embarcadero Center, 22nd Floor, San Francisco, CA 94111-5998 (Attn: Joshua D. Morse (joshua.morse@pillsburylaw.com), and Andrew V. Alfano (andrew.alfano@pillsburylaw.com), and (ii) Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: M. Blake Cleary (bcleary@potteranderson.com) and Brett M. Haywood (bhaywood@potteranderson.com));

- counsel for the [DIP Lender: (i) _____ LLP, _____, _____, __ _____ (Attn: _____ (_____@_____.com)) and (ii) _____ LLP, _____, _____, __ _____ (Attn: _____ (_____@_____.com))];

- proposed counsel for the Committee: (i) _____ LLP, _____, _____, __ _____ (Attn: _____ (_____@_____.com)) and (ii) _____ LLP, _____, _____, __ _____ (Attn: _____ (_____@_____.com));

- the U.S. Trustee;

- if applicable, counsel for the relevant Successful Bidder; and

- if applicable, counsel for any relevant Backup Bidder(s).

Following service of the Notice of Auction Results, Sale Notice Parties may object solely with respect to the conduct of the Auction and/or the Successful Bidder or Backup Bidder (in each case, if such bidder is not the Stalking Horse Bidder) (each such objection, a "Supplemental Sale Objection") by **April 1, 2025 at 4:00 p.m. (prevailing Eastern Time)** (the "Supplemental Sale Objection Deadline").

### E.    Notices Regarding Assumption and Assignment of Contracts

The Debtors will provide all notices regarding the proposed assumption and assignment of Contracts in accordance with the Assumption and Assignment Procedures set forth in the Bidding Procedures Order.

## XI.    CONSULTATION BY THE DEBTORS

A.    Throughout the Sale Process, the Debtors and their advisors will consult with the Consultation Parties as provided in these Bidding Procedures, or as is otherwise necessary or appropriate, as determined in the Debtors' business judgment.

B.    The Debtors shall consult with the Consultation Parties in good faith regarding the sale process, any diligence and other information requested by the Consultation Parties, and the Debtors will provide to the Consultation Parties reports concerning the sale process, including parties contacted, buyer feedback, copies of all letters of intent, drafts of definitive agreements and updates on proposals.  For the avoidance of doubt, and without limitation, the Debtors shall consult with the Consultation Parties on the selection of the Baseline Bid, how the Auction is conducted, any additional Auction procedures, adjourning the Auction, and selecting the Successful Bidder and the Backup Bidder.

C.    **Notwithstanding the foregoing, the Debtors will not consult with or provide copies of any bids or other confidential information to any Consultation Party or any insider or affiliate of the Debtors if such party is an active bidder for the Assets at the applicable time.**  If a member of the Committee submits a Qualified Bid for the Assets, the Committee will maintain its consultation rights as a Consultation Party; *provided* that the Committee excludes the

bidding Committee member from any discussions or deliberations regarding a transaction involving the relevant Assets, and shall not provide any confidential information regarding the Assets or otherwise involving the Sale Process to such bidding committee member; provided further that, upon written notice by such Committee member (which may be via email) to the Debtors, or express confirmation on the record during the Auction, of its withdrawal as a bidder for the Debtors' assets, such Committee member's rights as a Consultation Party (as a Committee member) shall be restored.

For the avoidance of doubt, any consultation rights afforded to the Consultation Parties by these Bidding Procedures or the Bidding Procedures Order shall not in any way limit the Debtors' discretion and shall not include the right to veto any decision made by the Debtors in the exercise of their reasonable business judgment.

**Exhibit A**

**Form APA**

**ASSET PURCHASE AGREEMENT**

BY AND AMONG

[●],
as Purchaser

AND

**NIKOLA CORPORATION**,
as Seller

Dated as of February [●], 2025

[THIS DRAFT FORM OF AGREEMENT IS SUBJECT TO REVISION BY THE PARTIES HERETO AT ANY TIME. THIS DRAFT FORM OF AGREEMENT IS NOT INTENDED TO CREATE, NOR DOES IT CREATE, A LEGALLY BINDING OR ENFORCEABLE OFFER OR AGREEMENT OF ANY TYPE OR NATURE, UNLESS AND UNTIL AGREED TO AND EXECUTED BY ALL OF THE PARTIES HERETO. THIS DRAFT FORM OF AGREEMENT SHALL BE KEPT CONFIDENTIAL PURSUANT TO THE TERMS OF THE CONFIDENTIALITY AGREEMENT ENTERED INTO BY THE PARTIES HEREOF.]

# TABLE OF CONTENTS

**Page**

**ARTICLE I** DEFINITIONS ........................................................................................1
    1.1     Certain Definitions ......................................................................................1
    1.2     Terms Defined Elsewhere in this Agreement .....................................................11

**ARTICLE II** PURCHASE AND SALE OF ASSETS; ASSUMPTION OF
            LIABILITIES.........................................................................................13
    2.1     Purchase and Sale of Assets.........................................................................13
    2.2     Excluded Assets ........................................................................................15
    2.3     Assumption of Liabilities.............................................................................16
    2.4     Excluded Liabilities ...................................................................................16
    2.5     Cure Amounts ..........................................................................................18
    2.6     Withholding .............................................................................................18

**ARTICLE III** CONSIDERATION ............................................................................18
    3.1     Consideration ...........................................................................................18
    3.2     Good Faith Deposit ...................................................................................19

**ARTICLE IV** CLOSING AND TERMINATION ..........................................................19
    4.1     Closing Date.............................................................................................20
    4.2     Deliveries by Seller ...................................................................................20
    4.3     Deliveries by Purchaser ..............................................................................21
    4.4     Termination of Agreement...........................................................................21
    4.5     Procedure Upon Termination........................................................................23
    4.6     Effect of Termination .................................................................................23

**ARTICLE V** REPRESENTATIONS AND WARRANTIES OF SELLER................................24
    5.1     Organization, Good Standing, Authority, and Validity ......................................24
    5.2     No Conflict...............................................................................................25
    5.3     Title and Ownership...................................................................................25
    5.4     Compliance with Law .................................................................................25
    5.5     Permits ...................................................................................................25
    5.6     Leased Real Property .................................................................................25
    5.7     Contracts ................................................................................................26
    5.8     Intellectual Property...................................................................................26
    5.9     Employees...............................................................................................26
    5.10    No Other Representations and Warranties.......................................................27

**ARTICLE VI** REPRESENTATIONS AND WARRANTIES OF PURCHASER ......................27
    6.1     Organization, Good Standing and Other Matters ..............................................27
    6.2     Authority ................................................................................................27
    6.3     No Conflict; Required Filings and Consents ...................................................28
    6.4     Litigation.................................................................................................28
    6.5     Financial Capability ...................................................................................28
    6.6     No Other Representations and Warranties.......................................................28

**ARTICLE VII** BANKRUPTCY COURT MATTERS .....................................................29

i

7.1     Competing Bids ................................................................................29
7.2     The Sale Order ..............................................................................29
7.3     Bankruptcy Court Filings................................................................30
7.4     Notice to Holder of Liens, Claims, and Interests.............................31
7.5     Purchased Contracts ......................................................................31

**ARTICLE VIII** COVENANTS...................................................................33
8.1     Access to Information ....................................................................33
8.2     Conduct of the Business Pending the Closing .................................33
8.3     Preservation of Records .................................................................33
8.4     Publicity .......................................................................................34
8.5     Assignment of Contracts and Rights................................................34
8.6     Transfer of Intellectual Property ....................................................35
8.7     Receipt of Misdirected Assets; Liabilities. .....................................35
8.8     HSR Act .......................................................................................35

**ARTICLE IX** EMPLOYEES AND EMPLOYEE BENEFITS...................36
9.1     Employment..................................................................................36
9.2     Alternate Procedure ......................................................................37
9.3     Employee Benefits ........................................................................37
9.4     Sole Beneficiaries. ........................................................................37

**ARTICLE X** CONDITIONS TO CLOSING ..........................................38
10.1    Conditions Precedent to Obligations of Purchaser ..........................38
10.2    Conditions Precedent to Obligations of Seller.................................38
10.3    Conditions Precedent to Obligations of Purchaser and Seller ...........39
10.4    Frustration of Closing Conditions...................................................39

**ARTICLE XI** TAXES ...........................................................................40
11.1    Transfer Taxes .............................................................................40
11.2    Prorations ....................................................................................40
11.3    Purchase Price Allocation..............................................................40
11.4    Cooperation on Tax Matters ..........................................................41

**ARTICLE XII** MISCELLANEOUS ........................................................41
12.1    Expenses ......................................................................................41
12.2    Survival .......................................................................................41
12.3    Specific Performance ....................................................................41
12.4    Governing Law; Submission to Jurisdiction; Consent to Service of
        Process .........................................................................................42
12.5    Waiver of Right to Trial by Jury.....................................................43
12.6    Entire Agreement; Amendments and Waivers .................................43
12.7    Notices ........................................................................................43
12.8    Releases........................................................................................44
12.9    Severability ..................................................................................46
12.10   Binding Effect; Assignment...........................................................46
12.11   Third Party Beneficiaries; Non-Recourse .......................................46

ii

12.12    Headings; Construction; Disclosure Schedules .................................................47
12.13    Risk of Loss .........................................................................................................48
12.14    Liquidating Trustee .............................................................................................48
12.15    Counterparts .........................................................................................................49

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of February [●], 2025 (the "Agreement"), is entered into by and among [●] ("Purchaser"), and Nikola Corporation (d/b/a Nikola Truck Manufacturing), a Delaware corporation ("Seller"). Purchaser and Seller together are referred to herein as the "Parties" and each, a "Party". All capitalized terms used in this Agreement shall have the meanings assigned to such terms in Article I or as otherwise defined elsewhere in this Agreement unless the context clearly indicates otherwise.

## W I T N E S S E T H:

WHEREAS, Seller has filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") (the date such petition was filed, the "Petition Date"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" and such cases, the "Bankruptcy Cases");

WHEREAS, Seller presently conducts the Business and owns all of the Purchased Assets;

WHEREAS, Seller desires to (i) sell, transfer and assign to Purchaser, and Purchaser desires to acquire and assume from Seller, pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, and (ii) retain all of the Excluded Assets and Excluded Liabilities, all as more specifically provided herein; and

WHEREAS, concurrently with the execution of this Agreement, Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the Good Faith Deposit (as defined below) into the Good Faith Deposit Escrow Account (as defined below).

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereof, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I

DEFINITIONS

1.1    Certain Definitions. For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Accounts Receivable" means accounts receivable solely relating to the Business and not, for the avoidance of doubt, the Excluded Business.

"Action" means any claim, action, suit, charge, complaint, grievance, arbitration, inquiry, mediation, audit, investigation, litigation or other proceeding (whether civil, criminal or administrative) that has been commenced, brought, conducted or heard by or before any Governmental Body, court, arbitrator or other tribunal.

"Affiliate" of any Person means any Person which, directly or indirectly, controls or is controlled by that Person, or is under common control with that Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Alternative Transaction" means any transaction or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale of any portion of the Business (except as sold or disposed of in the Ordinary Course of Business), the Equity Interests of Seller, or the Purchased Assets by Seller to a purchaser or purchasers other than Purchaser.

"Ancillary Documents" means each agreement, document, instrument, writing and/or certificate contemplated by this Agreement or executed in connection with the Transactions, including the Bill of Sale, the Assignment and Assumption Agreement [, the IP Assignment Agreements][1] and the Good Faith Deposit Escrow Agreement.

"Anti-Corruption and Anti-Money Laundering Laws" means (a) the U.S. Foreign Corrupt Practices Act of 1977, (b) all other applicable Laws, regulations, or Orders relating to anti-bribery or anti-corruption (governmental or commercial), and (c) all applicable money laundering-related laws of the United States and similar laws and regulations of the jurisdictions where the Business is conducted.

"Antitrust Law" means the Sherman Act, as amended, the Clayton Act, as amended, the HSR Act, the Federal Trade Commission Act, as amended, and all other Laws and Orders, that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"Avoidance Actions" means those actual and/or potential claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.

"Bidding Procedures Motion" means the motion to be filed with the Bankruptcy Court seeking the establishment of bidding procedures as contemplated pursuant to Article VII hereof, in form and substance acceptable to Purchaser.

"Bidding Procedures Order" means the Order entered by the Bankruptcy Court approving the Bidding Procedures Motion.

"Business" means the [●][2] as is currently being conducted, has been conducted during the twelve (12)-month period immediately preceding the date hereof, or is actively in the process of

---

[1] **NTD**: Only to be included in asset deals involving sale of Intellectual Property.

[2] **NTD**: Definition to capture, as applicable, (i) the manufacturing business of Seller that occurs within the Coolidge Facility, (ii) the corporate support functions, engineering, research and development, and energy functions that occur within the Phoenix HQ, (iii) Seller's business of developing, operating and maintaining fixed and modular hydrogen fueling stations in California and Canada, or (iv) the Intellectual Property of Seller.

considering, as of the Closing Date, other than as specifically and solely relates to the Excluded Business.

"Business Day" means any day of the year on which national banking institutions in New York, New York or Los Angeles, California are open to the public for conducting business and are not required or authorized by Law to close.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means that certain Confidentiality and Non-Disclosure Agreement by and between Seller and Purchaser dated January [●], 2025.

"Contract" means any written or oral commitment, agreement, note, letter of credit, mortgage, indenture, lease (whether for real or personal property), license, arrangement, contract, subcontract, undertaking, understanding or obligation of any kind or character.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer files and lists, vendor files, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), supplier lists, records, literature, correspondence (including e-mail communications), drawings, engineering and manufacturing data and other technical information and data, marketing documentation (sales brochures, flyers, pamphlets, advertising, promotional material, web pages, etc.), and other similar materials, in each case, that are related to, used in, held for use in or intended to be used in, or that arise out of, the Business or the Purchased Assets, in each case, whether or not in electronic form.

"Environmental Costs and Liabilities" means with respect to any Person, all Liabilities, remedial actions, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines and penalties incurred as a result of any Action, claim or demand by any other Person or in response to any violation of Environmental Law, to the extent based upon, related to, or arising under or pursuant to any Environmental Law, environmental Permit, Order or agreement with any Governmental Body or other Person, which relates to any environmental, human health (to the extent related to exposure to Hazardous Substances) or workplace safety condition, violation or non-compliance of Environmental Law or a release or threatened release of Hazardous Substances.

"Environmental Law" means any Law or Order relating to protection of the environment, natural resources, human health (to the extent related to exposure to Hazardous Substances) or workplace safety, exposure to Hazardous Substances, to pollution (or the cleanup thereof) or to the use, management, manufacture, treatment, storage, processing, production, disposal, release, threatened release or transportation of Hazardous Substances.

"Equity Interest" shall mean (a) any shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, (b) any ownership interests in a Person

3

other than a corporation, including membership interests, partnership interests, joint venture interests, phantom interests, and beneficial interests; and (c) any warrants, stock appreciation rights, options, units, or any other equity or equity-based compensation, convertible or exchangeable securities, calls or other rights to purchase or acquire any of the foregoing.

"ERISA" means the Employment Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any Person, trade or business (whether or not incorporated) that together with such Person, would be treated as a "single employer" or under common control with such Person under Section 414 of the Code or Section 4001(b) of ERISA.

"Escrow Agent" means Epiq Corporate Restructuring, LLC.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Business" means all businesses of Seller that are not included in the Business, including [●]³.

"Final Order" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, which (a) has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, reconsideration or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, reconsideration or rehearing has been timely taken, or (b) as to which any appeal that has been taken or any petition for certiorari or motion for reargument, reconsideration or rehearing that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, reconsideration or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; provided, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Federal Rule of Bankruptcy Procedure (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

"Fraud" means, with respect to any Party, an actual and intentional fraud with respect to the making of the representations and warranties contained in this Agreement; provided, that such actual and intentional fraud of such Party shall only be deemed to exist if (a) such Party had actual knowledge that the representations and warranties made by such Party were inaccurate, (b) that such representations and warranties were made with the express intent to induce another Party to rely thereon and take action or refrain from taking action to such other Party's detriment, (c) such

---

³ **NTD**: Definition to capture the combination of items (i)-(iv) not captured by the definition of Business ((i) the manufacturing business of Seller that occurs within the Coolidge Facility, (ii) the corporate support functions, engineering, research and development, and energy functions that occur within the Phoenix HQ, (iii) Seller's business of developing, operating and maintaining fixed and modular hydrogen fueling stations in California and Canada, and/or (iv) the Intellectual Property of Seller).

other Party acted in reliance on such inaccuracy and (d) such other Party suffered a loss as a result of such inaccuracy; provided, however, that for the avoidance of doubt, "Fraud" shall not include any type of constructive, negligent, promissory, unfair dealing, unjust enrichment, reckless or equitable fraud or other claim based on constructive knowledge, negligence or recklessness.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time.

"Good Faith Deposit" means an amount equal to [●] Dollars ($[●])[4].

"Good Faith Deposit Escrow Account" means the account designated by the Escrow Agent as the "Good Faith Deposit Escrow Account" into which the Good Faith Deposit is deposited with the Escrow Agent and held by it, subject to disbursement as provided in this Agreement and in the Good Faith Deposit Escrow Agreement.

"Good Faith Deposit Escrow Agreement" means that certain escrow agreement, dated as of the date hereof, by and among Seller, Purchaser and the Escrow Agent, governing the administration of the Good Faith Deposit.

"Governmental Body" means any domestic or foreign, national, supranational, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, or any entity, quasi-governmental, private body exercising any executive, legislative, judicial, regulatory or administration functions of, pertaining to government or Taxing Authority thereunder (including the IRS and the Bankruptcy Court).

