IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>Nikola Corp., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10258 (__)<br><br>(Joint Administration Requested) |

**DECLARATION OF DREW M. TALARICO IN SUPPORT OF THE DEBTORS'
MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES
FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS,
(B) AUTHORIZING THE DEBTORS TO DESIGNATE ONE OR MORE STALKING
HORSE BIDDERS AND TO PROVIDE BID PROTECTIONS, (C) SCHEDULING AN
AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
(D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES,
(E) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER
OF NOTICE THEREOF AND (F) GRANTING RELATED RELIEF; AND
(II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) APPROVING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

I, Drew M. Talarico, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a Managing Director in the Financial Restructuring Group at Houlihan Lokey Capital, Inc. ("Houlihan"), an investment banking and financial advisory firm. I am based out of Houlihan's New York office, located at 245 Park Avenue, 20th Floor, New York, New York 10167, and I am duly authorized to make this declaration (the "Declaration") on behalf of Houlihan. Houlihan has been retained as the investment banker of Nikola Corp., and certain of its

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Nikola Corp. (registered to do business in California as Nikola Truck Manufacturing Corp.) (1153); Nikola Properties, LLC (3648); Nikola Subsidiary Corp. (1876); Nikola Motor Co., LLC (0193); Nikola Energy Co., LLC (0706); Nikola Powersports, LLC (6771); Free Form Factory, Inc. (2510); Nikola H2 2081 W Placentia Lane LLC (N/A); 4141 East Broadway Rd., LLC (N/A); and Nikola Desert Logistics LLC (N/A). The Debtors' headquarters are located at 4141 East Broadway Road, Phoenix, AZ 85040.

subsidiaries, as debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "Debtors"). Houlihan and its senior professionals have extensive experience with reorganizing and restructuring distressed companies, both out-of-court and in chapter 11 proceedings. I have eighteen (18) years of experience in the restructuring industry and extensive experience (i) marketing companies or their assets for sale, including companies in distress and in chapter 11; (ii) raising capital for special situation transactions; and (iii) restructuring companies' balance sheets both in court and out of court.

2.  This Declaration is submitted in support of the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief*, filed contemporaneously herewith (the "Bidding Procedures Motion").[2]

3.  Except as otherwise indicated, all statements in this Declaration are based upon (i) my personal knowledge of the Debtors' operations and finances gleaned during the course of my engagement with the Debtors; (ii) my review of relevant documents, including data and information that I considered in forming my conclusions about the proposed Bidding Procedures

---

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Bidding Procedures Motion.

and overall sale process; (iii) information provided to me by Houlihan employees working under my supervision; (iv) information provided to me by, and discussions with, the members of the Debtors' management team or their other advisors; and (v) my views or opinions based upon my experience as a restructuring professional who has been involved in dozens of restructuring transaction processes. If called to testify, I could and would testify to each of the facts and opinions set forth herein. The Debtors have authorized me to submit this Declaration.

4. I am not being compensated specifically for this testimony other than through payments received by Houlihan as a professional retained by the Debtors as the Debtors' investment banker in these Chapter 11 Cases, which retention will be sought in the coming days. My compensation, and that of Houlihan, is not contingent upon my testimony in connection with the Bidding Procedures Motion.

### BACKGROUND AND QUALIFICATIONS

5. I have eighteen (18) years of investment banking experience, entirely in Houlihan's financial restructuring group. Since joining Houlihan in 2007, I have provided investment banking expertise and financing advice, including with respect to merger, acquisition and restructuring related advice, to companies, lenders, and other parties-in-interest, related to companies both in and outside of chapter 11. Over the most recent several years, a selection of my company- or creditor-side engagements involving a company in chapter 11 includes, among others, Northvolt AB, Cano Health, Seadrill Limited, Venator, Valaris, Noble Corporation and Roust Corp. I also have extensive experience working on and evaluating liability management and financing transactions. I received a Bachelor of Science degree, with concentrations in Systems Engineering and Economics, from the University of Virginia.

