**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nikola Corp., *et al.*,[1] | Case No. 25-10258 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF STEPHEN J. GIRSKY IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Stephen J. Girsky, hereby declare under penalty of perjury:

1.    I am the President and Chief Executive Officer of Nikola Corp. ("<u>Nikola</u>" and, collectively with its affiliated debtors and debtors in possession, the "<u>Debtors</u>").  The Debtors, together with their non-debtor affiliates, are referred to herein as the "<u>Company</u>."

2.    I served as President and CEO of VectoIQ Acquisition Corp. from its incorporation in January 2018 until the consummation of its business combination with Nikola (described further below).  Since August 2023, I have served as President and CEO of Nikola. Prior to my appointment as CEO, I was Chairman of the Board since September 2020.  I currently serve on the Board of Directors of Nikola.

3.    I have more than 30 years of leadership and technical experience in finance and business management in both public and private companies.  Prior to joining Nikola, I served as the Managing Director of VectoIQ, LLC, an independent advisory firm based in New York.  I also served in several capacities at General Motors from November 2009 until July 2014,

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Nikola Corp. (registered to do business in California as Nikola Truck Manufacturing Corp.) (1153); Nikola Properties, LLC (3648); Nikola Subsidiary Corp. (1876); Nikola Motor Co., LLC (0193); Nikola Energy Co., LLC (0706); Nikola Powersports, LLC (6771); Free Form Factory, Inc. (2510); Nikola H2 2081 W Placentia Lane LLC (N/A); 4141 East Broadway Rd., LLC (N/A); and Nikola Desert Logistics LLC (N/A).  The Debtors' headquarters are located at 4141 East Broadway Road, Phoenix, AZ 85040.

including Vice Chairman.  I served as Chairman of the Adam Opel AG Supervisory Board and was President of GM Europe for a period of time.  I was a special advisor to the CEO and CFO of General Motors Corporation from August 2005 to June 2006.  Prior to this, I served as President of Centerbridge Industrial Partners, an affiliate of Centerbridge Partners, LP, and a multibillion-dollar investment fund.  I also previously served as Managing Director at Morgan Stanley and as Senior Analyst of the Morgan Stanley Global Automotive and Auto Parts Research Team.

4.      I have significant experience as a board member of private and public companies. I served on the Board of Directors of Brookfield Business Partners Limited, the General Partner of Brookfield Business Partners, L.P., as well as Clarios, which is a leader in advanced low-voltage battery systems technology and manufacturing.  I also served on the Board of Directors of U.S. Steel from 2016 to 2021 and on the General Motors Board of Directors following its emergence from bankruptcy in June 2009 until June 2016.  Finally, I served as the Lead Director of Dana Holdings Corp., from 2008 to 2009.

5.      In my role as President and Chief Executive Officer and Director of Nikola, I am knowledgeable and familiar with the Debtors' day-to-day operations, business, and financial affairs, and the circumstances leading to the commencement of these Chapter 11 Cases.  Except as otherwise indicated herein, the statements in this declaration (the "Declaration") are based on my personal knowledge, my review of relevant documents, information provided to me by the Debtors or their employees, advisors or professionals, or my opinion based on my experience, knowledge, and information concerning the Company's operations and the industry in which it operates.  I am over the age of eighteen, and if called upon to testify, I would testify competently to the facts set forth in this Declaration.

4906-4978-1014

6.     On the date hereof (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court") commencing these chapter 11 cases (the "Chapter 11 Cases"). To minimize any disruption or other adverse effect resulting from the filing of the Chapter 11 Cases, on the Petition Date, the Debtors filed various motions seeking certain "first day" relief (collectively, the "First Day Motions"). I submit this Declaration in support of the First Day Motions and to assist the Court and parties-in-interest in understanding the Debtors, their business, and the circumstances leading to these Chapter 11 Cases.   This Declaration is organized into the following sections:

- **Part I** describes the Debtors' business, including their corporate history and operations;
- **Part II** describes the Debtors' corporate and capital structure;
- **Part III** describes the challenges faced by the Debtors over recent years;
- **Part IV** provides an overview of the Debtors' M&A initiatives and prepetition sale process leading to the commencement of these Chapter 11 Cases; and
- **Part V** discusses the First Day Motions.

## I.     Corporate History and Business Operations

### A.     General Background

7.     The Company is an early-stage growth company that designs and manufactures heavy-duty commercial hydrogen-electric ("FCEV") and battery-electric ("BEV") trucks and energy infrastructure solutions, via the HYLA brand. Nikola has been a pioneer in moving zero-emissions transportation forward, including bringing the first class 8 hydrogen fuel cell electric trucks to market in North America and developing the HYLA hydrogen refueling highway, connecting Northern California to Southern California. Its customers have driven approximately 3.3 million miles across both the FCEV and BEV truck platforms and the HYLA fueling network has dispensed well over 300 metric tons of hydrogen. The Company's

innovative business model sought to enable fleets and end users to integrate next-generation truck technology, hydrogen refueling infrastructure, electric vehicle charging solutions, and related maintenance with the goal of building a long-term competitive advantage for clean technology vehicles and next-generation fueling solutions.

8.     The Company operates in two business units: Truck and Energy.  The Truck business unit is commercializing FCEV and BEV Class 8 trucks that provide environmentally friendly, cost-effective solutions to the short, medium and long-haul trucking sectors.  The Energy business unit is developing hydrogen fueling infrastructure to support the Company's FCEV trucks covering supply, distribution and dispensing.

9.     The Company has a significant patent portfolio,[2] including 46 U.S. utility patents, 51 foreign utility patents, 15 U.S. design patents, and 115 foreign design patents.

**B.     The Debtors' Corporate History**

10.     Nikola is a Delaware corporation, which was incorporated originally as VectoIQ Acquisition Corp., or VectoIQ, in January 2018.  On June 3, 2020, VectoIQ consummated a business combination with Nikola's corporate predecessor ("Legacy Nikola"), and, in connection therewith, (i) VectoIQ's wholly-owned subsidiary merged with and into Legacy Nikola, whereby Legacy Nikola survived the merger and was deemed the accounting predecessor of the merger and became the successor registrant for SEC purposes and (ii)  changed its name to "Nikola Corporation."  Upon consummation of the foregoing transactions, Legacy Nikola became Nikola's wholly-owned subsidiary.

