# Exhibit A

OFFICIAL RECORDS OF
PINAL COUNTY RECORDER
Virginia Ross
Electronically Recorded

DATE/TIME:     01/08/2021  1244
FEE:           $30.00
PAGES:         23
FEE NUMBER:    2021-002625

WHEN RECORDED RETURN TO:
Global Water Resources, Inc.
21410 N. 19th Avenue, Suite 220
Phoenix, Arizona 85027

## MASTER UTILITY AGREEMENT

This Master Utility Agreement ("Agreement") is entered into as of this 15th day of December, 2020 between and among Global Water—Picacho Cove Water Company, Inc., an Arizona corporation ("GW-Picacho Water"), Global Water—Picacho Cove Utilities Company, Inc., an Arizona corporation ("GW-Picacho Wastewater", and collectively with GW-Picacho Water, "Global Water") and Nikola Corporation, a Delaware corporation ("Landowner") provides for the extension and provision of water, wastewater and recycled water service to Landowner's real property located in or near the City of Coolidge, Pinal County, Arizona, and which Landowner intends for development as a manufacturing facility for hydrogen-powered and battery-powered vehicles, as further described herein.

### RECITALS

WHEREAS, GW-Picacho Water and GW-Picacho Wastewater are public service corporations under Arizona law, subject to regulation by the Arizona Corporation Commission ("ACC"); and,

WHEREAS, GW-Picacho Water and GW-Picacho Wastewater have not yet been granted Certificates of Convenience and Necessity ("CC&N") by the ACC to be the exclusive provider of water, wastewater and recycled water service (the "Services") to the Landowner's property legally described in Appendix "A" hereto and incorporated herein by this reference ("Property") and which Property is depicted on the map attached as Appendix B hereto and incorporated herein by this reference; and,

WHEREAS, in connection with the construction and development of the Property, Landowner and its successors and/or its future assignees will require the Services for a variety of purposes; and,

WHEREAS, Global Water has advised Landowner of Global Water's willingness and ability to fully provide the Services necessary for the Property as set forth in this Agreement subject to the rules, requirements and orders of the ACC and all other regulatory authorities having jurisdiction over Global Water; and,

WHEREAS, Landowner intends to develop the Property in phases, with the anticipated timing and demands regarding Phase 0.5, Phase 1, Phase 2, and Phase 3 set forth in Appendix C, with any further phases to be determined; and

WHEREAS, the water, wastewater and recycled water infrastructure necessary and appropriate for Global Water to provide the Services to the Property, whether within or outside the Property will be financed by Global Water through debt and/or equity capital or other Global Water funds except for the portion financed by: (1) Commission-approved hook-up fee ("HUF") charges to be paid by the Landowner or its successors, and (2) Contributions-in-aid-of-Construction ("CIAC") for Water Production and Transmission Infrastructure or Wastewater Treatment Infrastructure (as those terms are defined below), as agreed between Global Water and Landowner or other third parties and as approved (if required) by the Commission as set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals, and in further consideration of the mutual covenants and conditions set forth below, Global Water and Landowner mutually covenant and agree as follows:

## AGREEMENT

## I.
## UTILITY OBLIGATIONS

1.01    Utility Infrastructure.    Global Water shall design, obtain approval for, and construct, install, operate and maintain, or cause to be designed, permitted, constructed and installed, the infrastructure necessary to enable Global Water to safely and reliably furnish the Services for the Property on an ongoing basis. The water supply infrastructure necessary for such purpose shall consist of, but not be limited to, all required production, treatment, storage, standard fire flow and pressure infrastructure, and transmission mains (collectively, the "Water Production and Transmission Infrastructure"). The wastewater infrastructure for such purpose shall consist of, but not be limited to, all required wastewater treatment, and water reclamation facilities, in addition to certain backbone collector and lift stations facilities if not a part of Section 2.02 (collectively, the "Wastewater Treatment Infrastructure").

1.01(A).    Phasing.    The Water Production and Transmission Infrastructure and Wastewater Treatment Infrastructure may be constructed in phases so that infrastructure is not constructed before it is needed, nor constructed with material excess capacity beyond what is required to service the Property or meet established engineering and regulatory standards, but the necessary and appropriate infrastructure will be available when needed as the Property is developed.

1.01(B).    Wastewater Service for Phase 0.5 and Phase 1.    The Parties acknowledge that GW-Picacho Wastewater will not provide wastewater service for Phase 0.5 and Phase 1; wastewater needs for those Phases will be addressed through vault and haul service obtained by Landowner from a third party and a Landowner constructed and operated septic system. GW-Picacho Wastewater will provide its written consent as needed to Landowner's Phase 0.5 and Phase 1 facilities for purposes of Landowner's demonstration to governmental authorities that the facilities are consistent with the Central Arizona Governments 208 Plan. Landowner will construct the facilities needed for the vault and haul system and the septic system. For subsequent phases, once wastewater flows meet or exceed 24,000 gallons per day, GW-Picacho Wastewater will provide wastewater service, through a physical interconnection located at the northern boundary

of the Property, to a future GW-Picacho Wastewater collection main running to its future wastewater regional campus approximately located at the corner of Arica Road and Vail Road.

