## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Nikola Corp., *et al.*,[1] | Case No. 25-10258 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: September 5, 2025 at 10:00 a.m. (ET)** <br> **Obj. Deadline: August 20, 2025 at 4:00 p.m. (ET)** |

**DEBTORS' (I) MEMORANDUM OF LAW IN SUPPORT OF THE DEBTORS'
CHAPTER 11 LIQUIDATING PLAN REGARDING PROPER CLASSIFICATION
OF THE MILTON CLAIM PURSUANT TO SECTION 510(C) OF THE
BANKRUPTCY CODE AND (II) OBJECTION TO THE MILTON CLAIM**

> *This Memorandum and Objection is filed in connection with the classification and subordination of a Claim under the Debtors' proposed Liquidating Plan. This Memorandum and Objection is <u>not</u> the Debtors' brief in support of confirmation of the Liquidating Plan, which will be filed on September 2, 2025.*
>
> **THIS MEMORANDUM AND OBJECTION OBJECTS TO THE MILTON CLAIM. THE CLAIMANT RECEIVING THIS MEMORANDUM AND OBJECTION SHOULD CAREFULLY REVIEW THIS MEMORANDUM AND OBJECTION AND, IF APPLICABLE, FILE A RESPONSE BY THE RESPONSE DEADLINE.**

Joshua D. Morse, Esq.
Jonathan Doolittle, Esq.
Andrew V. Alfano, Esq.
**PILLSBURY WINTHROP SHAW
PITTMAN LLP**
Four Embarcadero Center, 22nd Floor
San Francisco, California 94111-5998
Telephone: (415) 983-1000
Facsimile: (415) 983-1200
Email: joshua.morse@pillsburylaw.com
        jonathan.doolittle@pillsburylaw.com
        andrew.alfano@pillsburylaw.com

M. Blake Cleary (No. 3614)
Brett M. Haywood (No. 6166)
Maria Kotsiras (No. 6840)
Shannon A. Forshay (No. 7293)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: bcleary@potteranderson.com
        bhaywood@potteranderson.com
        mkotsiras@potteranderson.com
        sforshay@potteranderson.com

*Counsel to the Debtors and Debtors in Possession*

---

[1]    The Debtors in these chapter 11 cases (the "<u>Chapter 11 Cases</u>"), together with the last four digits of each Debtor's federal tax identification number, are: Nikola Corporation (registered to do business in California as Nikola Truck Manufacturing Corporation) (1153); Nikola Properties, LLC (3648); Nikola Subsidiary Corporation (1876); Nikola Motor Company LLC (0139); Nikola Energy Company LLC (0706); Nikola Powersports LLC (6771); Free Form Factory Inc. (2510); Nikola H2 2081 W Placentia Lane LLC (N/A); 4141 E Broadway Road LLC (N/A); and Nikola Desert Logistics LLC (N/A). The Debtors' mailing address is PO Box 27028, Tempe, AZ 85285.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

    A.     General Background ............................................................................................. 3

    B.     The Liquidating Plan............................................................................................ 4

    C.     The Debtors' Corporate History .......................................................................... 5

    D.     The Hindenburg Report ....................................................................................... 6

    E.     Milton's Resignation and the Separation and Indemnification Agreements .......... 7

    F.     Nikola SEC Investigation and Securities Litigation ........................................... 10

    G.     Federal Conviction and SEC Action................................................................... 11

          a.     Federal Conviction................................................................................ 11

          b.     SEC Civil Action ................................................................................. 13

    H.     The Arbitration Proceedings ............................................................................. 13

          a.     The Milton Fee Arbitration................................................................... 13

          b.     Nikola Initiates Breach of Duty Arbitration Proceeding ......................... 14

          c.     The Nikola Arbitration Appeal .............................................................. 17

    I.     The Milton Claim............................................................................................... 18

SECTION 510(C) REQUIRES EQUITABLE  SUBORDINATION OF THE MILTON
CLAIM................................................................................................................................... 20

ALTERNATIVELY, SECTION 502(B) REQUIRES THAT THE MILTON CLAIM BE
DISALLOWED ...................................................................................................................... 27

    A.     The Milton Claim Should be Disallowed Because It Is Facially Invalid ............. 28

    B.     Milton is Precluded from Relitigating His Indemnification Rights (or Lack
          Thereof) Under the Indemnification Agreement .................................................. 30

RESERVATION OF RIGHTS ................................................................................................. 32

NOTICE................................................................................................................................. 32

CONCLUSION....................................................................................................................... 33

4924-7436-6040.v5

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*United States v. 5 Unlabeled Boxes*,
    572 F.3d 169 (3d Cir. 2009) ......................................................................31

*In re 80 Nassau Assocs.*,
    169 B.R. 832 (Bankr. S.D.N.Y. 1994) ......................................................23

*In re Advance Nanotech, Inc.*,
    2014 WL 1320145 (Bank. D. Del. Apr. 2, 2014) .....................................22

*In re Allegheny Int'l, Inc.*,
    954 F.2d 167 (3d Cir. 1992) ...............................................................28, 30

*In re Autobacs Strauss, Inc.*,
    473 B.R. 525 (Bankr. D. Del. 2012) .........................................................22

*In re Burden v. United States*,
    917 F.2d 115 (3d Cir. 1990) ......................................................................20

*Burdick v. United States*,
    236 U.S. 79 (1915) ....................................................................................25

*In re Cascade Roads, Inc.*,
    34 F.3d 756 (9th Cir. 1994) ......................................................................27

*Century Glove, Inc. v. Iselin (In the Matter of Century Glove, Inc.)*,
    151 B.R. 327 (Bankr. D. Del. 1993) .........................................................21

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    160 F.3d 982 (3d Cir. 1998) ......................................................................21

*In re Docteroff*,
    133 F.3d 210 (3d Cir. 1997) ......................................................................31

*United States v. Flynn*,
    507 F. Supp. 3d 116 (D.D.C. 2020) ..........................................................25

*In re Furniture Factory Ultimate Holding, L.P.*,
    2023 WL 5662747 (Bankr. D. Del. Aug. 31, 2023) ..................................24

*In re Future Energy Corp.*,
    83 B.R. 470 (Bankr. S.D. Ohio 1988) .......................................................21

*Hovis v. Powers Constr. Co., Inc. (In re Hoffman Assocs., Inc.)*,
    194 B.R. 943 (Bankr. D.S.C. 1995) ..........................................................24

4924-7436-6040.v5

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
  458 F.3d 244 (3d Cir. 2006)................................................................................31

*Lettsome v. Waggoner*,
  1986 WL 1267671 (Terr. V.I. July 25, 1986), *aff'd*, 672 F. Supp. 858 (D.V.I. 1987) ...........25

*Machinery Rental, Inc. v. Herpel (In the Matter of Multiponics, Inc.)*,
  622 F.2d 709 (5th Cir. 1980) .............................................................................23

*In re Mid-Am. Waste Sys., Inc.*,
  284 B.R. 53 (Bankr. D. Del. 2002) ............................................20, 21, 22, 23, 24

*United States v. Noonan*,
  906 F.2d 952 (3d Cir. 1990)................................................................................25

*Payne v. Lampe (In re Lampe)*,
  665 F.3d 506 (3d Cir. 2011)................................................................................28

*Pepper v. Litton*,
  308 U.S. 295 (1939)...........................................................................................20

*Roberts v. Geremia (In re Roberts, Inc.)*,
  15 B.R. 584 (Bankr. D.R.I. 1981)......................................................................22

*In re Rooster, Inc.*,
  127 B.R. 560 (E.D. Pa. 1991) ............................................................................27

*In re Szymanski*,
  413 B.R. 232 (Bankr. E.D. Pa. 2009) ...............................................................27

*Teamsters Local 177 v. UPS*,
  966 F.3d 245 (3d Cir. 2020)...............................................................................31

*Matter of U.S. Abatement Corp.*,
  39 F.3d 556 (5th Cir. 1994) ...............................................................................21

*E.E.O.C. v. U.S. Steel Corp.*,
  921 F.2d 489 (3d Cir. 1990)................................................................................31

*In re Westgate-California Corp.*,
  642 F.2d 1174 (9th Cir. 1981) ...........................................................................23

