## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Nikola Corp., *et al.*,[1] | : | Case No. 25-10258 (TMH) |
| | : | (Jointly Administered) |
| Debtor. | : | |
| | : | **Hearing Date: September 5, 2025 at 10:00 AM ET** |
| | : | **Objection Deadline: August 20, 2025 at 4:00 PM ET** |
| | : | |
| | : | **Re: D.I. 726, 774** |

## UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF DEBTORS' FIRST AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION

In support of his objection to the *Debtors' First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation* [D.I. 726] (the "Combined Plan"), Andrew R. Vara, the United States Trustee for Regions 3 and 9 ("U.S. Trustee"), by and through his undersigned counsel, states:

## PRELIMINARY STATEMENT

1.    In contravention of United States Supreme Court precedent and applicable state law, the Combined Plan extracts non-consensual third-party releases from entities who do not opt out (together, the "Proposed Releasors"). But opt-out procedures do not supply the affirmative consent required under state law. The injunction in the Combined Plan also prevents holders of

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Nikola Corporation (registered to do business in California as Nikola Truck Manufacturing Corporation) (1153); Nikola Properties, LLC (3648); Nikola Subsidiary Corporation (1876); Nikola Motor Company LLC (0193); Nikola Energy Company LLC (0706); Nikola Powersports LLC (6771); Free Form Factory Inc. (2510); Nikola H2 2081 W Placentia Lane LLC (N/A); 4141 E Broadway Road LLC (N/A); and Nikola Desert Logistics LLC (N/A). The Debtors' headquarters are located at 4141 East Broadway Road, Phoenix, AZ 85040.

allowed claim or equity interests from pursuing their claims against Released Parties and Exculpated Parties. For these reasons, the Combined Plan should not be confirmed.

## JURISDICTION AND STANDING

2.      Under (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2), this Court has jurisdiction to hear and determine confirmation of the Combined Plan and this objection.

3.      Pursuant to 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District.  Such oversight is part of the U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").[2]

4.      Specifically, in accordance with 28 U.S.C. § 586(a)(3) and, more specifically, 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee is charged with the duties and obligations of supervising the administration of cases and trustees in Chapter 11 cases, monitoring plans and disclosure statements filed in Chapter 11 cases, and filing with the Court comments with respect to such plans and disclosure statements in connection with hearings under sections 1125 and 1128.

5.      Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the Combined Plan.  *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest).

---

[2]  *See* H.R. Rep. No. 595, 95th Cong., 2d Sess. 88 (1977) (United States Trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena.").

## **BACKGROUND**

6.     On February 19, 2025, the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

7.     The same day, the Debtors filed a motion to approve bidding procedures to sell substantially all the Debtor's assets. [D.I 15].

8.     On February 27, 2025, the U.S. Trustee appointed the Committee of Unsecured Creditors. [D.I. 96].

9.     After incorporating the various parties requested changes, the order approving the bidding procedures was entered on March 3, 2025. [D.I. 133].  On April 11, 2025, three orders approving the sale of certain of the Debtors' assets were entered. [D.I. 404, 407 and 408].

10.     On June 23, 2025, the Debtors filed the combined plan and disclosure statement and the Solicitation Motion.

11.     Thereafter, the U.S. Trustee provided informal comments regarding the Solicitation Motion and the combined plan and disclosure statement, and the Debtors agreed to make a number of changes that resolved most issues. On July 11, 2025, the U.S. Trustee filed an objection (the "U.S. Trustee Solicitation Objection") to the Solicitation Motion on the grounds on the grounds that the combined plan and disclosure statement should not be confirmed as it imposed nonconsensual releases on third parties who do not check the "opt-out" box on the Ballot. [D.I. 695]. On July 17, 2025, the Debtors filed the Combined Plan incorporating some of the U.S. Trustee's and other parties' requested changes.

12.     After a hearing on the Solicitation Motion, on July 22, 2025, the Court determined that the issues raised in the U.S. Trustee Solicitation Objection were reserved for the confirmation hearing on the Combined Plan and entered the *Order (I) Granting Interim Approval of the*

3

*Adequacy of Disclosures in the Combined Plan and Disclosure Statement; (II) Scheduling a Combined Confirmation Hearing and Setting Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Forms of Ballots and Notices; and (V) Granting Related Relief.* [D.I. 780 (as amended)].

