**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Nikola Corp., *et al.*,[1] | Case No. 25-10258 (TMH) |
| Debtors. | (Jointly Administered) |

## SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF NIKOLA CORPORATION AND ITS DEBTOR AFFILIATES

Joshua D. Morse, Esq.
Jonathan Doolittle, Esq.
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Four Embarcadero Center, 22nd Floor
San Francisco, California 94111-5998
Telephone: (415) 983-1000
Facsimile: (415) 983-1200
Email: joshua.morse@pillsburylaw.com
           jonathan.doolittle@pillsburylaw.com

-and-

Andrew V. Alfano, Esq.
Chazz C. Coleman, Esq.
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
31 West 52nd Street
New York, New York 10019
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
Email: andrew.alfano@pillsburylaw.com
           chazz.coleman@pillsburylaw.com

M. Blake Cleary (No. 3614)
Brett M. Haywood (No. 6166)
Maria Kotsiras (No. 6840)
Shannon A. Forshay (No. 7293)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: bcleary@potteranderson.com
           bhaywood@potteranderson.com
           mkotsiras@potteranderson.com
           sforshay@potteranderson.com

*Counsel to the Debtors and Debtors in Possession*

---

[1]   The Debtors in these chapter 11 cases together with the last four digits of each Debtor's federal tax identification number, are: Nikola Corporation (registered to do business in California as Nikola Truck Manufacturing Corporation) (1153); Nikola Properties, LLC (3648); Nikola Subsidiary Corporation (1876); Nikola Motor Company LLC (0139); Nikola Energy Company LLC (0706); Nikola Powersports LLC (6771); Free Form Factory Inc. (2510); Nikola H2 2081 W Placentia Lane LLC (N/A); 4141 E Broadway Road LLC (N/A); and Nikola Desert Logistics LLC (N/A).  The Debtors' mailing address is PO Box 27028, Tempe, AZ 85285.

<u>**IMPORTANT INFORMATION REGARDING THIS**</u>
<u>**COMBINED DISCLOSURE STATEMENT AND PLAN**</u>

**The Debtors are soliciting votes on this Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Nikola Corporation and its Debtor Affiliates from the Holders of Class 3 General Unsecured Claims:**

**If you are in Class 3, you are receiving this document and the accompanying materials because you are entitled to vote on the Plan. Before submitting a ballot to vote on the Plan, you should review this Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Nikola Corporation and its Debtor Affiliates.**

**ABSENT THE WRITTEN CONSENT OF THE DEBTORS, ALL BALLOTS MUST BE PROPERLY COMPLETED, EXECUTED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS IN THE BALLOTS AND THE SOLICITATION AND TABULATION PROCEDURES, SO THAT THE BALLOTS ARE ACTUALLY <u>RECEIVED</u> BY THE CLAIMS AND NOTICING AGENT NO LATER THAN AUGUST 20, 2025 AT 5:00 P.M. (PREVAILING EASTERN TIME). BALLOTS MUST BE SUBMITTED TO THE CLAIMS AND NOTICING AGENT ELECTRONICALLY (ON THE CLAIMS AND NOTICING AGENT'S ONLINE PORTAL) OR BY PHYSICAL DELIVERY BY HAND OR MAIL.**

You can vote electronically by visiting the case information website maintained by the Claims and Noticing Agent, (https://dm.epiq11.com/Nikola) clicking on the "E-Ballot" tab, and following the prompts and directions. You will need your unique E-Ballot ID# to submit your electronic ballot; your E-Ballot ID# can be found on your Ballot. Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your Ballot. Holders who vote electronically via the Claims and Noticing Agent's online portal should not also submit a paper Ballot. The electronic ballot portal is the only approved method to submit Ballots electronically, and Holders of Claims entitled to vote on the Plan are strongly encouraged to submit their Ballots via the electronic ballot portal. Ballots delivered by email, facsimile, or any other electronic means may not be counted.

**If you choose to vote via a paper Ballot, you must deliver, prior to the Voting Deadline, an original, completed, and executed Ballot in the pre-addressed postage-paid envelope that accompanied your Ballot or as follows:**

| If by First-Class Mail, Hand Delivery |
| --- |
| Nikola Corporation Ballot Processing Center<br>c/o Epiq Ballot Processing<br>P.O. Box 4419<br>Beaverton, OR 97076-4419 |

i

| If by Overnight Mail |
| --- |
| Nikola Corporation Ballot Processing Center<br>c/o Epiq Ballot Processing<br>10300 SW Allen Blvd.<br>Beaverton, OR 97005 |

**PLEASE READ YOUR BALLOT CAREFULLY FOR FURTHER INFORMATION AND INSTRUCTIONS. FAILURE TO ABIDE BY SUCH INSTRUCTIONS MAY RESULT IN YOUR BALLOT NOT BEING COUNTED.**

\*\*\*

### Preliminary Statement and Disclaimers[2]

The Bankruptcy Court has established **August 20, 2025 at 4:00 p.m. (prevailing Eastern Time)** as the deadline for filing and serving objections to the final approval of the Disclosure Statement and the confirmation of the Plan (the "Combined DS and Plan Objection Deadline"). Any objection to the final approval of the Disclosure Statement or the confirmation of the Plan must (a) be in writing, in English, and in text-searchable format, (b) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules for the Bankruptcy Court for the District of Delaware, and the Solicitation Order, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Bankruptcy Court no later than the Combined DS and Plan Objection Deadline.

A hearing on the final approval of the Disclosure Statement and the confirmation of the Plan (as such hearing may be continued from time to time, the "Joint Hearing") will commence on **September 5, 2025 at 10:00 a.m. (prevailing Eastern Time)** in the Bankruptcy Court before the Honorable Thomas M. Horan, courtroom 5 at 824 Market St., 5th Floor Wilmington, DE 19801. The Joint Hearing and related dates and deadlines may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors by announcement of the adjournment or continuance at a hearing before the Bankruptcy Court or by filing a notice on the docket of the Chapter 11 Cases. In accordance with the Plan, the Plan may be modified, if necessary, before, during, or as a result of the Joint Hearing without further action by the Debtors and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

This Combined DS and Plan contains summaries of certain provisions and certain other documents and information. The financial information included herein is provided solely for the purpose of soliciting votes on the Combined DS and Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Combined DS and Plan. While

---

[2] Capitalized terms used but not defined in this section shall have the meanings ascribed to them elsewhere in the *First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Nikola Corporation and its Debtor Affiliates* (as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements) thereto), the "Disclosure Statement," the "Combined DS and Plan," or the "Plan," as applicable).

the summaries in the Disclosure Statement shall not constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, the Debtors believe that the summaries contained in the Disclosure Statement are fair and accurate. The summaries of the financial information in the Disclosure Statement and the documents that are attached to, or incorporated by reference in, this Combined DS and Plan are qualified in their entirety by reference to such information and documents.

Except as otherwise provided herein or in accordance with applicable law, the Debtors are under no duty to update or supplement the Combined DS and Plan. The Bankruptcy Court's approval or confirmation of the Combined DS and Plan does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Combined DS and Plan. The statements and information contained herein have been made as of the date hereof unless otherwise specified. Holders of Claims reviewing the Combined DS and Plan should not assume at the time of such review that there have been no changes to the facts or information set forth herein since the date of the Combined DS and Plan. All holders of Claims entitled to vote on the Plan are advised and encouraged to read the Combined DS and Plan in its entirety before voting on the Plan. No holder of a Claim should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in the Combined DS and Plan (including the documents attached hereto). The Combined DS and Plan does not constitute, and shall not be deemed to constitute, legal, business, financial, tax, or other advice, including as it relates to holders of Claims against or Interests in the Debtors or any other party in interest. Any Person or Entity desiring any such advice should consult with their own advisors.

Although the Debtors have attempted to ensure the accuracy of the financial information provided herein or incorporated herein by reference, such information contained herein has not been audited, except to the extent specifically indicated otherwise herein. The financial information provided herein has been prepared by the Debtors' management and their financial advisor. Such information, while presented with numerical specificity, is necessarily based on a variety of estimates and assumptions that, although considered reasonable by management, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market, financial, and other uncertainties and contingencies, many of which are beyond the Debtors' control. The Debtors caution that no representations can be made as to the accuracy of such information or the ability to achieve the projected results. Some assumptions inevitably will not materialize. Further, events and circumstances occurring subsequent to the date on which the financial information was prepared may be different from those assumed or may have been unanticipated and, thus, the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. Such information, therefore, may not be relied upon as a guarantee or other assurance of the actual results that will occur.

With respect to any contested matters, adversary proceedings, and any other pending, threatened, or potential litigation or other actions, nothing in the Combined DS and Plan, nor any action taken by a Debtor in connection herewith, shall constitute or be construed as an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather constitutes, and is to be construed as, a statement made in the context of settlement negotiations in

accordance with Rule 408 of the Federal Rules of Evidence and any applicable analogous state or foreign laws or rules.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No Person or other Entity is or has been authorized to give any information with respect hereto and the matters addressed herein, other than that which is contained herein or incorporated herein by reference. No representations concerning the Debtors or the value of their property have been authorized by the Debtors other than as set forth herein. Any information, representations, or inducements made to obtain a vote on the Plan other than, or inconsistent with, the information contained herein should not be relied upon by any holder of a Claim.

The Combined DS and Plan contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Combined DS and Plan, the words "believe," "expect," "anticipate," "estimate," "intend," "project," "plan," "likely," "may," "will," "should," "shall," or other words or phrases of similar import generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in the Combined DS and Plan. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update or revise any forward-looking statement, whether as a result of new information, subsequent events, anticipated or unanticipated circumstances, or otherwise. *See* Article XVI for a discussion of certain considerations and risk factors that holders entitled to vote on the Plan should consider.

This Combined DS and Plan has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and not in accordance with federal or state securities laws or other non-applicable bankruptcy laws. This Combined DS and Plan has not been approved or disapproved by the SEC or any state or non-U.S. regulatory authority and neither the SEC nor any state or non-U.S. regulatory authority has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the solicitation of votes on the Plan, nor this Combined DS and Plan, is intended to constitute an offer to sell or the solicitation of an offer to buy securities in any state or other jurisdiction in which such offer or solicitation is not authorized or is unlawful.

***

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS AND INTERPRETATION ............................................................ 2

A.  Defined Terms ...................................................................................................... 2

B.  Interpretation ..................................................................................................... 16

C.  Headings ............................................................................................................ 16

D.  Application of Definitions and Rules of Construction Contained in the Bankruptcy Code. ................................................................................................................... 16

E.  Other Terms ....................................................................................................... 17

F.  Appendices to Plan Documents ......................................................................... 17

G.  Controlling Document ....................................................................................... 17

H.  Computation of Time ......................................................................................... 18

I.  References to Monetary Figures ........................................................................ 18

ARTICLE II. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ........................................................................................................................ 18

A.  The Debtors' Corporate History ........................................................................ 18

B.  The Company's Business Operations ................................................................. 18

C.  The Debtors' Prepetition Corporate and Capital Structure ............................... 20

ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 FILING ...................................... 23

A.  Macroeconomic Trends and Company-Specific Events .................................... 23

    1.  Challenges Facing the Debtors Over the Years ...................................... 23
    2.  SEC Settlement ....................................................................................... 24
    3.  Prepetition Litigation ............................................................................. 24
    4.  Liquidity Issues ...................................................................................... 24

B.  Prepetition Restructuring Efforts ...................................................................... 25

    1.  The Appointment of the Strategic Advisory Committee ......................... 25
    2.  The Debtors' Prepetition M&A Initiatives and Marketing Process Leading to the Commencement of These Chapter 11 Cases ............................................. 26

ARTICLE IV. EVENTS CONCURRENT WITH AND FOLLOWING COMMENCEMENT OF THE CHAPTER 11 CASES .................................................................................................. 28

A.  Operational and Other Relief ............................................................................ 28

B.  Retention of Debtors' Professionals .................................................................. 29

C.  Ordinary Course Professionals .......................................................................... 29

D.  Appointment of the Committee ......................................................................... 29

E.  Post-Petition Asset Sales ................................................................................... 30

1. The Sale of the Debtors' Operating Assets ........................................................ 30
2. De Minimis Asset Sales ...................................................................................... 31
3. Environmental Credits Sale Process ................................................................... 31
4. FCEV Inventory Sale ......................................................................................... 32

F. Claims Bar Date ..................................................................................................... 32

G. Milton Award, Pending Appeal Thereof, and Current Status of Collection Efforts ......... 33

H. Settlement of Derivative Actions ........................................................................... 35

I. Liquidating Trust .................................................................................................... 36

J. Resolution of Dispute Concerning the Treatment of the SEC Claim ............................ 36

ARTICLE V. PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE
PLAN ................................................................................................................................. 37

A. Treatment of Administrative Claims ....................................................................... 37

1. Time for Filing Administrative Claims ................................................................ 37
2. Allowance of Administrative Claims ................................................................... 38
3. Payment of Allowed Administrative Claims ........................................................ 38

B. Professional Compensation .................................................................................... 38

1. Professional Fee Escrow ..................................................................................... 38
2. Time for Filing Professional Fee Claims ............................................................. 39
3. Post-Effective Date Fees and Expenses. ............................................................. 39

C. Treatment of Tax Claims ........................................................................................ 40

D. Statutory Fees ........................................................................................................ 40

ARTICLE VI. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS ....................................................................................................................... 40

A. Summary of Classification ...................................................................................... 41

B. Treatment of Claims and Equity Interests ............................................................... 43

1. Class 1 – Other Priority Claims .......................................................................... 43
2. Class 2 – Other Secured Claims .......................................................................... 43
3. Class 3 – General Unsecured Claims ................................................................... 44
4. Class 4 – Intercompany Claims ........................................................................... 44
5. Class 5 – Equity Interests .................................................................................... 44
6. Class 6 – Intercompany Interests ........................................................................ 45
7. Class 7 – Section 510(b) and Other Junior Claims .............................................. 45
8. Class 8 – Equitably Subordinated Claims ........................................................... 46

C. Separate Classification of Claims Generally ........................................................... 46

D. Class Acceptance Requirement ............................................................................... 46

E. Controversy Concerning Impairment ...................................................................... 46

F. Cramdown .............................................................................................................. 47

4896-9948-8316.v22

G.     Subordinated Claims ..................................................................................................... 47

ARTICLE VII. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................... 47

A.     Sources of Consideration for Plan Distributions ........................................................... 47

B.     Preservation and Maintenance of Debtor Causes of Action; Preference Action Waiver . 47

    1.   Maintenance of Causes of Action. ..................................................................... 47
    2.   Preservation of All Causes of Action Not Expressly Settled or Released. ............... 48
    3.   D&O Actions and Litigation. .............................................................................. 48
    4.   Preference Action Waiver. .................................................................................. 49

C.     Creation, Vesting, and Transfer of Liquidating Trust Assets to the Liquidating Trust .... 49

    1.   Creation of Liquidating Trust .............................................................................. 49
    2.   Vesting of Liquidating Trust Assets .................................................................... 50
    3.   Transfer of Liquidating Trust Assets ................................................................... 50

D.     Corporate Action ........................................................................................................... 50

E.     Dissolution of the Debtors ............................................................................................. 51

F.     Cancellation of Instruments ........................................................................................... 51

G.     Liquidating Trust ........................................................................................................... 52

    1.   Purpose of Liquidating Trust ............................................................................... 52
    2.   Governance ........................................................................................................ 52
    3.   Books and Records and Privileges ...................................................................... 53
    4.   Liquidating Trust Assets ..................................................................................... 54
    5.   Role of the Liquidating Trustee .......................................................................... 54
    6.   Compensation of the Liquidating Trustee. ........................................................... 55
    7.   Retention of Professionals by the Liquidating Trustee .......................................... 56
    8.   Tax Treatment; No Successor in Interest ............................................................. 56
    9.   Disputed Claims Reserves ................................................................................... 56
    10.  Dissolution of the Liquidating Trust .................................................................... 57
    11.  Securities Exempt .............................................................................................. 57
    12.  BEV Recall ....................................................................................................... 57

ARTICLE VIII. SUBSTANTIVE CONSOLIDATION ................................................................ 57

ARTICLE IX. PLAN DISTRIBUTION PROVISIONS ............................................................... 58

A.     Plan Distributions .......................................................................................................... 58

B.     Delivery of Distributions to Unsecured Notes Indenture Trustee .................................... 58

C.     Disputed Claims Reserves .............................................................................................. 59

D.     Address for Delivery of Plan Distributions ..................................................................... 59

E.     Undeliverable and Unclaimed Distributions Held by Disbursing Agent .......................... 60

    1.   Holding of Undeliverable Distributions ............................................................... 60
    2.   After Distributions Become Deliverable .............................................................. 60
    3.   Failure to Claim Undeliverable Distributions ....................................................... 60

F.   Time Bar to Cash Payments ........................................................................... 60

G.   Manner of Payment under the Plan ................................................................. 61

H.   Fractional Plan Distributions ......................................................................... 61

I.   De Minimis Distributions ............................................................................... 61

J.   Foreign Currency Exchange Rate .................................................................. 61

K.   No Postpetition Interest on Claims ................................................................ 61

L.   Allocation Between Principal and Accrued Interest ...................................... 61

M.   Single Satisfaction ......................................................................................... 62

N.   Claims Paid or Payable by Third Parties ....................................................... 62

    1.   Claims Paid by Third Parties ................................................................ 62
    2.   Applicability of Insurance Contracts .................................................... 62

O.   Distributions on Account of Subordinated Claims ........................................ 63

ARTICLE X. PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS .. 63

A.   Allowance of Claims ...................................................................................... 63

B.   Prosecution of Disputed Claims ..................................................................... 63

C.   Entitlement to Plan Distributions upon Allowance ....................................... 64

D.   Adjustment to Claims or Interests Without Objection ................................... 64

E.   Estimation of Claims ...................................................................................... 64

ARTICLE XI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
.................................................................................................................................... 65

A.   Rejection of Executory Contracts and Unexpired Leases .............................. 65

    1.   Rejection of Executory Contracts and Unexpired Leases ..................... 65
    2.   Effect of Rejection ................................................................................ 65

B.   Claims Arising from Rejection, Expiration, or Termination ......................... 66

C.   Contracts and Leases Entered Into After the Petition Date ........................... 66

D.   Insurance Contracts ........................................................................................ 66

E.   Warranties ....................................................................................................... 67

F.   Reservation of Rights ..................................................................................... 67

ARTICLE XII. EFFECTS OF CONFIRMATION ................................................................ 67

A.   Releases by the Debtors .................................................................................. 67

B.   Releases by Creditors ...................................................................................... 68

C.   Exculpation ..................................................................................................... 69

D.   Injunctions ...................................................................................................... 70

4896-9948-8316.v22

E.    Satisfaction of Claims ................................................................................................. 71

F.    Distributions are Final................................................................................................. 71

G.    Setoff Rights ............................................................................................................... 71

H.    Third Party Agreements; Subordination ..................................................................... 72

I.    Release of Liens .......................................................................................................... 72

ARTICLE XIII. CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE
DATE ............................................................................................................................................ 72

A.    Conditions Precedent to the Occurrence of the Effective Date .................................. 72

B.    Waiver of Conditions .................................................................................................. 73

C.    Effect of Non-Occurrence of the Effective Date ........................................................ 73

D.    Option to Delay Occurrence of the Effective Date ..................................................... 73

E.    Modification of the Plan .............................................................................................. 74

F.    Revocation of Plan ...................................................................................................... 74

ARTICLE XIV. RETENTION OF JURISDICTION ................................................................... 74

ARTICLE XV. MISCELLANEOUS PROVISIONS .................................................................... 76

A.    Additional Documents ................................................................................................. 76

B.    Substantial Consummation .......................................................................................... 76

C.    Reservation of Rights................................................................................................... 76

D.    Successors and Assigns................................................................................................ 76

E.    Notices ......................................................................................................................... 77

F.    Governing Law ............................................................................................................ 77

G.    Exemption from Transfer Taxes .................................................................................. 77

H.    Notice of Entry of Confirmation Order and Relevant Dates ...................................... 77

I.    Compliance with Tax Requirements............................................................................ 78

J.    Rates............................................................................................................................. 78

K.    Immediate Binding Effect............................................................................................ 78

L.    Severability .................................................................................................................. 78

M.    Closing of the Chapter 11 Cases ................................................................................. 79

N.    No Admissions ............................................................................................................. 79

O.    Dissolution of the Committee and Any Other Statutory Committee............................ 79

P.    Additional SEC Matters............................................................................................... 79

ARTICLE XVI. PLAN-RELATED RISK FACTORS ................................................................. 80

A.    The Plan May Not Be Accepted .................................................................................. 80

B.      The Plan May Not Be Confirmed ................................................................. 80

C.      Parties in Interest May Object to the Amount or Classification of Claims ..................... 80

D.      The Debtors May Object to the Amount or Classification of a Claim ............................ 81

E.      Nonconsensual Confirmation ................................................................... 81

F.      The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code ................................................................................................. 81

G.      Plan Releases May Not Be Approved .......................................................... 82

H.      Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan ......................................................................................... 82

I.      Certain Tax and Securities Implications of the Plan ............................................. 82

J.      Failure To Consummate the Plan ............................................................... 82

K.      Any Valuation of Any Assets for Plan Distributions Is Speculative and Could Potentially Be Zero ................................................................................... 82

L.      Costs of Administrating the Estates ............................................................. 83

M.      The Retained Causes of Action May Be Pursued Against Holders that Vote To Accept or Reject the Plan ....................................................................................... 83

N.      Certain Tax Considerations ..................................................................... 83

O.      Trevor Milton-Related Risks ................................................................... 83

ARTICLE XVII. VOTING PROCEDURES AND REQUIREMENTS ..................................... 83

A.      Voting Instructions and Voting ................................................................. 84

B.      Parties Entitled to Vote ......................................................................... 85

C.      Agreements Upon Furnishing Ballot ........................................................... 86

D.      Change of Vote ................................................................................. 86

E.      Waivers of Defects, Irregularities, Etc. ........................................................ 86

F.      Miscellaneous .................................................................................. 87

G.      Further Information; Additional Copies ........................................................ 87

ARTICLE XVIII. CONFIRMATION REQUIREMENTS ................................................. 88

A.      The Joint Hearing .............................................................................. 88

B.      Classification ................................................................................... 88

C.      Consensual Confirmation ...................................................................... 88

D.      Feasibility and Best Interests of Creditors ..................................................... 89

        1.      Best Interests Test ..................................................................... 89
        2.      Liquidation Analysis .................................................................. 90
        3.      Liquidation Analysis .................................................................. 91
        4.      Application of the Best Interests Test ................................................ 92

x

5.    Feasibility...................................................................................................... 93

E.    Confirmation Without Necessary Acceptances; Cramdown ........................................... 93

ARTICLE XIX. CONCLUSION AND RECOMMENDATION................................................ 95

## INTRODUCTION

Pursuant to sections 1121(a) and 1125 of the Bankruptcy Code,[3] the Debtors propose this *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Nikola Corporation and its Debtor Affiliates*, as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including any Plan Supplements)) thereto, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes on the Plan and the Joint Hearing to consider confirmation thereof. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Other agreements and documents may supplement this Plan; such items have been or may be filed with the Bankruptcy Court. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Article IX, the Debtors reserve the right to alter, supplement, amend, or modify (one or more times), revoke, or withdraw the Plan prior to its substantial consummation.

The purpose of the Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to holders of Claims against the Debtors who have the right to vote on the Plan so that they can make informed decisions in doing so. Holders of Claims entitled to vote to accept or reject the Plan will receive a Ballot together with this Disclosure Statement to enable them to vote on the Plan in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

The Disclosure Statement includes information pertaining to the Debtors' prepetition business operations and financial history and the events leading up to the Chapter 11 Cases. In addition, this Combined DS and Plan includes the effects of confirmation of the Plan, certain risk factors associated with the Plan, the manner in which Plan Distributions will be made, the confirmation process, and confirmation requirements.

The Bankruptcy Court entered an order approving on an interim basis the Disclosure Statement contained in this Combined DS and Plan, as containing "adequate information" in compliance with section 1125 of the Bankruptcy Code (the "**Solicitation Order**"). Entry of the Solicitation Order does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration proposed thereunder. The Bankruptcy Court's interim approval of the Disclosure Statement contained herein does indicate, however, that the Bankruptcy Court has determined on an interim basis that the Disclosure Statement contains adequate information to permit a holder entitled to vote on the Plan to make an informed judgment in doing so. The adequacy of the Disclosure Statement is still subject to final approval by the Bankruptcy Court at the Joint Hearing.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS COMBINED DS AND PLAN IN ITS ENTIRETY**

---

[3] Capitalized terms used herein shall have the meanings ascribed to them in Article I unless otherwise defined elsewhere herein.

**BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  The Debtors believe that confirmation and consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors.  The Plan provides for an equitable distribution to holders of Claims and the compromise and settlement of certain claims and controversies among the Debtors and their key stakeholders and other parties in interest.  The Debtors believe that any alternative to confirmation of the Plan, such as liquidation under chapter 7 of the Bankruptcy Code, could result in the loss of significant value (and a corresponding reduction in the distributions to holders of Claims in certain Classes), and the potential for delay, litigation, and additional costs.  Consequently, the Debtors urge all eligible holders of Claims entitled to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims and Noticing Agent on or before the Voting Deadline.**

## ARTICLE I.
## DEFINITIONS AND INTERPRETATION

A.    *Defined Terms*

Unless the context otherwise requires, capitalized terms have the meanings set forth below.

"*9019 Motion*" has the meaning ascribed to it in Article IV.H below.

"*Administrative Claim*" means a Claim incurred by the Debtors (or their Estates) on or after the Petition Date and before the Effective Date for a cost or expense of administration in the Chapter 11 Cases entitled to priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

"*Administrative Claims Bar Date*" means, collectively, the Initial Administrative Claim Bar Date and the Final Administrative Claim Bar Date.

"*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code as if the referenced entity was a debtor in a case under the Bankruptcy Code.

"*Allowed*" when used: (a) with respect to any Claim, except for a Claim that is an Administrative Claim, means such Claim to the extent it is (i) expressly allowed under the Plan, or (ii) not a Disputed Claim or a Disallowed Claim; (b) with respect to an Administrative Claim, means such Administrative Claim to the extent it has become fixed in amount and priority pursuant to the procedures set forth in Article V.A of this Plan; and (c) with respect to Equity Interests in any Debtor, means the Equity Interests in such Debtor as reflected in the stock transfer ledger or similar register of such Debtor as of the Effective Date.  For the avoidance of doubt, a Proof of Claim filed after the Claims Bar Date or a request for payment of an Administrative Claim required to be filed under Article V.A filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim.  "Allowed," "Allow," "Allowance" and "Allowing" shall have correlative meanings.

2

"*Arbitration*" means the arbitration proceeding captioned *Nikola Corporation v. Trevor R. Milton*, AAA Case No. 01-21-0017-1964, before the American Arbitration Association, Commercial Arbitration Tribunal, and confirmed in *Nikola Corporation v. Trevor R. Milton* (D. Ariz.) docket numbers 48 and 49.

"*Asset Sale Proceeds*" means the Lucid Asset Sale Proceeds, the Environmental Credits Proceeds, the FCEV Inventory Proceeds, the Miscellaneous Asset Proceeds, and any other proceeds from the sale of any of the Debtors' assets.

"*Assets*" means all of the Debtors' right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

"*Avoidance Actions*" means all Causes of Action of the Estates that arise under sections 542, 544, 545, 547, 548, 549, 550, 551, 552 and/or 553 of the Bankruptcy Code.

"*Bankruptcy Code*" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

"*Bidding Procedures Order*" means the *Order (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Designate One or More Stalking Horse Bidders and to Provide Bid Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. 133].

"*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"*Cash*" means the legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America.

"*Causes of Action*" means any claims, Claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of state, federal, or other

law.   For the avoidance of doubt, "Causes of Action" includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Equity Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

"*Chapter 11 Cases*" means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to the Debtors styled as *In re Nikola Corp.*, *et al.*, Chapter 11 Case No. Case No. 25-10258 (TMH).

"*Chancery Court*" means the Court of Chancery of the State of Delaware.

"*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"*Claims and Noticing Agent*" means Epiq Corporate Restructuring, LLC.

"*Claims Bar Date*" means the applicable deadline for filing Proofs of Claim as set forth in the *Order (i) Establishing Deadline for Filing Proofs of Claim and Requests for Allowance of Administrative Expense Claims in These Cases, (ii) Approving the Forms and Manner of Notice Thereof, and (iii) Granting Related Relief* [D.I. 180] or another order of the Bankruptcy Court.

