<pre>
 1                   UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                      .  Chapter 11
                                 .  Case No. 25-10258 (TMH)
 4   NIKOLA CORP., et al.,       .
                                 .  (Jointly Administered)
 5                               .
                                 .  Courtroom No. 5
 6                               .  824 Market Street
              Debtors.          .  Wilmington, Delaware 19801
 7                               .
                                 .  Friday, September 5, 2025
 8   . . . . . . . . . . . . . .  10:01 a.m.

 9                      TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE THOMAS M. HORAN
10                UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:         M. Blake Cleary, Esquire
                              POTTER ANDERSON & CORROON, LLP
13                            1313 North Market Street
                              6th Floor
14                            Wilmington, Delaware 19801

15                            -and-

16                            Joshua D. Morse, Esquire
                              PILLSBURY WINTHROP SHAW PITTMAN, LLP
17                            Four Embarcadero Center
                              22nd Floor
18                            San Francisco, California 94111

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Ian Willoughby, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
</pre>

1  APPEARANCES (CONTINUED):

2  For the Debtors:           Rahman Connelly, Esquire
                              Andrew V. Alfano, Esquire
3                             PILLSBURY WINTHROP SHAW PITTMAN, LLP
                              31 West 52nd Street
4                             New York, New York 10019

5  For the U.S.
   Securities and
6  Exchange Commission:       David W. Baddley, Esquire
                              U.S. SECURITIES AND EXCHANGE
7                               COMMISSION ATLANTA REGIONAL OFFICE
                              950 East Paces Ferry Road, NE
8                             Suite 900
                              Atlanta, Georgia 30326
9

10 For Mitsubishi
   HC Capital:                Donald J. Detweiler, Esquire
11                            WOMBLE BOND DICKINSON (US) LLP
                              1313 North Market Street
12                            Suite 1200
                              Wilmington, Delaware 19801
13
   For the Official
14 Committee of
   Unsecured Creditors:       Doug Mannal, Esquire
15                            MORRISON & FOERSTER, LLP
                              250 West 55th Street
16                            New York, New York 10019

17
   For the Department of
18 Justice:                   Dante S. Pavan, Esquire
                              U.S. ATTORNEY'S OFFICE
19                            1313 Market Street
                              P.O. Box 2046
20                            Wilmington, Delaware 19801

21
   For Trevor Milton:         Scott D. Cousins, Esquire
22                            Sean M. Brennecke, Esquire
                              LEWIS BRISBOIS BISGAARD & SMITH, LLP
23                            500 Delaware Avenue
                              Suite 700
24                            Wilmington, Delaware 19801

25

1    APPEARANCES (CONTINUED):

2    For the U.S. Trustee:      Timothy J. Fox, Jr., Esquire
                                OFFICE OF THE UNITED STATES TRUSTEE
3                               J. Caleb Boggs Federal Building
                                844 King Street
4                               Suite 2207, Lockbox 35
                                Wilmington, Delaware 19801
5
     For Lead Class
6    Plaintiff(s):             Joseph C. Barsalona, II, Esquire
                                PASHMAN STEIN WALDER HAYDEN, P.C.
7                               824 North Market Street
                                Suite 800
8                               Wilmington, Delaware 19801

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2    <u>MOTIONS</u>:                                              <u>PAGE</u>

3    Agenda
     Item 1:    Second Amended Combined Disclosure Statement        6
4               and Chapter 11 Plan of Liquidation of Nikola
                Corporation and Its Debtors Affiliates
5               [Docket No. 955 – filed September 2, 2025]

6               Court's Ruling:                                   137

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX

2
     WITNESSES CALLED
3    BY THE DEBTORS:                                      PAGE

4          BRITTON M. WORTHEN

5          Direct examination by Mr. Connelly             29

6          Cross-examination by Mr. Brennecke             45

7          Redirect examination by Mr. Connelly           67

8

9

10                          EXHIBITS

11   DEBTORS' EXHIBITS:                                   PAGE

12    1 through 37 - Exhibits admitted *en masse*         28

13   39 through 52 - Exhibits admitted *en masse*         28

14

15

16                        DECLARATIONS

17   DECLARATIONS:                                        PAGE

18   1 - Declaration of Emily Young, Docket 952           22

19   2 - Declaration of Ryan P. Rowan, Docket 958         24

20   3 - Declaration of Britton M. Worthen, Docket 796-1  25

21   4 - Declaration of Britton M. Worthen, Docket 804-1  25

22   5 - Declaration of Britton M. Worthen, Docket 820-1  26

23   6 - Declaration of Britton M. Worthen, Docket 957    26

24

25   Transcriptionists' Certificate                       139

1       (Proceedings commenced at 10:01 a.m.)

2            MR. CLEARY:  And, Your Honor, may I please the

3  Court?

4            Blake Cleary of Potter Anderson & Corroon, on

5  behalf of Nikola Corp. and its affiliated debtors and

6  debtors-in-possession.

7            Your Honor, first of all, thank you for scheduling

8  confirmation today.  We do much appreciate it.  It's an

9  important day in the life of this company and the natural

10 progression and next step.  With that, we did file a couple

11 of pleadings at the end of yesterday, so we have an amended

12 agenda and hopefully these have made their way to you.  They

13 relate to a plan supplement, an amendment to the witness and

14 exhibit list, as well as a notation of the withdrawal of

15 Mr. Milton's objection to confirmation, Your Honor.  So --

16           THE COURT:  Yes.

17           MR. CLEARY:  Thank you.

18           With that, I wanted to make -- I'm here with my

19 colleagues from Potter Anderson, as well as Josh Morse and

20 his colleagues from Pillsbury.  He's going to make further

21 introductions, but I wanted to just set that up for Your

22 Honor and, again, thank you, and I will turn it over to my

23 co-counsel.

24           THE COURT:  Thank you, Mr. Cleary.

25           Good morning, Mr. Morse.  Good to see you.

1    MR. MORSE:  Good morning, Your Honor.  It's very

2  wonderful to see you on this Friday afternoon.

3    THE COURT:  Yes.

4    MR. MORSE:  For the record, Joshua Morse from

5  Pillsbury Winthrop Shaw Pittman, LLP, counsel to the debtors.

6    We have some new and some not-so-new faces here

7  today --

8    THE COURT:  Uh-huh.

9    MR. MORSE:  -- with me, and I want to make sure to

10  introduce members of my team, as well as the witnesses for my

11  team.  We have Rahman Connelly, my partner, and Ari Berman,

12  my partner, as well, as well as my colleagues, Andrew Alfano

13  and Chazz Berman -- Chazz Coleman, sorry.

14    THE COURT:  Yes, I'm familiar with his work.

15    (Laughter)

16    MR. MORSE:  A lot going on in my head right now.

17    The declarants, we have three:  one appearing

18  remotely, and that's Emily Young, who is the director at Epiq

19  Corporate Restructuring LLC, the debtors' the claims and

20  noticing agent.

21    THE COURT:  Yes.

22    MR. MORSE:  She'll be, in a moment, submitting a

23  ballot tabulation declaration, which appears at Docket 952,

24  which just confirms the debtors' compliance with solicitation

25  procedures order, providing the tabulation summary, and the

1  reported of excluded balance, as well as the report of the

2  opt-outs.

3           We also have, who's appearing in the courtroom

4  today, Ryan Rowan, a managing director at M3 Advisory

5  Partners --

6           THE COURT:  Good morning.

7           MR. MORSE:  -- LP, the debtors' financial advisor.

8  He submitted a confirmation brief declaration that appears at

9  Docket 958.  It provided an updated liquidation analysis,

10  which is attached as Exhibit 1 to his declaration.  It was

11  also attached as an exhibit to the second amended plan, which

12  we filed on Tuesday.  He had provided some testimony

13  regarding feasibility of the plan, as rebuttal evidence to

14  the Milton confirmation objection, which appeared at 910,

15  which has now been withdrawn, as Mr. Cleary indicated.

16           Also in the courtroom is Britton Worthen --

17           THE COURT:  Good morning.

18           MR. WORTHEN:  Good morning.

19           MR. MORSE:  -- who's the chief legal officer of

20  debtor, Nikola Corporation.  He submitted a number of

21  declarations --

22           THE COURT:  Yes, he did.

23           MR. MORSE:  -- some of which may be pertinent

24  today, some which may not be.  I just want to run through

25  those to give Your Honor some context.  First, the

1  confirmation brief declaration, which is Docket 957, provides

2  the evidentiary support for not only our confirmation brief,

3  but provides the 9019 support for the SEC support or, excuse

4  me, the SEC resolution, which I'm going to walk through in a

5  moment; the settlement of the derivative actions, which we'll

6  being seeking final approval of today; support for the

7  appointment of the liquidating trustee; and then provides

8  some limited rebuttal evidence to the Milton equitable

9  subordination objection, which that appears at Docket 911.

10         He also has provided four other declarations,

11  which we'll be seeking to move into evidence:  the SEC

12  classification memo declaration, which appears at

13  Docket 796-1, that provides the evidentiary support for the

14  relief requested in the SEC classification memo, Docket 796.

15  That's now been rendered moot by virtue of the SEC

16  resolution, as well as the Reyes action classification memo

17  declaration, which appears at Docket 804-1, that provides the

18  evidentiary support for the relief requested in the Reyes

19  classification memo, which is Docket 804.  That is not

20  contested; no objections were filed to that one.  As well as

21  the Milton claim classification memo declaration, that's

22  Docket 808-1, and that provides the evidentiary support for

23  the relief requested in the Milton claim classification memo,

24  that's Docket 808.  And that one, there is also a

25  counterparty to that docket that is unsealed.  There'll be

1   some discussion about that, that we'll need to deal with --

2           THE COURT:  Uh-huh.

3           MR. MORSE:  -- in a little while.  And, finally,

4   the shareholder securities claim classification memo

5   declaration, which is Docket 820-1, that provides the

6   evidentiary support for the relief requested in our

7   shareholder securities claim classification memo, that's

8   Docket 820.

9           Now, as you are well aware, we are here today

10  seeking entry of the confirmation order, which we initially

11  filed at Docket 964.  And then we had some additional cleanup

12  changes between Tuesday and late last night, and we filed a

13  nose of revised order, as well as a blackline --

14          THE COURT:  Yes.

15          MR. MORSE:  -- and Docket 999.  That order seeks

16  to approve the disclosure statement that you entered back in

17  July, on a final basis, and confirms the second amended plan,

18  which appears at 955.  I do want to note, as I spoke about at

19  the beginning of the presentation, that we did file a

20  blackline on Tuesday against the solicitation version of the

21  plan, that was Docket 744, and that blackline appears at

22  Docket 956.

23          Now, the plan is a fairly straightforward

24  liquidating plan.

25          THE COURT:  Uh-huh.

1          MR. MORSE:  It does a few things.  It establishes

2   a liquidating trust to pursue and monetize remaining assets,

3   including preserved estate claims.  It paves the way for the

4   settlement of the derivative actions, which I'm happy to

5   report we found out yesterday that Chancellor McCormick has

6   scheduled for November 22nd.

7          THE COURT:  Oh, okay.

8          MR. MORSE:  It winds down the remaining

9   operations, which are very, very limited at this point, of

10  the debtors' estates, and after paying administrative claims

11  and priority claims and cash in full on the effective date,

12  as set forth in the liquidation analysis, it estimates that

13  Class 3 general unsecured claim recoveries are going to be

14  between 20.7 percent and 75.3 percent.

15          As discussed in the Young declaration, the debtors

16  complied with all the solicitation procedure order

17  requirements regarding service of the required notices, as

18  well as the solicitation packages and the appropriate

19  certificates of service are filed on the docket.

20          The Young declaration also confirms that the

21  debtors received near unanimous approval in favor of the

22  plan, 99.98 percent, if my math is correct, representing

23  148.1 million in amount and 97.4, representing 68 out of 70,

24  in number from Class 3.  That's the only impaired class under

25  the plan entitled to vote, vote in favor of the plan.

1          In anticipation of today's hearing, the debtors

2     have also been working diligently to reach consensual

3     resolution of various objections.

4          THE COURT:  Uh-huh.

5          MR. MORSE:  As I indicated on Tuesday night, the

6     second amended plan, which is filed at Docket 955, addresses

7     certain of these resolutions, including the SEC objection,

8     which is Docket 935; the Mitsubishi objection, which is

9     Docket 937; and then also a few informal objections that we

10    received prior to the filing of that plan, including

11    objections raised by the Texas Comptroller of Public Accounts

12    and the U.S. Department of Justice.

13         And I want to walk through, after I take a drink

14    of water, I want to walk through and give the Court just a

15    brief update on each of those, the resolutions, most

16    importantly, the SEC objection.  And Mr. Baddley and

17    Ms. Scheuer -- I'm sure I butchered the pronunciation of her

18    name, even though I've had at least a hundred phone calls

19    with her, so I apologize -- are here in court and they've

20    been great partners with us throughout this case to try and

21    work this out.  But the SEC objection, which appears at

22    Docket 935, again, the debtors and the SEC were able to reach

23    agreement on a consensual resolution of the debtors'

24    purported subordination of the SEC claim under the plan for

25    the reasons that are complained in the SEC claim memorandum,

1   that we filed at Docket 796, and then, as they objected to.

2         And under this defined term that's in the plan,

3   the SEC claim resolution, it's contemplated to be approved by

4   the confirmation order.  The debtors and the SEC have agreed

5   that the SEC claim, which is Claim Number 10420, which the

6   SEC claim -- excuse me -- the SEC filed recently in the

7   amount of, in excess of $83 million, and that amended the

8   SEC's scheduled claim in the amount of $80.2 million, will be

9   allowed and treated under the plan in three different ways.

10        First, the SEC has voluntarily agreed that 40

11  million of that 83.025 million is going to be classified and

12  treated junior in priority to the general unsecured claims

13  and, therefore, the SEC junior claim, as we've defined it

14  under the plan, is going to be allowed and treated in Class 7

15  of the plan.  And then second, the debtors have agreed to

16  classify the residual $43,052,974.90 of the SEC claim as a

17  general unsecured claim, in Class 3, provided, however, that

18  the sole distribution, on account of that SEC unsecured

19  claim, is going to be a $4 million cash payment to the SEC on

20  the effective date.  And the SEC has agreed to forego any

21  further distributions on account of the SEC unsecured claim

22  under Class 3 of the plan.  And then, finally, there is an

23  agreement that the debtors, the estates, liquidating trust,

24  and their successors and assigns, will release all causes of

25  action that each of them may have against the SEC.

1        And with that, I would just ask Mr. Baddley and/or

2   Ms. Scheuer to confirm that their understanding of the

3   resolution is as articulated.

4        THE COURT:  Good morning, Mr. Baddley.  It's good

5   to see you.

6        MR. BADDLEY:  Good morning, Your Honor.  You, as

7   well.  David Baddley for the SEC with Therese Scheuer.

8        Mr. Morse's description of the compromise is

9   correct and it's set forth in Article 4(j) of the plan.

10        THE COURT:  Yes, thank you very much, Mr. Baddley.

11        MR. BADDLEY:  Thank you, Your Honor.

12        MR. MORSE:  I also want to point out that the

13   Committee worked hand-in-glove with the debtors on this

14   resolution, as confirmed in the Committee's statement that

15   appears at Docket 965.  The Committee helped develop the SEC

16   claim resolution and supports that fully, and if Mr. Mannal

17   is willing to confirm that on the record, I think --

18        MR. MANNAL:  For the record, Doug Mannal --

19        THE COURT:  Good morning, Mr. Mannal.

20        MR. MANNAL:  -- from Morrison & Foerster.  Good

21   morning, Your Honor.

22        I confirm with Mr. Morse, the Committee is fully

23   supportive of the SEC resolution.

24        THE COURT:  Thank you, Mr. Mannal.

25        MR. MORSE:  Okay.  Moving on to the Mitsubishi

1  resolution.  Mitsubishi filed an objection that appears at

2  Docket 937.  The debtor has agreed to add language to the

3  proposed confirmation order that we understand resolves that

4  objection.  With that, I'd ask counsel to Mister -- excuse

5  me -- to Mitsubishi, which I believe today is Mr. Detweiler,

6  to confirm on the record of the resolution of the Mitsubishi

7  objection.

8          THE COURT:  Okay.  Good to see you, Mr. Detweiler.

9  Welcome.

10          MR. DETWEILER:  Good to see you, Your Honor.

11          May I please the Court?  Don Detweiler, on behalf

12  of Mitsubishi HC Capital.

13          Mitsubishi's objection has been resolved by the

14  inclusion of the language.

15          THE COURT:  Thank you, Mr. Detweiler.

16          MR. DETWEILER:  Thank you, Your Honor, and thank

17  you, Counsel.

18          MR. MORSE:  I also mentioned a few informal

19  objections.  The Texas Comptroller had a few issues that we

20  were able to address through agreed provisions to the

21  confirmation order.  I'm unclear as to whether anyone from

22  the Texas Comptroller is either here in the courtroom or has

23  appeared at the hearing; however, we have email

24  communications that confirm that the informal

25  communications -- or excuse me -- the informal objection has

1   been resolved with the changes agreed.

2          THE COURT:  Okay.  Well, let me just pause and see

3   if anybody from the Texas Comptroller is on the line and

4   would like to be heard?

5       (No verbal response)

6          THE COURT:  Okay.  I hear no response.

7          MR. MORSE:  Thank you, Your Honor.

8          Similarly, with the U.S. Department of Justice,

9   we've had an active dialogue with counsel to the U.S.

10  Department of Justice in various capacities, but with respect

11  to informal objections and comments, we addressed those

12  concerns through changes to the confirmation order.  And I

13  believe, if counsel has appeared or would like to confirm

14  that on the record, we're happy to step aside and have that

15  happen, as well.

16         THE COURT:  Okay.  Would the Department of Justice

17  like to be heard?

18         Good morning, Mr. Pavan.  Welcome.

19         MR. PAVAN:  Good morning, Your Honor.  Dante

20  Pavan, on behalf of the United States.

21         I would just like to confirm that we have worked

22  with the debtors' counsel and all of our issues have been

23  resolved.

24         THE COURT:  Thank you, Mr. Pavan.

25         MR. PAVAN:  We'd like to thank them for working

1  with us.  Thank you.

2            THE COURT:  Thank you.

3            MR. MORSE:  And then one more that I didn't

4  mention, and that's the Milton confirmation objection at

5  Docket 910.  That one took issue with the feasibility of the

6  plan.  We found out during a meet-and-confer call yesterday

7  afternoon that that objection was going to be withdrawn.  And

8  I believe the notice of withdrawal was filed yesterday

9  afternoon.

10            THE COURT:  Yes, I saw that.

11            MR. MORSE:  So that leaves just a handful of

12  unresolved issues.  First of all, certain components of

13  the -- oh, I do want to mention the United States Trustee

14  objection that appears at Docket 908, taking issue with the

15  opt-out releases and then the injunction.  I did confirm to

16  Mr. Fox that the objection to the Bankruptcy Rule 3020

17  waiver, that we've resolved that issue.  I'll walk through

18  that during my presentation.  Also unresolved is the Milton

19  equitable subordination objection, that appears at

20  Docket 911, taking issue with the plan's classification and

21  treatment of the Milton claim in Class 8.  And then there's

22  two others that I will talk about in a moment.

23            I did want to raise one thing that we also learned

24  during our meet-and-confer with Milton's counsel yesterday

25  afternoon.  We found out for the first time yesterday that

1   Mr. Milton attempts to cross-examine Mr. Worthen on various

2   topics to support a brand new legal theory, which isn't

3   reflected in the equitable subordination objection, this is

4   Docket 911, that somehow Nikola's relative conduct should

5   alleviate the Milton claim from being equitably subordinated.

6           We don't believe there's any legal or factual

7   support that's been offered in the record or for us to be

8   able to respond to, other than potentially on the fly, and so

9   we may need some guidance from you later today as to how to

10  proceed, as this morning develops.

11          THE COURT:  Okay.  We'll get there.

12          MR. MORSE:  We'll get there.  Just previewing some

13  issues.