"Hazardous Substances" means any toxic, hazardous or dangerous chemical, waste or substance, any pollutant or contaminant regulated under Laws, and any other substance which is regulated, classified, or otherwise characterized under applicable Environmental Laws, including radiation, noise, biological agents, per- and polyfluoroalkyl substances, hydrocarbons, medical waste, petroleum or any fraction or product thereof, toxic mold, mycotoxins or microbial matter (naturally occurring or otherwise), polychlorinated biphenyls, asbestos or asbestos containing materials and any "contaminant," "pollutant", "hazardous waste," "hazardous material", "hazardous substance", "extremely hazardous substance" or "toxic substance" or words of similar import under any applicable Environmental Law.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Inbound IP Licenses" means any license, sublicense, consent to use agreement, settlement, coexistence agreement, covenant not to sue, waiver, release, or other express grants of or right to use which any third party has granted Seller with respect to any Intellectual Property used in connection with the Business, other than licenses of commercially available off-the-shelf software licensed pursuant to shrink-wrap or click-wrap licenses.

"Intellectual Property" means any and all right, title and interest in or relating to intellectual property, whether protected, created or arising under the Laws of the United States or any other

---

[4] **NTD**: Such amount to be 10% of purchase price.

jurisdiction, including all: (a) patents and patent applications, together with all reissuances, continuations, divisionals, continuations-in-part, revisions, substitutions, provisionals, renewals, extensions, and re-examinations thereof, and all rights to claim priority from any of the foregoing (collectively, "Patents"); (b) trademarks, service marks, service names, brand names, trade dress, trade names, logos, corporate names, and other indicators of the commercial source or origin or origin of a product or service and general intangibles of a like nature, in each case, whether or not registered, and all goodwill associated with any of the foregoing (collectively, "Trademarks"); (c) copyrights and copyrightable works, and all database and design rights, whether or not registered or published, including all data collections, "moral" rights, mask works, all registrations and applications to register, and renewals, extensions and reversions of, any of the foregoing, and corresponding rights in works of authorship, including any content embedded in social media accounts (collectively, "Copyrights"); (d) all trade secret rights and corresponding rights in confidential information and other non-public or proprietary information (whether or not patentable or copyrightable), including ideas, formulas, compositions, inventor's notes, discoveries and improvements, know-how, manufacturing and production processes and techniques, testing information, research and development information, inventions, invention disclosures, unpatented blueprints, drawings, specifications, designs, plans, proposals and technical data, business and marketing plans, market surveys, market know-how and customer lists and information (collectively, "Trade Secrets"); (e) website and internet domain names, electronic addresses, uniform resource locators and alphanumeric designations associated therewith and all registrations for any of the foregoing, and all and social media accounts and username and password credentials associated with the foregoing (collectively, "Domain Names"); (f) intellectual property rights arising from Software and other technology; (g) rights of privacy and publicity; and (h) any and all similar, corresponding or equivalent intellectual property or proprietary rights arising under the Laws of any jurisdiction throughout the world or pursuant to any international convention.[5]

"IRS" means the Internal Revenue Service.

"Knowledge of Seller" means the actual knowledge of the individuals set forth on Section 1.1 of the Disclosure Schedule, in each case, after (a) reasonable investigation of Seller's written and electronic records readily available to such individual, and (b) reasonable inquiry of such persons' direct reports who would reasonably be expected to have knowledge of the event, condition, circumstance, act or other matter in question.

"Law" means any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, rule, writ, injunction, directive, judgment, ordinance, principle of common law, regulation, statute or treaty (including the Bankruptcy Code) or other legally-binding requirement, in each case, having the force and effect of law, or any similar form of decision or approval of, or determination by, or binding interpretation or administration of, any of the foregoing issued, enacted, adopted, promulgated, implemented or otherwise put in effect by or under any Governmental Body.

"Liability" means any liability, debt, obligation, indebtedness, Tax, penalty, fine, damage, claim, assessment, amount to be paid in settlement, judgment or other loss, cost or expense

---

[5] **NTD**: Intellectual Property definitions only to be included in asset sales involving Intellectual Property.

(including reasonable attorneys' fees and reasonable costs of investigation and defense) of any kind or nature whatsoever, whether asserted or unasserted, absolute or contingent, known or unknown, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due.

"Licensed Intellectual Property" means all licensed Intellectual Property that is used, practiced or held for use or practice by Seller for the Business, except for any Owned Intellectual Property.

"Lien" means all liens, pledges, hypothecations, security interests, deeds of trust, mortgages and other possessory interests, conditional sale or other title retention agreements, lease or sublease in the nature thereof, the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction, assessments, easements, rights-of-way, restrictions, rights of offer, rights of first refusal, servitude, preference, priority, matter of record, encroachments, licenses, privileges, charges of any kind (including any agreement to grant any of the foregoing), and other burdens, encumbrances, or interests of any kind to the maximum extent permitted pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code.

"Liens, Claims, and Interests" shall have the meaning set forth in the Sale Order.

"Material Adverse Effect" means any effect, event, change, fact, occurrence, circumstance or development, individually or in the aggregate, that (i) has had a materially adverse effect on the condition (financial or otherwise) of the Business beyond the facts and circumstances leading to the filing of the Bankruptcy Cases or (ii) prevents or materially impairs, or would reasonably be expected to prevent or materially impair, the ability of Seller to perform its obligations under this Agreement or the Ancillary Documents or to consummate the Transactions; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition, or change, directly or indirectly, arising out of or attributable to: (a) general economic or political conditions affecting the industries or markets in which Seller or the Business operates; (b) any changes in financial, banking, or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates, currency exchange rates or commodities prices; (c) acts of war (whether or not declared), armed hostilities, or terrorism, or the escalation or worsening thereof; (d) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (e) any natural or man-made disaster or acts of God, epidemic, pandemic or disease outbreak (including the COVID-19 virus) or any escalation or worsening thereof; (f) any failure of Seller to meet any internal or external projections, forecasts or revenue predictions; provided that the facts and circumstances underlying any such failure may be considered in determining whether there has occurred a Material Adverse Effect; (g) the execution, delivery, announcement or pendency of this Agreement or the Transactions; (h) compliance with the terms of or the taking of any action required by this Agreement; (i) the effect of any breach, violation or non-performance of any provision of this Agreement by Purchaser; or (j) any action taken or statement made by Purchaser or its Affiliates or their respective representatives; except that such events, occurrences, facts, conditions or changes set forth in foregoing clauses (a), (b), (c), (d), and (e) shall be taken into account in determining whether any Material Adverse Effect has occurred to the extent that any such events, occurrences, facts, conditions or changes has had, or would be reasonably expected to have, a materially disproportionate impact on Seller or the Business (excluding the

Excluded Assets and the Excluded Liabilities) as a whole compared to other participants engaged in the industry in which Seller or the Business operate.

"<u>Order</u>" means any award, decision, injunction, judgment, writ, ruling or verdict entered, issued, made or rendered by any Governmental Body or arbitrator.

"<u>Ordinary Course of Business</u>" means the usual and ordinary course of normal day-to-day operations of the Business, consistent (with respect to quantity and frequency) with the Business's past custom and practice through the date of this Agreement.

"<u>Owned Intellectual Property</u>" means any and all Intellectual Property that is owned by Seller and used or held for use in the Business, including all Registered Intellectual Property, except any Intellectual Property used or held for use in the Excluded Business.

"<u>Permits</u>" means all permits, licenses, authorizations, certificates, franchises, consents and other approvals from any Governmental Body.

"<u>Permitted Liens</u>" means (a) statutory Liens for current Taxes, assessments or other governmental charges not yet due and payable, or Liens for Taxes being contested in good faith by appropriate proceedings and for which adequate reserves have been established on the financial statements relating to the Business, (b) landlord's, mechanics', carriers', workers', repairers' and other similar Liens arising or incurred in the Ordinary Course of Business for obligations that are not overdue or are being contested in good faith by appropriate proceedings, (c) as to interests in real property (including without limitation the Assumed Leases), personal property or Intellectual Property, any matters of record or defects or encumbrances to title, easements, rights of way, zoning, planning, building and other similar limitations, restrictions and rights of any Governmental Body to regulate property, that do not, individually or in the aggregate, materially interfere with the conduct of the Business as currently conducted, (d) liens incurred in the Ordinary Course of Business in connection with worker's compensation and unemployment insurance or similar Laws, (d) any Lien to be released on or prior to the Closing by Seller, (e) any Lien relating to Assumed Liabilities (and, for the avoidance of doubt, excluding any Lien relating to Excluded Liabilities) arising pursuant to, or as a result of, Purchaser's consummation of the Transactions and (f) any purchase money lien or lien securing any rental payments under any financing or capital lease arrangements.

"<u>Person</u>" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Body.

"<u>Product Inventory</u>" means all inventory of the Business, including (a) all Products, spare parts, chemicals, packaging materials or other supplies, that are, in each case, related to the Business and owned, controlled by or used (or held for use) by or on behalf of Seller, regardless of whether or not they are reflected on the Balance Sheets, whether in transit to or from Seller, and whether in any of the Leased Real Property, warehouse or distribution facility, held by third parties or otherwise and (b) all inventory in all open purchase orders with suppliers, distributors, or sourcing agents for Products, but excluding any products or other inventory shipped to third parties

prior to the Closing Date in the Ordinary Course of Business and for which title has passed to such third party.

"Products" means any and all products of the Business developed, manufactured, marketed or sold by or on behalf of Seller, whether work in progress or in final form.

"Purchased Intellectual Property" means all Owned Intellectual Property and all Inbound IP Licenses, together with all (a) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Seller with respect to such Intellectual Property, (b) claims and causes of action with respect to such Intellectual Property, including all past, present and future rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for infringement, misappropriation, or other violation thereof; and (c) all tangible embodiments of such Intellectual Property, including Software, works of authorship, data, documentation, websites, website content and technology.

"Related Person" means, with respect to any Person, all past and present directors, officers, members, managers, equityholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or other Representatives of any such Person.

"Registered Intellectual Property" means all Patents, pending applications for Patents, registered Trademarks, pending applications for registration of Trademarks, registered Copyrights, pending applications for registration of Copyrights, and Domain Names included in the Owned Intellectual Property.

"Required Regulatory Authorization" means any applicable statutory waiting period (including any extensions thereof) under the HSR Act relating to the Transactions having expired or been terminated.

"Representatives" means, with respect to any Person, any director, officer, agent, employee, general partner, member, stockholder, legal counsel, accountant, advisor or representative of such Person.

"Restructuring Transaction" means (a) a recapitalization transaction involving, in whole or in part, Seller and its existing security holders or creditors, (b) any merger, consolidation, share exchange, business combination or other similar transaction with Seller, (c) any tender offer or exchange offer for 10% or more of the outstanding Equity Interests of Seller or any class of Seller's debt securities or the filing of a registration statement under the Securities Act of 1933, as amended, in connection therewith, or (d) the acquisition of beneficial ownership or a right to acquire beneficial ownership of, or the formation of any "group" (as defined under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended) which beneficially owns or has the right to acquire beneficial ownership of 10% or more of the then outstanding Equity Interests of Seller or any class of Seller's debt securities or (e) the sale of all or substantially all of the assets of the Business or any of the Purchased Assets.

"Sale Motion" means the motion filed with the Bankruptcy Court by Seller seeking (a) approval of the terms and provisions of this Agreement, (b) authorization for (i) the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and (ii) the assumption and

assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code and (c) any other provisions acceptable to Purchaser.

"<u>Sale Order</u>" means the order of the Bankruptcy Court, in form and substance acceptable to Purchaser, granting the relief requested in the Sale Motion and authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens and Liens, Claims, and Interests, and as more fully described in <u>Section 7.3</u>, substantially in the form to be agreed on by the Purchaser and Seller in advance of the hearing on the Sale Motion.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"<u>Seller Disclosure Documents</u>" means all reports, schedules, forms, statements, registration statements, prospectuses and other documents required to be filed or furnished by the Company with the Securities and Exchange Commission under the Securities Act or the Exchange Act since January 1, 2021.

"<u>Seller Expenses</u>" means, without duplication, and to the extent unpaid as of immediately prior to the Closing, the aggregate amount of Liabilities incurred or subject to reimbursement by Seller in connection with the negotiation and consummation of the Transactions, including (a) the fees and expenses of any brokers, finders, consultants, agents, attorneys, data room providers and other advisors or service providers, (b) any fees and expenses incurred by Seller in connection with the Bankruptcy Cases and the related restructuring, (c) the amount of deferred compensation and accrued or deferred bonuses and benefits (including paid sick/leave/vacation) owed to any current or former employees or service providers of Seller stay bonuses, sales bonuses, transaction bonuses, change of control payments, severance payments, retention payments or other payments owed or payable by Seller that are accelerated or payable (in whole or in part, whether by single-trigger, double-trigger or multiple-trigger conditions) as a result of the execution of this Agreement or the consummation of the Transactions, and the amount of the employer's portion of any employment, payroll, unemployment, or social security Taxes with respect to the amounts set forth in this <u>clause (c)</u> of this definition and any other compensatory amounts payable hereunder ("<u>Compensatory Amounts</u>"), and (d) all costs and expenses with respect to or otherwise arising in connection with the Good Faith Deposit Escrow Agreement, including the Escrow Agent's costs thereunder.

"<u>Seller Plan</u>" means each "employee benefit plan" (within the meaning of Section 3(3) of ERISA), and each employment, individual consulting, equity, equity-based or cash incentive, severance, separation, termination, change-in-control, retention, transaction, "stay," deferred compensation, retirement, health, welfare and fringe benefit, paid time off or similar plan, program, policy or agreement, sponsored, maintained, contributed to, or required to be sponsored, maintained or contributed to, by Seller, or as to which Seller has any Liability on behalf of any current or former employees of the Business.

"<u>Software</u>" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code,

(b) data, databases and compilations, in any form, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all and all documentation related thereto.

"<u>Subsidiary</u>" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at any time directly or indirectly owned by such Person.

"<u>Tax</u>" or "<u>Taxes</u>" means (i) any and all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, escheat, unclaimed property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in <u>clause (i)</u>, and (iii) any Liability in respect of any items described in <u>clauses (i)</u> and/or <u>(ii)</u> payable by reason of contract (including any Tax allocation, sharing or similar Agreement), assumption, transferee liability, operation of law, Treasury Regulations Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under law) or otherwise.

"<u>Tax Return</u>" means any return, report or statement required to be filed with respect to any Tax (including any attachments thereto, and any amendment thereof) including, but not limited to, any information return, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes Seller or any of its Affiliates.

"<u>Taxing Authority</u>" means the U.S. Internal Revenue Service and any other Governmental Body responsible for the administration of any Tax.

"<u>Transactions</u>" means the transactions contemplated by this Agreement and the Ancillary Documents.

"<u>Treasury Regulations</u>" means the Treasury regulations promulgated under the Code.

"<u>U.S.</u>" means the United States of America.

"<u>WARN</u>" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar foreign, provincial, state or local Law.

"<u>Wind-Up End Date</u>" shall mean the date after the Closing Date on which the Bankruptcy Cases are dismissed, converted to a case under Chapter 7, or closed pursuant to Section 350 of the Bankruptcy Code.

1.2    <u>Terms Defined Elsewhere in this Agreement</u>. For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|------|---------|
| "Agreement" | Preamble |
| "Asset Acquisition Statement" | 11.3 |
| "Assignment and Assumption Agreement" | 4.2(a) |
| "Assumed Lease" | 2.1(d) |
| "Assumed Lease Assignment" | 4.2(d) |
| "Assumed Leased Real Property" | 2.1(d) |
| "Assumed Liabilities" | 2.3 |
| "Assumption Notice" | 7.5(a) |
| "Bankruptcy Cases" | Recitals |
| "Bankruptcy Code" | Recitals |
| "Bankruptcy Court" | Recitals |
| "Bill of Sale" | 4.2(a) |
| "Closing" | 4.1 |
| "Closing Date" | 4.1 |
| "Competing Bid" | 7.1 |
| "Copyrights" | 1.1 (in Intellectual Property definition) |
| "Cure Amounts" | 2.5 |
| "DOJ" | 8.8(b) |
| "Employee Liabilities" | 2.4(c) |
| "Excluded Assets" | 2.2 |
| "Excluded Employee" | 9.1(b) |
| "Excluded Liabilities" | 2.4 |
| "FTC" | 8.8(b) |
| "Lease" | 5.6 |
| "Leased Real Property" | 5.6 |
| "Party" | Preamble |
| "Party Affiliate" | 12.11 |
| "Patents" | 1.1 (in Intellectual Property definition) |
| "Purchase Price" | 3.1 |
| "Purchased Assets" | 2.1 |
| "Purchased Contracts" | 2.1(g) |
| "Purchased Permits" | 5.5 |
| "Purchaser" | Preamble |
| "Purchaser Released Persons" | 12.8(a) |
| "Purchaser Releasing Person" | 12.8(b) |
| "Revised Statements" | 11.3 |
| "Seller" | Preamble |
| "Seller Released Persons" | 12.8(b) |
| "Sellers Releasing Persons" | 12.8(a) |
| "Termination Date" | 4.4(a)(i) |
| "Trade Secrets" | 1.1 (in Intellectual Property definition) |
| "Transferred Employees" | 9.1(a) |

## ARTICLE II

PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Purchase and Sale of Assets. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of Seller's and its Subsidiaries right, title and interest in, to and under the Purchased Assets, free and clear of any and all Liens and Liens, Claims, and Interests to the extent permissible under Section 363(f) of the Bankruptcy Code, other than Permitted Liens. "Purchased Assets" shall mean all assets, properties, contractual rights, goodwill, going concern value, rights and claims of Seller and its Subsidiaries primarily related to, primarily used by or held for use primarily in the Business, wherever situated and of whatever kind and nature, real or personal, tangible or intangible, whether or not reflected on the books and records of Seller or its Subsidiaries (other than the Excluded Assets), including Seller's and its Subsidiaries' right, title and interest in, to and under each of the following assets (but excluding any such assets included in Excluded Assets):

(a)    [all cash deposited into any bank accounts of Seller, its Subsidiaries or the Business after the Closing solely in respect of the Business;][6]

(b)    [all Accounts Receivable and all payments, deposits (including customer deposits and security deposits for rent, electricity, telephone or otherwise), royalties, credits, and prepaid charges and expenses of Seller or its Subsidiaries solely with respect to the Business from whatever source paid];[7]

(c)    [all Product Inventory, including the Product Inventory set forth on Schedule 2.1(c);][8]

(d)    [(i) all of the Leased Real Property listed on Schedule 2.1(d) (the "Assumed Leased Real Property") and (ii) all rights of Seller and/or its Subsidiaries under each Lease governing such Assumed Leased Real Property set forth on Schedule 2.1(d) (and as may be amended, supplemented, or otherwise modified prior to assumption and assignment with the consent of Seller, Purchaser, and the contract counterparty, the "Assumed Leases"), in each case, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;][9]

(e)    [all items of tangible personal property primarily used in the Business (except as sold or disposed of subsequent to the date hereof in the Ordinary Course of Business) and owned or leased by Seller or its Subsidiaries, including, for the avoidance of doubt, all machinery, furniture, equipment, supplies, fixtures, furnishings, spare parts, tools, shop equipment, scrap materials, mechanical equipment and vehicles; ][10]

---

[6] **NTD**: Only to be included in the modular and permanent hydrogen stations business ("HYLA") asset sale.
[7] **NTD**: Unlikely to be included in any asset sale.
[8] **NTD**: Only to be included in HYLA asset sale.
[9] **NTD**: Only to be included in HYLA, Coolidge, and Phoenix HQ asset sales.
[10] **NTD**: Only to be included in HYLA, Coolidge, and Phoenix HQ asset sales.