6.  Houlihan is an internationally recognized investment banking and financial advisory firm, with offices worldwide and more than 2,500 professionals. Houlihan is a leader in providing investment banking and financial advisory services to debtors, unsecured and secured creditors, acquirers, and other parties in interest involved with financially troubled companies. Houlihan has been retained to provide investment banking and financial advisory services in some of the largest restructurings in the United States, including, *In re MVK Farmco LLC*, Case No. 23-11721 (Bankr. D. Del. Oct. 13, 2023); *In re David's Bridal, LLC*, Case No. 23-13131 (Bankr. D.N.J. Apr. 16, 2023); *In re Sungard AS New Holdings, LLC*, Case No. 22-90018 (Bankr. S.D. Tex. Apr. 11, 2022); *In re Bristow Group Inc.*, Case No. 19-32713 (Bankr. S.D. Tex. May 11, 2019); *In re PHI, Inc.*, Case No. 19-30923 (Bankr. N.D. Tex. Mar 14, 2019); *In re Walter Investment Management Corporation*, Case No. 17-13446 (Bankr. S.D.N.Y. Nov. 30, 2017); *In re Seadrill Limited*, Case No. 17-60079 (Bankr. S.D. Tex. Sep. 12, 2017); *In re Westinghouse Electric Company LLC*, Case No. 17-10751 (Bankr. S.D.N.Y. Mar. 29, 2017); *In re Roust Corporation*, Case No. 16-23786 (Bankr. S.D.N.Y. Dec. 30, 2016); *In re Sports Authority Holdings, Inc.*, Case No. 16-10527 (Bankr. D. Del. Mar. 2, 2016); *In re Relativity Fashion, LLC* (a.k.a. Relativity Media*)*, Case No. 15-11989 (Bankr. S.D.N.Y. Jul. 30, 2015); *In re RadioShack Corporation*, Case No. 15-10197 (Bankr. D. Del. Feb. 5, 2015); *In re Caesars Entertainment Operating Company, Inc.*, Case No. 15-01145 (Bankr. N.D. Ill. Jan. 15, 2015); *In re Entegra Power Group LLC*, Case No. 14-11859 (Bankr. D. Del. Aug. 4, 2014); *In re Premier International Holdings Inc.* (a.k.a. Six Flags Theme Parks), Case No. 09-12019 (Bankr. D. Del. June 13, 2009); *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008); *In re Buffets Holdings, Inc.*, Case No. 08-10141 (Bankr. D. Del. Jan. 22, 2008); *In re Conseco Inc*, Case No. 02-49672 (Bankr.

N.D. Ill. Dec. 17, 2002); *In re WorldCom, Inc.*, Case No. 02-13533 (Bankr. S.D.N.Y. July 21, 2002); and *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. Dec. 2, 2001).

7. Since Houlihan first started working closely with the Debtors in October 2024, I have been primarily responsible for the work product of the various Houlihan professionals who are all working on the Debtors' restructuring. I have also personally been involved, and supervised those Houlihan professionals, in: (i) performing various financial analyses of the Debtors; (ii) assisting the Debtors in assessing and managing their liquidity; (iii) preparing a comprehensive marketing plan and information materials to distribute to potential buyers on a confidential basis; (iv) identifying and evaluating potential counterparties for a potential sale and/or financing process; (v) soliciting third-party interest in an acquisition of the Debtors' assets; (vi) assisting the Debtors in contacting potential buyers, arranging meetings with potential buyers, and coordinating due diligence; (vii) assisting the Debtors with soliciting, negotiating, and documenting the postpetition debtor-in-possession financing; and (viii) preparing for the commencement of these Chapter 11 Cases. During its engagement, Houlihan has worked closely with the Debtors' management and other restructuring professionals. As a result of our extensive experience with the Debtors, the Houlihan team and I have acquired significant knowledge of the Debtors and their businesses, and have become intimately familiar with the Debtors' business operations, capital structure, liquidity needs, financial projections, and related matters.

**PREPETITION MARKETING PROCESS**

8. As discussed in greater detail in the First Day Declaration, to address their increasingly critical operational challenges and liquidity needs, the Debtors worked with various advisors to raise funds and engaged in various M&A initiatives in the year leading up to the Petition Date to explore numerous possible restructuring options. Since the Summer of 2024,

Nikola raised $80 million in convertible debt financing and an additional $65 million in common equity (in exchange for resetting the conversion price of another series of convertible debt) to support the Debtors' extensive efforts in pursuit of a strategic and/or financial transaction.

9. Extensive internal and external time and resources have been devoted to exploring transactions with numerous potential counterparties. Prior to Houlihan's involvement, I understand that initial conversations focused on operational work (*e.g.*, how to sell the trucks, potential for serving as a financing company, and other regular way strategic initiatives). Later conversations focused on potential financing and sale transactions to extend the liquidity runway. Most recently, the Company has solicited investor interest in buying individual assets.

10. Through the initial phases of the process, the Debtors utilized three investment bankers, all on a non-exclusive basis, to assist with raising funds (proposed common stock and convertible notes public offerings, and proposed private offerings, issue and sale of equity or convertible or hybrid securities) and exploring a possible sale of the Debtors as a going concern. Those bankers included Citigroup Global Markets Inc., BTIG, LLC, and Goldman Sachs & Co., LLC (collectively, the "Prepetition Investment Bankers").

11. While I understand Citigroup and BTIG primarily focused on capital raising strategies, commencing in the Summer of 2024, Goldman Sachs increased the urgency of Nikola's efforts to identify parties that it and the Company determined would be interested in acquiring the Company as a going concern. Approximately five (5) months before the Petition Date, Goldman Sachs reached out to approximately twenty-two (22) separate parties to gauge their interest in acquiring the Debtors as a going concern. This outreach focused on truck manufacturing companies and companies with transportation logistics needs who were large enough to possible be interested in an acquisition.