---

[2]     The Company has 65 pending patents, including mechanical systems, thermal, electrical, power Management, hydrogen systems, diagnostics, and controls.

4906-4978-1014

C.      **Business Operations**

i.      *Operations Overview*

11.      The Debtors commenced commercial production of BEV trucks in the first quarter of 2022 and commenced commercial production of FCEV trucks in the third quarter of 2023, both at its 691,000 square foot state of the art manufacturing facility in Coolidge, Arizona.  The Company's FCEV trucks were the first such trucks in serial production.  The Company's trucks have an estimated range of up to 330 miles for BEV trucks and up to 500 miles for FCEV trucks.  The current manufacturing capacity with existing tooling at Coolidge, Arizona is up to 2,400 units per year, over three shifts.



BEV truck.

4906-4978-1014



FCEV truck.

12.    As of the Petition Date, the Debtors have an inventory of 259 trucks (all located in Coolidge) consisting of 103 FCEV trucks and 156 BEV trucks.  A further 87 trucks (79 FCEV trucks and 8 BEV trucks) are at various dealer locations.[3]  Certain of those trucks are tied to specific end-user customers and are just waiting for customers to take delivery.

13.    The Debtors use an integrated approach to manufacturing trucks, that includes the in-house assembly of truck frames, electro-mechanical subassembly of truck batteries and all other truck components, final assembly, and testing.

---

[3]    The Debtors understand that some of these 87 trucks are not sellable (*e.g.*, certain BEV trucks are missing battery packs).

4906-4978-1014

14.     Beginning in the third quarter of 2023, production and sales of BEV trucks were impacted significantly by the voluntary recall of BEV trucks which required the Company to replace the battery packs in all BEV trucks.  The Debtors incurred significant expenses associated with this recall.  The battery replacement commenced in late 2023, and retrofit trucks are returned to dealers or end users once the battery packs are replaced.  The Company initially expected to complete the retrofit and return all end user and dealer trucks by the end of 2024; however, these Chapter 11 Cases will delay such activities.  To date, the Company has incurred losses of more than $44 million relating to the voluntary recall.  The total negative impact from all recall-related activity is expected to be approximately $56 million.

15.     The Company's global Energy brand, HYLA, encompasses energy products for procuring, distributing, and dispensing hydrogen to fuel the Company's FCEV trucks.  The Company planned to leverage multiple ownership structures where it either fully or partially owns, or does not own, hydrogen production assets.  In cases where the Company can source hydrogen supply, without ownership of hydrogen production assets, it has and expects to continue to enter long-term supply hydrogen production contracts.

16.     The Company's hydrogen dispensing network is up and running, with eight (8) operational fueling locations in California (Ontario, Long Beach, Santa Fe Springs, and a partner site with Nikola access in Oakland), Arizona (Coolidge), Illinois (Plainfield), Colorado (Kiowa), and Canada (Toronto).  Through those sites, the Company can fuel up to 120 FCEV trucks per day.

### ii.    The Debtors' Vendors, Suppliers, and Dealers

17.     The Debtors obtain components and subassemblies for their trucks from third-party suppliers and vendors, the majority of which are in the United States, with certain suppliers and vendors based in Canada, England, Germany, China, and Thailand.  The Debtors generally

purchase components and subassemblies from a limited group of suppliers through supply agreements.[4]  While the Company seeks to obtain components from multiple sources whenever possible, many of the components used in their vehicles are or will be purchased by from a single source, especially with respect to hydrogen fuel cells and batteries.  Indeed, numerous key components used in the Debtors' truck manufacturing process are each supplied by separate single-source suppliers.

18.    The Debtors rely on arrangements with 11 dealers (two dealerships have on-site hydrogen fueling locations established) in 22 locations in 14 states, ***plus*** Canada for the sale of the BEV and FCEV truck sales.

### iii.    The Debtors' Customers

19.    The Debtors' consumer truck sale operations occur largely through their 11 dealers, who sell trucks to national accounts, medium and small truck fleets, with a particular focus on marketing to the approximately 650 national truck fleets in the US.  The Company recognized that green policy incentive programs in the US and Canada drive both traditional fleet customers and strategic top-down decision makers.  The Company developed a best-in-class incentive management program, tracking every US and Canadian truck incentive to determine corporate strategy, and assist fleets in securing incentives to execute vehicle deliveries.  The Company has calculated that across the top six incentive states in the US and Canada, there is approximately $350 million in tax incentive funding available, which is sufficient for more than 1,862 trucks to be funded throughout 2025.

---

[4]    In general, the Debtors rely on these purchase orders and do not have written supply contracts with many of their key suppliers.

20.     The Debtors produced 282 FCEV trucks and shipped 200 in calendar year 2024. The Debtors shipped 26 BEV trucks and returned a total of 94 BEV trucks to existing customers subject to recall in calendar year 2024.  In calendar year 2024, the Debtors recognized aggregate $62 million in revenue from truck sales and $7 million in service and other activity.  In late 2024, the Debtors decided to cease further manufacturing of trucks to conserve cash and focus on the preparation for the sale of their assets through these Chapter 11 Cases.

### iv.     The Debtors' Employees

21.     The Debtors' employees are employed by Nikola Corp.  As of the Petition Date, there are 878 employees (collectively, the "Employees").  Of this total, 576 Employees are full-time salaried employees, and 302 Employees are hourly employees.

22.     The Employees provide a variety of essential functions, including management and leadership, sales and customer service, engineers and technicians, finance and accounting, IT and data management, manufacturing and servicing, human resources and legal, safety and operations, and warranty and supply chain.  The Employees include personnel that are intimately familiar with the Debtors' business and have specialized expertise in its innovative products, many of whom have developed relationships with dealers, suppliers, and key constituents essential to the Debtors' business.  The Employees are therefore essential to the effective operation of the Debtors' business and their ability to maximize value during the pendency of these cases as the Debtors work toward a sale of all or substantially all their assets.