1.01(C).   Water Service for Phase 0.5 and Phase 1.   For Phase 0.5, GW-Picacho Water will provide potable water service, including using hauled potable water if required.  In addition, Global Water may use temporary equipment (tankage, pumps and the like) during this phase.  GW-Picacho Water will invoice Landowner for all water hauling costs, which will be in addition to GW-Picacho Water's standard tariff rates.  GW-Picacho Water will use commercially reasonable efforts to provide raw water service (which may be provided using temporary facilities during Phase 0.5, and which may be untreated during Phase 0.5) to Landowner's fire tank not later than May 1, 2020, but Landowner acknowledges that the timetable for doing so is uncertain.  For Phase 1, GW-Picacho Water will provide service, using water from a well located on the Property and tankage and treatment (if necessary) also located on the Property, as depicted in Appendices C and D.  In the future, as appropriate, the Property may also be interconnected with GW-Picacho Water's regional system and regional utility campus, with service to the Property provided by a combination of the on-site facilities and the regional facilities.  Nothing in this Agreement is intended to prohibit Landowner's use of water Landowner pumps for Landowner's own use pursuant to Landowner's own grandfathered groundwater withdrawal right.

1.01(D).   Updating and cooperation.   Global Water is basing its service and phasing plan on Appendix C, which is derived from information provided by Landowner.  Landowner will keep Global Water informed of the development timetable for each parcel and Phases in the Property and Landowner and Global Water will confer from time to time regarding the phasing of the Water Production and Treatment Infrastructure and Wastewater Treatment Infrastructure.

1.01(E).   Fire Flow.   GW-Picacho Water's system will provide raw water sufficient to fill Landowner's fire tank in eight hours.  Landowner is responsible for all fire flow.  Landowner will be responsible for constructing and maintaining tanks, pumps, and other infrastructure needed to provide fire flow, which will be located on the Landowner's side of the point of connection to the Water Production and Treatment Infrastructure.

1.01(F).   Water Treatment.   Global Water will provide all necessary water treatment, beginning with Phase I, including: (a) treatment necessary to bring raw water to potable water standards for the potable water system; and (b) treatment to supply water for the fire flow system.  However, any treatment for the fire flow system will be limited to preventing corrosion by maintaining water pH between 6.5 and 8.0.

1.01(G).   Water Demand Study.   Global Water and Landowner will jointly study possibilities to reduce water demands for Landowner's property to potentially reduce future capital costs.

1.02   Construction Standards.   Global Water's construction and installation of the Water Production and Transmission Infrastructure and the Wastewater Treatment Infrastructure shall be: (i) in accordance with good utility and engineering practices, (ii) in accordance with the design and plans for each as approved by the Arizona Department of Environmental Quality ("ADEQ"), and/or Pinal County, (iii) in accordance with the applicable laws, codes, regulations and

3

requirements of all governmental agencies having jurisdiction over the Water Production and Transmission Infrastructure or the Wastewater Treatment Infrastructure, and (iv) constructed with new materials by a contractor having a valid contractor's license issued by the State of Arizona Registrar of Contractors encompassing the work to be performed, *provided however*, that Global Water may also construct facilities using appropriately qualified internal or parent company resources or personnel.

1.03    Timing of Design.    The Landowner may issue a Notice to Design to Global Water when the Property is ready to proceed with development. The Notice to Design will designate the anticipated schedule for development, and the anticipated water and wastewater demands. Upon receipt of a Notice to Design, Global Water shall retain one or more licensed and appropriately qualified design engineers to commence design and permitting of the Water Production and Transmission Infrastructure and the Wastewater Treatment Infrastructure for the Property as specified in a Notice to Design, or Global Water may use appropriately qualified in-house engineers. Global Water shall reasonably cooperate with Landowner to coordinate the design and permitting, including acquisition of needed rights-of-way, of the Water Production and Transmission Infrastructure and Wastewater Treatment Infrastructure with Landowner's design of and timeline as described in a Notice to Design to ensure that service is available when needed by Landowner.

1.04    Timing of Construction.    After Global Water completes a design as set forth in Section 1.03, the Landowner may issue a Notice to Construct to Global Water for each Phase of the project or Property that is ready to proceed with construction. A Notice to Construct will designate the Phase of the Property covered by the notice, the anticipated schedule for development, and the anticipated water and wastewater demands. Global Water shall retain one or more licensed and appropriately qualified contractors to commence and proceed with construction of the Water Production and Transmission Infrastructure and the Wastewater Treatment Infrastructure after receiving a written Notice to Construct from the Landowner, *provided however*, that Global Water may also perform some or all of the construction on a similar time schedule using appropriately qualified internal or parent company resources or personnel. Landowner may not issue a Notice to Construct unless: (i) the Landowner has received preliminary plat approval for the portion of the Property covered by a Notice to Construct if the Property is zoned for residential parcels, or site plan or similar applicable approval from the applicable governing jurisdiction if non-residentially zoned, (ii) Landowner has paid in full all HUFs (due or which would become due thereafter and amounts which would become due thereafter shall be credited against any future HUFs due for the Property) under ACC-approved tariffs for the capacity of the Phase of the project or portion of the Property covered by a Notice to Construct, (iii) Landowner has paid in full the amounts described in Section 1.06 of this Agreement, and (iv) if residentially zoned and to be subdivided into 6 or more lots, Landowner has obtained the Certificate of Assured Water Supply for the Property (or the portion of the Property covered by a Notice to Construct) unless GW-Picacho Water has obtained a Designation of Assured Water Supply. The first Notice to Construct must coincide with payment of the HUFs due under subsection (ii) above for not less than one home or an equivalent amount by water demand for commercial or industrial uses (using an equivalent home with a 5/8" x ¾" meter) if not otherwise specified in the HUF tariff. Upon receipt of a Notice to Construct, Landowner and Global Water will reasonably agree upon a desired completion date which shall coincide with Landowner's