*In re Whimsy Inc.*,
  221 B.R. 69 (S.D.N.Y. 1998)..............................................................................27

*In re Zohar III, Corp.*,
  620 F. Supp. 3d 147 (D. Del. 2022)....................................................................31

4924-7436-6040.v5

## Statutes and Codes

United States Code

    Title 11, sections 101(31)(B)(i)-(ii) ........................................................................24
    Title 11, section 101(31)(B)(iii) ............................................................................24
    Title 11, section 105(a) ...........................................................................................1
    Title 11, section 502 ...............................................................................................1
    Title 11, section 510(c) ...........................................................................................1
    Title 11, section 510(c)(1) .....................................................................................20
    Title 11, section 553 .............................................................................................26

Bankruptcy Code

    Section 105(a) .......................................................................................................26
    Section 502 .............................................................................................................1
    Section 502(a) .......................................................................................................28
    Section 502(b) ...................................................................................................2, 28
    Section 502(b)(1) .............................................................................................28, 29
    Section 510(c) ................................................................................................ *passim*
    Section 510(c)(1) ..................................................................................................26
    Section 1107(a) .......................................................................................................3
    Section 1108 ...........................................................................................................3
    Section 1111 .........................................................................................................20

Exchange Act

    Section 10(b) .........................................................................................................10

Securities Act

    Section 17(a) .........................................................................................................10

## Rules and Regulations

Federal Rules of Bankruptcy Procedure

    Rule 2002 ..............................................................................................................32
    Rule 3001 ................................................................................................................1
    Rule 3003(b)(1) ....................................................................................................20
    Rule 3007 ................................................................................................................1

4924-7436-6040.v5

Nikola Corporation ("Nikola") and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby submit this (a) memorandum of law, in support of confirmation of the Liquidating Plan (as defined below), which (i) subordinates Proof of Claim No. 54 (the "Milton Claim") filed by Trevor Milton ("Milton") pursuant to sections 105(a), 502, and 510(c) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and (ii) classifies the Milton Claim in Class 8 as an Equitably Subordinated Claim (as defined in the Liquidating Plan), and (b) objection to the Milton Claim pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rules 3001 and 3007 (the "Memorandum and Objection"). In support hereof, the Debtors submit the declaration of Britton M. Worthen attached hereto as **Exhibit A** (the "Worthen Declaration").

## PRELIMINARY STATEMENT

1.      The Debtors' Liquidating Plan seeks to equitably subordinate the Milton Claim under section 510(c) of the Bankruptcy Code due to Milton's grossly negligent, reckless, and bad faith actions while serving as the Debtors' Chief Executive Officer ("CEO") and Executive Chairman. Milton flagrantly breached his fiduciary duties, causing significant financial harm to the Debtors and ultimately contributing significantly to its insolvency by causing an avalanche of litigation against the Debtors and a massive SEC civil penalty all stemming from Milton's misleading and deceptive actions while serving as the Debtors' CEO and Executive Chairman. Milton was ultimately convicted on federal charges for his deceptive behavior.

2.      Following an extensive arbitration proceeding, Milton was found to have breached his fiduciary duties of loyalty and good faith to the Debtors pursuant to the *Decision and Final Award* (the "Milton Award") entered in the Nikola Breach of Duty Arbitration Proceeding (as defined below). The Milton Award further determined that Milton's breach of

fiduciary duties eliminated his entitlement to indemnification from the Debtors in connection with the Nikola Breach of Duty Arbitration Proceeding under the Indemnification Agreement and/or Separation Agreement (as defined below).[1]   The Milton Award determined that the Debtors were entitled to damages in excess of $196.2 million (of which more than approximately $96.8 million is currently due and owing from Milton) for Milton's conduct.

3.       Milton now seeks to subvert the Milton Award by claiming he is entitled to indemnification for $69,758,064.15 in legal fees and costs in the Chapter 11 Cases.  As a threshold matter, Milton is not entitled to indemnification from the Debtors because the Milton Award determined that Milton's actions eliminated his entitlement to indemnification. Accordingly, the Debtors believe that any claim for indemnification pursuant to the Separation Agreement or Indemnification Agreement is presently precluded under the terms and conditions of the Milton Award.  Further, allowing Milton to recover *any* amounts from the Debtors in the Chapter 11 Cases would betray this Court's purposes as a court of equity given Milton's actions are the genesis for the Debtors' financial insolvency.

4.       In light of Milton's criminal conviction and flagrant disregard for corporate norms, the Debtors request that the Milton Claim be equitably subordinated to all Allowed General Unsecured Claims in Class 3 pursuant to section 510(c) of the Bankruptcy Code and classified as an Equitably Subordinated Claim in Class 8.

5.       In the alternative, the Debtors request the Milton Claim be disallowed in its entirety pursuant to section 502(b) of the Bankruptcy Code.   The Milton Claim is unsubstantiated.  Milton has failed to provide any documentation in support of the Milton Claim,

---

[1]   Nikola's request in the Nikola Breach of Duty Arbitration Proceeding to recover the fees and expenses ██████████████████████████████ was denied without prejudice to resolution of such issue in the Milton Fee Arbitration following final resolution of the Federal Conviction.  *See* Milton Award at 77-83.

and it is impossible to independently determine whether the amounts asserted by the Milton Claim are reasonable and whether they have already been satisfied and/or deemed unreasonable in the Milton Fee Arbitration.   The Debtors also request a determination that Milton's indemnification claims against the Debtors are precluded by the Milton Award and Federal Conviction (as defined below).

## BACKGROUND

A.   **General Background**

6.   On February 19, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").   The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee or examiner has been appointed in these cases.

7.   On February 27, 2025, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Committee").   The Committee currently consists of the following four (4) members:  (1) Antara Capital LP; (2) Hexagon Purus GmbH; (3) Aztek Technologies S.A. DE C.V.; and (4) Proterra Powered LLC.

8.   Background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of the Chapter 11 Cases is set forth in the *Declaration of Stephen J. Girsky in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 18], which is incorporated herein by reference.

4924-7436-6040.v5

B.    **The Liquidating Plan**

9.    On July 24, 2025, the Court entered an order [Docket No. 780] approving, among other things, solicitation of the *[Solicitation Version] First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Nikola Corporation and its Debtor Affiliates* [Docket No. 774] (the "Liquidating Plan").[2]  If confirmed, the Liquidating Plan will create a liquidating trust to monetize the Debtors' remaining assets, administer claims, and make distributions of all remaining proceeds to creditors.

10.    There are eight (8) Classes of Claims and Interests under the Liquidating Plan. *See* Liquidating Plan § VI.A.  Class 8 contains Equitably Subordinated Claims.  *See id.* § VI.B.8. Equitably Subordinated Claims are defined as "any Claim or right of setoff of any kind or nature whatsoever (whether arising in law or equity, contract or tort, under the Bankruptcy Code, federal or state law, rule or regulation, common law or otherwise) held by any Control Person against any of the Debtors as of the Petition Date."  *Id.* at 6.  A Control Person is defined as "(a) Trevor Milton; (b) any Person with a familial relationship with the individual listed in clause (a); or (c) any other Person or Entity designated by the Debtors, with the consent of the Committee, in the Plan Supplement as a Control Person."  Liquidating Plan, at 4.  Claims in Class 8 are impaired, will be cancelled, released and extinguished and shall be of no further force or effect, and each Holder of such Claim will receive nothing under the Liquidating Plan.  *See* Liquidating Plan § VI.B.8.

11.    Class 3 consists of Allowed General Unsecured Claims.  Under the Liquidating Plan, Class 3 will receive a "pro rata share of Liquidating Trust Units, which shall entitle such Holder to its Pro Rata Share of the Liquidating Trust Net Assets."  Liquidating Plan § VI.B.3.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Liquidating Plan.

4924-7436-6040.v5

The Debtors estimate that holders of Class 3 will recover between 23.1% and 77.3% on account of their Allowed General Unsecured Claims.  *See* Liquidating Plan Ex. B.

C.    **The Debtors' Corporate History**

12.    Prior to the Petition Date, the Debtors were an early-stage growth company that designed and manufactured heavy-duty commercial FCEV and BEV trucks and energy infrastructure solutions, via the HYLA brand.