13.     Article XII.B of the Combined Plan seeks to impose third-party releases on each Releasing Party for all "Causes of Action" against any of the Released Parties.

14.     Article XII.D of the Combined Plan also enjoins all entities who hold any cause of action, claim or equity interest from pursuing any action against the Released Parties and Exculpated Parties, specifically stating "Each holder of an Allowed Claim or Allowed Equity Interest shall be deemed to have specifically consented to the injunctions set forth herein."

15.     In Article I.A of the Combined Plan, "Releasing Party" is defined as follows:

(a) all holders of Claims who are sent a Ballot and do not timely elect to opt-out of the releases provided by the Plan in accordance with the Solicitation Procedures; (b) each Related Party of each Entity in clause (a) of this definition; and (c) each Released Party (other than the Debtors, the Liquidating Trust, and the Liquidating Trustee); provided, however, that, for the avoidance of doubt and notwithstanding anything to the contrary herein, "Releasing Party" shall not include (i) Trevor Milton and any entity that Trevor Milton directly or indirectly owns, holds, or controls any equity in, or any prior or future transferee of property directly or indirectly owned, held, or controlled by Trevor Milton; (ii) any other party to a Preserved Estate Claim; (iii) all other professionals, advisors, and attorneys advising the Debtors prior to the Petition Date other than those specifically identified in clauses (c) through (g) of the definition "Released Party" in Article I.A. of this Plan; and (iv) the D&Os, including any Other Director and Officer, other than the Remaining Officers.

16.     In Article I.A of the Combined Plan, "Released Party" is defined as follows:

(a) all holders of Claims who are sent a Ballot and do not timely elect to opt-out of the releases provided by the Plan in accordance with the Solicitation Procedures; (b) each Related Party of each Entity in clause (a) of this definition; and (c) each Released Party (other than the Debtors, the Liquidating Trust, and the Liquidating Trustee); provided, however, that, for the avoidance of doubt and notwithstanding anything to the contrary herein, "Releasing Party" shall not include (i) Trevor Milton and any entity that Trevor Milton directly or indirectly owns,

4

holds, or controls any equity in, or any prior or future transferee of property directly or indirectly owned, held, or controlled by Trevor Milton; (ii) any other party to a Preserved Estate Claim; (iii) all other professionals, advisors, and attorneys advising the Debtors prior to the Petition Date other than those specifically identified in clauses (c) through (g) of the definition of "Released Party" in Article I.A. of this Plan; (iv) the D&Os, including any Other Director and Officer, other than the Remaining Officers; and (v) LG. For the avoidance of doubt, the Unsecured Notes Indenture Trustee is a Releasing Party solely in its capacity as indenture trustee under the Unsecured Notes Indentures and not individually or in any other capacity.

17. In Article I.A of the Combined Plan, "Causes of Action" is defined as follows:

any claims, Claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of state, federal, or other law. For the avoidance of doubt, "Causes of Action" includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Equity Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

## ARGUMENT

**A. The Combined Plan Cannot Be Confirmed Because the Releases Are Not Consensual.**

16. The Supreme Court held in *Harrington v. Purdue Pharma L.P.* that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual releases of, or injunctions barring, claims between them. 603 U.S. 204, 209, 227 (2024). The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *Id*. at 226.

17. A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law. As the Supreme Court recognized in *Purdue*, a release is a type

of settlement agreement.  *Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (internal quotations omitted).  A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for consensual release is the agreement itself, not the Bankruptcy Code.  If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish property rights.  Here, there is no existing release agreement between non-debtors.  Debtors instead seek a confirmation order that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent.  Such a confirmation order would impermissibly alter the relations between non-debtors because a valid release does not exist under nonbankruptcy law.