"*Claim Objection Deadline*" means the date that is one hundred and eighty (180) days after the Effective Date.

"*Class*" means a category of holders of Claims or Equity Interests under section 1122(a) of the Bankruptcy Code.

"*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases [D.I. 96, as amended by D.I. 445, as further amended by D.I. 599], pursuant to section 1102(a) of the Bankruptcy Code, as it may be reconstituted from time to time.

"*Company*" means the Debtors and their non-U.S. Affiliates.

"*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan, which shall be in a form reasonably acceptable to the Debtors and the Committee.

"*Control Persons*" means (a) Trevor Milton; (b) any Person with a familial relationship with the individual listed in clause (a); or (c) any other Person or Entity designated by the Debtors, with the consent of the Committee, in the Plan Supplement as a Control Person.

"*D&Os*" means all current and former directors, managers, members, officers, and employees of (a) the Debtors, (b) the Debtors' current and former direct and indirect subsidiaries, and (c) the Debtors' current and former Affiliates.

"*D&O Actions*" means any and all Causes of Action of each Debtor and Estate against any of the D&Os, including claims for breach of fiduciary duty, knowing participation in breach of fiduciary duty or aiding and abetting breach of fiduciary duty, fraud, gross negligence and/or reckless mismanagement, and against or any recoveries from all D&O Policies, including Causes of Action against current or former insurance carriers, reinsurance carriers, insurance brokers, underwriters occurrence carriers, or surety bond insurers, relating to coverage, indemnity, contribution, reimbursement, overpayment of premiums and fees, breach of contract or any other matters relating to, arising from, or based in whole or in part on, the D&O Policies; *provided*, that D&O Actions shall not include any Cause of Action against the Ubben Released Parties, subject to approval of the Derivative Action Stipulation and the Debtors' receipt of the Ubben Contribution.

"*D&O Policy Cap*" means the aggregate insurance proceeds available under all applicable D&O Policies.

"*D&O Policies*" means all insurance policies (including any "tail policy") issued at any time to any of the Debtors for certain liabilities of the Debtors and/or their current or former directors, managers, members and officers, and all agreements, documents or instruments related thereto.

"*Debtor in Possession*" means any Debtor, in its capacity as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

"*Debtors*" means, collectively, Nikola Corporation (registered to do business in California as Nikola Truck Manufacturing Corporation); Nikola Properties, LLC; Nikola Subsidiary Corporation; Nikola Motor Company LLC; Nikola Energy Company LLC; Nikola Powersports LLC; Free Form Factory Inc.; Nikola H2 2081 W Placentia Lane LLC; 4141 E Broadway Road LLC; and Nikola Desert Logistics LLC.

"*Derivative Actions*" means collectively, the pending derivative actions captioned *Huhn v. Milton, et al.*, 2:20-cv-2437 (D. Ariz); *In re Nikola Derivative Litigation*, C.A. No. 2022-0023-KSJM (Del. Chancery); *In re Nikola Derivative Litigation*, 20-cv-01277 (D. Del.); *In re Nikola Derivative Litigation*, Case No. 2:20-cv-2437 (D. Ariz.); and *Lomont v. Milton, et al.*, No. 2023-0908-KSJM (Del. Ch.).

"*Derivative Action Stipulation*" means the stipulation settling or otherwise resolving the Derivative Actions, attached as <u>Exhibit 1</u> to the 9019 Motion.

"*Disallowed*" means, with respect to any Claim that is not otherwise expressly Allowed hereunder, a Claim or any portion thereof that (a) has been Disallowed by a Final Order, (b) is scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Plan, (c) is not

4896-9948-8316.v22

scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Plan, or (d) has been waived or withdrawn by agreement of the applicable Debtor and the holder thereof, or has been waived or withdrawn by the holder thereof.

"*Disclosure Statement*" means the disclosure statement filed with respect to the Plan, as it may be amended, supplemented or otherwise modified from time to time, and the exhibits and schedules thereto.

"*Disputed*" means, with respect to any Claim or Equity Interest, a Claim or Equity Interest that is not yet Allowed or Disallowed, including (a) any Proof of Claim that, on its face, is contingent or unliquidated; (b) any Proof of Claim or request for payment of an Administrative Claim filed after the Effective Date or the deadline for filing Proofs of Claim based on the Debtors' rejection of Executory Contracts or Unexpired Leases, as applicable, and (c) any Claim that is subject to an objection or a motion to estimate, in each case that has not been withdrawn, resolved, or ruled on by a Final Order of the Bankruptcy Court.

"*Disputed Claims Reserve*" means one or more reserves for Disputed Claims established and maintained by the Liquidating Trustee in accordance with the Plan and the Liquidating Trust Agreement.

"*DTC*" means the Depository Trust and Clearing Corporation.

"*Effective Date*" means, with respect to each Debtor, the date that the Plan becomes effective, which shall be a Business Day after all of the conditions specified in Article XIII.A have been satisfied or waived (to the extent waivable).

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Environmental Credits Proceeds*" means any proceeds from the sale of certain environmental credits pursuant to the *Order (I) Approving Bidding Procedures for the Sale of the Environmental Credits, (II) Authorizing the Debtors to Designate PACCAR Inc. as the Stalking Horse Bidder and Provide Bid Protections, and (III) Granting Related Relief* [D.I. 489].

"*Equitably Subordinated Claims*" means any Claim or right of setoff of any kind or nature whatsoever (whether arising in law or equity, contract or tort, under the Bankruptcy Code, federal or state law, rule or regulation, common law or otherwise) held by any Control Person against any of the Debtors as of the Petition Date.

"*Equity Interest*" means (i) any outstanding ownership interest in any of the Debtors, including interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units or their equivalents, or other rights to purchase or otherwise receive any ownership interest in any Debtor and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation; and (ii) any Claim against the Debtors that is subordinated and has the same priority as common or preferred stock by operation of the Bankruptcy Code or any order entered by the Bankruptcy Court.

"*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

"*Exculpated Parties*" means collectively, and in each case each of the following, to the extent permitted by applicable law, solely in their capacity as such: (a) the Debtors; (b) each director, officer and/or executive of any of the Debtors who served as a director, officer and/or executive of any of the Debtors between the Petition Date and the Effective Date; (c) the Professionals retained by the Debtors; (d) the Committee and each of its members; and (e) the Professionals retained by the Committee.

"*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"*Fee Application*" means an application for allowance and payment of a Professional Fee Claim.

"*FCEV Inventory Proceeds*" means net sale proceeds from the sale of certain FCEV Inventory pursuant to the *Order (I) Approving Agency Agreement with Gordon Brothers Commercial & Industrial LLC; (II) Authorizing the Sale of Certain Remaining Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; and (III) Granting Related Relief* [D.I. 514].

"*Final Administrative Claim Bar Date*" means, for any unpaid Administrative Expense Claim arising on or between April 29, 2025, and the Effective Date, the date that is thirty (30) calendar days after service of the notice of Effective Date, with such date to be provided in the notice of Effective Date.

"*Final Order*" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument or rehearing shall then be pending; or (b) in the event that an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; *provided*, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

"*First Tier Claims*" means, collectively, all Allowed Administrative Claims, Other Priority Claims, Tax Claims, Effective Date Statutory Fees, and the SEC Unsecured Claim.

"*General Unsecured Claim*" means any Claim against any of the Debtors other than an Administrative Claim, an Other Priority Claim, a Tax Claim, a Professional Fee Claim, an Other Secured Claim, an Intercompany Claim, a Section 510(b) Claim, or Other Junior Claim, or an Equitably Subordinated Claim.

"*Governmental Bar Date*" means August 18, 2025, or solely for the SEC, August 26, 2025.

"*Impaired*" means a Class of Claims or Equity Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Initial Administrative Claim Bar Date*" means June 2, 2025, at 5:00 p.m. (prevailing Eastern Time), which is the deadline for Filing requests for allowance and payment of Administrative Expense Claims arising in the time period between the Petition Date and April 28, 2025.

"*Insurance Contracts*" means all insurance policies and all surety bonds and related agreements of indemnity that have been issued at any time or provide coverage, benefits, or proceeds to any of the Debtors and all agreements, documents, or instruments relating thereto, including the D&O Policies.

"*Insurer*" means any company or other Entity that issued an Insurance Contract, any third-party administrator, and any respective predecessors and/or Affiliates thereof.

"*Intercompany Claim*" means a Claim held by any Debtor against any other Debtor, other than any Administrative Claim.

"*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

"*Interim Compensation Order*" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals; and (II) Granting Related Relief* [D.I. 191].

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.

"*IRS*" means the United States Internal Revenue Service.

"*LG*" means LG Energy Solutions, Ltd., and its Affiliates.

"*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Liquidating Trust*" means the trust established pursuant to Article VII.G of the Plan.

"*Liquidating Trust Agreement*" means the agreement, in a form reasonably acceptable to the Debtors and the Committee, governing the Liquidating Trust, dated as of the Effective Date, which shall be substantially in the form filed with the Bankruptcy Court as part of the Plan Supplement.

"*Liquidating Trust Assets*" means the (a) amount of Asset Sale Proceeds and Cash remaining in the Estates as of the Effective Date; (b) the Preserved Estate Claims and the proceeds thereof; (c) the Milton Award; (d) the Arbitration; (e) proceeds from the settlement of the Derivative Actions, when received; and (f) any other assets of the Debtors' Estates not previously liquidated or abandoned.

"*Liquidating Trust Beneficiaries*" means holders of Liquidating Trust Units.

"*Liquidating Trust Expenses*" means the reasonable and documented fees and expenses incurred by the Liquidating Trust and reimbursable pursuant to the Plan and the Liquidating Trust Agreement.

"*Liquidating Trust Net Assets*" means the Liquidating Trust Assets remaining after funding any Reserve and satisfaction of all Liquidating Trust Expenses.

"*Liquidating Trust Units*" means beneficial interests in the Liquidating Trust entitling holders thereof to their pro rata share of distributions of Liquidating Trust Net Assets from the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement, which interests shall be reflected only through the claims register in these Chapter 11 Cases and not certificated in any fashion.

"*Liquidating Trustee*" means the Entity selected by the Committee to serve as trustee of the Liquidating Trust, who will be identified in the Plan Supplement.

"*Litigation Assets*" means any and all potential and existing Claims and Causes of Action held by the Debtors and the Estates including but not limited to D&O Actions and Avoidance Actions not released under the Plan. For the avoidance of doubt, Litigation Assets shall not include any Claims and Causes of Action specifically released, waived or settled during the Chapter 11 Cases with the consent of the Committee, including (a) the Prepetition Employee Payments Avoidance Actions;[4] (b) against Paul, Weiss, Rifkind, Wharton & Garrison LLP, subject to receipt by the Estates of the PWRW&G Refund; (c) against the Released Parties or that have otherwise been waived, released, or compromised in the Plan or other Final Order of the Bankruptcy Court; and (d) acquired by Lucid USA II, Inc., in connection with the Lucid Sale. For the avoidance of doubt, the Litigation Assets shall not include any claims or Cause of Action against the Ubben Released Parties, subject to approval of the Derivative Action Stipulation and the Debtors' receipt of the Ubben Contribution.

"*Lucid APA*" has the meaning ascribed to it in the definition of Lucid Sale below.

"*Lucid Asset Sale Proceeds*" has the meaning ascribed to it in the definition of Lucid Sale below.

"*Lucid Sale*" means the comprehensive sale process of a significant portion of the Debtors' assets, which resulted in a sale transaction with Lucid USA II, Inc., pursuant to that certain Asset Purchase Agreement, dated April 10, 2025 (the "<u>Lucid APA</u>"), yielding aggregate purchase consideration consisting of a $10.0 million Cash Purchase Price (as defined in the Lucid APA), a $7.0 million Battery Obligations Fund (as defined in the Lucid APA) and other consideration, including assumption of the Assumed Liabilities (as defined in the Lucid APA),

---

[4]  As partial consideration for waiver of the Prepetition Employee Payments Avoidance Actions, any Claims filed in these cases by any employee and/or Other Director and Officer, as applicable, shall be deemed satisfied and withdrawn on the Effective Date, including but not limited to, Proofs of Claim Nos. 10186, 10201, 10202, 10203, 10212, 10209, and 10214 on the claims register in these Chapter 11 Cases.

all as contemplated in the Lucid APA (collectively, the "<u>Lucid Asset Sale Proceeds</u>") for the Debtors' estates.

"*Lucid Sale Order*" means the *Order (A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreements, (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (D) Granting Related Relief* [D.I. 408].

"*Milton Award*" means the Decision and Final Award, issued in the Arbitration.

"*Milton Fee Arbitration*" means the arbitration proceeding captioned *Trevor Milton v. Nikola Corporation*, AAA Case No. 01-21-0004-8978, before the American Arbitration Association, Commercial Arbitration Tribunal.

"*Milton Preserved Claims*" means all Claims or Causes of Action that the Debtors and the Estates have or may have against Trevor Milton, including but not limited to, (a) the Milton Award; (b) all Claims that were asserted or could have been asserted as to Trevor Milton in: (i) *Huhn v. Milton, et al.*, 2:20-cv-2437 (D. Ariz); (ii) *In re Nikola Derivative Litigation*, 20-cv-01277 (D. Del.); (iii) *Roy v. Russell, et al.*, 1:24-cv-00230 (D. Del.); (iv) *In re Nikola Corp. Derivative Litigation*, C.A. No. 2022-0023 (Del. Ch.); (v) *Lomont v. Milton, et al.*, C.A. No. 2023-0908 (Del. Ch.); or (vi) *Nikola Corporation v. Trevor R. Milton and Chelsey Milton*, Case No. 2:24-cv-00563 (D. Ariz.); or (vii) the Milton Fee Arbitration.

"*Miscellaneous Asset Proceeds*" means the net proceeds from sales of certain miscellaneous assets of the Debtors sold pursuant to the *Order (I) Approving De Minimis Asset Sale Procedures and Related De Minimis Sale Transactions; and (II) Granting Related Relief* [D.I. 343].

"*OCP Order*" means the *Order (I) Authorizing Debtors to Employ Professionals Used in the Ordinary Course of Business, (II) Waiving Certain Information Requirements of Local Rule 2016-1, and (III) Granting Related Relief* [D.I. 195].

"*Other Director and Officer*" means, in their capacity as current or former directors, officers, or executives of the Debtors to the extent covered under a D&O Policy, each of (a) Steve Girsky; (b) Mike Mansuetti; (c) John Pertchik; (d) Mary Petrovich; (e) Steve Shindler; (f) Bruce Smith; (g) Carla Tully; (h) John Vesco; (i) Andy Vessey; (j) Tom Okray; (k) Mary Chan; (l) Ole Hoefelmann; (m) Julia Steyn; (n) Tony Epperson; (o) Brian DeHoog; (p) Aziz Khan; (q) Ryan Clayton; (r) Christian Appel; and (s) Joe Pike.

"*Other Junior Claims*" means any General Unsecured Claim, the holder of which voluntary agrees to be placed in a Class junior in payment to Class 3, which Other Junior Claims includes the SEC Junior Claim.

"*Other Priority Claims*" means any Claim to the extent such Claim is entitled to priority in right of payment, up to the applicable statutory caps, as specified in section 507(a) (4) and (5) of the Bankruptcy Code, other than Administrative Claims, Other Secured Claims, and Tax Claims.

4896-9948-8316.v22

"*Other Secured Claims*" means any secured Claim; *provided*, that any right of setoff held by any Control Person against the Debtors shall not be an Other Secured Claim.

"*Oversight Board*" has the meaning ascribed to it in Article VII.G.2 below.

"*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"*Petition Date"* means February 19, 2025.

"*Pillsbury*" means Pillsbury Winthrop Shaw Pittman LLP, as counsel to the Debtors.

"*Plan*" means this Plan, either in its present form or as it may be amended, supplemented or otherwise modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

"*Plan Distribution*" means the payment or distribution under the Plan of Cash, Assets, securities, or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim or a Liquidating Trust Beneficiary.

"*Plan Distribution Date*" means a date or dates, as determined by the Debtors or the Liquidation Trustee, as applicable, in accordance with the terms of the Plan, on which the Debtors or the Liquidation Trustee makes a Plan Distribution to holders of Allowed Claims.

"*Plan Documents*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court, including the Plan, the Plan Supplement, the Disclosure Statement and the Confirmation Order.

"*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules), each of which shall be in form and substance (except where otherwise provided) reasonably acceptable to the Debtors and the Committee, including: (a) the Liquidating Trust Agreement; and (b) the identity and compensation of the Liquidating Trustee, and the affiliations, if any, that the Liquidating Trustee has with respect to the Debtors.

"*Potter Anderson*" means Potter Anderson & Corroon LLP, as counsel to the Debtors.

"*Prepetition Employee Payments Avoidance Actions*" means any Avoidance Actions related to payments funded on February 14, 2025, and made to the Debtors' employees or Other Directors and Officers on account of those certain retention bonus agreements and executive retention agreements executed prior to the Petition Date.

"*Preserved Estate Claims*" means all Claims or Causes of Action of the Debtors and the Estates, including all Litigation Assets all Milton Preserved Claims, and all Claims or Causes of Action that the Debtors may have against LG, that in each case are not specifically waived, relinquished, released, compromised, or settled in the Plan or any Final Order. For the avoidance of doubt, the Preserved Estate Claims shall not include any claims or Causes of Action against

the Ubben Released Parties, subject to approval of the Derivative Action Stipulation and the Debtors' receipt of the Ubben Contribution.

"*Pro Rata Share*" means, for an Allowed Claim in a particular Class, a share proportional to the ratio of the amount of such Allowed Claim to the amount of all Allowed Claims in the same Class.

"*Proceeds of Estate Claims*" means proceeds of Preserved Estate Claims, which shall be transferred to or received by the Liquidating Trust.

"*Professional*" means an Entity employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331 and 363 of the Bankruptcy Code.

"*Professional Fee Claims*" means all Claims for accrued, contingent and/or unpaid fees and expenses (including hourly, transaction, and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Effective Date that the Bankruptcy Court has not Disallowed by a Final Order. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction Disallows or reduces by a Final Order any amount of a Professional's fees or expenses, then those Disallowed amounts or the amount of any such reduction shall no longer constitute Professional Fee Claims.

"*Professional Fee Escrow*" means an interest-bearing escrow account funded from the Reserve (as defined in the Interim Compensation Order) established under Section 2(j) of the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals; and (II) Granting Related Relief* [D.I. 191] (the "Interim Compensation Order") and additional Cash in an aggregate amount equal to the Professional Fee Escrow Amount solely for the purpose of paying any unpaid Professional Fee Claims, in accordance with Article V.B.1 which shall be funded on the Confirmation Date or as promptly thereafter as practicable (and in no event later than the Effective Date).

"*Professional Fee Escrow Amount*" means an amount sufficient to pay all estimated fees of the Debtors' Professionals and the Committee's Professionals through the Effective Date.

"*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

"*PWRW&G Refund*" means $1,000,000 transferred by Nikola to Paul, Weiss, Rifkind, Wharton & Garrison LLP, prior to the Petition Date, which shall be returned to the Estates on or before the Effective Date.

"*Related Party*" means, each solely in its capacity as such, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, assignors, participants, successors, assigns, majority-owned subsidiaries, direct or indirect partners, limited partners, general partners, members, principals,

management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

"*Released Party*" means collectively, and in each case each of the following solely in their capacity as such: (a) the Debtors; (b) the Committee and each of its members; (c) Pillsbury, as counsel to the Debtors; (d) Potter Anderson, as counsel to the Debtors; (e) Houlihan Lokey Capital, Inc., as financial advisor and investment banker to the Debtors; (f) M3 Advisory Partners, LP, as financial advisor to the Debtors; (g) Kasowitz Benson Torres LLP, as counsel to the Debtors; (h) the Ubben Released Parties, subject to approval of the Derivative Action Stipulation and the Debtors' receipt of the Ubben Contribution; (i) the Remaining Officers; (j) each Related Party of each Entity in clauses (b) through (i) above; and (k) the Unsecured Notes Indenture Trustee (solely in its capacity as indenture trustee under the Unsecured Notes Indentures); *provided, however*, that, for the avoidance of doubt and notwithstanding anything to the contrary herein, "Released Party" shall not include (i) Trevor Milton and any entity that Trevor Milton directly or indirectly owns, holds, or controls any equity in, or any prior or future transferee of property directly or indirectly owned, held, or controlled by Trevor Milton; (ii) any other party to a Preserved Estate Claim; (iii) all other professionals, advisors, and attorneys advising the Debtors prior to the Petition Date other than those specifically identified in clauses (c) through (g) of this definition of "Released Party;" (iv) the D&Os, including any Other Director and Officer, other than the Remaining Officers; and (v) LG.

"*Releasing Party*" means (a) all holders of Claims who are sent a Ballot and do not timely elect to opt-out of the releases provided by the Plan in accordance with the Solicitation Procedures; (b) each Related Party of each Entity in clause (a) of this definition; and (c) each Released Party (other than the Debtors, the Liquidating Trust, and the Liquidating Trustee); *provided, however*, that, for the avoidance of doubt and notwithstanding anything to the contrary herein, "Releasing Party" shall not include (i) Trevor Milton and any entity that Trevor Milton directly or indirectly owns, holds, or controls any equity in, or any prior or future transferee of property directly or indirectly owned, held, or controlled by Trevor Milton; (ii) any other party to a Preserved Estate Claim; (iii) all other professionals, advisors, and attorneys advising the Debtors prior to the Petition Date other than those specifically identified in clauses (c) through (g) of the definition of "Released Party" in Article I.A. of this Plan; (iv) the D&Os, including any Other Director and Officer, other than the Remaining Officers; and (v) LG. For the avoidance of doubt, the Unsecured Notes Indenture Trustee is a Releasing Party solely in its capacity as indenture trustee under the Unsecured Notes Indentures and not individually or in any other capacity.

"*Remaining Officers*" means (a) Britton Worthen, and (b) any other individual who may be designated by the Committee, who in each case shall use commercially reasonable efforts to cooperate fully with and support the Liquidating Trust, including with respect to the investigation and prosecution of any Preserved Estate Claims, and shall not obstruct the activities of the Liquidating Trust. For the avoidance of doubt, the Remaining Officers shall not include the Ubben Released Parties. For the avoidance of doubt, the use of the term "cooperate fully" above should not be interpreted to require the individual to provide information to the Liquidating Trust other than such information that is within her or his actual knowledge and/or possession.

4896-9948-8316.v22

"*Reserve*" means a reserve, established by the Liquidating Trust on the Effective Date from Liquidating Trust Net Assets, in a minimum initial amount sufficient to fund all First Tier Claims that are not paid on the Effective Date and the projected reasonable costs and expenses of administering the Liquidating Trust.

"*Roy Action*" means purported shareholder derivative action filed on February 21, 2024, in the United States District Court for the District of Delaware, captioned *Roy v. Russell, et al.*, as Case No. 1:24-cv-00230-UNA, purportedly on behalf of Nikola, against certain of the Nikola's current and former officers and directors alleging violations of Section 14(a) of the Exchange Act, breach of fiduciary duty based on false statements; oversight, and insider trading; unjust enrichment; abuse of control; corporate waste; and gross mismanagement.

"*Schedules*" means, unless otherwise stated, the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*SEC Claim*" means the $83,052,974.90 Proof of Claim (No. 10420) that the SEC filed timely by the Government Bar Date, which amended the SEC's scheduled claim in the amount of $80,200,000.00.  For purposes of the Plan, the SEC Claim consists of the SEC Unsecured Claim and the SEC Junior Claim.

"*SEC Claim Resolution*" means the agreement between the Debtors and the SEC concerning, among other things, the treatment of the SEC Claim, as set forth in Article IV.J below.

"*SEC Junior Claim*" means an Allowed Claim of the SEC in the amount of $40,000,000.00 that will be classified and treated in Class 7 of the Plan.

"*SEC Order*" has the meaning ascribed to it in Article III.A.2 below.

"*SEC Penalty*" has the meaning ascribed to it in Article IV.G below.

"*SEC Unsecured Claim*" means an Allowed General Unsecured Claim of the SEC in the amount of $43,052,974.90 that will be classified in Class 3 of the Plan, but treated solely as provided in the SEC Claim Resolution.

"*Section 510(b) Claims*" means any Claim subject to subordination under Section 510(b) of the Bankruptcy Code, including, but not limited to (a) any Claim filed against the Debtors on account of the Securities Class Action, including Proof of Claim No. 10257; and (b) any Claim filed against the Debtors on account of the Tenneson Action, including Proof of Claim No. 10254.

"*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a, *et seq*.

14

"*Securities Class Action*" means the consolidated securities class action lawsuit pending in the United States District Court of the District of Arizona under lead case *Borteanu v. Nikola Corporation, et al.*, Case No. CV-20-01797-PXL-SPL.

"*Tax Claim*" means a Claim against any of the Debtors that is of a kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Tenneson Action*" means purported securities class action filed on October 13, 2023, by John Tenneson in the United States District Court for the District of Arizona, captioned *Tenneson v. Nikola et al.*, as Case No. 2:23-cv-02131-DJH, asserting claims against Nikola and certain officers and directors under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, based on allegedly false and/or misleading statements and omissions in press releases, public filings, and in social media regarding the Nikola's safety and structural controls related to its manufacturing of battery components and the likelihood of a product recall.

"*Unexpired Lease*" means a lease to which any of the Debtors are a party that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

"*Unimpaired*" means a claim that is not "impaired" pursuant to section 1124 of the Bankruptcy Code.

"*Unnamed Parties*" means Joe Pike and Pablo Koziner.

"*Unsecured Notes*" means together those certain 8.00%/11.00% Convertible Senior PIK Toggle Notes due 2026 and those certain 8.00%/8.00% Convertible Senior PIK Toggle Notes due 2026.

"*Unsecured Notes Claim*" means any Claim on account of the Unsecured Notes derived from, based upon, relating to, or arising under the Unsecured Notes Indentures.

"*Unsecured Notes Claims Allowed Amount*" means the Allowed amount of the Unsecured Notes Claim as a Class 3 General Unsecured Claim equal to (a) $44,860,102.62 plus (b) the Unsecured Notes Indenture Trustee's rights to compensation and reimbursement under the Unsecured Notes Indentures.

"*Unsecured Notes Indentures*" means together that certain Indenture dated June 1, 2022 (as amended, restated, supplement, or otherwise modified from time to time) by and among Debtors, as issuer, the guarantor party thereto, and the Unsecured Notes Indenture Trustee and that certain Indenture dated June 23, 2023 (as amended, restated, supplement, or otherwise modified from time to time) by and among Debtors, as issuer, the guarantor party thereto, and the Unsecured Notes Indenture Trustee.

"*Unsecured Notes Indenture Trustee*" means U.S. Bank Trust Company, National Association, in its capacity as indenture trustee under the Unsecured Notes Indentures, or any successor trustee appointed in accordance with the terms set forth in the Unsecured Notes Indentures.

"*U.S. Trustee*" means the office of the United States Trustee for the District of Delaware.

"*Ubben Claims*" means any potential Claim or Cause of Action of the Ubben Released Parties including, but not limited to, the Claims filed as Proof of Claim Nos. 10175 and 10176 on the claims register in these Chapter 11 Cases.

"*Ubben Contribution*" means cash in the total amount of $6.95 million contemplated to be paid by or on behalf of the Ubben Released Parties in accordance with the terms of the 9019 Motion, the Derivative Action Stipulation and the Plan.

"*Ubben Released Parties*" means Jeffrey Ubben; Inclusive Capital Partners, L.P. and any of its affiliates, including without limitation Inclusive Capital Spring Fund Manager, L.L.C., Inclusive Capital Partners Holdco, L.P., Inclusive Capital Partners, L.L.C., Inclusive Capital Partners Spring Master Fund, L.P., Inclusive Capital Partners Spring Fund, L.P., Inclusive Capital Partners Spring International Fund, L.P. and Inclusive Capital Partners Spring NM, LLC.; ValueAct Holdings L.P. and any of its affiliates, including without limitation ValueAct Spring Master Fund, L.P. and VA Spring NM, LLC; and their respective insurers.

"*Voting Deadline*" means August 20, 2025 at 5:00 p.m. (prevailing Eastern Time), or such other date and time as may be set in accordance with the Solicitation Procedures.