14          THE COURT:  Okay.

15          MR. MORSE:  One other preview issue, we also

16  understand that Mr. Milton is here today to attempt to

17  substantiate, apparently, his proof of claim; this is

18  Claim 54.  And by way of background, you may have seen some

19  of this percolate a little bit when we were here during the

20  relief from stay proceedings, as well as you saw some of it

21  is the papers.  And Exhibit C to that claim includes a

22  listing of 19 professional firms and dollar amounts that are

23  alleged to have been paid to such firms as of April 1st,

24  2025.

25          As detailed at paragraph 139 of our memorandum,

1  back on July 8th, I requested proof of payment, confirmation

2  of how much had already been paid, because we believe, as set

3  forth in other pleadings, that nearly $40 million of that had

4  already been advanced, and then also to provide copies of all

5  the invoices supporting that proof of claim.  Nothing was

6  provided to the debtors and then in the Milton equitable

7  subordination objection, that's, again, Docket 911, at

8  page 10, footnote 3, there's an allegation that we didn't

9  request the information, quote "until quite recently and

10 Milton will supply the information once the compilation is

11 complete."

12         We inquired yesterday whether during a series of

13 meet-and-confers, when the compilation was going to be

14 complete and we're still awaiting an answer.

15         THE COURT:  This may be a question for

16 Mr. Milton's counsel:  Mr. Milton has not identified any

17 exhibits to be admitted today, so -- and Mr. Cousins, good

18 morning, it's good to have you here.

19         MR. COUSINS:  Good morning, Your Honor.

20         THE COURT:  If the fees that have been paid to

21 professionals are properly at issue today, I think that's an

22 issue that I'm sure we would get to, I mean, the only

23 evidence of those would be the invoices.  Testimony regarding

24 what they might say, clearly, would not be admissible.

25         MR. COUSINS:  Good morning, Your Honor.

1          Scott Cousins and Sean Brennecke, on behalf of

2   Trevor Milton, who is in the courtroom, Your Honor.

3          It's identified on the debtors' exhibit list.  We

4   had a meet-and-confer and we tried to agree to avoid bringing

5   Mr. Milton in, but we just couldn't reach an agreement.  He

6   will testify that the fees were paid.  They're entitled to

7   cross-examine him.  We believe that satisfies *prima facie*

8   evidence that has to get rebutted.  The Court can rule on it,

9   as appropriate, but it is identified as, I think it's the

10  debtors' last exhibit, and we just couldn't come to an

11  agreement about admissibility.

12          THE COURT:  Okay, thank you.

13          MR. COUSINS:  And I will add, his testimony is

14  going to be limited to just what's in the proof of claim and

15  the debtors and the Committee can cross-examine him on it.

16          THE COURT:  Thank you very much, Mr. Cousins.

17          MR. COUSINS:  Thank you, Your Honor.

18          MR. MORSE:  I mean, we're previewing this issue

19  now to avoid this circus of Mr. Milton going to come up and

20  try and substantiate more than $70 million of alleged

21  professional fees that have been paid.  He shouldn't be

22  allowed to show up today and offer testimony to attempt to do

23  so without supporting documentation.  We believe it's wholly

24  inappropriate and prejudicial.

25          The one thing they have provided, thus far, just

1   to give you a sense of the games that are going on are, to

2   the Committee, they provided pages of the Cahill invoices.

3   As you may have seen from the Exhibit C, Cahill was owed

4   quite a bit of money, allegedly, and it's pages and pages and

5   pages; however, every single time entry is completely

6   redacted, as to render the provision of these invoices wholly

7   irrelevant to the ability to do anything with them.

8           And so, again, to ask us to, on the fly, be able

9   to comprehend what he's going to tell us, to not be able to

10  take in, to not be able to analyze, especially when this

11  request has been pending for two months and we show up at

12  trial, it seems like something else is going on here.

13          THE COURT:  Okay.  Well, we'll get to that --

14          MR. MORSE:  We'll cross that bridge when we come

15  to it.

16          THE COURT:  -- in due course, yeah.

17          MR. MORSE:  Of course.

18          Two other objections are also unresolved:  the

19  lead securities class action plaintiff objection, Docket 909,

20  that takes issue with the plan's classification and treatment

21  of their claim in Class 7 and then the individual shareholder

22  objections, including a number of informal objections that

23  were listed on the initial agenda.  I don't have the updated

24  docket number, I apologize.  The initial one was Docket 969,

25  as responses and objections, Items (iii) through (ix), and

1    then also the Scudder objection, which is Docket 904, taking

2    issue with various plan confirmation issues.

3           Turning to the first order of, I guess, real

4    business, is to move into evidence the declarations that are

5    going to be providing the evidentiary support for today's

6    hearing.  The first declaration that we'd like to move into

7    evidence is the Young declaration, Your Honor.  That appears

8    at Docket 952.  And, again, we appreciate the accommodation

9    of allowing Ms. Young to appear remotely at today's hearing.

10           We ask that that declaration be moved into

11    evidence.

12           THE COURT:  Okay.  Does anybody object to the

13    admission of Ms. Young's declaration in support of

14    confirmation?

15       (No verbal response)

16           THE COURT:  Okay.  I hear no response.

17           The declaration is admitted.

18       (Young Declaration received in evidence)

19           THE COURT:  Is there anybody who wishes to cross-

20    examine Ms. Young?

21       (No verbal response)

22           THE COURT:  Okay.  Once again, I hear no response.

23           Ms. Young, thank you for appearing this morning.

24    I appreciate it.

25           MR. MORSE:  Thank you so much, Your Honor.

1    MR. FOX:  I don't want to do cross-examination; I

2  just want to introduce an item.

3    MR. MORSE:  Oh, sure.

4    Right now?

5    MR. FOX:  Yeah, if that's all right?

6    MR. MORSE:  Of course.

7    THE COURT:  Good morning, Mr. Fox.

8    MR. FOX:  Good morning, Your Honor.

9    May I please the Court?  Tim Fox, on behalf of the

10  United States Trustee.

11    Just to preview issues with respect to the

12  unresolved items in the U.S. Trustee objection, I did

13  identify that my office would like to move into evidence

14  Nikola Corporation's bankruptcy schedules at Docket Item 203.

15  I just wanted to preview that we will be using information

16  from Docket Item 203 in connection with some of Ms. Young's

17  testimony, so I thought this was an appropriate time to

18  identify that item for the Court.

19    THE COURT:  Okay, thank you.

20    MR. MORSE:  And, Your Honor, just so you know, we

21  will not have any objection to doing that.  We understand

22  what the purpose of that is going to be.

23    THE COURT:  Okay.  Thank you, Mr. Morse.

24    MR. MORSE:  The next declaration, Your Honor, is

25  the Rowan confirmation declaration, which appears at Docket

1  958.  Mr. Rowan is in the courtroom today and available for

2  cross-examination; if none, we'd ask to move to admit that

3  declaration into evidence.

4          THE COURT:  Does anybody object to the admission

5  of Mr. Rowan's declaration in support of plan confirmation?

6      (No verbal response)

7          THE COURT:  Okay.  I hear no response.

8          It is admitted.

9      (Rowan Declaration received in evidence)

10          THE COURT:  Does anybody wish to cross-examine Mr.

11  Rowan?

12      (No verbal response)

13          THE COURT:  Okay.  I hear no response.

14          MR. MORSE:  Thank you, Your Honor.

15          This is going to be a bit tedious, but I would

16  like to do Mr. Worthen's declaration, just one by one.  I

17  think that makes the --

18          THE COURT:  Yeah, no that's fine.

19          MR. MORSE:  -- most sense.  I apologize.

20          First, the SEC classification memo declaration,

21  which appears at Docket 796-1.  As I indicated, Mr. Worthen

22  is available for cross-examination; if none, we would seek to

23  move that into evidence.

24          THE COURT:  Okay.  Does anybody object to the

25  admission of Mr. Worthen's declaration that appears at

1  Docket 796-1?

2        (No verbal response)

3            THE COURT:  Okay.  I hear no response.

4            It is admitted.

5        (Worthen Declaration, Docket 796-1, received in

6  evidence)

7            MR. MORSE:  Next is the Reyes action

8  classification memo declaration from Mr. Worthen,

9  Docket 804-1.  Again, he's available for cross-examination;

10  if no objection or cross-examination, we would like to move

11  that into evidence.

12            THE COURT:  Does anybody object to the admission

13  of Mr. Worthen's declaration that appears at Docket 804-1?

14        (No verbal response)

15            THE COURT:  I hear no response.

16            It is admitted.

17        (Worthen Declaration, Docket 804-1, received in

18  evidence)

19            MR. MORSE:  Next is the Worthen shareholder

20  securities claim classification memo declaration, which

21  appears at 820-1.

22            THE COURT:  Okay.

23            MR. MORSE:  If no objections, we'd like to move

24  that into evidence.

25            THE COURT:  Does anybody object to the admission

1  of Mr. Worthen's declaration that appears at Docket 820-1?

2        (No verbal response)

3             THE COURT:  I hear no response.

4             It is admitted.

5        (Worthen Declaration, Docket 820-1, received in

6  evidence)

7             MR. MORSE:  Thank you, Your Honor.

8             Next is the Worthen confirmation brief

9  declaration, which appears at 957.  If no objections, we'd

10 request to move that into evidence.

11            THE COURT:  Does anybody object to the admission

12 of Mr. Worthen's declaration that appears at Docket 957?

13       (No verbal response)

14            THE COURT:  Okay.  I hear no response.

15            It is admitted.

16       (Worthen Declaration, Docket 957, received in evidence)

17            MR. MORSE:  Thank you, Your Honor.

18            And, finally, the Worthen-Milton claim

19 classification memo declaration, which appears at

20 Docket 808-1.

21            THE COURT:  Okay.  Subject to the ability to

22 cross-examine, does anybody object to the admission of

23 Mr. Worthen's declaration that appears at Docket 808-1?

24            Mr. Cousins?

25            MR. COUSINS:  Good morning, again, Your Honor.

1  Scott Cousins, on behalf of Trevor Milton.

2          We don't object to the admission, but we do want

3  to cross-examine.

4          THE COURT:  Okay.  Very good.

5          MR. COUSINS:  Thank you.

6          MR. MORSE:  And, Your Honor, one thing.  We are

7  going to offer Mr. Worthen for some supplemental direct

8  examination.

9          THE COURT:  Okay.

10          MR. MORSE:  I propose that we do that first and

11  then allow Mr. Cousins to do cross-examination so that he

12  could listen to the testimony and then cross on that, plus

13  anything else he'd like to cross on, with respect to the

14  declaration.

15          THE COURT:  Okay.  Very good.

16          MR. MORSE:  It seems like the more efficient way

17  to do everything.

18          THE COURT:  I agree.  I agree.  Okay.

19          MR. MORSE:  And with that, I'll invite

20  Mr. Connelly to come up to the podium and we'd call Britton

21  Worthen to the stand.

22          THE COURT:  Okay.  Very good.

23          Mr. Connelly, it's a pleasure to have you here.

24          MR. MORSE:  The one thing that I'm forgetting is

25  before we have the witness on the stand, we'd like to just go

1 ahead and move our exhibits, certain of our exhibits into

2 evidence.  Move in Exhibits 1 through 37 and 39 through 52.

3          THE COURT:  Okay.  Does anybody object to the

4 admission of debtors' Exhibits 1 through 37 and 39

5 through 52, in support of plan confirmation?

6          Mr. Cousins?

7          MR. COUSINS:  Your Honor, I'm sorry to stand up --

8 no objection -- I guess I could have shouted that from the

9 table, but...

10          THE COURT:  No, that's fine.  That's fine.  It's

11 good to have you at my podium.

12          MR. COUSINS:  Good to see you.

13          THE COURT:  Thank you.

14          Those exhibits are admitted.

15     (Debtors' Exhibits 1 through 37 and 39 through 52

16 received into evidence)

17          MR. MORSE:  Thank you, Your Honor.  Appreciate it.

18          THE COURT:  Mr. Connelly?

19          MR. CONNELLY:  Good morning, Your Honor.  It's a

20 pleasure to be here.

21          THE COURT:  Yes, a pleasure to have you.

22          MR. CONNELLY:  For the record, Rahman Connelly,

23 Pillsbury, for the debtors.

24          THE COURT:  Okay.

25          MR. CONNELLY:  As Mr. Morse mentioned, we are

 1  calling Mr. Worthen up for a supplemental direct testimony.

 2           THE COURT:  Okay.  Mr. Worthen, can you remain

 3  standing, please.  Thank you.

 4           THE CLERK:  Good morning, would you please raise

 5  your right hand.

 6        BRITTON M. WORTHEN, DEBTORS' WITNESS, AFFIRMED

 7           THE WITNESS:  Yes.

 8           THE CLERK:  Would you please state your full name

 9  and spell your last name for the record.

10           THE WITNESS:  My full name is Britton Mabidy

11  (phonetic) Worthen.  Last name is spelled W-o-r-t-h-e-n.

12           THE CLERK:  Thank you.

13           You may be seated.

14           THE COURT:  Okay.  Mr. Connelly?

15                      DIRECT EXAMINATION

16  BY MR. CONNELLY:

17  Q    Good morning, Mr. Worthen.

18       You stated your name for the record.  Could you please

19  state your current position?

20  A    Yes, I'm currently serving as the chief legal officer

21  of Nikola Corporation.

22  Q    How long have you served as the chief legal officer?

23  A    About 10 years.

24  Q    What are your primary responsibilities as chief legal

25  officer?

1   A      As chief legal officer, I'm generally responsible for

2   all legal matters at the company.

3   Q      So, would that include staying apprised and keeping up

4   to speed on legal matters involving the company, so pending

5   proceedings?

6   A      Yes.

7   Q      And as part of your responsibilities, did you have any

8   role in the engagement of outside counsel?

9   A      Yes, I did.

10  Q      And did you generally review invoices from outside

11  counsel?

12  A      Yes, I did.

13  Q      Are you familiar with the claim filed by Trevor Milton

14  in these Chapter 11 cases?

15  A      I am.

16  Q      And are you aware if the debtors are seeking to

17  equitably subordinate that claim?

18  A      That is my understanding, yes.

19  Q      Who was Trevor Milton, in relation to Nikola?

20  A      Trevor Milton was the founder, largest shareholder, and

21  CEO and then changed to the executive chairman when the

22  company went public.

23  Q      And are you aware if Mr. Milton was alleged to have

24  made any false or misleading statements to investors or the

25  public about Nikola?

1  A     Yes, I believe there were allegations related to

2  statements made by Mr. Milton and the veracity of those

3  statements.

4  Q     So, I don't want to get into the content of those

5  statements, but I want to talk about the fallout of those

6  allegations.

7         So, Mr. Worthen, are you familiar with the Hindenburg

8  Research report involving Nikola?

9  A     I am.

10 Q     And can we talk about that, I guess, just starting from

11 the basic question of, who's Hindenburg Research?

12 A     Hindenburg Research is a short-seller report that, at

13 various times, targets different companies.  It was led by an

14 individual named Nate Anderson.  We came to find out he

15 published a report about Nikola in September of 2020 time

16 period.

17 Q     And can you describe from a very high level, the nature

18 of that report?

19 A     The general headline of the report is that Nikola was a

20 fraud, but the contents of the report went on to make certain

21 allegations related to various public statements that

22 Mr. Milton had made in his social media account and other

23 things.

24 Q     And so following the report, did any regulators, the

25 SEC, or the DOJ, take any actions with respect to Mr. Milton

1  or with respect to Nikola?

2  A     Yes, following the report, Nikola actually engaged

3  counsel and to receive advice on how to actually deal with

4  this.  They thought it was best that we actually reach out to

5  the SEC and the DOJ to tell them that we were doing our own

6  internal investigation.

7         At the time that they had reached out, our counsel was

8  told that the SEC had already begun an investigation on the

9  company related to some of Mr. Milton's social media and then

10 shortly thereafter, we received subpoenas from the Department

11 of Justice and the SEC in an investigation into it.

12 Q     Okay.  And do you recall who your outside counsel was

13 for that matter?

14 A     It was Kirkland & Ellis.

15 Q     Okay.  So let's start with the SEC.

16        So, the SEC served you with a subpoena, you said,

17 right?

18 A     They did.

19 Q     And do you recall what the nature -- what is your

20 understanding of the nature of the SEC's inquiry?

21 A     The nature of the SEC's inquiry was to determine

22 whether or not any of the allegations that were leveled in

23 the Hindenburg report were accurate and whether or not Nikola

24 was, in fact, a fraud and whether or not there was truth or

25 not truth to some of the statements that had been made by the

1  company's executive chairman at the time.

2  Q     And did the investigation culminate into any formal

3  proceeding or enforcement action?

4  A     It did.  The company ended up settling with the SEC, I

5  believe, in December of '21.

6  Q     And do you recall the settlement amount?

7  A     It was about $125 million.

8  Q     And as of the bankruptcy petition date, do you recall

9  how much of that had been paid?

10  A     I believe approximately $45 million had been paid.

11  Q     So if my math is correct, that would mean $80 million

12  or so remained unpaid; is that correct?

13  A     That's correct.

14  Q     Did Nikola face any litigation from shareholders or

15  investors or other stakeholders?

16  A     Yes, shortly after the company had received the

17  subpoenas from the SEC and the DOJ and those were made

18  public, we received service of lawsuits as it related to

19  Securities class action and derivative actions based,

20  basically, on the same allegations that had been raised in

21  the Hindenburg report, related to statements made by

22  Mr. Milton.

23  Q     And do you recall, did Nikola hire outside counsel in

24  connection with those lawsuits, as well?

25  A     We did.

1  Q     And who was your outside counsel for that?

2  A     The outside counsel for both, the derivative and class

3  action, eventually landed at Paul Weiss.  We originally had

4  Kirkland helping on that and then we transitioned to Paul

5  Weiss.

6  Q     And then you mentioned, also, a Department of Justice

7  investigation.  Can you just describe your understanding from

8  a high level of the nature of that investigation?

9  A     Yes, it would have been the same as the SEC's

10 investigation.  So the DOJ and the SEC were working in

11 tandem.  They weren't really two separate investigations.

12       When there were witness interviews both, the SEC and

13 the DOJ would attend, and so the nature of the DOJ's

14 investigation was the same as the SEC's.  They were looking

15 into allegations of fraud and misrepresentation at the

16 company.

17 Q     And did you hire separate outside legal counsel for

18 that investigation?

19 A     We did not; it was the same counsel.  Kirkland & Ellis

20 represented the company in both investigations from the SEC

21 and the DOJ.

22 Q     And so in your role as chief legal officer, you

23 received invoices, I assume, from Kirkland & Ellis and Paul

24 Weiss; is that right?

25 A     That's correct.

1    Q      And Nikola incurred, would it be a fair

2    characterization to say, significant legal fees in connection

3    with those proceedings?

4    A      Yes.

5    Q      Do you recall the amount?

6    A      Yes, I think the amount was quantified as part of an

7    arbitration proceeding that was eventually adjudicated

8    in 2022 and then confirmed by a Federal District Court in

9    Arizona.  That amount is about $46 million.

10   Q      Moving on, are you aware of any arbitration proceedings

11   between Nikola and Mr. Milton?

12   A      Yes, there were two.  One I just mentioned, which was

13   brought by the company, at the direction of the company's

14   Board against Mr. Milton for breach of fiduciary duty and the

15   other was a fee arbitration, as there was a dispute as it

16   related to the advancement of fees and the reasonableness of

17   those fees that were being incurred as part of Mr. Milton's

18   defense.

19   Q      Okay.  So there were two arbitrations.

20          I want to focus for now on the breach of fiduciary duty

21   arbitration.

22   A      Okay.

23   Q      So you said Nikola brought claims in an arbitration

24   proceeding against Mr. Milton.

25          Can you describe, from a high level, the basis of those

1  breach of fiduciary duty claims?

2  A     Sure.  The gist of the claim was that Mr. Milton's

3  conduct related to certain things he was saying in social

4  media, via his own social media account or whether it be on a

5  podcast, were not in the best interests of the company and,

6  in fact, were made in bad faith and/or a breach of his duty

7  of loyalty and care to the company.

8  Q     And do you recall how the arbitration panel ruled on

9  those claims?

10 A     Yes, the three-judge arbitration panel ruled in favor

11 of the company, finding that Mr. Milton was 97 percent

12 responsible for the harm that he had caused as a result of

13 his breach of fiduciary duty.