(f)       [the Purchased Intellectual Property;][11]

(g)       all Contracts, including bids and quotations, listed on <u>Schedule 2.1(g)</u> that Purchaser elects to assume pursuant to <u>Section 7.5</u>, but excluding Contracts that expire or are terminated prior to the Closing in accordance with their terms (collectively, the "<u>Purchased Contracts</u>"), including all rights of Seller, its Subsidiaries or the Business under the Purchased Contracts. <u>Schedule 2.1(g)</u> also sets forth the estimated amounts (as of the date hereof) of all amounts which Seller expects will be payable pursuant to Section 365(b) of the Bankruptcy Code on account of the assumption and assignment of any Purchased Contract;

(h)       all Documents, including Documents relating to the [Owned Intellectual Property][12][, Products and Product Inventory][13] (each to the extent permitted under applicable Law);

(i)       [all Purchased Permits used or held by Seller in the operation of the Business, to the extent assignable;][14]

(j)       all rights of Seller, its Subsidiaries or the Business under or pursuant to all warranties, representations, indemnities and guarantees made by suppliers, manufacturers and contractors to the extent relating to products or services provided to Seller, its Subsidiaries or the Business or to the extent relating to the Purchased Assets;

(k)       all rights, claims, or causes of action which Seller, its Subsidiaries or the Business may have against any Person with respect to the Purchased Assets or related to the Business or the Assumed Liabilities, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date, except for any such rights, claims, or causes of action which Seller or any of its Affiliates or the Business may have against Purchaser relating to this Agreement, the Sale Order and the Ancillary Documents, or any claims that Seller or any of its Affiliates has in the Bankruptcy Cases;

(l)       all goodwill and other intangible assets associated with or related to the Business or the Purchased Assets, including customer and supplier lists[ and the goodwill associated with the Owned Intellectual Property][15];

(m)       all information technology, computer systems and communications systems, computers, hardware, Software, applications, databases, websites, firmware, systems, information technology equipment, and other equipment owned, operated, leased or licensed by Seller used to process, store, maintain, or operate data, information or functions used in connection with, or in the operation of, the Business, to the extent assignable; and

(n)       those items set forth on <u>Schedule 2.1(n)</u>.

---

[11] <u>**NTD**</u>: Only to be included in IP asset sale.
[12] <u>**NTD**</u>: Only to be included in IP asset sale.
[13] <u>**NTD**</u>: Only to be included in HYLA asset sale.
[14] <u>**NTD**</u>: Only to be included in HYLA asset sale.
[15] <u>**NTD**</u>: Only to be included in IP asset sale.

2.2     Excluded Assets. Nothing contained herein shall be deemed to transfer, assign or convey the Excluded Assets to Purchaser, and Seller and its Subsidiaries shall retain all right, title and interest to, in and under the Excluded Assets. "Excluded Assets" shall mean each of the following assets, properties and rights of Seller and/or its Subsidiaries:

(a)     any assets of Seller and/or its Subsidiaries primarily or exclusively related to the Excluded Business;

(b)     any deposits or prepaid charges and expenses paid in connection with or relating to the Excluded Business or the Excluded Liabilities;

(c)     any amounts (including the Purchase Price) paid or payable to Seller pursuant to this Agreement or any other Ancillary Document;

(d)     all cash deposited into any bank accounts of Seller and its Subsidiaries;

(e)     all Contracts, other than the Purchased Contracts, to which Seller or any of its respective Affiliates is a party;

(f)     other than the Assumed Leases, all of Seller's and/or its Subsidiaries right, title and interest in owned and leased real property;

(g)     all rights to any employee retention tax credits arising as a result of the operation of the Business prior to Closing;

(h)     any Seller Plan and all assets solely related thereto;

(i)     Seller's directors and officers liability insurance policies set forth on Schedule 2.2(i);

(j)     all Equity Interests of Seller and each of its Subsidiaries, including any options, warrants or other securities exchangeable or convertible into Equity Interests of Seller or any such Subsidiary, and all related governance documents;

(k)     all bank accounts of Seller and its Subsidiaries;

(l)     all causes of action (including counterclaims) and defenses to the extent relating to any Excluded Asset;

(m)     all nontransferable Permits;

(n)     all insurance policies of Seller and its Subsidiaries and all rights of any nature with respect to such insurance policies, including any recoveries thereunder, any rights to assert claims seeking any such recoveries and insurance proceeds in respect thereof (including any third party and casualty proceeds);

(o)     all rights to any Tax refunds or credits arising as a result of the operation of the Business prior to the Closing;

(p)     all Avoidance Actions; and

(q)     those items set forth on Schedule 2.2(q).

2.3     Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, Purchaser shall assume, effective as of the Closing, the following Liabilities of Seller (collectively, the "Assumed Liabilities"):

(a)     all Liabilities of Seller and its Subsidiaries  under the Purchased Contracts to the extent that any such Liabilities: (i) arise from facts, circumstances, events or obligations to be performed after the Closing; (ii) do not arise from a breach, violation or default of such Purchased Contract by Seller or its Subsidiaries or the Business on or prior to the Closing; or (iii) are not required to be performed prior to the Closing;

(b)     all Cure Amounts;

(c)     [all Liabilities under the Assumed Leases, solely to the extent such Liabilities arise at or after the Closing;][16]

(d)     all Liabilities to the extent solely resulting from the conduct of the Business by Purchaser or its Affiliates after the Closing and do not arise or relate to any facts or circumstances arising prior to the Closing; and

(e)     those items set forth on Schedule 2.3(e).

2.4     Excluded Liabilities. Notwithstanding anything in this Agreement to the contrary, Purchaser shall not assume, be deemed to have assumed, be obligated to assume or be obliged to pay, perform or otherwise discharge, or in any other way be liable or responsible for, any Liabilities other than the Assumed Liabilities (all Liabilities not assumed by Purchaser pursuant to Section 2.3, collectively, the "Excluded Liabilities") and Seller and its Affiliates shall be solely and exclusively liable with respect to all such Liabilities. Without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims all of the Excluded Liabilities, which, for the avoidance of doubt, include:

(a)     all Liabilities incurred prior to the Closing Date or that relate to or arise in connection with the operation of the Business or Seller prior to the Closing Date;

(b)     all Liabilities relating to the Excluded Assets or any other asset that is not a Purchased Asset;

(c)     all Liabilities arising out of, relating to or with respect to (i) the employment or performance of services, or termination of employment or services by Seller or any of its Affiliates, of any individual on or before the Closing Date, (ii) workers' compensation claims against Seller related to the Business that relate to the period on or before the Closing Date, irrespective of whether such claims are made prior to or after the Closing, (iii) WARN, irrespective of whether such Liabilities arise prior to or after the Closing and insofar as such Liabilities under

---

[16] **NTD**: Only to be included in HYLA asset sale.

WARN relate to employees of Seller which are not employed by Purchaser on or after the Closing; or (iv) any Seller Plan (collectively, "Employee Liabilities");

(d)    all Liabilities arising out of, under or in connection with Contracts that are not Purchased Contracts and, with respect to Purchased Contracts, Liabilities in respect of a breach by or default of Seller or the Business accruing under such Contracts with respect to any period prior to Closing;

(e)    all Liabilities arising out of, under or in connection with any indebtedness of Seller or the Business;

(f)    all Liabilities for (i) Transfer Taxes that are the responsibility of Seller pursuant to Sections 11.1, (ii) Taxes of Seller (or any Affiliate or equityholder thereof), (iii) Taxes that relate to the Purchased Assets or the Assumed Liabilities for taxable periods (or portions thereof) ending on or before the Closing Date, including Taxes allocable to Seller or the Business pursuant to Sections 11.1 and 11.2, and (iv) payments under any Tax allocation, sharing or similar agreement (whether oral or written) among Seller and its Subsidiaries;

(g)    all Liabilities in respect of any pending or threatened Action, or any claim arising out of, relating to or otherwise in respect of (i) the operation of the Business to the extent such Action or claim relates to such operation on or prior to the Closing Date, (ii) any Excluded Asset or (iii) any Product Inventory or Product distributed or sold by or on behalf of the Business prior to the Closing Date;

(h)    all Liabilities relating to or arising under any hedging or swap agreements of Seller or the Business;

(i)    any Liability with respect to Seller Expenses;

(j)    all Environmental Costs and Liabilities, to the extent arising out of or otherwise related to (A) the ownership or operation by Seller of the Leases (or any condition thereon) on or prior to the Closing Date (including (x) the release or continuing release (if existing as of the Closing) of any Hazardous Substance, regardless of by whom or (y) any noncompliance with Environmental Laws), (B) the operation of the Business on or prior to the Closing Date, (C) the Excluded Assets or any other real property formerly owned, operated, leased or otherwise used by Seller or (D) from offsite transportation, storage disposal, treatment or recycling of Hazardous Substances generated by and taken offsite by or on behalf of Seller prior to and through the Closing Date;

(k)    all Liabilities relating to amounts required to be paid by Seller hereunder;

(l)    all Liabilities to the extent arising out of or otherwise related to any failure of the Business or any Product or any Product Inventory, to comply with any applicable Laws on or prior to the Closing Date regardless of when such non-compliance becomes the subject of an enforcement Action, product recall, or third-party claim;

(m)    all Liabilities relating to the balance deferred or unpaid of the purchase price of any property, assets, securities or services (including all Tax-related payments, seller notes, any

17

earnout or similar contingent obligation and purchase price holdbacks (including purchase price settlement), in each case, calculated as the maximum amount payable under or pursuant to such obligation) of Seller or the Business;

(n)     all Liabilities by which Seller or any of its Affiliates assures a creditor or other party against loss (including obligations in respect of letters of credit, performance bonds, bankers acceptances, indemnities or similar obligations);

(o)     all Liabilities in respect of all obligations under leases of Seller or the Business which have been or must be recorded as capital or finance leases in the financial statements relating to the Business or in accordance with GAAP;

(p)     all Liabilities in respect of payables to, and other Liabilities of or to, any Related Person or Affiliate of Seller or the Business, or any immediate family member of such Related Person or Affiliate;

(q)     any Liability arising out of the violation of any Law by Seller;

(r)     any Liability arising out of the failure of Seller to comply with any Contract; and

(s)     those items set forth on Schedule 2.4(s).

2.5     Cure Amounts. At Closing and pursuant to Section 365 of the Bankruptcy Code, Seller shall assign to Purchaser and Purchaser shall assume the Purchased Contracts, including the Assumed Leases. The cure amounts, as determined by the Bankruptcy Court, if any (the "Cure Amounts"), necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts and Assumed Leases, shall be paid by Purchaser on or before Closing.

2.6     Withholding. The Parties (or any other Person that has any withholding obligation with respect to any payment made pursuant to this Agreement) shall be entitled to deduct and withhold from any amount payable pursuant to this Agreement such amounts as such Person determines in good faith are required by Law. To the extent such amounts are so deducted or withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid.

## ARTICLE III

### CONSIDERATION

3.1     Consideration. The aggregate consideration for the Purchased Assets shall be (collectively, the "Purchase Price"):

(a)     an amount in cash equal to $[●]; plus

(b)     the assumption of the Assumed Liabilities.

3.2     <u>Good Faith Deposit</u>.

(a)     Concurrently with the execution and delivery of this Agreement, Purchaser, Seller and the Escrow Agent have entered into the Good Faith Deposit Escrow Agreement. Concurrently with execution of this Agreement, Purchaser shall pay, or cause to be paid, to the Escrow Agent the Good Faith Deposit, by wire transfer of immediately available funds, which shall be deposited by the Escrow Agent into the Good Faith Deposit Escrow Account and shall be held, safeguarded and released pursuant to the terms of this Agreement, the Good Faith Deposit Escrow Agreement, and the Bidding Procedures Order. The Good Faith Deposit shall not be subject to any Lien, Action, interests, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser.

(b)     The Good Faith Deposit shall be released from the Good Faith Deposit Escrow Account by the Escrow Agent and delivered to either Purchaser or Seller, in accordance with the provisions of this Agreement, the Good Faith Deposit Escrow Agreement and the Bidding Procedures Order as follows (and Purchaser and Seller shall deliver joint written instructions to the Escrow Agent, within three (3) Business Days, to effect such distributions as and when required hereunder):

(i)     if the Closing occurs, the Good Faith Deposit shall be released from the Good Faith Deposit Escrow Account to Seller and applied towards the amount payable by Purchaser pursuant to <u>Section 4.3(a)</u>;

(ii)     if this Agreement has been terminated by Seller pursuant to <u>Section 4.4(d)(i)</u> or <u>Section 4.4(d)(ii)</u> then the Good Faith Deposit shall be released from the Good Faith Deposit Escrow Account to Seller; and

(iii)     if this Agreement has been terminated by any Party, other than as contemplated by <u>Section 3.2(b)(ii)</u>, then the Good Faith Deposit shall be released from the Good Faith Deposit Escrow Account to Purchaser.

(c)     The Parties agree that (i) the provisions of this <u>Section 3.2</u> are an integral part of the Transactions and, without these agreements, the Parties would not have entered into this Agreement, (ii) the Good Faith Deposit represents a good faith estimate of damages that Seller would suffer and shall constitute liquidated damages and not a penalty and shall not require Seller to prove actual damages, (iii) under no circumstance shall the Good Faith Deposit be payable or retained on more than one occasion, and (iv) under no circumstance shall Seller, its Affiliates and its Related Persons be entitled to aggregate monetary damages, as a result of the failure of the Transactions to be consummated or for a breach or failure to perform hereunder or for any representation, warranty, covenant, agreement or obligation made or alleged to have been made in connection with this Agreement, other than the Good Faith Deposit. Purchaser's Affiliates and its and their Related Persons are intended third party beneficiaries of this <u>Section 3.2</u>.

## ARTICLE IV

### CLOSING AND TERMINATION

4.1    <u>Closing Date</u>. Subject to the satisfaction of the conditions set forth in <u>Sections 10.1</u>, <u>10.2</u> and <u>10.3</u> hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in <u>Article II</u> hereof (the "<u>Closing</u>") shall take place remotely via the exchange of electronic documents and signatures by electronic mail on a date to be specified by the Parties, which date shall be no later than the second (2nd) Business Day after satisfaction or waiver of the conditions set forth in Article X (other than the conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) and, in any event, no later than the Termination Date (as defined below), unless another time or date, or both, are agreed to in writing by the Parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "<u>Closing Date</u>." For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 am (prevailing Pacific Time) on the Closing Date.

4.2    <u>Deliveries by Seller</u>. At the Closing, Seller shall deliver to Purchaser:

(a)    the Bill of Sale (the "<u>Bill of Sale</u>") and Assignment and Assumption Agreement (the "<u>Assignment and Assumption Agreement</u>"), in each case, (i) in form and substance reasonably acceptable to Purchaser, and (ii) duly executed by Seller;

(b)    [assignments of the Registered Intellectual Property that constitutes Purchased Intellectual Property, in a form suitable for recording in the U.S. patent or trademark office, as applicable, and general assignments of all other Owned Intellectual Property, in form and substance reasonably acceptable to Purchaser (collectively, the "<u>IP Assignment Agreements</u>"), duly executed by Seller;][17]

(c)    a duly completed and executed IRS Form W-9 of Seller;

(d)    [an assignment of all Assumed Leases, but solely to the extent such assignment is not effected pursuant to the Sale Order, duly executed by Seller (an "<u>Assumed Lease Assignment</u>");][18]

(e)    a certified copy of the Sale Order;

(f)    Seller's Closing Certificate, as required to be delivered pursuant to <u>Section 10.1(c)</u>;

(g)    a joint payment instruction letter, duly executed by Seller, directing the Escrow Agent to immediately release the Good Faith Deposit from the Good Faith Deposit Escrow Account to Seller; and

(h)    such other agreements, consents, documents, instruments and writings as are reasonably requested by Purchaser to be delivered by Seller pursuant to this Agreement or otherwise reasonably required to consummate the Transactions.

---

[17] **<u>NTD</u>**: Only included in sale of IP.
[18] **<u>NTD</u>**: Only included in HYLA, Coolidge, and Phoenix HQ sales.