12. Out of the parties contacted by Goldman Sachs, I understand that two (2) international automotive manufacturers expressed interest in a possible transaction. After one of those manufacturers dropped out, the Debtors had further discussions with the other party and various term sheets were exchanged. Unfortunately, that party ultimately fell away in the fall of 2024. As an out-of-court solution became less likely, Nikola sought to engage an investment banker with distressed capabilities to simultaneously explore restructuring options and continue the financial and strategic investor outreach initiated by the Prepetition Investment Bankers.

13. As the Debtors' liquidity position continued to erode, Houlihan Lokey Capital, Inc. ("HL"), was selected in October 2024 to provide prepetition investment banking services to the Debtors. In that role, HL has, among other things: (a) continued the marketing process with the parties that were engaged with the Debtors before HL's retention, and solicited additional third-party interest to gauge potential interest in both a standalone investment and an investment alongside a potential strategic partner; (b) assisted the Debtors in developing a sale strategy and bidding procedures for their postpetition marketing process; and (c) solicited lenders to provide a postpetition loan to the Debtors, negotiated loan terms, and advised the Debtors in connection with the loan.

14. Following its retention, HL initially reached out to twenty-four (24) financial investors regarding the Nikola opportunity. Multiple follow-up conversations were had with prospective investors; however, general feedback was that the investment required to achieve the business plan was too difficult for a financial investor without a strategic interest in the assets to make given the long and uncertain path towards profitability.

15. HL also assisted the Debtors with continuing to explore a sale of all their assets as an ongoing, operating business. In early December 2024, discussions with one potentially

interested international vehicle manufacturing company who previously executed a confidentiality agreement (neither of the two companies that engaged in discussions with the Prepetition Investment Bankers referenced above) restarted.  After a non-binding letter of intent was signed to facilitate discussions concerning a potential acquisition, the Debtors granted access to their electronic data room and invited the party to have meetings with the Debtors' management.

16.    Thereafter, the parties engaged (on an exclusive basis pursuant to the terms of the LOI) in substantial due diligence over an approximately four-week period, including a comprehensive review of the legal, financial, tax, commercial, environmental, intellectual property, operation, labor and employment and material agreements of the Debtors.  Due diligence included a several day-long site visit to the Debtors' manufacturing facility by the prospective buyer's agents, lawyers, accountants and advisors.  While it appeared that an agreement to purchase substantially all the Debtors' assets through a bankruptcy sale process was progressing, the prospective buyer ultimately walked away.

17.    Following the disappointing conclusion of negotiations outlined above, the Debtors, with the assistance of HL, redoubled their efforts to find a going concern buyer.  As of the Petition Date, the Debtors are in active discussions with at least three (3) parties interested in such opportunity.  Given the prior unsuccessful efforts by the Prepetition Investment Bankers and HL to find a buyer for the Debtors as a going concern sale, however, the Debtors, with the assistance of their advisors also have pivoted to evaluating the sale of the Debtors' separate business segments.  Since a going concern sale may not ultimately prove viable, HL and the Debtors have begun to market various of the Debtors' assets and business separately.  Those efforts will accelerate with the commencement of the Chapter 11 Cases.

**NEED FOR A TIMELY PROCESS**

18. The Debtors, in consultation with Houlihan and their other advisors, designed the Bidding Procedures to promote a competitive and expedient sale process that will position the Debtors to maximize the value received for the Assets. The process was designed with minimum barriers to entry that provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid. The Bidding Procedures give the Debtors flexibility to solicit proposals, negotiate transactions, hold an auction, and consummate a sale for the highest or otherwise best bid, and interested bidders the ability to participate in a competitive auction for the Debtors' Assets.

19. The circumstances of the Chapter 11 Cases require that the Debtors run an expedited, but robust, sale process. Speed and certainty are critical because the Debtors simply do not have sufficient liquidity to support a protracted sale process. Additionally, I believe that a protracted sale process could be detrimental to the Debtors' operations and relationships with key stakeholders, including employees, vendors and suppliers in the event that a going concern sale materializes, without whose support the Debtors may not be able to achieve the best sale outcome.

20. Moreover, before the Petition Date, the Debtors and their advisors conducted an extensive marketing process for the sale of the Debtors' business on a going concern basis. Houlihan will also continue to market the Debtors' assets to ensure the highest and best offer is secured.

21. Importantly, the most likely competing bidders are among those who the Debtors or Houlihan have already contacted and are therefore already part of the prepetition sales process. Specifically, the proposed Bidding Procedures provide interested parties with more than five (5) additional weeks to continue diligence and submit a qualified bid. While expedited, the timeline

set forth in the Bidding Procedures should be sufficient to provide any motivated potential purchasers with an adequate amount of time to diligence the assets and submit bids.

22. For the foregoing reasons, I believe that pursuing the sale in the manner and within the time periods prescribed in the Bidding Procedures is in the best interest of the Debtors' estates and will provide interested parties with sufficient opportunity to participate.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: February 19, 2025 

Respectfully submitted,

*/s/ Drew M. Talarico*
Drew M. Talarico
Managing Director
Houlihan Lokey Capital, Inc.