## II.     The Debtors' Prepetition Corporate and Capital Structure

### A.     The Debtors' Corporate Structure

#### i.     Nikola

23.     Nikola's Common Stock trades on the Nasdaq Stock Market LLC ("Nasdaq"), under the symbol "NKLA."

4906-4978-1014

24.     On June 24, 2024, the Company effected a one-for-thirty (1-for-30) reverse stock split of its common stock (the "Reverse Stock Split").  The Reverse Stock Split was approved by stockholders at Nikola's annual meeting of stockholders on June 5, 2024, and on June 13, 2024, Nikola's board of directors approved the Reverse Stock Split.  Contemporaneously with the Reverse Stock Split, the number of authorized shares of common stock was reduced from 1,600,000,000 to 1,000,000,000.  As of January 31, 2025, there were 119,400,666 shares of Nikola common stock outstanding.

25.     Nikola has 150,000,000 shares of authorized preferred stock, at $0.0001 par value, but no such shares were issued and outstanding as of December 31, 2024.

### ii.     The Other Debtors

26.     Nikola owns directly or indirectly 100% of the other Debtor legal entities, 100% of three (3) non-Debtor foreign subsidiaries (Nikola GmbH (Germany), Nikola Motor Canada, Inc., and Camions Nikola Inc. (Quebec)), 100% of a non-Debtor special purpose bankruptcy-remote entity (Nikola AG23 LLC), and 20% of (Wabash Valley Resources, LLC).[5]  As noted above, an organizational chart illustrating (partially) the corporate structure of the Debtors is set forth below.

---

[5]     In addition, the assets of Non-Debtor affiliate Romeo Power, Inc. (which owns 100% of Romeo Systems, Inc., which, in turn, owns a controlling interest in Romeo Systems Technology LLC) was transferred to SG Service Co., LLC as assignee pursuant to a general assignment for the benefit of creditors, on June 30, 2023, and the assignee is in the process of concluding the administration of that estate.

4906-4978-1014



**B.    The Debtors' Prepetition Capital Structure**

27.    As of the Petition Date, the Debtors have approximately $97.7 million in total funded debt and finance lease obligations (excluding accrued interest and certain costs). The following table depicts the Debtors' prepetition capital structure:

| Funded Debt and Other Obligations | Approx. Outstanding Principal | Maturity Date |
|---|---|---|
| Convertible Notes | $44.2 million | May 31, 2026 |
| Financing Obligations (operating and equipment leases) | $53.5 million | Various |

*i.    The Convertible Notes*

28.    The Company has funded most of its recent operations through capital raises in the form of senior unsecured convertible notes. To that end, principal on the following convertible note issuances remain outstanding on the date hereof:

A.    In June 2022, the Company completed a private placement of $200.0 million aggregate principal amount of June 2022 Toggle Convertible Notes, which mature on May 31, 2026. In June 2023, the Company completed the private placement of $11.0 million aggregate principal amount of June 2023 Toggle Convertible Notes (together with the June 2022 Toggle Convertible Notes, the "Toggle Convertible Notes"), which mature on May 31, 2026. The Company can elect to make any interest payment on the Toggle Convertible Notes in cash, through the issuance of additional Toggle Convertible Notes in the form of the Toggle Convertible Notes with respect to which such interest is due, or any

11

combination thereof.  Interest on the Toggle Convertible Notes is payable semi-annually in arrears.

29.     The holder of the remaining obligations owed on the Toggle Convertible Notes, Antara Capital LP, or Antara, on behalf of itself and certain advised or managed funds and accounts, has not exercised its conversion rights in full and is presently owed approximately $44.2 million.

### ii.     Financing Obligations

#### a.     Equipment Finance and Operating Leases

30.     The Company has entered into a number of manufacturing equipment leases.  As of December 31, 2024, the total lease liability (the discounted remaining payments on the leases) in respect to these leases was $41.8 million.

31.     The Company has entered into a number of operating leases for office and manufacturing space and for hydrogen fueling operations.  As of December 31, 2024, the total lease liability (the discounted remaining payments on the leases) was $11.7 million.

#### b.     Real Estate

32.     On May 10, 2022 (the "Sale Date"), the Company entered into a sale agreement (the "Sale Agreement"), pursuant to which the Company sold the land and property related to the Company's headquarters in Phoenix, Arizona for a purchase price of $52.5 million.  As of the Sale Date, $13.1 million was withheld from the proceeds received related to portions of the headquarters undergoing construction.  The Company received the remaining proceeds throughout the completion of construction pursuant to the terms of the Sale Agreement.  Concurrent with the sale, the Company entered into a lease agreement (the "Lease Agreement"), whereby the Company leased back the land and property related to the headquarters for an initial term of 20 years with four extension options for 7 years each.  As of the Sale Date, the Company

considered one extension option reasonably certain of being exercised.  The Lease Agreement is classified by the Company as a finance lease with the buyer not considered to have obtained control of the land and property related to the headquarters facility, for which reason this property is recognized on the Company's balance sheet.  As of December 31, 2024, the total financing liability (the discounted remaining payments on the financing obligation) in respect to this Sale Agreement was $52.5 million.

33.     On June 29, 2023 (the "Land Sale Date"), the Company entered into a sale agreement, pursuant to which the Company sold the land in Coolidge, Arizona on which the Company's manufacturing facility is located for a purchase price of $50.4 million.  Concurrent with the sale, the Company entered into a lease agreement (the "Land Lease Agreement"), whereby the Company leased back the land for an initial term of 99 years.  The Land Lease Agreement grants the Company an option to repurchase the land upon the fiftieth (50th) anniversary of the Land Sale Date for a price equal to the greater of the fair market value, or 300% of the purchase price.  As of the Land Sale Date, the Company considered the purchase option reasonably certain of being exercised.  The Land Lease Agreement is classified by the Company as a finance lease with the buyer not considered to have obtained control of the land and property related to the headquarters facility, for which reason this property is recognized on the Company's balance sheet.  As of December 31, 2024, the total financing liability (the discounted remaining payments on the financing obligation) in respect to this Land Lease Agreement was $51.9 million.

34.     As of the Land Sale Date, the Company received an appraisal for the Coolidge, Arizona facility and premises subject to the Lease Agreement in the amount of approximately $174 million, net of the aggregate liability associated with the Land Lease Agreement.