4

projected timeline for development of the portion of the Property and Phase covered by the Notice to Construct (the "Completion Date"). Following commencement, Global Water shall diligently pursue permitting and construction of the Water Production and Transmission Infrastructure and the Wastewater Treatment Infrastructure to finish all construction and permitting by the Completion Date. Landowner shall keep Global Water advised of the status of development for the portion of the Property covered by the Notice to Construct, and, in particular, Landowner shall advise Global Water if plans for development are delayed, suspended, or otherwise abandoned. Nothing in this paragraph limits Landowner's obligation to pay the HUF fees due for the Property in full no later than as due under the HUF tariff and as agreed herein, and to the extent the HUF fees received from the Landowner are insufficient to meet the requirements of the tariff (for example, because additional homes/meters were added to the plans) Landowner must remit any remaining HUF fees due as specified in the HUF tariff.

1.05    Easements and Right(s)-Of-Way.   Global Water shall bear full responsibility to obtain such easements and right(s)-of-way outside of the Property as may be necessary, if any, including necessary authorization to place Global Water facilities within or across property owned or controlled by the United States such as the Santa Rosa Canal property, in connection with the design, construction, installation, operation and maintenance of the Water Production and Transmission Infrastructure and the Wastewater Treatment Infrastructure, *provided, however,* that Landowner shall grant any plant locations, easements and right(s)-of-way within the Property (or on other lands owned by Landowner) as reasonably necessary for the Global Water's provision of Services to the Property without cost or liability to Global Water. In addition, to the extent Global Water does not have access from a public street to the onsite well location or the onsite utility campus (as provided in Section 2.07), Landowner hereby grants Global Water a License to access these properties through the internal roadways, alleys, parking lots or other access points in the Property, and such License will remain in effect as long as Global Water provides any of the Services to the Property; *provided however,* that Landowner may require reasonable security measures to be followed.

1.06    Financing of Water Production and Transmission Infrastructure and Wastewater Treatment Infrastructure.   The parties will be responsible for the costs of Water Production and Transmission Infrastructure and Wastewater Treatment Infrastructure as follows: for each Phase (with the exception of "Soft Costs" as defined in Section 1.09), Landowner will be responsible for 65% of the cost, and Global Water will be responsible for the remaining 35% of the cost. For each Phase, after receipt of a Notice to Construct, Global Water will prepare an estimated cost for construction. For each Phase, within 30 days of receipt of the estimated cost of construction from Global Water, Landowner shall deposit into escrow its 65% share of the estimated cost. Global Water will not be obligated to proceed with construction until Landowner deposits into escrow the amount required in this Section. As construction proceeds, Global Water will submit to the escrow company invoices or other evidence of construction costs incurred by Global Water, and the escrow company will then disburse the corresponding amounts to Global Water. All amounts paid by Landowner under this section will be considered CIAC and will not be subject to refund. However, the amounts paid by the Landowner under this Section shall constitute an offset towards any HUF due for the Property. Any undisbursed amounts remaining in the escrow account for a specific phase after construction is completed for that phase, will be returned by the escrow company to Landowner. In the event construction costs exceed the estimate, Landowner will pay

5

Landowner's 65% share of the excess costs directly to Global Water, within 30 days of being invoiced by Global Water. Landowner agrees and understands that Global Water will install the necessary and reasonable production, treatment, conveyance and storage systems necessary for the reasonable safe, compliant operation of the water, wastewater and recycled water systems in normal, peak and emergent conditions. To the extent that the Global Water provides Material Excess Capacity beyond the that reasonably required to meet Landowner's needs under normal, peak and emergent conditions, the additional cost of the Material Excess Capacity will not be part of the construction cost calculations under this Section. For the purposes of this Section, "Material Excess Capacity" means capacity that substantially exceeds what a reasonable engineer/utility would require.

1.07    Ownership. Global Water or its affiliates shall own, operate and maintain the Water Production and Transmission Infrastructure and the Wastewater Treatment Infrastructure.

1.08    CC&N. Global Water will use commercially reasonable efforts to promptly obtain an order or orders from the ACC including the Property in Global Water's CC&N. Global Water will be responsible for its costs for the CC&N proceedings at the ACC. Landowner may intervene as a party in each CC&N proceeding in support of a CC&N issuance, and may oppose the CC&N extension if the Commission Staff or any Commissioner proposes a term or condition that Landowner finds to be unreasonable, in Landowner's sole discretion, in which case the CC&N application will be withdrawn and this Agreement will terminate as to the Property, without further liability to either Party. Landowner will reasonably cooperate with Global Water in efforts to obtain a CC&N for the Property, including by providing information necessary to proceed with a CC&N request. If the ACC fails to approve the addition of all or any portion of the Property to Global Water's CC&N or imposes conditions that Global Water, in its reasonable discretion, finds to be unacceptable, this Agreement will terminate as to the Property or that portion of the Property that is included in the CC&N proceeding, without further liability to either party. In the event the ACC imposes time-based conditions ("deadlines") in the CC&N, and those deadlines cannot be met (for example, without limitation, due to delays in the Landowner's development of the Property), Landowner will cooperate with Global Water in seeking an extension of time from the ACC, including furnishing to Global Water request for service letters and other documentation. Landowner will cooperate with Global Water to request the ACC expedite approval of the CC&N for the Property. With respect to Phase 0.5 and Phase 1 as necessary, Global Water may seek approval to service the Property as a "contiguous" property under ACC rules. The Landowner will assist Global Water in obtaining this approval from the ACC. The Parties acknowledge that there is no assurance that the ACC will accept the contiguous property designation and acknowledge the importance of working together to obtain the CC&N as soon as possible.