13.    In 2012, Milton founded Bluegentech LLC, which in July 2017 converted from a limited liability company to a Delaware corporation and changed its name to Nikola Corporation ("Legacy Nikola").  Nikola was created through the merger of Legacy Nikola and VectoIQ Acquisition Corp. ("VectoIQ") in January 2018.  VectoIQ was formed in January 2018 as a special purpose acquisition corporation, or SPAC, for the purpose of effecting a business combination. VectoIQ completed an initial public offering in May 2018, at which time its securities began to be quoted on the Nasdaq Capital Market.

14.    On June 3, 2020, VectoIQ consummated a business combination with Legacy Nikola, and, in connection therewith, (i) VectoIQ's wholly-owned subsidiary merged with and into Legacy Nikola, whereby Legacy Nikola survived the merger and was deemed the accounting predecessor of the merger and became the successor registrant for SEC purposes and (ii) changed its name to "Nikola Corporation."  Upon consummation of the foregoing transactions, Legacy Nikola became Nikola's wholly owned subsidiary.  Milton was CEO and Executive Chairman of Legacy Nikola from its inception until June 3, 2020.

15.    On June 4, 2020, Nikola's common stock and warrants began trading on the Nasdaq Global Select Market.

16.    As determined by the Nikola Breach of Duty Arbitration (defined below) panel, while serving as Nikola's "public face" after becoming a public company, ███████████

5

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████    *See* Milton Award, at 2.

17.     Once Nikola's stock began trading publicly, ████████████████

████████████████████████████████████████████████████    *Id*. at 3-4.

18.     As further described in the Milton Award and the Indictment (defined below), from approximately March 2020 through September 2020, in his capacity as CEO and later as Executive Chairman of Nikola, Milton made materially false and misleading statements on numerous critical topics related to Nikola's capabilities, technology, reservations, products, and commercial prospects.

**D.     The Hindenburg Report**

19.     On September 10, 2020, Hindenburg Research LLC, published a report titled "*Nikola: How to Parlay An Ocean of Lies Into a Partnership With the Largest Auto OEM in America*" (the "Hindenburg Report").   A true and correct copy of the Hindenburg Report is attached hereto as **Exhibit C**.

20.     The Hindenburg Report opens by stating, "Today, we reveal why we believe Nikola is an intricate fraud built on dozens of lies over the course of its Founder and Executive Chairman Trevor Milton's career."   The Hindenburg Report opening remarks further state, "[w]e have gathered extensive evidence . . . detailing dozens of false statements by Nikola Founder Trevor Milton.  *We have never seen this level of deception at a public company, especially of this size*."   Hindenburg Report, at 1 (emphasis added).

21.     The Hindenburg Report disclosed multiple false and misleading statements made by Milton both before and after Nikola shares began trading publicly.

6

22.     Following publication of the Hindenburg Report, ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████    *See* Milton Award, at 40.

23.     Less than two hours after ████████████████████████

██████████████████████████████████    Milton tweeted photos of Nikola trucks,

stating: "These were planned to release later but alleged trucks didn't exist in Ulm Germany.  Do

these look fake?  Thanks to the Ulm fab / assembly teams for showing the trolls what's up.  You

guys have my admiration.  F@@k the haters.  Well [sic] come back stronger from the lies spread

about us."  *Id*. at 42. ██████████████████████████████████████

████████████████████    *See id*.

24.     Later that same day, Milton went on an Instagram Livestream, stating, among

other things, that "the SEC is not investigating us" and that "it's all bullshit," among other

misleading and unapproved statements regarding Nikola's discussions with the SEC and the

Hindenburg Report.  *Id*. at 42-43.

E.     **Milton's Resignation and the Separation and Indemnification Agreements**

25.     ████████████████████████████████████████████████

████████████████████████████    *See* Milton Award, at 44.

26.     According to Nikola's public SEC filing, "[o]n September 20, 2020, Mr. Milton

offered to voluntarily step down from his position as Executive Chairman, as a member of the

Company's board of directors, including all committees thereof, and from all positions as an

7

employee and officer of the Company.    The board accepted his resignation and appointed Stephen Girsky as Chairman of the board of directors." *Id.*

27.    That same day, September 20, 2020, Milton and Nikola entered into a detailed Separation Agreement (the "Separation Agreement").    By this time, Nikola was fully aware that the SEC and the DOJ were actively investigating it and Milton, as further discussed below. *See Id.* at 44-45.

28.    The Separation Agreement unequivocally provides that Milton agreed to voluntarily resign and relinquish all his positions with Nikola.    According to the recitals, "the Executive [Milton] desires to voluntarily step down from his positions as Executive Chairman of the Company and a member of the Board as of September 20, 2020 (the 'Effective Date') and the Board, after deliberation, has accepted such offer to step down."    Separation Agreement, ¶ 1.

29.    In the Separation Agreement, Milton also agreed to provide unpaid consulting services to Nikola as requested through December 3, 2020. *See id.*, ¶ 2.    Milton also agreed to relinquish 4,859,000 performance-based stock units granted to him only thirty-days before and any opportunity to enter into a two-year consulting agreement with an annual fee of $10,000,000. *See Id.*, ¶ 3.

30.    In return, Nikola made certain commitments to Milton.    Among other things, Nikola agreed to "comply with all indemnification and advancement obligations it has pursuant to the Indemnification Agreement dated June 3, 2020 by and between the Company and [Milton]." *Id.*, ¶ 4.

31.    The Separation Agreement contains an arbitration provision applicable to any dispute arising out of, related to or in any way connected with "any relationship between the Executive [Milton] and the Company (or between the Executive and any officer, director,

8

employee or affiliates of the Company, each of which is hereby designated as a third-party beneficiary of this Agreement regarding arbitration ….” *Id.*, ¶ 20.  It also makes clear that “[t]his arbitration provision is not intended to modify or limit substantive rights or the remedies available to the parties.” *Id.*

32.     As noted, the Separation Agreement expressly incorporates the parties’ Indemnification Agreement.

33.     Section 2 of the Indemnification Agreement provides that Nikola:

> shall indemnify Indemnitee [Milton] if Indemnitee was or is a party… to any Proceeding by or in the right of the Company… to procure a judgment in its favor by reason of the fact the Indemnitee is or was an Agent of the Company… against (i) Expenses; and (ii) to the fullest extent permitted by law, Liabilities if the **Indemnitee acted in good faith** and in a manner Indemnitee **reasonably** believed in or not opposed to the best interests of the of the Company. If the Indemnitee is found liable to the Company the Indemnification shall not be paid under (i) or (ii) unless the court determines under all the circumstances that the Indemnitee is fairly and reasonably entitled to Indemnification.

34.     As used in the Indemnification Agreement, the term “Expenses” is broadly defined in Section 17 to include:

> all direct and indirect costs (including, without limitation, attorneys’ fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, all other disbursements or out-of-pocket expenses and reasonable compensation for time spent by Indemnitee for which Indemnitee is not compensated by the Company or any third-party) actually and reasonably incurred in connection with either the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Agreement, applicable law or otherwise.

35.     Section 9 of the Indemnification Agreement contains a provision requiring Nikola “to contribute” to any judgments, fines or penalties incurred by Milton in a proceeding “in such

4924-7436-6040.v5

proportion as is deemed fair and reasonable" explicitly "to reflect" the "relative fault of the Company (and its directors [and] officers" and the Indemnitee [Milton]).  Section 9 states (emphasis added):

> To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement **is unavailable for any reason whatsoever,** the Company, in lieu of indemnifying the Indemnitee, **shall contribute** to the amount incurred by the Indemnitee, whether for judgments, fines,… penalties, amounts paid or to be paid in settlement and/or for Expenses in connection with any claim relating to an indemnifiable event under this Agreement, **in such proportion as is deemed fair and reasonable** in light of all the circumstances of such Proceeding in order to reflect the…**(ii) relative fault of the Company (and its directors, officers…and Indemnitee in connection with such event(s) and/or transaction(s)**.