18.     Three inconsistent tests have been suggested for determining whether a third-party release included in a bankruptcy court order is consensual: (1) it is only consensual when there is valid consent under applicable state contract law[3]; (2) parties who do not opt out can be deemed to have consented because class-action settlements are binding on those who do not opt out[4]; and (3) parties can be deemed to have consented the same way that a litigant may forfeit rights by failing to timely respond in litigation.[5]

---

[3] *See, e.g., In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024); *Emerge Energy Services, LP,* No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019); *In re Digital Impact, Inc.*, 223 B.R. 1, 14-15 (Bankr. N.D. Okla. 1998); *In re Arrowmill Dev. Corp.,* 211 B.R. 497, 507 (Bankr. D.N.J. 1997).

[4] *See, e.g., In re Robertshaw US Holding Corp.,* 662 B.R. 300, 323 n.120 (Bankr. S.D. Tex. 2024).

[5] *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re LATAM Airlines Grp. SA*, 2022 WL 2206829, at *46 (Bankr. S.D.N.Y. June 18, 2022); *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022).

19.     The first test is the correct one.  State law governs whether non-debtors have agreed

to release each other.  Nothing in the Bankruptcy Code allows parties to disregard state law when

debtors seek to impose third-party releases in their plans.  Under Delaware law, as in other states,

silence is not acceptance of an offer other than in limited circumstances inapplicable here. Debtors

thus cannot deem those who failed to opt out as having released claims because those claimants

have not agreed to the third-party release under state law.

## B.      State Contract Law Applies.

20.     "[T]he basic federal rule in bankruptcy is that state law governs the substance of

claims."  *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451

(2007) (internal quotations omitted); *accord Butner v. United States*, 440 U.S. 48 (1979).  Thus,

courts apply state law when the question is whether a debtor has entered a valid settlement

agreement.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995)

("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled

by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845

(Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that

settlement agreements in pending bankruptcy cases are considered contract matters governed by

state law.").

21.     The rule is no different for third-party releases.  They are separate agreements

between non-debtors governed by state law.   Unlike a bankruptcy discharge, which "is an

involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is

released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do*

*so*."  *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in

original).  *See also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental*

*Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority"). Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *Arrowmill*, 211 B.R. at 507.

22.     Because the Bankruptcy Code does not authorize the imposition of an involuntary release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law. There is no Bankruptcy Code provision that preempts otherwise applicable state contract law governing releases between non-debtors. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). Section 105(a), for example, "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted). But the Code does not confer any authority to impose a release of claims between non-debtors that would not be valid under state law. The Bankruptcy Code does not define a "consensual release." *See* 11 U.S.C. § 101. "There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). And no Code provision authorizes bankruptcy courts to deem a non-debtor to have consented to release claims against other non-debtors where such consent would not exist as a matter of state law.

23.     Some courts have held that federal law (rather than state law) applies to determine whether a third-party release is consensual.  But because there is no applicable Code provision, whether a non-debtor has consented to release another non-debtor is not, as one court concluded, a "matter of federal bankruptcy law." *In re Spirit Airlines, Inc.*, 668 B.R. 689, 716 (Bankr. S.D.N.Y 2025); *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of the Bankruptcy Code). Absent express authority in the Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims.  Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).  Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." *Erie*, 304 U.S. at 79 (internal quotations omitted); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return).  Courts thus may not invent their own rule for when parties may be "deemed" to have given up property rights by releasing claims.

24.     Accordingly, state-law contract principles govern whether a third-party release is consensual.  *See, e.g.*, *Patterson v. Mahwah Bergen Ret. Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that

would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original). Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp*., 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223). And "any such consensual agreement would be governed by state law." *Id.*

25. Even if federal law applied, however, it would not lead to a different result. That is because "federal contract law is largely indistinguishable from general contract principles under state common law." *Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344, 354 (5th Cir 2015) (internal quotations omitted); *see Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)).

## C.    Under State Law, Silence Is Not Acceptance.

26. The Debtor bears the burden to prove that their plan is confirmable. *See In re American Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012). They have not met this burden because they have failed to establish that the third-party release is consensual under applicable

10

state law. Under Delaware law, like in other states, an agreement to release claims—like any other contract—requires a manifestation of assent to that agreement.[6] *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."); *see also In re Hertz Corp.*, 120 F.4th 1181, 1192 (3d Cir. 2024) ("Contract law does not bind parties to promises they did not make."); *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018) ("Under Delaware law, overt manifestation of assent . . . controls the formation of a contract.") (internal quotations omitted).