B.      *Interpretation*

Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective section in, article of or exhibit to the Plan, as the same may be amended, waived or modified from time to time.  Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender.  The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

C.      *Headings*

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

D.      *Application of Definitions and Rules of Construction Contained in the Bankruptcy Code.*

Words and terms defined in section 101 of the Bankruptcy Code shall have the same meanings when used in the Plan, unless a different definition is given in Article I.A or elsewhere in the Plan.  Unless otherwise specified, the rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.  Captions and headings to Articles, Sections, schedules, and exhibits are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof.  Any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code, or the Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.  References to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system.  References to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable.  References to "shareholders," "directors," and "officers" shall also include "members" and "managers," as

4896-9948-8316.v22

applicable, as such terms are defined under the applicable state limited liability company laws or applicable foreign law.  The words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."   Unless otherwise stated, all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time.  Any reference herein to an Entity as a holder of a Claim or interest includes that Entity's successors and assigns.  Capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form.

Any immaterial effectuating provisions may be interpreted by the Debtors or the Liquidating Trustee, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided*, that no effectuating provision shall be immaterial or deemed immaterial if it has any substantive legal or economic effect on any Entity.

E.      *Other Terms*

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan.

F.      *Appendices to Plan Documents*

All appendices to the Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein.  Except as otherwise provided herein, the Plan Supplement shall be filed with the Bankruptcy Court not less than fourteen (14) days prior to the Voting Deadline.  Holders of Claims and Equity Interests may obtain a copy of the Plan Documents, once filed, at the Debtors' case information website located at https://dm.epiq11.com/Nikola or at www.deb.uscourts.gov, or by a written request sent to:

| | |
|---|---|
| Joshua D. Morse, Esq. | Andrew V. Alfano, Esq. |
| Jonathan Doolittle, Esq. | Chazz C. Coleman, Esq. |
| **PILLSBURY WINTHROP SHAW PITTMAN LLP** | **PILLSBURY WINTHROP SHAW PITTMAN LLP** |
| Four Embarcadero Center, 22nd Floor | 31 West 52nd Street |
| San Francisco, California 94111-5998 | New York, New York 10019 |
| Telephone: (415) 983-1000 | Telephone: (212) 858-1000 |
| Facsimile:  (415) 983-1200 | Facsimile:  (212) 858-1500 |
| Email: joshua.morse@pillsburylaw.com | Email: andrew.alfano@pillsburylaw.com |
|    jonathan.doolittle@pillsburylaw.com |    chazz.coleman@pillsburylaw.com |

Unless otherwise expressly provided in the Plan, the Debtors may alter, modify, or amend any Plan Supplement document in accordance with Article XV.

G.      *Controlling Document*

In the event of an inconsistency between this Combined DS and Plan or any solicitation document, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control.  In the event of an

4896-9948-8316.v22

inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

H.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. Unless otherwise specified, all references herein to times of day shall be references to prevailing Eastern Time. In the event that any payment or act hereunder is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

I.    *References to Monetary Figures*

All monetary figures referenced herein are denominated in U.S. dollars, unless otherwise expressly provided.

## ARTICLE II.
## THE DEBTORS' CORPORATE HISTORY,
## STRUCTURE, AND BUSINESS OVERVIEW

A.    *The Debtors' Corporate History*

Nikola Corporation ("Nikola") is a Delaware corporation, which was incorporated originally as VectoIQ Acquisition Corp., or VectoIQ, in January 2018. On June 3, 2020, VectoIQ consummated a business combination with Nikola's corporate predecessor ("Legacy Nikola"), and, in connection therewith, (i) VectoIQ's wholly-owned subsidiary merged with and into Legacy Nikola, whereby Legacy Nikola survived the merger and was deemed the accounting predecessor of the merger and became the successor registrant for SEC purposes and (ii) changed its name to "Nikola Corporation." Upon consummation of the foregoing transactions, Legacy Nikola became Nikola's wholly owned subsidiary.

B.    *The Company's Business Operations*

As of the Petition Date, the Company was an early-stage growth company that designed and manufactured heavy-duty commercial hydrogen-electric ("FCEV") and battery-electric ("BEV") trucks and energy infrastructure solutions, via the HYLA brand. The Company had been a pioneer in moving zero-emissions transportation forward, including bringing the first class 8 hydrogen fuel cell electric trucks to market in North America and developing the HYLA hydrogen refueling highway, connecting Northern California to Southern California.

As of the Petition Date, the Debtors operated in two business units: Truck and Energy. The Truck business unit commercialized FCEV and BEV Class 8 trucks that provide environmentally friendly, cost-effective solutions to the short, medium and long-haul trucking sectors. The Energy business unit developed hydrogen fueling infrastructure to support the Company's FCEV trucks covering supply, distribution and dispensing.

4896-9948-8316.v22

As of the Petition Date, the Debtors also had a significant patent portfolio,[5] including 46 U.S. utility patents, 51 foreign utility patents, 15 U.S. design patents, and 115 foreign design patents.

The Debtors commenced commercial production of BEV trucks in the first quarter of 2022 and commenced commercial production of FCEV trucks in the third quarter of 2023, both at its 691,000 square foot state of the art manufacturing facility in Coolidge, Arizona. The Debtors' FCEV trucks were the first such trucks in serial production. The trucks have an estimated range of up to 330 miles for BEV trucks and up to 500 miles for FCEV trucks. The manufacturing capacity at Coolidge, Arizona was up to 2,400 units per year, over three shifts.

As of the Petition Date, the Debtors had an inventory of 259 trucks (all located in Coolidge, AZ) consisting of 103 FCEV trucks and 156 BEV trucks. A further 87 trucks (79 FCEV trucks and 8 BEV trucks) were at various dealer locations.[6] Certain of those trucks were tied to specific end-user customers and are just waiting for customers to take delivery.

Beginning in the third quarter of 2023, production and sales of BEV trucks were impacted significantly by the voluntary recall of BEV trucks which required the Company to replace the battery packs in all BEV trucks. The Company incurred significant expenses associated with this recall. The battery replacement commenced in late 2023, and retrofit trucks are returned to dealers or end users once the battery packs were replaced. The Company initially expected to complete the retrofit and return all end user and dealer trucks by the end of 2024; however, these Chapter 11 Cases delayed such activities. As of the Petition Date, the Debtors have incurred losses of more than $44 million relating to the voluntary recall. The total negative impact from all recall-related activity is expected to be approximately $56 million.

As of the Petition Date, the Company's global Energy brand, HYLA, encompassed energy products for procuring, distributing, and dispensing hydrogen to fuel the Company's FCEV trucks. The Company planned to leverage multiple ownership structures where it either fully or partially owned, or does not own, hydrogen production assets. In cases where hydrogen supply could be sourced without ownership of hydrogen production assets, the Debtors entered long-term supply hydrogen production contracts.

As of the Petition Date, the Company's hydrogen dispensing network consisted of eight (8) operational fueling locations in California (Ontario, Long Beach, Santa Fe Springs, and a partner site with Nikola access in Oakland), Arizona (Coolidge), Illinois (Plainfield), Colorado (Kiowa), and Canada (Toronto). Through those sites, the Company could fuel up to 120 FCEV trucks per day.

A more detailed summary of the Company's business operations can be found in the *Declaration of Steven J. Girsky in Support of Debtors' Chapter 11 Proceedings and First Day*

---

[5] As of the Petition Date, the Company had 65 pending patents, including mechanical systems, thermal, electrical, power management, hydrogen systems, diagnostics, and controls.

[6] The Debtors understand that some of these 87 trucks are not sellable (*e.g.*, certain BEV trucks are missing battery packs).

4896-9948-8316.v22

*Pleadings* [D.I.187] (the "Girsky Declaration"), and the Debtors' Annual Report on Form 10-K, which is expected to be filed on or about July 31, 2025.

C.    *The Debtors' Prepetition Corporate and Capital Structure*[7]

    1.    The Debtors' Prepetition Corporate Structure

On June 24, 2024, the Company effected a one-for-thirty (1-for-30) reverse stock split of its common stock (the "Reverse Stock Split"). The Reverse Stock Split was approved by stockholders at the Company's annual meeting of stockholders on June 5, 2024, and on June 13, 2024, Nikola's board of directors approved the Reverse Stock Split. Contemporaneously with the Reverse Stock Split, the number of authorized shares of common stock was reduced from 1,600,000,000 to 1,000,000,000.

As of January 31, 2025, there were 119,400,666 shares of Nikola common stock outstanding. As of the Petition Date, Nikola had 150,000,000 shares of authorized preferred stock, at $0.0001 par value, but no such shares were issued and outstanding as of December 31, 2024.

As of the Petition Date, Nikola's common stock was publicly traded on the Nasdaq Stock Market LLC ("Nasdaq"), under the symbol "NKLA." On February 19, 2025, Nikola received a letter from the staff of the Nasdaq Listing Qualifications Department (the "Staff") notifying Nikola that the Staff had determined that Nikola's common stock would be delisted from Nasdaq. Trading of Nikola's common stock on Nasdaq was suspended by Nasdaq at the opening of business on February 26, 2025. On April 3, 2025, Nikola filed a Form 25 with the Securities and Exchange Commission to effectuate the delisting of its common stock on Nasdaq, which delisting became effective on or about the opening of business on April 14, 2025. Nikola's common stock trades currently on the Pink Market platform operated by OTC Markets Group, Inc., under the symbol "NKLAQ."

As of the Petition Date, Nikola owned directly or indirectly 100% of the other Debtor legal entities, 100% of three (3) non-Debtor foreign subsidiaries (Nikola GmbH (Germany), Nikola Motor Canada, Inc., and Camions Nikola Inc. (Quebec)), 100% of a non-Debtor special purpose bankruptcy-remote entity (Nikola AG23 LLC), and 20% of (Wabash Valley Resources, LLC).[8] A chart illustrating Nikola's corporate structure is attached hereto as **Exhibit A**.

---

[7]   The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits. Capitalized terms used but not defined in this Article I shall have the meanings ascribed to them in the applicable governing agreements.

[8]   In addition, the assets of Non-Debtor affiliate Romeo Power, Inc. (which owns 100% of Romeo Systems, Inc., which, in turn, owns a controlling interest in Romeo Systems Technology LLC)), was transferred to SG Service Co., LLC, as assignee pursuant to a general assignment for the benefit of creditors, on June 30, 2023, and the assignee is in the process of concluding the administration of that estate.

2.      The Debtors' Prepetition Capital Structure and Obligations

As of the Petition Date, the Debtors had approximately $97.7 million in total funded debt and financing lease obligations (excluding accrued interest and certain costs).  The following table depicts the Debtors' prepetition capital structure:

| Funded Debt and Other Obligations | Approx. Outstanding Principal | Maturity Date |
|---|---|---|
| Convertible Notes | $44.2 million | May 31, 2026 |
| Financing Obligations (operating and equipment leases) | $53.5 million | Various |

a.      The Convertible Notes

The Company funded most of its prepetition operations through capital raises in the form of senior unsecured convertible notes.  In June 2022, the Company completed a private placement of $200.0 million aggregate principal amount of June 2022 Toggle Convertible Notes, which mature on May 31, 2026.  In June 2023, the Company completed the private placement of $11.0 million aggregate principal amount of June 2023 Toggle Convertible Notes (together with the June 2022 Toggle Convertible Notes, the "Toggle Convertible Notes"), which mature on May 31, 2026.  The Company can elect to make any interest payment on the Toggle Convertible Notes in cash, through the issuance of additional Toggle Convertible Notes in the form of the Toggle Convertible Notes with respect to which such interest is due, or any combination thereof. Interest on the Toggle Convertible Notes is payable semi-annually in arrears.

Prior to the Petition Date, the holders of most of the Toggle Convertible Notes had exercised their conversion rights.  As of the Petition Date, the holder of the remaining obligations owed on the Toggle Convertible Notes, Antara Capital LP, on behalf of itself and certain advised or managed funds and accounts, had not exercised its conversion rights in full and was owed approximately $44.2 million.

b.      Equipment Finance and Operating Leases

The Company has entered into a number of manufacturing equipment leases.  As of December 31, 2024, the total lease liability (the discounted remaining payments on the leases) in respect to these leases was $41.8 million.

The Company has entered into a number of operating leases for office and manufacturing space and for hydrogen fueling operations.  As of December 31, 2024, the total lease liability (the discounted remaining payments on the leases) was $11.7 million.

c.      Real Estate Lease Obligations

On May 10, 2022 (the "Sale Date"), the Company entered into a sale agreement (the "Sale Agreement"), pursuant to which the Company sold the land and property related to the Company's headquarters in Phoenix, Arizona for a purchase price of $52.5 million.  As of the Sale Date, $13.1 million was withheld from the proceeds received related to portions of the

21

headquarters undergoing construction.   The Company received the remaining proceeds throughout the completion of construction pursuant to the terms of the Sale Agreement. Concurrent with the sale, the Company entered into a lease agreement (the "Lease Agreement"), whereby the Company leased back the land and property related to the headquarters for an initial term of 20 years with four extension options for 7 years each.  As of the Sale Date, the Company considered one extension option reasonably certain of being exercised.  The Lease Agreement is classified by the Company as a finance lease with the buyer not considered to have obtained control of the land and property related to the headquarters facility, for which reason this property is recognized on the Company's balance sheet.  As of December 31, 2024, the total financing liability (the discounted remaining payments on the financing obligation) in respect to this Sale Agreement was $52.5 million.

On June 29, 2023 (the "Land Sale Date"), the Company entered into a sale agreement, pursuant to which the Company sold the land in Coolidge, Arizona on which the Company's manufacturing facility is located for a purchase price of $50.4 million.  Concurrent with the sale, the Company entered into a lease agreement (the "Land Lease Agreement"), whereby the Company leased back the land for an initial term of 99 years.  The Land Lease Agreement grants the Company an option to repurchase the land upon the fiftieth (50th) anniversary of the Land Sale Date for a price equal to the greater of the fair market value, or 300% of the purchase price. As of the Land Sale Date, the Company considered the purchase option reasonably certain of being exercised.  The Land Lease Agreement is classified by the Company as a finance lease with the buyer not considered to have obtained control of the land and property related to the headquarters facility, for which reason this property is recognized on the Company's balance sheet.   As of December 31, 2024, the total financing liability (the discounted remaining payments on the financing obligation) in respect to this Land Lease Agreement was $51.9 million.

As of the Land Sale Date, the Company received an appraisal for the Coolidge, Arizona facility and premises subject to the Lease Agreement in the amount of approximately $174 million, net of the aggregate liability associated with the Land Lease Agreement.

On June 12, 2025, the Debtors sought entry of an order extending the period to assume or reject unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code for a period of ninety (90) days from June 19, 2025, through and including September 17, 2025 [D.I. 602].  A hearing before the Bankruptcy Court to consider such relief is schedule for June 26, 2025.

d.      Letters of Credit

During the first quarter of 2024, the Company executed a $3.0 million letter of credit in connection with the FFI Purchase Agreement through January 30, 2025.   As of December 30, 2024, no amounts have been drawn on the letter of credit.  During the third quarter of 2023, the Company executed a $1.2 million letter of credit to secure a customs bond through September 14, 2024.   The letter of credit was subsequently extended through September 14, 2025.  As of December 30, 2024, no amounts have been drawn on the letter of credit.

4896-9948-8316.v22

During the second quarter of 2022, and in conjunction with the execution of the Lease Agreement, the Company executed an irrevocable standby letter of credit for $12.5 million to collateralize the Company's lease obligation. The Lease Agreement was subsequently amended, increasing the amount of the letter of credit to $12.8 million. In connection with the closing of the Lucid Sale, however, the letter of credit was cancelled and all amounts posted by the Company thereunder have been returned.

e.    Unsecured Claims

In addition to their funded debt, the Debtors also have significant unsecured debt, including amounts owing on account of the Unsecured Notes, and to trade vendors. The Debtors routinely incur fixed, liquidated, and undisputed payment obligations in the ordinary course of business to various third-party providers of goods and services. Prior to the Petition Date, the Debtors relied on a broad network of vendors to supply parts for the production of the BEV trucks and FCEV trucks. A majority of these vendors conduct business with the Debtors on a purchase order-by-purchase-order basis and are paid on prearranged terms.

## ARTICLE III.
## EVENTS LEADING TO THE CHAPTER 11 FILING

A.    *Macroeconomic Trends and Company-Specific Events*

The Company was an early stage, capital intensive business that incurred net losses of $966.3 million, $812.7 million and $481.2 million for the year ended December 31, 2023 and for the nine months ended September 30, 2023 and 2024, respectively, and has an accumulated deficit of approximately $3.6 billion from the inception of Nikola Corporation, a Delaware corporation, prior to the merger with VectoIQ, or Legacy Nikola, through September 30, 2024.

Over the last year prior to the Petition Date, the Company contended with significant macroeconomic and company-specific headwinds that strained its business and resources and ultimately led the Debtors to seek chapter 11 relief.

1.    Challenges Facing the Debtors Over the Years

The hydrogen fuel cell vehicle market and hydrogen infrastructure are early-stage markets. As a result, the Company has experienced production shortages because of new technology supply chain challenges. Additionally, the lack of hydrogen infrastructure or supply for end users hampers truck sales and building out hydrogen infrastructure requires significant investment. The Company requires significant capital investment to execute its business plans. The Company is also facing significant litigation, the cost of which is draining cash from the Company. The Company is also obligated to make a significant payment to the SEC in respect to a settlement, the terms of which are further described below. Despite its best efforts, it became clear that the Company would not be able to raise the funds necessary to fund operations going forward.

23

2.    SEC Settlement

By order dated December 21, 2021 (the "SEC Order"), the Company and the SEC reached a settlement arising out of the SEC's investigation of the Company related to a short-seller article published in September 2020.  Under the terms of the settlement, without admitting or denying the SEC's findings, the Company, among other things, agreed to pay a $125 million civil penalty.

The first $25 million installment was paid at the end of 2021, and the remaining installments were to be paid semiannually through 2023. In July 2022, the Company and SEC agreed to an alternative payment plan.  The Company made payments of $1.5 million during the first and second quarters of 2024, a payment of $0.8 million during the third quarter of 2024, and the remainder of the payment plan is subject to determination.  As of September 30, 2024, the Company has reflected the remaining liability of $80.2 million in accrued expenses and other current liabilities on the condensed consolidated balance sheets.

3.    Prepetition Litigation

As described in the Girsky Declaration, which is incorporated herein by reference, the Debtors have been involved in numerous litigation actions during the prepetition period, including, among others, (a) the Shareholder Securities Litigation (as defined in the Girsky Declaration); (b) the arbitration claims asserted by Nikola against Mr. Trevor Milton in *Nikola Corp. v. Milton*, AAA Case No. 01-21-0017-1964, including but not limited to the arbitration award granted November 17, 2023, net of fees and costs to be paid to Kasowitz Benson Torres LLP, and the judgment in the Company's favor in *Nikola Corp. v. Milton*, 23-cv-02635-DJH (D. Ariz.); (c) the Consolidated Chancery Action (as defined in the Girsky Declaration); (d) the Brown & Gomes Action (as defined in the Girsky Declaration); (e) the Lomont Action (as defined in the Girsky Declaration); (f) the Roy Action; (g) the Tenneson Action; (h) litigation involving Lion Electric, and (i) litigation involving a former employee and Smithers Tire & Automotive Testing Inc.

4.    Liquidity Issues

Historically, losses were funded through a combination of existing cash on hand, sales of stock, debt financings, strategic partnerships, and sales of real estate.  To continue operating, the Company would require substantial additional capital to manufacture and validate its products and services, fund operations and satisfy obligations for the foreseeable future.  Furthermore, the Company's plans to move to the next generation of trucks and build out the hydrogen fueling station infrastructure would require significant incremental investments.  Despite its best efforts, the Company has simply not been able to raise the funds needed to continue effectuating its business plan.

Because the Company did not have sufficient cash to fund its operations and no prospects to raise those funds, the Company's board concluded that it was in best interest of the Company and its creditors to complete an orderly sale process to maximize the value received from asset sales, resulting in a better return for the Company and its creditors.  Nikola entered Chapter 11

with approximately $47 million in cash on hand to fund its limited operations, implement the postpetition sale process, and exit Chapter 11 through a plan process.

B.    *Prepetition Restructuring Efforts*

      1.    <u>The Appointment of the Strategic Advisory Committee</u>

As it became increasingly clear to the Board of Directors that the Debtors would need to extend liquidity to continue to develop strategic alternatives, the Board established a committee of the Board, designated as the "<u>Strategic Advisory Committee</u>".  The Strategic Advisory Committee, which remains subject to the direction of the Board, was tasked initially with working with management to interact with the Company's financial advisors to review and evaluate potential alternatives for the Company in the event the ongoing negotiations with certain strategic investors were not successful or did not result in an investment in the Company within the timeframe anticipated when the Strategic Advisory Committee was formed.  The Strategic Advisory Committee did not act in isolation, but instead was authorized to engage advisors, including additional financial advisors, and to coordinate with the Debtors' counsel and advisors evaluate potential alternatives, including alternative strategic transactions involving the Company, debt refinancing or restructuring alternatives.

The Strategic Advisory Committee was established on August 30, 2024, and was, until, February 18, 2025, compromised of four (4) members of the Board, including Steven M. Shindler, Jonathan M. Pertchik, Bruce L. Smith, and Carla M. Tully.[9]  Prior to the Petition Date, the Strategic Advisory Committee conducted nineteen (19) formal meetings.

In parallel with exploring various available transaction alternatives (explained in greater detail above), the Strategic Advisory Committee recommended several actions to resolve consensually material liabilities that were perceived as standing in the way of any strategic counterparty pursuing a transaction with the Company out of court.  Actions taken based on the recommendation of the Strategic Advisory Committee resulted in decreasing the "liability wall" facing the Company from upwards of $2.25 billion to potentially less than $400 million at cost of only minimal actual capital outlay by the Company.  Specific actions taken by the Company to clean up the balance sheet included, among others:

- Increasing the liquidity runway through raising convertible debt and equity;

- establishing an inventory purchase moratorium;

- reducing employee headcount;

- reducing significant Company liabilities through reduced/compromised payments to creditors;

- exploring an opportunity to consensually resolve the Company's liability with the SEC;

---

[9]    On, February 18, 2025, the Strategic Advisory Committee was reconstituted with the following three members of the Board: Steven M. Shindler, Jonathan M. Pertchik, and Carla M. Tully.

4896-9948-8316.v22

- reaching agreement to settle the consolidated securities class action litigation and litigation related to the Romeo Power / Lion Electric relationship;

- exiting unfavorable take or pay Hydrogen supply contract(s); and

- exploring other ways to reduce liabilities.

In parallel, the Strategic Advisory Committee began working on bankruptcy contingency planning toward the end of 2024, which included retaining M3 Advisory Partners, LP, in December 2024 to develop and administer short-term cash flow forecasting, and to assist Pillsbury with preparation of first day motions, the creditors' matrix, and preparation of a 13-week budget.

2.  The Debtors' Prepetition M&A Initiatives and Marketing Process Leading to the Commencement of These Chapter 11 Cases

To address their increasingly critical operational challenges and liquidity needs, the Debtors worked with various advisors to raise funds and engaged in various M&A initiatives in the year leading up to the Petition Date to explore numerous possible restructuring options. Since the Summer of 2024, Nikola raised $80 million in convertible debt financing and an additional $65 million in common equity (in exchange for resetting the conversion price of another series of convertible debt) to support the Debtors' extensive efforts in pursuit of a strategic and/or financial transaction.

a.  Prepetition Sale Marketing Process by Prepetition Investment Bankers

Extensive internal and external time and resources have been devoted to exploring transactions with numerous potential counterparties. Initial conversations focused on operational work (e.g., how to sell the trucks, potential for serving as a financing company, and other regular way strategic initiatives). Later conversations focused on potential financing and sale transactions to extend the liquidity runway. Most recently, the Company has solicited investor interest in buying individual assets.

Through the initial phases of the process, the Debtors utilized three investment bankers, all on a non-exclusive basis, to assist with raising funds (proposed common stock and convertible notes public offerings, and proposed private offerings, issue and sale of equity or convertible or hybrid securities) and exploring a possible sale of the Debtors as a going concern. Those bankers included Citigroup Global Markets Inc., BTIG, LLC, and Goldman Sachs & Co., LLC (collectively, the "Prepetition Investment Bankers").

While Citigroup and BTIG primarily focused on capital raising strategies, commencing in the Summer of 2024, Goldman Sachs increased the urgency of Nikola's efforts to identify parties that it and the Company determined would be interested in acquiring the Company as a going concern. Approximately five (5) months before the Petition Date, Goldman Sachs reached out to approximately twenty-two (22) separate parties to gauge their interest in acquiring the Debtors as a going concern. This outreach focused on truck manufacturing companies and companies with transportation logistics needs who were large enough to possibly be interested in an acquisition.

4896-9948-8316.v22

Out of the parties contacted by Goldman Sachs, two (2) international automotive manufacturers expressed interest in a possible transaction. After one of those manufacturers dropped out, the Debtors had further discussions with the other party and various term sheets were exchanged. Unfortunately, that party ultimately fell away in the fall of 2024. As an out-of-court solution became less likely, Nikola sought to engage an investment banker with distressed capabilities to simultaneously explore restructuring options and continue the financial and strategic investor outreach initiated by the Prepetition Investment Bankers.

b.    The Debtors Retain Houlihan Lokey

As the Debtors' liquidity position continued to erode, Houlihan Lokey Capital, Inc. ("HL"), was selected in October 2024 to provide prepetition investment banking services to the Debtors. In that role, HL has, among other things: (a) continued the marketing process with the parties that were engaged with the Debtors before HL's retention, and solicited additional third-party interest to gauge potential interest in both a standalone investment and an investment alongside a potential strategic partner (collectively, the "Marketing Process"); (b) assisted the Debtors in developing a sale strategy and bidding procedures for their postpetition marketing process; and (c) solicited lenders to provide a postpetition loan to the Debtors, negotiated loan terms, and advised the Debtors in connection with the loan.

Following its retention, HL initially reached out to twenty-four (24) financial investors regarding the Nikola opportunity. Multiple follow-up conversations were had with prospective investors; however, general feedback was that the investment required to achieve the business plan was too difficult for a financial investor without a strategic interest in the assets to make given the long and uncertain path towards profitability.

HL also assisted the Debtors with continuing to explore a sale of all their assets as an ongoing, operating business. In early December 2024, discussions with one potentially interested international vehicle manufacturing company who previously executed a confidentiality agreement (neither of the two companies that engaged in discussions with the Prepetition Investment Bankers referenced above) restarted. After a non-binding letter of intent was signed to facilitate discussions concerning a potential acquisition, the Debtors granted access to their electronic data room and invited the party to have meetings with the Debtors' management.

Thereafter, the parties engaged (on an exclusive basis pursuant to the terms of the LOI) in substantial due diligence over an approximately four-week period, including a comprehensive review of the legal, financial, tax, commercial, environmental, intellectual property, operation, labor and employment and material agreements of the Debtors. Due diligence included a several day-long site visit to the Debtors' manufacturing facility by the prospective buyer's agents, lawyers, accountants and advisors. While it appeared that an agreement to purchase substantially all the Debtors' assets through a bankruptcy sale process was progressing, the prospective buyer ultimately walked away.

Following the disappointing conclusion of negotiations outlined above, the Debtors, with the assistance of HL, redoubled their efforts to find a going concern buyer. As of the Petition Date, the Debtors were in active discussions with at least three (3) parties interested in such

4896-9948-8316.v22

opportunity. Given the prior unsuccessful efforts by the Prepetition Investment Bankers and HL to find a buyer for the Debtors as a going concern sale, however, the Debtors, with the assistance of their advisors, also evaluated the sale of the Debtors' separate business segments and begun to market various of the Debtors' assets and business separately. Those efforts accelerated with the commencement of the Chapter 11 Cases.

The Debtors continued the marketing and sale process by requesting the Bankruptcy Court's approval of bidding procedures to govern the sale process, including an auction. Moreover, HL continued marketing the Debtors' assets to potential buyers after the Petition Date and continue engaging in discussions with any party that executed a confidentiality agreement, with the goal of having as many bidders as possible participate in the auction and ensure a robust sale process that will maximize the value of the Debtors' assets. The post-petition sale process is described in detail below.

## ARTICLE IV.
## EVENTS CONCURRENT WITH AND FOLLOWING
## COMMENCEMENT OF THE CHAPTER 11 CASES

On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors remain in possession of their property and continue to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 and the *Order Directing Joint Administration of Chapter 11 Cases* [D.I. 46] entered by the Bankruptcy Court on February 20, 2025, in each of the Chapter 11 Cases. No request has been made for the appointment of a trustee or examiner.