14 Q     And did the arbitration panel grant Nikola any monetary

15 remedy?

16 A     Yes, the arbitration panel granted a total award

17 of $167 million related -- broken down to 46 million of that

18 being approximately from fees and costs incurred related to

19 professionals that the company had to engage as fallout from

20 Mr. Milton's conduct, as well as the $125 million settlement

21 that the company had entered into.  Both of those numbers, at

22 a 97 percent amount.

23 Q     Just to keep the record clear, the $125 million

24 settlement was with the SEC, right?

25 A     That's correct.

1  Q     And so in connection with the breach of fiduciary duty

2  arbitration proceeding, did Nikola hire outside legal

3  counsel?

4  A     We did.

5  Q     And do you recall who outside couple was for that

6  matter?

7  A     Yes, it was Kasowitz Benson & Torres.

8  Q     And do you recall, approximately, the amount of fees

9  that Kasowitz incurred?

10 A     Yeah, the arbitration proceeding that was handled by

11 Kasowitz cost the company about $11 million.

12 Q     Do you recall when the SEC and DOJ investigations

13 became public?

14 A     Yeah, I believe it was shortly after the company had

15 received the subpoenas, which would have been, you know, the

16 October time period of 2020.  The company had an obligation

17 to, as a publicly traded company, to report all material

18 matters that a reasonable investor would want to know and the

19 disclosure was made.

20 Q     So, does that mean that you would have had to have

21 filed an SEC filing disclosing the outstanding

22 investigations; is that fair?

23 A     Yeah.  Either -- and I can't remember exactly -- it

24 either would have been a standalone filing or it would have

25 been as part of an upcoming 10-Q that was filed with the

1  company, because it would have been right around the third

2  quarter.

3  Q     And around that time or following that public

4  disclosure, how did Nikola's stock perform?

5  A     Not well.  Yeah, the stock took a significant hit, not

6  only as a result of the disclosure of the SEC and the DOJ

7  investigation, but continuing activities and conduct

8  continued to put a downward pressure on the stock price.

9  Q     And based on your recollection, did these events, you

10 know, the public disclosure of the SEC and DOJ

11 investigations, and then the down, you know, the dip in the

12 stock price, did those events have any impact on Nikola's

13 operations?

14 A     Yes.  As a result of the DOJ and the SEC investigations

15 and the continual news about Mr. Milton's indictment and

16 eventual conviction, the company faced significant headwinds.

17 The company lost partners.  The company lost professionals.

18 The company -- the company's ability to raise capital was

19 significantly hindered; the cost of the capital went up.

20 Insurance costs went up.  There were significant, significant

21 problems.  We had various parties that we had entered into

22 term sheets with that had stepped away from those agreements

23 because of concerns about the allegations.

24 Q     So, I wont to expound a little bit on that.  You talked

25 about partners.

1       Do you have any specific examples in mind?

2   A    Sure, the company had publicly disclosed a deal that it

3   had entered into with General Motors, where it was going to

4   jointly develop fuel cells or buy fuel cells from GM,

5   batteries.  GM was going to take a significant stake in the

6   company; it was a several-billion-dollar transaction.  That

7   was announced before all of this came out, then after the SEC

8   and the DOJ investigation, GM stepped away from that deal and

9   we --

10  Q    And do you recall what --

11  A    Go ahead.

12  Q    Sorry.  Let me -- please finish your answer.  I didn't

13  mean to cut you off.  Sorry about that.

14  A    No, you're good.  I was going to move on to a separate

15  one if you're going to ask me about that.

16  Q    In your recollection, was the partnership with GM, was

17  that expected to be valuable for the company?

18  A    Oh, for sure.  I mean, GM was a -- I mean, is a

19  household name and their investment in Nikola and partnering

20  with them only technology would have allowed us to build

21  trucks at a cheaper cost.  We could have gotten to scale

22  faster.  And so it was a significant partnership that the

23  company was excited about that evaporated as a result of

24  these investigations.

25  Q    And do you think that partnering with a household name,

1   as you put it, would be good for brand value for Nikola?

2   A     Absolutely, for sure.

3   Q     Okay.  So, we talked about GM.

4         Do you have any other specific examples in mind?

5   A     Yes, we had entered into an agreement, also, with

6   Republic Services to work on a refuse truck.  Similarly, as a

7   result of the DOJ and SEC investigation, they had backed away

8   from that.  Not publicly disclosed at the time, but we had

9   been having conversations with BP about doing a partnership

10  related to energy and producing hydrogen and hydrogen-filling

11  stations and those conversations evaporated.

12        We also had been in very lengthy and deep conversations

13  with Amazon about truck purchases.  Once this hit, I mean,

14  those went away and we tried repeatedly to get them back to

15  the table to have a conversation; they would never talk to us

16  again, despite repeated efforts.

17  Q     And just to clarify the record, is "BP," does that mean

18  British Petroleum?

19  A     Yes, thank you.

20  Q     And, you know, like the GM relationships, were these

21  potential partnerships expected to be valuable for the

22  company?

23  A     Absolutely, otherwise, we wouldn't have been pursuing

24  them.

25  Q     So, you talked, also, about other relationships, I

1  think, you said with advisors.

2  A     Yes.

3  Q     Can you elaborate on that a little bit?

4  A     Sure.  I mean, we had been using Morgan Stanley as our

5  investment banker; they had helped us through the public IPO

6  process.  Because the IPO had gone so well, we were in

7  discussions with Morgan Stanley to go back out to market to

8  raise more money.  I mean, raised money is the lifeblood of

9  the company.  We weren't producing vehicles yet.  We didn't

10 have any revenue yet, and so we were depending on additional

11 proceeds, you know, either equity or debt, to kind of help

12 the company along and continue and finish out its development

13 of the products.

14       And so the plan was to go back to market immediately.

15 This hit, the DOJ and SEC investigation, there's no raising

16 money while that's pending.  Nobody will talk to you.

17       We had been working with Morgan Stanley.  They said

18 that they could still potentially help us out, but eventually

19 they told us that their Committee would not approve working

20 with Nikola going forward, so we lost our investment banker

21 as a result of this.

22       We lost our bank.  Our bankers even told us they wanted

23 us to move their money and we had, frankly, hundreds of

24 millions of dollars parked from the IPO with the bank.  The

25 bank said, Get out, go find another bank, so...

1    Q     So, in your capital-raising efforts, would you normally

2    have relied heavily on an investment banker like Morgan

3    Stanley?

4    A     Yeah, absolutely.  I mean, they have the relationships

5    with the potential investors.  I mean, they're a

6    significant -- and who you hire as a banker, you're relying

7    on them to be able to generate the interest in what you're

8    trying to do from the money raised, be able to communicate,

9    you know, the company's value.  And so having the right

10   investment banker is a critical piece.  Morgan Stanley is a

11   very good name, particularly in the vehicle-investment

12   banking space.  Losing them as a partner was difficult.

13   Q     So, would you say that losing an investment banker

14   precluded you from raising additional capital?

15   A     I don't know if that's a fair statement; I mean, you

16   can always go and try to get with other investment bankers,

17   and we did, eventually, but what you're left with,

18   particularly after, you know, the negative publicity that

19   Nikola had borne, was raising capital in less-than-ideal

20   circumstances.  The company needed money to continue to

21   operate and so, then, at that point, you're having

22   conversations with very expensive money partners that put

23   terms to you that are less-than-ideal, because you need the

24   money to keep the company afloat, to keep people employed, to

25   keep development going, and it's a tough cycle.

1  Q      So, I want to talk about the final item that you

2  mentioned, which is insurance premiums.

3         Can you elaborate on that --

4  A      Sure.

5  Q      -- you said that your insurance premiums went up, I

6  believe, right?

7  A      They did.  I mean, D&O coverage and any other coverage

8  for the company, given the history of the company, it got

9  expensive.  D&O coverage during that time was already

10  expensive.  It was -- they were already seeing historical

11  highs, but when we went to re-up policies, it was millions

12  more.

13  Q      So, all right.  I appreciate that.

14         To wrap it all up, so the SEC and the DOJ

15  investigations were linked, as you testified, to statements

16  Mr. Milton made to the public about Nikola; is that a fair

17  characterization?

18  A      Yeah, I think that's fair.

19         I mean, it was borne out of the Hindenburg report that

20  became public and then there was a direct inquiry by the SEC

21  and the DOJ.  Like I said before, though, when we had come to

22  the SEC, because the goal when you're under investigation or

23  when something like this happens, at least this is what I

24  learned from counsel, the goal is to get to the SEC and DOJ

25  first, kind of self-report and say, We're going to do an

1  investigation; we're going to get to the bottom of this.

2       When we went to the SEC and said, Hey, you know, we're

3  coming to you hat in hand, we're going to get to the bottom

4  of this and figure out if there's any truth to any of these

5  allegations in the Hindenburg report, the SEC said, Not so

6  fast.  We're not going to give you credit, because you're

7  already under an investigation, you just didn't know it;

8  we've been following you guys for a while, based on

9  statements that Mr. Milton had been making in the public.

10 Q    Okay.  And just to wrap it up, we talked about, you

11 know, penalties and fees.

12      Is it fair to say that the SEC investigation and the

13 DOJ investigation were bad for the company's balance sheet?

14 A    Absolutely.  I don't know how they could be good.  They

15 were devastating.

16 Q    And we talked about $45 million out the door to pay the

17 SEC fine, right?

18 A    Yes, that was what has been paid, at least as of the

19 filing of the bankruptcy, of the $125 million that's owed.

20 Q    And I think you mentioned a similar amount, about $46

21 million for advisor fees in connection with those

22 proceedings?

23 A    Yeah, I mean, that was up until the date of the

24 arbitration award, but, you know, we continue to incur costs

25 as it relates to, at least we did prior to bankruptcy, the

1  class-action litigation and the derivative litigation.

2  Q    And then you also mentioned fees payable or paid to

3  Kasowitz, about $11 million, right?

4  A    That's right, to bring the arbitration, to try to

5  recover from Mr. Milton.

6  Q    So, if my math is right, if you add those numbers up,

7  the amount paid to the SEC, the amount paid to Kirkland &

8  Ellis, the amount paid to Kasowitz, brings you to over a

9  hundred million about, right?

10 A    I think that's about right, yeah.

11       MR. CONNELLY:  No further questions, but would

12 like to reserve for redirect.

13       THE COURT:  Yes.

14       Mr. Brennecke, good morning, and welcome.

15       MR. BRENNECKE:  Good morning, Your Honor.

16       Thank you for allowing me to come in this morning.

17       Sean Brennecke of Lewis Brisbois, representing

18 Trevor Milton.

19       May I proceed, Your Honor?

20       THE COURT:  Yes, please do.

21       MR. BRENNECKE:  Thank you.

22                    CROSS-EXAMINATION

23 BY MR. BRENNECKE:

24 Q    Good morning.

25 A    Good morning.

1  Q     We haven't had a chance to meet, but as I introduced

2  myself to His Honor, my name is Sean Brennecke.  I'm an

3  attorney with Lewis Brisbois, representing Trevor Milton.

4  A     Nice to meet you.

5  Q     Pleasure.

6        You testified on direct that some of your

7  responsibilities as the chief legal officer were to generally

8  oversee all the legal matters for the company.  Do I have

9  that generally correct?

10 A     Yeah, I believe that's what I testified.

11 Q     And does that include making sure that public

12 statements are complete and accurate?

13 A     To the extent that I was aware of those statements,

14 yes.  We would always want to make sure that anything that

15 was said by the company was complete and accurate.

16 Q     And Nikola is a Delaware corporation, right?

17 A     It is.

18 Q     And you're aware that both, Delaware law and federal

19 securities law, require companies to have a level of controls

20 in place at the board level to make sure that information is

21 correct and accurate, right?

22 A     Sure, yes.

23 Q     Now, you testified a bit about Mr. Milton's proof of

24 claim in the case here.

25       Are you -- you're aware, are you not, that the debtor

1  is arguing that Mr. Milton is not entitled to

2  indemnification; is that correct?

3  A     I believe that's one of the arguments that's been made,

4  yes.

5  Q     And that is, in part, because the indemnification issue

6  had already been determined?

7  A     Yes, I believe you're referencing the arbitration award

8  by the three-judge panel that was confirmed by the Federal

9  Court or in both documents, the Federal Court and the panel

10 determined that based on Mr. Milton's conduct, that

11 indemnification was not warranted.

12 Q     Do you have the two exhibits binders up --

13 A     I don't.

14 Q     -- I think the debtors' counsel brought up two

15 notebooks.

16         MR. MORSE:  Your Honor, may we help the witness?

17         THE COURT:  Oh, certainly.

18         MR. MORSE:  Thank you so much.

19         THE WITNESS:  I appreciate that.

20     (Pause)

21 BY MR. BRENNECKE:

22 Q     Mr. Worthen, I'm going to ask you to turn to

23 Exhibit 10.

24 A     Is that Tab 10?

25 Q     Tab 10, yes, I believe you're right; the debtors'

1  memorandum of law in support of the debtors' Chapter 11

2  liquidating plan regarding proper classification of the

3  Milton claim, pursuant to Section 510(c) of the Bankruptcy

4  Code and objection to the Milton claim.

5       Is that the correct document?

6  A    Yes, I see that, thank you.

7  Q    And I will note that Exhibit 10, Tab 10 here has been

8  filed under seal, so I will ask you -- the questions I will

9  ask you, I am going to try to avoid having you testify as to

10 anything that was redacted and put in the public record, but

11 I'm sure my colleagues will correct me if I go over that line

12 and tell me that I'm going too far afield.

13      Do you recognize this document, sir?

14 A    I do.

15 Q    Did you have any involvement in putting this together?

16 A    Not really.  Counsel did that.  I had an opportunity to

17 review it and provide comment, but given the fact that it

18 was --

19 Q    And --

20 A    -- a legal memorandum, it was handled mostly by

21 counsel.

22 Q    My apologies for interrupting you.

23 A    No, you're fine.

24 Q    And you submitted a declaration attesting to the

25 accuracy of the information in here; is that correct?

1   A      That's correct.

2   Q      And I believe that's Exhibit 11?

3   A      Yes.

4   Q      Bear with me for a second here.  I want to make sure

5   that I have the redacted version of this, as well, and that's

6   Exhibit 20, the redacted public version.  So, I'm going to

7   ask you, if you can, to put both of those side-by-side.

8   A      They both say, "sealed."

9           MR. MORSE:  Don't worry about that.  He's only

10  going to ask you questions about the unredacted portions.

11          THE WITNESS:  I see it.  Thank you.

12  BY MR. BRENNECKE:

13  Q      Now, am I correct here that on page 30, in

14  paragraph 101, at the last line there, this is where the

15  debtor is talking about the indemnification amounts have

16  already been found to be unreasonable and should, therefore,

17  be disallowed.

18          Do I have that correct?

19  A      You're referring to page 30, paragraph 105?

20  Q      101, I'm sorry.

21          It starts on page 29 --

22  A      Okay.

23  Q      -- and runs over.

24          That would be my first question.  For simplicity, I'll

25  strike that and I will ask you about paragraph 105.

1      If you'd just read that, my question is simply going to

2  be, in this paragraph, the debtor is saying, it's confirming

3  what you just testified to, that the claim for

4  indemnification is precluded because of the arbitration award

5  that was issued; is that right?

6  A      Apologies.

7      Are you referring to paragraph 101 or paragraph --

8  Q      105.

9  A      -- 105, okay.  Nothing on 101?

10 Q      Nothing on 101.

11 A      Okay.

12 Q      I'm starting on 105.

13 A      Yes, it references the determination in the arbitration

14 proceeding that talks about their ruling that Mr. Milton is

15 not entitled to indemnification.  I believe that's what the

16 award says, yes.

17 Q      And if you can look at Footnote 6 on page 29, this, I

18 will caution you, this has a redacted portion, so I will only

19 ask -- I'll do my best to only ask you a question about the

20 unredacted portion.

21 A      Yes?

22 Q      So, if the arbitration provision, if the arbitration

23 award had precluded a claim for indemnification, but isn't

24 that contradicted by Footnote 6, which says that Nikola's

25 request in the Nikola breach of duty arbitration proceeding

1   to recover, and it was redacted out, was denied, without

2   prejudice to resolution of such issues in the Milton fee

3   arbitration following resolution of the federal conviction.

4       So, doesn't it stand to reason that the issue was

5   actually pushed down the line until after the resolution of

6   the federal conviction process?

7   A    Yeah, I don't believe so.  The arbitration award

8   clearly says that there is no indemnification; that's a clear

9   statement in there.  My interpretation of what the panel was

10  trying to do was to set aside this separate advancement issue

11  on the occasional fees that had already been advanced and

12  they were letting that be and, therefore, not bringing that

13  in.

14      So, advancement, at least my interpretation of what I

15  thought the panel was trying to do was there was a difference

16  between advancement in that instance and kind of

17  indemnification going forward.

18  Q    And you understand that the basis for Mr. Milton's

19  proof of claim here is his right to indemnification, right?

20  A    I -- yes, I believe that is the underlying basis for

21  his proof of claim.

22  Q    So, you had mentioned what your interpretation of the

23  arbitration award is.  I would like to turn to see what the

24  actual award says.  And this is another situation where we

25  have a document that was filed confidentially and then a

1  redacted version.  The confidential version is Exhibit 15 and

2  the redacted is Exhibit 25; if you could pull both of those.

3        Just let me know when you have both of those --

4  A    Oh, sorry.  I do, thank you.  Sorry about that.

5  Apologies.

6  Q    Okay.  Turning to page 79 onto 80, and I'll ask you,

7  sir, to look at the unredacted Exhibit 15.  And my questions

8  will be general, so as not to reveal any of the confidential

9  information.

10 A    Okay.  I'm at page 79.

11 Q    If you can review those pages, did the arbitration

12 panel reach any decisions about Mr. Milton's right to

13 indemnification?  It would be a "yes" or a "no," I believe.

14       You'd have to disclose what's in the confidential

15 information in order to, one way or the other.

16 A    Sorry, what's the question you're wanting me to say

17 "yes" or "no" to?

18 Q    So, did the arbitration panel here render any decisions

19 about Mr. Milton's right to indemnification?

20 A    Yeah, I believe I previously testified --

21             MR. MORSE:  Objection, Your Honor.

22             The prior testimony already confirmed his

23 understanding of what the award provided.  We just went over

24 this.

25             MR. BRENNECKE:  This is not a -- I'm not trying to

1  get at what his understanding is, Your Honor; I'm trying to

2  get at what the panel actually came out with.

3          MR. MORSE:  Sure, you can argue that in argument,

4  but you don't need him to read it and interpret it for you.

5          THE COURT:  Yeah, I guess -- and I'd invite your

6  response on this -- if it's a matter of what the arbitration

7  ruling says, that's for, I think that's for me to read.  I

8  don't know that Mr. Worthen's take on what it says would be

9  instructive.

10          MR. BRENNECKE:  Very well, thank you.

11          THE COURT:  Okay.  Thank you.

12  BY MR. BRENNECKE:

13  Q     And you had testified earlier that there were two

14  arbitrations pending.  The first was a breach of fiduciary

15  duty arbitration that Nikola brought and there was a second,

16  but I think Counsel had only focused on the breach of

17  fiduciary duty arbitration.  I'd like to ask you about the

18  other arbitration.

19          What is your understanding of that?

20  A     Yes, that arbitration actually was originally brought

21  by Mr. Milton against Nikola because there was a dispute

22  about the reasonableness of Cahill's fees.  And so there was

23  repeated conversations between myself and Mr. Milton's

24  attorney, Brad Bondi at Cahill, about the size of the legal

25  bills that we were getting.  And under the indemnification

1 agreement, I believe the company did have an obligation to

2 advance fees, but it said, specifically, that the company had

3 an obligation to advance reasonable fees, and so the company

4 was taking issue with the reasonableness of Cahill's fees.