4.3     Deliveries by Purchaser. At the Closing, Purchaser shall deliver or pay, or cause to be delivered or paid, as applicable:

(a)     to Seller, an amount equal to the Purchase Price (less the Good Faith Deposit); and

(b)     to Seller, the Bill of Sale, duly executed by Purchaser;

(c)     to Seller, the Assignment and Assumption Agreement, duly executed by Purchaser;

(d)     [to Seller, the Assumed Lease Assignment, duly executed by Purchaser;][19]

(e)     [to Seller, the IP Assignment Agreements, duly executed by Purchaser;][20]

(f)     to Seller, the authorizing resolutions adopted by the board of managers, board of directors, or other applicable governing body of Purchaser authorizing this Agreement, each other Ancillary Document to which such Purchaser is a party and the consummation of the Transactions; and

(g)     to Seller, the officer's certificates required to be delivered pursuant to Section 10.2(c); and

(h)     to Seller, a joint payment instruction letter, duly executed by Purchaser, directing the Escrow Agent to immediately release the Good Faith Deposit from the Good Faith Deposit Escrow Account to Seller.

4.4     Termination of Agreement. This Agreement may be terminated prior to the Closing as follows:

(a)     by either Purchaser or Seller, upon written notice to the other Party, if:

(i)     the Closing shall not have occurred by the close of business on April 4, 2025 (the "Termination Date"); provided, that if the Closing shall not have occurred prior to such date as a result of any Required Regulatory Authorization not having been obtained, such Termination Date shall be automatically extended by sixty (60) days; provided, further, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or Seller, then such breaching Party may not terminate this Agreement pursuant to this Section 4.4(a)(i);

(ii)     there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; provided that a Party may not terminate this Agreement pursuant to this Section 4.4(a)(ii) if such Party is in material breach of any

---

[19] **NTD**: To be included in HYLA, Coolidge, and Phoenix HQ asset sales.
[20] **NTD**: Only included in the sale of IP.

of its representations, warranties, covenants or agreements contained herein and such material breach is the primary cause or grounds for such Order; or

(iii)    (A) the Bankruptcy Court enters an Order approving a Competing Bid, a Restructuring Transaction or an Alternative Transaction or (ii) a Competing Bid, a Restructuring Transaction or an Alternative Transaction is consummated;

(b)    by mutual written consent of Seller and Purchaser;

(c)    by Purchaser, upon written notice to Seller, if:

(i)    the Bankruptcy Cases are (A) converted to cases under chapter 7 of the Bankruptcy Code or (B) dismissed prior to the Closing;

(ii)    a trustee or examiner is appointed under section 1104 of the Bankruptcy Code;

(iii)    the Sale Order is modified in any material respect or in any respect adverse to Purchaser without the consent of Purchaser;

(iv)    Seller enters into a definitive agreement with respect to an Alternative Transaction;

(v)    there has been a breach by Seller of any representation, warranty, covenant or agreement made by Seller contained in this Agreement, which would result in a failure of a condition set forth in Section 10.1 or 10.3 and which breach cannot be cured or has not been cured by the earlier of (i) ten (10) Business Days after the giving of written notice by Purchaser to Seller of such breach and (ii) the Termination Date; provided, however, that the right to terminate this Agreement pursuant to this Section 4.4(c)(v) shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if Purchaser is in breach of any of its representations, warranties, covenants or agreements contained herein, such that the conditions set forth in Section 10.2(a) and Section 10.2(b) cannot be satisfied; or

(vi)    the Sale Order has not been entered by the Bankruptcy Court within ten (10) days after the hearing to consider the entry of the Sale Order and, as of the time of such termination of this Agreement, the Sale Order has not been entered by the Bankruptcy Court.

(d)    by Seller, upon written notice to Purchaser, if:

(i)    there has been be a breach by Purchaser of any representation, warranty, covenant or agreement made by Purchaser contained in this Agreement, which would result in a failure of a condition set forth in Section 10.2 or 10.3 and which breach cannot be cured or has not been cured by the earlier of (i) ten (10) Business Days after the giving of written notice by Seller to Purchaser of such breach and (ii) the Termination Date; provided, however, that the right to terminate this Agreement pursuant to this

22

Section 4.4(d)(i) shall not be available to Seller if the failure of Seller to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or Seller is in breach of any of its representations, warranties, covenants or agreements contained herein such that the conditions set forth in Section 10.1(a) and Section 10.2(a) cannot be satisfied; or

      (ii)    (A) all of the conditions set forth in Section 10.1 and Section 10.3 have been satisfied or, to the extent permitted by applicable Law, waived (other than those conditions that by their nature are to be satisfied at the Closing), (B) Seller has indicated to Purchaser in writing that Seller is ready, willing and able to consummate the Transactions (subject to the satisfaction or waiver of all of the conditions set forth in Section 10.2), and (C) the Parties fail to consummate the Transactions by the earlier of (1) the date three (3) Business Days following the date on which the Closing should have occurred pursuant to Section 4.1 and (2) the Termination Date.

    4.5    Procedure Upon Termination. In the event of termination and abandonment by Purchaser or Seller, or both, pursuant to Section 4.4, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Seller. If this Agreement is terminated as provided herein each Party shall redeliver all documents, work papers and other material of any other Party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Party furnishing the same.

    4.6    Effect of Termination.

      (a)    In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without Liability to Purchaser or Seller; provided, however, that the obligations of the Parties set forth in Article XII and Sections 3.2, 4.5, and 4.6 hereof shall survive any such termination and shall be enforceable hereunder; provided, further, however, that nothing in this Section 4.6 shall be deemed to (a) relieve Purchaser or Seller of any Liability for a breach of this Agreement prior to the date of termination or any Fraud, willful misconduct or criminal acts prior to the effective date of such termination or (b) impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement.

      (b)    Notwithstanding anything to the contrary herein, the Parties agree that payment of the Good Faith Deposit to Seller, as set forth herein, is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Seller for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision. If this Agreement is terminated in a manner in which Seller is entitled to payment of the Good Faith Deposit in accordance with Section 3.2(b)(ii), then (i) the payment of the Good Faith Deposit to Seller as liquidated damages (and not a penalty) shall be the sole and exclusive right (whether in tort, contract or otherwise) of Seller or any of its Affiliates or Related Persons to recover monetary damages or losses from Purchaser, its Affiliates or any of their Related Persons for Purchaser's

23

breach of this Agreement or any Ancillary Document, including Purchaser's failure to consummate the Transactions or for any breach or failure to perform hereunder or for any representation, warranty, covenant, agreement or obligation made or alleged to have been made in connection with this Agreement, and (ii) in no event shall Purchaser (or any of its Affiliates or Representatives) have any obligation with respect thereto, other than execution and delivery of a joint written instructions to the Escrow Agent to deliver the Good Faith Deposit to Seller in accordance with <u>Section 4.3(h)</u>. Upon delivery of the joint written instructions pursuant to <u>Section 4.3(h)</u>, none of Purchaser, its Affiliates or any of their Related Persons shall have any further liability or obligation (whether in tort, contract or otherwise) to Seller, its Affiliates or any of its Related Persons relating to or arising out of this Agreement, the Ancillary Documents, or the Transactions.

### ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF SELLER

Except (a) as set forth in the disclosure schedules delivered by Seller to Purchaser (the "<u>Disclosure Schedule</u>"); <u>provided</u> that disclosure in the Disclosure Schedule as to a specific representation or warranty shall qualify any other sections of this Agreement to the extent (notwithstanding the absence of a specific cross reference) it is reasonably apparent on its face that such disclosure relates to such other sections), and (b) as otherwise disclosed or identified in the Seller Disclosure Documents (other than any forward-looking disclosures contained in the "Forward Looking Statements" and "Risk Factors" sections of the Seller Disclosure Documents or any other disclosures contained or referenced therein of information, factors or risks that are predictive, cautionary or forward-looking in nature), Seller hereby makes the representations and warranties contained in this <u>Article V</u> to Purchaser.

5.1    <u>Organization, Good Standing, Authority, and Validity</u>.

(a)    Seller is duly formed or incorporated and validly existing and in good standing under the laws of its respective state of incorporation or formation. Subject to any necessary authority from the Bankruptcy Court, Seller has the requisite corporate power and authority to use, own and operate the Purchased Assets and to carry out its obligations under this Agreement. Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    The execution and delivery of this Agreement has been duly authorized by all necessary corporate action by the boards of directors of Seller, and no other corporate proceedings are necessary for the performance by Seller of its obligations under this Agreement or the consummation by Seller of the Transactions. This Agreement has been duly and validly executed and delivered by Seller and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Purchaser, is a valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

5.2     No Conflict.  Neither the execution and delivery by Seller of this Agreement or any of the Ancillary Documents to which Seller is a party, nor (subject to the Bankruptcy Court's entry of the Sale Order), the consummation of the Transactions, nor compliance by Seller with any of the provisions hereof or thereof, will (x) conflict with or result in any material breach of any provision of the certificate of incorporation of Seller or the bylaws of Seller, or (y) materially violate any Law or any Order applicable to Seller, any of Seller's Affiliates or any of their respective properties or assets.

5.3     Title and Ownership. Seller or, as applicable, its Subsidiaries have good and valid title to, or right by license, lease or other agreement to use, the Purchased Assets. Subject to the entry of the Sale Order, at the Closing, Seller will have the right to transfer, and Purchaser will acquire good and marketable title to, in and under, the Purchased Assets to Purchaser free and clear of all Liens, other than Liens included in the Assumed Liabilities and Permitted Liens.

5.4     Compliance with Law. (i) Seller and its Subsidiaries have operated the Business in material compliance with all applicable Laws, and (ii) except as may result from the Bankruptcy Case, Seller and its Subsidiaries have not received written notice of any violation of any applicable Laws, nor are Sellers in default with respect to any Order applicable to the Purchased Assets.

5.5     Permits.   All Permits required for, or used primarily in connection with the ownership, operation and/or management of, the operation of the Business (the "Purchased Permits") are in full force and effect in all material respects.

5.6     Leased Real Property.  [Section 5.6 of the Disclosure Schedule sets forth a true, accurate, and complete list of all leased real property that is used for, or held for use in, the Business (such real property, the "Leased Real Property") which Seller as tenant or lessee leases, subleases, licenses, rents or otherwise occupies under any lease, sublease, license or other occupancy agreement as a tenant, subtenant or licensee as of the date of this Agreement. Seller has made available true and complete copies of each lease for the Leased Real Property (each, a "Lease"), including any guarantees, modifications, amendments, extensions and/or assignments thereto or thereof. Except as disclosed on Section 5.6 of the Disclosure Schedule, there are no leases, subleases, licenses, occupancy agreements or similar written agreements granting to any Person (other than Seller) the right to use or occupy any Leased Real Property. Except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to creditors' rights generally, or subject to general principles of equity, Seller has a valid, binding and enforceable leasehold interest under the applicable Lease for each of the Leased Real Properties, as applicable, in each case free and clear of all Liens except Permitted Liens. As of the date of this Agreement, (i) Seller has complied in all material respects with the terms of all Leases, (ii) all such Leases are in full force and effect, enforceable in accordance with their terms against Seller and, to the Knowledge of Seller, the counterparties thereto, and (iii) to the Knowledge of Seller, no event has occurred and no circumstances exists, which, if not remedied, and whether with or

without the passage of time or both would result in a material breach or material default under any Lease.][21]

5.7    Contracts.  As of the Effective Date, other than as set forth on Section 5.7 of the Disclosure Schedules or in motions or other pleadings or similar items filed with the Bankruptcy Court, neither Seller nor, to the Knowledge of Seller, any other party to any of the Purchased Contracts has commenced any action against any of the parties to such Purchased Contracts or given or received any written notice of any material default or violation under any Purchased Contract that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Sale Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Purchased Contracts). Assuming due authorization, execution, delivery and performance by the other parties thereto, each of the Purchased Contracts is, or will be immediately prior to the Closing, valid, binding and in full force and effect against Seller, except as otherwise set forth on Section 5.7 of the Disclosure Schedules.

5.8    Intellectual Property.  [Section 5.8 of the Disclosure Schedules sets forth an accurate and complete list of all registrations and applications for Intellectual Property that are owned by Seller and its Subsidiaries and primarily used in connection with the ownership, operation and/or management of the Business. Except as set forth in Section 5.8 of the Disclosure Schedules, Seller or its Subsidiaries, as applicable, are the sole and exclusive owners of the Owned Intellectual Property free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Liens) pursuant to the Sale Order. Except as set forth in Section 5.8 of the Disclosure Schedules, or as limited by Section 365(c)(1)(A) of the Bankruptcy Code, Seller or its Subsidiaries, as applicable, own all right, title and interest to, or are valid licensees with respect to, the Owned Intellectual Property, and, at Closing, will convey the Owned Intellectual Property to Purchaser free and clear of Liens (other than Liens included in the Assumed Liabilities and Permitted Liens) pursuant to the Sale Order. To the Knowledge of Seller, (i) no Person is engaging in any activity that infringes, dilutes, misappropriates or violates any Owned Intellectual Property and (ii) no claim has been asserted to Seller that the use of any Owned Intellectual Property or the operation of the Business infringes, dilutes, misappropriates or violates the Intellectual Property of any third party.][22]

5.9    Employees.

(a)    Seller is not party to any collective bargaining agreements or similar labor-related Contracts with any labor union representing any Transferred Employees. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) there is no written demand from any labor union seeking recognition as the exclusive bargaining representative of any Transferred Employee by Seller and (ii) there is no pending, or to the Knowledge of Seller, threatened strike, lockout, organized labor slowdown, or concerted work stoppage by any Transferred Employees.

(b)    Seller is in compliance with all applicable Laws with respect to employment practices and labor, including those related to wage and hours, collective bargaining,

---

[21] **NTD**: Only to be included in HYLA, Coolidge, and Phoenix HQ sales.
[22] **NTD:** Only included in IP sale.

unemployment insurance, workers' compensation, immigration, harassment and discrimination, disability rights and benefits, affirmative action, and employee layoffs, except where the failure to be in compliance would not reasonably be expected to result in a Material Adverse Effect.

(c)     There is no Action pending or, to the Knowledge of Seller, threatened in writing against Seller alleging a violation of any applicable labor or employment Law brought by any Transferred Employee before any Governmental Body, except for such Actions (or threatened Actions) that, if adversely determined, would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

5.10   <u>No Other Representations and Warranties</u>. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS <u>ARTICLE V</u>, NEITHER SELLER, NOR ANY OTHER PERSON MAKES ANY REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO SELLER, ITS BUSINESS, OPERATIONS, ASSETS, STOCK, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE) OR PROSPECTS. PURCHASER HEREBY EXPRESSLY WAIVES ANY CLAIMS AND CAUSES OF ACTION AND ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE IN EACH CASE RELATING TO THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO PURCHASER AND ITS REPRESENTATIVES BY OR ON BEHALF OF SELLER, INCLUDING MATERIALS FURNISHED TO PURCHASER THROUGH THE FIRMEX VIRTUAL DATA ROOM. WITHOUT LIMITING THE FOREGOING, NEITHER SELLER NOR ANY OTHER PERSON IS MAKING ANY REPRESENTATION OR WARRANTY TO PURCHASER WITH RESPECT TO ANY FINANCIAL PROJECTION OR FORECAST RELATING TO THE BUSINESS, OPERATIONS, ASSETS, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE) OR PROSPECTS OF SELLER OR BUSINESS.

**ARTICLE VI**

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the representations and warranties contained in this <u>Article VI</u> to Seller as of the date hereof.

6.1     <u>Organization, Good Standing and Other Matters</u>. Purchaser is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and has all requisite power and authority to own, lease and operate its assets and properties and to carry on its business as now being conducted and as presently proposed to be conducted by it except where such failure would not materially and adversely affect Purchaser's ability to consummate the Transactions.

6.2     <u>Authority</u>. Purchaser has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Ancillary Documents to which

Purchaser is a party, and the consummation by Purchaser of the Transactions, have been duly authorized and approved by its respective board of directors (or equivalent governing body), and no other action on the part of Purchaser or each entity's equityholders is necessary to authorize the execution, delivery and performance of this Agreement or any Ancillary Documents and the consummation of the Transactions. This Agreement and each of the Ancillary Documents to which Purchaser is a party has been duly executed and delivered by Purchaser, as the case may be, and, assuming the due execution of this Agreement and each of the Ancillary Documents to which Purchaser is a party by the other Persons that are a party thereto, constitute valid and binding obligations of Purchaser, as the case may be, enforceable against it in accordance with their terms except (a) to the extent that enforceability may be subject to, and limited by, applicable bankruptcy, insolvency, reorganization, moratorium, receivership or other Laws affecting the enforcement of creditors' rights generally and (b) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any proceeding thereto may be brought.

6.3     <u>No Conflict; Required Filings and Consents</u>. Except as set forth in <u>Schedule 6.3</u>, the execution and delivery of this Agreement and the consummation of the Transactions by Purchaser will not (a) violate the provisions of Purchaser's organizational documents, (b) violate any Law or Order to which it is subject or by which any of its properties or assets is bound, (c) require Purchaser to obtain any consent or approval, or give any notice to, or make any filing with, any Governmental Body, (d) result in a material violation or breach of (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation, modification, acceleration, first offer or first refusal under, or require the consent of any third party to, any material Contract to which Purchaser is a party, or (e) result in the imposition or creation of any Lien upon or with respect to any of Purchaser's assets or properties; excluding from the foregoing <u>clauses (a)</u> through <u>(e)</u> consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation, modification or termination, and Liens, the existence of which would not, individually or in the aggregate, materially and adversely affect Purchaser's ability to consummate the Transactions.

6.4     <u>Litigation</u>. There are no Actions pending against, or threatened against, Purchaser that would materially and adversely affect Purchaser's ability to consummate the Transactions.

6.5     <u>Financial Capability</u>.

(a)     Purchaser has and will have, at the Closing and at all times from the date of this Agreement to the Closing, sufficient funds to: (i) make all payments contemplated by this Agreement; and (ii) pay all fees and expenses required to be paid by Purchaser.

(b)     Purchaser understands and acknowledges that its obligations under this Agreement are not in any way contingent upon or otherwise subject to or conditional upon Purchaser's consummation of any financing arrangements, Purchaser's obtaining of any financing or the availability, grant, provision or extension of any financing to Purchaser.