### c.   *Letters of Credit*

35.     During the first quarter of 2024, the Company executed a $3.0 million letter of credit in connection with the FFI Purchase Agreement through January 30, 2025.  As of December 30, 2024, no amounts have been drawn on the letter of credit.  During the third quarter of 2023, the Company executed a $1.2 million letter of credit to secure a customs bond through September 14, 2024.   The letter of credit was subsequently extended through September 14, 2025.  As of December 30, 2024, no amounts have been drawn on the letter of credit.

36.     During the second quarter of 2022, and in conjunction with the execution of the Lease Agreement, the Company executed an irrevocable standby letter of credit for $12.5 million to collateralize the Company's lease obligation.   The Lease Agreement was subsequently amended, increasing the amount of the letter of credit to $12.8 million.  The letter of credit is subject to annual increases commensurate with base rent increases pursuant to the Lease Agreement.  The letter of credit will expire upon the expiration of the Lease Agreement but may be subject to reduction or early termination upon the satisfaction of certain conditions as described in the Lease Agreement.

### iii.   *Unsecured Claims*

37.     In addition to their funded debt, the Debtors also have significant unsecured debt, including amounts owed to the Securities and Exchange Commission, to former Officers and Directors on account of indemnity obligations related to an ongoing consolidated class action lawsuit pending in the United States District Court for the District of Arizona, and to trade vendors.  The Debtors routinely incur fixed, liquidated, and undisputed payment obligations in the ordinary course of business to various third-party providers of goods and services.  The Debtors rely on a broad network of vendors to supply parts for the production of the BEV trucks

and FCEV trucks.  A majority of these vendors conduct business with the Debtors on a purchase-order-by-purchase-order basis and are paid on prearranged terms.

### III.    Challenges Facing the Debtors Over the Years

38.    The hydrogen fuel cell vehicle market and hydrogen infrastructure are early-stage markets. As a result, the Company has experienced production shortages because of new technology supply chain challenges. Additionally, the lack of hydrogen infrastructure or supply for end users hampers truck sales and building out hydrogen infrastructure will require significant investment.  The Company requires significant capital investment to execute its business plans. The Company is also facing significant litigation, the cost of which is draining cash from the Company.  The Company is also obligated to make a significant payment to the SEC in respect to a settlement, the terms of which are further described below.  Despite its best efforts, it has become clear that the Company will not be able to raise the funds necessary to fund operations going forward.

39.    The Company is an early stage, capital intensive business that incurred net losses of $966.3 million, $812.7 million and $481.2 million for the year ended December 31, 2023 and for the nine months ended September 30, 2023 and 2024, respectively, and has an accumulated deficit of approximately $3.6 billion from the inception of Nikola Corporation, a Delaware corporation, prior to the merger with VectoIQ, or Legacy Nikola, through September 30, 2024.

40.    The Company also suffered significant losses from a voluntary product recall. Beginning in the third quarter of 2023, production and sales of the BEV was impacted significantly by the voluntary recall of BEV trucks. The recall was initiated in response to investigations prompted by a battery pack thermal event. To minimize vehicle downtime and maximize end user safety and satisfaction, the battery packs in trucks owned by dealers and their retail customers are being retrofitted with battery packs from an alternative supplier.  Through

4906-4978-1014

December 30, 2025, the Company accrued total recall campaign costs of $56.7 million for the BEV trucks.

A.   **SEC Settlement**

41.   By order dated December 21, 2021, the Company and the SEC reached a settlement arising out of the SEC's investigation of the Company related to a short-seller article published in September 2020.  Under the terms of the settlement, without admitting or denying the SEC's findings, the Company, among other things, agreed to pay a $125 million civil penalty.

42.   The first $25 million installment was paid at the end of 2021, and the remaining installments were to be paid semiannually through 2023. In July 2022, the Company and SEC agreed to an alternative payment plan.  The Company made payments of $1.5 million during the first and second quarters of 2024, a payment of $0.8 million during the third quarter of 2024, and the remainder of the payment plan is subject to determination.  As of September 30, 2024, the Company has reflected the remaining liability of $80.3 million in accrued expenses and other current liabilities on the condensed consolidated balance sheets.

B.   **Shareholder Securities Litigation**

43.   The Company and former officers and directors Kim J. Brady, Mark A. Russell, and Jeffrey Ubben (collectively, the "Individual Defendants," and, together with the Company, the "Defendants") are defendants in a consolidated securities class action lawsuit pending in the United States District Court of the District of Arizona (the "Shareholder Securities Litigation"). On December 15, 2020, the United States District Court for the District of Arizona consolidated the actions under lead case *Borteanu v. Nikola Corporation, et al.*, No. CV-20-01797-PXL-SPL. On January 24, 2022, the Lead Plaintiffs filed the Consolidated Amended Class Action Complaint which asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act

16

of 1934, as amended (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, based on allegedly false and/or misleading statements and omissions in press releases, public filings, and in social media regarding the Company's business plan and prospects.

44.     After the court dismissed the complaint with leave to amend, a Second Consolidated Amended Class Action Complaint was filed.  The Defendants filed motions to dismiss the Second Consolidated Amended Class Action Complaint on May 15, 2023.  On December 8, 2023, the court granted in part and denied in part Defendants' motion to dismiss. On January 26, 2024, the Company and certain former officers and directors answered the Second Consolidated Amended Class Action Complaint.  On February 23, 2024, the parties exchanged initial disclosures.  On May 17, 2024, Lead Plaintiffs moved for class certification. On August 19, 2024, Defendants filed an opposition to Lead Plaintiffs' motion for class certification, and a motion to exclude Lead Plaintiffs' expert's testimony.  Briefing on Defendants' motion to exclude concluded on September 30, 2024.  On October 1, 2024, Lead Plaintiffs filed a reply in further support of their motion for class certification.  On October 25, 2024, Defendants moved for leave to file a sur-reply in response to Lead Plaintiffs' reply.  On January 6, 2025, the Court granted Defendants' motion for leave to file a sur-reply, denied Defendants' motion to exclude, and granted Lead Plaintiffs' motion to certify the class, with certain modifications.  On January 21, 2025, certain Defendants filed a Rule 23(f) petition appealing the class certification decision.