1.09    Soft Costs. Landowner will pay a $200,000 Design Fee upon issuance of its Notice to Design for Phase 0.5. However, this Design Fee will be waived in its entirety if Pinal Land Holdings has issued a Notice to Design for its property to the north of Landowner's property prior to the date of Landowner's Notice to Design. No Design Fees will be due from Landowner for subsequent Notices to Design. The Design Fee, if any, will constitute CIAC. Other than the Design Fee set forth herein, Global Water will be responsible for all "Soft Costs", defined as all costs of engineering, permitting, and planning the Water Production and Transmission Infrastructure and the Wastewater Treatment Infrastructure, including studies and well testing

6

costs.  Soft Costs will not be considered for the purposes of the cost percentages in Section 1.06 of this Agreement.

# II.
# LANDOWNER OBLIGATIONS

2.01    Water Distribution Infrastructure.  Landowner shall design, permit and construct, or cause to be designed, permitted and constructed, the water distribution infrastructure within the Property necessary to enable GW-Picacho Water to safely and reliably deliver water to each and every service connection within the Property (the "Private Water Distribution Infrastructure"). The Private Water Distribution Infrastructure includes water distribution mains, pipelines, valves, hydrants, fittings, service lines, meters, and all other improvements necessary to provide water utility service to each building or lot in the Property.  The Private Water Distribution Infrastructure will be funded, constructed, owned, and operated by Landowner, and will not be subject to an MXA.

2.02    Wastewater Collection Infrastructure.    Landowner shall design, permit and construct, or cause to be designed, permitted, and constructed, the wastewater collection infrastructure within the Property necessary to enable GW-Picacho Wastewater to collect wastewater from each and every service connection within the Property (the "Private Wastewater Collection Infrastructure").  The Private Wastewater Collection Infrastructure includes wastewater collection mains, pipelines, valves, fittings, service lines, lift stations, vault and haul tanks, and all other improvements necessary to provide wastewater collection service to each building or lot in the Property.  The Private Wastewater Collection Infrastructure also includes facilities necessary to distribute recycled water within the Property from a connection provided by Global Water to the Property boundary, if any.  The Private Wastewater Collection Infrastructure will be funded, constructed, owned and operated by Landowner, and will not be subject to an MXA.

2.03    Payment of HUFs.  Landowner will pay all applicable HUFs, or other CIAC payments agreed by Global Water and Landowner, for Water Production and Transmission Infrastructure or Wastewater Treatment Infrastructure when due, and Global Water will not be obligated to extend any of the Services to the Property (or the portion of the Property or project covered by the Notice to Construct) or connect the Water Distribution Infrastructure or the Wastewater Collection Infrastructure to Global Water's Infrastructure until any applicable HUFs (or other agreed CIAC payments for Water Production and Transmission Infrastructure or Wastewater Treatment Infrastructure) for the Property (or the Phase of the Property or project covered by the Notice to Construct) are paid in full.

2.04    Water Resources: Assured Water Supply and Withdrawal Authority.

GW-Picacho Water does not maintain a Designation of Assured Water Supply ("DAWS"). Landowner acknowledges that Landowner is solely responsible for obtaining a Certificate of Assured Water Supply ("CAWS") from the Arizona Department of Water Resources ("ADWR") for the Property if required by law.  GW-Picacho Water will not extend Water Service to the Property without a CAWS, unless no such CAWS is required by the applicable law and/or GW-

7

Picacho Water has obtained a DAWS (as defined below). Unless a CAWS is not required by law or any applicable jurisdiction, Landowner must have the CAWS for the Property prior to issuing the Notice to Construct. Landowner is solely responsible for obtaining sufficient supplies of water (legal and physical availability) to meet Landowner's Certificate of Assured Water Supply demonstration needs, although Landowner may demonstrate legal availability through use of GW-Picacho Water's notice of intent to serve the property with GW-Picacho Water's Service Area Right, to be established. However, GW-Picacho Water, at its own election, may seek to obtain a DAWS. Should GW-Picacho Water seek to obtain a DAWS, Landowner will assign and transfer the CAWS or, if applicable, intermediary issuances by the ADWR such as an Analysis of Assured Water Supply, to GW-Picacho Water. As soon as reasonably practicable after Landowner issues the Notice to Design, Utility and Landowner will cooperatively pursue a GW-Picacho Water Service Area Right from ADWR that includes the Property, using up to four or more entities as the ultimate utility customers. Until such time that GW-Picacho Water obtains a Service Area Right, Landowner will use Landowner's Type 1 grandfathered groundwater withdrawal right to withdraw water to assist GW-Picacho Water to provide Service to the Property.