## F.    Nikola SEC Investigation and Securities Litigation

36.     Within days of the Hindenburg Report's publication, the SEC started to investigate Nikola and Milton.

37.     The SEC settled its claims against Nikola pursuant to a consent cease and desist order dated December 21, 2021 (the "SEC Order"), in which the SEC found, based on Nikola's Offer of Settlement, that Nikola violated Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act by: (1) making material misrepresentations to investors through Milton, (2) making material misrepresentations to investors apart from Milton's statements, and (3) lacking adequate internal disclosure controls or procedures.

38.     Under the terms of the SEC Order, without admitting or denying the SEC's findings, Nikola, among other things, agreed to pay a $125 million civil penalty.

39.     The first $25 million installment was paid at the end of 2021, and the remaining installments were to be paid semiannually through 2023.  In July 2022, Nikola and SEC agreed to an alternative payment plan.  Nikola made payments of $1.5 million during the first and

4924-7436-6040.v5

second quarters of 2024, a payment of $0.8 million during the third quarter of 2024, and the remainder of the payment plan is subject to determination.  As of September 30, 2024, Nikola has reflected the remaining liability of $80.2 million in accrued expenses and other current liabilities on the condensed consolidated balance sheets (the "SEC Claim").

G.     **Federal Conviction and SEC Action**

a.     **Federal Conviction**

40.     On July 28, 2021, a federal grand jury in the Southern District of New York issued an indictment (the "Indictment") against Milton for two counts of securities fraud and wire fraud for his false statements and deceptive behavior that ultimately defrauded Nikola's investors, in the action captioned *United States v. Milton*, No. 21-CR-00478 (ER) (the "DOJ Criminal Action").  A true and correct copy of the Indictment is attached hereto as **Exhibit D**.

41.     The Indictment details Milton's scheme to defraud investors, which targeted individual, non-professional investors (so-called "retail investors") by making false and misleading statements directly to the investing public through social media and television, print, and podcast interviews.  Indictment, at 1.

42.     The deceptive, false, and misleading claims made by Milton regarding the development of Nikola's products and technology, addressed nearly all aspects of the business and included:

> (a) false and misleading statements that the company had early success in creating a "fully functioning" semi-truck prototype known as the "Nikola One," when Milton knew that the prototype was inoperable;

> (b) false and misleading statements that Nikola had engineered and built an electric- and hydrogen-powered pickup truck known as "the Badger" from the "ground up" using Nikola's parts and technology, when Milton knew that was not true;

(c) false and misleading statements that Nikola was producing hydrogen and was doing so at a reduced cost, when Milton knew that in fact no hydrogen was being produced at all by Nikola, at any cost;

(d) false and misleading statements that Nikola had developed batteries and other important components in-house, when Milton knew that Nikola was acquiring those parts from third parties; and

(e) false and misleading claims that reservations made for the future delivery of Nikola's semi-trucks were binding orders representing billions in revenue, when the vast majority of those orders could be cancelled at any time and were for a truck Nikola had no intent to produce in the near-term.

*Id*. at 1-2.

43.     After Milton made false and misleading statements regarding Nikola's products and capabilities, tens of thousands of retail investors purchased Nikola stock, between in or around March and September 2020, and many ultimately suffered significant financial losses. *Id*. at 42-43.

44.     The value of Nikola's stock plummeted after the fact that certain of Milton's statements had been false and misleading was disclosed to the market in or around September 2020.  *See* Indictment, at 43.  Between September 18, 2020 and September 25, 2020, Nikola's market capitalization dropped approximately 43%.  *See Id.*  As a result, investors, including thousands of retail investors who were the targets of Milton's fraudulent scheme, suffered substantial losses, in some cases totaling in the tens or hundreds of thousands of dollars and compromising their financial security or retirement savings.  *See Id*. at 43.

45.     In October 2022, Milton was convicted on one count of securities fraud and two counts of wire fraud following a jury trial (the "Federal Conviction").  The jury found that from approximately November 2019 to September 2020, Milton induced investors to purchase shares of Nikola by making false and misleading statements about the company's product and

technology development.  A true and correct copy of the *Judgment in a Criminal Case* issued against Milton following the jury trial is attached hereto as **Exhibit E**.

46.    In December 2023, Milton was sentenced to four (4) years in prison.

47.    On March 27, 2025, President Donald J. Trump issued Milton a pardon for the Federal Conviction (the "Pardon").

**b.    SEC Civil Action**

48.    On July 29, 2021, the SEC initiated a civil action against Milton captioned *United States Securities and Exchange Commission v. Milton*, No. 1:21-cv-6445 (the "SEC Action"). The SEC Action charged Milton with violating the anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934.

49.    As of the filing of this Memorandum and Objection, the SEC Action remains pending in the United States District Court for the Southern District of New York.

**H.    The Arbitration Proceedings**

**a.    The Milton Fee Arbitration**

50.    As indemnification payments to Milton's counsel under the Separation Agreement escalated in 2020 and 2021, the Debtors pushed back on the excessiveness and unreasonableness of the fees and expenses being incurred.  Ultimately, Milton initiated an arbitration proceeding against Nikola in the arbitration action captioned as *Trevor Milton v. Nikola Corporation*, Case No. 01-21-0004-8978 (the "Milton Fee Arbitration") seeking advancement and indemnification of fees incurred in connection the DOJ Criminal Action and SEC Action.

51.    Taking into account payments made by Nikola prior to the commencement of the Milton Fee Arbitration and under orders entered in connection therewith on February 22, 2022,

March 9, 2022, and November 1, 2022,[3] Nikola has made advancements to Milton under the Separation Agreement in the aggregate amount of $36,844,896.65 (the "Advanced Fees").[4]  In addition, nearly $17 million of fees and expenses for Cahill Gordon & Reindel LLP, were found to be unreasonable and therefore disallowed in the Milton Fee Arbitration.  Following entry of the November 1, 2022, order in the Milton Fee Arbitration, Milton has not sought any further indemnification advancements from Nikola.

### b.    Nikola Initiates Breach of Duty Arbitration Proceeding

52.    On November 3, 2021, Nikola initiated an arbitration proceeding before the American Arbitration Association, captioned as *Nikola Corporation v. Trevor R. Milton*, Case No. 01-21-0017-1964, by filing an Arbitration Demand against Milton for his breaches of fiduciary duty to Nikola ("Nikola Breach of Duty Arbitration Proceeding").

53.    Following arbitration hearings from July 24-August 2, 2023, a majority of the three-member arbitration panel issued the Milton Award on November 17, 2023, which is incorporated herein by reference.  A true and correct copy of the Milton Award is attached hereto as **Exhibit F**.

54.    The Milton Award found that "Milton violated his fiduciary duties of loyalty and good faith to Nikola through his pattern of false and misleading public statements about Nikola's products and the state of their development and by subordinating the Company's interest to his own by refusing [] all efforts to review and approve his public statements in advance." Milton Award, at 53.

---

[3]    Copies of such orders are attached to the *Debtors' Objection to Trevor Milton's Motion to Modify the Automatic Stay to Permit Advancement of Arbitration Decision and Related Proceedings* [Docket No. 698] as Exhibits C, D, and E.

[4]    The Debtors reserve all rights with respect to the Advanced fees, including to claw back any amounts Milton was not entitled to receive.

4924-7436-6040.v5

55.     The Milton Award found, among other things, that:

> Milton consistently made false and misleading statement about, among other things: (1) the Nikola One prototype; (2) the Company's purported production of hydrogen and hydrogen stations; (3) Nikola's plans for and development of a zero-emissions consumer-focused truck, the "Badger"; (4) Nikola's development of in-house technology; and (5) Nikola's product reservations. ████████████████████████████████████████
> ████████████████████████████████████████
> ████████████████████████████████████████
> ████████████████████████████████████████

*Id.* at 53 n.6 (internal citations omitted).

56.     The Milton Award found Milton liable for certain damages claimed by Nikola as described in the Milton Award, which total in the aggregate amount of at least $96.8 million, plus interest.   The Milton Award also granted Nikola prejudgment interest on the damages awarded to Nikola at the fixed rate of 5.25% compounded quarterly.