27.     Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."[7] RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); *see Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent

---

[6] Section 19.17 of the Plan provides that Delaware state law applies. Although a plan's choice of law is not controlling for relations between non-debtors, the Court may apply Delaware law because no party has suggested that any other state's law applies. *See, e.g., Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits."). Nor has anyone suggested there would be a different outcome under the law of any other jurisdiction, so no choice of law is required. *See, e.g., In re Syntax-Brillian Corp.*, 573 F. App'x 154, 162 (3d Cir. 2014). Thus, the statement of one bankruptcy court that there is "no answer" to the choice of law question, *In re LaVie Care Cntrs., LLC*, No. 24-55507, 2024 WL 4988600, at *14 (Bankr. N.D. Ga. Dec. 5, 2024), is not true. Even if a choice of law had to be made, if such a choice is made difficult by the breadth of the third-party release that may be a reason not to approve the plan, but it is not an excuse to flout the court's obligation to make a choice of law if there is an actual conflict of laws. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985); *Cf. Patterson*, 636 B.R. at 669.

[7] Delaware, like many states, follows the Restatement (Second) of Contracts § 69. *See, e.g., Mack v. Mack*, No. 4240, 2015 WL 1607797, at *2 n.6 (Del. Ch. Mar. 31, 2015); *Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000); *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 52 (Tex. 2008); *The Levin Law Grp., P.C. v. Sigmon*, No. 14-08-01165-CV, 2010 WL 183525, at *3 (Tex. App. 2010); *Texas v. Triax Oil & Gas, Inc.*, 966 S.W. 2d 123, 128 (Tex. App. 1998).

without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).

28.     There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent." *Patterson*, 636 B.R. at 686; *see, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer"). "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

29.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id.* And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c; *see Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

**D.     Failing to Opt Out Does Not Provide the Required Affirmative Consent.**

30.     The Combined Plan imposes a third-party release on any holder of a claim against Debtor who do not elect to "opt-out" by marking the appropriate box on their respective Ballot. In other words, Debtor purports to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed"

12

consent.  But under black-letter law that silence is not acceptance of the offer to release non-debtors.  *See, e.g.*, *Patterson*, 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

31.    A case from the Ninth Circuit illustrates the point.  In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), the court held that a failure to opt out did not constitute consent to an arbitration agreement.  A consumer bought a Samsung phone and signed the Verizon Wireless Customer Agreement.  *Norcia*, 845 F.3d at 1282. The phone came with a Samsung warranty brochure that contained an arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage.  *Id*.  The customer did not opt out.  *Id*.  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *Id*. at 1282-83.

32.    The Ninth Circuit in *Norcia* held that the customer's failure to opt out did not constitute consent to arbitrate.  The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer."  *Norcia*, 845 F.3d at 1284 (quotation marks omitted).  The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement."  *Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless.  "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply,

even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id*. at 1286 (quotation marks and citation omitted). The Ninth Circuit held that none of the exceptions to this rule applied. *Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *Id*. at 1286.

33.     Here, too, the Debtor's creditors have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

      ***i.***    ***Not Voting and Not Opting Out Is Not Consent to Release Non-Debtors.***

34.     The Combined Plan here would impose a third-party release on any party who is sent a ballot and does not opt out—meaning even those who do not actually vote the ballot. But third-party releases cannot be imposed on those who do not vote and do not opt out. *See Smallhold*, 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). There is no basis to infer consent by those who do not vote and are taking no action with respect to the plan.

35.     Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *SunEdison*, 576 B.R. at 458–61. Creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison*, 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence). Consent thus cannot be inferred from their silence

because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. c (1981). Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

36.     Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases.[8] *SunEdison*, 576 B.R. at 461. "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix*, 533 B.R. at 81.

37.     "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties — which belong to the creditor and not the bankruptcy estate — a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *Smallhold*, 665 B.R. at 721; *see id.* at 719-20 (discussing *Chassix*). "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent. *Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only

---

[8] Here, the Combined Plan and associated materials run to over 100 pages.