Capitalized terms that are used in this Article IV but not otherwise defined in this Combined DS and Plan shall have the meanings ascribed to them in the relevant motions, orders, or filings.

A.    *Operational and Other Relief*

On the Petition Date, the Debtors filed several "first day" motions designed to ease the Debtors' transition into chapter 11, maximize the value of the Debtors' assets, and minimize the effects of the commencement of the Chapter 11 Cases. The relief requested in the motions has been granted in various orders entered by the Bankruptcy Court.

The orders entered by the Bankruptcy Court either on an interim and/or final basis enabled the Debtors to preserve value and efficiently administer the Chapter 11 Cases, including by, among other things, (1) authorizing the Debtors to maintain existing cash management systems, bank accounts, and business forms [D.I. 48, 169], (2) authorizing the Debtors to pay certain prepetition taxes and fees [D.I. 59, 190], (3) authorizing the Debtors to pay their obligations under prepetition insurance policies and honor obligations thereunder, and renew, supplement, modify, and purchase insurance coverage in the ordinary course of business [D.I. 58, 170], (4) granting authority to pay employees' wage Claims and related obligations in the ordinary course of business and maintain certain employee benefit programs [D.I. 47, 177],

28

(5) approving procedures for, among other things, determining adequate assurance for utility providers, establishing procedures for resolving any objections relating to the proposed adequate assurance, and prohibiting utility providers from altering, refusing, or discontinuing services [D.I. 57, 196], (6) authorizing payment of certain prepetition claims of trade claimants, lienholder claims, 503(b)(9) claims, and related relief [D.I. 55, 178], (7) seeking relief from the requirement to file lists of equity holder [D.I. 52], (8) authorizing the maintenance, administration and continuation of certain customer programs [D.I. 53, 171], and (9) authorizing the Debtors to implement restrictions and notification requirements regarding certain transfers of, and declarations of worthlessness with respect to, the Securities of Debtor Nikola Corporation [D.I. 49, 183].

B.    *Retention of Debtors' Professionals*

On the Petition Date, the Debtors filed an application to retain and employ Epiq Corporate Restructuring, LLC ("Epiq"), as Claims and Noticing Agent in the Chapter 11 Cases [D.I. 50] and a separate motion to retain Epiq as Administrative Advisor [D.I. 153].

In addition, to assist the Debtors in carrying out their duties as debtors in possession, and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Bankruptcy Court entered orders authorizing the Debtors to retain and employ the following professionals:  (1) Pillsbury, as counsel to the Debtors [D.I. 167]; (2) Potter Anderson, as counsel to the Debtors [D.I. 152]; (3) Houlihan Lokey Capital, Inc., as financial advisor and investment banker to the Debtors [D.I. 179]; and (4) M3 Advisory Partners, LP, as financial advisor to the Debtors [D.I. 166].

The foregoing Professionals are, in part, responsible for the administration of these Chapter 11 Cases.  The postpetition compensation of all of the Debtors' Professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the Bankruptcy Court's approval.

C.    *Ordinary Course Professionals*

On February 25, 2025, the Debtors filed a motion [D.I. 74] seeking entry of an order establishing a process for: (1) retaining Ordinary Course Professionals including accountants, attorneys, and other Professionals on an "as needed" basis without the submission of separate, formal retention applications; and (2) the allowance and payment of compensation and reimbursement of expenses of such Ordinary Course Professionals.  On March 19, 2025, the Bankruptcy Court entered the OCP Order [D.I. 195].

D.    *Appointment of the Committee*

On February 27, 2025, the U.S. Trustee appointed the Committee in these Chapter 11 Cases with the following members: (1) Antara Capital LP; (2) Hexagon Purus GmbH.; (3) duotec de Norteamérica S de RL de CV; (4) Fiedler Group; (5) Aztek Technologies S.A. DE C.V.; (6) STORE Master Funding XXXII, LLC; and (7) Proterra Powered LLC [D.I. 96]. Thereafter, on April 23, 2025, the U.S. Trustee amended the appointment of the Committee to include the following members:  (1) Antara Capital LP; (2) Hexagon Purus GmbH.; (3) duotec de Norteamérica S de RL de CV; (4) Fiedler Group; (5) Aztek Technologies S.A. DE C.V.; and

(6) Proterra Powered LLC [D.I. 445].  Then, on June 12, 2025, the U.S. Trustee further amended the appointment of the Committee to include the following members:  (1) Antara Capital LP; (2) Hexagon Purus GmbH.; (3) Fiedler Group; (4) Aztek Technologies S.A. DE C.V.; and (5) Proterra Powered LLC [D.I. 599].

To assist the Committee in carrying out its duties and otherwise represent the Committee's interests in the Chapter 11 Cases, the Bankruptcy Court entered orders authorizing the Committee to retain and employ the following professionals:  (1) Morrison & Foerster LLP, as counsel to the Committee [D.I. 421]; (2) Morris James LLP, as counsel to the Committee [D.I. 422]; (3) FTI Consulting, Inc., as financial advisor to the Committee [D.I. 430]; and (4) Ducera Partners LLC, as investment banker to the Committee [D.I. 431].  The postpetition compensation of all of the Committee's Professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the Bankruptcy Court's approval.

E.      *Post-Petition Asset Sales*

1.      <u>The Sale of the Debtors' Operating Assets</u>

To maximize the value of the Debtors' estates, on February 19, 2025, the Debtors sought entry of an order approving bidding procedures for the proposed sale of substantially all of the Debtors' assets, authorizing the Debtors to designate one or more stalking horse bidders, scheduling an auction and granting related relief.  On March 7, 2025, the Bankruptcy Court entered the Bidding Procedures Order, which among other things, authorized, but not directed, the Debtors, following consultation with the Consultation Parties (as defined in the Bidding Procedures Order), to designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement no later than March 17, 2025, at 4:00 p.m. (prevailing Eastern Time).  Ultimately, however, the Debtors, in consultation with the Consultation Parties, determined not to designate a stalking horse bidder or enter into a stalking horse agreement.

The Debtors with the assistance of their counsel and financial advisors, began to work immediately on the marketing and sale of substantially all of the Debtors' assets.  The Bidding Procedures Order fixed April 3, 2025, at 4:00 p.m. (prevailing Eastern Time) as the deadline for the submission of bids for the Assets (the "<u>Bid Deadline</u>").  Prior to the Bid Deadline, the Debtors received sixteen (16) written offers, four (4) of which the Debtors, after consultation with the Consultation Parties, determined were Qualified Bids for the bulk of the Debtors' assets. Additional bids were qualified for specific asset segments.

Pursuant to the Bidding Procedures Order, on April 7, 2025, the Debtors commenced the Auction at Pillsbury's offices in New York, New York, and continued virtually via Zoom.  The auction was transcribed by a certified reporter and monitored by counsel and financial advisors for the Debtors and the Committee.

a.      Sale of Wabash Assets

The first portion of the auction concerned the Debtors' 20% equity interest in Wabash Valley Resources Holdings LLC ("<u>Wabash Equity</u>") and a convertible promissory note issued by Wabash ("<u>Wabash Note</u>").

Midwest Infrastructure Partners submitted a Qualified Bid of $1,000,000 for the Wabash Equity. Phibro submitted a competing bid for $110,000. As a current member of Wabash, Phibro held a right of first refusal under the LLC agreement. At the conclusion of bidding, Phibro exercised this right, matching Midwest's offer and was deemed the Successful Bidder for the Wabash Equity.

For the Wabash Note, Peter Sherk initially bid $25,000. Phibro subsequently bid $125,000 and was declared the Successful Bidder.

These sales were approved by the Bankruptcy Court on April 11, 2025, through the entry of separate sale orders [D.I. 404, 407].

       b.     Sale of Core Operational Assets to Lucid USA II, Inc. (the "Purchaser")

The auction then moved to the Debtors' core manufacturing and real estate assets, comprising of:

- Nikola's headquarters in Phoenix, Arizona;

- The Coolidge, Arizona, manufacturing facility; and

- Substantially all associated machinery, equipment, and inventory.

Four parties submitted material bids for such assets. The Auction concluded with respect to such assets on April 10, 2025. As announced by the Debtors immediately prior to the conclusion of the Auction in accordance with the Bidding Procedures Order, the Debtors, in consultation with the Consultation Parties, determined the bid submitted by the Purchaser to be the Successful Bid (as defined in the Bidding Procedures Order).

On April 11, 2025, the Bankruptcy Court entered the Lucid Sale Order, which approved the Lucid Sale pursuant to the terms of the Lucid APA by and among the Debtors, the Purchaser and Lucid Group, Inc. A copy of the Lucid APA is attached to the Lucid Sale Order as Exhibit 1.

    2.    De Minimis Asset Sales

To further maximize the value of the Debtors' Estates, on March 14, 2025, the Debtors sought entry of an order approving procedures for selling *de minimis* assets having a sale price of $3,000,000 or less. On April 4, 2025, the Bankruptcy Court entered the *Order (I) Approving De Minimis Asset Sale Procedures and Related De Minimis Sale Transactions; and (II) Granting Related Relief* [D.I. 343].

As of the date hereof, the Debtors have closed one de minimis asset sale [D.I. 606, 700].

    3.    Environmental Credits Sale Process

On April 25, 2025, the Debtors filed a motion [D.I. 454] requesting approval of a separate sales process for certain environmental credits (*e.g.*, GHG and ACT Credits, collectively, the "Environmental Credits"). The motion requested authority to retain STX Commodities, LLC, as the Debtors' commodities broker, approval of bidding procedures tailored

to environmental credit sales; authorization to designate PACCAR Inc., as the stalking horse bidder; bid protections in favor of PACCAR; and entry of an order authorizing the sale of the credits free and clear of all liens under 11 U.S.C. § 363(f).

On May 8, 2025, the Bankruptcy Court approved a motion establishing the procedures for sale of the Environmental Credits [D.I. 489] and on May 13, 2025, the Bankruptcy Court approved the retention of STX Commodities, LLC [D.I. 508]. The hearing to approve the winning bidder(s) for the Environmental Credits was scheduled for June 9, 2025, but was adjourned to June 26, 2025.

On June 20, 2025, the Debtors filed the *Notice of Results of RFP Process and Successful Bidder(s) for Environmental Credits* [D.I. 620], announcing the selection of the $15.3 million bid submitted by Mack Trucks, Inc. as the winning bid for certain of the Environmental Credits. The Debtors also selected bids submitted by International Motors, LLC (d/b/a International Motors USA LLC in Illinois and Ohio), and FCA US LLC totaling $592,500 in the aggregate as the winning bids for subsets of the Environmental Credits, which were consummated pursuant to the Debtors' *de minimis* asset sale procedures [D.I. 589]. On June 24, 2025, the Bankruptcy Court entered the *Order (A) Approving the Sale of Certain of the Debtors' Environmental Credits Free and Clear of Liens, Claims, Interests, and Encumbrances, and (B) Granting Related Relief* [D.I. 648] approving the sale to Mack Trucks, Inc.

4.    FCEV Inventory Sale

On April 25, 2025, the Debtors sought entry of an order approving an agency agreement with Gordon Brothers Commercial & Industrial LLC ("Gordon Brothers"), for the marketing and sale of certain FCEV Vehicle inventory and other inventory, machinery, and equipment related to the FCEV Vehicles [D.I. 451]. Thereafter, on May 13, 2025, the Bankruptcy Court entered the order approving such relief [D.I. 514]. The process for Gordon Brothers to monetize such assets remains ongoing.

Thereafter, on May 30, 2025, the Debtors sought entry of an order approving the retention and employment of Hilco IP Services, LLC d/b/a Hilco Streambank ("Hilco Streambank") as intangible assets disposition consultant to the Debtors [D.I. 576]. On June 17, 2025, the Bankruptcy Court entered the order approving such relief [D.I. 607]. The process for Hilco Streambank to monetize the Debtors' intangible assets remains ongoing.

F.    *Claims Bar Date*

On March 13, 2025, the Bankruptcy Court entered the *Order (i) Establishing Deadlines for Filing Proofs of Claim and Requests for Allowance of Administrative Expense Claims in These Cases, (ii) Approving the Forms and Manner of Notice Thereof, and (iii) Granting Related Relief* [D.I. 180], establishing, among other things, (1) 5:00 p.m. (prevailing Eastern Time) on April 28, 2025 as the deadline for all non-governmental units to file Proofs of Claim in the Chapter 11 Cases, (2) August 18, 2025 as the deadline for all governmental units to file Proofs of Claim in the Chapter 11 Cases, (3) June 2, 2025, as the deadline for any person or entity to file a request for allowance of an Administrative Expense Claim that arose on or after the Petition Date through and including April 28, 2025, (4) the procedures for filing Proofs of Claim, and (5) the form and manner of notice of the various Bar Dates, each subject to the terms and exceptions set

forth therein.  On August 15, 2025, the Bankruptcy Court entered an Order [D.I. 888] approving a stipulation that extended the Governmental Bar Date solely for the SEC to August 26, 2025.

G.    *Milton Award, Pending Appeal Thereof, and Current Status of Collection Efforts*

On November 3, 2021, Nikola initiated the Arbitration against Trevor Milton asserting claims for breaches of fiduciary duty.  Nikola asserted that Trevor Milton breached his fiduciary duties to Nikola and was responsible for damaging Nikola including by causing Nikola to incur legal and professional fees and expenses in connection with government investigations and litigation.

On December 21, 2021, while the Arbitration was pending, the SEC Order was entered. The SEC Order stated that "Nikola primarily misled investors through scores of misrepresentations by its CEO and later Executive Chairman [ ] Milton."  SEC Order ¶ 2.  Based on various false and misleading statements that had been made to the public, the SEC imposed a civil money penalty in the amount of $125 million on Nikola (the "SEC Penalty"), which Nikola was to pay in installments.  *Id*. § IV(B).

The Arbitration culminated in an eight-day hearing before a panel of three arbitrators from July 24, 2023, through August 2, 2023.  On November 17, 2023, the panel issued the Milton Award.  *Id*.

The Milton Award found that Trevor Milton violated his fiduciary duties of loyalty and good faith to Nikola.  *See* Milton Award at 7, 50.  Specifically, Trevor Milton breached his fiduciary duties through a pattern of false and misleading public statements about Nikola's products and by subordinating Nikola's interests to his own by refusing efforts to review and approve his public statements.  *See id*. at 53.  The Milton Award awarded Nikola damages equal to 97% of the amount of the SEC Penalty that the Debtors paid.  *See id*. at 126.  To date, Nikola has paid $38 million of the SEC penalty, meaning that Trevor Milton owes Nikola $36.86 million.  *Id*.  In addition, Nikola was awarded approximately $46.5 million as damages for the fees and expenses paid to attorneys and professionals in connection with the government investigations and lawsuits related to Trevor Milton's conduct.  *See id*. at 127-30.  In total, with interest, Trevor Milton currently owes Nikola approximately $96.8 million.

On December 18, 2023, Nikola filed in the United States District Court for the District of Arizona a petition to confirm the Milton Award.  On September 9, 2024, the District Court granted Nikola's petition, confirmed the Milton Award, and entered judgment in favor of Nikola, and against Trevor Milton.  On September 27, 2024, Nikola filed a *Motion to Amend or Clarify the Judgment*, requesting, among other things, that the District Court amend the judgment to include the specific amounts awarded and the terms set forth in the Milton Award.  Thereafter, on November 4, 2024, the District Court granted Nikola's motion and entered an *Amended Judgment* in favor of Nikola, and against Trevor Milton.

On December 3, 2024, Trevor Milton filed an *Amended Notice of Appeal* seeking an appeal to the United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit") from the *Amended Judgment* referenced in the immediately preceding paragraph.  Thereafter, on June 27,

2025, Trevor Milton filed the *Opening Brief* seeking to vacate the *Amended Judgment* in whole or in part.

On December 17, 2024, Nikola filed a *Motion for an Order Certifying Judgment for Registration* to permit Nikola to register the *Amended Judgment* in other judicial districts in which Nikola believes, based on information to date, that Trevor Milton has property and assets. On May 16, 2025, the District Court granted Nikola's motion and certified the *Amended Judgment* for registration in Utah, Wyoming, Nevada, and Delaware.  On June 6, 2025, Nikola filed a *Motion for an Order for Appearance at Judgment Debtor's Examination*, which seeks and order from the District Court requiring Trevor Milton to (i) personally appear before the District Court for an examination and to give answers regarding the assets, property, and financial affairs of Trevor Milton and any of his affiliates, affiliated entities, and other persons acting on his behalf, and (ii) produce to Nikola documents regarding the same.  That motion was granted by the District Court on June 20, 2025.   Trevor Milton believes that if he is successful in prosecuting the appeal referenced in the immediately preceding paragraph, it is possible that the Milton Award could be vacated in whole or in part by an appellate court.  Trevor Milton further believes that in such circumstances, the appellate court would reverse Nikola's domestication of the *Amended Judgment*.

Going forward, Nikola and/or the Liquidating Trust intends to pursue all available enforcement and collection efforts to execute and fully collect all monies owed to Nikola by Trevor Milton pursuant to the *Amended Judgment*.

On April 23, 2025, Trevor Milton filed a Proof of Claim that appears as Claim Number 54 on the Official Claims Register in these Chapter 11 Cases ("Claim No. 54").  Claim No. 54 asserts a general unsecured claim against Nikola in the amount of $69,758,064.15, on account of amounts allegedly owing to Milton as indemnification pursuant to various prepetition agreements between Nikola and Trevor Milton.  The $69,758,064.15 purports to be comprised of amounts allegedly "paid as of April 1 2025" [sic] to the nineteen (19) separate law firms, consulting firms, individuals, and even the AAA Arbitration Panel associated with the Milton Award.

The Debtors intend to objected to the allowance of Claim No. 54 on numerous grounds, including the Milton Award's ruling that Milton is not entitled to indemnification.  Based on Milton's criminal conviction and the rulings included in the Milton Award, such objection also seeks to equitably subordinate Claim No. 54.  If successful, the substantive issues of allowance of indemnification and other matters asserted in Claim No. 54, which are also at issue in the Milton Fee Arbitration, will be rendered moot.

Trevor Milton disagrees with the Debtors' position and believes that if he is even partially successful in the Milton Fee Arbitration, which currently remains stalled and subject to the automatic stay [D.I. 698], it may be more than sufficient to offset the amount that Trevor Milton owes to Nikola under the Milton Award, which remains subject to the pending appeal in the Ninth Circuit discussed above.

4896-9948-8316.v22

H.    *Settlement of Derivative Actions*

The Derivative Actions were commenced prior to the Petition Date and assert that certain Individual Defendants (as defined in the Derivative Action Stipulation) breached their fiduciary duties, including disclosure violations under *Malone* and oversight failures under *Caremark,* and that certain Individual Defendants misappropriated nonpublic information under *Brophy* or aided and abetted such misappropriation. Prior to the Petition Date, the parties to the Derivative Actions reached a settlement of the claims asserted in the Derivative Actions.

During the pendency of these Chapter 11 Cases, the Committee conducted a broad investigation into the Causes of Action underlying the Derivative Actions and the terms of the prepetition settlement of the Derivative Actions noted immediately above. Through that investigation, the Committee determined that the original settlement of the Derivative Actions reached by the Debtors prior to the Petition Date is fair and reasonable under the circumstances, subject to certain additional consideration and enhancements the Committee was able to obtain from the Ubben Released Parties and the Plaintiffs to the Derivative Actions, as outlined in the motion the Debtors intend to file (the "9019 Motion") (to be heard concurrently with the Debtors' motion seeking interim approval from the Bankruptcy Court of this Combined DS and Plan). The 9019 Motion will seek entry of an order by the Bankruptcy Court (a) authorizing the Debtors to enter into the Derivative Action Stipulation; (b) confirming that the automatic stay imposed under section 362(a) of the Bankruptcy Code does not apply, or, to the extent it does apply, confirming it is lifted and modified to allow the Debtors to (i) seek Final Approval (as defined in the Derivative Action Stipulation) of, and any other relief necessary in furtherance of the Derivative Action Stipulation from the Chancery Court; and (ii) take all steps necessary to implement and effectuate the Derivative Action Stipulation; and (c) subject to entry of the Confirmation Order, approving the Derivative Action Stipulation, including incorporation of the "Releases" in Paragraphs 2 through 5 thereof, under Rule 9019 of the Bankruptcy Rules.

The settlement documented in the Derivative Action Stipulation, as enhanced, contemplates the Estates receiving aggregate net settlement proceeds in the amount of $25.65 million upon the Effective Date through a combination of insurance proceeds and contributions from individual defendants named in the Derivative Actions, and reflects an agreed reduction of fees and expenses to be awarded to the Plaintiffs' counsel at $1.8 million. If authorized by the Bankruptcy Court, the Debtors will present the Derivative Action Stipulation to the Chancery Court for approval immediately. Because the Derivative Action Stipulation is such an integral part of this Plan, and its approval by the Chancery Court requires advance notice to Nikola Corporation shareholders, the Debtors require initial approval of the 9019 Motion by the Bankruptcy Court to not further delay the ultimate resolution of these Chapter 11 Cases.

As part of the aggregate consideration contemplated under the settlement of the Derivative Actions, the Ubben Released Parties shall, within fifteen (15) Business Days of entry of a Final Order by the Delaware Chancery Court, pay the Ubben Contribution to the Debtors and their Estates in full and final satisfaction of all claims, obligations or liabilities related to the Derivative Action, and the Debtors' and their Estates, other than in connection with the Securities Class Action, as set forth in the 9019 Motion, the Derivative Action Stipulation and

the Plan.  In exchange, the Ubben Claims shall be deemed satisfied on the Effective Date, as set forth in the Plan, and shall not be entitled to any recovery or distribution.[10]

As shall be set forth in the Final Order approving the 9019 Motion and the Confirmation Order, this Plan will, as of the Effective Date, approve the "Releases" set forth in Paragraphs 2 through 5 of the Derivative Action Stipulation.  In addition, the Confirmation Order will confirm that the Unnamed Parties shall, as of the Effective Date, be deemed to be Released Defendant Parties (as defined in the Derivative Action Stipulation), and the Plaintiffs' Releasing Parties (as defined in the Derivative Action Stipulation) shall be deemed to have, and by operation of law shall have, completely, fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, and discharged, and shall forever be barred and enjoined from commencing or prosecuting, each and all of the Unnamed Parties from any and all of the Plaintiffs' Released Derivative Claims.  In the event of any conflict between the terms of the Derivative Action Stipulation (once approved) and the terms of the Plan (once confirmed), the terms of the Plan and the Confirmation Order control.

Additional information regarding the terms and conditions of the settlement of the Derivative Actions can be found in the 9019 Motion and Derivative Action Stipulation.

I.    *Liquidating Trust*

This Combined DS and Plan contemplates the establishment of the Liquidating Trust to administer post-Effective Date responsibilities of the Debtors and wind-down the Debtors' business under the Plan, including: (1) administering the Assets being vested with the Liquidating Trust, (2) making distributions to holders of Allowed Claims in accordance with the terms of this Plan and the Liquidating Trust Agreement, (3) resolving all Disputed Claims and effectuating the Claims reconciliation process pursuant to the procedures prescribed in this Combined DS and Plan, (4) prosecuting, settling, and resolving Preserved Estate Claims, (5) recovering, through enforcement, resolution, settlement, collection, or otherwise, Assets on behalf of the Liquidating Trust (which assets shall become part of the Liquidating Trust Assets), (6) winding down the affairs of the Debtors and all non-Debtor Affiliates, if and to the extent necessary, including taking any steps to dissolve, liquidate, or take other similar action with respect to each of the Debtors and each of the non-Debtor Affiliates, including by terminating the corporate or organizational existence of each such Debtor and non-Debtor Affiliate, and (7) performing all actions and executing all agreements, instruments and other documents necessary to effectuate the purpose of the Liquidating Trust.

J.    *Resolution of Dispute Concerning the Treatment of the SEC Claim*

On July 25, 2025, the Debtors filed a memorandum of law [D.I. 796] in support of their position that the entire SEC Claim is subject to subordination under Section 510(b) of the Bankruptcy Code.  On August 26, 2025 the SEC filed an objection [D.I. 935] taking the position that the SEC Claim is not subject to subordination as argued by the Debtors.  Both before and

---

[10]    In view of this resolution of the Ubben Claims contemplated by the Derivative Action Stipulation, the 9019 Motion and the Plan, such claims have not been classified pursuant to the terms of the Plan and are not entitled to vote on the same.

after these filings, the Debtors and SEC engaged in good-faith negotiations to resolve the dispute and, on August 29, 2025, came to an agreement regarding, among other things, the classification and treatment of the SEC Claim as set forth below (the "SEC Claim Resolution") and notwithstanding anything to the contrary herein.

First, the SEC voluntarily agreed that $40,000,000.00 of the SEC Claim would be classified and treated junior in priority to General Unsecured Claims. Thus, the SEC Junior Claim will be allowed and treated in Class 7 of the Plan. Second, the Debtors agreed to classify $43,052,974.90 of the SEC Claim as a General Unsecured Claim in Class 3 of the Plan, provided, however, that the sole distribution on account of the SEC Unsecured Claim will be a $4,000,000 Cash payment to the SEC on the Effective Date. The SEC agrees to forego any further distributions on account of the SEC Unsecured Claim under Class 3 of the Plan. Third, the Debtors, their Estates and the Liquidating Trust, including their respective successors and assigns and anyone acting on their behalf, shall release any and all Causes of Action that each may have against the SEC.

The Debtors believe that the terms of the SEC Claim Resolution are fair and reasonable under the circumstances and in the best interests of the Debtors' Estates. As set forth in the Liquidation Analysis, the Debtors believe that holders of General Unsecured Claims would receive distributions in a Chapter 7 less than the projected distributions they will receive under the Plan, even with the allowance and treatment of the SEC Claim as set forth under the SEC Claim Resolution. In addition, even though the SEC Unsecured Claim will receive a $4,000,000 Cash distribution on the Effective Date, the amount of that distribution will be less in value than the projected distributions that holders of General Unsecured Claims will receive under Class 3 of the Plan.

## ARTICLE V.
## PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN

Administrative Claims and Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Such Claims are not designated as classes of Claims for the purposes of this Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

A.    *Treatment of Administrative Claims*

1.    <u>Time for Filing Administrative Claims</u>

The holder of an Administrative Claim, other than (a) a Professional Fee Claim or (b) an Administrative Claim that has been Allowed or paid on or before the Administrative Bar Date, must file with the Bankruptcy Court and serve on the Debtors and the Office of the United States Trustee, notice of such Administrative Claim by no later than the Administrative Claims Bar Date. Such notice must include, at a minimum, (x) the name of the holder of the Claim, (y) the amount of the Claim, and (z) the basis of the Claim. Failure to file and serve such notice timely and properly shall result in the Administrative Claim being forever barred.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH**

**ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SET FORTH HEREIN SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE ESTATES, AND THE LIQUIDATING TRUST, OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

2.    Allowance of Administrative Claims

An Administrative Claim (other than a Professional Fee Claim) (i) with respect to which, in the case of Administrative Claims that must be filed and noticed pursuant to Article V.A.1, notice has been timely and properly filed and served pursuant to Article V.A.1 or (ii) with respect to which, in the case of Claims under section 503(b)(9) of the Bankruptcy Code, a valid Proof of Claim has been filed prior to the applicable Claims Bar Date, shall become an Allowed Administrative Claim if no objection is filed within sixty (60) days after the later of (i) the Effective Date, (ii) the date of service of the applicable notice of Administrative Claim, or (iii) such later date as may be (A) agreed to by the holder of such Administrative Claim or (B) approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 60-day period (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

3.    Payment of Allowed Administrative Claims

On the later of (a) the Effective Date or (b) the date such Allowed Administrative Claim becomes due in the ordinary course, in full and final satisfaction of such Claim, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims) shall receive (i) the amount of such holder's Allowed Administrative Claim in one Cash payment, or (ii) such other treatment as may be agreed to by such holder of an Allowed Administrative Claim and the Debtors (prior to the Effective Date, with the consent of the Committee) or the Liquidating Trust (on or after the Effective Date); *provided*, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; *provided*, *further*, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business at any time prior to the occurrence of the Effective Date. Any Allowed Administrative Claim (other than a Professional Fee Claim) that becomes due after the Effective Date shall be paid by the Liquidating Trust from the Reserve.