5        And so while we were disputing that, there were several

6 months that bills went unpaid to Cahill.  Cahill filed the

7 arbitration to request payment.  The issue was never about

8 whether or not, at least from Nikola's position, whether or

9 not Mr. Milton was entitled to advancement.  That was in the

10 agreement and we had said that.  The issue was always about

11 the reasonableness of the fees that were being incurred by

12 Cahill; literally, millions and millions of dollars a month.

13        And so we had an arbitration proceeding that was in

14 Arizona under the AAA three-judge panel.  We had argued that

15 $18 million of the fees were unreasonable.  I think the panel

16 came back and said that $17.2 million of the fees were found

17 to be unreasonable.  They basically found in our favor on the

18 unreasonableness.

19 Q    So that arbitration, what is the status of that

20 arbitration, by the way?

21 A    I mean, nothing has happened in that arbitration for

22 multiple years.

23 Q    It's stayed; is that correct?

24 A    I don't know about "stayed."

25        We had a ruling.  The parties can go back at any time,

1  to the extent, I believe, if there is still any issues with

2  bills, but no bills have ever been put back in front of that

3  panel for years.

4  Q    The arbitration is still pending.  It's just stayed; is

5  that right?

6  A    Like I said before, I don't know if that's accurate.  I

7  think it's -- the panel had reached out at one point to

8  determine whether or not it could be closed and I think the

9  parties potentially said, You could leave it open to the

10 extent that anybody is going to be billed, but nobody has

11 brought any bills or any issues before that panel for a

12 couple of years.

13 Q    Do you understand that the reason for that is the

14 automatic stay imposed by the filing of the bankruptcy?

15 A    The reason for what?

16 Q    The reason for the stay or the lag in the first

17 arbitration proceeding.

18 A    I am generally aware of the automatic stay, but I don't

19 believe that's the reason why nothing has been put in front

20 of that panel in a couple of years.

21 Q    Could I ask you to turn to Exhibit 28, please.

22 A    I'm there.

23 Q    And this is the second amended, combined disclosure

24 statement and Chapter 11 plan of liquidation for the Nikola

25 Corporation and its debtor affiliates.

1      Have you seen this document?

2   A    I believe I have.  There's been a lot of filings in

3   this case.  I actually make an effort to view everything, so

4   I'm sure at one point I did view this document.

5   Q    Okay.  If you have any question, you can turn to

6   Exhibit 30, which is a declaration, I believe it's titled

7   it's in support of this.

8   A    Okay.

9   Q    Does that help you with whether you reviewed this?

10  A    Yes, like I said, I believe I had reviewed it.

11  Q    All right.  In Exhibit 28, if you could turn to

12  page 34.  I'm going to direct your attention to the bottom of

13  the page, to the last paragraph.

14      Do you see that?

15  A    I do.

16  Q    And doesn't this say that it's the Milton fee

17  arbitration, which, do you understand that to mean that

18  that's the arbitration that Mr. Milton filed that we've been

19  talking about, as the first arbitration?

20  A    Yes.  I believe that is right.

21  Q    And that that stay remains stalled and subject to the

22  automatic stay, right?

23  A    I'm not disputing that. I thought your previous

24  question was, you know, the reason why there hasn't been

25  anything  put in front of that court for the last two years

1  was because of the automatic stay that was recently issued by

2  this Court.

3      I guess my testimony was trying to clarify that that is

4  not my understanding, the reason why nothing has been done in

5  that arbitration proceeding for years.

6  Q    You had testified a bit about the SEC investigation and

7  specifically the investigation into -- that it started into

8  Nikola.  Do you remember that testimony?

9  A    I do.

10 Q    I think your testimony was that the nature of that

11 inquiry was whether the allegations in the Hindenburg report

12 were accurate in the fraud and truth of the statements that

13 Mr. Milton made.  Is that correct?

14 A    It was a high-level generalization but I think that is

15 generally accurate, yeah.

16 Q    I would ask you to turn to Exhibit 7.  Let me know when

17 you are there.

18 A    I'm there.

19 Q    Okay.  So, if we turn to page 2 -- let me step back.

20     Do you recognize this document?

21 A    I do.

22 Q    Is this the -- its titled "Order instituting cease and

23 desist proceedings pursuant to Section 8(a) of the Securities

24 Act of 1933 and Section 21(c) of the Securities Exchange Act

25 of 1934, making findings and imposing remedial sanctions and

1    a cease and desist order."

2         Is this the document that Nikola entered into to

3    resolve the SEC investigation?

4    A    Yes.

5    Q    And you reviewed this document?

6    A    I have.

7    Q    If we turn to page 2, paragraphs 1, 2, and 3, isn't it

8    true that the inquiry that the SEC was investigating, and the

9    subject of this order, was not limited to the truth of the

10   statements that Mr. Milton had made but also included

11   Nikola's violations of federal securities rules pertaining to

12   the implementation and the maintenance of controls and

13   procedures?

14   A    Yes.  I would agree that the document includes not only

15   allegations about -- like it says in paragraph 2 that Nikola

16   primarily mislead investors through scores and

17   misrepresentations by its CEO and later executive chairman,

18   Trevor Milton.  There is other allegations in here as it

19   relates to company conduct but I would also add:

20        One, that you're given this document by the SEC and not

21   given any opportunity to make any revisions to it. It's a

22   take it or leave it document, given that they tell you it's

23   on a no admit or deny basis.

24        Two, while the company disagreed specifically with

25   specific things related to things that the SEC took issue

1  within the company's filings, the company has restated, never

2  changed, never had to correct a financial statement based

3  upon its disclosures.

4  Q    I guess the answer to my question then was that the SEC

5  investigation wasn't just limited to the truth of statements

6  that Mr. Milton had made, right?

7  A    Yeah, that's correct.  And I don't believe I testified

8  previously that that is the only thing that it was about.

9  Q    And if we turn to page 5, paragraph 19, the SEC here

10  finds that Nikola did not have a process in place to ensure

11  that information published by Milton was communicated to

12  management.  As the general counsel, wouldn't that have been

13  within your scope of responsibility to make sure that that

14  was in place?

15  A    Yes.  I would agree with that and I would disagree with

16  this statement by the SEC.  We did have a process in place.

17  We had asked Mr. Milton to have his social media reviewed. He

18  had refused. The only time that Trevor came to me and asked

19  me to review pieces of his social media was when it had to do

20  something related to the SPAC filing or something related to

21  our public offering, which, frankly, none of those were ever

22  considered inaccurate or were the subject of the

23  investigation against Mr. Milton.

24      If it had to do with anything about vehicle technology,

25  the advancement of, you know, our fueling, any of those other

1  things, Trevor never would have, nor did he ever come to me

2  about those types of things in his social media.  He was

3  considered the expert on those, not me.  And despite our

4  requests, not only from me but also from the CEO at the time,

5  Mark Russell, and Kim Brady, the CFO at the time, we couldn't

6  get Mr. Milton to comply with that.  He was posting things on

7  social media.

8       We had asked the media team to alert us to any issues

9  that they were aware of.  Occasionally they did and when they

10  did, I would raise those issues with Mr. Milton but as we

11  came to find out, in the Hindenburg report, there were a

12  whole bunch of things that we were never aware of.  And

13  apparently the media department didn't know they were issues.

14  Q     Well, there were things that the SEC includes in this

15  cease and desist order that don't pertain to things about

16  Mr. Milton including misleading pictures and statements about

17  refueling capabilities, hydrogen stations, the ability to

18  produce electricity; all of those things are included in

19  here, correct, without involving statements pertaining to

20  Mr. Milton?

21       MR. MORSE:  Your Honor, may I be heard just

22  briefly.  This goes back to my issue with this whole sojourn

23  into these questions.  We made a point to tee up today's

24  proceedings, what I would characterize as, the right way.  We

25  filed our plan.  We filed our disclosure statement.  We got

1  approval of that.

2          We filed our memorandum of law seeking to

3  equitably subordinate Mr. Milton's claim on July 29th, 2025.

4  The objection that we got back did not take issue with or

5  raise this comparable faults theory that is trying to be

6  manufactured in front of our eyes, which we don't understand

7  the basis for in the law, and believe is quite a waste of the

8  Court's time.

9          We continue to object and have been very patient

10 with the witness and his time.  He traveled here from Arizona

11 to support confirmation but I think enough is enough and we

12 would like to close this portion of the proceeding and move

13 forward with the rest of our confirmation hearing.

14          THE COURT:  Mr. Brennecke.

15          MR. BRENNECKE:  I can certainly appreciate their

16 desire to close this portion. I would suggest, though, Your

17 Honor, that they are seeking to subordinate this claim on an

18 equitable basis and they have painted a picture throughout

19 the course here of these proceedings as to all of these

20 actions that Mr. Milton had taken and how he did all of this

21 and actually -- on direct, it was all the testimony about how

22 Mr. Milton's actions caused all this harm and how he had done

23 all this.  What we are doing, Your Honor, is an inequitable

24 position. Your Honor needs to consider all the factors,

25 everything that is going on.

1          THE COURT:  Okay.  This might be a good time to

2   talk about, you know, what I think the relevant evidence may

3   be regarding the equitable subordination issue.  The argument

4   for equitable subordination is based upon the conviction for

5   which Mr. Milton, subsequently was pardoned by President

6   Trump, and it's also based upon the arbitral rulings that

7   were affirmed and made an order of the District Court.  It

8   just seems to me, as a matter of issue preclusion, I can't

9   and won't revisit what the court found and what the jury

10  found in the criminal proceeding, nor the findings that were

11  affirmed by the District Court in Arizona.

12         You know, as a general matter I understand -- I

13  think I understand where you're going but also you are

14  raising issues that could have been raised in the two plan

15  objections and wasn't raised there.  And I'm struggling to

16  determine why there aren't any new objections haven't been

17  waived.

18         MR. BRENNECKE:  On the plan objection point, Your

19  Honor, may I have a moment to consult with my colleague?

20         THE COURT:  Oh, of course.  Please do.

21         MR. BRENNECKE:  Thank you.

22      (Pause)

23         MR. BRENNECKE:  Thank you for your patience, Your

24  Honor.

25         THE COURT:  Yes, Mr. Brennecke.  Certainly.

1          MR. BRENNECKE:  I spoke to my colleague about the

2    inclusion of the objections.  Your Honor, this is not a part

3    of the objection.  It's under Rule 510(c) and its asking the

4    Court to consider all of the relevant factors and the witness

5    had testified to one of the arbitrations and got into some

6    detail about that.  So, we are partially exploring that.

7          Then there was a mention of the second arbitration

8    but nothing there.  And that is the basis or one of the bases

9    for the equitable subordination and then to some extent also

10   the claim disallowance.  So, we would ask Your Honor to allow

11   us to continue to show what actually was going on in that

12   arbitration, exploring the testimony and discussing the

13   arbitration that wasn't covered.

14          THE COURT:  Mr. Morse.

15          MR. MORSE:  Your Honor, the other side appears to

16   be attempting to craft an argument about comparable faults.

17   The main arbitration panel, as you are well aware, after many

18   witnesses, I think the proceedings went on for nine or ten

19   days, found that Mr. Milton was 97 percent at fault and we're

20   going to litigate that and talk about the SEC order and

21   things like that.

22          THE COURT:  Yeah, that was my -- that was the

23   question I was going to pose. It seems to me that the

24   arbitral finding was that there was three percent fault of

25   the company and that is an issue or it's a fact that is

1 | before the Court and I am bound by.

2 | So, I appreciate the point that you are trying to

3 | get to but I think it's already been established and nothing

4 | that Mr. Worthen could testify to would cause me to take the

5 | improper test of revisiting issues that I'm precluded from

6 | revisiting.

7 | MR. MORSE:  And as -- if I may continue, Your

8 | Honor.  As to this other, you know, fee arbitration, as you

9 | recall, this is the same fee arbitration that they attempted

10 | to obtain relief from the automatic stay in order to restart

11 | after it had been long dormant.

12 | Our position, and this is more argument for later,

13 | is that once the arbitration panel had ruled that Mr. Milton

14 | as not entitled to indemnification and then the District

15 | Court affirmed that on page 4 of Exhibit 50, which

16 | Mr. Worthen also confirmed, through his testimony, that, of

17 | course, nothing happened because Mr. Milton knew that he

18 | wasn't entitled to any indemnification, notwithstanding

19 | apparently that he had paid $40 something million dollars.

20 | If he was entitled to this indemnification, you

21 | know that if I'm coming out of pocket $40 million that I'm

22 | going absolutely back to that panel, every month as I'm

23 | stroking checks, and I'm going back to the company if I think

24 | that I have a right. I mean actions speak louder than words.

25 | MR. BRENNECKE:  Your Honor, I think counsel was

1  correct when he started that that is for argument.  That is

2  certainly an argument here but I think he missed one point in

3  that he's presuming there was a decision on the right to

4  indemnification.  We would submit that wasn't the case under

5  the arbitration award that --

6          THE COURT:  Right.  That is what I'm saying that I

7  can read the documents and interpret it.  There is no amount

8  of outside of extrinsic evidence that would inform my reading

9  of the arbitral ruling.

10         So, you know, where does that leave us?  I don't

11 think that the -- you know, what I agree is a line of

12 questioning that seems to be going at the relative  fault of

13 Nikola as opposed to Mr. Milton is at issue because its

14 already been determined.  So, I don't know that it's

15 necessary or really relevant to pursue a further line of

16 questioning going to that issue because, again, I think its

17 issue preclusion, I'm bound by it, there's nothing new that I

18 can learn.

19         MR. BRENNECKE:  I understand.

20         THE COURT:  Thank you, Mr. Brennecke.

21 BY MR. BRENNECKE:

22 Q    Just a few more questions.

23      This goes to your testimony you had talked about the

24 agreement with General Motors, right?

25 A    Yes.

1  Q     And that -- I think your testimony was that that was

2  harmed as a result of the SEC investigations.

3  A     Yes.

4  Q     That was -- I will -- that was also -- there were other

5  aspects to the General Motors issue, right, not just those

6  investigations?

7  A     I don't know what you're talking about.

8  Q     And you had also testified that the other shareholder

9  suits were also born out of the statements by Mr. Milton,

10  right?

11  A     Yes.

12  Q     Like we had discussed earlier, there were also other

13  basis for those suits, right?

14  A     Yeah.  They brought other allegations in those class

15  actions and derivative actions, yes.

16              MR. BRENNECKE:  One more moment, Your Honor.

17              THE COURT:  Yeah, certainly.

18         (Pause)

19              THE COURT:  Mr. Detweiler.

20              MR. DETWEILER:  May I please the Court, Donald

21  Detweiler on behalf of Mitsubishi HC Capital.

22              Your Honor, I have another matter and have to be

23  excused.

24              THE COURT:  I thought you were rising to ask for

25  that.

1          MR. DETWEILER:  And my counsel is on as well.  We
2   both ask to be excused.

3          THE COURT:  Certainly.  Have a good weekend,
4   Mr. Detweiler.

5          MR. DETWEILER:  Yes. Thank you, Your Honor.  You
6   too.

7          THE COURT:  Thank you.

8          MR. BRENNECKE:  Your Honor, I have no further
9   questions.

10          THE COURT:  Thank you, Mr. Brennecke.

11          MR. BRENNECKE:  Thank you.

12          THE COURT:  Mr. Connelly, any redirect?

13          MR. CONNELLY:  I actually got very good news which
14   is that -- there is -- my partner here is grabbing me and its
15   very inappropriate I might add.

16      (Laughter)

17          MR. CONNELLY:  I have good news which is that
18   pretty much everything I had for redirect has been addressed.
19   There is just one single question that I wanted to clarify.

20                     REDIRECT EXAMINATION
21   BY MR. CONNELLY:

22   Q    On direct we talked about the Milton arbitration award.
23   Do you recall that?

24   A    Yes.

25   Q    That hasn't been collected yet, right?

1  A     That is correct.  It has not been collected.

2          MR. CONNELLY:  No further questions.

3          THE COURT:  Okay, thank you.

4          Based upon that question, any more re-cross, Mr.

5  Brennecke?

6          MR. BRENNECKE:  No, Your Honor.  Thank you.

7          THE COURT:  Is there anybody else who wishes to

8  question the witness?

9      (No verbal response)

10         THE COURT:  Okay, I hear no response.

11 Mr. Worthen, you are excused, sir.

12         THE WITNESS:  Thank you, Your Honor.

13         THE COURT:  Thank you.

14     (Witness excused)

15         THE COURT:  Mr. Baddley.

16         MR. BADDLEY:  Those benches can jump out at you.

17 Your Honor, I just wanted to make a quick statement. I hope

18 it's an obvious point but there was some testimony, both on

19 direct and cross-examination, about certain statements that

20 members of the SEC staff may have made.  We are not a party

21 to this dispute so we are not raising evidentiary objections.

22 I just wanted to point out for the record that we consider

23 that hearsay and that our silence should not be interpreted

24 as any sort of agreement or endorsement with that testimony.

25         THE COURT:  I certainly understand.

1          MR. BADDLEY:  Thank you.

2          THE COURT:  Thank you, sir.

3          Mr. Morse.

4          MR. MORSE:  Thank you, Your Honor.  For the

5    record, Joshua Morse for the debtors.

6          I think that moves us to the main fireworks, I

7    guess, plan confirmation.  Our confirmation brief, filed at

8    Docket Number 959, goes through exhaustively, I believe, all

9    applicable requirements. I appreciate you extending our page

10   limit.  We tried to put everything into a single document so

11   that it would be perhaps more streamlined, I guess, but we

12   believe that all applicable requirements to not only approve

13   the disclosure statement on a final basis but find compliance

14   with the solicitation procedures order and, finally, confirm

15   the plan are set forth in that brief.

16         The confirmation brief also addresses the reasons

17   the debtors believe each of the remaining objections that

18   haven't been resolved, as I walked through, should be

19   overruled.  The debtors also believe we have met all relevant

20   final disclosure statement approvals, solicitation and

21   confirmation requirements have been met, and that the plan

22   satisfies all of the debtors obligations under the

23   solicitation procedures order and Sections, among others,

24   1125, 1126, 1129 of the Bankruptcy Code.

25         For efficiency purposes and to save everyone in

1  the audience from falling asleep, I propose that we dispose

2  of the recitation of all the individual confirmation

3  standards and we just sort of move straight into arguments

4  regarding the remaining objections. I would like to first

5  start with the United States Trustee objection.

6            THE COURT:  Okay.

7            MR. MORSE:  Then I will move into the Milton

8  equitable subordination objection. I am going to handle both

9  of those.  Then we will do the lead securities class action

10 plaintiff objection and the individual shareholder objection.

11 My colleague, Mr. Alfano, is going to handle both of those.

12            THE COURT:  Okay.  Now, at some point I believe

13 that Mr. Cousins and Mr. Brennecke are going to want to put

14 on evidence in support of their objection to confirmation.

15 Am I correct about that?

16            MR. COUSINS:  Good morning, Your Honor.  Scott

17 Cousins.

18            THE COURT:  Good morning.

19            MR. COUSINS:  Not -- we're not objecting to

20 confirmation but to the --

21            THE COURT:  Well, to -- well, yeah, in so far as

22 the plan would equitably subordinate Mr. Milton's claim. So,

23 on that issue you do intend to put on evidence in support of

24 your objection?

25            MR. COUSINS:  Yes.

1          THE COURT:  Okay.  Why don't you think about

2  timing and whether it would make sense at some point in the

3  next while to stop for lunch and if there is going to be

4  additional witness testimony whether we might do that after

5  people have had an opportunity to have a bite.

6          MR. MORSE:  What if we were to perhaps do the U.S.

7  Trustee objection, and then I sit down and let Mr. Alfano

8  jump up and we do the other two, and then we do the equitable

9  subordination after the break.

10          THE COURT:  I think that is fine.

11          MR. MORSE:  Okay.

12          THE COURT:  Thank you.

13          MR. MORSE:  So, the United States Trustee has

14  objected at Docket Number 908, has taken issue with the opt-

15  out releases.  When we were in front of Your Honor for the

16  initial approval of the disclosure statement and solicitation

17  procedures, back on July 21st, we were exceedingly careful to

18  determine a release approach using an opt-out voting process

19  for Class 3 that we believe was sound.  That process ensured

20  to provide members of Class 3 with clear and conspicuous

21  notice of the releases and a meaningful opportunity to opt-

22  out of granting them to the debtors.  It also provided each

23  of those members of that class an opportunity to object to

24  the granting of those releases.  That ability to opt-out and

25  to object, of course, was separate and apart from their

1   opportunity to vote on the plan.