6.6     <u>No Other Representations and Warranties</u>. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS <u>ARTICLE VI</u>, SELLER ACKNOWLEDGES AND AGREES THAT NEITHER PURCHASER NOR ANY OTHER

28

PERSON MAKES ANY REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO SELLER OR ITS BUSINESS, OPERATIONS, ASSETS, STOCK, LIABILITIES, CONDITION (FINANCIAL OR OTHERWISE) OR PROSPECTS. SELLER HEREBY EXPRESSLY WAIVES ANY CLAIMS AND CAUSES OF ACTION AND ANY OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE IN EACH CASE RELATING TO THE ACCURACY, COMPLETENESS OR MATERIALITY OF ANY INFORMATION, DATA OR OTHER MATERIALS (WRITTEN OR ORAL) HERETOFORE FURNISHED TO SELLER AND ITS REPRESENTATIVES BY OR ON BEHALF OF PURCHASER.

## ARTICLE VII

### BANKRUPTCY COURT MATTERS

7.1     <u>Competing Bids</u>. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids in respect of the Purchased Assets (whether in combination with other assets of Seller and its respective Subsidiaries or otherwise) in accordance with the terms of the Bidding Procedures Order (each, a "<u>Competing Bid</u>").

7.2     <u>The Sale Order</u>. Subject to their right to pursue a Competing Bid in accordance with the Bidding Procedures Order, Seller shall use their best efforts to cause the Bankruptcy Court to enter a Sale Order, which contains, among other provisions requested by Purchaser, the following provisions:

(a)     the sale of the Purchased Assets by Seller to Purchaser (A) are or will be legal, valid and effective transfers of the Purchased Assets; (B) vest or will vest Purchaser with all right, title and interest of Seller to the Purchased Assets free and clear of all Liens, Claims, and Interests, and other "interests" pursuant to Section 363(f) of the Bankruptcy Code (other than Permitted Liens); and (C) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the state in which Seller is incorporated and any other applicable non-bankruptcy laws;

(b)     all Persons are enjoined from taking any actions against Purchaser or any Affiliates of Purchaser (as they existed immediately prior to the Closing) to recover any claim which such Person has solely against Seller or its Affiliates;

(c)     obligations of Seller relating to Taxes, whether arising under law, by this Agreement, or otherwise, shall be fulfilled by Seller;

(d)     the provisions of the Sale Order are non-severable and mutually dependent;

(e)     provide that Purchaser will not have any derivative, successor, transferee or vicarious liability for Liabilities of Seller or any Subsidiary of Seller (whether under federal or state law or otherwise) as a result of the sale of the Purchased Assets, including such Liabilities on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Business or the Purchased Assets;

29

(f)     Purchaser has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, the Transactions are undertaken by Purchaser and Seller at arm's length, without collusion and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and such Parties are entitled to the protections of Section 363(m) of the Bankruptcy Code;

(g)     all Purchased Contracts shall be assumed by Purchaser and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code and Purchaser shall be obligated to pay all Cure Amounts pursuant to <u>Section 2.5</u> of this Agreement;

(h)     the Bankruptcy Court retains exclusive jurisdiction to interpret and enforce the provisions of this Agreement, the Bidding Procedures Order and the Sale Order in all respects; <u>provided</u>, <u>however</u>, that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this clause or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter; and

(i)     such other provisions as Purchaser may agree to.

7.3     <u>Bankruptcy Court Filings</u>.

(a)     At least twenty-one (21) days prior to the hearing approving the Sale Order, Seller shall serve a copy of the Sale Motion (along with a copy at the proposed Sale Order and the Bidding Procedures Order) on each jurisdiction where the Purchased Assets are subject to Tax, all creditors and equityholders of Seller, applicable regulators, and all parties that have an interest in the Purchased Assets.

(b)     Seller shall use its best efforts to obtain entry of the Sale Order no later than the Termination Date.

(c)     Seller and Purchaser acknowledge that this Agreement and the Transactions are subject to entry of the Sale Order. In the event of any discrepancy between this Agreement, and the Sale Order, the Sale Order shall govern.

(d)     Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement.

(e)     After entry of the Sale Order, Seller shall not take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Order.

(f)     To the extent reasonably practicable, prior to filing any material pleadings, motions or other document in the Bankruptcy Cases that relates, in material part, to this Agreement, Seller shall (i) use commercially reasonable efforts to provide a copy thereof to Purchaser and its counsel, (ii) provide Purchaser and its counsel a reasonable opportunity to review and comment

on such document, and any amendment or supplement thereto and (iii) reasonably consider any reasonable comments of Purchaser and its counsel, as determined in the sole discretion of Seller and its counsel, into such document and any amendment or supplement thereto that are consistent with the terms of this Agreement and the Transactions.

(g)     In the event an appeal is taken, or a stay pending appeal is requested, from the Sale Order, Seller shall promptly notify Purchaser of such appeal or stay request. Seller shall use commercially reasonable efforts to defend any such appeal.

7.4     <u>Notice to Holder of Liens, Claims, and Interests</u>. Seller shall provide notice of the Sale Order to all holders of Liens, Claims, and Interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and any other applicable Order of the Bankruptcy Court.

7.5     <u>Purchased Contracts</u>.

(a)     Seller shall file (or cause to be filed) a notice of assumption (the "<u>Assumption Notice</u>") with the Bankruptcy Court in accordance with the Bidding Procedures Order and serve such notice on each counterparty to a Purchased Contract listed thereon. The Assumption Notice shall identify all Purchased Contracts that Seller and Purchaser believe may be assumed and assigned in connection with the sale of the Purchased Assets and set forth a good faith estimate of the amount of Cure Amounts applicable to each such Purchased Contract (and if no Cure Amount is estimated to be applicable with respect to any particular Purchased Contract, the amount of such Cure Cost designated for such Purchased Contract shall be "$0.00"). Purchaser shall have the right, by written notice delivered to Seller at any time during the period from and after the date hereof and until the Closing Date to delete any Contract (including any Lease) from <u>Schedule 2.1(g)</u> (it being understood that any such Contract deleted by Purchaser from <u>Schedule 2.1(g)</u> may subsequently be rejected by Seller in the Bankruptcy Cases). Purchaser shall also have the right by written notice delivered to Seller at any time during the period from and after the date hereof and until the Closing Date to add any Contract to <u>Schedule 2.1(g)</u>; <u>provided</u> that such Contract has not been previously rejected in the Bankruptcy Cases.

(b)     Prior to the Closing Date, Purchaser shall provide to Seller a list of those Purchased Contracts that Purchaser elects to have assumed and assigned to Purchaser on the Closing Date. Only those executory Purchased Contracts that Purchaser elects to have assumed and assigned prior to the Closing Date will constitute Purchased Contracts and will be assumed by Purchaser and assigned to Purchaser pursuant to the Sale Order. Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Purchased Contracts and to determine the amount of the Cure Amounts; <u>provided</u>, that nothing herein shall preclude Seller from filing one or more motion to reject any Contracts that are not Purchased Contracts.

(c)     Notwithstanding any provision in this Agreement to the contrary, a Contract shall not be a Purchased Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is (i) deemed rejected under Section 365 of the Bankruptcy Code, (ii) the subject of an objection to assignment or assumption or requires the consent of any Governmental Body or other third party (other than, and in addition to, the Bankruptcy Court) in order to permit the assumption and assignment by Seller to Purchaser of such Contract pursuant to

Section 365 of the Bankruptcy Code, and such objection has not been resolved or such consent has not been obtained prior to the thirtieth day following the Closing Date (as such period may be extended by mutual agreement of Seller and Purchaser), or (iii) is terminated by any party thereto other than Seller, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as a Purchased Contract hereunder and is not continued or otherwise extended upon assumption. In no event shall the failure to assign to Purchaser any Contract in accordance with subsections (i) through (iii) above reduce the Purchase Price payable to Seller or constitute a failure to satisfy the conditions precedent of Seller under Section 10.2.

(d)      Subject to the terms of Section 4.2, Section 4.3, Section 7.5(a) and Section 7.5(b), Purchaser shall make provision for the payment of the Cure Amounts in accordance with the Sale Order.

(e)      Notwithstanding any provision in this Agreement to the contrary, from and after the date of the Assumption Notice through the Closing Date, Seller will not reject or take any action (or fail to take any action necessary to prevent rejection by operation of Law) to reject, withdraw, repudiate or disclaim any Purchased Contract unless (i) Purchaser has provided its prior written consent or (ii) Purchaser has removed such Purchased Contract from the list of Contracts to be assumed and assigned.

**ARTICLE VIII**

COVENANTS

8.1     <u>Access to Information</u>. Seller agrees that, from the date hereof until the earlier of the Closing Date and the termination of this Agreement, Purchaser shall be entitled, through its Representatives, to make such investigation of the properties, records, businesses and operations of the Business and such examination of the books, records and financial condition of the Business as it reasonably requests in advance in writing, and to make extracts and copies of such books and records at Purchaser's sole cost and expense; <u>provided</u>, <u>however</u>, that (a) such access does not unreasonably interfere with the operation of Seller or the Business and shall be subject to Seller's reasonable security measures and insurance requirements, (b) Purchaser and its authorized agents and Representatives shall not contact or otherwise communicate with the employees, customers or suppliers of Seller or the Business in connection with the transactions contemplated by this Agreement unless, in each instance, approved in writing in advance by Seller, (c) under no circumstances shall Purchaser be entitled to conduct any sampling, testing or other surface or subsurface investigation of any environmental media or other building material without consent of Seller, which shall not be unreasonably withheld or delayed, and (d) nothing herein shall require Seller to furnish to Purchaser or provide Purchaser with access to information that legal counsel for Seller reasonably concludes is restricted by applicable Contract or Law except in strict compliance with the applicable Contract or Law, or that may be subject to attorney-client privilege. Seller shall use reasonable efforts to promptly deliver to Purchaser such copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed by Seller in the Bankruptcy Cases related, in material part, to the proposed sale of the Purchased Assets and otherwise cooperate with Purchaser, to the extent reasonably necessary in connection with Purchaser's preparation for or participation in any part of the Bankruptcy Cases in which Purchaser's participation is necessary, required or reasonably appropriate. Seller shall promptly deliver to Purchaser all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed in any other Action as Purchaser may reasonably request.

8.2     <u>Conduct of the Business Pending the Closing</u>. Between the date of this Agreement and the Closing Date, Seller shall use commercially reasonable efforts to, and, as applicable, cause its Affiliates and Related Persons to use commercially reasonable efforts to, (i) obtain those third party consents set forth on <u>Schedule 8.2</u>, waivers, authorizations and Required Regulatory Authorizations, and of all other Persons, required to be obtained by Seller in connection with the execution, delivery and performance by it of this Agreement and the Ancillary Agreements to which Seller is a party; provided, however, that the failure to obtain any such third party consents set forth on <u>Schedule 8.2</u> shall not be deemed a breach of this Agreement; (ii) take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the Transactions; and (iii) maintain and preserve the Purchased Assets substantially in accordance with Seller's current practices and procedures.

8.3     <u>Preservation of Records</u>. For a period of until the later to occur of (a) three (3) years after the Closing Date and (b) the conclusion of all proceedings relating to the Bankruptcy Cases, Purchaser shall promptly provide to Seller and its respective Affiliates (after reasonable notice and during reasonable business hours, and solely to the extent such access does not unreasonably

33

interfere with the business of Purchaser and its Affiliates), at Seller's sole cost and expense, access to all Documents included in the Purchased Assets for periods prior to the Closing and reasonable access to Transferred Employees with the consent of Purchaser to the extent such access is necessary in order for Seller or its Affiliates (as applicable) to comply with applicable Law or any Contract to which it is party, for liquidation, winding up, Tax reporting or other proper purposes, including any litigation and claims that are Excluded Liabilities, and so long as such access is subject to an obligation of confidentiality and would not interfere unreasonably with the Business or operations of Purchaser and its Affiliates. Such access shall include access to any information in electronic form to the extent reasonably available and to the extent Purchaser elects in its sole discretion to provide such information in electronic form.

8.4     Publicity. Following the Closing Date, neither Seller nor any of its Affiliates shall issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of Purchaser, unless any filing, announcement, or other disclosure is otherwise required by applicable Law (including, for the avoidance of doubt, as required by the Securities Act and the Exchange Act and pursuant to the rules and regulations of any applicable stock exchange) or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement.

8.5     Assignment of Contracts and Rights.

(a)     To the maximum extent permitted by the Bankruptcy Code, the Purchased Assets shall be assigned to and assumed by Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable and all Cure Amounts shall be paid pursuant to Section 2.5 of this Agreement. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment without the consent of a third party would constitute a breach or in any way adversely affect the rights of Purchaser following the Closing (all such Purchased Assets, "Delayed Transfer Assets"). For the avoidance of doubt, no Excluded Asset shall be deemed a Delayed Transfer Asset. If, as of the Closing Date, such consent is not obtained or such assignment is not attainable pursuant to sections 105, 363 or 365 of the Bankruptcy Code other than at Purchaser's request then until the earlier of (x) one hundred eighty (180) days from the Closing Date and (y) the Wind-Up End Date, but in no event earlier than ninety (90) days from the Closing Date, unless otherwise mutually agreed to by Seller and the Purchaser, Seller shall:

(i)     hold the Delayed Transfer Assets in trust for Purchaser;

(ii)     comply with the terms and provisions of or relating to the Delayed Transfer Assets as agents (or such other designation as may be permitted by applicable Law) for Purchaser at Purchaser's cost and for Purchaser's benefit; and

(iii)     co-operate with Purchaser in any reasonable and lawful arrangements designed to provide the benefits of the Delayed Transfer Assets to Purchaser, including subcontracting, sublicensing or subleasing the Delayed Transfer Assets to Purchaser.

8.6     Transfer of Intellectual Property. If, at any time after the Closing Date, Seller or Purchaser, or any of their respective Affiliates, discovers that any Purchased Intellectual Property has not been transferred by Seller as contemplated herein, Seller will promptly transfer or cause to be transferred, such Purchased Intellectual Property to Purchaser or its designee in accordance with the terms of this Agreement (including by executing and delivering to Purchaser or its designee, or causing to be executed and delivered, any instruments and documents necessary to effect such transfer of such Purchased Intellectual Property); provided, that Purchaser shall not be required to pay Seller any additional compensation for such Purchased Intellectual Property. Prior to any such transfer, Seller will hold such Purchased Intellectual Property in trust for Purchaser and pay over to Purchaser any amounts or benefits received with respect to such Purchased Intellectual Property following the Closing Date.

8.7     Receipt of Misdirected Assets; Liabilities.

(a)     From and after the Closing, if Seller or any of its respective designees receives any right, property or asset that is a Purchased Asset, Seller shall transfer or cause such designee to transfer such right, property or asset (and shall endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its designees receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its designees to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to Seller, and such asset will be deemed the property of Seller held in trust Purchaser for Seller until so transferred.

(b)     From and after the Closing, if Seller or any of its respective designees is subject to a Liability that is an Assumed Liability, then Seller shall promptly transfer or cause such of its designees to transfer such Assumed Liability to Purchaser, and Purchaser shall assume and accept such Assumed Liability. From and after the Closing, if Purchaser or any of its designees is subject to a Liability that is an Excluded Liability, Purchaser shall promptly transfer or cause such of its designees to transfer such Excluded Liability to Seller, and Seller shall assume and accept such Excluded Liability.

8.8     HSR Act.

(a)     [If applicable, subject to the terms and conditions of this Agreement, each of the parties will (i) use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary under applicable Antitrust Laws to consummate the Transactions, (ii) if the Transactions require a Notification and Report Form pursuant to the HSR Act, use commercially reasonable efforts to file such Notification and Report Form with respect to the transactions contemplated by this Agreement within five (5) Business Days following the entry of the Sale Order, supplying as promptly as practicable any additional information and documentary material that may be requested pursuant to the HSR Act and (iii) use commercially reasonable efforts to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as practicable.

(b)     In connection with the efforts referenced in <u>Section 8.8(a)</u> to obtain all requisite approvals and authorizations for the Transactions under the HSR Act or any other Antitrust Law (if applicable), each of the parties shall use commercially reasonable efforts to (i) cooperate with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party, (ii) keep the other parties informed in all material respects of any material communication received by such party from, or given by such party to, the Federal Trade Commission (the "<u>FTC</u>"), the Antitrust Division of the Department of Justice (the "<u>DOJ</u>") or any other Government Authority and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated by this Agreement and (iii) permit the other parties to review any material communication given to it by, and consult with each other in advance of any meeting or conference with, the FTC, the DOJ or any other Government Authority in connection with any proceeding by a private party. The foregoing obligations in this <u>Section 8.8(b)</u> shall be subject to the Confidentiality Agreement with respect to the confidential information of Purchaser and Seller, and any attorney-client, work product or other privilege, and each of the Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as such other parties may reasonably request in connection with the foregoing.][23]

## ARTICLE IX

## EMPLOYEES AND EMPLOYEE BENEFITS

9.1     <u>Employment</u>.

(a)     <u>Transferred Employees</u>. Subject to Seller providing an updated Employee Census prior to Closing, prior to the Closing, Purchaser, or an Affiliate of Purchaser, shall deliver, in writing, an offer of employment (on an "at will" basis) to those employees of Seller identified by Purchaser, at Purchaser's sole discretion, on a schedule to be delivered to Seller no later than ten (10) Business Days prior to the Closing to commence immediately upon the day following the Closing, subject to Purchaser's and its Affiliates' human resources policies and standard pre-employment requirements and screenings and contingent on the offeree's agreement to standard policies, practices, agreements and procedures. Such individuals who accept such offer by the Closing Date and commence employment with such Affiliate of Purchaser are hereinafter referred to as the "<u>Transferred Employees</u>." Subject to applicable Laws, on and after the Closing Date, Purchaser or the relevant Affiliate of Purchaser employing the Transferred Employees shall have the right to reassign or dismiss any or all Transferred Employees at any time, with or without cause, and to change the terms and conditions of their employment (including compensation and employee benefits provided to them).