45.     Prior to the Petition Date, the Company reached an agreement with the Lead Plaintiffs to settle the Shareholder Securities Litigation.  Subject to approval by this Court pursuant to a motion to be filed in due course pursuant to Bankruptcy Rule 9019, the Debtors'

plan in these Chapter 11 Cases will provide for the following to be distributed to the Lead Plaintiffs:

- The Company's full assignment of the arbitration claims asserted by Nikola against Mr. Milton in *Nikola Corp. v. Milton*, AAA Case No. 01-21-0017- 1964, including but not limited to the arbitration award granted November 17, 2023, net of fees and costs to be paid to Kasowitz Benson Torres LLP, and the judgment in the Company's favor in *Nikola Corp. v. Milton*, 23-cv-02635-DJH (D. Ariz.);

- The Company's assignment of all proceeds, net of any attorneys' fees and costs awarded to derivative plaintiffs' counsel by the court, obtained by the Company from a settlement of the derivative actions captioned *In re Nikola Derivative Litigation*, C.A. No. 2022-0023-KSJM (Del. Chancery), *In re Nikola Derivative Litigation*, Case No. 20-cv-01277-CFC (D. Del.), *Huhn v. Milton et al.*, Case No. 2:20-cv-2437 (D. Ariz.), and *Lomont v. Milton, et al.*, No. 2023-0908-KSJM (Del. Ch.); and

- $10.5 million in cash, comprised of a cash payment to be paid or caused to be paid by the Company, on behalf of the Defendants and other released parties, and a separate cash payment specifically on behalf of Mr. Ubben and his related parties.

**C.**    **Derivative Litigation and Other Litigation**

46.    Several purported shareholder derivative actions have been filed against some of the Debtors, including the following:

- ***A.***    Two purported shareholder derivative actions were filed in the United States District Court for the District of Delaware (*Byun v. Milton, et al.* , Case No. 1:20-cv-01277-UNA; *Salguocar v. Girsky et. al.,* Case No. 1:20-cv-01404-UNA), purportedly on behalf of Nikola, against certain of the Nikola's current and former directors alleging breaches of fiduciary duties, violations of Section 14(a) of the Exchange Act, and gross mismanagement.  The *Byun* action also brings claims for unjust enrichment and abuse of control, while the *Salguocar* action brings a claim for waste of corporate assets.  On November 17, 2020, the *Byun* and *Salguocar* actions were consolidated as *In re Nikola Corporation Derivative Litigation,* Lead Case No. 20-cv-01277-CFC.  In its order consolidating the actions, the court stayed the consolidated action. until 30 days after the earlier of (a) the Shareholder Securities Litigation being dismissed in their entirety with prejudice; (b) defendants filing an answer to any complaint in the Shareholder Securities Litigation; or (c) a joint request by plaintiff and defendants to lift the stay. On January 31, 2023, plaintiffs filed an amended complaint.

**B.**     On December 18, 2020, a purported shareholder derivative action was filed in the United States District Court for the District of Arizona, *Huhn v. Milton et al.*, Case No. 2:20-cv-02437-DWL, purportedly on behalf of the Nikola, against certain of Nikola's current and former directors alleging breaches of fiduciary duties, violations of Section 14(a) of the Exchange Act, unjust enrichment, and against defendant Jeff Ubben, a member of Nikola's board of directors, insider selling and misappropriation of information.  This action has been stayed on the same terms set out in the order staying the *Byun* and *Salguocar* consolidated action.

**C.**     On January 7, 2022, Barbara Rhodes, a purported stockholder of the Company, filed her Verified Stockholder Derivative Complaint in Delaware Chancery Court captioned *Rhodes v. Milton, et al. and Nikola Corp.* , C.A. No. 2022-0023-KSJM (the "Rhodes Action").  On January 10, 2022, Zachary BeHage and Benjamin Rowe, purported stockholders of the Company, filed their Verified Shareholder Derivative Complaint in Delaware Chancery Court captioned *BeHage v. Milton, et al. and Nikola Corp.*, C.A. No. 2022-0045-KSJM. (the "BeHage Rowe Action" and, together with the Rhodes Action, the "Related Actions").  These actions are against certain of the Company's current and former directors and allege breach of fiduciary duties, insider selling under *Brophy*, aiding and abetting insider selling, aiding and abetting breach of fiduciary duties, unjust enrichment, and waste of corporate assets.   On February 1, 2022, the court consolidated the Rhodes Action and the BeHage Rowe Action as *In re Nikola Corporation Derivative Litigation* , C.A. No. 2022-0023-KJSM (the "Consolidated Chancery Action").

**D.**     On March 10, 2022, Michelle Brown and Crisanto Gomes, purported stockholders of the Company, filed their Verified Shareholder Derivative Complaint in Delaware Chancery Court captioned *Brown v. Milton, et al. and Nikola Corp.*, C.A. No. 2022-0223-KSJM (the "Brown & Gomes Action").  The Brown & Gomes Action likewise alleges claims against certain of the Company's current and former directors for purported breaches of fiduciary duty and unjust enrichment.  Plaintiffs then filed a second amended complaint on February 14, 2023.  On January 12, 2023, the parties entered into a stipulation consolidating the Brown & Gomes Action in the Consolidated Chancery Action.  After the court granted a motion to dismiss in part, the deadline for the respondents to file an answer was extended through December 6, 2024.  On December 2, 2024, the parties notified the Court they had reached an agreement-in-principle to settle the action and requested that the Court suspend all proceedings pending finalization of that settlement.

**E.**     On September 6, 2023, Lomont filed a Verified Stockholder Derivative Complaint in Delaware Chancery Court captioned *Lomont v. Milton, et al.*, C.A. No. 2023-0908-KSJM (the "Lomont Action") against certain of the Nikola's current and former directors, alleging claims against those

defendants for purported breaches of fiduciary duty, unjust enrichment, and contribution and indemnification.  The Lomont Action alleges that Nikola constructively and wrongfully refused Lomont's demand that Nikola bring claims against officers and directors. On February 21, 2024, the court entered the parties' stipulation staying the action for six months. On September 16, 2024, the court entered the parties' stipulation staying the action for an additional two months.  On December 12, 2024, the parties notified the Court they had reached an agreement-in-principle to settle the action and requested that the Court suspend all proceedings pending finalization of that settlement.