2.05    Wells. At GW-Picacho Water's election, one well on the Property shall be deeded by Landowner to GW-Picacho Water at no cost to GW-Picacho Water, including real property sufficient for the well site (not to exceed 200 feet by 200 feet) (the "GW Well Site"). The Landowner may retain all remaining wells within the Property for Landowner's own use within the Property, and Landowner will be responsible for compliance with laws to cap or abandon unused wells. Global Water may place a concrete block wall around the GW Well Site. GW-Picacho Water will be responsible for obtaining electrical power to the GW Well Site. GW-Picacho Water will use commercially reasonable efforts to place the raw water line running from the GW Well Site in the public right of way for Houser Road to avoid the need for a water line easement in parallel to Houser Road; however, the parties acknowledge that a water line easement (approximate width 20 feet) will be needed for the raw water line to then run north to the utility campus in accordance with Section 1.05. However, none of the existing agricultural wells are determined by Global Water to be not feasible, then Landowner and GW-Picacho Water will select an alternative and mutually-agreeable GW Well Site for a new well.

2.06    Source Control Tariff. Landowner must comply with GW-Picacho Wastewater's Source Control Tariff on file with the ACC, as it may be updated from time to time.

2.07    Utility Campus. At no cost, Landowner will deed to Global Water a mutually-agreed two-acre parcel for use as a utility campus (the "Utility Campus"), which will accommodate the placement of the water tanks, pumps, buildings, treatment systems as necessary, and related equipment. The Utility Campus will be located approximately at the location shown on Appendix D. Global Water will be responsible for obtaining electrical service to the Utility Campus.

2.08    Liability for Income Taxes for non-HUF CIAC. Under current law, the Landowner's CIAC will constitute taxable income to Global Water (or taxable income to a direct or indirect parent company, if GW-Picacho Water and GW-Picacho Wastewater are included in a consolidated tax return with the direct or indirect parent company) and therefore Landowner will advance additional funds to Global Water (the "Gross-Up Amount") in relation to the tax liability related to CIAC. The Landowner shall pay the Gross-Up Amount to Global Water within twenty

8

(20) days following the Global Water's notification to Landowner. Global Water's notification shall include the basis for determining that CIAC constitutes taxable income and the calculation of the Gross-Up Amount, including the statutory marginal income tax rate applicable to the Global Water. The calculation shall be made using the "Gross-Up Sharing Method" approved by the ACC in Docket No. AU-00000A-17-0379 (Decision No. 77104, as amended and corrected in Decision No. 77540). However, in the event the ACC modifies or eliminates the "Gross-Up Sharing Method", and authorized a full gross up, then the Gross-Up Amount will be calculated using the "Full Gross-Up Method", if permitted by the Arizona Corporation Commission. If there is a change in the law such that CIAC is not taxable to Global Water (or its Parent Company), then the Gross-Up Amount shall be zero. However, under current law and Decision 77104, in no event will the actual amount of taxes paid by the Global Water (or its Parent Company) in any particular year be considered in the calculation. The Gross-Up obligation will apply regardless of whether the Company is taxed as a limited liability company, "S" corporation, or "C" corporation, as long as the advance or contribution received from the Landowner constitutes taxable income to the Global Water or any of its direct or indirect parent companies. In the event that payment of a Gross-Up Amount is required under this Section 2.08, the Gross-Up Amount shall also be CIAC. In addition, Landowner shall indemnify and hold Global Water harmless for, from and against any tax-related interest, fines and penalties assessed against Global Water and other costs and expenses incurred by Global Water as a consequence of late payment by Landowner of amounts described above. If Landowner fails to pay the Gross-Up Amount with the 20 day period described above, Global Water may: (1) terminate this Agreement by sending notice to the Landowner, (2) refuse to connect the Facilities to its system; (3) set-off the amounts due from any refunds owing under this Agreement, (4) decline to accept any transfer of ownership of the Facilities from the Landowner; or (5) take other lawful collection or enforcement actions. However, this Section 2.08 will not apply to any HUFs paid by Landowner, or other CIAC paid by Landowner that is treated as an offset towards a HUF under Section 1.06.

## III.
## MISCELLANEOUS UTILITY PROVISIONS

3.01   <u>Main Extension Agreements.</u> [Intentionally Omitted].

3.02   <u>Water Service; Construction Water.</u>   Global Water will provide the Services to the Property for all purposes, and all water use will be metered; and all charges for the Services will be in accordance Global Water's applicable rates and charges on file with or approved by the ACC from time-to-time. Landowner may use its own water for construction purposes as long as Landowner's self-service meets all applicable laws and regulations and does not unreasonably interfere with Global Water's provision of Services within the Property. The Services to the Property will be subject to all ACC tariffs of Global Water, all rules, regulations, and orders of the ACC and of any other regulatory authority with jurisdiction over Global Water.