57.     Accordingly, the total amount of the award, including prejudgment interest, is **$196,274,362**.  Of that amount **$96,816,193** is due from Milton now, and, if Nikola paid the remaining amounts owed on the SEC civil penalty, an additional **$99,458,169** would be due from Milton within 10 days of Nikola making the payment.

58.     The Milton Award also confirmed that Milton ***was not entitled to indemnification from Nikola***:

> Under paragraph 2(c) of the Indemnification Agreement, Milton is entitled to indemnification only "if the Indemnitee acted in good faith and in a manner Indemnitee reasonably believed in or not opposed to the best interests of the of the Company."
>
> As we have already made clear in deciding Nikola's claim against Milton for breach of fiduciary duty, on the record before us, we could not conclude he acted in "good faith" and in a manner that

4924-7436-6040.v5

he **reasonably** believed to be in or not opposed to the best interests of Nikola.  Accordingly, there is no basis for Milton to receive indemnification.

*Id.* at 59 (emphasis in original) (footnote omitted).[5]

59.     On December 18, 2023, Nikola filed a *Petition for Confirmation of Arbitration Award and For Entry of Judgment Thereon* (the "Confirmation Petition") in the United States District Court for the District of Arizona.  On September 9, 2024, the District Court granted the Confirmation Petition, finding that no grounds existed to vacate or modify the Milton Award and entered judgment in favor of Nikola, and against Milton.

60.     On September 27, 2024, Nikola filed a *Motion to Amend or Clarify the Judgment*, requesting that the District Court amend the judgment to, among other things, include the specific amounts awarded and the terms set forth in the Milton Award.  On November 4, 2024, the District Court issued an order granting Nikola's motion and entered an Amended Judgment in favor of Nikola, and against Milton (the "Amended Judgment").

61.     On December 17, 2024, Nikola filed a *Motion for an Order Certifying Judgment for Registration* to permit Nikola to register the *Amended Judgment* in other judicial districts in which Nikola believes, based on information to date, that Milton has property and assets.

62.     On May 16, 2025, the District Court granted Nikola's motion and certified the *Amended Judgment* for registration in Utah, Wyoming, Nevada, and Delaware.

63.     On June 6, 2025, Nikola filed a *Motion for an Order for Appearance at Judgment Debtor's Examination*, which seeks an order from the District Court requiring Trevor Milton to (i) personally appear before the District Court for an examination and to give answers regarding

---

[5]     Nikola's request in the Nikola Breach of Duty Arbitration Proceeding ███████████ ███████████████████████████████████████ was denied without prejudice to resolution of such issue in the Milton Fee Arbitration following final resolution of the Federal Conviction.  *See* Milton Award at 77-83.

4924-7436-6040.v5

the assets, property, and financial affairs of Milton and any of his affiliates, affiliated entities, and other persons acting on his behalf, and (ii) produce to Nikola documents regarding the same. The District Court granted that motion and the Debtors are working with Milton to confirm the date by which he will complete the court-ordered production and sit for the court-supervised examination.

        **c.**      **The Nikola Arbitration Appeal**

64.      On December 3, 2024, Milton filed an *Amended Notice of Appeal* seeking an appeal to the United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit") from the Amended Judgment entered in connection with the Nikola Breach of Duty Arbitration Proceeding (the "Nikola Arbitration Appeal").

65.      Following commencement of the Chapter 11 Cases, on February 21, 2025, Milton filed a *Notice of Filing Bankruptcy* with the Ninth Circuit. When the Ninth Circuit took no action, on March 6, 2025, Milton followed up by filing the *Motion to Stay Proceedings Pending Bankruptcy*, requesting that the Ninth Circuit "issue[] a stay pending the resolution of the bankruptcy proceedings."

66.      Nikola opposed the relief requested by Milton on March 17, 2025. Milton replied on March 24, 2025.

67.      On April 3, 2025, the Ninth Circuit denied Milton's attempt to stay the Nikola Arbitration Appeal (the "Ninth Circuit Stay Denial Order").

68.      On June 27, 2025, Milton filed his Opening Brief in the Nikola Arbitration Appeal.

69.      On June 30, 2025, Milton filed *Trevor Milton's Motion to Modify the Automatic Stay to Permit Advancement of Arbitration Decision and Related Proceedings* in the Chapter 11 Cases (the "Stay Relief Motion"), which sought relief from the automatic stay to reinitiate the

Milton Arbitration Proceeding and continue litigating the Ninth Circuit appeal (despite Milton's previous attempt to stay the Ninth Circuit appeal under the auspice that the automatic stay applied to the Ninth Circuit appeal).  At a July 21, 2025, hearing, this Court denied the relief requested in the Stay Relief Motion.  An formal order confirming such ruling is forthcoming.

I.      **The Milton Claim**

70.    On March 17, 2025, the Court entered the *Order (I) Establishing Deadlines for the Filing of Proofs of Claim and Requests for Allowance of Administrative Expense Claims, (II) Approving the Forms and Manner of Notice Thereof, and (III) Granting Related Relief* [Docket No. 180], establishing April 28, 2025, as the deadline for any person or entity (except governmental units) to file a Proof of Claim in the Chapter 11 Cases.

71.    On April 23, 2025, Milton filed the Milton Claim asserting a general unsecured claim against Nikola in the amount of $69,758,064.15.  The Milton Claim seeks recovery from Nikola of amounts allegedly owing to Milton under the Separation Agreement and the Indemnification Agreement.  The $69,758,064.15 purports to be comprised of amounts allegedly "paid as of April 1 2025" [sic] to the following nineteen (19) separate law firms, consulting firms, individuals, and even the AAA Arbitration Panel associated with the Milton Award:

4924-7436-6040.v5

|  | As of April 1 2025 | |
| --- | --- | --- |
|  | Total Paid | Invoices Backed Up |
| Cahill | $31,853,367.00 | x |
| Gallagher | $124,701.26 | x |
| GT Law | 356,954.09 | x |
| Hughes Hubbard | $10,143,487.29 | x |
| Mukasey | $14,282,376.85 | x |
| Shapiro | $1,432,482.00 | x |
| Paul Hastings | $1,958,379.58 | x |
| Wallin Hester | $1,493,092.61 | x |
| Curtis Tuttle Plc | $1,671,474.00 | |
| Coherent | $457,531.01 | x |
| Traci Zeller | $628,820.90 | x |
| Hatch | $1,562,192.22 | x |
| Tiffany and Bosco | $52,742.56 | x |
| AAA | $737,574.00 | x |
| DOAR | $605,569.56 | x |
| Trial Graphix | $119,276.97 | x |
| Sard Vebenin | $365,547.92 | x |
| Guidepost | $1,099,661.00 | x |
| Consulting | $812,833.33 | |
|  | | |
| **Total** | **$69,758,064.15** | |

72.    The Debtors and the Committee requested that Milton's counsel provide supporting information and other details concerning the $69,758,064.15 sought pursuant to the Milton Claim, including but not limited to (a) proof of Milton's actual payment of such amounts; (b) the portion of such amount subject to prior satisfaction by the Debtors in connection with the Milton Fee Arbitration or otherwise; and (c) copies of the invoices comprising the aggregate requested amount.

73.    According to Milton's Reply in Support of the Stay Relief Motion [Docket No. 719], "[o]ver 6,200 documents are being reviewed for production to Debtors' counsel" regarding the Milton Claim.  As of the filing of this Memorandum and Objection, no response or requested information has been provided, even though the *Addendum to Proof of Claim of Trevor Milton* attached to the Milton Claim represents that copies of the invoices supporting the figures would be provided upon request.

4924-7436-6040.v5

## SECTION 510(C) REQUIRES EQUITABLE
## SUBORDINATION OF THE MILTON CLAIM

74.     Section 1111 of the Bankruptcy Code deems allowed any claim or interest in the

schedules as filed, unless that claim or interest is scheduled as disputed, contingent, or

unliquidated.  Federal Rule of Bankruptcy Procedure 3003(b)(1) confirms that "[a]n entry on the

schedules of liabilities filed under § 521(a)(1)(B)(i) is prima facie evidence of the validity and

the amount of a creditor's claim–except for a claim scheduled as disputed, contingent, or

unliquidated.  Filing a proof of claim is unnecessary …."  Fed. R. Bankr. P. 3003(b)(1).