15

"[c]arelessness, inattentiveness, or mistake." *Id.* Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix*, 533 B.R. at 81–82.

> **ii.** **Voting on a Plan Plus a Failure to Opt Out Does Not Manifest Consent to a Non-Debtor Release.**

38.    Voting to accept a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). Voting to approve a plan plus a failure to opt out of a third-party release is nothing more than silence with respect to the offer to release claims against non-debtors. The act of voting on a chapter 11 plan without opting out is not conduct that "manifest[s] [an] intention that silence may operate as acceptance" of a proposal that the creditor release claims against non-debtors. *Id.* Impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan. 11 U.S.C. § 1126(a). Merely exercising that right does not manifest consent to release claims against non-debtors.

39.    Even more obviously, those who vote to reject the plan are not consenting to third-party releases by failing to mark an opt-out box. Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan. As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*" 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

### iii.    *Smallhold's Conclusion That Voting Plus a Failure to Opt Out Equals Consent to a Non-Debtor Release Is Incorrect.*

40.    One bankruptcy court has found that, in at least some circumstances, a failure to opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if they do not vote.  *See Smallhold,* 665 B.R. at 723.  Although stating it was applying "ordinary contract principles," *id.* at 724, the *Smallhold* decision did not correctly apply those principles to the question of when silence can constitute consent for those who vote on the plan.

41.    As an initial matter, the *Smallhold* court correctly recognized that a failure to opt out by those who do not vote does not constitute consent.  *See Smallhold*, 665 B.R. at 721-23.  The *Smallhold* court elucidated the point with a hypothetical: a chapter 11 plan requiring that any creditor that did not "check an 'opt out' box on a ballot . . . make a $100 contribution to the college education fund for the children of the CEO of the debtor."  *Id.* at 710.  As the court observed, "no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution."  *Id.*  None of the cases that allow imposing a non-debtor release based on a failure to opt out "provides any limiting principle that would distinguish the third-party release from the college education fund plan."  *Id.*

42.    Contract law likewise does not support imputing consent to a third-party release based on a failure to opt-out by those who vote on the plan.  Nevertheless, the *Smallhold* court incorrectly reasoned that because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-party release, failing to opt out binds the voter to the release.  *Smallhold,* 665 B.R. at 717, 723-724.  But while voting is an "affirmative step" with respect to the debtor's plan, it is not a "*manifestation of intention* that silence may operate as acceptance" of a third-party release.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added).

43.    "The mere receipt of an unsolicited offer does not impair the offeree's freedom of

action or inaction," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a—in this case, the federal right to vote on a chapter 11 plan. 11 U.S.C. § 1126(a). Nor does it "impose on him any duty to speak," RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an "opt-out" box. Voting on a plan while failing to opt out thus cannot be equated with affirmative conduct manifesting consent to the non-debtor release. Just like the hypothetical creditors in *Smallhold* could not be forced to contribute $100 to a college fund to benefit the debtor's CEO's children merely because they failed to return a ballot with an "opt-out" box, *Smallhold*, 665 B.R. at 710, creditors who cast such a ballot should not be forced to make such a contribution merely because they failed to check that "opt out" box.[9]

44.    State law affords no basis to conclude that consent to release *third-party* claims (which are governed by *nonbankruptcy* law) can properly be inferred from a party's failure to check an opt-out box on a ballot expressing its views about the proposed treatment of its claims against the *debtor* (governed by *bankruptcy* law). *See supra* Part B(ii). As a result, the "general proposition" that *Smallhold* recognized continues to apply: "creditors must *affirmatively express consent to the release* in order to be bound by it." *Id.* at 717 (emphasis added).

45.    Notably, the Ninth and Second Circuit cases cited by *Smallhold* do not support its conclusion that the act of voting on a chapter 11 plan while remaining silent regarding the non-debtor release constitutes consent. *Smallhold,* 665 B.R. at 724 n.60 (citing *Berman v. Freedom*

---

[9] The *Spirit* court concluded that "creditors entitled to vote who returned a ballot but did not check the opt-out box on that ballot also clearly manifested their consent to the Third-Party Releases." *In re Spirit Airlines, Inc.*, 668 B.R. at 720-21 (Bankr. S.D.N.Y 2025). That is wrong because an unsolicited offer of a third-party release cannot impose a duty to speak or impair the freedom to vote on a plan. Further, the *Spirit* court erred in assuming that the failure to check an opt-out box on a ballot necessarily shows that a creditor "affirmatively chose" not to check the box. *Id.* at 720. "When the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). A failure to check an opt-out box is equally consistent with inadvertence or lack of understanding.