B.    *Professional Compensation*

1.    Professional Fee Escrow

As soon as reasonably practicable on or after the Confirmation Date (and in no event later than the Effective Date without the consent of the applicable Professional), the Debtors shall establish the Professional Fee Escrow funded from the Reserve established under Section 2(j) of the Interim Compensation Order (the "Interim Comp Reserve") and additional Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow shall be maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates or the Liquidating

Trust; *provided*, that after all Allowed Professional Fee Claims have been paid in full, Fee Applications in connection with all Professional Fee Claims have been filed, there are no Fee Applications pending before the Bankruptcy Court, and there are no Disputed Professional Fee Claims, any remaining Cash in the Professional Fee Escrow shall be distributed to the Liquidating Trust to be administered as Liquidating Trust Assets.  No Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way.  The Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Interim Comp Reserve or the Professional Fee Escrow Account.

After the Effective Date, amounts owing to the applicable holder of a Professional Fee Claim shall be paid in Cash to such holder from funds held in the Professional Fee Escrow when such Professional Fee Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid pursuant to the Interim Compensation Order or other order of the Bankruptcy Court. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Expense Claim for any such deficiency, and the Debtors, or the Liquidating Trustee, as applicable, shall pay the full unpaid amount of such Allowed Administrative Expense Claim in Cash.

Following the Effective Date, the Professional Fee Escrow Account shall be administered by the Liquidating Trustee in accordance with the Liquidating Trust Agreement; *provided, however*, amounts held in the Professional Fee Escrow Account shall not be Liquidating Trust Assets on the Effective Date.  In the event there is a remaining balance in the Professional Fee Escrow Account following payment to all holders of Allowed Claims for Professional Fees under the Plan, any such amounts shall become Liquidating Trust Assets.

2.      Time for Filing Professional Fee Claims

Each Professional who holds or asserts a Professional Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date, for final Allowances of compensation for services rendered and reimbursement of expenses incurred.  The failure to timely file and serve such Fee Application shall result in the Professional Fee Claim being forever barred.  Objections to the Allowance of Professional Fee Claims must be filed and served no later than 4:00 p.m. (prevailing Eastern Time) on the date that is twenty-one (21) days after the filing of the applicable Fee Application.  The Debtors or the Liquidating Trustee, as applicable, shall pay Professional Fee Claims in Cash in the full amount the Bankruptcy Court allows, including from funds held in the Professional Fee Escrow Account.

3.      Post-Effective Date Fees and Expenses.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and, the Liquidating Trust may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to

4896-9948-8316.v22

or action, order, or approval of the Bankruptcy Court in accordance with the Plan and the Liquidating Trust Agreement.

C.    *Treatment of Tax Claims*

On the Plan Distribution Date, in full and final satisfaction of such Claim, each holder of an Allowed Tax Claim, at the election of the Debtors (prior to the Effective Date, with the consent of the Committee) or the Liquidating Trust (on or after the Effective Date), will receive: (a) payment in Cash of the Allowed amount of such Claim over five (5) years, pursuant to section 1129(a)(9)(c)(ii) of the Bankruptcy Code <u>plus</u> interest at a rate determined in accordance with section 511 of the Bankruptcy Code; (b) a one-time payment in Cash of the Allowed amount of such Claim on the Effective Date or as soon thereafter as is reasonably practical, or, if such Allowed Tax Claim is not allowed as of the Effective Date, the first Business Day that is thirty (30) calendar days after the date on which such Allowed Tax Claim became an Allowed Claim; or (c) such other treatment as may be agreed to by such holder of an Allowed Tax Claim and the Debtors (prior to the Effective Date, with the consent of the Committee) or the Liquidating Trust (on or after the Effective Date); *provided*, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim.  After the Effective Date, Allowed Tax Claims shall be satisfied by the Liquidating Trust from the Reserve.

D.    *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code (the "<u>Statutory Fees</u>") prior to the Effective Date shall be paid by the Debtors on or before the Effective Date.  Any Statutory Fees due and payable after the Effective Date for the calendar quarter that includes the Effective Date (the "<u>Effective Date Statutory Fees</u>") shall be paid by the Liquidating Trust from the Reserve.  All Statutory Fees (other than Effective Date Statutory Fees) that become due and payable after the Effective Date (a) for distributions by the Liquidating Trust, shall be paid by the Liquidating Trust from the Liquidating Trust Assets. Notwithstanding anything to the contrary herein, after the Effective Date, the Debtors and the Liquidating Trust shall be jointly and severally liable to pay any and all Statutory Fees when due and payable.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, if applicable, the Liquidating Trustee and the Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Each of the Debtor and the Liquidating Trustee shall remain obligated to pay Statutory Fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the Chapter 11 Cases and shall not be treated as providing any release under the Plan.

## ARTICLE VI.
## <u>CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS</u>

For the purposes of organization, voting and all confirmation matters, <u>except</u> as otherwise provided herein, all Claims against and all Equity Interests in the Debtors shall be classified as set forth in this Article VI.

A.    *Summary of Classification*

Except for the Claims addressed in Article V, all Claims against and Interests in the Debtors are classified in the Classes set forth in this Article VI for all purposes, including voting, Confirmation, and Distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving Distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan shall apply as a substantively consolidated Plan for all of the Debtors.  All of the potential Classes for the Debtors are set forth herein.

The information in the following chart is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims reconciliation process.  It is intended to provide guidance regarding the anticipated range of recovery to holders of Claims and Interests under the Plan.  Any estimates of Claims or Interests in this Combined DS and Plan may vary from the final amounts Allowed by the Bankruptcy Court and/or recovered by Holders of Claims and Interests.  The actual recoveries under the Plan may vary based on final amounts Allowed by the Bankruptcy Court. Distributions under the Plan are subject to the Plan being confirmed and satisfaction of all conditions to the Effective Date.  Moreover, any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein or the actual Distributions received by Holders of Allowed Claims.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the Combined Plan and Disclosure Statement, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates.  The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

4896-9948-8316.v22

The Classes of Claims against and the Equity Interests in the Debtors shall be classified under the Plan as follows:

| Class | Claim | Status | Voting Rights | Estimated Amount of Claims[11] | Projected Recovery Under the Plan |
|-------|-------|--------|---------------|-------------------------------|-----------------------------------|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $1,283 | 100% |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | N/A | N/A |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote | $209,943,226-$242,856,394 | 20.7%-75.3%[12] |
| 4 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A |
| 5 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A |
| 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A |
| 7 | Section 510(b) and Other Junior Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | $967,880,092 | N/A |

---

[11] These amounts represent estimated Allowed Claims against the Debtors and do not represent amounts that will ultimately be Allowed or amounts actually asserted by creditors in Proofs of Claim or otherwise. The Debtors have not completed their analysis of Claims in the Chapter 11 Cases, and all objections to such Claims have not been filed or fully litigated and may continue following the Effective Date. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be greater or lower than estimated. Additional information is included in the Liquidation Analysis, attached hereto as **Exhibit B**.

[12] The projected recovery for holders of General Unsecured Claims depends on the ultimate amount of distribution proceeds, of which the amount is undetermined at this time due to uncertainties, contingencies, and difficulty in assessing the likelihood of success in connection with the potential future proceeds from the sale of intellectual property and other intangible assets and estate claims and any recoveries associated therewith are speculative at this time. Additional information is included in the Liquidation Analysis, attached hereto as **Exhibit B**.

4896-9948-8316.v22

| Class | Claim | Status | Voting Rights | Estimated Amount of Claims[11] | Projected Recovery Under the Plan |
|-------|-------|--------|---------------|-------------------------------|----------------------------------|
| 8 | Equitably Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | $69,758,064 | N/A |

B.      *Treatment of Claims and Equity Interests*

The classes of Claims against the Debtors and Equity Interests in the Debtors shall be treated under the Plan as follows:

1.      Class 1 – Other Priority Claims

     a.      *Classification*:  Class 1 shall consist of all Other Priority Claims against the Debtors.

     b.      *Treatment*:  On the Plan Distribution Date, except to the extent that less favorable treatment is agreed to by a holder of an Allowed Other Priority Claim and the Debtors (prior to the Effective Date, with the consent of the Committee) or the Liquidating Trust (on or after the Effective Date), in full and final satisfaction of such Claim, each holder of an Allowed Other Priority Claim shall be paid in full and in Cash or provided such other treatment rendering such holder's Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. After the Effective Date, Allowed Other Priority Claims shall be satisfied from the First Tier Claims Reserve.

     c.      *Voting*: Claims in Class 1 are Unimpaired.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Secured Claims

     a.      *Classification*:  Class 2 shall consist of all Other Secured Claims against the Debtors.

     b.      *Treatment*:  On the Plan Distribution Date, except to the extent that less favorable treatment is agreed to by a holder of an Allowed Other Secured Claim and the Debtors (prior to the Effective Date, with the consent of the Committee) or the Liquidating Trust (on or after the Effective Date), in full and final satisfaction of such Claim, each holder of an Allowed Other Secured Claim shall, at the option of the Liquidating Trust, (i) be paid in full and in Cash, (ii) receive its collateral in full satisfaction of its Claim, or (iii) such other treatment rendering such holder's Allowed Other

43

Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

c.  *Voting*: Claims in Class 2 are Unimpaired.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.  <u>Class 3 – General Unsecured Claims</u>

a.  *Classification*:  Class 3 shall consist of all General Unsecured Claims.

b.  *Treatment:* On the Plan Distribution Date, except to the extent that a holder of an Allowed General Unsecured Claim and the Debtors (prior to the Effective Date, with the consent of the Committee) or the Liquidating Trust (after the Effective Date) agrees to less favorable treatment, in full and final satisfaction of such Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the Liquidating Trust Units, which shall entitle such Holder to its Pro Rata Share of the Liquidating Trust Net Assets.  The SEC Unsecured Claim shall be treated in accordance with the SEC Claim Resolution.

c.  *Voting:* Claims in Class 3 are Impaired.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

4.  <u>Class 4 – Intercompany Claims</u>

a.  *Classification*: Class 4 shall consist of all Intercompany Claims among Debtors.

b.  *Treatment*: On the Effective Date, all Intercompany Claims shall be deemed automatically cancelled, released, and extinguished and shall be of no further force or effect.  No holder of an Intercompany Claim will receive any Plan Distribution on account thereof.  For the avoidance of doubt, any Claims held by the Debtors against their non-Debtor subsidiaries or Affiliates shall not be affected or otherwise modified by the Plan.

c.  *Voting:* Claims in Class 5 are Impaired.  Holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

5.  <u>Class 5 – Equity Interests</u>

a.  *Classification*: Class 5 shall consist of all Equity Interests in the Debtors.

b.  *Treatment*:  On the Effective Date, the existing Interests in the Debtors will be canceled.  Each holder of an Equity Interest in a Debtor shall not receive anything on account of such Interest.  The entry of the Confirmation Order shall act as an order approving and effecting the cancellation of all shares of the common stock of Nikola Corp. (and all securities convertible or exercisable for or evidencing any other right in or with respect to shares of the common stock of Nikola Corp.) outstanding immediately prior to the Effective Date without any conversion thereof or distribution with respect thereto.

c.  *Voting*: Equity Interests in Class 5 are Impaired.  Holders of Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Equity Interests are not entitled to vote to accept or reject the Plan.

6.  Class 6 – Intercompany Interests

a.  *Classification*: Class 6 consists of all Intercompany Interests.

b.  *Treatment*: On the Effective Date, all Intercompany Interests shall be deemed automatically cancelled, released, and extinguished and shall be of no further force or effect.  No holder of an Intercompany Interest will receive any Plan Distribution on account thereof.

c.  *Voting*: Intercompany Interests in Class 6 are Impaired. Holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

7.  Class 7 – Section 510(b) and Other Junior Claims

a.  *Classification*: Class 7 consists of all Section 510(b) and Other Junior Claims.

b.  *Treatment*: On the Effective Date, all Section 510(b) and Other Junior Claims shall be deemed automatically cancelled, released, and extinguished and shall be of no further force or effect.  No holder of a Section 510(b) and Other Junior Claim will receive any Plan Distribution on account thereof.

c.  *Voting*: Section 510(b) and Other Junior Claims in Class 7 are Impaired. Holders of Section 510(b) and Other Junior Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Section 510(b) and Other Junior Claims are not entitled to vote to accept or reject the Plan.

4896-9948-8316.v22

8.  Class 8 – Equitably Subordinated Claims

   a.  *Classification*: Class 8 consists of all Equitably Subordinated Claims.

   b.  *Treatment*: On the Effective Date, all Equitably Subordinated Claims shall be deemed automatically cancelled, released, and extinguished and shall be of no further force or effect.  No holder of an Equitably Subordinated Claim will receive any Plan Distribution on account thereof.

   c.  *Voting*: Equitably Subordinated Claims in Class 8 are Impaired. Holders of Equitably Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Equitably Subordinated Claims are not entitled to vote to accept or reject the Plan.

C.  *Separate Classification of Claims Generally*

   Any Class of Claims or Equity Interests that does not have a holder of an Allowed Claim or Allowed Interests shall be deemed eliminated from the Plan solely for purposes of (i) voting to accept or reject the Plan; and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. For all purposes under the Plan, each Class will contain sub-Classes for each Debtor.  Tabulation of votes accepting or rejecting the Plan shall be conducted on a Debtor-by-Debtor basis.

   Each Other Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for purposes of receiving distributions under this Plan.

D.  *Class Acceptance Requirement*

   A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.  A class of Equity Interests shall have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) of the Equity Interests in such Class that actually vote on the Plan.

   With respect to each Debtor, if a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject this Plan, this Plan shall be presumed accepted by the holders of such Claims in such Class.

E.  *Controversy Concerning Impairment*

   If a controversy arises as to whether any Claims or Equity Interests, or any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

F.    *Cramdown*

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a)(1) through (16) of the Bankruptcy Code, *except* subsection (8) thereof, then the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims and Equity Interests that is impaired under, and has not accepted, the Plan.

G.    *Subordinated Claims*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(b) of the Bankruptcy Code, any of the prepetition intercreditor agreements with respect to the prepetition debt documents or otherwise, that a holder of a Claim or Equity Interest may have against other Claim or Equity Interest holders with respect to any distribution made pursuant to the Plan. Nothing in the Plan shall release or impair any creditor's rights to enforce any subordination agreement against any other creditor pursuant to Bankruptcy Code section 510 or any subordination agreement and the rights and defenses of any creditor related to such enforcement. Except with respect to Claims that are expressly allowed by this Plan or other Final Order of this Court, pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE VII.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    *Sources of Consideration for Plan Distributions*

On the Effective Date, the Debtors shall make Plan Distributions in accordance with the Plan to holders of Allowed Administrative Claims, Allowed Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims that are due and payable as of the Effective Date using Cash on hand. Upon completion of such Plan Distributions, on the Effective Date, the Debtors shall transfer all Liquidating Trust Assets to the Liquidating Trust. After the Effective Date, the Liquidating Trustee shall fund the Reserve and shall make Plan Distributions from Liquidating Trust Net Assets on account of Allowed Claims in accordance with the Plan and the Liquidating Trust Agreement.

B.    *Preservation and Maintenance of Debtor Causes of Action; Preference Action Waiver*

1.    <u>Maintenance of Causes of Action.</u>

Except as otherwise provided in this Plan or the Confirmation Order, after the Effective Date, the Liquidating Trust shall automatically be deemed to have been vested with any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Preserved Estate Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including in an adversary proceeding filed in the Bankruptcy Court in connection with the Chapter 11 Cases. The Liquidating Trust as the successor in interest to the Debtors and the

47

Estates, may, in its sole and absolute discretion, and will have the exclusive right to, investigate, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any Preserved Estate Claims without notice to or approval from the Bankruptcy Court or the Debtors. The Liquidating Trust or its successor(s) may pursue such Preserved Estate Claims as appropriate in accordance with the best interests of the Liquidating Trust, or its successor(s) who hold such rights.

      2.      <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>.

Unless a Cause of Action of the Debtors is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order or by virtue of the allowance of such Claim hereunder), such Cause of Action is expressly preserved for later adjudication by the Liquidating Trust (including Causes of Action not specifically identified or of which the Debtors or their creditors who shall receive beneficial interests in the Liquidating Trust may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist and all Preserved Estate Claims, to the extent such claims are not released by this Plan). No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Preserved Estate Claims, except where such Causes of Action have been expressly released in the Plan (including, and for the avoidance of doubt, the releases contained in the Confirmation Order).

Any Preserved Estate Claims shall be automatically deemed to have vested in and been transferred to the Liquidating Trust on the Effective Date for investigation and potential prosecution and adjudication by the Liquidating Trust. In addition, the Liquidating Trust shall have the exclusive right to pursue or adopt, and shall be entitled to be substituted as the party to, any Preserved Estate Claims in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including the plaintiffs or co-defendants in such lawsuits. The Debtors and the Liquidating Trustee, as applicable, expressly reserve all rights to prosecute all Preserved Estate Claims.

      3.      <u>D&O Actions and Litigation</u>.

Notwithstanding anything to the contrary in this Plan (including in this Article VII and/or in Article XII of this Plan) or otherwise, any recovery (including by way of settlement or judgment) from the D&O Actions against any Other Director and Officer shall, unless otherwise agreed to by an Other Director and Officer in writing, be limited to the applicable D&O Policy Cap; *provided*, that there shall be no such limitation on recoveries with respect to any Other Director and Officer that is found by Final Order (a) to have intentionally and materially impaired or impeded insurance coverage, (b) to have intentionally attempted to cause or caused a material delay of any insurance coverage or the payment thereof, or (c) not to be entitled to insurance coverage (i) on account of such Other Director and Officer's failure to make a timely claim under the applicable D&O Policies; (ii) as a result of such Other Director and Officer's failure to cooperate with the insurers or otherwise comply in all material respects with its obligations under the D&O Policies, including any obligation to assist in the defense of claims as

48

may be required by such D&O Policies; or (iii) as a result of an act or omission determined under a Final Order to have constituted willful misconduct, gross negligence, or fraud.

Except as specifically set forth in this Plan, nothing in this Plan shall be construed to limit, diminish, or otherwise impair, waive, or release any objections, defenses, or counterclaims of the Debtors or the Liquidating Trust, as applicable to any Proof of Claim or Administrative Claim filed by a D&O, other than claims against the Ubben Released Parties, which claims shall be released in accordance with the terms of the 9019 Motion, the Derivative Action Stipulation and the Plan. Except as otherwise provided in this Plan, nothing herein shall limit, diminish, or otherwise impair, waive, or release any claims, defenses, counterclaims, or rights of any of the D&Os arising from, related to, or in connection with the D&O Actions.

On or after the Confirmation Date, neither the Debtors nor the Liquidating Trustee shall terminate or otherwise reduce the coverage under any D&O Policies (including any "tail policy") in effect prior to the Effective Date, and any Other Director and Officer shall be entitled to the full benefits of any D&O Policies (including any "tail policy") for the full term of such policy regardless of whether such Other Director and Officer remains in such positions before or after the Effective Date. The D&O Policies (including any "tail policy") shall remain in full force and effect for their entire term and shall not be cancelled (notwithstanding, for the avoidance of doubt, the dissolution of any Debtor or the Liquidating Trust).

4.     Preference Action Waiver.

Notwithstanding anything to the contrary contained in the Plan, as of the Effective Date, the Debtors waive and release any Cause of Action arising under section 547 of the Bankruptcy Code, section 548 of the Bankruptcy Code to the extent arising under the same facts as any such Avoidance Action arising under section 547 of the Bankruptcy Code, or any state law equivalent thereof, in each case, other than against the following Entities, including their respective Affiliates: (i) 3i, LP, and any funds, accounts, or other entities managed or advised by 3i, LP; (ii) Kirkland & Ellis LLP; (iii) Robert Bosch LLC; and (iv) The Lion Electric Company. For the avoidance of doubt, Avoidance Actions against the entities listed in (i)–(iv) of this paragraph are not released and shall be Preserved Estate Claims.

C.     *Creation, Vesting, and Transfer of Liquidating Trust Assets to the Liquidating Trust*

1.     Creation of Liquidating Trust

On the Effective Date, in furtherance of the liquidation of the Debtors, the Liquidating Trust shall be established for the benefit of the Liquidating Trust Beneficiaries. The Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust pursuant to the Liquidating Trust Agreement and consistent with the Plan. The form of the Liquidating Trust Agreement shall be included in the Plan Supplement and approved pursuant to the Plan. The powers, authority, responsibilities, and duties of the Liquidating Trust and the Liquidating Trustee are set forth in and shall be governed by the Plan and the Liquidating Trust Agreement.

On the Effective Date, the Liquidating Trust Assets shall be transferred by the Debtors to the Liquidating Trust.

2.       Vesting of Liquidating Trust Assets

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or in the Confirmation Order, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Liquidating Trust Assets (including all interests, and rights related thereto) of each of the Debtors, shall immediately vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests.  All Claims, Liens, encumbrances, charges, and other interests in or on the Liquidating Trust Assets shall be deemed fully released as of the Effective Date, except as otherwise provided in the Plan or the Confirmation Order.

3.       Transfer of Liquidating Trust Assets

On the Effective Date, other than as set forth in this Plan or the Confirmation Order, the Debtors are authorized and directed to and shall be deemed to have irrevocably transferred, granted, assigned, conveyed, and delivered to the Liquidating Trust, for the benefit of the Liquidating Trust Beneficiaries, in the form thereof existing on such date, all of the Debtors' and Estates' right, title and interest in and to all of the Liquidating Trust Assets free and clear of any and all Liens, Claims, encumbrances and interests (legal, beneficial or otherwise) of all other Entities.  The Debtors, the Liquidating Trustee, the Liquidating Trust Beneficiaries, and any party under the control of such parties will execute any documents or other instruments and shall take all other steps as necessary to cause title to the Liquidating Trust Assets to be transferred to the Liquidating Trust.  Upon the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors shall have no interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.  Upon delivery of the Liquidating Trust Assets to the Liquidating Trust, the Debtors and their predecessors, successors, and assigns shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in, or with respect to, the Liquidating Trust Assets or the Liquidating Trust in accordance with this Article VII.E of the Plan.  Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Liquidating Trust Assets to the Liquidating Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

D.       *Corporate Action*

The entry of the Confirmation Order shall constitute authorization for the Debtors and the Liquidating Trustee, as applicable, to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan Documents prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, (i) the incurrence of all obligations contemplated by the Plan and the making of Plan Distributions, (ii) the implementation of all settlements and compromises as set forth in or contemplated by the Plan and (iii) the execution, delivery, filing and/or recording of any contracts, agreements, instruments or other documents contemplated by the Plan Documents (or necessary or desirable to effectuate the transactions contemplated by the Plan Documents).  On the Effective Date, the officers of the

50

Debtors and the Liquidating Trust are authorized to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary actions required in connection therewith, in the name of and on behalf of the Debtor and the Liquidating Trust.

E.    *Dissolution of the Debtors*

On the Effective Date, each of the Debtors' directors and officers shall be discharged from their duties and terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and, unless subject to a separate agreement with the Liquidating Trustee, shall have no continuing obligations to the Debtors after the Effective Date.

Each Debtor shall be deemed dissolved without further order of the Bankruptcy Court or action by the Debtors or the Liquidating Trustee; *provided*, that the Liquidating Trustee is authorized to file certificates of cancellation and any other documents with the secretary of state in which such dissolved Debtor was formed or in any other jurisdiction; *provided*, *further*, that, one or more of the Debtors may continue to exist after the Effective Date in accordance with the respective laws of the state under which any such Debtor was formed and pursuant to any such Debtor's certificates of incorporation, bylaws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, to the extent necessary to comply with the Debtors' obligations hereunder, or otherwise until such date as reasonably determined by the Liquidating Trustee, subject in all respects to Article VII.C. The Liquidating Trustee or the director(s) appointed to the board of directors or equivalent governing body of any Debtor that continues to exist after the Effective Date to be identified in the Plan Supplement.

F.    *Cancellation of Instruments*

Except as otherwise provided herein (including in Article VI.B), the Debtors' obligations under any other note, bond, indenture, as well as the duties, if any, of any trustee under such indenture including the Unsecured Notes Indenture Trustee, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors shall be deemed released, settled, and compromised on the Effective Date.

Notwithstanding anything in this Article VII.F, the Unsecured Notes Indentures shall remain in effect solely with respect to the rights of the Unsecured Notes Indenture Trustee (a) to make Plan distributions in accordance with the Plan, (b) to preserve the rights and protections of the Unsecured Notes Indenture Trustee with respect to the Holders of Unsecured Notes Claims, and (c) preserve the Unsecured Notes Indenture Trustee's charging lien rights set forth in the Unsecured Notes Indentures. Except for the distribution of Class 3 Plan consideration delivered to it in accordance with the Unsecured Notes Indentures at the expense of the Debtors, the Unsecured Notes Indenture Trustee shall have no duties to Holders of Unsecured Notes Claims following the Effective Date of the Plan, including no duty to object to claims or treatment of other creditors.

4896-9948-8316.v22

G.    *Liquidating Trust*

    1.    Purpose of Liquidating Trust

The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d) and as a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671 through 679 of the Internal Revenue Code (excluding any Disputed Claims Reserve), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust, and without effect to its status as a "liquidating trust" for U. S. federal income tax purposes. The Liquidating Trust shall be governed by the Plan and the Liquidating Trust Agreement. The Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including any and all provisions necessary to ensure the continued treatment of the Liquidating Trust (excluding any Disputed Claims Reserve) as a grantor trust and the Liquidating Trust Beneficiaries as the grantors and owners thereof for U.S. federal income tax purposes. The Liquidating Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities are for the primary purpose of receiving all Net Liquidating Trust Assets and distributing any such assets pursuant to the Plan.

The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b), as well as the sole representative of the Estates appointed pursuant to section 1123(b)(3) of the Bankruptcy Code and shall have all powers, authority, and responsibilities specified in the Plan and Liquidating Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code.

    2.    Governance

The Liquidating Trustee shall be overseen and managed by a board (the "Oversight Board"), consisting of three (3) members selected by the Committee to be identified in the Plan Supplement each with one (1) vote, whom shall be responsible for overseeing and directing the Liquidating Trustee in accordance with the Liquidating Trust Agreement, whom shall also be identified in the Plan Supplement, and approved in connection with confirmation of the Plan, and her/his implementation and administration of the Liquidating Trust.

The Liquidating Trustee shall perform the day-to-day activities implementing the Liquidating Trust. The Oversight Board shall have the responsibility to oversee the administration of the Liquidating Trust and the activities of the Liquidating Trustee, as set forth in the Liquidating Trust Agreement filed with the Plan Supplement.

The Liquidating Trustee shall hold meetings with the Oversight Board at least quarterly for the purpose of consulting in good faith with the Oversight Board regarding all material issues affecting the Liquidating Trust, including the resolution of Claims and the disposition of Liquidating Trust Assets. The Liquidating Trustee will publish periodic reports regarding the Trust's activities.

The Liquidating Trustee shall seek approval for material decisions from the Oversight Board, as set forth in the Liquidating Trust Agreement. The Liquidating Trustee shall provide reasonable advance notice to the Oversight Board of: (a) any proposed sale, transfer, or exchange of Liquidating Trust Assets above $500,000; (b) any settlements of Causes of Action asserted in an amount in excess of $1,000,000, or asserted in an unliquidated amount but which the Liquidating Trustee in consultation with the Oversight Board reasonably estimates could be asserted in an amount in excess of $1,000,000; (c) any claims resolutions that result in an Allowed Claim in excess of $1,000,000; and (d) any proposed material modifications to the Liquidating Trust Agreement, including, but not limited to, any adjustment to the compensation of the Liquidating Trustee.

Promptly after the Effective Date, the Liquidating Trustee shall establish the Reserve. Following the Effective Date, the Liquidating Trustee, in consultation with the Oversight Board, shall determine the Reserve prior to making any distribution of Liquidating Trust Net Assets from the Liquidating Trust.

3.  Books and Records and Privileges

The Liquidating Trust shall be given access by the Debtors and their professionals (at the expense of the Liquidating Trust with respect to any expenditure of resources that is more than de minimis) to all information the Liquidating Trustee determines is necessary to prosecute, investigate, sell, transfer, or convey any of the Preserved Estate Claims and to benefit from any relevant Privileges.

Prior to the Effective Date, at the sole cost of the Debtors, the Debtors shall deliver or cause to be delivered to the Liquidating Trust any and all books and records and all other documents, files, electronic data, tangible objects, and communications, or copies of the same (the "Debtors' Records"). The Debtors shall not destroy, abandon, or otherwise render the Debtors' Records unavailable.