2           The release provisions in the plan are also

3   structured as very limited opt-out consensual releases that

4   apply only to the creditors who are entitled to vote on the

5   plan. So, it's only the holders of general unsecured claims

6   in Class 3 that received notice of the plan and its releases

7   and that affirmatively elected not to opt-out or didn't,

8   otherwise, object to granting the releases in the plan.

9           We didn't come up with this approach out of thin

10  air.  Its consistent with the approach to granting releases

11  and many other Chapter 11 cases in this District, including

12  the Indianapolis Downs case, Spansion, Arsenal Intermediate

13  Holdings, and Mallinckrodt to name a few.  And we have cited

14  all of these in our brief for Your Honor.  We also --

15          THE COURT:  Now you cite Arsenal, of course that

16  was a Judge Goldblatt decision and I think it's fair to say

17  that he's reconsidered his views.

18          MR. MORSE:  Perhaps.  Yes, I understand.

19          We also intentionally styled it after what Your

20  Honor ultimately approved in the Fisker case.  And the goal

21  was to provide detailed and transparent notice regarding the

22  effect of third party releases to the effected parties and an

23  opportunity to opt-out or to object.  The reply brief goes

24  through the multiple avenues that Class 3 had to opt-out and

25  showed Your Honor what the form of ballot looked like and we

1   also did that in our disclosure statement reply.

2           So, what did the results yield, and this is what

3   Mr. Fox is going to stand up and take issue with.  But as set

4   forth in the Young declaration, and that is Docket

5   Number 952, Class 3 did take advantage of the ability to opt-

6   out of granting releases.  Forty-two of the 70 Class 3

7   holders that voted for the plan opted out of granting the

8   releases.  That is the Young declaration, Exhibit C. In

9   addition, 16 other holders who didn't vote on the plan they

10  submitted opt-outs and that is the Young declaration,

11  paragraph 12.  We believe that this is evidence that the opt-

12  out approach that we implemented actually worked.

13          Our memorandum also cited, you know, Chapter 11

14  cases around the country that implemented, kind of, similar

15  opt-out mechanisms in a post *Purdue* world.  And I am not

16  going to go through the chapter and verse of all those

17  because it's going to put everyone to sleep.  And I know you

18  are very familiar with these cases.

19          Recent Delaware cases have continued to reject

20  similar arguments made by Mr. Fox's office which I know you

21  are also well-aware of and the debtors solicitation process

22  satisfies factors that are found in all of those recent

23  cases, including, among other things, transparent and

24  prominent notice, overwhelming creditor support, and limited

25  release provisions as well.  Based on that, we believe that

1  the third-party releases here are consensual, and

2  appropriate, and should be approved.

3          The U.S. Trustee makes two other arguments. Number

4  one, that there is no legal basis for the injunction barring

5  the claims against the non-debtors.  We understand that Judge

6  Stickles ruled in the *99 Cents* store case in a very similar

7  context that the injunction provisions that are included in

8  Article 12(d) of the plan just merely implement the release

9  and exculpation provisions.  We believe it is appropriate

10 here and the objection should be overruled.

11         The U.S. Trustee also took issue with the waiver

12 of the Bankruptcy Rule 3020 stay.  Given the timing of

13 between confirmation and the effective date, which can't

14 occur until we have the final hearing in the Chancery Court

15 which isn't going to happen until November 20th, we just

16 simply agreed to remove that and I have informed Mr. Fox of

17 that.

18         THE COURT:  Yes.

19         MR. MORSE:  And with that, I will pass the podium

20 to Mr. Fox and reserve additional comments.

21         THE COURT:  Certainly.

22         Good morning, Mr. Fox.

23         MR. FOX:  Good morning, Your Honor.  May I please

24 the Court, Tim Fox on behalf of the United States Trustee.

25         So, Your Honor, I appreciate Mr. Morse's comments

1   and, again, note the 3020 issue has been mooted by the time

2   here.  So, we appreciate that.

3           I want to start, similarly, to where Mr. Morse did

4   and that is, Your Honor, our papers reflect the U.S. Trustees

5   position on this issue.  I know Your Honor has ruled on this

6   in the past, so I'm not going to try to belabor the points of

7   law but to the extent Your Honor has any questions about the

8   briefing or anything with respect to those arguments as

9   applied to the facts here, of course, I'm at your disposal to

10  respond to those queries.

11          What Mr. Morse, in his argument, outlined is, and

12  consistent with my earlier request to admit the bankruptcy

13  schedules for Nikola Corporation at Docket Item 203,

14  Mr. Morse touted that you had 70 parties that voted on the

15  plan as well as an additional 16 that acted on the opt-out.

16  And, Your Honor, the reason the U.S. Trustee moved into

17  evidence the debtors schedule, and this is at Nikola

18  Corporation, the main operating debtor of these Chapter 11

19  debtors, is that in Docket Item 203 for Schedule E/F, which

20  is at page 155 according to the ECF stamp at the top of that

21  document, Nikola Corporation scheduled 526 general unsecured

22  creditors with respect to what was in its books and records

23  as the schedules were prepared.  If you compare that to the

24  parties acting on the plan and the opt-out here in this case,

25  that results in about a 16 percent level of engagement with

1  the scheduled creditors of Nikola Corporation as it relates

2  to that opt-out.

3          So, Your Honor, the U.S. Trustee, as noted in our

4  papers, contends that that level of participation doesn't

5  reflect consent among the creditors sought to be bound by

6  these third party releases but rather reflects a default

7  position as being forced to act on the opt-out as opposed to

8  affirmatively agree to relinquish rights against non-debtor

9  third parties.

10          One of the common elements my office has stressed

11  is that when talking about the third party relief that is

12  being sought you have a non-debtor on the one hand in the

13  form of the creditor or other party that the plan intends to

14  bind and another non-debtor on the part of the beneficiaries

15  of the third party release.  And, again, the U.S. Trustee

16  contends that there is no provision of the bankruptcy code

17  that requires non-debtor creditors of voting parties to act

18  to avoid an impairment of their rights to non-debtor third

19  party release beneficiaries.  It's not the same as rejection

20  of a contract or anything else under the code that would put

21  a parties rights at risk of default if they don't appear and

22  voice opposition to that relief.

23          So, Your Honor, again, there is low participation

24  rate.  I know that that exists in many cases with respect to

25  voting on plans as a primary principle but when it relates to

1 the rights against third parties, again, the U.S. Trustee

2 views that as not a sufficient manifestation of consent in

3 light of the Supreme Court's guidance in Purdue to have those

4 parties relinquish those rights.

5          So, Your Honor, if you have any questions, again,

6 happy to address them and would, otherwise, just rely on our

7 papers with respect to the issue.

8          THE COURT:  Yeah, I understand the argument and

9 its application to the facts of this case.  And I do thank

10 you and your office for the outstanding briefing on an issue

11 that certainly remains somewhat contentious and I understand

12 the importance of it to your office.  So, I thank you for the

13 presentation.

14          MR. FOX:  Thank you, Your Honor.

15          THE COURT:  Thank you.

16          MR. MORSE:  Your Honor, I don't have any comments

17 in response.  So, I think we will just rest on our papers and

18 argument on that point and turn the podium over to

19 Mr. Alfano.

20          MR. ALFANO:  Good morning, Your Honor.

21          THE COURT:  Mr. Alfano, good morning.  Good to

22 have you.

23          MR. ALFANO:  For the record, Andrew Alfano from

24 Pillsbury for the debtors.

25          I believe I might be the last act before lunch, so

1   I will try and keep it brief but also give the objections the
2   thoroughness, particularly the pro se objections, that they
3   deserve.  So, I will be handling two different kinds of
4   objections to the plan.  The first is the objection by the
5   lead class plaintiffs, that is romanette (xiii) on the
6   agenda.  And then also the several formal and informal
7   objections by Class 5 equity holders and those are listed at
8   romanette (iii) through (ix), (xi), and (xvi).
9           Now, with respect to the objection -- the limited
10  objection by the class action plaintiffs to subordination
11  under the plan for the sake of the record the debtors filed
12  their brief in support of subordination on August 1st at
13  Docket Number 820. That was about 19 days before objections
14  to the plan were due and over a month before the debtors
15  brief in support of confirmation was due.  And I will talk a
16  little bit more about why that is relevant later.
17          The class action plaintiffs filed their limited
18  objection with respect to subordination pursuant to the plan
19  on August 20th at Docket Number 909.  And the debtors filed
20  their reply to the limited objection and brief in support of
21  confirmation and subordination at Docket Number 959 on
22  September 2nd.
23          Now before I get into the objection, if I may set
24  the stage. As Your Honor, I'm sure, is aware from your review
25  of the plan, Class 7 of the plan seeks to subordinate certain

1  claims pursuant to Section 510(b) of the Bankruptcy Code.

2  And Section 510(b) requires subordination of any claims that

3  are based on the purchase or sale of securities.  And while

4  the Court, I'm sure, is familiar with this provision of the

5  code, I understand we may or may not have some new clerks in

6  the room.

7          So, for everyone's benefit, Section 510(b) is to

8  essentially prevent equity holders who took the higher risk

9  of an equity investment to elevate that equity interest into

10 a claim by alleging, for example, damages resulting from the

11 purchase and sale of securities.  So, the debtors brief sets

12 forth their arguments with respect to subordination.

13         First, the class action plaintiffs filed a $13

14 million claim against debtor, Nikola Corporation, and that is

15 on the claims register as Proof of Claim Number 10257.  That

16 claim is based on a prepetition term sheet between Nikola and

17 the class action plaintiffs that would have settled a

18 purported class action pending in the United States District

19 Court for the District of Arizona titled Borteanu v. Nikola

20 Corporation.  That action, essentially, asserts securities

21 law violations based on false and misleading statements and

22 omissions by Nikola regarding its business plan and its

23 business prospect in press releases and SEC filings and the

24 like.

25         I quote from the complaint, "As a result of those

1  misrepresentations and omissions, Nikola shareholders who

2  purchased or, otherwise, acquired shares of Nikola's

3  securities did so at artificially inflated prices, and then

4  the subsequent decline in the value of those securities, once

5  those things came to light, is the damages that they

6  suffered".  That is at paragraph 884 of the class action

7  plaintiffs complaint which we attached as Exhibit B to our

8  brief in support of subordination.

9          Now there are multiple other instances in the

10 class action plaintiffs complaint where they say in no

11 unclear terms that the claims they assert arise from the

12 purchase and sale of securities and that is at paragraphs 416

13 and 886 of the class action plaintiffs complaint that is,

14 again, attached to the brief in support of subordination.

15         We also cite cases, including from this district,

16 that show the law requires but for causation when analyzing

17 whether a claim arises from the purchase or sale of

18 securities. In other words, the fact that the lead class

19 plaintiffs may assert a claim based on breach of contract, if

20 the term sheet even was a contract, does not elevate it to a

21 general unsecured claim.  We still believe its subordinated.

22         In response to our brief which was filed on

23 August 1st, the class action plaintiffs filed their limited

24 objection on August 20th with respect to subordination.  The

25 objection takes issue with the process that the debtors

1  undertook.  The class action plaintiffs assert that

2  Bankruptcy Rule 3007 a claim objection is the proper

3  procedural mechanism for the debtors to seek subordination.

4         They also claim that a claim objection, under

5  Bankruptcy Rule 3007, would constitute proper notice and a

6  hearing under the bankruptcy code and not subordination

7  pursuant to the plan.  As we stated in our reply, Your Honor,

8  we believe the bankruptcy rules say the precise opposition

9  under Bankruptcy Rule 7001(h). It actually requires an

10 adversary proceeding to subordinate a claim except when

11 subordination is provided in a Chapter 11 plan.

12        Although we believe Rule 7001(h) is enough on its

13 own, we believe our request to subordinate their claim

14 through the plan has provided more than appropriate notice

15 and a hearing under these circumstances.  Our brief in

16 support of confirmation was not due until September 2nd.  We

17 filed our brief in support of confirmation with respect to

18 subordination on August 1st.  So, they had approximately 19

19 days until their objection deadline to respond to that.  And

20 we filed our reply in support of subordination on

21 September 2nd.

22        Now, you know, we are here today before Your Honor

23 to argue the issue after its been fully briefed.  Therefore,

24 for those reasons, Your Honor, we ask that you overrule the

25 class action plaintiffs objection to subordination.

1               THE COURT:  Okay.  Let me hear from the lead class

2   plaintiffs, please.

3               Mr. Barsalona, great to have you here.  Good

4   morning.

5               MR. BARSALONA:  Good morning, Your Honor.  For the

6   record, Joe Barsalona from Pashman Stein Walder & Hayden on

7   behalf of the class plaintiffs.

8               Your Honor, we did file a limited objection and I

9   think this a very simple argument. It is procedural but it's

10  also legal in a bit.  Can a plan object to a claim.  Your

11  Honor, the code and the rules do not contemplate that a plan

12  is the proper procedural vehicle to object to a claim.

13              THE COURT:  Isn't objection and subordination are

14  two different concepts?

15              MR. BARSALONA:  Correct, Your Honor.  Yes.  But

16  they can make a ruling on subordination but they didn't take

17  the steps to give us our day in court to talk about the

18  underlying guts of the claim itself. I mean you're seeing in

19  this hearing right now Mr. Milton is prosecuting his claim.

20  That is because the code doesn't contemplate putting claim

21  objections into a plan confirmation, right.  There are other

22  components of the plan that can survive and continue but

23  still it must be bifurcated, we must get our day in court

24  because we're not just filing a proof of claim and saying

25  this is our damages.

1        There was a negotiated document with the debtors

2   prepetition, their restructuring counsel, based on a

3   settlement and representations made to the class about what

4   we would get.  An assigned written agreement, executory

5   contract was made and we came into court believing the

6   debtors would prosecute all the agreements that they

7   committed to previously. In fact, they even listed, under

8   penalty of perjury, on their top creditors list with the

9   petition.  Our claim is the, I think, fifth largest GUC claim

10  at the time.

11       So, again, I'm not here to litigate that claim and

12  the code contemplates that no one should have to litigate

13  their claim in connection with confirmation. I am arguing the

14  fact, Your Honor, that 503(a), 1123, none of these provisions

15  provide for a plan to object to a claim.  Honestly, if the

16  debtors had reached out and said, well, extricate your claim,

17  I wouldn't be standing here today; however, now its wrapped

18  up into this concept of the plan and we have to think about

19  appellate rights.  I'm glad the 3020 waiver is now gone.

20  There are other issues that we need to think about and deal

21  with.

22       Counsel can't state that they didn't think about

23  filing proofs -- objections to claims earlier because their

24  first omnibus objection, at 861, was to other equitable

25  proofs of interest to subordinate them.  They could have done

1  the same thing with us.  They could have filed a motion to

2  reject our executory contract, the settlement agreement and

3  then we could have dealt with all the subordination issues

4  there.  They did not.  They wanted to consolidate it into

5  this one plan to prosecute it with the momentum of

6  confirmation, which I completely appreciate, but we should

7  have our separate day in court and the code gives us that

8  right.

9              THE COURT:  What if they never object to the plan?

10              MR. BARSALONA:  Then it stands --

11              THE COURT:  If its subordinated, as a practical

12  matter, why would anybody object to the claim unless the

13  returns into the estate were so large that -- I mean, you

14  would be dealing with a very good problem at that point but I

15  just view the -- I'm struggling to understand why

16  subordination under 510(b), which is specifically provided

17  for under the code, should be viewed as an objection to a

18  claim when it's really just seeking certain treatment of what

19  presently is an allowed claim against the debtors estates.

20              MR. BARSALONA:  Because, Your Honor, the plan

21  contemplates termination, disallowance, other rights and, you

22  know, destruction of that claim through the plan, through the

23  confirmation order. It is supposed to be a bifurcated claim.

24  They should have taken the extra step to bring us into court.

25  Maybe they didn't want to deal with that issue because,

1   again, there are a lot of thorny issues related to the facts

2   of how we came to that settlement agreement and sat on our

3   rights as we allowed the case to proceed.

4          So, again, I'm not here to litigate the claim. I

5   am here just on the legal argument that a plan cannot include

6   an objection to that claim and that should be bifurcated and

7   we should have our separate day in court.

8          THE COURT:  Thank you very much, Mr. Barsalona.

9          MR. BARSALONA:  Thank you, Your Honor.

10          THE COURT:  Mr. Alfano, any response to

11   Mr. Barsalona's comments?

12          MR. ALFANO:  Yes, Your Honor. I will try and keep

13   it brief.

14          I think Your Honor understands well that we're not

15   objecting to allowance of the claim at this point through the

16   plan.  We are seeking to subordinate the claim.  Bankruptcy

17   Rule 7001(h) clearly allows us to do so pursuant to the plan.

18          Simply, if we get subordination of the claim, as

19   Your Honor pointed out, we don't intend to object to

20   allowance. It would be a waste of estate dollars.  And, you

21   know, any concerns about us, you know, not wanting to use

22   confirmation or not giving them their day in court is sort of

23   belied by the fact that, you know, we filed this brief in

24   support of subordination, frankly, earlier then we may have

25   otherwise had to under the solicitation procedures orders.

1    In all, Your Honor, I'm just struggling to see how

2    they square their position about a claim objection in light

3    of the plain language of Rule 7001(h).

4        THE COURT:  I have no further questions.

5        MR. ALFANO:  Okay, great.  Thank you, Your Honor.

6        With that, I will move on to the individual

7    shareholder objections.  The debtors received several formal

8    and informal objections from Class 5 holders of equity

9    interests under the plan.  Those include the objections by

10   Lisa Scudder and Lukasz Niparko who filed their objections to

11   the plan.  And some portions of those objections actually are

12   more so disclosure objections to the disclosure statement.

13   The formal objections were filed at Docket Numbers 904 and

14   922 on August 19th and August 23rd respectively.  The

15   informal objections we have listed -- they're not on the

16   docket but we have listed them on the agenda and they're at

17   romanette (iii) through (ix).

18       The individual equity holders share some common

19   themes among them, which we addressed in our reply brief.

20   First, the objections allege the debtors did not provide any

21   detail on the valuation of assets or the methodology.  At the

22   same time, they also allege that the debtors have not

23   performed an independent valuation of assets or that there

24   was no valuation of assets done at all.  The debtors

25   respectfully disagree.

1          I think it would be difficult to find other cases

2   where there were as many market checks on value of the

3   debtors assets as there were in this one.  You know, there

4   were multiple prepetition marketing processes which are

5   detailed on Article 3(b)(2)(a) of the plan including by

6   Citibank, BTIG, and Goldman Sachs.

7          Before the petition date, around the same time

8   that, you know, Pillsbury came onto the scene, there was a

9   marketing process conducted by Houlihan Lokey to sell the

10  business as a going concern and then there were subsequent

11  marketing processes by Hilco, STX Commodities, and Gordon

12  Brothers.  All these marketing processes are detailed in

13  Sections 3(b)(2) and 4(e) of the plan.

14         Then attached as Exhibit 2 to the Ryan Rowan

15  declaration filed at Docket 958 shows the methodology and the

16  assumptions used in the liquidation analysis and,

17  essentially, the waterfall and distribution of estate

18  proceeds which we believe show conclusively that holders of

19  equity interest are not entitled to any distribution  under

20  the plan.

21         Next, the holders of equity interest allege that

22  the debtors have failed to perform a meaningful

23  investigation.  Unfortunately, this company has been under

24  some form of investigation in one way or another since the

25  fall of 2020, essentially.  There were multiple

1   investigations conducted by governmental authorities

2   internally by the company prepetition, which Mr. Worthen

3   spoke to earlier.  And then most recently, post-petition, by

4   the UCC who takes their fiduciary role very seriously. The

5   UCC ultimately agreed to support the derivative settlement

6   and then narrow releases and exculpations in the plan for

7   officers and directors and, therefore, we believe that more

8   than adequate investigation has been performed.

9        Next, the holders of equity interest lack -- argue

10  a lack of meaningful participation in the bankruptcy process.

11  The Young declaration, at Docket Number 952, shows that all

12  holders were provided with notice of interim approval of the

13  disclosure statement and of the plan confirmation hearing.

14  The debtors took in all the informal and the formal

15  objections that were filed irrespective of when and we are

16  now addressing them here before Your Honor.