(b)     <u>Excluded Employees</u>. Any employee of Seller who (i) is not offered employment by Purchaser, on behalf of the Affiliate of Purchaser referenced in <u>Section 9.1(a)</u>, prior to Closing, (ii) does not accept an offer of employment with such Affiliate of Purchaser or

---

[23] **NTD**: Subject to antitrust review.

(iii) does not commence employment with such Affiliate of Purchaser, in each case pursuant to Section 9.1(a), is hereinafter referred to as an "Excluded Employee."

(c)     Seller agrees that, notwithstanding the terms of any noncompetition, customer non-solicit or other restrictive covenant obligation between Seller and any of its employees, such employee shall be permitted to provide services to Purchaser and its Affiliates following the Closing, and Seller will not seek to enforce the terms of any such restrictive covenant following the Closing with respect to such employee's services to Purchaser and its Affiliates.

(d)     Except as otherwise set forth under this Agreement, Seller shall retain all Employee Liabilities.

9.2     Alternate Procedure. Pursuant to the "Alternate Procedure" provided in Section 5 of Revenue Procedure 2004-53, 2004-34 I.R.B. 320, (i) Purchaser shall report on a successor basis as set forth therein, (ii) Seller will be relieved from filing a Form W-2 with respect to any Transferred Employees, and (iii) Purchaser will undertake to file (or cause to be filed) a Form W-2 for each such Transferred Employee for the entire year during which such employees are employed by Purchaser that includes the Closing Date, including the portion of such year that such employee was employed by Seller.

9.3     Employee Benefits.  For a period of one year from and after such time as a Transferred Employee begins employment with Purchaser, Purchaser shall provide such Transferred Employee to be provided with (i) a base salary or hourly wage rate no less favorable than the base salary or hourly wage rate such Transferred Employee received from Seller immediately prior to the date hereof, and (ii) other compensation and benefits (excluding defined benefit pension, retiree medical, equity or equity-based incentive compensation, change in control, nonqualified deferred compensation and severance benefits) that are substantially similar in the aggregate as those provided by Seller to such Transferred Employee as of immediately prior to the date hereof; provided, that such compensation and benefits are consistent with market norms. For purposes of eligibility, vesting, and determining level of benefits under the benefit plans and programs maintained by Purchaser or any of its Affiliates or any applicable PEO after the Closing Date, each Transferred Employee shall be credited with his or her years of service with Seller before the Closing Date, except to the extent such credit would result in a duplication of benefits. All accrued and unused vacation balances as of the date hereof with respect to each Transferred Employee whose primary place of employment is in the United States will be credited under the vacation policy of Purchaser or one of its Affiliates.  After such one year period, (A) all terms and conditions of employment of the Transferred Employees shall be determined by Purchaser or its Affiliate, as applicable, in its sole discretion, and (B) each Transferred Employee shall be eligible to participate in all employee benefit plans and programs of Purchaser and its Affiliates made available to similarly situated employees of Purchaser and its Affiliates, subject to the terms of the applicable employee benefit plan/program.

9.4     Sole Beneficiaries. This Article IX shall operate exclusively for the benefit of Seller and Purchaser and not for the benefit of any other Person, including any current or former employees of Seller, the Excluded Employees or the Transferred Employees, which Persons shall have no rights to enforce this Article IX. Nothing in this Article IX shall: (i) entitle any Transferred Employee to employment with Purchaser or any of its Affiliates; (ii) change such Transferred

Employee's status as an employee-at-will or restrict the ability of Purchaser to terminate the service of any Transferred Employee at any time or for any reason; (iii) create any third party rights in any current or former service provider of Seller; (iv) constitute the establishment or adoption of or be treated as an amendment of or modification to any Seller Plan or other employee benefit plan or arrangement or restrict the ability of Purchaser, Seller or any of its respective Affiliates to amend, modify, discontinue or terminate any Seller Plan or other employee benefit plan or arrangement; or (v) provide any Transferred Employee with any rights to continued employment (or resumed employment) or any other matter (including level of compensation or benefits for any specified period, of any nature or kind whatsoever under or by reason of this Agreement).

## ARTICLE X

## CONDITIONS TO CLOSING

10.1    <u>Conditions Precedent to Obligations of Purchaser</u>. The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Seller set forth in <u>Article V</u> shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality", "Material Adverse Effect" or words of similar import set forth therein) as of the date of this Agreement and as of the Closing as though made at and as of the Closing (except for those representations and warranties that address matters only as of a particular date need only be true and correct in all respects as of such date) except where the failure of the representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect;

(b)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date;

(c)    a closing certificate of Seller, certifying to the effect that the conditions specified in <u>Section 10.1(a)</u> and <u>Section 10.1(b)</u> have been satisfied, duly executed by an officer of Seller, solely in such capacity on behalf of Seller, dated as of the Closing Date;

(d)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction (including the Bankruptcy Court) restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

(e)    subject to <u>Section 7.5</u> and <u>Section 8.5</u>, all Purchased Contracts and Assumed Leases to be assumed by Purchaser shall have been assigned by Seller pursuant to Sections 363 and 365 of the Bankruptcy Code.

10.2    <u>Conditions Precedent to Obligations of Seller</u>. The obligations of Seller to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each

of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)      The representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality", "Material Adverse Effect" or words of similar import set forth therein) as of the date of this Agreement and as of the Closing as though made at and as of the Closing, except for those representations and warranties that address matters only as of a particular date need only be true and correct in all material respects as of such date, and except where the failure of the representations and warranties to be so true and correct would not, individually or in the aggregate, have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement;

(b)      Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date;

(c)      a certificate signed by an authorized officer of Purchaser, in form and substance reasonably satisfactory to Seller, certifying to the effect that the conditions specified in Section 10.2(a) and Section 10.2(b), duly executed by such officer, solely in such capacity on behalf of Purchaser, dated as of the Closing Date; and

(d)      there shall not be in effect any Order by a Governmental Body of competent jurisdiction (including the Bankruptcy Court) restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

10.3      <u>Conditions Precedent to Obligations of Purchaser and Seller</u>. The respective obligations of Purchaser and Seller to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)      there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining (including the Bankruptcy Court), enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)      the applicable waiting period under the HSR Act shall have expired or terminated (if applicable) and no court of competent jurisdiction or other Governmental Authority shall have issued an order or taken any other action restraining, enjoining, or otherwise prohibiting the transactions contemplated by this Agreement pursuant to Antitrust Law;

(c)      the Bankruptcy Court shall have entered the Bidding Procedures Order, and the Bidding Procedures Order shall be a Final Order; and

(d)      the Bankruptcy Court shall have entered the Sale Order by the Termination Date, and the Sale Order shall be a Final Order.

10.4      <u>Frustration of Closing Conditions</u>. Neither Seller nor Purchaser may rely on the failure of any condition set forth in Sections 10.1, 10.2, 10.3, as the case may be, if such failure

to be satisfied was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions.

## ARTICLE XI

### TAXES

11.1    <u>Transfer Taxes</u>. Purchaser shall (i) be responsible for (and shall indemnify and hold harmless Seller against) any and all Liabilities for any sales, use, stamp, documentary, filing, recording, transfer, real estate transfer, stock transfer, gross receipts, registration, duty, securities transactions or similar fees or taxes or governmental charges (together with any interest or penalty, addition to tax or additional amount imposed) as levied by any Taxing Authority in connection with the Transactions (collectively, "<u>Transfer Taxes</u>"), regardless of the Person liable for such Transfer Taxes under applicable Law and (ii) timely file or caused to be filed all necessary documents (including all Tax Returns) with respect to Transfer Taxes. The Parties will reasonably cooperate to minimize any such Transfer Taxes, including with respect to delivery location.

11.2    <u>Prorations</u>. Seller shall bear all property and ad valorem Tax Liability with respect to the Purchased Assets if the lien or assessment date arises prior to the Closing Date irrespective of the reporting and payment dates of such Taxes. All other real property Taxes, personal property Taxes, or ad valorem obligations and similar recurring Taxes and fees on the Purchased Assets for taxable periods beginning before, and ending after, the Closing Date (excluding any Transfer Taxes, which shall be governed pursuant to <u>Section 11.1</u>), shall be prorated between Purchaser and Seller as of the end of the day on the Closing Date. With respect to Taxes described in this <u>Section 11.2</u>, Seller shall timely file all Tax Returns due before the Closing Date with respect to such Taxes and Purchaser shall prepare and timely file all Tax Returns due after the Closing Date with respect to such Taxes. If one Party remits to the appropriate Taxing Authority payment for Taxes, which are subject to proration under this <u>Section 11.2</u> and such payment includes the other Party's share of such Taxes, such other Party shall promptly reimburse the remitting Party for its share of such Taxes.

11.3    <u>Purchase Price Allocation</u>. Not later than one hundred and twenty (120) days after the Closing Date, Purchaser shall prepare and deliver to Seller copies of Form 8594 and any required exhibits thereto (the "<u>Asset Acquisition Statement</u>") allocating the Purchase Price (including the Assumed Liabilities) among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder, as well as the methodology reflected on <u>Schedule 11.3</u>. Purchaser shall prepare and deliver to Seller from time to time revised copies of the Asset Acquisition Statement (the "<u>Revised Statements</u>") in accordance with the methodology reflected on <u>Schedule 11.3</u> so as to report any matters on the Asset Acquisition Statement that need updating. The Purchase Price for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Purchaser to Seller, and all income Tax Returns and reports filed by Purchaser and Seller shall be prepared consistently with such methodology. Seller and Purchaser, for a period of at least thirty (30) days, shall cooperate in good faith to resolve any disagreements Seller may have with an Asset Acquisition Statement or a Revised Statement.

11.4    Cooperation on Tax Matters.

(a)    Purchaser and Seller shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters.

(b)    Purchaser shall retain possession of all material accounting, business, financial and Tax records and information relating to the Purchased Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Purchaser hereunder for a period of at least five (5) years from the Closing Date. Purchaser shall give Seller reasonable notice and an opportunity to retain any such records in the event that Purchaser determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, Purchaser shall provide access to Seller (after reasonably detailed prior notice and during normal business hours), to the books, records, documents and other information relating to the Purchased Assets or the Assumed Liabilities as is reasonably necessary for Sellers to properly prepare for, file, prove, answer, prosecute and/or defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer.

**ARTICLE XII**

MISCELLANEOUS

12.1    Expenses. [All amounts owed in respect of rent and operating expenses arising under the Assumed Leases shall be prorated between Purchaser and Seller as of the end of the day on the Closing Date. Subject to the immediately preceding sentence and][24] except as otherwise provided in this Agreement, Seller and Purchaser shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

12.2    Survival. Except in the case of Fraud or as expressly set forth in this Agreement to the contrary, all representations and warranties and covenants of any Party contained in this Agreement or in any certificate delivered pursuant hereto shall not survive the Closing Date and thereafter shall be of no further force and effect. Notwithstanding the foregoing, all covenants and agreements set forth in this Agreement, which by their express terms would require performance after the Closing Date, shall survive until fully performed or until such covenant or agreement expires by its terms. Notwithstanding the foregoing, that the obligations of the Parties set forth in this Article XII and Sections 3.2 and 4.6, hereof shall survive the Closing.

12.3    Specific Performance. The Parties agree that, if any of the provisions of this Agreement or any other document contemplated by this Agreement were not performed in accordance with its specific terms or were otherwise breached by any Party, irreparable damage

---

[24] **NTD**: To be included only in the HYLA, Coolidge, and Phoenix HQ asset sales.

would occur, no adequate remedy at law would exist and damages would be difficult to determine, and, therefore, the Parties shall be entitled to an injunction or injunctions, specific performance, or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with the terms of the Agreement in any court of competent jurisdiction without proof of damages or inadequacy of legal remedy without the posting or provision of any bond or other security, this being in addition to any other remedy to which they are entitled under, and in accordance with the terms of, this Agreement. Notwithstanding anything in this Agreement to the contrary, Seller shall be entitled to seek specific performance of Purchaser's obligations to consummate the Transactions if, and only if, (i) all of the conditions set forth in Section 10.1 (other than those conditions that, by their nature, are to be satisfied at the Closing, each of which is capable of being satisfied) have been satisfied or would be waived by Seller at the Closing (ii) all conditions in Section 10.2 and Section 10.3 have been satisfied (other than those that, by their nature, are to be satisfied at the Closing, each of which is capable of being satisfied and will be satisfied at Closing), (iii) Purchaser fails to complete the Closing at the time the Closing is required to have occurred, (iv) no monetary damages have been paid by or on behalf of Purchaser nor has the Good Faith Deposit been released from the Good Faith Deposit Escrow Account to Seller in accordance with Section 3.2(b)(ii), and (v) Seller has irrevocably confirmed in writing that, if specific performance is granted, then Seller is ready, willing and able to consummate the Transactions in accordance with the terms of this Agreement. Seller may not seek specific performance to compel Purchaser to consummate the Closing if Seller is in breach of the representations, warranties, covenants and agreements contained in this Agreement. In no event shall Purchaser be obligated to both specifically perform this Agreement and pay monetary damages to Seller.

12.4    Governing Law; Submission to Jurisdiction; Consent to Service of Process.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of Delaware applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action; provided that, if the Bankruptcy Cases are closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Chancery Court or, if such court will not have jurisdiction, any federal court located in the State of Delaware or other Delaware state court, and any appellate court from any thereof for the resolution of any such claim or dispute. The Parties each hereby irrevocably waive, to the fullest extent permitted by applicable Laws, the defense of an inconvenient forum to the maintenance of any such Action. The Parties each consent to service

of process by mail (in accordance with <u>Section 12.7</u>) or any other manner permitted by applicable Law.

12.5    <u>Waiver of Right to Trial by Jury</u>. THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY OR SUCH PARTY'S REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.6    <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the schedules and exhibits hereto) represents the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

12.7    <u>Notices</u>. All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) when sent by email of a PDF transmission (upon manual or electronic confirmation of delivery), or (c) one (1) Business Day after being sent to the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses set forth below (or to such other addresses as a Party may designate by notice to the other Parties in accordance with this provision):

If to Seller, to:

Nikola Corporation
(d/b/a Nikola Truck Manufacturing)
4141 E Broadway Road
Phoenix, AZ 85040
Attention: [●]
Email: [●]

With copies to (which shall not constitute notice):

Pillsbury Winthrop Shaw Pittman LLP
Four Embarcadero Center, 22nd Floor

San Francisco, CA 94111-5998
E-mail: joshua.morse@pillsburylaw.com
Attention: Joshua D. Morse

and

Pillsbury Winthrop Shaw Pittman LLP
725 South Figueroa Street, 36th Floor
Los Angeles, CA 90017-5524
E-mail: drew.simonrooke@pillsburylaw.com
Attention: Drew Simon-Rooke

If to Purchaser, to:

E-mail:
Attention:

With copies to (which shall not constitute notice):

Attention:
Email:

12.8    <u>Releases</u>.

(a)      Effective as of the Closing and subject to entry of the Sale Order (with any discrepancy between the release provided in the Sale Order, if any, and this Agreement being controlled by the Sale Order), each of the Sellers on their own behalf, and on behalf of their estates, and on behalf of their respective past, present, and future Related Persons, Affiliates, predecessors, successors and assigns, (other than the Sellers and their estates, in their derivative capacity only), (each, a "<u>Seller Releasing Person</u>") hereby unconditionally, irrevocably, and fully forever releases, remises, acquits, relinquishes, irrevocably waives, and discharges, Purchaser, and each of its predecessors, successors, assigns, Subsidiaries and Affiliates, and each of their respective former, current or future, direct or indirect, equity holders, officers, employees, directors, agents, advisory board members, representatives, owners, members, partners, employees, management companies, direct and indirect parent entities, "controlling persons" (within the meaning of federal securities law), heirs, administrators and executors, financial advisors, legal advisors, shareholders, managers, principals, consultants, accountants, attorneys, actuaries, investment bankers and other professionals in each case acting in such capacity, as applicable (collectively, the "<u>Purchaser Released Persons</u>"), of and from any and all claims, demands, Liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, franchises, rights, assertions, allegations, Actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, foreseen or unforeseen, accrued, unaccrued, fixed, contingent, liquidated or unliquidated, secured or unsecured, direct or derivative, matured or unmatured, pending, or

threatened, including all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract or otherwise, that such Seller Releasing Persons (whether individually or collectively) ever had, now have, or may have against the Purchaser Released Persons, in each case arising or existing prior to Closing related to this Sale or these Chapter 11 Cases; provided that nothing herein shall release the Purchaser of its obligations under this Agreement, the Sale Order and the Ancillary Documents (unless expressly released therein), or otherwise constitute a release by the Sellers or any of their Affiliates of any claims that Sellers or any of their Affiliates have in the Bankruptcy Cases. Nothing in this Section 12.8(a) shall limit Sellers' or their respective Affiliates' rights in the case of Fraud (but not, for the avoidance of doubt, fraudulent conveyance claims). Effective as of the Closing and subject to entry of the Sale Order (with any discrepancy between the release provided in the Sale Order, if any, and this Agreement being controlled by the Sale Order), Seller on its own behalf and on behalf of its past, present, and future predecessors, successors and assigns, covenants not to sue Purchaser or any Purchaser Released Person, or to instigate, initiate, or pursue against any of them, in any manner of judicial or administrative proceeding on such Seller's own behalf or on behalf of any of the Sellers Releasing Persons, or any other Person, regarding or in connection with any of the claims released pursuant to this Section 12.8(a).