F.     On February 21, 2024, a purported shareholder derivative action was filed in the United States District Court for the District of Delaware, captioned *Roy v. Russell, et al.,* Case No. 1:24-cv-00230-UNA (the "Roy Action"), purportedly on behalf of Nikola, against certain of the Nikola's current and former officers and directors alleging violations of Section 14(a) of the Exchange Act, breach of fiduciary duty based on false statements; oversight, and insider trading; unjust enrichment; abuse of control; corporate waste; and gross mismanagement. On May 2, 2024, the court entered the parties' stipulation staying the action through the final resolution of the Tenneson Action, described below.

G.     On October 13, 2023, John Tenneson filed a purported securities class action in the United States District Court for the District of Arizona, captioned Tenneson v. Nikola et al. , Case No. 2:23-cv-02131-DJH (the "Tenneson Action").  The Tenneson Action asserts claims against the Company and certain officers and directors asserts under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, based on allegedly false and/or misleading statements and omissions in press releases, public filings, and in social media regarding the Company's safety and structural controls related to its manufacturing of battery components and the likelihood of a product recall.  On April 25, 2024, the District of Arizona court appointed plaintiff Reyes as lead plaintiff. On May 24, 2024, the lead plaintiff filed an amended complaint. On July 25, 2024, defendants moved to dismiss, and briefing concluded on August 29, 2024. The motion is currently pending.

H.     On March 2, 2023, Lion Electric filed a complaint against Nikola in Arizona federal district court alleging that the Company tortiously interfered with the Romeo Power, Inc. / Lion Electric business relationship and Lion's business expectancy from the commercial relationship. Nikola denies the allegations and intends to vigorously defend the matter.  In December 2024, this matter was settled for a future payment in the amount of $3.25 million.

I.     On August 15, 2024, the Company received notice of a complaint filed by a former Nikola employee, against Smithers Tire & Automotive Testing Inc. ("Smithers"), for an injury sustained while working at a Smither's facility. Smithers in turn filed a third-party action against Nikola that

alleges breach of the lease agreement between Nikola and Smithers for failing to indemnify against the former employee's claims. Nikola disputes the contentions in the complaint and intends to fully defend the matter.

47.     The Company cannot accurately estimate its liability in each of the litigation matters described above if they went to trial or were resolved by settlement, but the potential liabilities are material.

**D.     <u>Liquidity Issues</u>**

48.     Historically, losses have been funded through a combination of existing cash on hand, sales of stock, debt financings, strategic partnerships, and sales of real estate.  To continue operating, the Company would require substantial additional capital to manufacture and validate its products and services, fund operations and satisfy obligations for the foreseeable future. Furthermore, the Company's plans to move to the next generation of trucks and build out the hydrogen fueling station infrastructure would require significant incremental investments. Despite its best efforts, the Company has simply not been able to raise the funds needed to continue effectuating its business plan.

49.     Because the Company does not have sufficient cash to fund its operations and no prospects to raise those funds, the Company's board has concluded that it is in best interest of the Company and its creditors to complete an orderly sale process to maximize the value received from asset sales, resulting in a better return for the Company and its creditors.

50.     Nikola enters Chapter 11 with approximately $47 million in cash on hand to fund its limited operations, implement the postpetition sale process described below, and exit these Chapter 11 Cases through a plan process.  Given the Company's liquidity profile and the anticipated expense of these Chapter 11 Cases and limited operations in Chapter 11, the Company intends to request authority from the Court to consummate a sale of its assets on a

timeline that balances its liquidity needs with its significant prepetition marketing efforts to best position the Company to maximize value for its stakeholders.

**IV.**     **The Appointment of the Strategic Advisory Committee**

51.     As it became increasing clear to the Board of Directors that the Debtors would need to extend liquidity to continue to develop strategic alternatives, the Board established a committee of the Board, designated as the "Strategic Advisory Committee".   The Strategic Advisory Committee, which remains subject to the direction of the Board, was tasked initially with working with management to interact with the Company's financial advisors to review and evaluate potential alternatives for the Company in the event the ongoing negotiations with certain strategic investors were not successful or did not result in an investment in the Company within the timeframe anticipated when the Strategic Advisory Committee was formed.   The Strategic Advisory Committee did not act in isolation, but instead was authorized to engage advisors, including additional financial advisors, and to coordinate with the Debtors' counsel and advisors evaluate potential alternatives, including alternative strategic transactions involving the Company, debt refinancing or restructuring alternatives.

52.     The Strategic Advisory Committee was established on August 30, 2024, and was, until, February 18, 2025, compromised of four (4) members of the Board, including Steven M. Shindler, Jonathan M. Pertchik, Bruce L. Smith, and Carla M. Tully.[6]   Prior to the Petition Date, the Strategic Advisory Committee conducted nineteen (19) formal meetings.

53.     In parallel with exploring various available transaction alternatives (explained in greater detail above), the Strategic Advisory Committee recommended several actions to resolve

---

[6]     On, February 18, 2025, the Strategic Advisory Committee was reconstituted with the following three members of the Board: Steven M. Shindler, Jonathan M. Pertchik, and Carla M. Tully.

4906-4978-1014

consensually material liabilities that were perceived as standing in the way of any strategic counterparty pursuing a transaction with the Company out of court.  Actions taken based on the recommendation of the Strategic Advisory Committee resulted in decreasing the "liability wall" facing the Company from upwards of $2.25 billion to potentially less than $400 million at cost of only minimal actual capital outlay by the Company.  Specific actions taken by the Company to clean up the balance sheet included, among others:

- Increasing the liquidity runway through raising convertible debt and equity;

- establishing an inventory purchase moratorium;

- reducing employee headcount;

- reducing significant Company liabilities through reduced/compromised payments to creditors;

- exploring an opportunity to consensually resolve the Company's liability with the SEC;

- reaching agreement to settle the consolidated securities class action litigation and litigation related to the Romeo Power / Lion Electric relationship; and

- exiting unfavorable take or pay Hydrogen supply contract(s); and

- exploring other ways to reduce liabilities.