3.03   <u>Limits on Service.</u>   Global Water will use commercially reasonable efforts to maintain continuous Services to the Property, but Global Water does not guarantee a continuous supply of the Services under all circumstances and conditions. Global Water is not liable for damages occasioned by interruptions or failure to commence the Services or unsatisfactory

9

Services caused by an act of God or the public enemy, strikes, riots, war, order of any court or judge granted in any bona fide adverse legal proceedings or action, or any order of any commission or tribunal authority having jurisdiction, or, without limitation by the preceding enumeration, any other act or thing reasonably beyond Global Water's control. In the event any such interruption or failure to commence Services due to such causes occurs, then Global Water will use commercially reasonable efforts to commence or re-establish the Services as soon as reasonably possible. Any liability of Global Water under this Agreement is limited by the terms of the Global Water's Terms and Conditions Tariff on file with the ACC.

**IV.**
**GENERAL PROVISIONS**

4.01   Incorporation of Recitals.   The Recitals set forth at the beginning of this Agreement are hereby incorporated by reference and made a specific part of this Agreement.

4.02   Indemnification.   Landowner and Global Water will defend, indemnify and hold harmless each other and each other's officers, directors, agents, and employees from and against any and all claims, damages, judgments, fines, penalties, assessments, costs and expenses, including reasonable attorneys' fees and court costs, to which they or any of them may be subjected by reason of injury, death, loss, claim, penalty, assessment or damage caused or contributed to by the active negligence or willful misconduct of the party, its agents, servants, employees, contractors or subcontractors in the execution of, or failure to execute the obligations under this Agreement; *provided, however,* that neither party shall be required to indemnify the other to the extent of any negligent or wrongful acts of the party requesting indemnification.

4.03   Waivers.   The failure of either party to this Agreement to enforce any of the provisions of this Agreement or the waiver by either party of any of its rights under this Agreement in any instance shall not be construed as a general waiver or relinquishment on its part of any such provision but the same shall, nevertheless, be and remain in full force and effect.

4.04   Notices.   Communications under or relating to this Agreement shall be sent to GW-Picacho Water and GW-Picacho Wastewater at their current statutory agents of record on file with the Arizona Corporation Commission (available at https://ecorp.azcc.gov/EntitySearch/Index) or to such other address or addresses as Global Water may advise Customer in writing; and to Landowner at:

Nikola Corporation
Attn: Plant Manager
4141 E. Broadway Rd.
Phoenix, AZ  85040
Email: _____

with a copy to:

Nikola Corporation
Attn:  General Counsel

10



4141 E. Broadway Rd.
Phoenix, AZ 85040
britton@nikolamotor.com

Or to such other address or addresses as Landowner may advise Global Water in writing.

Notices shall be in writing and delivered in person or by nationally recognized overnight carrier and shall be effective upon receipt or if delivery is refused, on the same day if in person, or the following business day if by nationally recognized overnight carrier. Notices shall also be sent concurrently to the e-mail addresses above.

4.05    No Joint Venture. Nothing in this Agreement shall at any time be construed so as to create a relationship of employer and employee, partnership, principal and agent, or joint venture as between Global Water and Landowner or to authorize or enable either party to incur any costs or expenses on behalf of the other party.

4.06    Remedies; Cure Periods. Each party shall be entitled to all rights and remedies available at law or in equity to redress a default under this Agreement by the other party; *provided, however,* that notwithstanding the foregoing to the contrary: (i) neither party will be liable to the other party for any incidental, consequential, special, punitive, or other indirect damages, regardless of whether such damages arise under breach of contract, tort, or other theory of law; and (ii) no party shall be deemed to be in default under this Agreement unless (a) such party has failed to pay a monetary amount when due under this Agreement and such failure has continued for more than thirty (30) days following written notice of such failure by the other party, or (b) such party has failed to perform any obligation under this Agreement, other than that described in clause (a) above, and such failure has continued for more than sixty (60) days following written notice of such failure by the other party, unless such failure cannot be cured within such 60-day period, in which event no default shall be deemed to have occurred if the party having received such notice commences a reasonably diligent effort to cure such failure within such 60-day period and continues such diligent effort until such failure is fully and completely cured.

4.07    Governing Law. This Agreement is governed by and construed in accordance with the laws of the State of Arizona, without giving effect to its conflicts of law provisions.

4.08    Entire Agreement. Following full execution by each party, this Agreement shall represent the entire understanding between the parties with respect to its subject matter, superseding all prior communications, understandings and agreements of or between the parties with respect to such subject matter. There are no oral or collateral agreements between the parties with respect to such subject matter. All changes or amendments to, and any termination of, this Agreement must be in writing and signed by Global Water and Landowner. If any provision of this Agreement is deemed unenforceable by a court of competent jurisdiction, the provision shall be severable and, at the election of the benefitted party to the severed provision, the remainder of the Agreement shall be enforceable.

4.09    Assignment. This Agreement shall be binding upon and inure to the benefit of Global Water and Landowner and their respective legal representatives, successors and assigns.

11

Neither Landowner nor Global Water shall assign its rights, obligations or interest in this Agreement without the prior written consent of the other, and any attempted assignment without such consent shall be void and of no effect; except that: (i) Landowner shall not be required to obtain the written consent of Global Water to assign its rights under this Agreement to any party who acquires all or any portion of the Property and who agrees to be bound by this Agreement; and (ii) Global Water shall not be required to obtain the written consent of Landowner to assign its rights under this Agreement to any party who acquires ownership of Global Water's stock and/or assets and has obtained, or succeeds to the benefits of, Global Water's CC&N for the Property from the ACC. The term "Landowner" as used in this Agreement includes each successor-in-interest under this paragraph to the Landowner. This Agreement constitutes a covenant running with the land and any person acquiring any portion of the Property, upon acquisition thereof, and shall be deemed to have assumed the obligations of the Landowner arising from this Agreement with respect to that portion of the Property acquired, without the necessity for the execution of any separate instrument.