75.     The Milton Claim, and any future claims asserted by Milton in the Chapter 11

Cases, should be equitably subordinated pursuant to section 510(c) of the Bankruptcy Code to

General Unsecured Claims in Class 3 who were injured ultimately by Milton's misleading

statements and actions.

76.     Section 510(c)(1) authorizes the Court to "subordinate for purposes of distribution

all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed

interest to all or part of another allowed interest."  11 U.S.C. § 510(c)(1).  "In the exercise of its

equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding

any claim to see that injustice or unfairness is not done in administration of the bankrupt estate."

*In re Burden v. United States*, 917 F.2d 115, 117 (3d Cir. 1990) (quoting *Pepper v. Litton*, 308

U.S. 295, 307–08, (1939)); *In re Mid-Am. Waste Sys., Inc.,* 284 B.R. 53, 68 (Bankr. D.

Del. 2002).  The essential purpose of equitable subordination is to undo any inequality in the

claim position of a creditor that will produce injustice or unfairness to other creditors in terms of

distribution of the estate.  *See Mid-Am. Waste Sys., Inc.*, 284 B.R. at 68.

77.     Although section 510(c) deals with allowed claims, a determination as to whether

a claim is subject to equitable subordination under section 510(c) may be made before the

4924-7436-6040.v5

determination as to the allowance of the claim.  *See id.*; *see also Matter of U.S. Abatement Corp.*, 39 F.3d 556, 560 (5th Cir. 1994) ("There is no requirement in the Bankruptcy Code, Bankruptcy Rules or case law that a bankruptcy court address the merits of a pending claim prior to disposing of a motion for equitable subordination.").  Equitable subordination is a legally distinct proceeding which seeks to re-prioritize the order of allowed claims based on the equities of the case, rather than to allow or disallow the claim in the first instance.  *See Mid-Am. Waste Sys., Inc.*, 284 B.R. at 68.

78.     Courts generally apply a three-pronged test to determine whether a claim may be equitably subordinated: (1) the claimant must have engaged in some type of inequitable conduct; (2) the claimant's misconduct must have resulted in injury to other creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the Bankruptcy Code.  *See Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998); *Mid-Am. Waste Sys., Inc.*, 284 B.R. at 68; *Century Glove, Inc. v. Iselin (In the Matter of Century Glove, Inc.)*, 151 B.R. 327, 333 (Bankr. D. Del. 1993).  The inequitable conduct directed against the debtor or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim. *See Mid-Am. Waste Sys., Inc.*, 284 B.R. at 69.

79.     The most important factor in determining if a claimant has engaged in inequitable conduct for the purposes of equitable subordination is whether the claimant was an insider of the debtor at the time of the inequitable conduct.  *See Mid-Am. Waste Sys., Inc.*, 284 B.R. at 69. Where the claimant is an insider, the standard for finding inequitable conduct is much lower. *See id.*; *In re Future Energy Corp.*, 83 B.R. 470 (Bankr. S.D. Ohio 1988) (finding that the standard of proof for insider and fiduciary claimants is material evidence of unfair conduct).  Because "an

insider's conduct is rigorously scrutinized," *In re Autobacs Strauss, Inc.,* 473 B.R. 525, 582 (Bankr. D. Del. 2012), the Debtors "need not plead inequitable conduct with the level of particularity required for an outsider," *In re Advance Nanotech, Inc.,* 2014 WL 1320145, at *8 (Bank. D. Del. Apr. 2, 2014).

80.     Once the proponent of subordination comes forward with material evidence of unfair conduct, the burden shifts to the insider or fiduciary claimant to demonstrate the fairness of his conduct.  *See Mid-Am. Waste Sys., Inc.*, 284 B.R. at 69.  The burden on the fiduciary is not only to prove the good faith of its conduct but also to show the inherent fairness from the point of view of the corporation and those with interests therein.  *See id.*

81.     Courts have generally recognized three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego. *See Mid-Am. Waste Sys., Inc.*, 284 B.R. at 70; *Roberts v. Geremia (In re Roberts, Inc.)*, 15 B.R. 584, 586 (Bankr. D.R.I. 1981) (holding that the claimant's criminal activities constituted inequitable conduct justifying equitable subordination).  To qualify as inequitable conduct, the insider or fiduciary creditor must have used its power to control the debtor or its position of trust with the debtor to its own advantage or to the other creditors' detriment.  *See Mid-Am. Waste Sys., Inc.*, 284 B.R. at 70; *Roberts*, 15 B.R. at 586 ("A bankruptcy court can equitably subordinate a creditor's claim where that creditor has breached a fiduciary duty resulting in detriment to other creditors.").

82.     Under the second prong of an equitable subordination analysis, the Court must determine whether the claimant's inequitable conduct either (i) created some unfair advantage for the claimant **or** (ii) harmed the debtor or its creditors.  *See Mid-Am. Waste Sys., Inc.*, 284

22

B.R. at 71 ("This standard is stated in the disjunctive so only either unfair advantage or harm must be established.") (emphasis added).  The second prong of the analysis is satisfied if the party seeking equitable subordination demonstrates that the claimant's conduct has harmed the debtor or its other creditors that will benefit from the subordination of the claim.  *See id. see also Machinery Rental, Inc. v. Herpel (In the Matter of Multiponics, Inc.)*, 622 F.2d 709, 720 (5th Cir. 1980) ("actual fraud need not be shown for equitable subordination").  Any alleged good faith on the part of the claimant will not negate the harm sustained by the debtor or its creditors.  *See Multiponics, Inc.*, 622 F.2d at 720.

83.     An injury to the debtor caused by a claimant's inequitable conduct in reasonable proximity to bankruptcy or while the corporation is in financial distress decreases the likelihood of the recovery of claims by general creditors, and thus injures them.  *See Mid-Am. Waste Sys., Inc.*, 284 B.R. at 71; *In re 80 Nassau Assocs.*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994) ("If the misconduct results in harm to the entire creditor body, the objecting party need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner.")  There is no requirement that the misconduct or the harm it causes is a major cause of the debtor's bankruptcy.  *See id.*

84.     Full quantification of the harm caused by the insider's inequitable conduct is not required. *See Mid-Am. Waste Sys., Inc.*, 284 B.R. at 72.  Nor does the burden of providing the evidence of the amount of harm fall fully on the proponent of subordination.  *See id.*  Rather, once the proponent establishes that the inequitable conduct caused substantial harm to the debtor or its creditors, the burden shifts to the claimant who engaged in the inequitable conduct to demonstrate that the (i) harm caused was discrete in nature and (ii) the court can determine the amount of harm done without undue complication. *See id.*; *In re Westgate-California Corp.*, 642

23

F.2d 1174, 1178 (9th Cir. 1981) (finding that the court need not engage in extensive litigation to determine the extent of damages caused by claimant's inequitable conduct).

85.     Under the third prong of a section 510(c) analysis, the Court must determine whether the subordination of a particular claim is consistent with the Bankruptcy Code.  *See Mid-Am. Waste Sys., Inc.*, 284 B.R. at 73.  This prong is satisfied if subordination is consistent with the basic goal of equality of distribution in bankruptcy.  *See id.*  A claimant whose inequitable conduct has harmed other creditors has skewed the prospects for equal distribution, and subordination corrects this.  *See Hovis v. Powers Constr. Co., Inc. (In re Hoffman Assocs., Inc.)*, 194 B.R. 943, 966 (Bankr. D.S.C. 1995).

86.     Based on the foregoing, there can be no question here that the Milton Claim should be equitably subordinated under section 510(c) of the Bankruptcy Code.  At all relevant times, Milton was a statutory insider of the Debtors.  *See In re Furniture Factory Ultimate Holding, L.P.*, 2023 WL 5662747, at *31 (Bankr. D. Del. Aug. 31, 2023) ("For the purposes of a claim for equitable subordination, a party is an insider if it . . . meets the statutory definition of insider.").  Specifically, and as described in more detail above, Milton was an officer or director of the Debtors under 11 U.S.C. § 101(31)(B)(i)-(ii).  Furthermore, Milton was a "person in control" of the Debtors under 11 U.S.C. § 101(31)(B)(iii) because he had the ability to (and did in fact) exercise control over the day-to-day operations of the Debtors.