*Fin. Network*, 30 F.4th 849, 856 (9th Cir. 2022); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).  Those cases emphasize that notice to the offeree is a prerequisite to consent "*regardless of apparent manifestation of his consent.*"  *Meyer*, 868 F.3d at 74 (internal quotation marks omitted; emphasis added).  But while notice of a contractual term is necessary for consent, notice alone is not sufficient.[10]  *See, e.g., Meyer*, 868 F.3d at 74; *Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  There must also be a manifestation of an intent to accept the offer.  *See, e.g., Berman*, 30 F.4th at 85; *Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  For the reasons discussed above, the failure to opt out of the third-party release is not such a manifestation of consent.

### E.   Opt Outs Cannot Be Imposed Based on a Procedural Default Theory.

46.   Applicable state contract law cannot be disregarded on a procedural default theory, applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[11]  *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at *5-*6 (Bankr. D. Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011).  These courts reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the

---

[10] For this reason, cases that rely solely on notice to conclude that there is consent to a third-party release are likewise off base. *See, e.g., In re Spirit Airlines, Inc.*, 668 B.R. 689, at 703-04, 706-07 (Bankr. S.D.N.Y Mar. 7, 2025) (collecting cases).

[11] Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines,* 668 B.R. at 714, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond, *id.* at 703-04, 706-07.

consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release. *Cf. Smallhold*, 665 B.R. at 708 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

47.     A fuller explanation of this theory was articulated prior to the *Purdue* ruling in *In re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022). The *Mallinckrodt* court stated that "the notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system." *Id*. "When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them." *Id*. at 879. The court reasoned that "[t]here is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization." *Id*.

48.     This is wrong. First, when a party in litigation is bound to a result based on a failure to timely respond, it is not because the defaulting party has *consented* to an adverse ruling. Rather, "failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right. *United States v. Olano*, 507 U.S. 725, 731 (1993). Forfeiture, unlike waiver, is not an intentional relinquishment of a known right. *Id*. at 733. *Cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default."). Forfeiture principles thus do not show consent. Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan. No one has submitted the released claims for adjudication by the bankruptcy court. *See Olano*, 507 U.S. at 731.

49.     And under *Purdue*, imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan. *See Purdue,* 603 U.S. at 215-227 & n.1; *see also Smallhold*, 2665 B.R. at 709 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."). It is therefore "no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Smallhold*, 665 B.R. at 719. The Supreme Court's *Purdue* decision rejected a fundamental premise of the procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *See Smallhold*, 665 B.R. at 708-09; *see also id*. at 708 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances. *Id*. at 717-18. As the *Smallhold* court explained, however, under the default theory, a plan's opt-out provision functions not as a method to secure consent but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *Id*. at 709; *see also id*. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way.  It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

50.     But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the

plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation. *Id*. at 709; *see also id*. at *722 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see also Thomson v. Wooster*, 114 U.S. 104, 113 (1885) (holding a decree *pro confesso* may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (internal quotations omitted).

51.     "[After *Purdue*], that is no longer the case in the context of a third-party release." *Smallhold*, 665 B.R. at 722.  A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."  *Id*.  "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment."  *Id*.  That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties.  Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release."  *Id*. at 719-20.

52.     Because *Purdue* establishes that a *non*consensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default."  *Id*. at 709.  And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny."  *Id*.  Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing

22

parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.[12]  Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required.  *Id*. at 720 (emphasis added).

**F.    There is No Legal Basis for the Injunction Barring Claims Against Non-Debtors.**

53.    This Court may not approve the injunction enforcing the third-party release by barring claims against non-debtors.  *Purdue* held that non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code.  *See Purdue*, 603 U.S. at 227.  As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and these cases are not asbestos-related.  *See id*. at 222 (citing 11 U.S.C. § 524(g)).