The Liquidating Trust shall stand in the same position as the Debtors and their estates and the Committee as to all evidentiary privileges of any type or nature whatsoever, including attorney-client privilege, the work product privilege or doctrine, any other privilege or immunity attaching to any documents or communications in any form, including electronic data hosted on remote servers, and any other applicable evidentiary privileges of each of the foregoing (collectively, the "Privileges"), and shall succeed to all of the rights of the Debtors and their estates and the Committee to preserve, assert, or waive any such Privileges, and shall be deemed to be the assignee by each Debtor and its respective estate and the Committee of each such Privilege as of the latter of (a) the Effective Date, or (b) the formation of the Liquidating Trust.

For the avoidance of doubt, the Privileges shall be shared with, and shall vest in, the Liquidating Trust. Notwithstanding the Debtors, the Committee, or any party-in-interest providing any privileged information to the Liquidating Trust, the Liquidating Trustee, or the Oversight Board, including any member thereof, such privileged information shall be without waiver in recognition of the joint and/or successor interest in investigating and prosecuting the Preserved Estate Claims and shall remain privileged.

53

4.      Liquidating Trust Assets

On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all steps necessary to establish the Liquidating Trust in accordance with the Plan and for the benefit of the Liquidating Trust Beneficiaries. Additionally, on the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust all of the Debtors' Estates' rights, title, and interest in and to all of the Liquidating Trust Assets and, in accordance with section 1141 of the Bankruptcy Code, the Liquidating Trust Assets shall automatically vest in the Liquidating Trust free and clear of all claims, liens, encumbrances, or interests, subject to the terms of this Plan and the Liquidating Trust Agreement.  The act of transferring the Liquidating Trust Assets to the Liquidating Trust shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Trust as if the asset or right was still held by the Debtors.  The Liquidating Trustee may abandon or otherwise not accept any assets that the Liquidating Trustee believes, in good faith, to have no value to, or will be unduly burdensome to, the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement.  Any assets that the Liquidating Trustee abandons or otherwise does not accept shall not be property of the Liquidating Trust.

5.      Role of the Liquidating Trustee

In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, the Liquidating Trustee shall: (i) hold the assets of the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries; (ii) have the power and authority to hold, manage, sell and distribute Cash or non-Cash assets of the Liquidating Trust obtained through the exercise of its power and authority in accordance with the Plan; (iii) have the power and authority to investigate, prosecute and resolve, in the name of the Debtors and/or the name of the Liquidating Trustee, any Preserved Estate Claims and to enter into arrangements to fund such litigation with third parties and/or certain holders of beneficial interests in such Liquidating Trust on such terms as are determined to be reasonable and in the interest of the Liquidating Trust (*provided*, that any such funding with respect to the Preserved Estate Claims shall have recourse solely to the proceeds of the Preserved Estate Claims); (iv) have the power and authority to perform such other functions as are provided in the Plan; and (v) have the power and authority to administer the closure of the Chapter 11 Cases. Under the supervision of the Oversight Board, the Liquidating Trustee shall be responsible for all decisions and duties with respect to the Liquidating Trust and the Liquidating Trust Assets.  In all circumstances, the Liquidating Trustee shall act in the best interests of all beneficiaries of the Liquidating Trust and in furtherance of the purpose of the Liquidating Trust.

The Liquidating Trust shall have sole authority to investigate, prosecute, settle, or abandon the Preserved Estate Claims.  In pursuing any claim, right, or Preserved Estate Claim, the Liquidating Trust shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code and shall succeed to the Debtors' rights with respect to the time periods in which a Cause of Action may be brought under the Bankruptcy Code.  Moreover, any holder of a Claim that timely filed a Proof of Claim is not required, under section 108 of the Bankruptcy Code or applicable law, to commence or continue any action in a non-bankruptcy forum in order

4896-9948-8316.v22

to further toll or satisfy any limitations period with respect to any such holder's Claim that had not expired prior to the Petition Date.

The Liquidating Trustee shall file tax returns for the Liquidating Trust (excluding any Disputed Claims Reserve) as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and in accordance with this Plan and comply with any other applicable tax reporting obligations imposed on the Liquidating Trust. The Liquidating Trust's taxable income, gain, loss, deduction, or credit (other than such items attributable to any Disputed Claims Reserve) will be allocated to each of the Liquidating Trust Beneficiaries in accordance with their relative beneficial interest in the Liquidating Trust.

As soon as possible after the Effective Date, the Liquidating Trustee shall make (or cause to be made) a good faith valuation of the assets of the Liquidating Trust, and such valuation shall be used consistently by all parties for U.S. federal income tax purposes.

Except as otherwise set forth in this Plan and to the extent permitted by applicable law, the Liquidating Trustee, in the performance of his or her duties hereunder, shall be defended, held harmless and indemnified from time to time by the Liquidating Trust (and not any other person) against any and all losses, claims, costs, expenses and liabilities to which the Liquidating Trustee may be subject by reason of his or her execution of duties pursuant to the discretion, power and authority conferred on the Liquidating Trustee by the Plan or the Confirmation Order; *provided*, *however*, that the indemnification obligations arising pursuant to this Section shall not indemnify the Liquidating Trustee for any actions taken by such members which constitute fraud, gross negligence, willful misconduct, criminal conduct or intentional breach of the Plan or the Confirmation Order. Satisfaction of any obligation of the Liquidating Trust arising pursuant to the terms of this Section shall be payable only from the assets of the Liquidating Trust, including, if available, any insurance maintained by the Liquidating Trust. The indemnification provisions contained in this Section shall remain available to and be binding upon any future Liquidating Trustee or the estate of any decedent. The Liquidating Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Liquidating Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the Liquidating Trustee, which insurance coverage may, at the sole option of the Liquidating Trustee, be extended for a reasonable period after the termination of the Liquidating Trust Agreement.

On the Effective Date, the Liquidating Trust shall be deemed to be substituted as the party to any pending litigation in which the any Debtor is a party and shall be authorized, but not required, to file notices or other pleadings in such actions to effectuate its substitution for such Debtor. Such substitution shall not result in holders of Claims receiving greater rights in or against the Liquidating Trust than they are otherwise entitled to under the Plan and Liquidating Trust Agreement on account of such Claims.

6.      Compensation of the Liquidating Trustee

The Liquidating Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy proceedings and as disclosed in the Plan Supplement.

4896-9948-8316.v22

7.      Retention of Professionals by the Liquidating Trustee

The Liquidating Trustee may retain and reasonably compensate counsel and other professionals to assist in its duties as Liquidating Trustee on such terms as the Liquidating Trustee deems appropriate without Bankruptcy Court approval.  The Liquidating Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

8.      Tax Treatment; No Successor in Interest

The Liquidating Trust (excluding any Disputed Claims Reserve) is intended to be treated for U.S. federal income tax purposes as a liquidating trust described in Treasury Regulation section 301.7701-4(d).  Pursuant to the Liquidating Trust Agreement, all relevant parties shall treat, for U.S. federal income tax purposes, the transfer of the Liquidating Trust Assets by the Debtors to the Liquidating Trust (a) in part as the transfer of Assets, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such Assets, by the Debtors to the holders of Allowed General Unsecured Claims, followed by the transfer of such Assets (subject to such liabilities) by such holders to the Liquidating Trust in exchange for the Liquidating Trust Units, and (b) in part as the transfer of such Assets by the Debtors to one or more Disputed Claims Reserves, and to the extent permitted by applicable law, all relevant parties shall report consistently for state and local income tax purposes. Notwithstanding the foregoing, in the event of a final determination under section 1313(a) of the Internal Revenue Code that the Liquidating Trust does not qualify as a grantor trust, the Liquidating Trust Beneficiaries and the Liquidating Trustee intend that the Liquidating Trust (excluding any Disputed Claims Reserve) be treated as a partnership for U.S. federal income tax purposes and will take all actions reasonably necessary to cause the Liquidating Trust (excluding any Disputed Claims Reserve) to be treated as such a partnership.

9.      Disputed Claims Reserves

The Liquidating Trustee shall treat each Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment).  The Liquidating Trustee shall be the administrator of the Disputed Claims Reserves within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all tax reporting and withholding required by the Disputed Claims Reserves. Pursuant to Treasury Regulation section 1.468B-9, no holder of a Claim will be treated as the grantor or deemed owner of any asset reserved for Disputed Claims until such holder receives or is allocated an interest in such asset. The Liquidating Trustee will file all Tax returns on a basis consistent with the treatment of the Liquidating Trust in part as a liquidating trust described in Treasury Regulation section 301.7701-4(d) (and grantor trust pursuant to Treasury Regulation section 1.671-l(a)) and in part as one or more Disputed Claims Reserves taxed as disputed ownership funds, and will pay all taxes imposed on the Liquidating Trust (including any taxes imposed on any Disputed Claims Reserve) from Liquidating Trust Assets (although any taxes imposed on any Disputed Claims Reserve will be paid out of such Disputed Claims Reserve and not out of general assets held by the Liquidating Trust).

4896-9948-8316.v22

10. <u>Dissolution of the Liquidating Trust</u>

The Liquidating Trustee, the Oversight Board, and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all Liquidating Trust Assets have been liquidated and (ii) all distributions required to be made by the Liquidating Trustee under the Plan have been made, but in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary of the Effective Date (and, in the case of any extension, within six (6) months prior to the end of such extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, absent a favorable letter ruling from the IRS providing that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the assets of the Liquidating Trust.

11. <u>Securities Exempt</u>

The issuance of any beneficial interests of the Liquidating Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act, as amended, and any state or local law requiring registration.

12. <u>BEV Recall</u>

Consistent with Section 8.9 of the Lucid APA, during the Battery Obligations Period (as defined in the Lucid APA), the Debtors conducted the Battery Recall Obligations (as defined in the Lucid APA) and have completed the Battery Recall Obligations.

## ARTICLE VIII.
## <u>SUBSTANTIVE CONSOLIDATION</u>

The Plan shall serve as a motion by the Debtors seeking entry of an order substantively consolidating each of the Estates into a single consolidated estate for all purposes associated with confirmation and consummation of the Plan.

The entry of the Confirmation Order shall constitute approval by the Bankruptcy Court of the substantive consolidation of the Debtors and their respective Estates for all purposes relating to the Plan, including for purposes of voting, Confirmation, and Distributions. If this substantive consolidation is approved, then for all purposes associated with the Confirmation and Consummation of the Plan, all assets and liabilities of the Debtors shall be treated as though they were merged into a single economic unit, and all guarantees by any Debtor of the obligations of any other Debtor, to the extent such exist, shall be considered eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be treated as one collective obligation of the Debtors. Moreover, (a) no Distribution shall be made under the Plan on account of any Intercompany Interest, if any, held by any Debtor in any of the other Debtors except to the extent necessary to effect the substantive consolidation provided for herein, (b) all guaranties of any Debtor of the obligations of any of the other Debtors, to the extent such exist, shall be eliminated so that any Claim against any Debtor, and any guaranty thereof executed by any of the other

Debtors, shall be one obligation of the consolidated Debtors' Estates, and (c) every Claim that is timely filed or to be filed in the Chapter 11 Cases of any of the Debtors shall be deemed filed against the consolidated Estates and shall be one Claim against, and one obligation of, the Estates.

Notwithstanding any provision of the Plan to the contrary, any Holder of multiple Allowed Claims against more than one Debtor that arise from the contractual, joint, joint and several, or several liability of such Debtors, the guaranty by one Debtor of another Debtor's obligation or other similar circumstances, shall be entitled to one Allowed Claim that, in the aggregate, does not exceed the amount of the underlying Claim giving rise to such multiple Claims. Claims against more than one of the Debtors arising from the same injury, damage, cause of action, or common facts shall be Allowed only once as if such Claim were against a single Debtor.

Any alleged defaults under any applicable agreement, including Executory Contracts and Unexpired Leases, with the Debtors arising from substantive consolidation under the Plan shall be deemed unenforceable as of the Effective Date.

## ARTICLE IX.
## PLAN DISTRIBUTION PROVISIONS

A.    *Plan Distributions*

The Debtors, the Liquidating Trustee or a designated agent (which agent shall be selected by the Debtors, and reasonably acceptable to the Committee if selected prior to the Effective Date, or the Liquidating Trustee) shall make all Plan Distributions to the Liquidating Trust Beneficiaries and holders of Allowed Administrative Claims, Allowed Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims in accordance with the Plan and the Liquidating Trust Agreement, except as otherwise provided in the Plan and the Confirmation Order.  In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day but shall be deemed to have been made on the date otherwise due.  Except as otherwise provided herein, Plan Distributions shall be made to the holders of Allowed Claims as reflected in the registry of Claims maintained by the Claims and Noticing Agent, as of the Plan Distribution Date.  The Liquidating Trustee shall also distribute Liquidating Trust Units to the holders of any General Unsecured Claims that constitute Allowed Claims as of such date and shall make further distributions of such beneficial interests to holders of any other General Unsecured Claims that have not become Allowed Claims as of such Plan Distribution Date, promptly after any of such General Unsecured Claims have been Allowed.

B.    *Delivery of Distributions to Unsecured Notes Indenture Trustee*

Distributions to be made to Holders of Unsecured Notes Claims shall be made to, or at the reasonable direction of, the Unsecured Notes Indenture Trustee, which shall transmit or direct the transmission of such distributions to Holders of Unsecured Notes Claims, subject to the priority and charging lien rights of the Unsecured Notes Indenture Trustee.  The Unsecured Notes Indenture Trustee, subject to the payment of its fees and expenses, shall transfer or direct

the transfer of such distributions.  Except to the extent inconsistent with this Article IX.B, the Unsecured Notes Indenture Trustee shall be entitled to recognize and deal for all purposes under the Plan with Holders of the Unsecured Notes Claims to the extent consistent with the customary practices of DTC.  Because the Liquidating Trust Units will not be eligible for distribution through DTC, the Unsecured Notes Indenture Trustee will work with the Debtors and the Liquidating Trustee at the Debtors' expense to distribute the Liquidating Trust Units in accordance with the terms of the Unsecured Notes Indentures.  All distributions by the Liquidating Trustee on account of the Liquidating Trust Units shall be made to the Unsecured Notes Indenture Trustee until such time as the Liquidating Trust Units are distributed to Holders of Unsecured Notes Claims on the records of the Liquidating Trustee.  The Unsecured Notes Indenture Trustee is not responsible for distributions by the Liquidating Trustee.

C.    *Disputed Claims Reserves*

On the Effective Date or as soon thereafter as is practicable, the Liquidating Trustee may establish and administer Disputed Claims Reserves for each Class or category, in the case of unclassified Claims, of Disputed Claims as of each Plan Distribution Date in accordance with the Liquidating Trust Agreement.  The Liquidating Trustee may reserve, in Cash or Liquidating Trust Units, as applicable, the expected recovery that such Disputed Claim would receive if it were ultimately determined to be an Allowed Claim (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing) with respect to each such Disputed Claim. For the avoidance of doubt, the Liquidating Trustee may administer the Disputed Claims Reserves by book entry.

The Cash or Liquidating Trust Units in the Disputed Claims Reserves shall be held in trust for the benefit of the holders of Claims ultimately determined to be Allowed in each applicable Class or category, in the case of unclassified Claims.  The Disputed Claims Reserve shall be closed by the Liquidating Trustee when all Plan Distributions required to be made under this Plan to the holders of Disputed Claims that subsequently become Allowed have been made in accordance with the terms of this Plan and no Disputed Claims relating to such Disputed Claims Reserve remain. Upon closure of a Disputed Claims Reserve, all Cash and other property held in that Disputed Claims Reserve shall be transferred to the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement.

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. When a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim shall thereupon become entitled to receive Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

D.    *Address for Delivery of Plan Distributions*

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the last known address of such holder as set forth (i) in the Schedules, (ii) on the Proof of Claim filed by such holder, (iii) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or

(iv) in any notice served by such holder giving details of a change of address; *provided*, *however*, that with respect to syndicated bank debt or other similarly situated creditor groups, if requested by the agent bank, Plan Distributions may be made to the agent bank to forward to the participating banks in accordance with the applicable credit documents.

E.    *Undeliverable and Unclaimed Distributions Held by Disbursing Agent*

1.    Holding of Undeliverable Distributions

If any Plan Distribution to a holder of an Allowed Claim is returned to the Liquidating Trust as undeliverable (other than on account of an Unsecured Notes Claim), no further distributions will be made to such holder unless and until the Liquidating Trust is notified by written certification of such holder's then-current address. Nothing contained in the Plan shall require the Liquidating Trust to attempt to locate any holder of an Allowed Claim.

2.    After Distributions Become Deliverable

On each Plan Distribution Date, the Liquidating Trustee will make all Plan Distributions that became deliverable to holders of Allowed Claims after the most recent Plan Distribution Date; *provided*, *however,* that the Liquidating Trustee may establish a record date prior to each Plan Distribution Date, such that only Claims Allowed as of the record date will participate in such periodic Plan Distribution. Notwithstanding the foregoing, the Liquidating Trustee reserves the right to postpone a Plan Distribution Date, if it determines a Plan Distribution on any Plan Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable.

3.    Failure to Claim Undeliverable Distributions

Any holder of an Allowed Claim that does not assert its right to an undeliverable Plan Distribution prior to the date that is six (6) months after the applicable Plan Distribution Date will be forever barred from asserting any such Claim against the Debtors, the Estates, or the Liquidating Trust, as applicable, and their respective property. In such cases, (a) the undeliverable Plan Distributions shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and vest in the Liquidating Trust; (b) the Allowed Claims with respect to such Plan Distributions shall be automatically cancelled; (c) the right of the holders entitled to those Plan Distributions shall be discharged and forever barred; and (d) the undeliverable Plan Distributions shall be reserved or distributed in accordance with the Plan and the Liquidating Trust Agreement.

F.    *Time Bar to Cash Payments*

Checks issued in respect of Allowed Claims shall be null and void if not presented within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Liquidating Trustee by the holder of the Allowed Claim to whom such check was originally issued.  Any claim in respect of such a voided check shall be made within ninety (90) days after the date of issuance of such check.  If no request is made as provided in the preceding sentence, any claim in respect of such voided check shall be forever barred and any Cash held for payment on account of such voided check shall be deemed to be

4896-9948-8316.v22

unclaimed property and shall vest in the Liquidating Trust, and be deemed to be Liquidating Trust Assets.

G.     *Manner of Payment under the Plan*

Unless the Entity receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank.  Cash payments to foreign creditors may, in addition to the foregoing, be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

H.     *Fractional Plan Distributions*

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractions of dollars will be made.  Fractions of dollars shall be rounded to the nearest whole unit (with any amount equal to or less than one-half dollar to be rounded down).

I.     *De Minimis Distributions*

Notwithstanding anything contrary contained herein, no Plan Distribution of less than fifty dollars ($50.00) shall be made to the holder of any Claim unless a request therefor is made in writing to the Liquidating Trustee.  If no request is made as provided in the preceding sentence within ninety (90) days of the Effective Date, all such Plan Distributions shall be added to and constitute a portion of the Net Liquidating Trust Assets.

J.     *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition,* on the Petition Date.

K.     *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, including any Disputed Claims, against the Debtors, and no holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.  Plan Distributions made after the Effective Date to holders of Allowed Claims shall be deemed to have been made on the Effective Date and no interest shall accrue or be payable with respect to such Claims or any distribution related thereto.

L.     *Allocation Between Principal and Accrued Interest*

To the extent that any Allowed Claim entitled to a Plan Distribution from the Liquidating Trust consists of indebtedness for U.S. federal income tax purposes and other amounts (such as accrued but unpaid interest thereon), such Plan Distribution shall be allocated first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to

the extent the consideration exceeds the principal amount of the Claim, to such other amounts, if any.

M.    *Single Satisfaction*

In no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

N.    *Claims Paid or Payable by Third Parties*

1.    <u>Claims Paid by Third Parties</u>

The Debtors, or the Liquidating Trust, as applicable, shall reduce in full a Claim, and such Claim shall be hereby Disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Liquidating Trust; *provided*, that the Debtors or the Liquidating Trustee, as applicable, shall provide fourteen (14) days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a Plan Distribution on account of such Claim and receives payment from a party that is not a Debtor or the Liquidating Trust on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the Plan Distribution to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim. The failure of such holder to timely repay or return such Plan Distribution shall result in the holder owing the Liquidating Trust annualized interest at the federal judgment rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.    <u>Applicability of Insurance Contracts</u>

No Plan Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract. To the extent that one or more of the Debtors' Insurers agrees to satisfy in full or in part a Claim, then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, that the Liquidating Trustee shall provide fourteen (14) days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

Except as otherwise provided in the Plan, Plan Distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contract. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action under any Insurance Contract that the Debtors or any entity may hold against any other entity, including

Insurers, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

O.      *Distributions on Account of Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Equity Interests and the respective distributions on account thereof take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Except with respect to Claims that are expressly allowed by this Plan or other Final Order of this Court, pursuant to section 510 of the Bankruptcy Code, the Debtors with advance written notice to Committee, or the Liquidating Trustee, as applicable, reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto. Notwithstanding the foregoing, the Plan shall be without prejudice to the contractual, legal, or equitable subordination rights (if any) in favor of any holder of any Allowed Claim, and any holder of any Allowed Claim (if any) subject to any such contractual, legal, or equitable subordination shall remit any distribution on account of such Claim to which such holder's Claim is subordinated in accordance with and to the extent required under any applicable contractual, legal, or equitable subordination obligation.

## ARTICLE X.
## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

A.      *Allowance of Claims*

After the Effective Date, the Liquidating Trustee shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or satisfied, settled, released, and discharged under this Plan. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no proof of Claim has been timely filed by the applicable Claims Bar Date, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

For the avoidance of doubt, the Unsecured Notes Claims shall be Allowed in the aggregate amount of the Unsecured Notes Claims Allowed Amount.

B.      *Prosecution of Disputed Claims*

Except as otherwise specifically provided in this Plan, the Debtors (in consultation with the Committee), before the Effective Date, and the Liquidating Trustee, after the Effective Date, subject to the Liquidating Trust Agreement, shall have the sole authority to: (a) file, withdraw or litigate to judgment, objections to Claims; (b) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court (other than a

Professional Fee Claim); and (c) direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order, or approval by the Bankruptcy Court.

Objections to Claims and Interests must be filed and served by no later than the Claims Objection Deadline (subject to such being extended by an order of the Bankruptcy Court). For the avoidance of doubt, the Claims Objection Deadline may be extended on multiple occasions.

C.      *Entitlement to Plan Distributions upon Allowance*

Notwithstanding any other provision of the Plan, no Plan Distribution shall be made with respect to any Claim to the extent it is a Disputed Claim, unless and until such Disputed Claim becomes an Allowed Claim, subject to the setoff rights as provided in Article XII.G.  When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim (regardless of when) the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

D.      *Adjustment to Claims or Interests Without Objection*

Any Claim that has been paid, satisfied, or assumed, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Liquidating Trustee (as applicable) without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Estimation of Claims*

The Debtors or the Liquidating Trustee, as applicable, may, at any time, request that the Bankruptcy Court estimate any respective Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Liquidating Trustee or the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the Allowed amount of such Claim for all purposes under the Plan.  All the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

4896-9948-8316.v22

## ARTICLE XI.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Rejection of Executory Contracts and Unexpired Leases*

    1.    Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors, shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code, **except**: (i) any Executory Contracts and Unexpired Leases that are the subject of separate motions to reject, assume, or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the entry of the Confirmation Order; (ii) all Executory Contracts and Unexpired Leases (if any) assumed or assumed and assigned by order of the Bankruptcy Court entered before the Effective Date and not subsequently rejected pursuant to an order of the Bankruptcy Court; (iii) any guaranty or similar agreement executed by a third party which guarantees repayment or performance of an obligation owed to the Debtors or to indemnify the Debtors; (iv) agreements with third parties regarding preservation of the confidentiality of documents produced by the Debtors; and (v) the Insurance Contracts.  Any order entered post-confirmation by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an Executory Contract or Unexpired Lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered pre-confirmation.  The Debtors reserve the right to amend the Plan Supplement prior to the entry of the Confirmation Order.  All indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, engagement letters, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be rejected.  For the avoidance of doubt, the Debtors shall not be deemed to have assumed any obligation to provide defense and indemnification to any director or officer that would entitle such individuals to any claim against, or satisfaction from, the Debtors or the Liquidating Trust, as applicable, other than from insurance proceeds, if any, that may be available under any applicable Insurance Contracts.

    2.    Effect of Rejection

Exclusion of a contract, lease, or other agreement from the exceptions from Article XI.A.1 shall constitute adequate and sufficient notice of (i) any Claims arising thereunder or related thereto shall be treated as General Unsecured Claims under the Plan and (ii) the Debtors are no longer bound by, or otherwise obligated to perform, any such obligations, transactions, or undertakings relating thereto or arising thereunder.  The Plan shall constitute a motion to reject such Executory Contracts and Unexpired Leases rejected pursuant to this section, and the Debtors shall have no liability thereunder except as is specifically provided in the Plan.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected agreement, Executory Contract or Unexpired Lease is burdensome, and that the rejection thereof is in the best interests of the Debtors and their Estates.

4896-9948-8316.v22

B.    *Claims Arising from Rejection, Expiration, or Termination*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days of service of the Notice of Effective Date.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Liquidating Trust or property of the foregoing parties, without the need for any objection by the Debtors or the Liquidating Trustee, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article VI.B.3, and such claims may be objected to in accordance with this Plan.

C.    *Contracts and Leases Entered Into After the Petition Date*

Executory Contracts and Unexpired Leases entered into or assumed by the Debtors after the Petition Date that are not assigned to a non-Debtor third-party or the Liquidating Trust (or have not otherwise previously been assigned pursuant to a Final Order prior to the Effective Date) shall be considered repudiated by the Debtors as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such contract or lease, must file a Proof of Claim within thirty (30) days of service of the Notice of Effective Date in accordance with this Plan or have their rights forever satisfied.

D.    *Insurance Contracts*

Notwithstanding Article XI.A.1, above, all Insurance Contracts to which any Debtor is a party as of the Effective Date, including but not limited to the D&O Policies (including any "tail policy"), shall be deemed to be and treated as Executory Contracts and shall be assumed by the applicable Debtor and assigned to the Liquidating Trust effective as of the Effective Date, and such Insurance Contracts shall continue in full force and effect after the Effective Date in accordance with their respective terms. Nothing in the Plan (including the assignment of any Insurance Contract to the Liquidating Trust pursuant to the Plan) shall impair, diminish, or otherwise adversely modify the enforceability of, or any coverage under, any Insurance Contracts.

The Liquidating Trust shall be responsible for monitoring and preserving the ability to maintain claims against the Insurance Contracts.  To the extent the Debtors are not the first named insured under any Insurance Contract and notwithstanding Confirmation of the Plan or the occurrence of the Effective Date (i) nothing herein shall constitute a rejection of such Insurance Contracts, (ii) such Insurance Contracts shall remain in full force and effect, and (iii) any and all rights of the Debtors under such Insurance Contracts shall remain in full force and effect.  For the avoidance of doubt, the Liquidating Trust shall retain all rights of the applicable Debtors to assert claims against the Insurance Contracts and/or to recover the proceeds thereof,

66

and the dissolution of the Debtors shall have no impact upon the rights of the Liquidating Trust to assert claims against the Insurance Contracts or to recover the proceeds thereof.

E.    *Warranties*

Notwithstanding the rejection of any of the Debtors' Executory Contracts under this Plan or by separate motion, the Debtors and the Liquidating Trust, as applicable, shall retain and be entitled to enforce any warranties provided to, or for the benefit of, the Debtors under applicable federal or state law; *provided*, for the avoidance of doubt, that the foregoing does not include any warranties provided to, or for the benefit of, the Debtors pursuant to any contract that has been assumed and assigned (other than to the Liquidating Trust) by order entered by the Bankruptcy Court on or before the Effective Date. For the avoidance of doubt, the Debtors are not assuming any warranty obligations of the Debtors or otherwise provided by the Debtors under any Executory Contract that is rejected pursuant to this Plan or otherwise rejected in the Chapter 11 Cases.

F.    *Reservation of Rights*

Nothing contained in the Plan, or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Liquidating Trust has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of rejection, the Liquidating Trustee shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## ARTICLE XII.
## EFFECTS OF CONFIRMATION

A.    *Releases by the Debtors*

**Except as otherwise provided herein, as of the Effective Date, for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions of the Released Parties to facilitate and implement this Plan, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, generally, individually, collectively, irrevocably, and forever released and discharged by the Debtors and their Estates, including any of their successors and assigns, including but not limited to the Liquidating Trust, and any and all other Entities who may purport to assert any Causes of Action, directly or derivatively, by, through, for, or because of the Debtors or their Estates from any and all Causes of Action whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, notwithstanding section 1542 of the California Civil Code or any law of any jurisdiction that is similar, comparable or equivalent thereto (which shall conclusively be deemed waived) whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, a Debtor, the Estates, or**

other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, as such Entities existed prior to or after the Petition Date, the Debtors' in- and out-of-court restructuring efforts, the Chapter 11 Cases, the Plan Documents, or any other instrument, contract, or document related to the foregoing, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, administration, implementation, or consummation of the Chapter 11 Cases (including any payments, distributions or transfers in connection therewith), the Plan Documents, or any other instrument, contract, or document related to the foregoing, or any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.