17       Bankruptcy Code Section 1126(g) we believe shows

18  clearly, and that is consistent with Your Honor's ruling on

19  the solicitation procedures order, that Class 5 equity

20  holders, because they're not entitled to anything under the

21  plan, they are deemed to reject and simply not entitled to

22  vote.  So, we think that, you know, under these circumstances

23  holders of equity interest have had all the meaningful

24  participation that they are entitled to in these cases.

25       Just the last point that I will address is that

1  Class 5 equity holders argue unfair treatment and, you know,

2  unfortunate -- and while I do sympathize with them,

3  unfortunately, under the absolute priority rule under

4  Section 1129(b)(2)(b)(ii) senior classes must be paid in full

5  before junior classes can receive any distributions under a

6  Chapter 11 plan.  The liquidation analysis and the market

7  tests that we have conducted over the course of these cases

8  prove conclusively that they simply are not entitled to any

9  distribution on account of their equity interests.

10         With that, Your Honor, I would ask that you

11 overrule the Class 5 equity holder objections.  I did just

12 want to note that at some point I saw one of the informal

13 objectors pop-up on Zoom and I will leave it at that.

14         THE COURT:  Okay.  Let me start by asking if the

15 objectors who filed formal objections would like to be heard.

16         So, I first would invite Ms. Scudder, if she's on

17 the line, to offer her comments.

18     (No verbal response)

19         THE COURT:  Ms. Scudder, are you there?

20     (No verbal response)

21         THE COURT:  Okay.  I hear no response.

22         Then, Mr. Niparko, are you on the line, sir?

23     (No verbal response)

24         THE COURT:  Okay.  Again, for the record I have

25 paused, waited for a response, and I have heard no response

1   from either Ms. Scudder or Mr. Niparko.

2           Are there any others on the line who are equity

3   holders who wish to be heard?

4       (No verbal response)

5           THE COURT:  Okay.  The record should show that I

6   paused about 10 seconds and have heard no response.

7           MR. ALFANO:  Thank you, Your Honor.

8           THE COURT:  Mr. Morse.

9           MR. MORSE:  Your Honor, I believe that leaves the

10  Milton equitable subordination objection which I think we

11  talked earlier we would maybe take a break and then come

12  back.  Given that it is Friday afternoon, still with great

13  weather outside, I would propose that we take a very

14  accelerated break and conclude today's proceedings as quickly

15  as -- as promptly as possible.

16          THE COURT:  Yeah, I --

17          MR. MORSE:  Also, not to put your staff at any

18  inconvenience as well.

19          THE COURT:  -- like to come back on the record

20  at 1:15.  You know, I think we should think conceptually

21  about what it is that is before us with regard to equitable

22  subordination and give everybody a chance to refine their

23  presentations for the afternoon.

24          I think I hinted at some of it.  It seems that the

25  analysis for me is that, again, I have President Trump's

1  pardon, I have the conviction, and I have the arbitral award

2  that was confirmed by the District Court in Arizona and those

3  are, sort of, the issues that have been put at play in

4  addition to remarks that President Trump has represented in

5  the papers to have made following the granting of the pardon.

6           As I've indicated earlier, it seems to me that

7  there is an issue -- well, there is a matter of issue

8  preclusion and that I have the fact of the conviction. I have

9  the fact of the arbitral award.  I can't revisit any of the

10  findings made there.  So, we have had argument about the

11  effect of the pardon.

12          I will offer an opportunity for parties to address

13  this issue following lunch but given -- well, let me start

14  with this, is there any question that the pardon that was

15  attached as an objection to Mr. Milton's objection is the

16  pardon that President Trump granted?

17          MR. MORSE:  We don't believe so, Your Honor.  We

18  have indicated it's not an innocence pardon. It's the normal

19  regular pardon that --

20          THE COURT:  My question is, there is no dispute

21  about -- there is not going to be any objection to its

22  authenticity or anything like that?

23          MR. MORSE:  None from the debtors, Your Honor.

24          THE COURT:  Okay.  So, again, have an opportunity

25  to address this point. I want to offer you the chance to

1  think about it.

2           The -- you know, my presumption, of course, is

3  that like any president, President Trump speaks with

4  absolutely clarity when he issues a pardon.  The pardon says

5  what it says.  Any comments that he may have made outside of

6  the pardon would strike me as likely being inadmissible as

7  extrinsic evidence to interpret what I think is a fairly, you

8  know, straightforward and robust statement about the nature

9  of the pardon.

10          So, I am not making any decisions about

11  admissibility of evidence but I do want to offer you the

12  opportunity to consider that as you prepare for the

13  afternoon.  So, I think that the way I am, at least,

14  conceptualizing it, and I have just spent a great deal of

15  time thinking about this, that the analysis requires looking

16  at the findings of the courts and the arbitration panel that

17  was affirmed by a court, what is the effect of those, whether

18  issue preclusion applies and assuming, for the sake of

19  argument, that the pardon would carry with it a determination

20  of innocence; whether that is supportable under applicable

21  law and whether, in fact, that occurred.

22          So, I think it could -- I think with those

23  comments, which I hope are helpful, I think it can inform the

24  evidentiary presentation for the afternoon.  But it strikes

25  me as, you know, if I make a determination that equitable

1  subordination is appropriate then I don't need to get to the

2  alternative relief that was requested that was disallowing

3  the claim. If, on the other hand, I determine that equitable

4  subordination is not warranted then there is a claim

5  objection and there is an issue that we have to determine

6  there.

7         So, it may be that we deal with equitable

8  subordination first and after I have had an opportunity to

9  consider everything before me, if we need to get to the claim

10  allowance thing that we can deal with that.  So, I think a

11  step-by-step approach might be more efficient for everybody.

12         MR. MORSE:  I agree, Your Honor.  We would be

13  happy to proceed in that manner.

14         THE COURT:  Okay.  Since I'm talking about

15  Mr. Milton's issues let me just hear from Mr. Cousins or

16  Mr. Brennecke if that conceptual approach to how to deal with

17  the afternoon's proceedings makes sense to you.

18         MR. COUSINS:  Good afternoon, Your Honor.

19         THE COURT:  Good afternoon.

20         MR. COUSINS:  Scott Cousins on behalf of Trevor

21  Milton.

22         Mr. Morse and I did have a discussion about this.

23  It's not really bifurcated. It's the gating issue.

24         THE COURT:  Yeah, it's a gating issue.

25         MR. COUSINS:  Then bifurcation whether it goes

1   back to the second arbitration panel or the court determines

2   indemnification rights and reasonableness of fees.  So, I

3   agree with the approach. I hear you loud and clear on both

4   the criminal versus the civil.  As the Court knows and

5   everybody knows, pardon doesn't get you out of civil

6   liability.  It's just related to the conviction and we will

7   be prepared to address that.

8           THE COURT:  Okay.

9           MR. COUSINS:  And I am going to defer to the

10  Court, Mr. Milton would not need to testify on the gating --

11  if the Court determines the gating issue then we wouldn't

12  need testimony about the claim because you would have

13  subordinated it.  I guess to create the record, I think I

14  have to put Mr. Milton on to talk about that and then whether

15  the Court gives that any weight and bifurcates or whether the

16  Court knocks it out under 510(c) would come into play.

17          THE COURT:  Well, I think what might be most

18  efficient would be for us to view them as, sort of, two

19  separate proceedings because if the equitable subordination

20  issue turns out to be dispositive then there would be no need

21  for Mr. Milton's testimony on the allowance and

22  reasonableness of the fee issue.

23          So, I tend to think that efficiency would ask us

24  to actually bifurcate those proceedings and all this

25  afternoon, but that is where I am going with that.

1          MR. MORSE:   The debtors are happy to proceed in

2 that fashion, Your Honor.  That makes a lot of sense to us.

3          THE COURT:  Does that make -- does that prejudice

4 in any way your ability to argue the equitable subordination?

5 I take it not because I think you have acknowledged that is

6 not an issue that requires testimony.

7          MR. COUSINS:  That is correct, Your Honor.  I

8 think that does make sense and Mr. Morse and I, just

9 yesterday, talked about, you know, is there a way to make it

10 more efficient for the Court and others.

11          THE COURT:  Well, as Mr. Morse pointed out, it's a

12 Friday, the weather is beautiful.  No, but the important

13 thing is that it matters a great deal to me that Mr. Milton

14 has the opportunity to make all his arguments.

15          MR. COUSINS:  My client came in from a very long

16 way, so I want to make sure that if the Court says, yeah, I

17 want to hear that, that he has an opportunity to testify.

18          THE COURT:  Oh, he will.  Yeah, absolutely.

19          MR. COUSINS:  Okay.

20          THE COURT:  I appreciate him coming.  That is why

21 we're here today.

22          MR. COUSINS:  Thank you, Your Honor, as always.

23          THE COURT:  Thank you.

24          Okay.  So, we will come back at 1:15.  We're in

25 recess.

1    (Recess taken at 12:15 p.m.)

2    (Proceedings resumed at 1:16 p.m.)

3        THE COURT OFFICER:  All rise.

4        THE COURT:  Please be seated.

5        Okay, Mr. Morse.

6        MR. BADDLEY:  Good afternoon, Your Honor.  David

7  Baddley.

8        We don't want to interrupt the proceedings later.

9  I think Ms. Scheuer and I may need to depart in about an

10  hour.  I have run it by Mr. Morse. I don't think he has any

11  reason why we need to stay. I just wanted to make sure Your

12  Honor would be okay if we were to excuse ourselves.

13        THE COURT:  Certainly.  Thank you for coming up

14  today.

15        MR. BADDLEY:  Thank you.

16        MR. MORSE:  Your Honor, Joshua Morse for the

17  debtors.

18        I think based on our pre-break order of operations

19  we're going to do the Milton equitable subordination

20  objection and then see where that takes us.  Then if we need

21  to do the claim disallowance, we would do that secondarily

22  but we would focus now on the equitable subordination.

23        THE COURT:  Okay.

24        MR. MORSE:  So that brings us to the equitable

25  subordination objection which appears at Docket Number 911,

1  which takes issue with the debtors proposed classification

2  and treatment of the Milton claim into Class Number 8.  As

3  detailed in our Milton claim memo, which appears at Docket

4  Number 808, which was filed back on July 29th, debtors seek

5  to equitably subordinate the Proof of Claim Number 54, which

6  appears as Exhibit Number 38.  For the record, it has not

7  been admitted.  It's just here today.  Or, in the

8  alternative, to disallow the Milton claim in its entirety but

9  we hope not to need to eve get to that.

10         Class 8 of the plan consists of equitably

11  subordinated claims. The only one that is at issue is Mr.

12  Milton's claim. The Milton claim is classified under the plan

13  as Class 8 pursuant to Section 510(c) of the Bankruptcy Code

14  and the principles of equitable subordination.

15         There is three elements directionally to a request

16  for equitable subordination.  Number one, there has to be

17  inequitable conduct.  Number two, there has to be injury to

18  the debtor or its creditors.  Number three, equitably

19  subordinating a claim can't be inconsistent with the

20  bankruptcy code as set forth in our confirmation -- our brief

21  in support of confirmation.  We believe all three of those

22  elements are more than satisfied here.

23         Turning to the first element, which is the

24  inequitable conduct, as the Court is well aware Milton was an

25  insider of the debtors.  He served as the debtors' CEO and

1   executive chairman until September of 2020, and he dominated

2   the debtors' communications with the public.  There's

3   evidence of that in Exhibit Number 13, which is the

4   indictment at page 12.

5          Milton, quote:  "I wanted to be in control, I

6   wanted to be in communication with the public about what we

7   are."

8          As an insider, Milton's conduct demands closer

9   scrutiny under the case law, and Milton must rebut the

10  debtors' material evidence of unfair conduct by proving the

11  fairness of his transactions with the debtor.  That's from

12  the Mid-American Waste Systems case, which we're going to be

13  referring to a lot during my argument today, that's at 284

14  B.R. 53, page 69 (Bankr. D. Del. 2002).

15         Milton used his insider power to control the

16  debtors and ultimately breached his fiduciary duties of

17  loyalty and good faith to Nikola, and was ultimately

18  convicted of securities and wire fraud.  But as we've talked

19  about earlier, we're not here to rehash or retry or do any of

20  that with respect to that conduct because you have more than

21  enough evidence in front of you about that, and let's just go

22  through just very briefly what that evidence is.

23         The contours of that behavior have been litigated

24  ad nauseam by both the Milton Award Arbitration Panel and

25  S.D.N.Y.  The parties to the breach of duty arbitration

1  proceeding conducted months of extensive discovery before

2  holding the eight-day hearing before the three-member

3  arbitration panel that resulted in the Milton award.  The

4  Milton award conclusively found, as you've seen, that, quote,

5  "Milton violated his fiduciary duties of loyalty and good

6  faith to Nikola through a pattern of false and misleading

7  public statements about Nikola's products and the state of

8  their development, and by subordinating the company's

9  interests to his own by refusing to all efforts to review and

10  approve his public statements in advance."

11          That's at Exhibit 25 of the redacted Milton award

12  at page 53.

13          The Milton arbitration panel also held, quote, "We

14  could not conclude Milton acted in good faith and in a manner

15  that Milton reasonably believed to be in or not opposed to

16  the best interests of Nikola.  Accordingly, there's no basis

17  for Milton to receive indemnification."

18          That's Exhibit 25, the redacted Milton award,

19  at 59, under this indemnification agreement.  That forms the

20  basis for his claim Number 54.  And Milton is precluded, as

21  we've talked about, from re-litigating the Milton award

22  before this Court.

23          The fact that the Milton award is on appeal in the

24  Ninth Circuit, which is something that I would have expected

25  them to argue, but they didn't, is of no consequence, and I

1   just want to give you comfort of that.  The pendency of an

2   appeal does not mitigate the preclusive effect of an

3   otherwise valid judgment.  And this is from the U.S. v. 5

4   Unlabeled Boxes case, 572 F.3d 169 at page 175 (3d Cir.

5   2009).

6           And then upon confirmation of the Milton award by

7   the District Court in Arizona, the Milton award became

8   final -- a valid and final judgment entitled to the same

9   force and effect as a judgment in any other action.  That's

10  from the Teamsters Local 177 v. UPS case, found at 966 F.3d

11  245 at page 251 (3d Cir. 2020).

12          Milton's revisionist history with respect to this

13  Milton pardon also lacks merit.  In the first instance, this

14  statement by President Trump is admissible hearsay, not only

15  under Federal Rule of Evidence 801(c), but under cases that

16  include U.S. v. Sallins that we cited, 993 F.2d 344 at

17  page 346 (3d Cir. 1993).

18           There's also, as we indicated in our papers, no

19  indication that Milton received a, quote-unquote, "innocence-

20  based pardon."  We explained that in our memo at pages 53

21  and 54.

22          Now, a pardon for actual innocence must state on

23  its face that it was based on actual innocence.  As indicated

24  in the -- I'm going to mess up the pronunciation -- Boultbee

25  v. U.S., 2024 WL 3220261 *8, that's a Federal CL June 27th,

1  2024 case.

2          Like the Benton pardon that we cited in our

3  papers, Milton's pardon is silent on its face as to Milton's

4  innocence or rehabilitation, rendering their arguments, which

5  Mr. Cousins appeared to move away from right before we left

6  for lunch, totally moot.  We attached a copy of that Benton

7  pardon -- or, excuse me, it's admitted as Exhibit Number 34,

8  so you can compare that pardon with Mr. Milton's pardon and

9  see their exactly the same.  And that case is U.S. v. Benton,

10  98 F.4th 1119 (D.C. Cir. 2024).

11          With that, we believe that the inequitable conduct

12  element has been established.

13          Element two is injury to the debtor or its

14  creditors.  We've submitted a mountain of evidence on the

15  injury, and also had Mr. Worthen supplement that evidence

16  this morning during his supplemental testimony.  Milton's

17  inequitable conduct directly injured not only Nikola, but

18  it's creditors as well.  Following the issuance of the

19  Hindenburg report, which publicized multiple false and

20  misleading statements made by Milton, Nikola's stock price

21  dropped approximately 43 percent, resulting in substantial

22  losses to not only Nikola's investors, but substantial harm

23  to the debtors as well.  That's found at Exhibit Number 13,

24  which is the indictment, at page 43.

25          Thousands of retail investors targeted by Milton's

1  inequitable conduct suffered substantial losses, in some

2  cases totaling tens of hundreds of thousands of dollars,

3  compromising their financial security and retirement savings.

4  Same exhibit at the same page, 43.

5         Milton's false and misleading statements caused an

6  onslaught of litigation against the debtors.  We heard about

7  that this morning, not the only the SEC investigation that

8  resulted in the $125 million civil penalty, of which

9  approximately 45 million was paid as of the petition date,

10  but there's another four million that's going to be paid to

11  the SEC under our plan.

12         Nikola incurred substantial additional legal fees

13  defending against the SEC investigation and various class

14  actions stemming from Milton's conduct related to

15  Mr. Milton's conduct.  As Mr. Worthen testified this morning,

16  those costs -- certainly of those costs were quantified in

17  the arbitration in the amount of about $46 million, but those

18  also did not include the $11 million that were paid to

19  Kasowitz to conduct the arbitration.

20         Mr. Worthen also testified this morning about

21  increased cost of capital, increased cost of D&O insurance,

22  loss of customer opportunities, including General Motors and

23  others, as well as lost relationships, some with investment

24  banks, Morgan Stanley, and things like that.

25         The debtors were ultimately unable to ever recover

 1  from the reputational damage, civil penalties, and massing

 2  legal fees caused by Milton's misconduct, which is a

 3  substantial factor for why we stand here before Your Honor

 4  today.

 5          Under the Mid-American case that I mentioned in

 6  the beginning of my presentation, Milton's burden is to rebut

 7  all of this harm that we have brought before Your Honor, and

 8  that's found at 284 B.R. pages 76 and 77.  There's no

 9  evidence that's been submitted to rebut any of that harm.  As

10  a result, we believe element number two has also been

11  established.

12          Element number three is that the equitable

13  subordination that the debtors have requested is consistent

14  with the goal of the Bankruptcy Code.  We believe that

15  Milton's conduct here skewed the prospect for distributions

16  in this case on an equitable basis and subordination of his

17  claim corrects this.  What do I mean by this?  So, if the

18  Court does not subordinate or disallow his claim, he's

19  presumably going to be permitted to share pro rata in Class 3

20  with the other general unsecured creditors.

21          Part of the trust assets that are going to be used

22  to satisfy general unsecured claims are going to be

23  collections from the Milton arbitration award, which is

24  currently 96.8 million, plus we're going to lop on interest,

25  plus the $4 million that's going to be paid to the SEC.  This

1  would obviously include proceeds under the arbitration award

2  from 97 percent -- or his 97 percent share or fault from the

3  SEC fine, among other things.  He should not be able to share

4  ratably with other general unsecured creditors on account of

5  claims held by debtors against him because of his wrongful

6  conduct.

7          All other arguments and issues aside, that would

8  in and of itself be an inequitable result here and,

9  accordingly, subordinating his claim is not inconsistent with

10 the Bankruptcy Code, it essentially rights the wrong, and we

11 submit that subordinating his claim on an equitable basis

12 under 510(c), as we've requested under the plan, is more than

13 appropriate.

14         I'll reserve for any comments.

15         THE COURT:  Okay.  Let me hear from Mr. Milton's

16 team, please.  Mr. Cousins.

17         MR. COUSINS:  Good afternoon, Your Honor --

18         THE COURT:  Good afternoon.

19         MR. COUSINS:  -- Scott Cousins on behalf of Trevor

20 Milton.

21         We agree with Mr. Morse, Mr. Milton needs an

22 opportunity to rebut and he's here to testify.  What we're

23 seeing, Your Honor, is, loosely nomenclature, a double

24 penalty, the 97 percent and the three percent that we've been

25 talking about, but then an effort to wipe out, subordinate,

1  whatever the term is, his claims.  Now, that wouldn't be an

2  unsecured claim because the classical netting-setoff-

3  recoupment scenario, when A owes B and B owes A, that's

4  netted, and he needs an opportunity to rebut the claims of

5  inequitable conduct and ultimately prove up his claim;

6  otherwise, he's suffering effectively a double penalty,

7  the 90 percent -- 97 percent and the vacation, for lack of a

8  better verb, of his potential counterclaims.