(b)     Effective as of the Closing, Purchaser, on its own behalf and on behalf of its respective past, present, and future Related Persons, Affiliates, predecessors, successors and assigns (each, a "Purchaser Releasing Person") hereby unconditionally, irrevocably, and fully forever releases, remises, acquits, relinquishes, irrevocably waives, and discharges, each Seller and each of its predecessors, successors, assigns, Subsidiaries and Affiliates, and each of their respective former, current or future, direct or indirect, equity holders, officers, employees, directors, agents, advisory board members, representatives, owners, members, partners, employees, management companies, direct and indirect parent entities, "controlling persons" (within the meaning of federal securities law), heirs, administrators and executors, financial advisors, legal advisors, shareholders, managers, principals, consultants, accountants, attorneys, actuaries, investment bankers and other professionals in each case acting in such capacity whether current or former, including in their capacity, as applicable (collectively, the "Seller Released Persons"), of and from any and all claims, demands, Liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, franchises, rights, assertions, allegations, Actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, foreseen or unforeseen, accrued, unaccrued, fixed, contingent, liquidated or unliquidated, secured or unsecured, direct or derivative, matured or unmatured, pending, or threatened, including all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract or otherwise, that such Purchaser Releasing Persons (whether individually or collectively) ever had, now have, or may have against the Seller Released Persons, in each case arising or existing prior to Closing related to this Sale or these Chapter 11 Cases; provided that nothing herein shall release the Seller of its obligations under this Agreement, the Sale Order and the Ancillary Documents (unless expressly released therein), or otherwise constitute a release by Purchaser or any of its Affiliates of any claims that Purchaser or any of its Affiliates have in the Bankruptcy Cases. Nothing in this Section 12.8(b) shall limit Purchaser's or its respective Affiliates' rights in the case of Fraud (but not, for the avoidance of doubt, fraudulent conveyance claims). Effective as of the, Purchaser on its own behalf and on behalf of their past,

present, and future predecessors, successors and assigns, covenants not to sue the Sellers or any Seller Released Person, or to instigate, initiate, or pursue against any of them, in any manner of judicial or administrative proceeding on Purchaser's own behalf or on behalf of any of the Purchaser Releasing Persons, or any other Person, regarding or in connection with any of the claims released pursuant to this <u>Section 12.8(b)</u>.

12.9    <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Any such term or provision held invalid, illegal, or incapable of being enforced only in part or degree will remain in full force and effect to the extent not held invalid, illegal, or incapable of being enforced. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, such term or provision is hereby deemed modified to give effect to the original written intent of the Parties to the greatest extent consistent with being valid and enforceable under applicable Law.

12.10   <u>Binding Effect; Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a Party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void; <u>provided</u>, <u>however</u>, that Purchaser may assign this Agreement and any or all rights or obligations hereunder (including Purchaser's rights to purchase the Purchased Assets and assume the Assumed Liabilities) to any Affiliate of Purchaser which assignment shall not relieve Purchaser of its obligations hereunder; <u>provided</u>, <u>further</u>, that Seller may transfer or assign such rights and obligations under this Agreement to a liquidation trust or similar vehicle under a confirmed chapter 11 plan of liquidation under the Bankruptcy Code in the Bankruptcy Cases. Upon any such permitted assignment, the references in this Agreement to Purchaser and Seller shall also apply to any such assignee unless the context otherwise requires.

12.11   <u>Third Party Beneficiaries; Non-Recourse</u>. Except with respect to Purchaser's Affiliates and Related Persons pursuant to <u>Section 3.2(c)</u>, and the Party Affiliates pursuant to the following sentence, nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement, except as expressly provided herein. Each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Persons that are expressly Parties to this Agreement or the Ancillary Documents will have any obligation hereunder or thereunder and that it has no rights of recovery hereunder or thereunder against, and no recourse hereunder or thereunder or in respect of any oral representations made or alleged to be made in connection therewith will be had against, any former, current or future Affiliate, incorporator, controlling Person, fiduciary, representative, co-owner or equity holder of Purchaser or Seller (or any of their successors or permitted assignees) (each, a "<u>Party Affiliate</u>"); it being expressly agreed and acknowledged that, other than in the case of Fraud, no personal Liability whatsoever will attach to, be imposed on or otherwise be incurred by any Party Affiliate, as such, for any

46

obligations of the applicable Person under this Agreement or any Ancillary Document or the Transactions, under any documents or instruments delivered contemporaneously therewith, in respect of any oral representations made or alleged to be made in connection therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

12.12   Headings; Construction; Disclosure Schedules.

(a)   The headings and captions contained in this Agreement and the Disclosure Schedule are provided for convenience only and will not affect its construction or interpretation of this Agreement or the Disclosure Schedule.

(b)   The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Agreement.

(c)   Unless the express context otherwise requires:

(i)   the meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term, and words denoting any gender shall include all genders;

(ii)   where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning;

(iii)   whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation";

(iv)   the words "hereof", "herein" and "herewith" and words of similar import shall be construed to refer to this Agreement and the Disclosure Schedule as a whole and not to any particular provision of this Agreement or Disclosure Schedule, and article, section, paragraph, exhibit, appendix and schedule references are to the articles, sections, paragraphs, exhibits, appendices and schedules of this Agreement or Disclosure Schedule unless expressly otherwise specified herein or therein;

(v)   a reference to any legislation, statute, rule, standard, regulation or other Law or to any provision of any legislation shall include any amendment, substitution, modification, supplement, replacement, re-enactment and consolidation thereto;

(vi)   references to any section of any statute, listing rule, rule, standard, regulation or other law include any successor to such section;

(vii)   references to any Contract (including this Agreement) are to the Contract as amended, modified, supplemented or replaced from time to time, unless otherwise stated;

(viii)    all references to "dollars" or "$" in this Agreement refer to United States dollars, which is the currency used for all purposes in this Agreement;

(ix)    when calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded; and

(x)    if the last day of a period of time is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(d)    any information set forth in one section of the Disclosure Schedule will be deemed to apply to other sections of the Disclosure Schedule to which its relevance is reasonably apparent from the face of such disclosure (notwithstanding the omission of a reference or cross-reference thereto). The specification of any dollar amount in the representations and warranties contained in this Agreement or the inclusion of any specific item in the Disclosure Schedule hereto is not intended to imply that such amounts, or higher or lower amounts, or the items so included, are or are not required to be disclosed, and neither Party shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Disclosure Schedule in any dispute or controversy with any Party as to whether any obligation, item or matter not described herein or included in a Disclosure Schedule hereto is or is not required to be disclosed (including whether such amounts or items are required to be disclosed as material). The information contained in the Disclosure Schedule hereto is disclosed solely for the purposes of this Agreement, and no information contained therein shall be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of any agreement.

12.13    Risk of Loss. Seller will bear all risk of loss occurring to or upon any portion of the Purchased Assets prior to the Closing Date. In the event that any material portion of any Purchased Assets is damaged or destroyed prior to Closing Date, then Seller shall provide prompt written notice of such damage or destruction prior to the Closing and, thereafter, with respect to such Purchased Assets, Purchaser may, at Purchaser's option, either (a) proceed to close notwithstanding the damage or destruction of such Purchased Assets or (b) exclude such Purchased Assets, in which event Purchaser shall not have any obligation to close if as a consequence of the exclusion of such Purchased Assets any condition to Closing in Article X would not be satisfied. If Purchaser closes notwithstanding an unrepaired or unrestored loss to a Purchased Asset, Seller will deliver or assign to Purchaser any insurance proceeds with respect to such damage or destruction and all claims against third parties relating thereto.

12.14    Liquidating Trustee. If at any time Seller liquidates, its estate is converted to a case under Chapter 7 of the Bankruptcy Code, or otherwise has a trustee or other representative appointed by the Bankruptcy Court (as applicable, a "Trustee"), then (a) such Trustee will be bound to perform the obligations of Seller and will be entitled to exercise the rights of Seller under this Agreement, and (b) with respect to all of Seller's assets that are abandoned (if any) following the date hereof, Seller grants to such Trustee a power of attorney for purposes of performing Seller's obligations under Section 8.5 with respect to such abandoned assets. Seller acknowledges and agrees that the power of attorney granted to such Trustee (if any) pursuant to the foregoing clause (b) is coupled with an interest and will be irrevocable. Further, such power of attorney will also be granted to Purchaser for purposes of performing Seller's obligations under Section 8.5 with

respect to such abandoned assets, as determined by Purchaser, and in the event Purchaser exercises such power of attorney, the Trustee will not commit any act or take any action that is inconsistent with such exercise by Purchaser, except as requested in writing by Purchaser.

12.15   <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

[*Remainder of Page Intentionally Left Blank*]

49

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**PURCHASER:**

[●]

By: _____
    Name:
    Title:

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**SELLER:**

NIKOLA CORPORATION

By: _____
    Name:
    Title:

**<u>Exhibit 2</u>**

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nikola Corp., *et al.*,[1] | Case No. 25-10258 (TMH) |
| Debtors. | (Joint Administration Requested) |

**NOTICE OF SALE, BIDDING PROCEDURES, AUCTION,
SALE HEARING AND OTHER DEADLINES RELATED THERETO**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On February __, 2025, the debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases filed with the United States Bankruptcy Court for the District of Delaware (the "Court") a motion [Docket No. __] (the "Motion") seeking entry of (A) an order (the "Bidding Procedures Order") (i) approving bidding procedures (the "Bidding Procedures")[2] to be used in connection with the sale (each, a "Sale") of all, substantially all, or a portion of the Debtors' assets (the "Assets"); (ii) authorizing the Debtors to designate a Stalking Horse Bidder and provide Bid Protections in accordance with the Stalking Horse Designation Procedures; (iii) scheduling (a) an auction of the Assets (the "Auction") and (b) a final hearing to consider approval of the proposed Sale (the "Sale Hearing"); (iv) approving the form and manner of notice of the Bidding Procedures, the Auction and the Sale Hearing; (v) approving procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts") in connection with the Sale; (vi) approving the form and manner of notice to each relevant non-debtor counterparty to a Contract of the Debtors' calculation of the amount necessary to cure any defaults under an applicable Contract and certain other information regarding the potential assumption and assignment of Contracts in connection with a Sale; and (vii) granting related relief; and (B) an order (the "Sale Order") (i) authorizing the sale of the Assets free and

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Nikola Corporation (registered to do business in California as Nikola Truck Manufacturing Corporation) (1153); Nikola Properties, LLC (3648); Nikola Subsidiary Corporation (1876); Nikola Motor Company LLC (0193); Nikola Energy Company LLC (0706); Nikola Powersports LLC (6771); Free Form Factory Inc. (2510); Nikola H2 2081 W Placentia Lane LLC (N/A); 4141 E Broadway Road LLC (N/A); and Nikola Desert Logistics LLC (N/A).  The Debtors' headquarters are located at 4141 East Broadway Road, Phoenix, AZ 85040.

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion or the Bidding Procedures, as applicable.  Any summary of the Bidding Procedures or the Bidding Procedures Order (or any provision thereof) contained herein is qualified in its entirety by the actual terms and conditions thereof.  To the extent that there is any inconsistency between any summary in this Sale Notice and the terms and conditions of either of the Bidding Procedures or the Bidding Procedures Order, the actual terms and conditions in those documents shall control.

clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances as determined by the Debtors and any Successful Bidder (as defined in Section VII.C.1 of the Bidding Procedures), with liens to attach to the proceeds of the Sale; (ii) authorizing the assumption and assignment of certain Contracts in connection with approved Sale; and (iii) granting related relief.

On March [_], 2025, the Court entered the Bidding Procedures Order [Docket No. [_].

## ASSETS FOR SALE

The Debtors intend to sell all, substantially all, or a portion of their Assets.

A Prospective Bidder (as defined in Section III of the Bidding Procedures) may bid on the Assets, subject to the conditions set forth herein.

The ability to undertake and consummate a sale of the Assets shall be subject to competitive bidding, as set forth herein, and approval by the Court. In addition to any Stalking Horse Bid (as defined in the Motion), and as set forth herein, the Debtors will consider bids for the Assets from other parties.

Any party interested in submitting a bid for any of the Debtors' Assets should contact the Debtors' investment banker at Houlihan Lokey Capital, Inc. ("Houlihan Lokey"):

**Houlihan Lokey Capital, Inc.**
245 Park Avenue, 20th Floor
New York, NY 10167
Attn: Drew M. Talarico and Marcus Bellows
DTalarico@HL.com | (212) 497-4240
MBellows@HL.com | (212) 497-4214

## KEY DATES AND DEADLINES

### A.    Bid Deadline

Any Prospective Bidder that intends to participate in the Auction must submit in writing to the Bid Notice Parties a Qualified Bid (as defined in Section VI.A of the Bidding Procedures) **on or before March 27, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

The Qualified Bid requirements are set forth in Section VI.A of the Bidding Procedures.

### B.    Stalking Horse Bidder Designation

The Debtors may designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement **no later than March 10, 2025, at 4:00 p.m. (prevailing Eastern Time)**, which deadline may be extended by the Debtors (after consultation with the Consultation Parties).

C.    **Auction**

If the Debtors receive more than one Qualified Bid (including a combination of bids that, when considered together, constitute a Qualified Bid) for the Assets, the Debtors will conduct an Auction for the Assets.  If any Stalking Horse Bid is the only Qualified Bid received in respect of the Assets subject to such Stalking Horse Bid, the Debtors will not conduct an Auction for such applicable Assets and will seek approval of such Stalking Horse Bid at the Sale Hearing.

Professionals and principals for the Debtors, each Qualified Bidder (including, its representative(s), if any), each of the Consultation Parties, and any creditor of the Debtors that has provided notice in writing of its intent to observe the Auction via electronic mail to co-counsel for the Debtors, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: Brett M. Haywood (bhaywood@potteranderson.com) and Maria Kotsiras (mkotsiras@potteranderson.com)) at least one (1) day prior to the start of the Auction shall be able to attend and observe the Auction, along with any other parties the Debtors deem appropriate.

The Auction, if required, will be conducted on **March 31, 2025, at 10:00 a.m. (prevailing Eastern Time)**, either (i) at the offices of Houlihan Lokey Capital, Inc., 245 Park Avenue, 20th Floor, New York, NY 10167, (ii) some other physical location to be determined by the Debtors, or (iii) virtually or at such other date, time or location as designated by the Debtors.  If the Debtors conduct the Auction virtually, the Debtors will provide instructions setting forth how to attend the Auction to the participants and other attendees via electronic mail.  The Debtors will provide notice (via electronic mail or otherwise) of any change in the date, time or location of the Auction to Qualified Bidders, and will cause publication of such change to occur on the website maintained by Epiq Corporate Restructuring, LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://dm.epiq11.com/Nikola (the "Epiq Website") as soon as reasonably practicable and in any event no later than 24 hours before the Auction.

Upon the earlier to occur of (i) five (5) business hours after the conclusion of the Auction; and (ii) Noon (prevailing Eastern Time) the calendar day after the conclusion of the Auction, the Debtors will file with the Court, serve on the Sale Notice Parties (as defined in Section X.B of the Bidding Procedures) and cause to be published on the Epiq Website, a notice of the results of the Auction, which will, among other things, (i) identify the Successful Bidder and Backup Bidder(s); (ii) either include a copy of the Successful Bid and the Backup Bid or a summary of the material terms of such bids or provide instructions for accessing the Successful Bid and the Backup Bid free of charge from the Epiq Website; and (iii) set forth the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction.

If the Debtors determine not to hold an Auction for some or all of the Assets, the Debtors shall file with the Court, serve on the Sale Notice Parties, and cause to be published on the Epiq Website, a notice containing the following information (as applicable): (i) a statement that the Auction for the relevant Assets has been canceled; (ii) the identity of the Successful Bidder; (iii) either include a copy of the Successful Bid or a summary of the material terms of such bid or provide instructions for accessing the Successful Bid free of charge from the Epiq Website; and (iv) the date, time, and location of the Sale Hearing.

### C.      Objection Deadlines

1.  Sale Objection Deadline.  Except objections to the conduct of the Auction, the Successful Bidder or the Backup Bidder (in each case other than the Stalking Horse Bidder), all objections to a sale of the Assets, including (a) any objection to a sale of the Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code and (b) entry of any Sale Order must be (i) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; and (ii) filed with the Court by **no later than March 28, 2025 at 4:00 p.m. (prevailing Eastern Time)** and served on the Objection Notice Parties (as defined in Section X.D of the Bidding Procedures).

2.  Cure Objection Deadline.  Any objection to the Debtors' proposed Cure Costs (each such objection, a "Cure Objection") shall be (a) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (b) filed with the Court by **no later than March 28, 2025, at 4:00 p.m. (prevailing Eastern Time)**; and (c) served on the Objection Notice Parties.

3.  Supplemental Sale Objection Deadline. Following service of the Notice of Auction Results, parties may object solely with respect to the particular terms of a proposed Sale or the Successful Bid or Backup Bid (in each case, if such bidder is not the Stalking Horse Bidder).  Any Supplemental Sale Objection must be (a) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; and (b) filed with the Court by no later **April 1, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Supplemental Sale Objection Deadline") and served on the Objection Notice Parties.

4.  Adequate Assurance Objection.  Any objection to the proposed assumption and assignment of a Contract, the subject of which objection is a Successful Bidder's (or any other relevant assignee's), other than the Stalking Horse Bidder's, proposed form of adequate assurance of future performance with respect to the Contract (each such objection, an "Adequate Assurance Objection" and, together with a Cure Objection, a "Contract Objection"), shall be (a) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (b) filed with the Court by **no later than April 1, 2025 at 4:00 p.m. (prevailing Eastern Time)**; and (c) served on the Objection Notice Parties.

### D.      Notice of Auction Results

Upon the earlier to occur of (i) five (5) business hours after the conclusion of the Auction; and (ii) Noon (prevailing Eastern Time) the calendar day after the conclusion of the Auction, the Debtors shall file with the Court, serve on the Sale Notice Parties, and cause to be published on the Epiq Website located at https://dm.epiq11.com/Nikola, a Notice of Auction Results.  The

Notice of Auction Results will (a) identify each Successful Bidder and each Backup Bidder, as applicable; (b) either include a copy of each Successful Bid and each Backup Bid or a summary of the material terms of such bid, or provide instructions for accessing each Successful Bid and each Backup Bid free of charge from the Epiq Website; and (c) set forth the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction.