In parallel, the Strategic Advisory Committee began working on bankruptcy contingency planning toward the end of 2024, which included retaining M3 Advisory Partners, LP in December 2024 to develop and administer short-term cash flow forecasting, and to assist

4906-4978-1014

the Company's counsel with preparation of first day motions, the creditors' matrix, and preparation of a 13-week budget.

## V.   The Debtors' Prepetition M&A Initiatives and Marketing Process Leading to the Commencement of These Chapter 11 Cases

54.    To address their increasingly critical operational challenges and liquidity needs, the Debtors worked with various advisors to raise funds and engaged in various M&A initiatives in the year leading up to the Petition Date to explore numerous possible restructuring options. Since the Summer of 2024, Nikola raised $80 million in convertible debt financing and an additional $65 million in common equity (in exchange for resetting the conversion price of another series of convertible debt) to support the Debtors' extensive efforts in pursuit of a strategic and/or financial transaction.

### A.    Prepetition Sale Marketing Process by Prepetition Investment Bankers

55.    Extensive internal and external time and resources have been devoted to exploring transactions with numerous potential counterparties.  Initial conversations focused on operational work (*e.g.,* how to sell the trucks, potential for serving as a financing company, and other regular way strategic initiatives).   Later conversations focused on potential financing and sale transactions to extend the liquidity runway.  Most recently, the Company has solicited investor interest in buying individual assets.

56.    Through the initial phases of the process, the Debtors utilized three investment bankers, all on a non-exclusive basis, to assist with raising funds (proposed common stock and convertible notes public offerings, and proposed private offerings, issue and sale of equity or convertible or hybrid securities) and exploring a possible sale of the Debtors as a going concern. Those bankers included Citigroup Global Markets Inc., BTIG, LLC, and Goldman Sachs & Co., LLC (collectively, the "Prepetition Investment Bankers").

24

57.    While Citigroup and BTIG primarily focused on capital raising strategies, commencing in the Summer of 2024, Goldman Sachs increased the urgency of Nikola's efforts to identify parties that it and the Company determined would be interested in acquiring the Company as a going concern.  Approximately five (5) months before the Petition Date, Goldman Sachs reached out to approximately twenty-two (22) separate parties to gauge their interest in acquiring the Debtors as a going concern.   This outreach focused on truck manufacturing companies and companies with transportation logistics needs who were large enough to possible be interested in an acquisition.

58.    Out of the parties contacted by Goldman Sachs, two (2) international automotive manufacturers expressed interest in a possible transaction.  After one of those manufacturers dropped out, the Debtors had further discussions with the other party and various term sheets were exchanged.  Unfortunately, that party ultimately fell away in the fall of 2024.  As an out-of-court solution became less likely, Nikola sought to engage an investment banker with distressed capabilities to simultaneously explore restructuring options and continue the financial and strategic investor outreach initiated by the Prepetition Investment Bankers.

### B.    The Debtors Retain Houlihan Lokey

59.    As the Debtors' liquidity position continued to erode, Houlihan Lokey Capital, Inc. ("HL"), was selected in October 2024 to provide prepetition investment banking services to the Debtors.  In that role, HL has, among other things: (a) continued the marketing process with the parties that were engaged with the Debtors before HL's retention, and solicited additional third-party interest to gauge potential interest in both a standalone investment and an investment alongside a potential strategic partner (collectively, the "Marketing Process"); (b) assisted the Debtors in developing a sale strategy and bidding procedures for their postpetition marketing

process; and (c) solicited lenders to provide a postpetition loan to the Debtors, negotiated loan terms, and advised the Debtors in connection with the loan.

60.     Following its retention, HL initially reached out to twenty-four (24) financial investors regarding the Nikola opportunity.  Multiple follow-up conversations were had with prospective investors; however, general feedback was that the investment required to achieve the business plan was too difficult for a financial investor without a strategic interest in the assets to make given the long and uncertain path towards profitability.

61.     HL also assisted the Debtors with continuing to explore a sale of all their assets as an ongoing, operating business.  In early December 2024, discussions with one potentially interested international vehicle manufacturing company who previously executed a confidentiality agreement (neither of the two companies that engaged in discussions with the Prepetition Investment Bankers referenced above) restarted.  After a non-binding letter of intent was signed to facilitate discussions concerning a potential acquisition, the Debtors granted access to their electronic data room and invited the party to have meetings with the Debtors' management.

62.     Thereafter, the parties engaged (on an exclusive basis pursuant to the terms of the LOI) in substantial due diligence over an approximately four-week period, including a comprehensive review of the legal, financial, tax, commercial, environmental, intellectual property, operation, labor and employment and material agreements of the Debtors.  Due diligence included a several day-long site visit to the Debtors' manufacturing facility by the prospective buyer's agents, lawyers, accountants and advisors.  While it appeared that an agreement to purchase substantially all the Debtors' assets through a bankruptcy sale process was progressing, the prospective buyer ultimately walked away.

4906-4978-1014

63.     Following the disappointing conclusion of negotiations outlined above, the Debtors, with the assistance of HL, redoubled their efforts to find a going concern buyer.  As of the Petition Date, the Debtors are in active discussions with at least three (3) parties interested in such opportunity.  Given the prior unsuccessful efforts by the Prepetition Investment Bankers and HL to find a buyer for the Debtors as a going concern sale, however, the Debtors, with the assistance of their advisors, also have pivoted to evaluating the sale of the Debtors' separate business segments.  Since a going concern sale may not ultimately prove viable, HL and the Debtors have begun to market various of the Debtors' assets and business separately.  Those efforts will accelerate with the commencement of the Chapter 11 Cases.

64.     The Debtors intend to continue the marketing and sale process by requesting the Court's approval of bidding procedures to govern the sale process, including an auction. Moreover, the Debtors have instructed HL to continue marketing the Debtors' assets to potential buyers after the Petition Date and to continue engaging in discussions with any party that executes a confidentiality agreement, with the goal of having as many bidders as possible participate in the auction and ensure a robust sale process that will maximize the value of the Debtors' assets.

**C.     Need For A Timely Process**

65.     The circumstances of these Chapter 11 Cases require that the Debtors run an expedited, but robust, sale process.  Speed and certainty are critical because the Debtors simply do not have sufficient liquidity to support a protracted sale process.  Additionally, I believe that a protracted sale process could be detrimental to the Debtors' operations and relationships with key stakeholders, including employees, vendors and suppliers in the event that a going concern sale materializes, without whose support the Debtors may not be able to achieve the best sale outcome.