    4.10    Counterparts. This Agreement may be executed in multiple counterparts, together which shall constitute one original. This Agreement may be executed by facsimile or .pdf signature attached to the document as finalized by the parties, which shall constitute an original.

    4.11    Due Authorization. Each party hereto represents and warrants that the signatory is authorized to bind its respective company and no individual signatory on behalf of a legal entity shall be individually liable hereunder.

    IN WITNESS WHEREOF, this Agreement has been duly executed by Global Water and Customer.

GLOBAL WATER—PICACHO WATER COMPANY, INC.

By:    Michael J. Liebman
Its:    First Vice President

Date: _1-7-2021_

GLOBAL WATER—PICACHO COVE UTILITIES COMPANY, INC.

By:    Michael J. Liebman
Its:    First Vice President

Date: _1-7-2021_

[Additional signatures follow on next page.]

12



LANDOWNER:

NIKOLA CORPORATION

By:  Mark Duchesne
Its:  Global Head of Manufacturing

Date:  12·18·20

STATE OF ARIZONA )
                 ) ss.
County of Maricopa )

On Jan 7, 2021, before me, Joyce Goodwin, a Notary Public in and for the State of Arizona, personally appeared Michael J. Liebman, in his capacities as the First Vice President of Global Water—Picacho Cove Water Company, Inc. and the First Vice President of Global Water—Picacho Cove Utilities Company, Inc., personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to this instrument and acknowledged to me that he executed the same in his authorized capacities, and that by his signatures on the instrument, the entities upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public

My Commission Expires: October 28, 2022

JOYCE GOODWIN
Notary Public, State of Arizona
Maricopa County
Commission # 555333
My Commission Expires
October 28, 2022

STATE OF ARIZONA )
                 ) ss.
County of Maricopa )

On Dec. 18, 2020, before me, Arthur Macaulay Smith, a Notary Public in and for the State of Arizona, personally appeared Mark Duchesne, in his capacity as the Global Head of Manufacturing of Nikola Corporation, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to this instrument and acknowledged to me that he executed the same in his authorized capacities, and that by his signatures on the instrument, the entities upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public

My Commission Expires: Dec. 29, 2022

ARTHUR MACAULAY SMITH
Notary Public - Arizona
Maricopa County
Commission # 556261
My Comm. Expires Dec 29, 2022

14

**APPENDIX "A"**

**Legal Description and Depiction of the Property**

# APPENDIX A

## Legal Description

All of Section 27, Township 7 South, Range 8 East of the Gila and Salt River Base and Meridian, Pinal County, Arizona, lying East of the East right-of-way of the Southern Pacific Railroad;

EXCEPT the North 307 feet; and

EXCEPT that portion of land conveyed to the Natural Gas Service of Arizona, an Arizona corporation recorded in Docket 101, page 516, records of Pinal County, Arizona; and

EXCEPT that parcel of land being situated within the East half of Section 27, Township 7 South, Range 8 East of the Gila and Salt River Meridian, Pinal County, Arizona, being more particularly described as follows:

BEGINNING at a found Department of the Interior brass cap flush accepted as the Southeast corner of said Section 27 from which a found 5/8 inch rebar w/2 inch aluminum cap w/ sectional markings accepted as the East quarter corner thereof bears North 00°08'05" West, 2641.08 feet;

THENCE South 89°35'45" West, 73.77 feet along the South line of the Southeast quarter of said Section 27;

THENCE leaving said South line, North 19°09'56" West, 693.78 feet;

THENCE North 00°08'05" West, 4318.71 feet along a line that is parallel with and 300.00 feet West of the East line of said Section 27;

THENCE leaving said parallel line, North 89°41'08" East, 300.00 feet along a line that is parallel with and 307.00 feet South of the North line of the Northeast quarter of said Section 27;

THENCE leaving last said parallel line, South 00°08'05" East, 4975.17 feet along the East line of said Section 27 to the POINT OF BEGINNING

EXCEPT from said parcel of land, the North 75.00 feet of the South 121.00 feet of the West 75.00 feet of the East 116.00 feet of the Southeast quarter of said Section 27.

**APPENDIX "B"**

**Map of Subject Property**



2



SHEDD RD
SANTA ROSA CANAL
HIGHWAY 87
SANTA ROSA CANAL
MUSTANG DR
STALLION DR
COLT DR
PINTO DR
APPALOOSA DR
SHETLAND RD
UNION PACIFIC RAILROAD
S27, T7S, R8E
VAIL RD
NIKOLA BOUNDARY
HOUSER RD
EDGEDALE RD
APPROX. 3.75 MILES TO INTERSTATE 10

N

2000  1000   0        2000
SCALE: 1" = 2000 FEET

| PROJ.NO.: | 1295.04 | | |
|---|---|---|---|
| DATE: | DEC 2020 | N.W.C. OF HOUSER ROAD & VAIL ROAD CITY OF COOLIDGE, ARIZONA | |
| SCALE: | 1" = 2,000' | | |
| DRAWN BY: | SL | | |
| CHECKED BY: AT | | APPENDIX B | |