87.     As evidenced by the Federal Conviction (which the Pardon does not negate) and detailed in the Milton Award, Milton engaged in flagrant, repeated inequitable conduct by making misleading, deceptive, and false statements to the general public about Nikola's products and technology.  As determined by the Milton Award, Milton breached his fiduciary duties to Nikola "through his pattern of false and misleading public statements about [Nikola] and by

4924-7436-6040.v5

subverting all efforts by individuals . . . to review and approve Milton's public statements in advance." Milton Award, at 57. In addition to breaching his fiduciary duties of loyalty and good faith, Milton engaged in criminal conduct that resulted in the Indictment and ultimately the Federal Conviction.

88.     Furthermore, Milton's criminal and inequitable conduct is not absolved by the Pardon. *See United States v. Noonan*, 906 F.2d 952, 958 (3d Cir. 1990) ("A pardon does not 'blot out guilt' nor does it restore the offender to a state of innocence in the eye of the law"). A pardon does not obliterate the crime itself. *See Lettsome v. Waggoner*, 1986 WL 1267671, at *4 (Terr. V.I. July 25, 1986), *aff'd*, 672 F. Supp. 858 (D.V.I. 1987); *United States v. Flynn*, 507 F. Supp. 3d 116, 136-37 (D.D.C. 2020) (a pardon, "standing alone," "does not necessarily render 'innocent' a defendant of any alleged violation of the law"). The Federal Conviction remains and the record of that fact may be used as evidence notwithstanding a subsequent pardon. *See id.* A pardon implies forgiveness and not forgetfulness. *See id.*; *see also Burdick v. United States*, 236 U.S. 79, 94 (1915) ("a pardon . . . carries an imputation of guilt; acceptance a confession of it").

89.     Moreover, Milton has continued his inequitable conduct throughout the pendency of the Chapter 11 Cases, as demonstrated by his misrepresentations regarding the Nikola Arbitration Appeal. Milton was fully aware that the Nikola Arbitration Appeal was not stayed by the automatic stay in these Chapter 11 Cases when he filed the Stay Relief Motion to re-initiate the Milton Arbitration Proceeding, which has been dormant since October 2022. In fact, Milton filed his opening brief in the Nikola Arbitration Appeal **three days** before filing his Stay Relief Motion, in which Milton asserts stay relief was necessary to proceed with the Nikola Arbitration Appeal. Furthermore, the Ninth Circuit issued the Ninth Circuit Stay Denial Order,

which confirmed the Nikola Arbitration Appeal was not subject to the automatic stay. Milton's Stay Relief Motion was a bald-faced attempt to further delay the administration of the Chapter 11 Cases to the detriment of the Debtors' unsecured creditors.

90. Milton's inequitable conduct caused a landslide of litigation against the Debtors (as further described in the First Day Declaration), an SEC investigation that resulted in the SEC Claim, and the Debtors' ultimate financial destruction. The excessive and unreasonable legal fees requested by Milton in the Milton Fee Arbitration, in addition to the cost of litigating the Milton Fee Arbitration, further deteriorated the Debtors' financial condition. Milton's inequitable conduct also harmed the Debtors' creditor body and thousands of investors that relied on Milton's deceptive statements while investing in the Debtors. As discussed herein, following publication of the Hindenburg Report and Milton's resignation on September 20, 2020, Nikola's stock price dropped by approximately 43%, resulting in substantial losses to Nikola's investors and the Debtors. Milton thus engaged in inequitable conduct that resulted in injury to the Debtors and its creditors.

91. Equitably subordinating the Milton Claim, and any other claims asserted by Milton against the Debtors, is consistent with the provisions of the Bankruptcy Code. The Bankruptcy Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by Milton against the Debtors are subordinated pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code. No funds which would otherwise be paid to General Unsecured Claims in Class 3 should be paid to Milton.

92. Additionally, Milton should not be permitted to setoff any of his claims against the Debtors pursuant to 11 U.S.C. § 553. Setoff is an equitable doctrine codified by section 553

of the Bankruptcy Code.  Section 553 does not create a right to setoff, but merely recognizes and preserves setoff rights that may exist under other applicable law.  Further, a creditor's right of setoff is not mandatory but is permissive based on the underlying facts of the claim and debt giving rise to the request for setoff.  *See In re Rooster, Inc.*, 127 B.R. 560, 569 (E.D. Pa. 1991).  Generally, courts will disallow an otherwise valid right to setoff in "compelling circumstances," where the creditor has committed inequitable, illegal, or fraudulent acts, or the application of setoff would violate public policy.  *See In re Szymanski*, 413 B.R. 232, 243 (Bankr. E.D. Pa. 2009) (citing *In re Whimsy Inc.*, 221 B.R. 69, 74 (S.D.N.Y. 1998) and *In re Cascade Roads, Inc.*, 34 F.3d 756, 766 (9th Cir. 1994)).  While the Debtors dispute that Milton has a valid right of setoff given that, based upon the findings of bad faith and intentional wrongdoing in the Milton Award and the Federal Conviction, he is not entitled to indemnification under the Indemnification Agreement, assuming *arguendo*, that the Milton Claim is eligible for setoff, allowing Milton to setoff any portion of his claims against the Debtors would reward Milton for his inequitable conduct and impart an unfair advantage on Milton to the detriment of General Unsecured Claims in Class 3.

93.      Accordingly, the Milton Claim, and any future claims asserted by Milton, should be equitably subordinated to General Unsecured Claims in Class 3 pursuant to section 510(c) and classified as an Equitably Subordinated Claim in Class 8 under the Liquidating Plan.

## ALTERNATIVELY, SECTION 502(B) REQUIRES THAT THE MILTON CLAIM BE DISALLOWED

94.      In the alternative to equitable subordination, the Debtors object to allowance of the Milton Claim in its entirety.

4924-7436-6040.v5

A.      **The Milton Claim Should be Disallowed Because It Is Facially Invalid**

95.      Section 502(a) of the Bankruptcy Code provides, in pertinent part, that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  When asserting a proof of claim against a bankrupt estate, a claimant must allege facts that, if true, would support a finding that the debtor is legally liable to the claimant.  *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). Once an objection to a claim is filed, the Court, after notice and a hearing, shall determine the allowed amount of the claim.  *See* 11 U.S.C. § 502(b).  Section 502(b)(1) of the Bankruptcy Code provides, in part, that a claim may not be allowed to the extent that it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).

96.      While a properly filed proof of claim is *prima facie* evidence of the claim's allowed amount, when an objecting party rebuts a claim's *prima facie* validity, the claimant bears the burden of proving the claim's validity by a preponderance of evidence.  *See In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173-74 (3d Cir. 1992).  In practice, the objecting party must produce evidence that would refute at least one of the allegations essential to the claim's legal sufficiency.  *See id.*  Once the objecting party produces such evidence, the burden shifts back to the claimant to prove the validity of his or her claim by a preponderance of the evidence.  *See id.* The burden of persuasion with respect to the claim is always on the claimant.  *See Payne v. Lampe* (*In re Lampe),* 665 F.3d 506, 514 (3d Cir. 2011).

97.      The Milton Claim represents amounts allegedly owing to Milton pursuant to the Separation Agreement and the Indemnification Agreement.  The $69,758,064.15 asserted by Milton purports to be comprised of amounts allegedly paid to an extensive list of professionals.

28

98.     Milton provided no supporting documents for the amounts asserted in the Milton Claim.  The dearth of supporting documents in the Milton Claim prohibits the Debtors from properly evaluating the veracity of the amounts sought.  The Debtors (and the Committee) have requested invoices and confirmation of payment for the amounts asserted in the Milton Claim but have received no supporting documents as of the filing of this Memorandum and Objection.  The Milton Claim should thus be disallowed on this basis alone for lack of substantiation.  The Debtors reserve their right to supplement and/or amend this Memorandum and Objection upon the production of supporting documents by Milton.