54.    Even if the third-party release was consensual, that would not mean that the court has authority to impose an injunction.  An injunction is critically different from a consensual non-debtor release.  The legal effect of a consensual release is based on the parties' agreement.  *See Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority").  The non-debtor parties themselves are altering their relations; the court is not using its judicial power to effect that change.  An injunction, by contrast, relies on the court's power to enter orders binding on parties.  The court must therefore have both constitutional and statutory authority to enter an injunction.  And, once such jurisdiction and authority are established, the

---

[12] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory.  *See id.* at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

court still must determine that an injunction is warranted.  But jurisdiction, authority, and a showing that injunctive relief is warranted are all absent here.

55.    The Bankruptcy Code contains no authority for an injunction barring claims between non-debtors.  Debtors cannot rely on section 105(a) for this authority because it "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted).  But nothing in the Code authorizes the court to use its judicial power to bar claims between non-debtors. *Id*. at 227.

56.    Finally, such an injunction is not warranted by the traditional factors that support injunctive relief.  A party seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see Purdue Pharma*, 144 S. Ct. at 2085 (noting that an injunction is an "extraordinary remedy"); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1119 (3d Cir. 1989) ("We have long followed the principle that equitable remedies are available once legal remedies are found to be inadequate.") (citing *Weinberger*).

57.    Debtors have not shown that any of these factors are met.  There is no imminent threat that anyone is going to bring suit on a released claim.  And if a released claim is brought, the release may be asserted as an affirmative defense.  An injunction is "unavailable absent a

24

showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again – a likelihood of substantial and immediate irreparable injury." *L.A. v. Lyons*, 461 U.S. 95, 111 (1983) (internal quotations omitted). Further, the injunction harms those bound by it because it precludes them from challenging the applicability or enforceability of the third-party release (e.g., based on mistake or lack of capacity) under applicable non-bankruptcy law.

### G.    The Court Should Not Waive the Rule 3020 Stay

58.    The U.S. Trustee objects to the request to shorten the 14-day stay imposed by Federal Rule of Bankruptcy Procedure 3020(e), which provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).  The Committee Notes explain that subsection (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot."  *Id*.

59.    Plan proponents frequently include stay waiver provisions to invoke the doctrine of "equitable mootness" as a sword to evade appellate review.  *See In re Chemtura Corp*. No. 09–11233, 2010 WL 4607822, at *1 (Bankr. S.D.N.Y. Nov. 3, 2010).  Courts, however, should be "wary of wholly denying any party at least an opportunity to seek a stay to avoid the mooting of its appeal" in deciding whether to waive Rule 3020(e)'s 14-day stay.  *Id.*; *see also In re Adelphia Comm. Corp*., 368 B.R. 140, 282 (Bankr. S.D.N.Y. 2007) (denying request to waive automatic stay because "fairness to [objecting creditors] . . . requires that I not take an affirmative step that would foreclose all opportunities for judicial review").  "An orderly bankruptcy process depends on a concomitantly efficient appeals process," *In re Syncora Guarantee Inc*., 757 F.3d 511, 517

(6th Cir. 2014) (citations omitted), and a waiver of the 14-day stay undermines this goal by forcing parties to seek an emergency stay.

60.　The Debtors have presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review. The Court should thus deny their request to waive Rule 3020(e)'s stay.

### RESERVATION OF RIGHTS

61.　The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights to (i) amend or supplement this Objection and/or (ii) conduct discovery.

**WHEREFORE,** the U.S. Trustee respectfully requests that this Court deny confirmation of the Combined Plan and grant such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

**By:** ___*/s/ Megan Seliber*___
　　Megan Seliber
　　Timothy Fox
　　Trial Attorneys, U.S. Trustee's Office
　　J. Caleb Boggs Federal Building
　　844 King Street, Suite 2207, Lockbox 35
　　Wilmington, DE 19801
　　(302) 573-6026; timothy.fox@usdoj.gov
　　(202) 567-1480; megan.seliber@usdoj.gov

Dated: August 20, 2025