For the avoidance of doubt and notwithstanding anything to the contrary in this Plan, the Confirmation Order, or any prior order of the Bankruptcy Court, the releases set forth in this **Article XII.A** and **Article XII.B** (1) shall be in addition to the Causes of Action released as part of the SEC Claim Resolution; and (2) do **NOT** release: (a) any Released Party, other than the Ubben Released Parties subject to approval of the Derivative Action Stipulation and the Debtors' receipt of the Ubben Contribution, from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence; (b) any obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (c) any Claims or Causes of Action against any Entity that is not a Released Party; (d) any Preserved Estate Claims including but not limited to (i) the D&O Actions, subject to the limitations set forth in Article VII.B.3 above, or (ii) Claims or Causes of Action of the Debtors against Trevor Milton and any entity that Trevor Milton directly or indirectly owns, holds, or controls any equity in; and (e) any Released Party from any Causes of Action arising from or related to (x) the Securities Class Action; (y) the Roy Action; or (z) the Tenneson Action.

B.    *Releases by Creditors*

Except as otherwise provided in the Plan, as of the Effective Date and to the fullest extent authorized by applicable law, for good and valuable consideration, including the obligations of the Debtors under this Plan and the contributions of the Released Parties to facilitate and implement this Plan, each Releasing Party conclusively, absolutely, unconditionally, generally, individually, collectively, irrevocably, and forever releases and discharges the Released Parties from any and all Causes of Action whatsoever (including any derivative claims purportedly asserted or assertable by any Releasing Party against any Released Party), whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, a Debtor, the Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors'

in- and out-of-court restructuring efforts, the Chapter 11 Cases, the Plan Documents, or any other instrument, contract, or document related to the foregoing, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests before or during the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, administration, implementation, or consummation of the Chapter 11 Cases (including any payments, distributions or transfers in connection therewith), the Plan Documents, or any other instrument, contract, or document related to the foregoing.

For the avoidance of doubt and notwithstanding anything to the contrary in this Plan, the Confirmation Order, or any prior order of the Bankruptcy Court, the releases set forth in this **Article XII.B** do **NOT** release: (a) any Released Party, other than the Ubben Released Parties subject to approval of the Derivative Action Stipulation and the Debtors' receipt of the Ubben Contribution, from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence; (b) any obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (c) any Claims or Causes of Action against any Entity that is not a Released Party; (d) any Preserved Estate Claims including but not limited to (i) the D&O Actions, subject to the limitations set forth in Article VII.B.3 above, or (ii) Claims or Causes of Action of the Debtors against Trevor Milton and any entity that Trevor Milton directly or indirectly owns, holds, or controls any equity in; and (e) any Released Party from any Causes of Action arising from or related to (x) the Securities Class Action; (y) the Roy Action; or (z) the Tenneson Action.

C.    *Exculpation*

No Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from any Claim, obligation, Cause of Action or liability for any Claim related to any act or omission occurring between the Petition Date and the Effective Date in connection with or arising out of, the administration of the Chapter 11 Cases, the events described in Article IV of this Plan, the entry into the Liquidating Trust Agreement, the negotiation and pursuit of this Plan, or the solicitation of votes for, or confirmation of, this Plan, the funding of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, and the issuance of securities or beneficial interests under or in connection with this Plan or the transactions contemplated by the foregoing, except for willful misconduct, gross negligence, or fraud as finally determined by a Final Order, but in all respects such Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities pursuant to this Plan.  The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.  Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the foregoing provisions of this exculpation

69

provision shall not operate to waive or release the rights of the Debtors or other parties in interest to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan and Plan Supplement or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court.

D.    *Injunctions*

Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Entities who have held, hold or may hold Causes of Action, Claims or Equity Interests in the Debtors or the Estates that have been released or are subject to exculpation or are otherwise treated under this Plan are, with respect to any such Causes of Action, Claims or Equity Interests, enjoined, from and after the Effective Date through and until the date upon which all remaining property of the Debtors is vested in and been transferred to the Liquidating Trust, has been liquidated and distributed to creditors, or otherwise, in accordance with the terms of the Plan and the Liquidating Trust Agreement, and the Plan has been fully administered, subject to further extension or reduction by motion on notice, with all parties' rights with respect to such extension or reduction reserved, from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Estates or any of their Assets, the Liquidating Trust, the Released Parties, the Exculpated Parties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to any of the foregoing Entities or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Estates or any of their Assets, the Liquidating Trust, the Released Parties, the Exculpated Parties or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Estates or any of their Assets, the Liquidating Trust, the Released Parties, the Exculpated Parties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities, or any property of any such transferee or successor; (iv) commencing or continuing in any manner or in any place, any suit, action or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order, including the releases and exculpations provided under **Article XII.A**, **Article XII.B**, and **XII.C** of the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the fullest extent permitted by applicable law; and (vi) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; *provided*, *however*, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of this Plan. Each holder of an Allowed Claim or Allowed Equity Interest shall be deemed to have specifically consented to the injunctions set forth

4896-9948-8316.v22

**herein.  For the avoidance of doubt, the foregoing provisions of this Section shall not operate to waive or release the rights of the Debtors or other parties in interest to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan and Plan Supplement or assumed pursuant to the Plan or assumed pursuant to Final Order of the Bankruptcy Court.**

E.    *Satisfaction of Claims*

(a)    Subject to the occurrence of the Effective Date, as of the Effective Date, except as provided in the Plan, the Plan Distributions and rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be in exchange for and in complete satisfaction of all Claims against the Debtors, and in satisfaction of all Equity Interests and the termination of Equity Interests in the Debtors.  Except as otherwise specifically provided in the Plan, as of the Effective Date any interest accrued on Claims against the Debtors from and after the Petition Date shall be cancelled.  Accordingly, except as otherwise provided in the Plan or the Confirmation Order, confirmation of the Plan shall, as of the Effective Date, satisfy, terminate and cancel all Claims against the Debtors and Equity Interests and other rights of equity security holders in the Debtors.

(b)    Subject to the occurrence of the Effective Date, as of the Effective Date, except as provided in the Plan, all Entities shall be precluded from asserting against the Debtors, the Liquidating Trust, or their respective successors or property, any other or further Claims, debts, rights, Causes of Action, liabilities or Equity Interests based upon any act, omission, transaction or other activity of any kind or nature that occurred prior to the Petition Date.

(c)    No Entity holding a Claim may receive on account of such Claim any payment from, or seek recourse or recovery against, any Assets that are to be distributed under the Plan, other than Assets required to be distributed to that Entity under the Plan.

F.    *Distributions are Final*

Subject to Article IX of the Plan, all Plan Distributions made to holders of Allowed Claims and Allowed Equity Interests in any Class are intended to be and shall be final. Notwithstanding any other provision of this Plan, the Debtors shall not receive a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code.

G.    *Setoff Rights*

Except with respect to Claims released under the Plan, the Debtor and the Liquidating Trust, as applicable, may set off any Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) against all Claims that the applicable Debtor may have held against the holder of such Claim or exercise recoupment with respect thereto.  Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor or the Liquidating Trustee, as applicable, may have against the holder of any Claim.

In no event shall Trevor Milton and any entity that Trevor Milton directly or indirectly owns, holds, or controls any equity in, or any prior or future transferee of property directly or

indirectly owned, held, or controlled by Trevor Milton, be entitled to assert any right of setoff, subrogation, or recoupment of any kind against any obligation due from, or against the property of, the Debtors, the Exculpated Parties, the Released Parties, or the Liquidating Trust.

H.    *Third Party Agreements; Subordination*

The Plan Distributions to the various classes of Claims hereunder shall not affect the right of any Entity to levy, garnish, attach or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise.  All such rights and any agreements relating thereto shall remain in full force and effect, except as otherwise compromised and settled pursuant to the Plan.

Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan.  Except with respect to Claims that are expressly allowed by this Plan or other Final Order of this Court, the right of the Debtors or the Liquidating Trust to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Equity Interest that becomes a subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination.  Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a subordinated Claim or subordinated Equity Interest.

I.    *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Liquidating Trustee, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to the Liquidating Trust and their successors and assigns.

## ARTICLE XIII.
## CONDITIONS PRECEDENT TO THE OCCURRENCE OF THE EFFECTIVE DATE

A.    *Conditions Precedent to the Occurrence of the Effective Date*

The following are conditions precedent to the occurrence of the Effective Date with respect to each of the Debtors' Estates:

(1)    the Confirmation Order shall be a Final Order and be in form and substance reasonably satisfactory to the Debtors and the Committee;

(2)    the Liquidating Trust shall have been formed and the Liquidating Trustee shall have been appointed, and the Debtors shall have taken such actions and provided such information as reasonably requested by the prospective Liquidating Trustee that are reasonably necessary to allow the Liquidating Trustee to perform its duties under and in accordance with the Plan and the Liquidating Trust Agreement;

4896-9948-8316.v22

(3)     no orders, decisions, or injunctions shall have been issued by a governmental unit prohibiting, modifying, or conditioning any transaction contemplated herein;

(4)     all necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan Documents, including satisfaction or waiver of all conditions to the obligations of the Debtors under the Plan Documents in accordance with Article XIII.A of the Plan;

(5)     the Delaware Chancery Court shall have entered a Final Order approving the Derivative Action Stipulation and the Debtors shall have received the Settlement Fund (as defined in the Derivative Action Stipulation);

(6)     the Ubben Contribution shall have been paid in full in accordance with the settlement of the Derivative Actions described in the 9019 Motion within fifteen (15) Business Days of entry of a Final Order approving the Derivative Action Stipulation by the Delaware Chancery Court;

(7)     all Allowed Professional Fee Claims shall have been paid in full in accordance with Article V.B.1 of this Plan, the Professional Fee Escrow shall have been funded with the Professional Fee Escrow Amount in accordance with Article V.B.1 of this Plan, and the Reserve shall have been funded in accordance with Article I.A.77 of this Plan; and

(8)     the PWRW&G Refund shall have been returned to the Estates.

B.     *Waiver of Conditions*

The Debtors, with the prior written consent of the Committee, may waive any one or more of the conditions set forth in Article XIII.A or Article XIII.B without notice or order of the Bankruptcy Court and without notice to any other parties in interest.

C.     *Effect of Non-Occurrence of the Effective Date*

If the Effective Date shall not occur (except as provided in Article XIII.D hereof), the Plan shall be null and void and nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, including any right to seek an extension of the exclusivity periods under section 1121(d) of the Bankruptcy Code; or (iii) constitute an admission, acknowledgement, offer or undertaking by the Debtors.

D.     *Option to Delay Occurrence of the Effective Date*

Notwithstanding anything in the Plan to the contrary, the Debtors reserve, with the prior written consent of the Committee, the right to delay the occurrence of the Effective Date with respect to one or more of the Debtors' Estates to a later date; *provided*, *however*, that any such election by the Debtors to delay the occurrence of the Effective Date with respect to one Estate shall not prevent the occurrence of the Effective Date with respect to any of the other Estates.

4896-9948-8316.v22

E.  *Modification of the Plan*

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors, with consent of the Debtors and the Committee, at any time before confirmation, *provided*, that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code. The Debtors may, with the written consent of the Committee, modify the Plan at any time after confirmation and before substantial consummation, *provided*, that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such holder.

F.  *Revocation of Plan*

The Debtors, with the written consent of the Committee, reserve the right to revoke and withdraw the Plan and/or to adjourn the Confirmation Hearing prior to the occurrence of the Effective Date. If the Debtors revoke or withdraw the Plan, or if the Effective Date does not occur, then the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in the Debtors or to prejudice in any manner the rights of the Debtors or any other Entity in any other further proceedings involving the Debtors.

## ARTICLE XIV.
## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

1.  to hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XI hereof for the rejection of Executory Contracts or Unexpired Leases to which any Debtor is a party or with respect to which a Debtor may be liable, and to hear and determine any and all Claims and any related disputes (including the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any Executory Contract or Unexpired Lease);

2.  to hear and determine any and all adversary proceedings, applications, motions and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Liquidating Trustee after the Effective Date, including any adversary proceedings which the Liquidating Trustee may choose to bring in the Bankruptcy Court in respect to any of the Preserved Estate Claims;

3.      to hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Disputed Claim in whole or in part;

4.      to issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

5.      to consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

6.      to hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

7.      to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with the Plan Documents or their interpretation, implementation, enforcement or consummation;

8.      to the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of or against the Estates, any of the Preserved Estate Claims;

9.      to determine such other matters that may be set forth in the Plan or the Confirmation Order, or that may arise in connection with the Plan or the Confirmation Order;

10.     to hear and determine matters concerning state, local and federal taxes, fines, penalties or additions to taxes for which the Debtors may be liable in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

11.     to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with any setoff and/or recoupment rights of the Debtors or any Entity under the Plan;

12.     to hear and determine all controversies, suits and disputes that may relate to, impact upon or arise in connection with Causes of Action of the Debtors or the Estates (including the Preserved Estate Claims) commenced by the Liquidating Trustee, the Debtors or any third parties, as applicable, before or after the Effective Date;

13.     to enter an order or final decree closing the Chapter 11 Cases;

14.     to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

15.     to extend the initial stated terms of the Liquidating Trust in accordance with the provisions concerning such a potential extension in the Liquidating Trust Agreement;

17.     to hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

18      to hear and determine any matters related to the 9019 Motion; and

19      to hear and determine all controversies and disputes related to the Derivative Actions, including but not limited to relief related to the failure of any Individual Defendant (as defined in the Derivative Action Stipulation) to pay any portion of their obligation of the Settlement Fund (as defined in the Derivative Action Stipulation).

## ARTICLE XV.
## MISCELLANEOUS PROVISIONS

A.     *Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Liquidating Trustee (as applicable) and all holders of Claims or Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may reasonably be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

B.     *Substantial Consummation*

On the Effective Date, this Plan shall be deemed to be substantially consummated (within the meaning set forth in section 1101 of the Bankruptcy Code) pursuant to section 1127(b) of the Bankruptcy Code.

C.     *Reservation of Rights*

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims or Equity Interests prior to the Effective Date.

D.     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, beneficiaries or guardian, if any, of each Entity.

E.    *Notices*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Liquidating Trust shall be served on the Liquidating Trust and its counsel at the notice address set forth in the Liquidating Trust Agreement.

F.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (*including* the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of Delaware, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents and instruments executed in connection with the Plan, *except* as otherwise expressly provided in such instruments, agreements or documents.

G.    *Exemption from Transfer Taxes*

Pursuant to, and to the fullest extent permitted by, section 1146 of the Bankruptcy Code, any transfers (including any transfer from a Debtor to the Liquidating Trust) of property pursuant to, in contemplation of, or in connection with the Plan, including any transfer pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, property, or other interest in the Debtors or the Liquidating Trust; (2) any transfer, sale or exchange of the assets that is the subject of a motion or notice pursuant to section 363 of the Bankruptcy Code filed by the Debtors before the Effective Date regardless of the date the transaction is approved by the Bankruptcy Court or the date such transfer, sale or exchange closes; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any stamp, real estate transfer, personal property transfer tax, mortgage recording, sales, use or other similar tax, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax.  To effectuate the terms of this Section, the Bankruptcy Court may enter any order necessary or appropriate to implement this provision of the Plan.

H.    *Notice of Entry of Confirmation Order and Relevant Dates*

Promptly upon entry of the Confirmation Order, the Debtors shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Equity Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan, including the deadline for filing notice of Administrative Claims, and the deadline for filing rejection damage Claims.

4896-9948-8316.v22

I.    *Compliance with Tax Requirements*

In connection with the Plan, the Debtors and the Liquidating Trustee, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding the foregoing, the Debtors and the Liquidating Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding in kind, liquidating a portion of the distributions to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. For purposes of the Plan, any withheld amount (or property) paid to the applicable Tax Authority shall be treated as if paid to the applicable claimant. The Debtors and the Liquidating Trust reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. Notwithstanding the foregoing, each holder of an Allowed Claim that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution.  The Liquidating Trustee has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Liquidating Trustee for payment of any such tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Debtors or the Liquidating Trustee may require, as a condition to the receipt of a distribution, that the holder complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each holder.

J.    *Rates*

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

K.    *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Liquidating Trustee, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

L.    *Severability*

In the event the Bankruptcy Court determines that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Equity Interest or transaction, the Debtors may modify the Plan in accordance with Article XIII.E so that such provision shall be not be applicable to the holder of any such Claim or Equity Interest or transaction.  Any such

determination of unenforceability shall not (i) limit or affect the enforceability and operative effect of any other provision of the Plan or (ii) require the re-solicitation of any acceptance or rejection of the Plan.

M.    *Closing of the Chapter 11 Cases*

On or after the Effective Date, the Liquidating Trustee shall be authorized to file a motion requesting entry of one or more orders of this Court closing any of the Chapter 11 Cases. Such motion may be heard by the Bankruptcy Court on fourteen (14) days' notice to the U.S. Trustee and all other parties entitled to notice under Local Rule 2002-1(b). Each Debtor estate shall be entitled to appoint the Liquidating Trustee to prosecute claims and defenses and make distributions and attend to other wind down affairs on behalf of each of the other prior Debtors as if such Debtor estates continued to exist solely for that purpose. The Liquidating Trustee shall, promptly after the full administration of the Chapter 11 Cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court and file a motion under Local Rule 3022-1(a) to close the case of any other Debtor whose case remains open at that time. Upon the filing of such a motion, the Liquidating Trustee shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

N.    *No Admissions*

As to contested matters, adversary proceedings and other Causes of Action or threatened Causes of Action, this Plan shall not constitute or be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.

O.    *Dissolution of the Committee and Any Other Statutory Committee*

On the Effective Date, the Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve automatically and the members thereof and the Professionals retained by the Committee shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided*, that, the Committee shall continue to exist, and its Professionals shall continue to be retained, after the Effective Date and have standing and a right to be heard for the following limited purposes: (a) requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date, and (b) any appeals of the Confirmation Order or other appeal or pending litigation to which the Committee is a party.

P.    *Additional SEC Matters*

Other than with respect to the SEC Claim Resolution, notwithstanding any language to the contrary contained in the Combined Disclosure Statement and Plan or the Plan Confirmation Order, no provision of the Combined Disclosure Statement and Plan or Plan Confirmation Order shall (a) preclude the SEC from enforcing its police or regulatory powers, or (b) enjoin, limit, impair, or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against the Debtors or any non-debtor person or entity in any forum.

4896-9948-8316.v22

# ARTICLE XVI.
## PLAN-RELATED RISK FACTORS

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING THE RISK FACTORS SET FORTH BELOW.  HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH HEREIN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.    *The Plan May Not Be Accepted*

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan for the Debtors, or otherwise, that may not have the support of the holders, or may liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative plan would be similar to or as favorable to holders as those proposed in the Plan.

B.    *The Plan May Not Be Confirmed*

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan.  Even if the Bankruptcy Court determines that the Disclosure Statement, the balloting procedures, and the results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes.  If the Plan is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan.

C.    *Parties in Interest May Object to the Amount or Classification of Claims*

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Interests in, the Debtors.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or interest is substantially similar to the other Claims or interests of such Class.  The Debtors believe that all Claims and interests have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors may seek (a) to modify the Plan to provide for whatever classification might be required for Confirmation or (b) to use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote

4896-9948-8316.v22

required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, if it were to find that a classification was inappropriate and required a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

D.      *The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided herein, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth herein cannot be relied upon by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described herein.

E.      *Nonconsensual Confirmation*

In the event that any Impaired Class of Claims or interests does not vote to accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan if at least one Impaired Class has accepted the Plan, and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation may result in, among other things, increased expenses relating to professional compensation.

F.      *The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code*

If the Bankruptcy Court finds that it would be in the best interest of creditors or any Debtor, the Bankruptcy Court may convert such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate such Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would

result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the Assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than selling the Assets at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during a liquidation.

G.      *Plan Releases May Not Be Approved*

There can be no assurance that the releases, third-party releases, exculpation, and injunction provisions, as provided in Article XII, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan, or the Plan not being confirmed.

H.      *Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims under the Plan*

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual Allowed amounts of Claims may differ from these estimates.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Should these underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated herein.  Because certain Plan Distributions are linked to the amount and value of Allowed Claims, any material increase in the amount of Allowed Claims over the amounts estimated by the Debtors would materially reduce the recovery to certain holders of Allowed Claims under the Plan.

I.      *Certain Tax and Securities Implications of the Plan*

There are several material securities and income tax considerations, risks, and uncertainties associated with the Plan.  Each holder should consult its own advisors regarding these matters, based upon the particular circumstances pertaining to such holder.

J.      *Failure To Consummate the Plan*

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date hereof, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

K.      *Any Valuation of Any Assets for Plan Distributions Is Speculative and Could Potentially Be Zero*

The Debtors have not obtained or requested an opinion from any bank or other firm as to the value of the Liquidating Trust Assets.  As such, any valuation of any of the Plan Distributions (*i.e.*, the Liquidating Trust Assets) is necessarily speculative, and the value of certain of such assets could potentially be zero.  Accordingly, the ultimate value, if any, of the

Plan Distributions (*i.e.*, the Liquidating Trust Assets) could materially affect, among other things, recoveries to holders of Allowed Claims in Class 3.

L.      *Costs of Administrating the Estates*

Liquidation of the Estates' remaining assets and the disbursement of the proceeds of such liquidation will require certain administrative costs that may vary based on a variety of factors. Such administrative costs cannot be predicted with certainty and may affect recoveries under the Plan.

M.      *The Retained Causes of Action May Be Pursued Against Holders that Vote To Accept or Reject the Plan*

Pursuant to Article VII.G.5, the Liquidating Trust, as applicable, will be permitted to pursue Causes of Action that have not otherwise been expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order.  Accordingly, holders that vote to accept or reject the Plan can be sued with respect to such Causes of Action.

N.      *Certain Tax Considerations*

There are several material income tax considerations, risks and uncertainties associated with the Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND APPLICABLE FOREIGN TAX CONSEQUENCES OF THE PLAN.

O.      *Trevor Milton-Related Risks*

As explained in Article IV.G, even though the Milton Award confirms that Trevor Milton is not entitled to indemnification from Nikola, Trevor Milton believes that he could prevail in whole or in part in the pending appeal of the Milton Award and/or the Milton Fee Arbitration.  In such an event, distributions to Holders of General Unsecured Claims (Class 3) could be negatively impacted.  *See* Article VI.A and Liquidation Analysis.

## ARTICLE XVII.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of Allowed Claims or General Unsecured Claims should carefully review this Combined DS and Plan.

This section is qualified in its entirety by the Solicitation Order.

A.    *Voting Instructions and Voting*

Holders in Class 3 (General Unsecured Claims) are entitled to vote to accept or reject the Plan. All holders within Class 3 have been sent a Ballot together with this Combined DS and Plan. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote. Each Ballot contains detailed voting instructions. Each Ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots. The Voting Record Date for determining which holders are entitled to vote on the Plan is July 14, 2025. The Voting Deadline is August 20, 2025, at 5:00 p.m. (prevailing Eastern Time).

**The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from holders of Claims within Class 3 who are entitled to a vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballot sent to you with this Combined DS and Plan. In order for your Ballot to be counted, please complete and sign your Ballot, and submit it so as to be actually received by 5:00 p.m. (Prevailing Eastern Time), on August 20, 2025 using <u>one</u> of the following methods:**

**<u>For holders of Claims in Class 3 (General Unsecured Claims), if by Mail or Hand Delivery:</u>**

> **Nikola Corporation Ballot Processing Center**
> **c/o Epiq Ballot Processing**
> **P.O. Box 4419**
> **Beaverton, OR 97076-4419**

**<u>If by Electronic, Online Submission:</u>**

> **Visit the Debtors' restructuring website at: https://dm.epiq11.com/Nikola, click on the "E-Ballot" tab, and follow the prompts and directions.**

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY TELECOPY, FACSIMILE, OR EMAIL BE ACCEPTED.** Following the Voting Deadline, the Claims Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan. Ballots submitted to the Debtors or any of its agents and advisors (other than the Claims and Noticing Agent) will not be counted.

If you have any questions regarding the Ballot, did not receive a return envelope with your Ballot, did not receive an electronic copy of the Combined DS and Plan, or need physical copies of the Ballot or other enclosed materials, please contact the Claims and Noticing Agent at https://dm.epiq11.com/Nikola or via telephone at (855) 627-0143 (toll-free in the U.S. and Canada) or +1 (971) 447-0919 (international).

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT (A) WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, (B)

PARTIALLY ACCEPTS AND PARTIALLY REJECTS THE PLAN, OR (C) INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU ARE AN ELIGIBLE HOLDER AND YOU DID NOT RECEIVE A BALLOT, RECEIVED A DAMAGED BALLOT, OR LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT AT HTTPS://DM.EPIQ11.COM/NIKOLA OR VIA TELEPHONE AT (855) 627-0143 (TOLL-FREE IN THE U.S. AND CANADA) OR +1 (971) 447-0919 (INTERNATIONAL).

B.    *Parties Entitled to Vote*

Under the Bankruptcy Code, only holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan.  Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an Impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or interest, the Bankruptcy Code deems such holder to have rejected the Plan, and, accordingly, holders of such Claims and Interests do not vote on the Plan and will not receive a Ballot. If a Claim or interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or interest to have accepted the Plan and, accordingly, holders of such Claims and interests are not entitled to vote on the Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

As set forth above, the Bankruptcy Code defines "acceptance" of a plan by a class of: (1) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (2) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the interests that cast ballots for acceptance or rejection of the plan.

Claims in Class 3 are impaired under the Plan and entitled to vote to accept or reject the Plan.  Claims in all other Classes are either unimpaired and presumed to accept or will not receive a Distribution under the Plan and deemed to reject the Plan, and therefore are not entitled to vote. For a detailed description of the treatment of Claims and Interests under the Plan, see Article VI.B herein.

The Debtors will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code over the deemed rejection of the Plan by all holders of Claims or Interests in Class 4 (Intercompany Claims), Class 5 (Equity Interests), Class 6 (Intercompany Interests),

Class 7 (Section 510(b) Claims), and Class 8 (Equitably Subordinated Claims).  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article XVIII.E of this Combined DS and Plan.

C.    *Agreements Upon Furnishing Ballot*

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this solicitation; and (ii) to the extent such accepting Ballot does not opt out of the voluntary releases contained in 0 of the Plan by checking the "opt out" box on the Ballot, the terms of the Plan including the injunction, releases, and exculpations set forth in Article XII.A through Article XII.D therein. All parties in interest retain their right to object to confirmation of the Plan.

D.    *Change of Vote*

Any party who has previously submitted to the Claims and Noticing Agent prior to the Voting Deadline a properly completed Ballot may change its vote by submitting to the Claims and Noticing Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

E.    *Waivers of Defects, Irregularities, Etc.*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Claims and Noticing Agent and/or the Debtors, as applicable, in their sole reasonable discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors; *provided*, *however*, that the Debtors may not waive the requirement that a Ballot must be signed to be counted. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors or the Bankruptcy Court may determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

4896-9948-8316.v22

F.      *Miscellaneous*

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Claims and Noticing Agent is authorized, but not required, to contact parties that submit incomplete or otherwise deficient votes to make a reasonable effort to cure such deficiencies. If you simultaneously return duplicative Ballots that are voted inconsistently, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of the Claims or Interests, as applicable, who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Claims and Noticing Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Claims and Noticing Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to include it in the tabulation of votes for or against the Plan.

As a cost saving measure, the Debtors are authorized to cause the Claims and Noticing Agent to distribute this Combined DS and Plan and the Solicitation Order (without exhibits) to claimholders by email to the extent possible.  Additionally, for purposes of serving the solicitation packages, combined hearing notice, and notice of non-voting status, the Debtors are authorized to rely on the address information for voting and non-voting Classes as compiled, updated, and maintained by the Claims and Noticing Agent as of the Voting Record Date. The Debtors and the Claims and Noticing Agent are not required to conduct any additional research for updated addresses based on undeliverable solicitation packages, combined hearing notices, and notices of non-voting status.  In the event the Debtors do not have an email address for a claimholder in a voting Class, the Claims and Noticing Agent will serve this Combined DS and Plan and the Solicitation Order on such voting claimholder in paper format or electronic format (*i.e.*, a USB drive) via first class U.S. mail to the extent a valid physical mailing address is known.