9        We're prepared to put him on the stand, we're

10 prepared to talk about it, but we do need an opportunity.  We

11 request the Court, an opportunity before the Court just

12 subordinates without the bifurcated process that we were

13 talking about.

14        THE COURT:  Let me ask you this.  What type of

15 evidence could I consider by way of rebuttal when, you know,

16 as I signaled earlier, I believe that just on the grounds of

17 issue preclusion there are facts that have been established

18 judicially that are binding upon this Court.  So, how could

19 we possibly rebut any of that when, you know, if you look at

20 the arbitration ruling -- you know, I read it and dozens of

21 pages of findings regarding the conduct that the tribunal

22 found to give rise to liability and the effects of that

23 conduct, so I think that's all been established in such a way

24 that there's just -- there's no further evidence on that I

25 can consider because it's already been done.

1        MR. COUSINS:  Well, what I'm talking about is his

2  ability, whether -- and we cited some cases on this front --

3  to assert a recoupment netting setoff, a claim that if the

4  Court equitably subordinates his claim that setoff, that

5  recoupment is gone, it's vacated, and he has no ability to

6  mitigate his 97-percent responsibility and it's effectively

7  akin to a default.  We certainly believe that under

8  principles of equitable subordination the Court needs to look

9  at all factors, including his potential claims, which he's

10 prepared to talk about and testify about, and address -- I do

11 want to address the testimony that Mr. Worthen went into that

12 asked the Court to take a look at the unsealed -- or, I'm

13 sorry, the sealed version of --

14       THE COURT:  Yes.

15       MR. COUSINS:  -- the exhibit that we walked

16 through, pages 79 to 81, where we have an instance where the

17 debtors are asserting that he has no right to indemnification

18 and he has no right to advancement of fees, but that's not

19 what -- I want to be careful -- that's not what the -- that's

20 not what the sealed version of that says.  And there's a

21 separate arbitration panel, and I highlighted it this morning

22 before lunch, that is prepared to address that, the

23 reasonableness and the fees, the rights to advancement, the

24 right to indemnification, or this Court could do it in a, I

25 don't know, a mini-trial, an estimation proceeding, and

1    determine whether the fees that Mr. Worthen testified he

2    reviewed and objected to, the Cahill Gordon fees, are

3    reasonable.

4         And that's all I'm asking for is the Court address

5    the bifurcation issue, don't subordinate now, let us address

6    the counterclaim, the recoupment, et cetera.  And in

7    particular I think when you look at the solicitation, for

8    example, that's the plan -- the liquidating plan talks about

9    Milton's breach of fiduciary duties eliminated his

10   entitlement to indemnification.  Well, that's not true, Your

11   Honor, they solicited based on that.  And when the Court

12   looks at the sealed version of the award you'll see they

13   didn't even agree to that, certainly the panel didn't.

14        And, again, this is a threshold matter, he's not

15   entitled to indemnification.  His boldfaced attempt to

16   further delay the administration, it's all over their

17   pleadings, in particular the plan, the confirmation brief.

18   And the committee even goes and adopts that and says he was

19   not entitled to indemnification for the failure to act in

20   good faith in a matter.  Now, that's citing one of the two

21   arbitration provisions -- decisions, which is up on appeal in

22   the Ninth Circuit, but it's ignoring the second one.  And the

23   Court will recall we were here before the Court seeking

24   relief from the automatic stay in order to go back to what

25   we're calling is the second arbitration, but Mr. Milton

 1  commenced it first, and I would just encourage the Court to

 2  see that that this is so one-sided it amounts to a double

 3  penalty.  He doesn't get to liquidate his claims and set off

 4  those claims against the 97 percent that we've been talking

 5  about.

 6          With respect to the pardon, yes, he was indicted,

 7  yes, he was convicted, yes, he was sentenced to four years,

 8  but yes, he was pardoned, but this isn't the general pardon.

 9  Now, for example, the Carter administration in the -- I'll

10  find it in a second case -- in the Noonan --

11          THE COURT:  The Noonan case?

12          MR. COUSINS:  Yeah, and that was just a general

13  draft dogma, I didn't mean the pejorative, but it was

14  essentially a pardon, a general pardon that wasn't specific,

15  and there wasn't a specific finding of innocence.  Take it

16  what it's worth, but, you know, President Trump did say that

17  Mr. Milton did nothing wrong.  It's a specific pardon and I'm

18  willing to stipulate, Your Honor, that for purposes of the

19  criminal piece and with respect to the pardon, and it's

20  Hornbooks law, that it doesn't address state law claims, it

21  only addresses the federal law claims, and he specifically

22  found that Milton was found innocent.

23          THE COURT:  Well, I mean, but he didn't -- I read

24  the pardon, he didn't say that.  We know of instances where

25  the President has purported to grant a pardon based upon his

1  belief that the person convicted was innocent.  So we know

2  that a President knows how to say that in a pardon and, you

3  know, President Trump, he just didn't say it.  It's been

4  represented to me -- and I believe you, I read the passage in

5  your objection where he said he did nothing wrong, but aren't

6  I in the first instance required to look at the pardon and

7  determine if it's clear on its face.  And only if I can't

8  decipher it, at that point might I look to extrinsic evidence

9  to interpret it, but I do believe that our President speaks

10  with great clarity and did so in this instance when he

11  granted the pardon.  You know, I don't know why I would look

12  beyond his own words in that pardon to try to interpret its

13  meaning.

14          MR. COUSINS:  Well, I will suggest politely, Your

15  Honor, this to my knowledge is an issue of first impression

16  where a Bankruptcy Court is asked to weigh the impact of a

17  pardon in connection with 510(c) --

18          THE COURT:  I believe it is, I believe it is.

19          MR. COUSINS:  -- and not to suggest that -- well,

20  I understand the Court, but I also understand that you don't

21  have to address a criminal piece when if you look at the

22  civil piece that gets back to the double penalties, if it

23  were, is that he has to have a right to assert his claims to

24  mitigate the 97 percent that we've been talking about.

25          I do -- the Supreme Court cases, there's some very

1  old cases.  The Garland case, for example, talks about blot

2  out the existence of guilt.  I think it's far simpler for the

3  Court to look just at the civil piece as opposed to the

4  criminal piece, and I look for guidance from Bankruptcy

5  Courts, it's not there.  I understand the Court's point

6  about -- it's not parol evidence, but secondary evidence to

7  indicate what President Trump meant in connection with the

8  pardon, but we certainly believe that you don't have to get

9  there; you can just look at the civil piece.

10          With respect to the civil piece, this is a court

11 of equity and under 510(c) the Court is required to weigh the

12 principles of equity.  And we believe that Mr. Milton, and

13 Mr. Morse agrees, that we must be able to rebut the claims of

14 inequitable conduct, the injury to creditors, and not being

15 inconsistent with provisions of the Bankruptcy Code.

16          THE COURT:  But wasn't the opportunity to do that

17 at the arbitration?

18          MR. COUSINS:  Well --

19          THE COURT:  And then in the subsequent proceedings

20 in the District Court in Arizona, and then ultimately in the

21 appeal?  Like what --

22          MR. COUSINS:  Other than --

23          THE COURT:  -- this isn't the place to determine

24 the extent of his liability or to the extent to which it

25 might have been mitigated by activities that would be imputed

1  to the company because it's already been done.

2          MR. COUSINS:  Other than there's a proof of claim

3  that is in this court that the Court is seeking -- is being

4  asked to subordinate, and I think that that's an independent

5  basis, I understand.

6          And, again, I'm not asking this Court to

7  revisit  -- I'm not sure if it's full faith and credit or

8  *res* --

9          THE COURT:  No, I think it's issue preclusion --

10         MR. COUSINS:  Yeah --

11         THE COURT:  -- is what it is --

12         MR. COUSINS:  -- issue preclusion or whatever --

13         THE COURT:  -- you know, collateral estoppel.

14         MR. COUSINS:  Yeah, why would this Court second

15  guess a finding by a tribunal --

16         THE COURT:  Well, it's not why would I, it's I

17  can't.

18         MR. COUSINS:  Okay, fair enough.

19         THE COURT:  I literally don't have that authority,

20  there's nothing I can do with that.  I mean, that's the

21  concern that I want to tease out and get an opportunity to

22  hear about because I don't think that I quite literally have

23  that authority.

24         MR. COUSINS:  Fair enough, but Mr. Milton is here,

25  he's entitled to rebut.  What we would ask is that he be

1   allowed to take the stand and talk about his conduct, the

2   company's conduct, and the $69 million in attorneys' fees.

3            For example --

4            THE COURT:  Well, the $69 million in attorneys'

5   fees only becomes relevant if we make it past the 510(c)

6   issue, right?

7            MR. COUSINS:  Exactly --

8            THE COURT:  That's how we agreed we go forward.

9            MR. COUSINS:  -- the gating -- and we've been

10  calling it -- I agree with that, Your Honor.

11           I will note that Mr. Milton did not get a chance

12  in the arbitration to testify because he was invoking his

13  Fifth Amendment privilege --

14           THE COURT:  Well, it's not that he didn't have a

15  chance; he made probably the right decision, but it was a

16  decision that he was able to make for himself.

17           MR. COUSINS:  Your Honor, you and I are in

18  agreement.  I might be using the wrong words, but, yes,

19  that's right, he invoked that privilege.  Yes, he could have

20  testified, he could have potentially risked that exposure.

21  He doesn't have that exposure as a result of the pardon, and

22  I believe it's important for the Court to weigh both the

23  conduct that he's been accused of --

24           THE COURT:  That he's been found liable for.

25           MR. COUSINS:  Well --

1          THE COURT:  It's different, it's different.

2          MR. COUSINS:  -- not in the SEC, for example, the

3   SEC hasn't made a finding, but --

4          THE COURT:  Well, the arbitration --

5          MR. COUSINS:  The arbitration.

6          THE COURT:  -- and in the criminal case.

7          MR. COUSINS:  And an opportunity to either prove

8   up his claims, right to indemnification, advancement, and

9   reimbursement, either here or before the second arbitration

10  panel.  And, Your Honor, I'm trying to stay away from that

11  because you already denied that and I'm not trying to re-

12  litigate that, but I just -- at some point that needs to be

13  litigated and what I would suggest, respectfully, is save the

14  subordination piece, go to the bifurcation piece, address

15  that claim -- it's a secured claim, it's not a Class 3

16  claim -- and see if he can net off -- net, setoff, et cetera,

17  his claims, and he's certainly here to testify if the Court

18  would be willing to hear from him.

19         THE COURT:  Well, to return to that issue about

20  setoff and recoupment because I thought that was an

21  interesting issue.  You cite one case, you cite the Kaiser

22  case, which is a Judge Walrath case, and that in turn cited a

23  Third Circuit case, I think Lee v. Schweiker --

24         MR. COUSINS:  Yeah.

25         THE COURT:  -- I did read those cases and in

1    neither of those cases was subordination of a claim at issue.

2           MR. COUSINS:  Right.

3           THE COURT:  Look, I know you work well, if you had

4    found that case that addressed it in the context of equitable

5    subordination, you would have cited it, but in reading the

6    two opinions, Judge Walrath's opinion and the Third Circuit

7    opinion, I struggle to sync it up with the considerations

8    when determining whether equitable subordination is warranted

9    under 510(c).  So maybe you could address that more directly.

10          MR. COUSINS:  That's fair.  So, the way I've been

11   thinking about it -- and we did not cite this case, it's

12   Jersey Medical, a Third Circuit decision -- is what it talks

13   about is a recoupment is a common law right, it's not in 553,

14   whatever the setoff provision, it's not a backdoor way of

15   calculating a secured claim because -- but it's a common law

16   right.  So, he has a right to prove up that claim and, if

17   that right mitigates the 97 -- loosely saying, the 97

18   percent, he should have an opportunity to do that, and that's

19   just consistent with due process.

20          So, Jersey Medical, as I recall, had to do with

21   Medicare recoupments, but it talks about the common law right

22   of recoupment that's not statutory.

23          THE COURT:  Yes.

24          MR. COUSINS:  And so -- and that's the way I've

25   always looked at it and, Your Honor, we did not cite that,

1 but it's just the way I viewed it now that this has

2 developed.  We are not trying to re-litigate the arbitration.

3 I understand very clear we have an appellate right, the Court

4 has respectfully -- or, as the Court points, not allowed to

5 collaterally attack that or address it, but what I'm talking

6 about as the bifurcation process is that it would be

7 inequitable, it would be a double penalty if the Court today

8 equitably subordinated his claim and didn't give him the

9 opportunity to prove up the other pieces of his claim.

10         THE COURT:  Okay, I understand the argument,

11 Mr. Cousins.

12         MR. COUSINS:  Thank you, Your Honor.

13         THE COURT:  Okay.  Mr. Morse, do you have any

14 response?

15         MR. MORSE:  Just a few pieces to make you a little

16 more comfortable with some things that Mr. Cousins said

17 perhaps.  One thing, he did indicate incorrectly that we

18 solicited on the basis of Mr. Milton's claim being fully

19 subordinated, that's incorrect.

20         If you look at one of my favorite documents in

21 this case, as Mr. Cousins knows, is our liquidation analysis,

22 which he did not read.

23         THE COURT:  Yeah.  No, I did review the

24 liquidation analysis --

25         MR. MORSE:  Yes, so --

1         THE COURT:  -- and I understand the point.

2         MR. MORSE:  No, but Exhibit B to Docket

3  Number 774, that's the solicitation version.

4         THE COURT:  Okay.

5         MR. MORSE:  And if you look at page 113 of 115,

6  these are the global notes.  These talk about, you know,

7  various -- the notes to the liquidation analysis.  So, in

8  note 14 at the bottom of that page, it talks about the

9  estimated general unsecured claims.  "The Lowe" -- and I'm

10  quoting here -- "The Lowe case assumes a scenario where Claim

11  Number 54 filed by Trevor Milton is equitably subordinated

12  and/or disallowed in full.  The Hyde (ph) case scenario

13  assumes a scenario where Claim Number 54 filed Trevor Milton

14  is allowed as a general unsecured claim in the amount of

15  $32.91 million, which represents the difference between the

16  filed claim amount," which is the 69.8 million that we've

17  been talking about, "and the aggregate amount of

18  indemnity" -- going to the next page -- "expenses Nikola has

19  already advanced and paid to Trevor Milton," the 36.844

20  million, "pursuant to orders entered in the Milton fee

21  arbitration and otherwise."

22         This ties back to in the Milton claim memo, this

23  is the paragraph that Mr. Cousins' partner inadvertently

24  started talking about with Mr. Worthen on the stand that

25  confirmed that we've already advanced a substantial portion

1   of this $69.8 million, number one, and that we believe the

2   fee arbitration panel has already found that another large

3   portion, the 17.2 of Cahill's fees, has already been found to

4   be unreasonable.  I believe this is why that they haven't

5   responded to my request for confirmation of how much is still

6   outstanding because 69.8 million isn't outstanding, it's more

7   like 14 or 15, or something like that, because we've already

8   paid 36.  The arbitration panel, the fee arbitration panel

9   has already found 17 to be unreasonable, and these other 18

10  or 19 firms, if you look at the indemnification award and his

11  indemnification agreement, which is my next point, are

12  probably not going to be able to fall within the appropriate

13  indemnifiable expenses under that agreement.

14           Now, going back to this whole point of under the

15  indemnification agreement, indemnification award, and trying

16  to trap Mr. Worthen into saying this, that, and the other,

17  the whole point of that is to -- and I'm going to just

18  clarify this for Your Honor, so when you go back and read

19  this, it's going to be very clear -- on page 59 -- and I'm

20  going to just use page numbers because these are redacted --

21  or some of these are redacted provisions -- so, on page 59,

22  the panel found just directionally that he was not entitled

23  to indemnification because he breached his fiduciary duties.

24  Okay?

25           And this goes back to his indemnification

1  agreement, which is Exhibit A to his proof of claim.  Now,

2  this is not admitted because there was an attempt last night

3  to have us agree to admit this that we thought was perhaps

4  for an improper reason, and so that's why we didn't move

5  to  -- or agree to admit this, and we didn't want to get

6  tricked into anything, but this indemnification agreement is

7  talked about *ad nauseam* in the arbitration award.  And you

8  can read it for yourself, but it's paragraph 2(c) at the top

9  of page 3, and it talks about that, you know, essentially,

10  he's only entitled to indemnification if, indemnity, acted in

11  good faith and in a manner, indemnity, reasonably believed to

12  be in or not opposed to the best interests of the company.

13        Under relevant case law, when you are convicted of

14  fraud and wire -- all the things that we're convicted of,

15  that the pardon does not strip away -- it strips away the

16  penalty associated with that, but it doesn't strip away the

17  underlying conviction -- you are not acting in the best -- in

18  the good faith, which is why the panel found, we believe --

19  or we assert that he's not entitled to indemnification, and

20  you can read for yourself why the panel thought that.

21        This other reference on page 79 is talking about

22  something wholly different all together.  It's talking about

23  the $36.8 million and whether the arbitration panel can award

24  those damages to the company as part of the award.  Those are

25  the monies that we had already advanced to Mr. Milton by the

1   separate fee arbitration panel.  And this arbitration panel,

2   it's more of like a jurisdictional issue, they are saying --

3   again, our interpretation -- that we don't want to mess with

4   that panel.  If you believe that you're entitled to go and do

5   that clawback, then you go to that panel and you go force

6   Mr. Milton to give that money back to you with that panel.

7            That was our interpretation of this.  That's that

8   footnote that they tried, the gotcha footnote that they tried

9   to have Mr. Worthen, you know, admit to earlier, and that's

10  what this whole thing is about.

11           But importantly, if you look at the District Court

12  decision affirming the arbitration panel award, that's

13  Exhibit 50, if you look at page 4, line 18 through 21, and

14  I'll quote, talking about what the panel found, it then

15  settled that there was no basis for Milton to receive

16  indemnification under the indemnification agreement, but that

17  he was entitled to contribution from Nikola based on the

18  contribution provision.  Okay?

19           So he may be entitled to something else, but he is

20  not entitled to this indemnification.  And so if he's seeking

21  indemnification, that's what he's asserting under this claim,

22  we've paid most of it to him, we've asked for the documents.

23  Him getting up on the stand and saying that we've paid it, we

24  this, we that, that is not going to do anything today other

25  than cause more of a circus than we've already had before

1   Your Honor.

2          The other thing --

3          THE COURT:  Well, it's the world's most boring

4   circus.

5          MR. MORSE:  Yeah, it's the world's most boring

6   circus, to be sure, to be sure.

7          THE COURT:  No, it hasn't been a circus.  I

8   thought it's been --

9          MR. MORSE:  No, but also --

10         THE COURT:  -- very good argument.

11         MR. MORSE:  -- but also it's irrelevant.  If you

12  find that the claim is -- the claim, whatever it is, which

13  doesn't matter right now, is equitably subordinated -- it may

14  matter at some point down the road if the claim is one

15  dollar, if it's 69, or if it's the $300 million that they

16  asserted in two pleadings signed by their lawyers in previous

17  cases or in previous situations -- it doesn't matter because

18  that only matters down the road if we somehow collect

19  millions and millions and millions and millions of dollars,

20  or the litigation trustee does.

21         THE COURT:  Yeah.

22         MR. MORSE:  But today, equitable subordination,

23  we've proven it up.  It was their time to come and at least

24  make an attempt to show why it wasn't appropriate, and that

25  process is not to have Mr. Milton get up on the stand and say

1  that I paid those expenses or let me explain why -- who

2  consulting for $983,000.33 is.

3              THE COURT:  Okay.  Mr. Cousins.

4              MR. COUSINS:  Thank you, Your Honor.  Mr. Worthen

5  testified to the payment of Kirkland's fees, Cahill's fees,

6  Kasowitz's fees, we should be entitled to the same testimony.

7  Mr. Morse can cross Mr. Milton as to the basis for the claim

8  and his theories, and this, that, and the other thing, we

9  just request an opportunity for him to testify, not rule on

10 the gating item, the gating issue, the equitable

11 subordination, and then address -- perhaps address that after

12 Mr. Milton's testimony.

13             THE COURT:  Well, the thing about gating issues is

14 that they come first.