      E.      **Sale Hearing**

      The Sale Hearing shall take place on **April 3, 2025 at [●:● a/p.m.] (prevailing Eastern Time)** before The Honorable _____, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 N. Market Street, Wilmington, Delaware 19801 __[rd/th] floor, courtroom #__.  The Debtors may adjourn the Sale Hearing may by filing a notice or by announcing such adjournment or rescheduling at the Auction or in Court on the date of the originally scheduled Sale Hearing

<u>**RESERVATION OF RIGHTS TO MODIFY BIDDING PROCEDURES**</u>

      The Debtors reserve the right to, in their reasonable business judgment and after consultation with the Consultation Parties (subject to Section XI.C of, as defined in, the Bidding Procedures) in a manner consistent with their fiduciary duties and applicable law, modify the Bidding Procedures, including to, among other things, extend or waive deadlines or other terms and conditions set forth therein; adopt new rules and procedures for conducting the bidding and Auction process so long as any such modifications are disclosed to all Prospective Bidders and Qualified Bidders, as applicable; or otherwise modify these Bidding Procedures to further promote competitive bidding for and maximizing the of value of the Assets, in each case, to the extent not materially inconsistent with the Bidding Procedures or the Bidding Procedures Order.

<u>**ADDITIONAL INFORMATION**</u>

      Copies of the Motion, the Bidding Procedures Order and the Bidding Procedures may be obtained free of charge by visiting the Epiq Website located at <u>https://dm.epiq11.com/Nikola</u>.

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER OR ANY OTHER APPLICABLE ORDER OF THE COURT ENTERED IN THE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID AND YOUR DISQUALIFICATION FROM PARTICIPATING IN THE BIDDING FOR AND AUCTION OF ANY OF THE DEBTORS' ASSETS.**

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER, INCLUDING THE FAILURE TO FILE ANY SUCH OBJECTION BY THE APPLICABLE OBJECTION DEADLINE, SHALL FOREVER BAR SUCH PERSON OR ENTITY FROM ASSERTING, AT THE SALE HEARING OR THEREAFTER, ANY SUCH OBJECTION TO THE RELIEF REQUESTED IN THE MOTION, THE CONSUMMATION OF ANY APPLICABLE SALE, INCLUDING THE SALE OF ANY ASSETS TO A SUCCESSFUL BIDDER FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO SECTION 363(f) OF THE BANKRUPTCY CODE**

OR THE TERMS OF THE STALKING HORSE AGREEMENT OR OTHER ASSET PURCHASE AGREEMENT EXECUTED BY THE DEBTORS.

Dated: February __, 2025
      Wilmington, Delaware

Respectfully submitted,

*/s/ DRAFT*

Joshua D. Morse, Esq.
Jonathan R. Doolittle, Esq.
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Four Embarcadero Center, 22nd Floor
San Francisco, California 94111-5998
Telephone: (415) 983-1000
Facsimile:  (415) 983-1200
Email: joshua.morse@pillsburylaw.com
      jonathan.doolittle@pillsburylaw.com

-and-

Andrew V. Alfano, Esq.
Caroline Tart, Esq.
Chazz C. Coleman, Esq.
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
31 West 52nd Street
New York, New York 10019
Telephone: (212) 858-1000
Facsimile:  (212) 858-1500
Email: andrew.alfano@pillsburylaw.com
      caroline.tart@pillsburylaw.com
      chazz.coleman@pillsburylaw.com

M. Blake Cleary (No. 3614)
Brett M. Haywood (No. 6166)
Maria Kotsiras (No. 6840)
Shannon A. Forshay (No. 7293)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email: bcleary@potteranderson.com
      bhaywood@potteranderson.com
      mkotsiras@potteranderson.com
      sforshay@potteranderson.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Exhibit 3**

**Assumption and Assignment Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nikola Corp., *et al.*,[1] | Case No. 24-12245 (KBO) |
| Debtors. | (Joint Administration Requested) |

**NOTICE OF CURE COSTS AND POTENTIAL ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL ASSETS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On February __, 2025, the debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases filed with the United States Bankruptcy Court for the District of Delaware (the "Court") a motion [Docket No. __] (the "Motion") seeking entry of (A) an order (the "Bidding Procedures Order") (i) approving bidding procedures (the "Bidding Procedures")[2] to be used in connection with the sale (each, a "Sale") of all, substantially all, or a portion of the Debtors' assets (the "Assets"); (ii) authorizing the Debtors to designate a Stalking Horse Bidder and provide Bid Protections in accordance with the Stalking Horse Designation Procedures; (iii) scheduling (a) an auction of the Assets (the "Auction") and (b) a final hearing to consider approval of the proposed Sale (the "Sale Hearing"); (iv) approving the form and manner of notice of the Bidding Procedures, the Auction and the Sale Hearing; (v) approving procedures for the assumption and assignment of executory contracts and unexpired leases (collectively, the "Contracts") in connection with the Sale; (vi) approving the form and manner of notice to each relevant non-debtor counterparty to a Contract of the Debtors' calculation of the amount necessary to cure any defaults under an applicable Contract and certain other information regarding the potential assumption and assignment of Contracts in connection with a Sale; and (vii) granting related relief; and (B) an order (the "Sale Order") (i) authorizing the sale of the Assets free and

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Nikola Corporation (registered to do business in California as Nikola Truck Manufacturing Corporation) (1153); Nikola Properties, LLC (3648); Nikola Subsidiary Corporation (1876); Nikola Motor Company LLC (0193); Nikola Energy Company LLC (0706); Nikola Powersports LLC (6771); Free Form Factory Inc. (2510); Nikola H2 2081 W Placentia Lane LLC (N/A); 4141 E Broadway Road LLC (N/A); and Nikola Desert Logistics LLC (N/A).  The Debtors' headquarters are located at 4141 East Broadway Road, Phoenix, AZ 85040.

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Motion or the Bidding Procedures, as applicable.  Any summary of the Bidding Procedures or the Bidding Procedures Order (or any provision thereof) contained herein is qualified in its entirety by the actual terms and conditions thereof.  To the extent that there is any inconsistency between any summary in this Sale Notice and the terms and conditions of either of the Bidding Procedures or the Bidding Procedures Order, the actual terms and conditions in those documents shall control.

clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances as determined by the Debtors and any Successful Bidder (as defined in Section VII.C.1 of the Bidding Procedures), with liens to attach to the proceeds of the Sale; (ii) authorizing the assumption and assignment of certain Contracts in connection with approved Sale; and (iii) granting related relief.

On March [___], 2025, the Court entered the Bidding Procedures Order [Docket No. [_].

**You are receiving this Notice because you may be a Counterparty to a Contract of the Debtor that may be assumed and assigned to the Successful Bidder for the Debtors' Assets.**

## <u>CURE COSTS</u>

In accordance with the Assumption and Assignment Procedures and the Bidding Procedures Order, the Debtors may, in connection with the Sale with the Successful Bidder at the Auction, seek to assume and assign to the Successful Bidder certain of their Contracts. Each of the Contracts that potentially could be assumed and assigned in connection with the Sale, together with the Debtors' calculation of Cure Costs with respect to such Contracts, is set forth on <u>Schedule 1</u> hereto. The inclusion of any Contract on <u>Schedule 1</u> does not constitute an admission by the Debtors, the Stalking Horse Bidder, any Successful Bidder, or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such Contract ultimately will be assumed or assigned. All rights of the Debtors with respect thereto are reserved.

In addition, to the extent that any of the Cure Costs set forth on <u>Schedule 1</u> do not reflect (i) postpetition payments that have been made by the Debtors in respect of applicable Cure Costs or (ii) any payments that are made by the Debtors in respect of such Cure Costs after the filing of this Notice, the respective amounts required to be paid to cure any existing defaults under the applicable Contracts shall be reduced by any such corresponding postpetition payments, and the Debtors reserve their rights to update the Cure Costs set forth on <u>Schedule 1</u> accordingly, either by filing a supplemental notice with the Court or by written notice to the applicable Counterparty.

## <u>CONTRACT OBJECTIONS</u>

### A.     **Contract Objection Deadline**

Any Counterparty that wishes to object to the Debtors' proposed Cure Costs or the assumption and assignment on any basis (each such objection, a "<u>Contract Objection</u>") must file with the Court by **no later than March 28, 2025, at 4:00 p.m. (prevailing Eastern Time)** and serve on the Objection Notice Parties (as defined in Section X.D of the Bidding Procedures) its Contract Objection, which must be in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof.

### B.     **Resolution of Contract Objections**

Pursuant to the Bidding Procedures Order, the Debtors or the Successful Bidder, and the objecting Counterparty shall first confer in good faith to attempt to resolve the Contract Objection without Court intervention. If the parties are unable to consensually resolve the Contract Objection prior to the commencement of the Sale Hearing, the Court shall make all necessary determinations

2

relating to the applicable Contract Objection at a hearing scheduled pursuant to the following paragraph.  If a Contract Objection is resolved in a manner that is not in the best interests of the Debtors and their estates, whether or not such resolution occurs prior to or after the closing of the Sale, the Debtors and the Successful Bidder may determine that any Contract subject to such resolved Contract Objection no longer will be assumed and assigned.

### C.    Adjourned Cure Objections

If a timely filed Contract Objection cannot otherwise be resolved by the parties, the Contract Objection may be heard at the Sale Hearing, or, at the option of the Debtors, in consultation with the Consultation Parties (subject to Section XI.C of, and as defined in, the Bidding Procedures) and the Successful Bidder, be adjourned to a subsequent hearing (each such Contract Objection, an "Adjourned Contract Objection").  Any Contract that is the subject of such Adjourned Contract Objection that is solely with regards to Cure Costs may, at the election of the Successful Bidder, and subject to the Debtors' rights set forth in the Bidding Procedures Order, be assumed and assigned to the Successful Bidder prior to the resolution of such objection as of the closing date of the Sale, so long as the Debtors or Successful Bidder, as applicable, (i) pay any undisputed Cure Costs on or before (x) the Closing Date (as defined in the Stalking Horse Agreement) or (y) in the event the Successful Bidder as of the closing date of the sale of the Assets.is a party other than the Stalking Horse Bidder, the date designated for consummating the sale under such Successful Bidder's purchase agreement and (ii) appropriately reserve funding for the disputed portion of the Cure Costs pending resolution of the dispute.

**IF A COUNTERPARTY FAILS TO FILE WITH THE COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY CONTRACT OBJECTION, THE COUNTERPARTY SHALL BE (i) DEEMED TO HAVE CONSENTED TO THE ASSUMPTION BY THE DEBTORS AND ASSIGNMENT TO THE SUCCESSFUL BIDDER, (ii) PROHIBITED FROM ASSERTING THAT THE SUCCESSFUL BIDDER FAILED TO PROVIDE ADEQUATE ASSURANCE, AND (iii) FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO THE ASSUMPTION AND ASSIGNMENT OF THE APPLICABLE CONTRACT, THE COST TO CURE ANY DEFAULTS UNDER THE APPLICABLE CONTRACT, OR ADEQUATE ASSURANCE OF FUTURE PERFORMANCE, AND THE CURE COSTS SET FORTH ON SCHEDULE 1 HERETO SHALL BE CONTROLLING AND WILL BE THE ONLY AMOUNT NECESSARY TO CURE OUTSTANDING DEFAULTS UNDER THE CONTRACT AND SATISFY THE REQUIREMENTS OF SECTION 365(b) OF THE BANKRUPTCY CODE, AND THE COUNTERPARTY TO THE CONTRACT SHALL BE DEEMED BOUND BY AND TO HAVE CONSENTED TO THE CURE COSTS.  THE APPLICABLE SUCCESSFUL BIDDER SHALL BE DEEMED TO HAVE PROVIDED ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO THE CONTRACT IN ACCORDANCE WITH BANKRUPTCY CODE SECTIONS 365(b)(1)(C), 365(f)(2)(B) AND, IF APPLICABLE, 365(b)(3), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE CONTRACT OR ANY OTHER DOCUMENT.**

**NOTICE OF AUCTION RESULTS**

The Auction, if required, will be conducted on **March 31, 2025, at 10:00 a.m. (prevailing Eastern Time)**, either (i) at the offices of at the offices of Houlihan Lokey Capital, Inc., 245 Park Avenue, 20th Floor, New York, NY 10167, (ii) at some other physical location to be determined by the Debtors, or (iii) virtually or at such other date, time or location as designated by the Debtor. If the Debtors conduct the Auction virtually, the Debtors will provide instructions setting forth how to attend the Auction to the participants and other attendees via electronic mail.

Professionals and principals for the Debtors, each Qualified Bidder (including, its representative(s), if any), each of the Consultation Parties, and any creditor of the Debtors that has provided notice in writing of its intent to observe the Auction via electronic mail to co-counsel for the Debtors, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801 (Attn: Brett M. Haywood (bhaywood@potteranderson.com) and Maria Kotsiras (mkotsiras@potteranderson.com)) at least one (1) day prior to the start of the Auction shall be able to attend and observe the Auction, along with any other parties the Debtors deem appropriate.

The Debtors will provide notice (via electronic mail or otherwise) of any change in the date, time or location of the Auction to Qualified Bidders, and will cause publication of such change to occur on the Epiq Website as soon as reasonably practicable and in any event no later than 24 hours before the Auction.

Upon the earlier to occur of (i) five (5) business hours after the conclusion of the Auction; and (ii) Noon (prevailing Eastern Time) the calendar day after the conclusion of the Auction, the Debtors will file with the Court, serve on the Sale Notice Parties (as defined in Section X.B of the Bidding Procedures) and cause to be published on the website maintained by Epiq Corporate Restructuring, LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://dm.epiq11.com/Nikola (the "Epiq Website") a notice of the results of the Auction, which will, among other things, (i) identify the Successful Bidder(s) and Backup Bidder(s); (ii) either include a copy of each Successful Bid and each Backup Bid or a summary of the material terms of such bids, or provide instructions for accessing each Successful Bid and each Backup Bid free of charge from the Epiq Website; and (iii) set forth the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Sale Notice Parties of the outcome of the Auction.

**ADEQUATE ASSURANCE OBJECTIONS**

**A.     Adequate Assurance Objection Deadline**

Any Counterparty to a Contract that wishes to object to the proposed assumption and assignment of a Contract, the subject of which objection is the Successful Bidder's (or any other relevant assignee's but not the Stalking Horse Bidder's) proposed form of adequate assurance of future performance with respect to the Contract (each such objection, an "Adequate Assurance Objection"), must file with the Court and serve on the Objection Notice Parties an Adequate Assurance Objection, which must state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof, by **April 1, 2025 at 4:00 p.m. (prevailing Eastern Time)**.

**B.      Resolution of Adequate Assurance Objections**

Pursuant to the Bidding Procedures Order, the Debtors, the Successful Bidder and the objecting Counterparty must first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention.  If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the Successful Bidder (or any other relevant assignee) shall be determined by the Court at the Sale Hearing or, at the option of the Debtors and the Successful Bidder, be adjourned to a subsequent hearing, with notice to the party having filed the Adequate Assurance Objection.

**IF A COUNTERPARTY FAILS TO FILE WITH THE COURT AND SERVE ON THE OBJECTION NOTICE PARTIES A TIMELY ADEQUATE ASSURANCE OBJECTION, THE COUNTERPARTY SHALL FOREVER BE BARRED FROM ASSERTING ANY OBJECTION TO THE ASSUMPTION AND/OR ASSIGNMENT OF THE APPLICABLE CONTRACT WITH REGARD TO ADEQUATE ASSURANCE OF FUTURE PERFORMANCE.  THE APPLICABLE SUCCESSFUL BIDDER SHALL BE DEEMED TO HAVE PROVIDED ADEQUATE ASSURANCE OF FUTURE PERFORMANCE WITH RESPECT TO THE CONTRACT IN ACCORDANCE WITH BANKRUPTCY CODE SECTIONS 365(b)(1)(C), 365(f)(2)(B) AND, IF APPLICABLE, 365(b)(3), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE CONTRACT OR ANY OTHER DOCUMENT.**

## SALE HEARING

The Sale Hearing shall take place on **April 3, 2025 at [●:● a/p.m.] (prevailing Eastern Time)** before The Honorable _____, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, located at 824 N. Market Street, Wilmington, Delaware 19801 __[rd/th] floor, courtroom #__.

## ADDITIONAL INFORMATION

Copies of the Motion, the Bidding Procedures Order and the Bidding Procedures may be obtained free of charge by visiting the Epiq Website.

Dated: February __, 2025
      Wilmington, Delaware

Joshua D. Morse, Esq.
Jonathan R. Doolittle, Esq.
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Four Embarcadero Center, 22nd Floor
San Francisco, California 94111-5998
Telephone: (415) 983-1000
Facsimile:  (415) 983-1200
Email: joshua.morse@pillsburylaw.com
      jonathan.doolittle@pillsburylaw.com

-and-

 Andrew V. Alfano, Esq.
 Caroline Tart, Esq.
 Chazz C. Coleman, Esq.
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
31 West 52nd Street
New York, New York 10019
Telephone: (212) 858-1000
Facsimile:  (212) 858-1500
Email: andrew.alfano@pillsburylaw.com
      caroline.tart@pillsburylaw.com
      chazz.coleman@pillsburylaw.com

Respectfully submitted,

_/s/ DRAFT_ 

M. Blake Cleary (No. 3614)
Brett M. Haywood (No. 6166)
Maria Kotsiras (No. 6840)
Shannon A. Forshay (No. 7293)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email: bcleary@potteranderson.com
      bhaywood@potteranderson.com
      mkotsiras@potteranderson.com
      sforshay@potteranderson.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Schedule 1**

(To Be Filed)