4906-4978-1014

66. Accordingly, the Bidding Procedures propose the following timeline to comply with a proposed schedule established by the Debtors to ensure that the sale process is completed before the Debtors deplete their cash reserves:

| | |
|---|---|
| **Two business days after the entry of the Bidding Procedures Order** | Deadline to file and serve Sale Notice |
| **Three business days after the entry of the Bidding Procedures Order** | Deadline to file and serve Assumption and Assignment Notice |
| **Within five business days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter** | Deadline to publish Publication Notice |
| **March 10, 2025, at 4:00 p.m. (ET)** | Deadline for Debtors to designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement |
| **March 27, 2025, at 4:00 p.m. (ET)** | Bid Deadline |
| **March 28, 2025, at 4:00 p.m. (ET)** | Sale Objection Deadline, Cure Objection Deadline, and Contract Objection Deadline |
| **March 31, 2025, at 10:00 a.m. (ET)** | Auction (if necessary) |
| **Earlier of five (5) business hours after the conclusion of the Auction and Noon (ET) the calendar day after the conclusion of the Auction** | Deadline to file and serve Notice of Auction Results |
| **April 1, 2025 at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline (if necessary) |
| **12:00 p.m. (ET) one business day before the Sale Hearing** | Deadline to reply to any Sale Objections or Supplemental Sale Objections |
| **April 3, 2025 at [●:● a/p.m.] (ET) (subject to the Court's availability)** | Sale Hearing |
| **April 11, 2025** | Deadline to consummate approved Sale |

67. The expedited timeline proposed by the Debtors minimizes the adverse impact on the Debtors' operations, vendors, and employees, and provides adequate opportunity to secure executable bids for the Debtors' assets for the highest or best value. The amount of work done in the prepetition period by the Debtors and their professionals in connection with the Marketing Process enhances their ability to complete the Marketing Process on the timeframe proposed and does not prejudice parties in interest. The Debtors are confident that parties who are the most

28

likely to be participants in the Debtors' sale process are either already involved in, or aware of, the prepetition Marketing Process, or will have adequate time to participate under the Debtors' timeline. The Debtors believe that proceeding with the Marketing Process is preferable to any other alternative and will inure to the benefit of all constituents, including their employees.

## VI.    First Day Motions

68.     The Debtors have filed the First Day Motions to facilitate a smooth transition into chapter 11 and minimize disruptions to the Debtors' business operations.

69.     A list of the First Day Motions is set forth below:

i.      *Debtors' Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases;*

ii.     *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Perform Intercompany Transactions, and (D) Maintain Exiting Business Forms; (II) Authorizing the Debtors' Banks to Honor All Related Payment Requests; and (III) Granting Related Relief;*

iii.    *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief;*

iv.     *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, (II) Authorizing the Debtors' Banks to Honor All Related Payment Requests, and (III) Granting Related Relief;*

v.      *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Them to (A) Maintain Insurance Policies and Honor Obligations Thereunder, and (B) Renew, Amend, Supplement, Extend, or Purchase New Insurance Policies, and (II) Granting Related Relief;*

vi.     *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Wages, Compensation, Employe Benefits, and Other Employee Obligations and (B) Continue Certain Employee Benefit Programs in the Ordinary Course;*

29

       *(II) Authorizing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations; and (III) Granting Related Relief*;

vii.      *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Trade Claimants, Foreign Claims, Lienholder Claims, and 503(b)(9) Claims; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief*;

viii.     *Debtors' Motion for an Order Seeking Relief from the Requirement to File Lists of Equity Holders*;

ix.      *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance, Administration, Continuation of Debtors' Customer Programs, and (II) Granting Related Relief*;

x.       *Debtors' Motion for an Order Shortening and Limiting Notice With Respect to the Debtors' Bid Procedures Motion*;

xi.      *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and (ii) Granting Related Relief*;

xii.     *Debtors' Motion for Entry of an Order (I) Authorizing Redaction of Certain Personal Identifying Information Within the Consolidated List of Creditors and Other Filings, (II) Authorizing Service to International Vendors Via E-Mail, and (III) Granting Related Relief*;

xiii.     *Debtors' Application for Authorization to Employ and Retain Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Effective as of the Petition Date*; and

xiv.     *Debtors' Motion to Reject Investment Banker Agreements Nunc Pro Tunc.*

70.     The above First Day Motions seek authority to, among other things, honor work-force related compensation and benefit obligations, pay certain prepetition claims, continue using the Debtors' bank accounts, and continue other operations in the ordinary course of business.

71.     The Debtors have narrowly tailored the First Day Motions to (i) continue their operations in chapter 11 to preserve value for the Debtors' estates and their stakeholders; (ii) provide an adequate runway for the Debtors to effectuate a successful sale process; and (iii) establish procedures for the efficient administration of the Chapter 11 Cases.

4906-4978-1014

72.     I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, information and belief, the facts set forth therein are true and correct.  I incorporate by reference the factual statements set forth in each of the First Day Motions as though set forth herein.  Based on my personal knowledge, information supplied to me by and discussions with other members of the Debtors' management, Debtors' counsel, professionals, and representatives, my review of relevant documents, my opinion based upon my experience and the aforementioned review and discussions, and as set forth in more detail below, I believe that the relief sought in each First Day Motion is (a) necessary for the Debtors to (i) minimize disruption and loss of productivity to their business; (ii) effectuate a smooth transition into and operate within, these Chapter 11 Cases, (iii) avoid immediate and irreparable harm; (b) in the best interests of the Debtors' creditors, estates, and other stakeholders; and (c) constitutes a critical element in preserving value during these Chapter 11 Cases until a successful sale can occur.

73.     Additionally, several of the First Day Motions request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm."  Given this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors' estates.  Other relief will be deferred for consideration at a later hearing.

*[Remainder of page intentionally left blank]*

31

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: February 19, 2025

By:    */s/ Stephen J. Girsky*
Name:   Stephen J. Girsky
Title:   President and Chief Executive Officer