© COPR 2020, HILGARTWILSON, LLC

APPENDIX B

**HILGARTWILSON**
2141 E. HIGHLAND AVE., STE. 250
PHOENIX, AZ 85016
P: 602.490.0535 / F: 602.368.2436

U:\1200\1295\ENGR\EXHIBITS\1295.04 Vicinity Map.dwg  12/17/2020 9:36 AM

**Appendix C**

**Phasing and Demand Information Provided by Landowner**

Nikola - Phase 0.5
Coolidge, AZ
Rev 2
10/5/2020

**NIKOLA** MOTOR COMPANY   **Walbridge**   **ssoe**®   **HILGARTWILSON**

## Water and Wastewater characteristics

| Water | Ave Gal / Day Potable | Gray/ Recycled | Initial Fill & Maintenance Non Corrosive | Peak Gallons Per Minute | Comments |
|---|---|---|---|---|---|
| **Phase 0.5** | | | | | |
| Domestic | 900 | 0 | | 52 | |
| Toilets | 600 | 600 | | In above | Either Potable or Gray |
| Process | 100 | | | 100 | System recycles |
| Fire protection (Initial and Annual) | | | 350,000 | <729 | Can also be potable, Initial fill and annual test, after fire |
| | 1,600 | 600 | 350,000 | 881 | |
| | | | | | |
| **Phase 1.0 (includes Phase 0.5)** | | | | | |
| Domestic | 7,500 | 0 | | 87 | |
| Toilets | 5,000 | 5,000 | | In above | Either Potable or Gray |
| Process | 200 | | | 100 | System recycles |
| Fire protection (Initial and Annual) | | | 350,000 | 729 | Can also be potable, Initial fill and annual test, after fire |
| | 12,700 | 5,000 | 350,000 | 916 | |
| | | | | | |
| **Phase 2.0 (includes Phases 1 and 0.5)** | | | | | |
| Domestic | 15,000 | 0 | | 174 | |
| Toilets | 10,000 | 10,000 | | in above | Either Potable or Gray |
| Process | 200 | | | 100 | System recycles |
| Fire protection (Initial and Annual) | | | 350,000 | 729 | Can also be potable, Initial fill and annual test, after fire |
| | 25,200 | 10,000 | 350,000 | 1,003 | |
| | | | | | |
| **Phase 3.0 (includes Phases 2, 1 and 0.5)** | | | | | |
| Domestic | 27,000 | 0 | | 313 | |
| Toilets | 18,000 | 18,000 | | in above | Either Potable or Gray |
| Process | 25,880 | | | 273 | System recycles |
| Fire protection (Initial and Annual) | | | 350,000 | 729 | Can also be potable, Initial fill and annual test, after fire |
| | 70,880 | 18,000 | 350,000 | 1,315 | |

Nikola - Phase 0.5
Coolidge, AZ
Rev 2
10/5/2020



## Water and Wastewater characteristics
Does not include Irrigation for Agriculture or landscaping

| Wastewater | Ave Gal / Day | Ave Gal / Day |
|---|---|---|
| | Domestic Biological | Supplied from Water / Minerals 4 Times |
| **Phase 0.5** | | |
| Domestic | 900 | |
| Toilets | 600 | |
| Process | NA | |
| Fire protection (initial and Annual) | NA | |
| | **1,500** | |
| | | |
| **Phase 1.0 (includes Phase 0.5)** | | |
| Domestic | 7,500 | |
| Toilets | 5,000 | |
| Process | NA | |
| Fire protection (initial and Annual) | NA | |
| | **12,500** | |
| | | |
| **Phase 2.0 (includes Phases 1 and 0.5)** | | |
| Domestic | 15,000 | |
| Toilets | 10,000 | |
| Process | NA | |
| Fire protection (initial and Annual) | NA | |
| | **25,000** | |
| | | |
| **Phase 3.0 (includes Phases 2, 1 and 0.5)** | | |
| Domestic | 27,000 | |
| Toilets | 18,000 | |
| Process | NA | 920  Weld Water Tower blowdown |
| Fire protection (initial and Annual) | NA | |
| | **45,000** | 920 |

**Appendix D**

**Conceptual Site Plan Provided by Nikola**

**Showing Preferred GW Well Site and Proposed Utility Campus**



2



S27, T7S, R8E

UTILITY CAMPUS

UPRR

VAIL ROAD

WELL SITE

EXISTING WELL

HOUSER ROAD

LEGEND

NIKOLA BOUNDARY

APPROXIMATE GLOBAL WATER
FACILITY LOCATIONS

EXISTING WELL

N

800    400    0    800

SCALE:    1" = 800 FEET

| PROJ.NO.: | 1295.04 |
| DATE: | DEC 2020 |
| SCALE: | 1" = 800' |
| DRAWN BY: | SL |
| CHECKED BY: AT | |

N.W.C. OF HOUSER ROAD & VAIL ROAD
CITY OF COOLIDGE, ARIZONA

APPENDIX  D

HILGARTWILSON
2141 E. HIGHLAND AVE., STE. 250
PHOENIX, AZ 85016
P: 602.490.0535 / F: 602.368.2436

© COPR 2020, HILGARTWILSON, LLC          U:\1200\1295\ENGR\EXHIBITS\1295.04 Proposed Well Exhibit.dwg  12/16/2020 1:14 PM