99.     In addition, pursuant to section 502(b)(1) of the Bankruptcy Code, the Milton Claim is unenforceable against the Debtors based on the Milton Award and the Federal Conviction, which confirm that Milton failed to act in good faith and engaged in intentional wrongdoing.  *See* Milton Award, at 59 ("on the record before us, we could not conclude [Milton] acted in "good faith" and in a manner that he ***reasonably*** believed to be in or not opposed to the best interests of Nikola.  Accordingly, there is no basis for Milton to receive indemnification.") (emphasis in original).[6]

100.     Additionally, the Milton Claim includes amounts for (1) Milton's personal lawyer (Curtis Tuttle PLC), (2) an unknown "Consulting" firm, and (3) Milton's legal expenses related to the Milton Award, none of which Milton is entitled to under the now void Indemnification Agreement.

101.     Upon information and belief, the Milton Claim also includes duplicative claims for the Advanced Fees and amounts that were previously determined in the Milton Fee

---

[6]     Nikola's request in the Nikola Breach of Duty Arbitration Proceeding to recover ███████████████ ██████████████████████████████████████████████ was denied without prejudice to resolution of such issue in the Milton Fee Arbitration following final resolution of the Federal Conviction.  *See* Milton Award at 77-83.

4924-7436-6040.v5

Arbitration to be unreasonable and therefore not subject to reimbursement/advancement. Accordingly, even if the Debtors were somehow obligated to indemnify Milton, which they are not, the Milton claim is grossly overstated. The Milton Claim appears to include $36,844,896.65 in fees previously advanced to Milton in the Milton Fee Arbitration and nearly $17 million of fees and expenses for Cahill Gordon & Reindel LLP, previously found to be unreasonable and therefore disallowed in the Milton Fee Arbitration.

102.    The burden of persuasion for claims brought in bankruptcy always rests with the claimant. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992). In view of the facts set forth herein, Milton has not and cannot set forth sufficient facts to prove that the Milton Claim should be allowed.

103.    As such, in the event that this Court does not grant the relief sought by the Debtors above, the Milton Claim should be disallowed entirely and/or reduced to reflect the Advanced Fees.

104.    The Debtors reserve any and all other defenses and rights to object to Milton's claims on any other grounds.

**B.    Milton is Precluded from Relitigating His Indemnification Rights (or Lack Thereof) Under the Indemnification Agreement**

105.    Milton's claims for indemnification in connection with the Nikola Breach of Duty Arbitration Proceeding against the Debtors under the Indemnification Agreement or Separation Agreement are precluded by the Milton Award. The Milton Award unequivocally determined that Milton is **not** entitled to indemnification under the Indemnification Agreement due to the breach of his fiduciary duties and unreasonable actions. *See* Milton Award, at 58-59.[7]

---

[7]    Nikola's request in the Nikola Breach of Duty Arbitration Proceeding ███████████████ ██████████████████████████████████████████████████ was denied without

106.    Collateral estoppel, otherwise known as issue preclusion, means a party cannot relitigate issues already decided in a prior lawsuit.  *See In re Docteroff*, 133 F.3d 210, 214 (3d Cir. 1997); *In re Zohar III, Corp.*, 620 F. Supp. 3d 147, 154 (D. Del. 2022).  Collateral estoppel applies "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."  *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006).

107.    In applying collateral estoppel, courts look to whether (1) the issue sought to be precluded is the same as the one involved in the prior action, (2) it was actually litigated, (3) it was determined by a valid and final judgment, and (4) that determination was essential to the prior judgment. *See  Zohar III Corp.*, 620 F. Supp 3d at 154 (citing *Docteroff*, 133 F.3d at 214).

108.    Similarly, claim preclusion, or true *res judicata*, requires a showing that there has been (1) a final judgment on the merits in a prior suit involving (2) the same claim and (3) the same parties or their privies.  *See E.E.O.C. v. U.S. Steel Corp.*, 921 F.2d 489, 494 (3d Cir. 1990).

109.    The Milton Award is a final judgment for issue and claim preclusion purposes. *See Teamsters Local 177 v. UPS*, 966 F.3d 245, 251 (3d Cir. 2020) ("[o]nce confirmed, an arbitration award becomes a judgment of the court, entitled to the same force and effect, in all respects, as, and…subject to all the provisions of law relating to, a judgment in [any other] action.").  Further, the pendency of the Nikola Arbitration Appeal does not affect the preclusive nature of the Milton Award.  *See United States v. 5 Unlabeled Boxes*, 572 F.3d 169, 175 (3d Cir. 2009) ("[t]he pendency of an appeal does not affect the potential for res judicata flowing from an otherwise-valid judgment").

---

prejudice to resolution of such issue in the Milton Fee Arbitration following final resolution of the Federal Conviction. *See* Milton Award at 77-83.

110.    The parties vigorously litigated the enforceability of the Indemnification Agreement during the Nikola Breach of Duty Arbitration Proceeding, which resulted in the Milton Award that was affirmed by the Confirmation Petition and Amended Judgment.

111.    Despite the Milton Award, Milton now seeks to relitigate his indemnification rights under the Indemnification Agreement through the Milton Claim.  The identical issue of enforceability of the Indemnification Agreement was previously litigated in the Nikola Breach of Duty Arbitration Proceeding.  Milton now seeks a proverbial "second bite at the apple" by filing a proof of claim in the Chapter 11 Cases seeking enforcement of the Indemnification Agreement.

112.    Accordingly, the Milton Claim, and any future claims asserted by Milton against the Debtors stemming from the Indemnification Agreement or Separation Agreement are precluded by the Milton Award.

## RESERVATION OF RIGHTS

113.    The Debtors hereby reserve their right to amend, modify and/or supplement this Memorandum and Objection, including to object to the Milton Claim on any grounds, and nothing in this Memorandum and Objection shall affect the Debtors' right to object to the Milton Claim at a future date on a basis other than as set forth in this Memorandum and Objection as permitted by bankruptcy or non-bankruptcy law, subject to any limitations set forth in the Local Bankruptcy Rules.

## NOTICE

114.    Notice of the filing of this Memorandum and Objection will be provided to: (i) the Office of the U.S. Trustee for the District of Delaware; (ii) any party that has requested notice pursuant to Bankruptcy Rule 2002; (iii) counsel to the Committee, Morrison & Foerster and Morris James; and (iv) counsel to Milton.  A copy of this Memorandum and Objection has been made available on the website of the Debtors' notice and claims agent, Epiq, at

https://dm.epiq11.com/Nikola.  In light of the nature of the relief requested herein, the Debtors

submit that no other or further notice is necessary.

## **CONCLUSION**

      **WHEREFORE**, the Debtors respectfully submit that the Court should order that

the Milton Claim be subordinated pursuant to section 510(c) of the Bankruptcy Code and

classified in Class 8 of the Liquidating Plan, or in the alternative, enter the Order, substantially in

the form attached hereto as **Exhibit B**, disallowing the Milton Claim its entirety.

*[Signature Page Follows]*

4924-7436-6040.v5

Dated: July 29, 2025
      Wilmington, Delaware

Joshua D. Morse, Esq.
Jonathan R. Doolittle, Esq.
**PILLSBURY WINTHROP SHAW
PITTMAN LLP**
Four Embarcadero Center, 22nd Floor
San Francisco, California 94111-5998
Telephone: (415) 983-1000
Facsimile: (415) 983-1200
Email: joshua.morse@pillsburylaw.com
      jonathan.doolittle@pillsburylaw

-and-

Andrew V. Alfano, Esq.
Chazz C. Coleman, Esq.
**PILLSBURY WINTHROP SHAW
PITTMAN LLP**
31 West 52nd Street
New York, New York 10019
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
Email: andrew.alfano@pillsburylaw.com
      chazz.coleman@pillsburylaw.com

Respectfully submitted,

*/s/ Shannon A. Forshay*
M. Blake Cleary (No. 3614)
Brett M. Haywood (No. 6166)
Maria Kotsiras (No. 6840)
Shannon A. Forshay (No. 7293)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: bcleary@potteranderson.com
      bhaywood@potteranderson.com
      mkotsiras@potteranderson.com
      sforshay@potteranderson.com

*Counsel to the Debtors and Debtors in Possession*

4924-7436-6040.v5