G.      *Further Information; Additional Copies*

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of this Combined DS and Plan, the Solicitation Order, or any exhibits thereto, please contact the Claims and Noticing Agent.

# ARTICLE XVIII.
## CONFIRMATION REQUIREMENTS

The following is a brief summary of the Plan Confirmation process.  Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and consult their own legal, financial, and other advisors.

A.     *The Joint Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.  The Solicitation Order sets the date and time for the Joint Hearing to consider (a) final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.   The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Joint Hearing or by filing a notice with the Bankruptcy Court.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  **Objections to Confirmation of the Plan must be made in writing and must be filed with the Bankruptcy Court and served in accordance with the** Solicitation Order (as described in the Preliminary Statement hereto).

B.     *Classification*

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims (excluding administrative claims) against, and equity interests in, a debtor into separate classes based upon their legal nature.  Pursuant to section 1122 of the Bankruptcy Code, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the Plan classifies all Claims and Interests in compliance with the provisions of the Bankruptcy Code because valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created hereunder.  Accordingly, the classification of Claims and Interests in the Plan complies with section 1122 of the Bankruptcy Code.

C.     *Consensual Confirmation*

In general, the Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a chapter 11 plan accept the plan.  As further set forth in section 1124 of the Bankruptcy Code, a class is impaired unless the plan (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the holder of such claim or interest or (2) cures any default, reinstates the original terms of the obligation, and does not otherwise alter the legal, equitable, or contractual rights to which the claim or interest entitles the holder of such claim or interest.  In addition, Classes that receive no Plan Distributions are not entitled to vote on the Plan and are deemed to have rejected the Plan.

4896-9948-8316.v22

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  For the avoidance of doubt, votes will be solicited and tabulated in accordance with the procedures approved in the Solicitation Order.

The Bankruptcy Court can confirm the Plan only if it determines that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code.  One of these technical requirements is that the Bankruptcy Court finds, among other things, that the Plan has been accepted by the requisite votes of all Classes of Impaired Claims and Interests, unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the nonacceptance by one or more such Classes.

In addition to the voting requirements, section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (1) the Plan has classified Claims in a permissible manner, (2) the Plan complies with applicable provisions of the Bankruptcy Code, (3) the Plan has been proposed in good faith and not by any means forbidden by law, (4) the disclosure required by section 1125 of the Bankruptcy Code has been made, (5) the Plan has been accepted by the requisite votes of holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code), (6) the Plan is "feasible" and Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless such liquidation or reorganization is proposed in the Plan, (7) the Plan is in the "best interests" of all holders of Claims in an Impaired Class by providing such holders on account of their Claims property of a value, as of the Effective Date, that is not less than the amount that such holders would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan, and (8) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Joint Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.  The Debtors believe that the Plan fully complies with all the applicable requirements of section 1129 of the Bankruptcy Code (see "Best Interests Test" and "Feasibility" below), other than those pertaining to voting, which has not yet concluded.

D.    *Feasibility and Best Interests of Creditors*

1.    Best Interests Test

As noted above, even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires a court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the

amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code (the "Best Interests Test").

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7 of the Bankruptcy Code, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

2.   Liquidation Analysis

Amounts that Holders of Claims or Interests in Impaired Classes would receive in a hypothetical chapter 7 liquidation are discussed in the following liquidation analysis of the Debtors prepared by the Debtors' management with the assistance of the Debtors' financial advisors (the "Liquidation Analysis"), a copy of which is attached hereto as **Exhibit B**. As described below, the Debtors developed the Liquidation Analysis based on forecasted values as of an assumed chapter 7 conversion date of September 5, 2025. The recoveries may change based on further refinements of Allowed Claims and as the Debtors' claims objection and reconciliation process progresses.

As described in the Liquidation Analysis, underlying the analysis is a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management and financial advisor, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management or a chapter 7 trustee. The Liquidation Analysis is based on assumptions regarding liquidation decisions that are subject to change. Accordingly, the assumptions reflected in the Liquidation Analysis might not be realized if the Debtors were, in fact, to undergo a liquidation.

This Liquidation Analysis is solely for the purposes of (a) providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims entitled to vote under the Plan to make an informed judgment about the Plan and (b) providing the Bankruptcy Court with appropriate support for the satisfaction of the Best Interests Test, pursuant to section 1129(a)(7) of the Bankruptcy Code, and should not be used or relied upon for any other purpose, including the purchase or sale of Securities of, or Claims or interests in, the Debtors or any of their Affiliates.

Events and circumstances occurring after the date on which the Liquidation Analysis was prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors do not intend to and do not undertake any obligation to update or otherwise revise the Liquidation Analysis to reflect events or circumstances existing

or arising after the date the Liquidation Analysis is initially filed or to reflect the occurrence of unanticipated events. Therefore, the Liquidation Analysis may not be relied upon as a guarantee or other assurance of the actual results that will occur.

In deciding whether to vote to accept or reject the Plan, holders of Claims must make their own determinations as to the reasonableness of any assumptions underlying the Liquidation Analysis and the reliability of the Liquidation Analysis.

3.    Liquidation Analysis

Under a chapter 7 liquidation, no class of claims that is junior to a class of claims may be paid unless the senior class of claims is paid in full.

Once the Bankruptcy Court ascertains the recoveries in liquidation of secured claimants and priority claimants, it must determine the probable distribution to general unsecured claimants and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such claimants and equity security holders under the Plan, then the Plan is not in the best interests of claimants and equity security holders and cannot be confirmed by the Bankruptcy Court. The Debtors believe that each member of each class of impaired claims will receive at least as much as, or more, under the Plan than it would receive if the Debtors' Assets were liquidated under chapter 7 as explained below.

a.    Liquidation under Chapter 7 of the Bankruptcy Code

Because the Debtors will sell, liquidate, or otherwise dispose of their remaining assets during the Chapter 11 Cases, the Plan contemplates the liquidation of the Debtors' remaining Assets. To calculate the probable distribution to members of each impaired class of holders of claims and interests if a Debtor were liquidated under Chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' remaining Assets if these Chapter 11 Cases were converted to Chapter 7 cases under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of such Debtor's Assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured claimants would be reduced by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and these Chapter 11 Cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of one or more chapter 7 trustee(s), as well as of counsel and other professionals retained by the chapter 7 trustee(s), asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs, costs associated with maintaining operations, and claims arising from the operations of the debtor during the pendency of the chapter 11 case.[13] The fact that an estate's assets are being

---

[13]    It is possible that more than one chapter 7 trustee would be appointed to liquidate the Debtors' estates. Each additional chapter 7 trustee would have their own fees and would be entitled to appoint their own advisors, which, in turn, will incur their own fees. The costs of multiple chapter 7 trustees and teams of chapter 7

liquidated in a chapter 7 case may further depress the value received for such assets. A chapter 7 trustee also may seek to abandon assets that have burdensome obligations. Moreover, the lack of familiarity that a chapter 7 trustee and his advisors would have respecting the Debtors' Assets, business, and Chapter 11 Cases would likely increase the cost of administration. A chapter 7 trustee and its professionals would need to review the entire docket in these Chapter 11 Cases and become familiar with, among other things, (i) the Debtors' books and records, (ii) the Debtors' historical capital structure, and (iii) the historical proceedings of these Chapter 11 Cases, while simultaneously undertaking investigations and valuations that may be duplicative of work already done by the Committee in these Chapter 11 Cases.

The Plan provides for the creation of the Trusts for the purpose of liquidating or otherwise monetizing the Debtors' Assets for the benefit of the Liquidating Trust Beneficiaries, including General Unsecured Creditors. If the Plan is not confirmed and the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, there would be a distribution to General Unsecured Claims that is less than what they will receive if the Plan is confirmed, because the additional layer of administrative expenses would reduce the funds otherwise available to Class 3 claimants. In that scenario, the Assets would not be transferred to the respective Trusts and, instead, would be liquidated or otherwise monetized by a chapter 7 trustee.

In light of the foregoing, the Debtors believe that the Plan meets the best interests test of section 1129(a)(7) of the Bankruptcy Code, and that the members of each impaired Class of Claims will receive more under the Plan than they would in a chapter 7 liquidation.

        b.      Alternative Liquidating Plan under Chapter 11 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors, the Committee, or any other party in interest could attempt to formulate a different plan providing for an orderly liquidation of the Debtors. The Debtors believe that the Plan described herein allows holders of Claims to realize the greatest recovery under the circumstances.

        4.      <u>Application of the Best Interests Test</u>

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the Best Interests Test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that, in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case. The Plan effects a wind-down and liquidation of the remaining assets of the Estates. Liquidating the Estates under the Plan would provide holders of Claims with larger, more timely recoveries due to the potential for delay and additional costs that would result from converting to a chapter 7 case at this stage of the Chapter 11 Cases.

As set forth in the Liquidation Analysis, the costs of liquidation under chapter 7 of the Bankruptcy Code would include compensating a trustee, as well as the costs of counsel and other

---

professionals would multiply the costs of liquidating the Debtors' estates and further erode the amount of liquidation value available to unsecured claimants.

professionals retained by the trustee.  The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors.  Conversion also would likely delay the liquidation process.  The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are allowed in the chapter 7 cases.

Accordingly, the Debtors believe that, based on the Liquidation Analysis, the Plan meets the Best Interest Test.  As the Plan and the Liquidation Analysis indicate, Confirmation of the Plan will provide each holder of an Allowed Claim with an equal or greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code, and therefore, the classification and treatment of Claims and interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

5.    <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successors to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.  Inasmuch as the Debtors are being liquidated and the Plan provides for the distribution of all of the proceeds of that liquidation to holders of Claims that are Allowed as of the Effective Date, the Debtors maintain that the Plan is effectively exempted from the feasibility requirements in accordance with the express terms of section 1129(a)(11) of the Bankruptcy Code.

E.    *Confirmation Without Necessary Acceptances; Cramdown*

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code, which requires that a court find that a plan (1) "does not discriminate unfairly" and (2) is "fair and equitable" with respect to each non-accepting impaired class of claims or interests.  Here, because holders of Claims or Interests in Classes 4, 5, 6, and 7 are deemed to reject the Plan, the Debtors will seek Confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those Classes will receive any property under the Plan.

A plan "does not discriminate unfairly" if (1) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (2) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests that are similarly situated, if any, and no class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed interests in such Class.  Accordingly,

the Debtors believe that the Plan does not discriminate unfairly as to any impaired Class of Claims or interests.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." In order to determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

1.      Secured Creditors.  Either (a) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (b) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (c) subject to section 363(k) of the Bankruptcy Code, the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (a) or (b) above.

2.      Unsecured Creditors.  Either (a) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

3.      Holders of Interests.  Either (a) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (b) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

The Debtors believe that the distributions provided under the Plan satisfy the "fair and equitable" standard.  Accordingly, the Debtors are seeking Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to each rejecting Class of Claims or interests, and the Plan constitutes a motion for such nonconsensual Confirmation.

4896-9948-8316.v22

## ARTICLE XIX.
## CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors.  The Debtors believe that any alternative to confirmation of the Plan could result in significant delay and additional costs, as well as a reduction in Plan Distributions.  **Consequently, the Debtors urge all holders of Claims eligible to vote on the Plan to vote to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims and Noticing Agent on or before the Voting Deadline.**

Respectfully submitted,

September 2, 2025                          Nikola Corporation (for itself and all Debtors)


                                          By:     */s/ Britton Worthen*_____
                                          Name:    Britton Worthen
                                          Title:    Chief Legal Officer

4896-9948-8316.v22

## EXHIBIT A



**EXHIBIT B**

**(Liquidation Analysis)**

# LIQUIDATION ANALYSIS FOR
# NIKOLA CORPORATION, *et al.*[1]

## I. INTRODUCTION

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a bankruptcy court may not confirm a plan under chapter 11 of the Bankruptcy Code unless each holder of an allowed claim or interest in an impaired class either:  (a) accepts the plan; or (b) will receive or retain property on account of such claim or interest of a value, as of the Conversion Date (defined below) of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the proposed plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their advisors, have prepared the following hypothetical liquidation analysis presenting recoveries available assuming a hypothetical liquidation (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to this Liquidation Analysis.

This Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests that may be realizable upon the disposition of assets pursuant to a hypothetical chapter 7 liquidation of the Debtors' estates.  As illustrated by this Liquidation Analysis, Holders of General Unsecured Claims would receive a lower recovery in a hypothetical liquidation than they would under the Plan.  Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a hypothetical chapter 7 liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

## Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in this Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  This Liquidation Analysis is not intended, and should not be used, for any other purpose.  The underlying financial information in this Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm.  In addition, various liquidation decisions upon which certain assumptions are based, are subject to change.  As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' Estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of the hypothetical chapter 7 cases.  Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in this Liquidation Analysis.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Nikola Corporation and Its Debtor Affiliates [Docket No. 640] (the "Disclosure Statement").

**NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A CHAPTER 7 LIQUIDATION OF THE DEBTORS' ESTATES WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THIS LIQUIDATION ANALYSIS. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS' ESTATES IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED IN THIS LIQUIDATION ANALYSIS.**

**THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN CONVERSION DATE. THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM AGAINST OR INTEREST IN THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.**

## II. GLOBAL ASSUMPTIONS

The Liquidation Analysis should be read in conjunction with the following global assumptions:

**Basis of Presentation**

This Liquidation Analysis has been prepared assuming that the Debtors convert their current chapter 11 cases to cases under chapter 7 of the Bankruptcy Code on or about December 22, 2025 (the "Conversion Date"). Except as otherwise noted herein, this Liquidation Analysis is based upon the unaudited balance sheets of the Debtors, and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. Certain balances, including cash, and certain receipts and expenses have been projected forward or estimated as of the Conversion Date. As noted above, the assets available to the Debtors in an actual liquidation may differ from the assets assumed to be available pursuant to this Liquidation Analysis.

In preparing this Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements. In addition, this Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and Allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, chapter 7 Administrative Claims such as liquidation and wind-down expenses, trustee fees, and professional fees attributable to the liquidation and wind-down. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims that were used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in this Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distributions to be made on account of Allowed Claims and Interests under the Plan.

**Conversion Date and Appointment of a Chapter 7 Trustee**

This Liquidation Analysis assumes that on the Conversion Date, the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates, during which time all of the Debtors' assets would be sold or surrendered and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law.  There can be no assurance, however, that the liquidation would be completed within a certain timeframe, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  In accordance with section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties in interest. The Liquidation Analysis is an estimate and is subject to material change and revision in all respects, and takes a conservative approach to analyzing the value to Holders of Claims in a chapter 7 liquidation.

**Additional Global Notes and Assumptions**

This Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

1.  Unaudited Financial Statements.  This Liquidation Analysis contains numerous estimates.  Except as otherwise noted herein, available recoveries are based upon the unaudited financial statements and balance sheets of the Debtors as projected as of the Conversion Date.

2.  Chapter 7 Liquidation Costs.  The Debtors have assumed that a hypothetical chapter 7 liquidation would last approximately six (6) months, to pursue sales of substantially all remaining assets and collect receivables as well as to arrange distributions and otherwise administer and close the estates.  In an actual liquidation, the length of the wind-down process could vary significantly, thereby impacting recoveries. Accordingly, there can be no assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation.

3.  Distribution of Net Proceeds.  Pursuant to section 726 of the Bankruptcy Code, Allowed Administrative Claims incurred by the chapter 7 trustee, including expenses affiliated with selling the Debtors' assets, are entitled to payment in full prior to any distribution to chapter 11 Administrative Claims or Other Priority Claims. The estimates used in this Liquidation Analysis for these expenses include estimates for operational expenses and certain legal, accounting, and other professionals, as well as an assumed 3.0% fee based upon liquidated assets payable to the chapter 7 trustee.  Any remaining net Cash would then be distributed to creditors in accordance with applicable law. Under the absolute priority rule, no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full, and no equity holder at such entity would receive any distribution until all creditors at such entity are paid in full.  The assumed distributions to creditors as reflected in this Liquidation Analysis are estimated in accordance with the absolute priority rule.

4.  Certain Exclusions and Assumptions.  This Liquidation Analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis.  Such tax consequences may be material.

## III.  CONCLUSIONS

**THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS GREATER THAN OR EQUAL TO WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

## IV.  LIQUIDATION ANALYSIS

*See following pages.*

**Best-Interests Liquidation Analysis**
**As of 9/1/2025**

| ($ in 000s) | Projected Book Value 12/22/2025 | Ch. 11 Liquidating Plan | | | | Hypothetical Ch. 7 Liquidation | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Est. Recovery (%) | | Est. Recovery ($) | | Est. Recovery (%) | | Est. Recovery ($) | |
| | | Low | High | Low | High | Low | High | Low | High |
| **Gross Liquidation Proceeds** | | | | | | | | | |
| [1] Est. Unrestricted Cash Available for Distribution | $46,304 | 100% | 100% | $46,304 | $46,304 | 104% | 104% | $47,954 | $47,954 |
| [2] Accounts Receivable | 31,210 | 0% | 13% | – | 3,975 | 0% | 6% | – | 1,988 |
| [3] Deposits & Prepaids | 26,189 | 5% | 12% | 1,189 | 3,143 | 0% | 0% | – | – |
| [4] 3i Preference Claim | 39,000 | 25% | 100% | 9,750 | 39,000 | 10% | 100% | 3,900 | 39,000 |
| [5] Liquidated Arbitration Award | 96,816 | 0% | 75% | – | 72,612 | 0% | 75% | – | 72,612 |
| [6] Other Proceeds | 400 | 50% | 100% | 200 | 400 | 50% | 100% | 200 | 400 |
| **Total Liquidation Proceeds** | **$239,919** | **23.9%** | **69.0%** | **$57,443** | **$165,434** | **21.7%** | **67.5%** | **$52,054** | **$161,953** |
| | | | | | | | | | |
| **Less: Costs Associated with Liquidation** | | | | | | | | | |
| [7] Ch. 7 Trustee Fees | | | | – | – | | | ($1,562) | ($4,859) |
| [8] Professional Fees | | | | (650) | (650) | | | (1,950) | (1,950) |
| [9] Wind-Down Costs and Other Rx Items | | | | (2,282) | (2,282) | | | (2,282) | (2,282) |
| **Total Costs Associated with Liquidation** | | | | **($2,932)** | **($2,932)** | | | **($5,794)** | **($9,091)** |
| | | | | | | | | | |
| **Net Proceeds Available for Distribution to Creditors** | | | | **$54,511** | **$162,501** | | | **$46,260** | **$152,862** |
| | | | | | | | | | |
| **Administrative & Priority Claims** | | | | | | | | | |
| [10] Estimated Admin & Priority Claims | $4,346 | | | ($4,346) | ($4,346) | | | ($4,346) | ($4,346) |
| **Total Administrative & Priority Claims** | **$4,346** | **100.0%** | **100.0%** | **($4,346)** | **($4,346)** | **100.0%** | **100.0%** | **($4,346)** | **($4,346)** |
| | | | | | | | | | |
| **Net Proceeds Available for Distribution to General Unsecured Creditors** | | | | **$50,165** | **$158,155** | | | **$41,914** | **$148,516** |
| | | | | | | | | | |
| **General Unsecured Claims** | | | | | | | | | |
| [11] Estimated General Unsecured Claims | $209,943 | | | ($242,856) | ($209,943) | | | ($242,856) | ($209,943) |
| **Total General Unsecured Claims** | **$209,943** | **20.7%** | **75.3%** | **($242,856)** | **($209,943)** | **17.3%** | **70.7%** | **($242,856)** | **($209,943)** |
| | | | | | | | | | |
| **Remaining General Unsecured Claims** | | | | **192,692** | **51,788** | | | **200,943** | **61,427** |
| | | | | | | | | | |
| **Subordinated Claims** | | | | | | | | | |
| [12] Estimated Section 510(b) Claims | $967,880 | | | ($967,880) | ($967,880) | | | ($967,880) | ($967,880) |
| **Total Subordinated Claims** | **$967,880** | **0.0%** | **0.0%** | **($967,880)** | **($967,880)** | **0.0%** | **0.0%** | **($967,880)** | **($967,880)** |
| | | | | | | | | | |
| **Equitably Subordinated Claims** | | | | | | | | | |
| [13] Estimated Equitably Subordinated Claims | $69,758 | | | ($69,758) | ($69,758) | | | ($69,758) | ($69,758) |
| **Total Equitably Subordinated Claims** | **$69,758** | **0.0%** | **0.0%** | **($69,758)** | **($69,758)** | **0.0%** | **0.0%** | **($69,758)** | **($69,758)** |
| | | | | | | | | | |
| **Total Remaining Unsecured + Subordinated Claims** | | | | **$1,230,330** | **$1,089,426** | | | **$1,238,581** | **$1,099,065** |

## V.  NOTES TO THE LIQUIDATION ANALYSIS

**Gross Liquidation Proceeds:**

1. Est. Unrestricted Cash Available for Distribution
   a. Consists of forecasted unrestricted cash in the Debtors' bank accounts as of the Effective Date on December 22, 2025, in the latest cash flow budget as of August 29, 2025.
   b. The estimated recovery from this asset category is 100% in both the low and high recovery cases for the Chapter 11 scenario. The unrestricted cash balance for the Chapter 7 scenarios is higher due to the exclusion of a $1.65 million restructuring fee payable to UCC investment banker, Ducera, under the Chapter 11 scenario.

2. Accounts Receivables
   a. Includes trade vendor receivables for truck sales and HYLA sales assumed to be collectible from customers.
   b. The estimated recoveries from this asset category are 0% and 13% in the low and high recovery cases, respectively, for the Chapter 11 plan and 0% and 6% in the low and high recovery cases, respectively, for the Chapter 7 scenario. The 13% high assumption for the Chapter 11 scenario represents residual cash and the proceeds from the sale of ERC credits to Romeo Systems.

3. Deposits & Prepaids
   a. Consists of deposits held by real estate and equipment lessors, inventory and parts suppliers, utilities vendors, bankruptcy professionals, and other vendors with prepaid expenses to lessors, suppliers, and other vendors.
   b. The estimated recoveries from this asset category are 5% and 12% in the low and high recovery cases, respectively, for the Chapter 11 plan and 0% for both cases under a Chapter 7 scenario. The 5% Chapter 11 low estimated recovery assumption is based on the dollar value of professional fee retainers that are forecasted to be returned to the Debtors at the end of the case. The 12% high estimated recovery assumption in the Chapter 11 plan is based on these professional fee retainers plus deposits the Debtors have a high degree of confidence in recovering.

4. 3i Preference Claim
   a. Proceeds represent a preference claim owed to the Debtors for the payment of convertible debt.
   b. The estimated recoveries from this asset category are 25% and 100% in the low and high recovery cases, respectively, for the Chapter 11 plan and 10% and 100% in the low and high recovery cases, respectively, for the Chapter 7 scenario.

5. Liquidated Arbitration Award
   a. Represents recoveries on account of the Milton Award. The low and high recovery cases do not include additional recovery on account of (i) the ongoing accrual of post-judgement interest, as contemplated in the Milton Award, (ii) the recovery of any of the $36,844,896.65 in indemnity advancements made by the Company to Trevor Milton prior to the Petition Date through the Milton Fee Arbitration, as contemplated by the Milton Award; or (iii) additional damages the Company may receive pursuant to any payments made on account of the SEC Claim.
   b. The estimated recoveries from this asset category are 0% and 75% in the low and high recovery cases, respectively, for both scenarios. The 0% low case assumption represents a scenario where Trevor Milton prevails completely in his ongoing efforts to appeal the Milton Award. The 75% high case assumption represents a scenario where Trevor Milton does not prevail in such appeal and the award is net of legal fees owed calculated as a percentage of the total award amount.

6. Other Proceeds

      a.  Consists of the estimated proceeds to be received from a potential purchase of the Debtor's 35% ownership interest in EMBR Motors and other causes of action.

      b.  The estimated recoveries from this asset category are 50% and 100% in the low and high recovery cases, respectively, for both scenarios.

**Costs Associated with Liquidation:**

7.  Chapter 7 Trustee Fees

      a.  Trustee fees include all fees paid to the Trustee by the Debtors, consistent with the fee structure set forth in the Bankruptcy Code. The Trustee fee is estimated at 3% of all distributions to creditors from gross asset proceeds (including cash), inclusive of payments of chapter 7 and chapter 11 administrative claims and all prepetition claims. See 11 U.S.C. § 326(a).

8.  Professional Fees

      a.  Chapter 7 scenario contemplates an increase in professional fees as a result of the lack of institutional knowledge and relationships held by the Chapter 7 Trustee (and other professionals) with key counterparties required to effectuate the wind down of the Estate.

9.  Wind-Down Costs and Other Restructuring Items

      a.  Includes operating disbursements relating to document retention, payroll and contractor expenses, tax advisors, and rent for the post-effective period as well as fees for plan administrator, United States Trustee, litigation trust funding, and other restructuring related fees to effectuate the wind down of the Estate.

**Claims:**

10.  Estimated Administrative and Priority Claims

      a.  The Debtors have forecasted paydown of $4.35 million in administrative and priority claims prior to the effective date.

      b.  Holders of administrative and priority claims are forecasted to recover 100% of claim values in the low and high recovery cases for both scenarios.

11.  Estimated General Unsecured Claims

      a.  The Debtors have estimated the general unsecured claims pool to range from $209.94 million to $242.86 million. The high case assumes a scenario where Claim No. 54 (filed by Trevor Milton) is equitably subordinated and/or disallowed in full. The low case assumes a scenario where Claim No. 54 (filed by Trevor Milton) is Allowed as a General Unsecured Claim in the amount of $32.91 million, which represents the difference between the filed amount of Claim No. 54 ($69,758,064.15) and the aggregate amount of indemnity expenses Nikola has already advanced and paid to Trevor Milton ($36,844,896.65) pursuant to orders entered in the Milton Fee Arbitration and otherwise.

      b.  Holders of general unsecured claims are forecasted to recover 20.7% and 75.3% in the low and high cases of the Chapter 11 scenario, respectively, and 17.3% and 70.7% in the low and high cases of the Chapter 7 scenario, respectively.

12.  Estimated Subordinated Claims

      a.  Includes $967.88 million of Section 510(b) Claims and Other Junior Claims in the event that such filed and/or scheduled Claims, as the case may be, are ordered subordinated pursuant to the Plan or otherwise, including (i) $40.0 million of the SEC Claim (which the SEC has voluntarily agreed to junior treatment), and (ii) any Claim filed on account of the Securities Class Action, including Claim No. 10257; and (iii) any Claim filed on account of the Tenneson Action, including Claim No. 10254. Holders of subordinated claims are forecasted to recover 0% of claim values in the low and high recovery cases for both scenarios.

      b.  Pursuant to the SEC Claim Resolution under the Plan, the Debtors and the SEC have agreed that the SEC Claim (Claim No. 10420), filed by the SEC in the amount of

$83,052,974.90, which amends the SEC's scheduled claim in the amount of $80,200,000, will be Allowed and treated under the Plan as follows:

    i.  First, the SEC voluntarily agreed that $40,000,000.00 of the SEC Claim would be classified and treated junior in priority to General Unsecured Claims.  Thus, the SEC Junior Claim will be allowed and treated in Class 7 of the Plan.

    ii.  Second, the Debtors agreed to classify $43,052,974.90 of the SEC Claim as a General Unsecured Claim in Class 3 of the Plan, provided, however, that the sole distribution on account of the SEC Unsecured Claim will be a $4.0 million Cash payment to the SEC on the Effective Date.  The SEC agrees to forego any further distributions on account of the SEC Unsecured Claim under Class 3 of the Plan.

    iii.  Third, the Debtors, their Estates and the Liquidating Trust, including their respective successors and assigns and anyone acting on their behalf, shall release any and all Causes of Action that each may have against the SEC.

13. Estimated Equitably Subordinated Claims

    a.  Both the low and high cases assume a scenario where Claim No. 54 (filed by Trevor Milton) is equitably subordinated in the full amount of the filed claim ($69.76 million). Because the Debtors do not anticipate being able to make distributions to satisfy Estimated General Unsecured Claims in full (let alone Estimated Section 510(b) Claims), no adjustment has been made to reflect the potential that any portion of Claim No. 54 is ultimately treated as a General Unsecured Claim.