15             MR. COUSINS:  I know.

16      (Laughter)

17             MR. MORSE:  I think we already agreed to the

18 rules, didn't we?

19             THE COURT:  Right?  I'm not being smart, I mean --

20             MR. COUSINS:  No, I --

21             THE COURT:  -- that's kind of the definition of

22 it, it has to come first.

23             MR. COUSINS:  And I understand and that's why I'm

24 saying that, absent hearing from Mr. Milton, it's a double

25 penalty.  He has no -- his claim is vacated and we all can

1  agree that equity, a subordinated claim is never going to

2  receive a dime in this case.

3          So to say that, oh, maybe one day under 502(j) I

4  can reconsider and have his claim allowed, equity is not

5  going to -- or a subordinated claim would not get a recovery.

6          THE COURT:  I understand.

7          MR. COUSINS:  Thank you, Your Honor.

8          THE COURT:  Okay.  Thank you, Mr. Cousins.

9          Did anybody else wish to be heard before we

10 conclude?

11         MR. MANNAL:  Your Honor, Doug Mannal of Morrison &

12 Foerster on behalf of the official committee.  Your Honor, we

13 submitted a statement in support of confirmation --

14         THE COURT:  Yes, you did.

15         MR. MANNAL:  -- of the Chapter 11 plan, and it's

16 one of these rare instances where I couldn't agree more with

17 my colleague Mr. Morse.

18     (Laughter)

19         MR. MANNAL:  It doesn't happen that often, but I

20 think he's identified all the key issues, and I think we have

21 a gating item before us before we need to hear any further

22 evidence.

23         THE COURT:  Okay.

24         MR. MANNAL:  Thank you, Your Honor.

25         THE COURT:  Okay.  Thank you.

1      Look, I've given this issue a great deal of

2  consideration and while I found the argument today to be very

3  well presented, it doesn't change the analysis that I arrived

4  at as of this morning.  So I'm just going to give my ruling

5  on the equitable subordination issue.  I am going to overrule

6  the objection.

7      The debtors are seeking to subordinate

8  Mr. Milton's claims under 510(c)(1), and that section allows

9  for subordination of a claim under principles of equitable

10  subordination.  This Court has enumerated a number of times

11  over the principles of equitable subordination, and the

12  proper method for determining whether a claim should be

13  equitably subordinated; In re Mid-American Waste Systems is a

14  significant case on this point.  And in that case this Court

15  explained that the essential purpose of equitable

16  subordination is to undo any inequality in the claim position

17  of a creditor that will produce injustice or unfairness to

18  other creditors in terms of distribution of the estate.

19      And we identified the three-prong test that

20  Mr. Morse pointed to, which are that the claimant must have

21  engaged in some type of inequitable conduct, that the

22  misconduct must have resulted in injury to other creditors or

23  conferred an unfair advantage on the claimant, and that

24  equitable subordination of the claim must not be inconsistent

25  with the Bankruptcy Code.

1          We know that from Mid-American and a number of

2  other opinions, including my own opinion in AmeriFirst

3  Financial, that claims when asserted by an insider or a

4  fiduciary require a higher level of scrutiny.  And when a

5  claimant is an insider there are three categories of

6  misconduct that constitute inequitable conduct, which goes to

7  the first prong of the test, and that those are fraud,

8  illegality, and breach of fiduciary duties under

9  capitalization, or the claimant's use of the creditor as an

10 alter ego or mere instrumentality.

11         In support of the request for equitable

12 subordination, the debtors first assert that Mr. Milton is an

13 insider.  I think we can all agree that he was an insider.

14 He was the founder, the CEO at the time of the misconduct,

15 and plainly he was an insider for purposes of the first prong

16 of that three-prong test.  And when we get to that first

17 prong to look at inequitable conduct, as I've signaled

18 throughout today's hearing, I do find that it's already been

19 established in other proceedings that Mr. Milton committed

20 misconduct in the form of fraud, illegality, and breach of

21 fiduciary duties, and his criminal conviction and the

22 arbitration finding evidence this, and it's not something

23 that is subject to challenge.  I find the principle of

24 collateral estoppel applies here or issue preclusion and, for

25 that reason, there is no evidence that I could hear that

1   would in any way tend to mitigate the damages or otherwise

2   affect the analysis on equitable subordination, and that's

3   why I don't need, nor do I think it's appropriate to hear any

4   other evidence in support of the equitable subordination

5   issue.

6            In the -- what's been referred to as the Milton

7   award, the arbitral finding, the panel found that Mr. Milton

8   violated his fiduciary duties of loyalty and good faith

9   through a pattern of false and misleading public statements

10  about Nikola's products and the state of their development,

11  and by subordinating the company's interests to his own by

12  refusing all efforts to review and approve his public

13  statements in advance, which goes to some of the testimony

14  that we heard this morning.  Thus, it was established in the

15  arbitration that Mr. Milton, at a minimum, breached his

16  fiduciary duties, which is inequitable conduct as we

17  understand it when assessing whether equitable subordination

18  is appropriate.

19           The criminal conviction also evidences the

20  commission of fraud and other illegality.  And the argument

21  that Mr. Milton has made is that his criminal conduct can't

22  constitute evidence to support equitable subordination

23  because his contention is that the President made a

24  determination of innocence and pardoned Mr. Milton on the

25  basis of that innocence, and I disagree with this argument

1 for several reasons.

2         First, the pardon power does not extend to the

3 authority to determine innocence, and the Supreme Court and

4 the Third Circuit have reviewed the President's pardon power

5 multiple times.  We talked about In re Garland from 159 years

6 ago.  There's been a lot of case law in the interim, which

7 shows how the Supreme Court has evolved in its thinking on

8 what it means to receive a pardon, and the Third Circuit in

9 the Noonan opinion engaged in a really deep dive of what a

10 pardon is, where does the power come from.  I mean, it's a

11 great discussion of how the Founders would have understood

12 the pardon power based upon the English common law and it

13 goes back hundreds of years in its analysis.

14         So we have guidance.  The ex parte Garland case

15 did say that a presidential pardon blots out of existence the

16 guilt of the convicted; however, there is that subsequent

17 jurisprudence and the -- one could look at the Nixon v.

18 United States opinion from the Supreme Court where they said

19 that the granting of a pardon is in no sense an overturning

20 of a judgment of conviction by some other tribunal.

21         And the Supreme Court in Noonan -- and there -- I

22 spent Labor Day weekend reading pardon cases, my fault is

23 very interesting, but I really wanted to understand this

24 because I think it's a very -- you know, it's an important

25 issue -- and the courts have very widely recognized that

1   Garland, the dictum in Garland is not -- it's not good law,

2   it's not the standard that the Supreme Court applies.  And

3   the Nixon opinion is pretty explicit in that regard, as well

4   as in earlier cases and a bunch of cases since.

5           The Noonan opinion, which of course is a Third

6   Circuit opinion and therefore binds me, offers particularly

7   helpful guidance for this matter, I thought.  And although

8   that case is about whether a pardon can cause a court to

9   expunge the pardoned person's criminal record, as I noted, it

10  offers a fulsome detailing of pardon law and analysis of a

11  pardon's effects, and the extent of a President's power when

12  issuing a pardon.

13          And one of the things about the Noonan opinion

14  that is most interesting, and it -- again, their analysis I

15  do believe to be binding on me, is that they looked at the

16  interaction between the presidential pardon power and the

17  judicial power.  So it emphasized that there's a separation

18  of powers and Article II, Section 2 of the Constitution.  The

19  President has the power to grant reprieves and pardons for

20  offenses against the United States, that power is

21  unquestioned and it's certainly not at issue here, Mr. Milton

22  received a pardon, but Article III of the Constitution

23  establishes that the judicial power of the United States is

24  vested in one Supreme Court and in such inferior courts as

25  Congress may from time to time ordain and establish.  And

1  based on the Third Circuit's analysis of those sections of

2  the Constitution, the Third Circuit concluded that the

3  authority to maintain judicial records in the case of

4  expungement was an inherent judicial power that the

5  Constitution delegated to the judicial branch and, because of

6  that delegation to the judicial branch, the pardon power

7  which is delegated to the President in Article II couldn't

8  interfere with the judicial power.

9          So, in other words, as I understand Noonan, the

10  teaching of that case is that the President is without power

11  to adjudicate a person to be innocent such that records could

12  be expunged or that -- and I think it would apply in this

13  case -- that I could find that there was a finding of

14  innocence such as to erase the existence of the criminal case

15  and the findings and the verdict in that case because, just

16  as the authority to maintain judicial records is an inherent

17  judicial power, the authority to determine criminal liability

18  is an inherent judicial power and it's one of the important

19  powers that the judiciary has.  So, when we're determining if

20  somebody is criminally liable or innocent, the judiciary has

21  to make that determination.

22          The presidential power has been described in

23  various ways, as a prerogative of mercy or an act that the

24  President can make to serve the public good, but the Supreme

25  Court, you know, stated a pardon is an act of grace and it's

1  proceeding from the power entrusted with the execution of

2  laws, which exempts the individual on whom it is bestowed

3  from the punishment the law inflicts for a crime he has

4  committed.  So the President did bestow this act of grace on

5  Mr. Milton, but it doesn't rewrite history or erase the facts

6  that were determined at his criminal trial.

7         But even if the pardon power did extend to

8  determine innocence, I'm left with the point that I made

9  repeatedly that the pardon is clear on its face and there was

10  no finding of innocence.  And I assume that the President

11  speaks with complete clarity and he did so when issuing an

12  official grant of clemency pursuant to that constitutional

13  pardon power, and because the pardon is unambiguous and clear

14  on its face, I don't need to look to, nor can I look to

15  extrinsic evidence or the President's other statements to

16  interpret or supplement the official pardon.  So I'm not

17  going to consider any out-of-court statements that the

18  President made when his words were perfectly direct and clear

19  and stated exactly what his intentions were when issuing the

20  pardon.

21         And even if I couldn't consider the criminal

22  conviction, I do have the arbitration panel's findings of the

23  misconduct, and they provide more than adequate evidence, an

24  overwhelming amount of evidence to fulfill the first prong of

25  the equitable subordination test.  In this forum we can't re-

1  litigate the issues in the arbitration, we can't re-litigate

2  whether he breached his fiduciary duties, those findings were

3  made and the award was upheld by the District Court in the

4  District of Arizona, and the re-litigating would be contrary

5  to the principle of issue preclusion, which was raised a

6  number of times, and it applies when there's been a final

7  determination on the merits and that's what you have in the

8  arbitration.

9        So, because there has been a final determination

10 on the merits in that arbitration and as affirmed by the --

11 and ordered by the District Court, Mr. Milton would be

12 precluded from denying that there was any breach of his

13 fiduciary duties.

14       So I'm settled on that first prong, but I'll go

15 over the other prongs.  The second prong requires that the

16 claimant's misconduct resulted in injury to other creditors

17 or conferred an unfair advantage on the claimant.  There is

18 certainly overwhelming evidence of that first prong, the

19 injury to other creditors, we have extensive un-rebutted

20 evidence on that fact.  The evidence before me is that the

21 fraudulent statements and breaches of fiduciary duty resulted

22 in an injury to creditors, to shareholders, and to the

23 company itself, and that damage caused millions and millions

24 and millions, hundreds of millions of dollars in losses.

25       These actions largely led to Nikola's inability to

1   pay a lot of its debt, the fall of its stock price, and

2   ultimately its insolvency.  So there is ample evidence in the

3   record about the harm to the debtors that was caused by the

4   misconduct.

5          Finally, that third prong examines whether

6   equitable subordination -- or requires that it not be

7   inconsistent with other provisions of the Bankruptcy Code,

8   and there are no other provisions of the Bankruptcy Code that

9   anybody has pointed to or that I could find that would make a

10  finding of equitable subordination inconsistent with the

11  Code.  And on the setoff issue, you know, I've looked at the

12  cases that Mr. Milton cites and I simply don't find them

13  applicable to the analysis of equitable subordination, so I

14  didn't find them of an awful lot of help in determining these

15  issues.

16         So, because the debtor has met all three prongs

17  for equitable subordination and because the pardon argument

18  of innocence fails, I'm overruling the objection to equitable

19  subordination of Mr. Milton's Claim Number 54.

20         I have few other objections that I need to

21  address, and the first one that I heard was the United States

22  Trustee's objection.  And, again, I thank Mr. Fox and his

23  office for their very thoughtful argument and thoroughness of

24  the briefs.

25         As Mr. Fox knows and as others in the courtroom

1  are aware, on other instances I've found that an opt-out

2  post-Purdue can be an appropriate mechanism of determining

3  that consent was given.  And the United States Trustee's

4  argument addresses in part sort of a philosophical view or a

5  doctrinal difference in how this should be approached with

6  one being sort of the due process, which is what I've adopted

7  on other occasions, and on the other hand this contract

8  theory that my colleague and friend Judge Goldblatt applied

9  in the Smallhold case.  I think the due process argument is

10 an appropriate argument and the -- in this case the third

11 party releases or the opt-out had applied to one class of

12 creditors.  This is not an instance where -- I've seen in

13 other places where, for instance, shareholders are being

14 required to execute an opt-out, this only went to a small --

15 a fairly small class of creditors.

16          And it's hard to attach much weight to how many

17 creditors opted out because there is a creditor apathy

18 problem; we're all familiar with that.  The math that was

19 recited to me was that we had about a 16-percent rate on

20 votes.  In my experience, that's not a bad number, it's

21 actually a pretty good response, but ultimately I don't know

22 if that's all that germane to the analysis because my

23 determination is based on that due process analysis that I

24 think the majority of courts have employed over a period of

25 many, many years.  There was an opportunity for creditors in

1   Class 3 to tell us whether they've consented or not by opting

2   out, and it was -- the ballot and the papers were clear on

3   their face that if they wished to opt out of the third party

4   releases that they could simply return a ballot and strike

5   the opt-out box and stake their ground out.  And a number of

6   creditors did it, a number -- a significant number, I

7   thought, who didn't vote opted out.

8           So, I do find that the opt-out mechanism used here

9   was appropriate.

10          On the injunction issue, I'll suffice it to say

11  that I agree with the analysis of my colleague Judge Stickles

12  and do find that the injunction here is appropriately

13  tailored and drafted and similar to what we've seen in a

14  number of other cases where it's been approved.  And of

15  course the Rule 3020 issue is no longer in play, but based on

16  all that I'm going to overrule the objection by the Office of

17  the United States Trustee and, again, express my thanks to

18  the -- Mr. Fox and the attorneys at that program for their

19  excellent work in connection with this issue that I know is

20  very important to them.

21          The lead class plaintiffs also objected to the

22  plan.  And, again, you know, I've given the arguments a great

23  deal of consideration, and 510(b) requires subordination of

24  claims that arise from damages arising from the purchase or

25  sale of securities, and that's precisely what we have here.

1    I don't agree that subordination must be pursued through a

2    claim objection under Rule 3007.  I could find no authority

3    that to my satisfaction would support that that's the rule

4    and it would be, in my view, inconsistent with the structure

5    of the Bankruptcy Code and also with implicitly Rule 7001-8,

6    which implicitly provides that you can do it through a

7    contested matter and, again, as I've described with the

8    structure of the Code, that can be done in connection with

9    plan confirmation.

10           The lead class plaintiffs certainly received

11   notice and opportunity for a hearing; that hearing has

12   happened.  I've considered the arguments very carefully, but

13   I am going to overrule them because I do frankly just view it

14   as fairly garden-variety 510(b) subordination arising out of

15   the damages from the purchase or claim of securities.  So

16   that objection is also overruled.

17           As for the equity holder objections, we had two

18   written objections and we had -- plaintiffs had several

19   formal -- or informal objections.  I have read the formal

20   objections and today was the date that all parties had notice

21   of as the date where we would have a hearing on confirmation

22   of the plan.  I invited each of the formal objectors to be

23   heard today and neither one of them appeared to have attended

24   the hearing by Zoom, which was the opportunity that they had,

25   and similarly there were no -- there were no people who spoke

1    up when I asked for any informal objectors to be heard.

2              So I would view those objections as abandoned, but

3    I will address in substance the arguments that they made.

4    There was an objection based upon disclosure and I don't find

5    that argument to be credible.  There was a liquidation

6    analysis that came accompanied with a great deal of

7    explanation as to how the liquidation analysis operated, the

8    assumptions, and how it worked, and there was Mr. Rowan's

9    declaration that gets into detail on that.  Mr. Rowan was

10   subject to cross-examination today, and nobody took the

11   opportunity to cross-examine him and test his testimony

12   regarding the liquidation analysis.

13             There was also a contention that there had been no

14   meaningful investigation.  I think to say the least, the

15   notion that Nikola hasn't been adequately investigated is a

16   difficult one to support.  We know that the Department of

17   Justice and the Securities and Exchange Commission expended

18   an enormous amount of time and resources in their

19   investigations.  The evidence before me is also that there

20   was an internal investigation, and the committee has reported

21   that it's done its own investigation.  So I think it's fair

22   to say that the bushes have been more than soundly thrashed

23   and beaten in pursuit of causes of action that might be

24   pursued on behalf of the estate.

25             There was also an objection common to the two

1  written objections that there had been a lack of opportunity

2  for meaningful participation.  The fact that they received

3  notice and had the opportunity to respond would tend to

4  undermine that argument, in my view, and in addition I noted

5  that today was the day to speak directly to me and nobody

6  took that opportunity.

7          Class 5 is a class that was deemed to reject and

8  for that reason, as is universally the case, doesn't get to

9  vote.  That's what the Bankruptcy Code requires.  So there

10  was no requirement here that equity holders be given the

11  opportunity to vote on the plan because they are presumed to

12  reject because equity is being canceled under this plan.

13          And then, finally, there's the argument that

14  they're being unfairly treated, but under

15  Section 1129(b)(2)(B) we have the absolute priority rule and

16  it dictates the result that I'm approving today because there

17  is -- there's frankly no prospect of recovery to equity, and

18  there is simply -- there's just no path to recovery,

19  unfortunately.  It's always sad when retail investors lose in

20  these cases, and it's particularly regrettable when the

21  losses may have been attributable or were found to be

22  attributable to bad acts, but that's -- this is the result

23  that the Bankruptcy Code mandates.

24          So, with all that, I am overruling the objections

25  to the plan.  And I also find on a final basis that the

1  disclosure statement satisfies the requirements of

2  Section 1125, so it's approved on a final basis, and the plan

3  likewise meets all the requirements for confirmation

4  under 1129 and the related provisions of the Bankruptcy Code

5  that Section 1129 incorporates.  So, for those reasons, I am

6  confirming the plan today.

7          MR. MORSE:  For the record, Joshua Morse for the

8  debtors.  Thank you very much, Your Honor.  We very much

9  appreciate the well-reasoned words.  I think you've seen the

10  revised form of confirmation order --

11          THE COURT:  Yes, I reviewed it this morning.

12          MR. MORSE:  Perfect.  I think what we'd like to

13  do, we have a couple, you know, sort of conforming nits to

14  the plan that will be submitted as an exhibit to that

15  confirmation, what we'd like to do is just submit that under

16  certification of counsel following the hearing --

17          THE COURT:  Yes.

18          MR. MORSE:  -- so that everything is buttoned up,

19  and we'll do that.

20          And I don't think we have anything else for Your

21  Honor.  Thank you and your chambers for all the help and

22  assistance today.

23          THE COURT:  Thank you.

24          And I want to express my gratitude for the really,

25  really fine work that all the attorneys who appeared before

1 | me today rendered in furtherance of this case.  It was
2 | outstanding work all around and you have my gratitude for
3 | that.  There were really important issues and it was very
4 | well presented.  It makes it a pleasure to do my job when I
5 | have the aid of such effective counsel.  Thank you.
6 |            MR. MORSE:  Thank you so much, Your Honor.
7 |            THE COURT:  Okay.  All right.  Well, I wish
8 | everybody a good weekend.
9 |        (Proceedings concluded at 2:29 p.m.)
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |

1                           CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    September 6, 2025

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Mary Zajaczkowski                     September 6, 2025

13   Mary Zajaczkowski, CET-531

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Tracey J. Williams                    September 6, 2025

18   Tracey J. Williams, CET-914

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25